IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

DR. ROSANDRA DAYWALKER           §
    *Plaintiff,*                        §
                                       §
v.                                §
                                       §
UNIVERSITY OF TEXAS MEDICAL       §    No. 3:20-CV-00099
BRANCH AT GALVESTON, AND DR.      §
BEN G. RAIMER, IN HIS OFFICIAL    §
CAPACITY                          §
    *Defendants.*                       §

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

ESTEBAN S.M. SOTO
Chief of the Transportation Division
State Bar No.24052284
S.D. Tex. Admission No. 1014954

TODD A. DICKERSON
Attorney-in-charge
Texas Bar No. 24118368
Southern District ID No. 3544329
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 |Fax: (512) 320-0667
Todd.Dickerson@oag.texas.gov

SHEKEIRA WARD
State Bar No. 24098575
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone (512) 475-4054
Shekeira.ward@oag.texas.gov
esteban.soto@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

i

# TABLE OF CONTENTS

Table of Contents...................................................................................................................ii

Index of Authorities...............................................................................................................iv

Statement of Undisputed Facts ............................................................................................3

   I.   Daywalker Enters UTMB's Otolaryngology Residency Program in 2015. .....................3

   II.  Daywalker Struggled to Adequately Perform at UTMB. ....................................................4

   III. In 2018, UTMB, Following a Multi-Level Process, Placed Daywalker on
       Remediation for Continued, Severe Violations. ...............................................................6

   IV. Daywalker's Continued Struggles on Remediation Led UTMB to Update Her
       Remediation to Retain Her at a Third-Year Academic Level Until She Passes the
       Remediation. .....................................................................................................................9

   V.  Daywalker Hired an Attorney While on Leave and Voluntarily Resigned....................10

   VI. Daywalker Alleges That She Was Offended by a Few Stray Comments Szeremeta
       Allegedly Made in Academic Discussions. ......................................................................11

Legal Standard.....................................................................................................................12

Argument .............................................................................................................................12

   I.   Daywalker's Discrete Claims Fail as a Matter of Law.....................................................13

      A.   Daywalker's race discrimination claims fail because she did not suffer an
          ultimate employment action and she cannot identify a similarly-situated
          comparator who was treated better. ..........................................................................13

          1. Neither of the claims involve an adverse employment action. ..............................13

          2. Daywalker also cannot show that any of her fellow residents were similarly-
              situated and treated more favorably. ...............................................................15

      B.   Daywalker's discrete retaliation claims fail because she cannot show they were
          materially adverse, were temporally connected to her protect activity, or even that a
          majority of the decision-makers had knowledge of her protected activity. .................16

          1. Daywalker's purported post-employment retaliation is not a separate adverse
              employment action. .........................................................................................16

          2. UTMB's unanimous decision to retain Daywalker at a PGY-3 academic level was
              not a materially adverse action. ........................................................................17

           3. There is no causal connection between the alleged protected activities and the
              alleged adverse employment actions. ...............................................................18

      C.   UTMB's Legitimate Reasons Are Based on Academic and Professional Judgment
          and Therefore are Entitled to Deference. ...................................................................20

   II. Daywalker Cannot Establish a Hostile Work Environment Claim Under the Fifth
       Circuit Demanding Standards.............................................................................................22

A.   Daywalker cannot establish a hostile work environment claim. .............................22

1.  Plaintiff cannot maintain a retaliatory hostile work environment claim. ................23

2.   The multiple changes in Daywalker's supervisors were intervening acts for her hostile work environment claims. .....................................................................................24

3.  Most of the alleged harassment is not actionable in a hostile work environment claim. ..................................................................................................................................25

4.  Even if true, the alleged harassment is not severe or pervasive under Fifth Circuit precedent. ............................................................................................................................26

B.   UTMB is entitled to summary judgment on its *Faragher-Ellerth* defense. ................28

III.  Daywalker's Constructive Discharge Claim Fails as a Matter of Law. ........................29

Conclusion .......................................................................................................................................30

Certificate of Service ....................................................................................................................32

# INDEX OF AUTHORITIES

**Federal Cases**

*Alaniz v. Zamora–Quezada,*
591 F.3d 761 (5th Cir. 2009)..................................................................29

*Amsel v. Tex. Water Dev. Bd.,*
464 Fed.Appx. 395 (5th Cir.2012) ..........................................................19

*Aryain v. Wal-Mart Stores Texas LP,*
534 F.3d 472 (5th Cir. 2008)..................................................................29

*Board of Curators, Univ. of Mo. v. Horowitz,*
435 U.S. 78 (1978)..................................................................................21

*Boze v. Branstetter,*
912 F.2d 801 (5th Cir.1990)....................................................................30

*Brown v. Kinney Shoe Corp.,*
237 F.3d 556 (5th Cir. 2001)..................................................................30

*Brown v. Liberty Mut. Grp., Inc.,*
616 Fed.Appx. 654 (5th Cir. 2015) ........................................................25

*Burlington Indus., Inc. v. Ellerth,*
524 U.S. 742 (1998)................................................................................28

*Burlington Northern & Santa Fe Railway Co. v. White,*
548 U.S. 53 (2006)..........................................................................18, 25

*Casiano v. AT&T Corp.,*
213 F.3d 278 (5th Cir. 2000)..................................................................29

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)................................................................................12

*Charetta v. St. John Valley Soil and Water Conservation District,*
332 F. Supp. 3d 316 (D. Maine 2018) ....................................................30

*Clark Cty. Sch. Dist. v. Breeden,*
532 U.S. 268 (2001)................................................................................20

*Colson v. Grohman,*
174 F.3d 498 (5th Cir. 1999)..................................................................12

*Cooper Tire & Rubber Co. v. Nat'l Labor Rels Bd.*,
  866 F.3d 885 (8th Cir. 2017)................................................................26

*Daigle v. Liberty Life Ins. Co.*,
  70 F.3d 394 (5th Cir. 1995)..................................................................20

*Dailey v. Shintech, Inc.*,
  629 F. App'x 638 (5th Cir. 2015) .........................................................27

*Dailey v. Whitehorn*,
  539 Fed.Appx. 409 (5th Cir. 2013) .......................................................15

*Dediol v. Best Chevrolet, Inc.*,
  655 F.3d 435 (5th Cir. 2011).................................................................27

*Deeds v. State Farm Mut. Auto. Ins. Co.*,
  No. 10–1422012, 2012 WL 1150755 (M.D. La. April 5, 2012) .................19

*Delaware State College v. Ricks*,
  449 U.S. 250 (1980)...............................................................................17

*E.E.O.C. v. Kohl's Dep't Stores, Inc.*,
  774 F.3d 127 (1st Cir. 2014) .................................................................30

*EEOC v. WC&M Enters.*,
  496 F.3d 393 (5th Cir. 2007)..................................................................22

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998)................................................................22, 26, 28

*Faruki v. Parsons*,
  123 F.3d 315 (5th Cir. 1997).................................................................29

*Haley v. Alliance Compressor LLC*,
  391 F.3d 644 (5th Cir. 2004)..................................................................30

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993)................................................................................27

*Hockman v. Westward Comm., LLC*,
  282 F.Supp.2d 512 (E.D. Tex. 2003).....................................................15

*Hockman v. Westward Commc'ns, LLC*,
  407 F.3d 317 (5th Cir. 2004).................................................................28

*Hurley v. Tupelo Pub. Sch. Dist.*,
  152 F. Supp. 3d 581 (N.D. Miss. 2015) .................................................25

*Jackson v. City of Chicago*,
   552 F.3d 619 (7th Cir. 2009)........................................................................17

*Jackson v. Honeywell Int'l, Inc.*,
   601 Fed. Appx. 280 (5th Cir. 2015) ............................................................18

*Krull v. Centurytel, Inc.,* 829 F.Supp. 2d 474, 481 (W.D. La 2011)................................29

*Latif v. Univ. of Tex. Sw. Med. Ctr.*,
   834 F. Supp. 2d 518 (N.D. Tex. 2011).........................................................15

*Leach v. Baylor College of Medicine*,
   No. H–07–0921, 2009 WL 385450 (S.D. Tex. Feb. 17, 2009) .............................17

*Ledbetter v. Goodyear Tire & Rubber Co.*,
   550 U.S. 618 (2007).....................................................................................17

*Lopez v. Kempthorne*,
   684 F.Supp.2d 827 (S.D. Tex. 2010) ...........................................................15

*Manning v. Chevron Chem. Co. LLC*,
   332 F.3d 874 (5th Cir. 2003).......................................................................19

*Mawaldi v. St. Elizabeth Health Center*,
   381 F.Supp.2d 675 (N.D. Ohio 2005)..........................................................14

*McCoy v. City of Shreveport*,
   492 F.3d 551 (5th Cir. 2007).......................................................................14

*Minor v. Univ. of Tex. Southwestern Med. Ctr.*,
   No. 3:12-CV-0036-G, 2013 WL 3477223, (N.D. Tex. July 10, 2013) ...................23

*Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*,
   261 F.3d 512 (5th Cir. 2001).......................................................................16

*Nasti v. CIBA Specialty Chems. Corp.*,
   492 F.3d 589 (5th Cir. 2007).......................................................................13

*National R.R. Passenger Corp. v. Morgan*,
   536 U.S. 101 (2002).....................................................................................24

*Nigro v. Virginia Commonwealth Univ. Med. College*,
   No. 5:09–CV–00064, 2010 WL 4879076, (W.D. Va. Nov. 23, 2010) ...................22

*Ramsey v. Henderson*,
   286 F.3d 264 (5th Cir. 2002).......................................................................23

*Rowe v. Jewell,*
    88 F.Supp.3d 647 (E.D. La. 2015) ...................................................................23

*Scrivner v. Socorro Indep. Sch. Dist.,*
    169 F.3d 969 (5th Cir.1999)...........................................................................29

*Shepherd v. Comptroller of Pub. Accts. Of State of Texas,*
    168 F.3d 871 (5th Cir. 1999)..........................................................................28

*Stewart v. Miss. Transp. Comm'n,*
    586 F.3d 321 (5th Cir. 2009).................................................................... 24, 30

*Sun v. Bd. of Trs. of Univ. of Ill.,*
    473 F.3d 799 (7th Cir. 2007)..........................................................................22

*Vallecillo v. U.S. Dep't of Hous. & Urb. Dev.*
    155 F. App'x 764 (5th Cir. 2005) ............................................................. 27, 30

*Walker v. Thompson,*
    214 F.3d 615 (5th Cir. 2000)..........................................................................25

*Washburn v. Harvey,*
    504 F.3d 505 (5th Cir. 2007)..........................................................................19

*Watts v. Kroger Co.,*
    170 F.3d 505 (5th Cir. 1999)..........................................................................22

*Wheeler v. BL Dev. Corp.,*
    415 F.3d 399 (5th Cir. 2005)..........................................................................15

*White v. Gov't Emps. Ins. Co.,*
    457 F. App'x 374 (5th Cir. 2012) ...................................................................27

*Williams v. E.I. du Pont de Nemours & Co.,*
    154 F. Supp. 3d 407 (M.D. La. 2015)............................................................24

*Williams v. Paulson,*
    No. 1:06-CV-0876-CC-AJB, 2007 WL 9652983 (N.D. Ga. Dec. 24, 2007) ........................25

## Federal Statutes

42 U.S.C. § 2000e–5(e)(1)...............................................................................25

42 U.S.C. § 2000e-5(e)(3)................................................................................17

This case centers around the struggles of a medical resident to adjust to the demands of a rigorous medical residency program. The resident, Dr. Rosandra Daywalker ("Daywalker"), attended the Texas Medical Branch at Galveston ("UTMB") in its Department of Otolaryngology. The program is five years long, and each year the expectations for successful progression increase as the resident is provided more responsibility. While she was a promising doctor, Daywalker struggled to prioritize tasks and timely complete necessary medical documentation. UTMB at first tried to address the issues informally by raising them with Daywalker and notifying her that she needed to improve her performance. The deficiencies, however, continued as she progressed through her third year. After UTMB discovered additional severe work violations in 2018—including Daywalker leaving multiple medical notes unfinished for almost a year and information suggesting that she may have falsified medical documents—the program determined it had to take more formal action. The Department's faculty unanimously decided to place Daywalker on a remediation plan designed to help improve her performance. It also worked with her in developing a working environment that placed her in the best position to succeed (for example, by changing Daywalker's day-to-day immediate supervisor multiple times upon her requests, granting her request for four months personal leave, which later changed to Family Medical Leave at her request). Despite these interventions, Daywalker continued to have performance issues.

Throughout all of Daywalker's academic and professional struggles, UTMB took intermediate steps to support Daywalker in a way that would not permanently impact her career. For instance, it first tried to resolve the issues through informal counseling before taking formal action. When she failed to improve, UTMB made the decision to place her on a

1

remediation plan (which is not reportable to the Medical Board or future employers) rather than escalate it straight to probation (which is reportable) to address her performance deficiencies. Daywalker, however, pushed back and questioned the academic and medical judgment of the entire Otolaryngology faculty. Because Daywalker considered herself a star resident without the need for correction and improvement, she failed to comply with the terms of her remediation plan. As a result, her performance continued to fall short of expectations. Still, determined to assist Daywalker in progressing within the residency program, UTMB promoted Daywalker's employment to that of a fourth-year resident. Due to Daywalker's repeated and uncorrected deficiencies, UTMB made the decision to simply have her repeat selected third year rotations to increase her competency level rather than terminate her employment. In total, UTMB never formally disciplined Daywalker, never took any action that impacted her pay, and never ended the working relationship. Rather than stay on and work through the remediation, however, Daywalker hired a lawyer, voluntarily resigned, and sued.

Armed with only a subjective belief that she was treated unfairly, Daywalker asserts a litany of claims under Title VII, 42 U.S.C. §2000e, et seq. (race discrimination and retaliation, hostile working environment, and constructive discharge), Section 504 of the 1973 Rehabilitation Act, 29 U.S.C. § 701, et seq. ("Rehab Act") (retaliation), and the Family Medical Leave Act, 29 U.S.C. 2601, et seq. ("FMLA")(retaliation). *See* Dkt 18. But, as the undisputed facts in this case make clear, UTMB has legitimate, non-discriminatory, and non-retaliatory reasons for every action that it took. Notably, UTMB's decisions to place Daywalker on remediation and continue her at a third-year academic level were unanimously approved by a multi-level review process that included the Department's Clinical Competency Committee,

2

the faculty, and the Associate Dean of Graduate Medical Education. While Daywalker points the finger—falsely—at her program director, it is undisputed that her struggles preceded his appointment to the director position and continued after he was removed from her day-to-day supervision. Daywalker has no evidence that the host of decisionmakers that were involved in the process were motivated by discriminatory or retaliatory animus.

Nevertheless, despite the faculty's unanimous judgment that Daywalker was struggling academically and professionally, she essentially asks this Court to overrule the faculty's academic and medical judgment to reinstate her to the program and advance her to a fourth-year academic level. For the reasons explained below, the Court should decline Daywalker's invitation and enter judgment as a matter of law in favor of Defendants.

## STATEMENT OF UNDISPUTED FACTS

## I.    Daywalker Enters UTMB's Otolaryngology Residency Program in 2015.

In 2015, Daywalker[1] matriculated into UTMB's residency program in Otolaryngology. Dkt 18 at ¶ 10.  Otolaryngology is a medical subspecialty that concerns surgical and medical management of conditions of the head and neck.[2] At UTMB, the Department of Otolaryngology—Head and Neck Surgery operates a residency program that seeks to academically train medical residents so that they can competently practice independently in the field following their graduation from the program. Ex G-1.

To accomplish this aim, residents are trained by a faculty of medical providers including doctors who practice in the field of Otolaryngology. *Id.; see also* Ex. N at 19:23-20:23. The

---

[1] The Plaintiff, Rosandra Daywalker, formerly went by the name Rosandra Walker.
[2] *Otolaryngology*, Merriam-Webster, https://www.merriam-webster.com/dictionary/otolaryngology. (last visited October 13, 2021).

residents attend lectures, participate in weekly didactic activities, and work in various rotations.[3] UTMB provides the residents feedback through interactions with faculty during clinic and rotations, and through twice-annual evaluations. Ex. N at 56:20-57:3. A group of faculty members also meet regularly as part of the Department's Clinical Competency Committee—which discusses residents' progress and potential interventions to help advance residents through the program. Ex. A at ¶ 5.

Residents at UTMB are both employees and students. Dkt 86. The program requires the successful completion of five post-graduate academic years. Ex. G-1 at 4.;. As residents progress through the program, they advance through post-graduate years ("PGY") both for their employment level and their academic level. Ex. C at ¶ 5; Ex. N at 183:16-184:13 *Id.* While these two levels typically advance in lockstep for residents, they can diverge if a resident does not timely graduate to the next academic year. *Id.*

## II.    Daywalker Struggled to Adequately Perform at UTMB.

While Daywalker was a promising doctor, she struggled from the inception of her residency with the requirement to timely complete medical documentation. Documentation is an important aspect of medical practice. Ex. N at 63:21-64:15. Medical notes communicate the background of the clinical care delivered to patients. Ex. L at 44:15-45:19. The records allow other providers to understand the patient's history so that they can provide the best possible treatment for the patient. Ex. A at ¶ 7. In the program, the Department policy required residents to complete clinic, inpatient, and operative notes within 24 hours (although

---

[3]    *Medical Education*, Department of Otolaryngology—Head & Neck Surgery, https://www.utmb.edu/oto/medical-education/residency-program (last visited October 13, 2021).

individual faculty could set stricter standards). *Id.*; Ex. G at ¶ 4; G-1 at 71.

During her first two years in the program, Daywalker was supervised by the Department's program director, Susan McCammon. Dkt 18 at ¶ 11. In a first-year evaluation, McCammon noted that faculty had concerns with Daywalker's professionalism and noted that she thought it was "important" for Daywalker to "focus on professionalism in the next 6-month block" with examples including "being on time . . . completing duty hour logs, operative log, clinic notes and other accountable documents promptly." D-1 at 28 (also notes the faculty's concerns with her timeliness "in ways that may affect patient care.").

Daywalker's struggles with documentation persisted as she advanced through the program. As she entered her second year, while she made strides in some areas, documentation continued as an area of concern. In a second-year evaluation, faculty noted concerns such as:

- "Significant challenges with timely completion of clinic notes. Does not seem to appreciate the relative importance of documentation."
- "Needs to develop efficiency in clinical interviewing and documentation."
- "Reason for lower score is persistent tardiness and procrastination of documentation/task such as case logs."
- "[S]till needs to build efficiency in clinic encounters and notes. May need better time management to prevent procrastination."

*Id.* at 14-16.

In April 2017, Dr. Wasyl Szeremeta replaced McCammon as the Department's program director. Dkt 18 at ¶ 11. As Szeremeta noted in his evaluation of Daywalker at the end of her second year, the CCC had several areas of concern with Daywalker's performance, the most prominent being her persistent failure to timely complete documentation of patient care. D-1 at 17. Around August of 2017, Szeremeta and the assistant program director, Dr. Farrah Siddiqui, met with Daywalker to discuss her progress in the program and stress the

importance of improving in her documentation. Ex. A-1 at 1.

Daywalker's showed some initial improvements after her meeting with Szeremeta and Siddiqui. As one faculty member noted in her first third year evaluation, Daywalker's "[r]enewed energy and positive, confident attitude have improved [her] clinical efficiency/documentation." D-1. at 8.  Another noted, that a "[g]reat change in attitude with better organization/time management shown by completing documentation and search plans on time." *Id.* But others still noted deficiencies, including that Daywalker had "some difficulty with incorporating feedback and the timely completion of medical documentation" and she "had issues with documentation and accountable deadlines at the beginning of the year." *Id.* Szeremeta rated her as "meets expectation" in five areas (an improvement from her last second year evaluation) and rated her as "requires attention" in the areas of professionalism and interpersonal and communication skills. *Id.* at 10.

## III.    In 2018, UTMB, Following a Multi-Level Process, Placed Daywalker on Remediation for Continued, Severe Violations.

Daywalker's initial improvement, however, did not continue. Around May 2018, UTMB conducted a routine department-wide review of medical documentation, which revealed that five of Daywalker's notes had been incomplete since June 2017. Ex. A-1. When questioned about the issue, Daywalker stated that four of the five patients "[l]eft without being seen and were supposed to be removed from the schedule." *Id.* at 3. Further review found this to be false and that Daywalker "subsequently created notes and 'documentation,'" seemingly to cover up her error. *Id.* at 4.  Indeed, Daywalker seemingly copied-and-pasted prior notes from two other doctors without making any significant edits. *Id.* In short, the CCC had serious

concern that Daywalker had falsified medical records, a possible criminal offense that could have led to the loss of her medical license. *Id.*

This incident, coupled with a few others occurring around this time, undercut Daywalker's improvement during her last evaluation period. In late May 2018, the CCC and the faculty put Daywalker on remediation, which is merely a warning and a performance plan that carries no negative penalties. *Id.* at 5-7. Daywalker's placement on remediation was decided through a multi-level process. First, the members of the CCC voted on the decision—with all members voting unanimously to place Daywalker on remediation. Ex. D at ¶ 8. Then the entire Department faculty unanimously voted to approve the placement. *Id.* At that point, the decision went up to the Associate Dean of Graduate Medical Education, Dr. Thomas Blackwell, who conducted an independent review and affirmed the decision to place Daywalker on remediation. Ex. C at ¶ 4.

The faculty's serious concerns about Daywalker were also reflected in their evaluation for this same period (from January through June 2018). Ex. D-1 at 1-3. Indeed, the faculty members were nearly unanimously critical of Daywalker's performance during this period:

- "Her clinical skills in terms of examination/evaluation and judgment on call especially are below her PGY level. Due to continued problems with professionalism, there is lack of trust when it comes to her judgment within the healthcare team."

- "[Daywalker's interpersonal communication skill] suffers due to documentation which impacts overall patient care and communication."

- "Dr. Walker needs to improve her efficiency in the outpatient and inpatient clinical settings as this is negatively impacting her ability to work effectively within the residency and health care team structure."

- "Dr. Walker does not seem to accept feedback in a positive way and this has made it difficult for her to progress appropriately through her residency training."

- "Has had difficulty with procrastination and timely completion of tasks especially relating to documentation. Dr. Walker has been reminded many times to improve in this area. She has demonstrated ability to perform well in this area for 2–3 weeks, but then regresses back to prior patterns."

- "[Professionalism] has continued to be an issue. Whereas she has improved in some aspects, she is still a cut slower than her age matched peers in her pace."

- "Dr. Walker continues to have serious issues with completion of medical documentation in a timely manner. This has on occasion negatively impacted patient care."

- "I am seriously concerned with the progress of this resident—she has lost the trust of not only residents but faculty as well—very difficult to see how she will succeed as an upper year resident. There are multiple serious lapses in professionalism and behavior that does not engender trust."

*Id.* at 2-3.

On May 30, 2018, Dr. Szeremeta sent a letter to Daywalker notifying her of the decision to place her on remediation. Ex. A-1 at 1. The letter explained that Daywalker's "severe lapses in professional behavior have created an environment where it is difficult for the faculty to trust you in the care of our patients here at UTMB." *Id.* The letter identified numerous instances, backed by evidence, where Daywalker's performance was insufficient. *Id.* at 1-5. For example, the letter quoted various attending physicians who complained about Daywalker's inability to prioritize her tasks and complete medical records in a timely manner. *Id.*

The remediation letter advised Daywalker of institutional requirements and explained that she was responsible for "knowing these deadlines and complying with them." *Id.* at 5. The letter stated that: (1) Daywalker could be on remediation for up to six months; (2) violations of the remediation plan could result in probation; and (3) any other evidence of fraudulent medical documentation would result in her immediate dismissal from the program. *Id.* at 7.

A few days later, Daywalker met with the Department's Chair, Dr. Vicente Resto. Ex. G at ¶ 8. In the meeting, she complained about the decision to place her on remediation and

Szeremeta. *Id.* Yet, she acknowledged that she was "amenable to remediation" in part because it would "be a great exercise to continually improve [her] performance and efficiency." Ex. N at Ex. 21 (P-00073).

Despite Daywalker's amenability to remediation, she believed it was unfair and, for the first time, engaged in protected activity by submitting an internal complaint of discrimination against Szeremeta to UTMB on or about June 1, 2018. Dkt 18 at ¶ 16.

In June 2018, on Daywalker's request, Resto replaced Szeremeta as Daywalker's day-to-day supervisor while on remediation—substituting in Siddiqui. Ex. N at 307:10-308:5; Ex. G at ¶ 9. When Daywalker later complained about Siddiqui, UTMB appointed a program director, Dr. Christopher Thomas, from a residency program to replace her as Daywalker's day-to-day contact. *Id.*

## IV. Daywalker's Continued Struggles on Remediation Led UTMB to Update Her Remediation to Retain Her at a Third-Year Academic Level Until She Passes the Remediation.

Despite UTMB's attempts to bring Daywalker's performance up to standard, Daywalker continued to struggle while on remediation. Approximately one month into the remediation, Siddiqui and Resto met with Daywalker to discuss her performance on remediation. Ex. F at ¶ 9. They let her know she had work deficiencies that were in violation of the remediation and, at that point, was barely passing. *Id.*

In early August 2018, a few weeks after completing only a fraction of her remediation plan, Daywalker requested four months personal leave. Ex. A at ¶ 8. UTMB approved this request and informed Daywalker of this decision via a letter dated August 8, 2018. Ex. A-2. Dr. Resto drafted this letter, which "included the recommendations from the CCC, the entire

Faculty as well as the GME office." *Id.* The letter informed Daywalker that [w]hen you return to active duty on December 10, 2018, you will still be under the same terms of remediation as before" and that she would "return as a PGY-3" so she could "build confidence . . . [and] gain the skills needed to be a successful PGY 4 in July." *Id.* This update to the remediation was unanimously approved by members of the CCC,[4] the faculty, and Dean Blackwell. Ex. D at ¶ 11; Ex. C at ¶ 4.

The decision to keep Daywalker at a third-year academic level was also in accordance with UTMB's leave policy, which states: "Extended absences from the program may require additional time and training." Ex. C-1 at 14.  Indeed, in an email sent just a few days before the August 8th letter, Daywalker acknowledged that her leave request "obviously will affect my training substantially, will likely elongate my training for another year, and likely jeopardizes my ability to apply to and match into Facial Plastic Surgery." -Ex. D-2.

While the update to the remediation kept Daywalker at a third-year *academic* level, it did not impact her *employment* level. Indeed, within approximately one week of UTMB's decision to retain Daywalker at a third year academic level, Szeremeta approved Daywalker's promotion, which included a bump in pay, to a fourth year employment level based on years of service at UTMB. D at ¶ 13; Ex. D-3.

## V.    Daywalker Hired an Attorney While on Leave and Voluntarily Resigned.

Following the August 8th letter, Daywalker discussed the matter with her attorney, "completed the FMLA paperwork," and converted her personal leave to FMLA leave. Dkt 18

---

[4] One faculty member of the CCC abstained from voting. The remainder of the faculty and CCC, however, voted unanimously in favor of the update. D at ¶ 11.

at ¶ 21. When she returned to work on November 6, 2018, she returned to the same position, employment/pay level, and academic level as before she went out on leave. Ex. D at ¶ 14. Nevertheless, on her first day back, she met with Szeremeta and tendered her resignation, stating that after "conferr[ing] with legal and health professional[s]" she decided to resign effective immediately. Ex. D-4.  She then filed this lawsuit. Dkt 1.

## VI.    Daywalker Alleges That She Was Offended by a Few Stray Comments Szeremeta Allegedly Made in Academic Discussions.

As part of her lawsuit, Daywalker alleges that UTMB subjected her to a hostile work environment based on harassment from Szeremeta. Dkt. 18 at ¶¶ 10-11. The alleged "harassment" included a few alleged stray comments made by Szeremeta in or around 2016 that touched on race. *Id.*

The comments attributed to Szeremeta occurred in 2016, before he supervised her as program director. Dkt 18 at ¶¶ 10-11; Ex. L at 89:24-90:7. They also took place as part of larger didactic conversations related to her training. Ex. D at ¶ 18, Ex. O at 314:7-316:23, 321:3-323:4. For instance, in 2016, Szeremeta engaged Daywalker in a conversation about healthcare disparities in different socio-economic groups—specific that African Americans and other groups disproportionately use emergency room over primary care. *Id.* This topic was related to prior research Szeremeta took part in at Temple University in Philadelphia. *Id.* Daywalker alleges that as part of this conversation, Szeremeta asked her if that also was true in her experience as a doctor here in Texas. *Id.* Daywalker also points to comments made by Szeremeta during the Morbidity and Mortality conference. see Dkt 18 at ¶ 11. In that instance, Szeremeta sought to instruct residents on how they could diffuse potential explosive doctor-patient confrontations by calmly explaining why the doctor made the medical decision in

question. Ex. D at ¶ 18. In the example in question, Szeremeta discussed a situation where a patient's mother accused him of not prescribing the pediatric patient narcotics because the patient was Black. *Id.* Szeremeta diffused the situation by explaining that the standard of care for all pediatric patients that age was Tylenol and Motrin. *Id.* Daywalker alleges that Szeremeta references to race in these discussions constituted harassment. Nevertheless, it is undisputed that Daywalker did not report these—or any other—allegations to UTMB until her June 1, 2018, internal complaint regarding her being placed on remediation. Ex. L at 94:6-13; *see* C-1 at 17 (UTMB anti-harassment policy).

## LEGAL STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). For this analysis, the evidence is examined in the light most favorable to the nonmovant. *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir. 1999). "If the record as a whole could not lead a rational jury to find for the nonmoving party, there is no genuine issue for trial and summary judgment is warranted." *Wheeler v. Miller*, 168 F.3d 241, 247 (5th Cir. 1999).

## ARGUMENT

Daywalker has applied the kitchen-sink approach to this litigation, asserting a number of discrimination and retaliation claims under Title VII, the FMLA, and the Rehab Act. The Court has already dismissed Daywalker's sex discrimination claims, see Dkt. 29, and, at her deposition, Daywalker explicitly disavowed that she was asserting disability discrimination claims or failure to accommodate claims. Ex. L at 23:15-25:25. What is left are the following classes of allegations:

12

1. Discrete Claims of Discrimination and Retaliation: Daywalker alleges that she was discriminated against based on her race when UTMB placed her on remediation and retained her at a PGY-3 academic level. Daywalker also alleges that she was retaliated against (based on Title VII, Rehab Act, and FMLA protected activity) when it retained her at a PGY-3 academic level and communicated that classification to the Board of Otolaryngology.
2. Hostile Work Environment: Daywalker alleges that UTMB subjected her to a hostile work environment based on her race and protected activity.
3. Constructive Discharge: Daywalker alleges that UTMB constructively discharged her based on her race and protected activity.

As is explained in more detail below, all of Daywalker's claims fail as a matter of law for multiple reasons.

## I.    Daywalker's Discrete Claims Fail as a Matter of Law.

### A.    Daywalker's race discrimination claims fail because she did not suffer an ultimate employment action and she cannot identify a similarly-situated comparator who was treated better.

Daywalker alleges that she was placed on remediation on May 30, 2018, and later held back as a PGY-3 in violation of Title VII's prohibition on race discrimination. To establish a prima facie disparate treatment claim, Daywalker must show that: (1) she is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) others similarly situated outside of her protected class were treated more favorably. *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007). Both claims, however, fail right out of the gate, as Daywalker cannot show she suffered an adverse employment action in the discrimination context, or identify a similarly-situated comparator who was treated more favorably than her.

### 1.    Neither of the claims involve an adverse employment action. In the context of Title VII discrimination claims, adverse employment actions only include "ultimate

employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport,* 492 F.3d 551, 559 (5th Cir. 2007).

The remediation, which is essentially an academic performance improvement plan that has no impact on pay, leave, or Daywalker's employment status, plainly does not fall within the categories of ultimate employment decisions as other courts have found. *See, e.g, Mawaldi v. St. Elizabeth Health Center,* 381 F.Supp.2d 675, 686–87 (N.D. Ohio 2005) (holding that neither probation nor remediation were adverse employment actions).

Daywalker's second discrete discrimination claim—that she was allegedly demoted when UTMB decided to have her continue rotations as a third year academic level also fails to establish an ultimate employment decision. As discussed above, medical residents at UTMB have PGY classifications for both their employment/pay level and their academic level. Ex C at ¶ 5. While these classifications are in lockstep for most residents, they can diverge in instances—like with Daywalker—where a resident is required to repeat education components of their training based on the academic and medical evaluations of their faculty.

Notably, for the purposes of her employment, it is undisputed that Daywalker was promoted to a fourth year employment/pay level in 2018 and paid the same as her other fourth year contemporaries. Ex. D at ¶ 13. The fact she was held back academically did not impact her pay, leave, or her employment status. Nor did it foreclose that she could have graduated academically to a fourth year had she stayed in the program and successfully completed the remediation. Accordingly, keeping her on a third year academic level until she successfully progressed to the next level, by itself, does not constitute an ultimate employment decision. *See Latif v. Univ. of Tex. Sw. Med. Ctr.,* 834 F. Supp. 2d 518, 523 (N.D. Tex. 2011) (University's

decision to have medical resident repeat his final rotation was not an ultimate employment decision); *see also Dailey v. Whitehorn*, 539 Fed.Appx. 409, 411-12 (5th Cir. 2013) (delayed promotion was not an adverse action).

2.      **Daywalker also cannot show that any of her fellow residents were similarly-situated and treated more favorably.** Importantly, similarly-situated comparators "are employees who are treated more favorably in 'nearly identical' circumstances [and] the Fifth Circuit defines 'similarly situated' narrowly." *Lopez v. Kempthorne*, 684 F.Supp.2d 827, 856 (S.D. Tex. 2010) (citing *Wheeler v. BL Dev. Corp.,* 415 F.3d 399, 405 (5th Cir. 2005)). "The 'nearly identical' standard … is a stringent standard—employees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical.'" *Hockman v. Westward Comm., LLC*, 282 F.Supp.2d 512, 527–28 (E.D. Tex. 2003).

Here, there is no evidence that any other resident in the Otolaryngology Department committed the same or nearly identical work violations, poor reviews, or had nearly identical allegations made against them. For instance, there is no competent evidence that any other resident (1) left multiple medical notes unfinished for almost a year, (2) was regularly dilatory in completing notes across multiple rotations, (3) had repeated trouble prioritizing tasks, and (4) had allegations that she had falsified medical documents. Ex. A-1

Daywalker may point to another resident who was placed on remediation—resident 6. But resident 6 did not have nearly identical work violations. Instead, resident 6, a PGY-1, was counseled, placed on probation, and had his contract non-renewed for work violations such as (1) unexcused work absences, (2) tardiness, and (3) unresponsiveness. Ex. D-5. Moreover,

the fact that resident 6 was a first-year resident with no supervisory duties and had different work rule violations, differentiates the resident from Daywalker, a PGY-3 with some supervisor duties. *Id.;* Ex. D at ¶ 22. And even if that were not the case, the fact that resident 6 was placed on probation and had his contract non-renewed, means that Daywalker cannot show that resident was "treated more favorably" than her.

These undisputed facts are dispositive of Daywalker's discrete discrimination claims.

> **B.** **Daywalker's discrete retaliation claims fail because she cannot show they were materially adverse, were temporally connected to her protect activity, or even that a majority of the decision-makers had knowledge of her protected activity.**

Daywalker also asserts that UTMB retaliated against her for engaging in three purported types of protected activity: (1) for an internal complaint about alleged race and gender discrimination on June 1, 2018; (2) for FMLA leave starting in August 2018; and (3) for a medical accommodation request in November 2018. *See* Dkt. 18 at ¶¶ 16, 21. To make out a prima facie case for retaliation, a plaintiff must generally establish that: "(1) [she] engaged in protected activity, as described in Title VII; (2) [she] suffered an adverse employment action; and (3) a causal nexus exists between the protected activity and the adverse employment action." *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.,* 261 F.3d 512, 519 (5th Cir. 2001). Here, Daywalker presents two potential discrete retaliation claims: first, that she was held back as a PGY-3 and, second, that UTMB reported to the Board of Otolaryngology that she was a PGY-3. But these claims fail to make a prima facie case of retaliation for multiple reasons.

> **1.** **Daywalker's purported post-employment retaliation is not a separate adverse employment action.** Daywalker alleges that UTMB retaliated against her by holding

her back as a PGY-3 and then reporting her to the Board of Otolaryngology under that classification. But the latter claim is simply a foreseeable effect of the former claim.

For a claim of discrimination or retaliation, the claim generally accrues when the alleged discriminatory or retaliatory act occurs, not at the time "at which the consequences of the acts became most painful." *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (internal quotations omitted). "A new violation does not occur . . . upon the occurrence of subsequent nondiscriminatory acts that entail adverse effect resulting from the past discrimination." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 623-24 (2007), *superseded in part by statute on other grounds*, 42 U.S.C. § 2000e-5(e)(3); *see also Leach v. Baylor College of Medicine*, No. H–07–0921, 2009 WL 385450, at *17 (S.D. Tex. Feb. 17, 2009) ("The rule set out in *Ledbetter* and prior cases . . . is still binding law for Title VII disparate treatment cases involving discrete acts other than pay.").

In this instance, Daywalker's complaint is really that UTMB unanimously decided to retain her at a third year academic level in 2018. That UTMB later reported that PGY year to the Board—as it is required to do—was neither a surprise (see August 2018 letter) nor a new violation. Instead, it was simply a natural consequence of the prior decision. *See Jackson v. City of Chicago*, 552 F.3d 619, 624 (7th Cir. 2009) (applying *Ledbetter* to a failure to promote claim).

2.   **UTMB's unanimous decision to retain Daywalker at a PGY-3 academic level was not a materially adverse action.** "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67 (2006).   Accordingly, a plaintiff needs to "show that a reasonable employee would have found the challenged action

materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* 548 U.S. at 68 (internal quotations omitted).

As discussed above, UTMB's decision to keep Daywalker as a third year for academic purposes did not impact her pay or employment status. Ex. D at ¶ 13. Instead, it was an academic decision that simply updated terms of her remediation plan. *Jackson v. Honeywell Int'l, Inc.*, 601 Fed. Appx. 280, 286 (5th Cir. 2015) (performance improvement plans are not materially adverse actions). And even if the remediation delayed Daywalker's promotion to a fourth year resident for purposes of her academic progression—it did not for her employment and pay. In fact, for employment purposes she was promoted and paid a salary commensurate with that of a PGY–4. That Daywalker may have viewed this decision as unfair or improper does not convert UTMB's academic decision into an employment decision.

**3.    There is no causal connection between the alleged protected activities and the alleged adverse employment actions.** Finally, assuming *arguendo* that the actions were materially adverse employment actions, Daywalker cannot establish a causal connection between the actions and her protected activity.

First, Daywalker cannot show that most of the decision-makers where even aware of her protected activity at the time they decided to retain her at a third year academic level.[5] Here, Daywalker "must produce at least some evidence that the decisionmakers had

---

[5] It is undisputed that the decision to retain Daywalker at a PGY-3 level occurred before her request for FMLA leave or her November accommodate request. *See* Ex. A-2 (August 8, 2018, letter).

knowledge of h[er] protected activity." *Manning v. Chevron Chem. Co. LLC*, 332 F.3d 874, 884 (5th Cir. 2003).

The only protected activity that preceded the decision to retain Daywalker at a third year academic level, was the June 1, 2018, internal discrimination complaint. But those complaints are confidential and, as the declarations make clear, many of the faculty that decided the issue was not aware of the complaints. *Manning,* 332 F.3d at 884 ("If the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity."); *see also* Exs. E, H, I.

Second, there is no causal connection between the protected activity and the alleged adverse employment actions. To establish causation based on temporal proximity, the two events must be "very close" in time. *Washburn v. Harvey*, 504 F.3d 505, 511 (5th Cir. 2007). Here, the gaps between the June 1, 2018, internal complaint and the August 8, 2018, PGY-3 decision and the November 2018 communication of the decision to the Board, are 68 days and six months respectively. The Fifth Circuit has found that similar gaps do not establish a causal connection for retaliation. *See Amsel v. Tex. Water Dev. Bd.,* 464 Fed.Appx. 395, 401–02 (5th Cir. 2012) (69-day gap between protected activity and termination while "short, it is not, by itself, enough to show a causal connection based upon temporal proximity alone."); *Deeds v. State Farm Mut. Auto. Ins. Co.*, No. 10–1422012, 2012 WL 1150755, at *10 (M.D. La. April 5, 2012) (two-month gap is insufficient).

In addition, there is no causal connection between the actions at issue and Daywalker's FMLA leave or an accommodation request. Notably, it is undisputed that these two protected

activities occurred *after* UTMB's August 2018 decision to retain Daywalker at a PGY-3 academic level. Therefore, Daywalker's subsequent protected activity has no connection to the decision or the foreseeable effects of that decision). *See Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

### C. UTMB's Legitimate Reasons Are Based on Academic and Professional Judgment and Therefore are Entitled to Deference.

Even if Daywalker could meet her prima facie burden—which she cannot—UTMB still is entitled to summary judgment on her claims because it had legitimate, non-discriminatory, and non-retaliatory reasons for every action it took. *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (If the employer produces any evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory or nonretaliatory reason for the adverse action, then the employer has satisfied its burden of production" under Title VII's burden shifting). Specifically, UTMB placed Daywalker on remediation because of concerns of her academic and clinical competency, including concerns that she was (1) not completing tasks in a timely fashion, (2) not effectively prioritizing tasks, (3) not timely or accurately documenting medical notes, and (4) concerns about her trustworthiness. *See* Ex. A-2. UTMB decided to retain her a PGY-3 academic level based on those same concerns coupled with (1) Daywalker's performance on remediation and (2) the effects of taking months off for personal leave. *See* Ex. A-2. Szeremeta accurately reported Daywalker's PGY level to the Board because (1) it was one of his job duties to do so, (2) UTMB had not progressed Daywalker to

a PGY-3 academic level, and (3) the Board had inaccurately listed Daywalker as a PGY-4. *See* Ex. D at ¶ 15.

While Daywalker challenges some of the rationale behind the decisions, there is no real dispute that the core of the work violations at issue actually occurred. Ultimately, Daywalker may actually believe that she was treated unfairly, but UTMB's obligation is to prepare residents to practice medicine independently. And when a resident falls behind in their academic training, UTMB has an obligation to address those issues with the resident.

Furthermore, these actions and the judgment underlying the actions, are squarely within UTMB's academic and professional judgment. Unlike the traditional business decisions in an employment case, the decisions here are academic in nature. *See Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978) (holding that medical resident's dismissal was academic decision because it "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal"). Daywalker essentially asks this Court to overrule the UTMB's faculty's academic and medical judgment in order to reinstate her to the program and advance her to a fourth-year academic level. *See* Dkt. 18 at ¶ 39. But Courts recognize that faculty, and not judges or juries, are in the best position to make these academic and expert judgments. *Id.* (holding that academic decisions regarding a medical resident require "expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking"); *see also Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 815 (7th Cir. 2007) (courts are reticence to "second-guess the expert decisions of faculty committees.").

Accordingly, the faculty's *unanimous* decision to place Daywalker on remediation and retain her at a third year academic level should be afforded deference. *See Abdel-Raouf v. Yale Univ.*, No. 3:12CV776, 2015 WL 687440, at *3 (D. Conn. Feb. 18, 2015); *Nigro v. Virginia Commonwealth Univ. Med. College*, No. 5:09–CV–00064, 2010 WL 4879076, at * 9 (W.D. Va. Nov. 23, 2010).

## II.   Daywalker Cannot Establish a Hostile Work Environment Claim Under the Fifth Circuit Demanding Standards.

### A.   Daywalker cannot establish a hostile work environment claim.

Daywalker next alleges that she endured a hostile work environment based on race discrimination and retaliation. A hostile work environment claim based on supervisor harassment requires (1) membership in a protected group; (2) harassment (3) based on a factor rendered impermissible by Title VII; and (4) the harassment affected a term, condition, or privilege of employment. *Watts v. Kroger Co.*, 170 F.3d 505, 509 & n.3 (5th Cir. 1999). The harassment must be "extreme" and "sufficiently severe or pervasive" to alter the conditions of the victim's employment and create an abusive working environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Moreover, the complained-of conduct must be both objectively and subjectively offensive. *EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007). This means that not only must a plaintiff perceive the environment to be hostile, but it must appear hostile or abusive to a reasonable person. *Id.* To determine whether conduct is objectively offensive, the totality of the circumstances is considered, including: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Id.*

Here, Daywalker's hostile work environment claim consists of the following alleged "harassment" (1) a few stray comments allegedly made by Szeremeta in 2016 before he became program director—Szeremeta *See* Dkt. 18 at ¶¶ 12-13; (2) that UTMB placed her on remediation, gave her negative reviews, closely monitored her work, and unfairly critiqued her. Ex. L at 71:11-85:23-7, (3) that Szeremeta made posts in support of conservative political positions and candidates on his personal Facebook page that offended Daywalker. *Id* 81:16-82:2. These allegations, however, even if true, do not come close to establishing a hostile work environment under the Fifth Circuit demanding standards.

1.     **Plaintiff cannot maintain a retaliatory hostile work environment claim.**
"The Fifth Circuit has never recognized a cause of action under Title VII for a retaliatory hostile work environment." *Rowe v. Jewell*, 88 F.Supp.3d 647, 671 (E.D. La. 2015). Because Daywalker brings a cause of action that has not been recognized in the Fifth Circuit, the Court should dismiss the claim. *Minor v. Univ. of Tex. Southwestern Med. Ctr.*, No. 3:12-CV-0036-G, 2013 WL 3477223, at *18 (N.D. Tex. July 10, 2013) (granting employer's motion for summary judgment because "[t]he Fifth Circuit has declined to expressly recognize a cause of action for retaliatory hostile work environment").

Nevertheless, even if such a claim were cognizable, Daywalker would need to show that the harassment was based on her protected activity. *See, e.g., Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). There is simply no evidence to support such a claim.  Indeed, Daywalker alleges that the hostile work environment started years before she ever engaged in protected activity. *See* Ex. L at 89:24-90:7 (harassment occurred in 2016). Without this evidence

connecting the alleged harassment to her protected activities, Daywalker cannot maintain a retaliatory hostile work environment claim.

2.      **The multiple changes in Daywalker's supervisors were intervening acts for her hostile work environment claims.** In support of her hostile work environment action, Daywalker alleges purported harassment that occurred from 2016 to the end of her employment in 2018. But for these "separate acts" to be actionable under a single continuing action claim, Daywalker must show they are related. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 118 (2002). Notably, intervening action by the employer, will sever the acts and "preclud[e] liability for preceding act outside of the filing window." *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009). A change in supervisors is one such intervening act that will sever a hostile work environment claim. *See Morgan,* 536 U.S. at 118; *Williams v. E.I. du Pont de Nemours & Co.*, 154 F. Supp. 3d 407, 425 (M.D. La. 2015) (a change in supervisors was an intervening action that severed the claim).

Here, UTMB changed Daywalker's direct supervisor multiple times during the alleged hostile work environment period. Most prominently, UTMB replaced McCammon with Szeremeta in 2017. Later, in June 2018, after Daywalker filed her internal complaint of discrimination, UTMB took prompt remedial action to replace Szeremeta, and later Siddiqui, (both at Daywalker's request) as Daywalker's day-to-day supervisor while on remediation. These intervening acts mean the 2016 comments that were attributed to Szeremeta, see Ex. L at 89:24-90:7, are severed from Daywalker's 2017-18 hostile work environment claim. *See Williams v. Paulson*, No. 1:06-CV-0876-CC-AJB, 2007 WL 9652983 (N.D. Ga. Dec. 24, 2007) (A change in the plaintiff's "direct supervisor" was an "intervening event" that "therefore,

created a second hostile work environment claim."). The same is true for action that allegedly occurred after Szeremeta was replaced by Siddiqui and then Thomas in June-July 2018. *Id.* A consequence, to the extent Daywalker bases her hostile work environment claim on Szeremeta alleged comments in 2016, the claim is time barred. 42 U.S.C. § 2000e–5(e)(1) (claim must be exhausted within 300 days); Ex. K (EEOC Charge filed October 29, 2018).

> **3.** **Most of the alleged harassment is not actionable in a hostile work environment claim.** Under Szeremeta's supervision in 2017 and 2018, Daywalker's allegations consist almost exclusive of complaints about work related critiques and action. "Actionable [racial] harassment must involve 'racially discriminatory intimidation, ridicule and insults'". *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000) *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Here, however, the overwhelming majority of the purported harassment simply details work related critique and performance-based actions. This type of complaint simply does not support a hostile work environment claim. *See Hurley v. Tupelo Pub. Sch. Dist.*, 152 F. Supp. 3d 581, 594 (N.D. Miss. 2015) ("allegations that negative evaluations and reprimands, all job-related criticisms, created a hostile work environment do not rise to the level necessary to establish her claim"); *Brown v. Liberty Mut. Grp., Inc.*, 616 Fed.Appx. 654, 657–58 (5th Cir. 2015) (holding job-related criticisms are unlikely to support a hostile work environment claim).

Likewise, Daywalker's complaints about Szeremeta's Facebook posts cannot support a hostile work environment claim for multiple reasons. First, Szeremeta and Daywalker were not Facebook friends. Indeed, there is no evidence that Daywalker even viewed Szeremeta's posting while she was employed at UTMB.  Second, Daywalker was not required to interact

with Szeremeta on Facebook, so even if she did view his posts, she did so voluntarily and outside of the scope of her employment. Third, regardless of whether Szeremeta's political posts, in favor of Republican or conservative positions, were subjectively offensive to Daywalker, they cannot be objectively offensive given that large portions of the country support the political and candidate preferences allegedly espoused by Szeremeta on Facebook. Fourth, and finally, there is no evidence that the posts were directed at Daywalker much less caused by Daywalker's race or protective activity.

      **4.**     **Even if true, the alleged harassment is not severe or pervasive under Fifth Circuit precedent.** Stripped away of the job-related criticism and the Facebook posts, Daywalker's hostile work environment claim rests on allegations that Szeremeta, on a few occasions years before the events at issue in this lawsuit, made inappropriate racial comments while discussing larger policy and medical issues. But a few stray comments, even if offensive, simply do not constitute harassment severe or pervasive enough to establish a hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[O]ffhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."); *Cooper Tire & Rubber Co. v. Nat'l Labor Rels Bd.*, 866 F.3d 885, 891 (8th Cir. 2017) ("Stray remarks in the workplace generally are not severe or pervasive enough to change the conditions of employment."). Indeed, as the Fifth Circuit has explained, its "[h]ostile work environment jurisprudence is not designed to prohibit all verbal or physical harassment in the workplace." *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 443 (5th Cir. 2011) (internal quotation marks omitted).

Notably, while Daywalker alleges she was offended by Szeremeta's comments, Daywalker does not allege ever used any racial slurs, physical intimidation or any other type of "harassment" that are typically required to establish a hostile work environment. Ex. L at 86:3-15; 246:4-248:6. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (describing workplace "permeated with discriminatory intimidation, ridicule, and insult").

Furthermore, a foray into Fifth Circuit precedent illustrates that any alleged "harassment" here does not rise to an actionable level of severe or pervasive conduct:

- *White v. Gov't Emps. Ins. Co.,* 457 F. App'x 374 (5th Cir. 2012): The plaintiff's branch manager: (1) referred to an African-American client as a "n****" in plaintiff's presence; (2) referenced the set up of the office as "ghetto" or a "FEMA trailer"; and (3) told another African-American employee that he knew "she always wanted to be a white female." *Id.* at 374, 376, 380. The Fifth Circuit upheld the trial court's grant of summary judgment to the defendant, explaining that "[the plaintiff's] race-based comments . . . pale[d] in comparison, both in severity and frequency, to the kinds of verbal harassment that this court and other circuits have held would support a Title VII hostile work environment claim." *Id.* at 381–82 (quotations omitted).

- *Vallecillo v. U.S. Dep't of Hous. & Urb. Dev.* 155 F. App'x 764 (5th Cir. 2005): The plaintiff claimed that one supervisor referred to him as "Che Guevara" and another supervisor called him an "aggressive Hispanic." *Id.* at 767. The Fifth Circuit questioned whether "these statements can be classified as racially offensive" and found that, regardless, "they are not sufficiently severe or pervasive to constitute a hostile work environment." *Id.*

- *Dailey v. Shintech, Inc.,* 629 F. App'x 638 (5th Cir. 2015): the plaintiff (African-American) claimed that his supervisor called hm a "black little mother--r" on at least two occasions and told the plaintiff he would "kick his black a--s." *Id.* at 640. The Fifth Circuit found that the supervisor's comments "[did] not rise to the level of 'severe or pervasive' harassment." *Id.* at 644.[6]

This standard is designed to be "demanding" to "filter out complaints attacking the ordinary tribulations of the workplace" and to prevent anti-discrimination statutes from becoming

---

[6] *See also Hockman v. Westward Commc'ns, LLC,* 407 F.3d 317, 325-26 (5th Cir. 2004); *Shepherd v. Comptroller of Pub. Accts. Of State of Texas,* 168 F.3d 871 (5th Cir. 1999).

"general civility code[s]." *Faragher* 524 U.S. at 788 (internal quotations omitted). In comparison to the Fifth Circuit's demanding precedent, the alleged conduct here cannot possibly constitute harassment severe or pervasive enough to support a hostile work environment claim.

### B.   UTMB is entitled to summary judgment on its *Faragher-Ellerth* defense.

Even if Daywalker could establish a hostile work environment claim, UTMB still is not liable because (1) Daywalker did not suffer a tangible employment action, (2) UTMB exercised reasonable care to prevent harassment and took prompt remedial action to correct any harassing behavior, and (3) Daywalker did not take advantage of the preventive or corrective opportunities. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

First, Daywalker did not suffer a tangible employment action. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits . . . A tangible employment action in most cases inflicts direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62 (1998). Here, it is undisputed that Daywalker did not suffer direct economic harm. Daywalker may point to her remediation and the fact that she was held back academically in 2018, but neither of those action impacted her employment classification, benefits, or pay—indeed Szeremeta promoted her with a raise to a fourth-year employment level in August 2018. *See Alaniz v. Zamora–Quezada*, 591 F.3d 761, 772 (5th Cir. 2009) (reassignment was not a tangible employment action because the plaintiff retained her same salary, and her actual duties remained the same); *Krull v. Centurytel, Inc.,* 829 F.Supp. 2d 474, 481 (W.D. La 2011) (performance improvement plan was not a tangible employment action). Likewise, because Daywalker's constructive discharge

claim fails as a matter of law, it cannot establish a tangible employment action. *See Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 472 (5th Cir. 2008).

Second, it is undisputed that UTMB had a nondiscrimination policy and, once it learned of Daywalker's complaints about Szeremeta, it investigated the allegations and took prompt remedial action to limit his interactions with Daywalker. *See* Dkt. 18 at ¶ 17; Ex. G at ¶ 9.

Third, Daywalker alleges that the harassment started in 2016 but it took her over two years to take advantage of UTMB's anti-harassment policy. *Scrivner v. Socorro Indep. Sch. Dist.*, 169 F.3d 969 (5th Cir.1999) (finding employee unreasonably failed to take advantage of any preventive or corrective opportunities when she failed to report harassment that allegedly occurred for an eight-nine month period); *Casiano v. AT&T Corp.*, 213 F.3d 278, 284–85 (5th Cir. 2000) (four month wait was unreasonable).

## III.   Daywalker's Constructive Discharge Claim Fails as a Matter of Law.

Rather than continue with her remediation, Daywalker chose to voluntarily resign once she returned from leave. Now she claims she was constructively discharged from the program. To establish a constructive discharge claim, a "plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Faruki v. Parsons*, 123 F.3d 315, 319 (5th Cir. 1997). Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge. *Boze v. Branstetter*, 912 F.2d 801, 805 (5th Cir.1990). Daywalker cannot meet this standard.

First, to establish a constructive discharge claim, a plaintiff must show a "greater degree of harassment than that required by a hostile work environment claim." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). Therefore, Daywalker's constructive discharge claim

fails for the same reasons as her hostile work environment claim. *Vallecillo v. U.S. Dep't of Hous. & Urb. Dev.*, 155 F. App'x 764, 768 (5th Cir. 2005) ("[B]ecause Appellant's hostile work environment claim has failed, his constructive discharge claim must also fail."). Indeed, even if Daywalker's allegations of harassment are true, under Fifth Circuit precedent they do not establish a constructive discharge claim. *See, e.g., Haley v. Alliance Compressor LLC*, 391 F.3d 644, 650, 653 (5th Cir. 2004); *Brown v. Bunge Corp.*, 207 F.3d 776, 782–83 (5th Cir.2000).

Second, UTMB took prompt remedial action after Daywalker submitted her complaints by removing Szeremeta and Siddiqui as her day-to-day supervisor in the summer of 2018. Therefore, even if Daywalker could establish that she was being harassed by Szeremeta, UTMB took steps to work with her by changing her supervisor and limiting her interactions with Szeremeta and Siddiqui. Like with her hostile work environment, these intervening actions limit the alleged harassment that could form the basis of a continuing action based constructive discharge claim. *See Stewart*, 586 F.3d at 329-30 And as other courts have found in similar circumstances, "a reasonable person would simply not feel 'compelled to resign' when her employer offered to discuss other work arrangements with her." *E.E.O.C. v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014); *see also Charetta v. St. John Valley Soil and Water Conservation District*, 332 F. Supp. 3d 316, 355 (D. Maine 2018).

So too here. Daywalker chose to voluntarily resign rather than continue working at UTMB and her allegations, even if true, do not meet the high bar necessarily to establish a constructive discharge claim.

## CONCLUSION

The Court should dismiss Daywalker's entire suit with prejudice.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division


*/s/ Esteban Soto*
TODD A. DICKERSON
Attorney-in-charge
Texas Bar No. 24118368
Southern District ID No. 3544329
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 │Fax: (512) 320-0667
Todd.Dickerson@oag.texas.gov

ESTEBAN S.M. SOTO
Chief of the Transportation Division
State Bar No.24052284
S.D. Tex. Admission No. 1014954
SHEKEIRA WARD
State Bar No. 24098575
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone (512) 475-4054
esteban.soto@oag.texas.gov
shekeria.ward@oag.texas.gov
*COUNSEL FOR DEFENDANTS*

**CERTIFICATE OF SERVICE**

I certify that that on October 13, 2021, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Esteban Soto*
ESTEBAN SOTO
Assistant Attorney General