IN THE UNITED STATES DISTRICT COURT
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DR. ROSANDRA DAYWALKER | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | No. 3:20-CV-00099 |
| BRANCH AT GALVESTON, AND DR. | § | |
| BEN G. RAIMER, IN HIS OFFICIAL | § | |
| CAPACITY | § | |
| *Defendants.* | § | |

## DECLARATION OF DR. HAROLD PINE

1. My name is Harold Pine, M.D., FAAP, FACS. I have personal knowledge of the matters contained in this Declaration and am fully competent to make this Declaration.

2. I am currently employed as an ~~Associate~~ Professor in the Department of Otolaryngology at The University of Texas Medical Branch at Galveston ("UTMB"). I have held this position at UTMB since _2009_.

3. My duties as a faculty member at UTMB include training, teaching, and working with medical residents in the Department of Otolaryngology. My job also entails using my professional judgment to evaluate residents' academic and medical development as they progress through the Department's residency program.

4. I was a faculty member and a member of the Clinical Competency Committee (the "CCC") in 2017 and 2018 while Dr. Rosandra Daywalker was a medical resident at UTMB.

5. The CCC—which is comprised of at least three faculty members—must: (1) review all resident evaluations at least semi-annually; (2) determine each resident's progress on achievement of the specialty-specific Milestones; and (3) meet prior to the residents' semi-annual evaluations and advise the program director regarding each resident's progress. The program director then, "with input from the CCC, must meet with and review with each resident their documented semi-annual evaluation of performance.

EXHIBIT A

These performance evaluations must be accessible for review by the resident. At the program's end, the program director provides a final evaluation of the resident based on predetermined metrics, such as specialty-specific Milestones and Case Logs. This final evaluation must consider recommendations from the CCC and be shared with the resident upon completion of the program. These decisions are made with the aim to ensure that residents are providing high quality, safe care to patients while in training, and will be well prepared to do so once in practice.

6. In May 2018, I participated in the decision to place Daywalker on remediation. Remediation is a plan to provide tailored assistance, training, and/or supervision to residents who need additional support to meet expectations. Remediation is not formal discipline and is not reportable to the American Board of Otolaryngology or to future employers.

7. As detailed in Exhibits A-1 and A-2, Dr. Daywalker was not meeting expectations in the progress of her clinical and academic competency. Among other deficiencies, I was concerned about Dr. Daywalker's repeated failure to timely complete medical notes after seeing patients. While Dr. Daywalker was a resident, UTMB policy required residents to complete clinic, operative, and inpatient notes within 24 hours, although faculty could institute stricter timelines. A true and correct copy of excerpts from UTMB's 2016 Department of Otolaryngology Residency Handbook is attached hereto as Exhibit A-3. Medical record keeping is an integral component in good professional medical practice and the delivery of quality healthcare. Consequently, failing to timely complete accurate notes can negatively impact patient care and safety. In considering remediation, multiple faculty brough to my attention that Dr. Daywalker was habitually late in completing notes, including one instance in which five of Dr. Daywalker's notes had been incomplete for almost one year. In light of this concern and the other issues raised in Exhibit A-1, I voted in favor of placing Dr. Daywalker on remediation. I hoped that remediation would provide Dr. Daywalker the support and assistance she needed to successfully improve her performance and complete the program.

8. A couple months into her remediation plan, Dr. Daywalker requested four months of personal leave. The CCC approved this request via a letter date August 8, 2018. *See* Ex. A-2. The letter informed Dr. Daywalker that "[w]hen you return to active duty on December 10, 2018, you will still be under the same terms of remediation as before and that she would "return as a PGY-3" so that she could "build confidence . . . [and] gain the skills needed to be a successful PGY 4 in July." I voted in favor of the terms of the letter including keep Dr. Daywalker as a PGY-3 because of concerns about her clinical competency and academic progress as reflected by the information contained in Exhibit A-2.

9.  I delivered the letter marked as Exhibit A-2 to Dr. Daywalker on August 8, 2018. I agreed to deliver the letter because I had a good relationship with Dr. Daywalker and thought my presence would help the situation. I did not have any authority to deliver any message on behalf of UTMB to Dr. Daywalker other than what was included in the letter.

10. I was not aware of Dr. Daywalker's June 2018 internal complaint of discrimination, her August 2018 request for Family and Medical Leave, or any request for medical accommodations at the times I voted for her to be placed on remediation or continue as a PGY-3.

11. All of my actions related to Dr. Daywalker's employment at UTMB were made based on legitimate reasons that were not related or motived by Dr. Daywalker's race or her complaints of discrimination and retaliation, medical leave, or accommodation requests.


I declare under penalty of perjury that the foregoing is true and correct.


EXECUTED on _20_ of September 2021

_____
DECLARANT

 Health

Department of Otolaryngology

301 University Boulevard
Galveston, Texas 77555-0521
P: 409.772.2701   F: 409.772.1715

**Vicente Resto,** MD, PhD, FACS
Professor and Chair
Head and Neck Reconstructive Surgery
Skull Base Surgery

Annmarie Barnett, PA
General Otolaryngology

Deborah Carlson, PhD, ASHA Fellow
Associate Professor
Director of Audiology and Speech
Pathology

Orly Coblens, MD
Assistant Professor
Head & Neck Reconstructive Surgery

Paul Brindley, MD, FACS
Assistant Professor
General Otolaryngology and Rhinology

Mohamad Chaaban, MD, MSCR,
MBA, FACS, FAAOA
Assistant Professor
Rhinology and Allergy

Robert Darling, MD
Assistant Professor
General Otolaryngology

Kate Kerr, MS, CCC-SLP
Assistant Director for the Center for
Audiology and Speech Pathology

Tomoko Makishima, MD, PhD
Associate Professor
Otology

Suzanne Patton, PA
General Otolaryngology

Harold Pine, MD, FAAP, FACS
Associate Professor
Pediatric Otolaryngology

Farrah Siddiqui, MD, FAAOA
Assistant Professor
General Otolaryngology and Allergy

Wasyl Szeremeta, MD, MBA
Professor and Residency Program Director
Pediatric Otolaryngology

Michael Underbrink, MD, MBA, FACS
Associate Professor
Laryngology

Tammara Watts, MD, PhD, FACS
Associate Professor
Head and Neck Surgery
Endocrine Surgery

Dayton Young, MD
Assistant Professor
Otology and Neurotology

Administration

Alice Oberholtzer, MBA
Administrator

Dorian Nackos, MHA/MBA
Assistant Administrator

To:  Rosandra Walker, MD

From:  Faculty – UTMB – Department of Otolaryngology

RE:  Leave of Absence – Remediation Update

Date: August 8, 2018

Dear Dr. Walker:

This letter is being written to grant your request for a personal Leave of Absence.  This decision was made reviewing your performance on remediation thus far and included the recommendations from the CCC, the entire Faculty as well as the GME office.

Granting leave is never an easy decision to make but it is the opinion of the Faculty of the Department of Otolaryngology that your request for Leave is appropriate and has the potential for positive changes.

The Leave will be effective at the close of business on Friday, August 10 and have a duration of 4 months. Your leave will be officially over at 8 AM on Monday, December 10, 2018.

During the Leave you will be expected to use the time for intensive study to improve your medical knowledge and for time for reflection and growth to be able to handle the stresses of modern day otolaryngology.  The terms of remediation asked you to perform on a consistent basis the daily routines which are expected of all the residents.  We feel that this time off will allow you to explore pathways to find the strength to be able to be successful in accomplishing all these tasks in a consistent manner.

We are attaching a suggested reading list and study guide to assist you in your personal didactic program.

During your leave, you will be able to utilize your accrued vacation and holiday time. The remainder of the leave will be unpaid as this is considered a voluntary Personal Leave and not considered a medically related leave (FMLA).

When you return to active duty on December 10, 2018, you will still be under the same terms of remediation as before.  You will also return as a PGY-3 and have clinical rotations on A team, B team, TDC, and the rotation with Dr. Kridel – as a junior resident – to ease back into the clinical rotation, to build confidence and to gain the skills needed to be a successful PGY 4 in July.

After your return, your performance while on remediation will be reviewed on a monthly basis for 3 months.

Violations of any of the terms of remediation will be grounds for immediate placement on probation.

Your signature of this document will acknowledge your acceptance of the terms of your leave and the continued conditions of your remediation.

As has been the case all along, all of us in the faculty hold every hope you will successfully progress through the program.

Sincerely,

Vicente A. Resto, MD, PhD, FACS


**ACCEPTANCE**

I have read the above and agree with the terms stated.


Rosandra Walker, MD


Cc: Dr. Thomas A. Blackwell
    Dr. Christopher R. Thomas

To: Rosandra Walker, MD

From: Wasyl Szeremeta, MD MBA

RE: Initiation of Remediation

Date: May 30, 2018

Dear Dr. Walker:

This letter is being written to you to inform you that as of today you have officially been placed on remediation. Upon deliberation with members of the CCC and other faculty members, your severe lapses in professional behavior have created an environment where it is difficult for the faculty to trust you in the care of our patients here at UTMB.

This was not an easy decision to make, but given the events of the last several months, the Committee and I feel that we have no alternative but to begin a period of mandatory remediation.

Prior to your beginning your MD Anderson rotation last year – you had a meeting with me and Dr. Siddiqui to comment on your performance. At that time it had been noted that your performance was falling short of what we had expected for a PGY-3 level resident. Specifically, we discussed your failure to meet expectations in the areas of professionalism, documentation, completing tasks in timely fashion and prioritization of tasks. In your defense you claimed that there had been extenuating circumstances that led to your subpar performance. At the time there was consideration for placing you on remediation, but it was decided that you should be given the benefit of the doubt and we were hoping that a change of environment and our conversation would let you perform at a much higher level.

Since that meeting, there have been several areas that lead to our continued concern that you are not making the progress that should be made not only to advance in this residency, but also to be able to graduate and become an independent and competent practicing physician.

1. Completing tasks in a timely fashion.
   Several attendings on multiple rotations have noted how your productivity continues to lag behind your peer members. Furthermore, despite the fact that you see fewer patients, what continues to be more of a concern is that your documentation continues to be late and inaccurate.

   One attending wrote, "I want to give you some feedback on your clinic performance yesterday. You saw 6 out of the 24 patients. Of those 6 patients, only 1 had a completed note at

EXHIBIT A-2

the end of the day.  As you know, I have sent you emails to remind you to finish these notes. [the] average resident sees between 10-12 patients on a clinic day and is able to complete the notes by the end of day.  This is goal that you should aim for."

Another attending on a different service wrote, "I just closed all her clinic notes from yesterday. And wrote two of them from scratch because they were not done. I only had 19 patients on my schedule and still saw one or two on my own during the morning session so there was no reason for her not to finish her clinic notes."

A third attending noted, "She has great skill in developing a relationship with the patients and is often very thorough, however this is also to her determinant in terms of clinical efficiency. Her encounters with patients take 2-3 times longer than her peers and as a result she also sees 2-3 times less patients. By the end of the clinic day, most of her notes have not even been started and she inconsistently places orders.

In one specific case your failure to provide accurate and timely clinical documentation of an outpatient visit caused a 19-year old patient to have her surgery cancelled.  This provided hardship for the patient as she was trying to coordinate her care with her college schedule.  Eventually the surgery was performed almost one year later, but the quality of care suffered simply because documentation was not performed in a timely fashion.

2.  Prioritization of tasks
    While you have been an active participant in meetings and mission trips, you failed on multiple occasions to complete the work at hand.  In all that we do, patient care comes first, and the patient always comes first.  Failure of timely documentation puts that responsibility in question and risks error and patient harm.

    Examples of this include the following:
    "She left for a mission trip to Vietnam and requested to leave clinic prior to completing her notes because she wanted to get home to finish getting ready for her flight. She "promised" me that she would complete the notes that evening prior to her departure. The clinic was 3/14/18, by the end of clinic she had seen 9 patients throughout the day and completed only two notes. Upon my arrival to work the following day I expected to see the remainder of the notes completed and the encounters closed, however they were not. Given that she had already departed I completed one note myself and Dr. Foon contacted Dr. Walker who informed him that the notes would be completed as soon as she arrived to her hotel that evening. The notes were completed over the next two days with the final note being signed on 3/16/18 at 18:26. She never reached out to me, prior to her departure to inform me of her delinquency and to provide me with a plan for completion. "

    Another examples of this lack of prioritization can be found in your recent research presentation at the SBAS.  Although your presentation garnered an award,  your approach to the presentation came at a cost to your clinical and surgical experience and at a cost to your colleagues being able to share in the quality of the actual presentation that you made at the conference.

    Your research mentor was quite critical in your approach and professionalism as it related to presenting her research to your colleagues in the department.  She sent you the following email, "Needless to say I was very disappointed in your update. I think you waited to the last minute and threw something together

that was not coherent. I placed those materials on the s-drive for you on Monday at your request. If you had simply searched in your folder by even the last date modified you would have found the folder that said research update. In there were all the slides from my recent talk at MDACC which included all of your data, the pictures I took, as well as a foundation for what the lab studies."

You also asked to leave the operating room on Thursday to attend the conference, yet your presentation was not until 2 days later on Saturday, and you were not present at the conference on Friday as was noted by Dr. McCammon.

3. Documentation
This is the most serious area of concern. Your inability to document on charts in a timely fashion creates a situation where you make significant errors. Some of these errors appear to be simple acts of omission yet others appear to be deliberate fabrications.

An example of a simple act of omission is demonstrated in the following attending's comment, "Toward the end of the clinic she was getting "on-call" pages and needed to return to Galveston to address some consults. She left clinic without finishing her notes and she completed them within 48 hours, however some were incomplete, including documentation and coding for NPL examinations. "

A much more serious documentation inaccuracy concerns your TDC charts from June 27, 2017.

In a recent review of departmental documentation a review of TDC charts revealed 5 of your notes that were incomplete from June 27, 2017. A letter from Dr. Underbrink to you stated the following:
There are 5 open encounters from 6/27/2017 that you were/are responsible for documentation and closing out your notes. Please review the attached document, address this issue, and complete it possible so that we can close out those encounters.

Your response to Dr. Underbrink stated the following:

Hello,

Thank you for the update. All of the aforementioned encounters are closed now. 4 of the 5 encounters were TDC patients that "Left without being seen" and were supposed to be removed from the schedule.

Thanks!

R. Walker, MD.

A review of these encounters actually revealed that the patients did not leave without being seen and, in fact, you subsequently created notes and "documentation." A review of these notes indicate a high suspicion of a falsification of medical records as the information written in your notes with the concomitant detail would be very hard to believe. There was a note in which you indicated a procedure being performed but not billed for. The note was copied from a previous note by Dr Tignor, which had a procedure. The age of your patient in your note had not changed – indicating likely that you copied the note without making any substantial edits. One of these patients was a cancer follow up patient and you copied a note from Dr. Son who had seen the patient 2 years earlier. According to your note, there was no change in his condition nor in his age.

All these notes also had bills attached to them as well.

Falsification of a medical record for whatever reason cannot be tolerated and is potentially a criminal offense. Physicians have not only been terminated for such an infraction but also have the potential for losing their medical license as well as being criminally charged and prosecuted resulting in fines and/or imprisonment.

I cannot be more clear how important a timely and accurate and honest medical record is. There can be no deviation from this – and any deviation will not be tolerated.

4. Trustworthiness

The care of another human being places the physician in an incredible position of needing to demonstrate unquestionable trust and reliability. This trust and reliability are developed and cultivated not only throughout our training as residents, but continues into our professional career. It takes a lifetime to build complete trust and only seconds to destroy that same trust. The example of the poor records from June 27, 2017 shows how the lack of timely documentation can create a situation where it is not possible to trust the documentation that is actually written. Furthermore, it is more worrisome that you initially wrote that the patients left without being seen and then 24-48 hours later, "documentation" appeared.

Therefore, you were either not truthful in reporting that the patients left without being seen, or not accurate in your documentation on patients that had been seen almost one year ago.

Another troublesome event occurred on May 2, 2018. This was the day of the QI competition. You had texted me that you would not be at Grand Rounds because of "technical issues regarding your poster."

OAG-0000336

In fact your text to me at 7:05 said the following" Due to technical error at UPS on island, I had to send my QI poster to 24 spot in Houston, so I will miss didactics today as I pick it up before clinic. I am currently at VL dealing with one of my team's postop patients who has bleeding."

You were on A team at this time. The "technical error" you were speaking of resulted from your procrastination and being unable to provide the poster materials the Friday before to Cheshe as agreed. Your failure to plan created an unnecessary emergency that you tried to remedy by getting members of the support staff to do your work for you. This is not their job. Fortunately, Roxanne was able to pick up your poster and mount it for you so you could be represented at the QI competition. This is not a very professional way to deal with those who can help you but there needs to be responsibility and accountability for your actions – which was not evident in this event.

What is even more troubling is the matter of the patient you were caring for at VL. Your chief resident (Tignor) was not aware of any patient at that time. Your attending on call (Darling) was not aware of any patient. Your attendings on A team - (Watts and Coblens) were not aware of any patient.

So the question is – was there a patient that you cared for completely by yourself and did not involve your team, or was there any real patient at all?

Either way, this does not constitute professional and trustworthy behavior that is expected for any UTMB Otolaryngology resident – especially one who is about to be a senior resident in 5 weeks.

GIVEN ALL THESE EVENTS AND NO INDICATION THAT IMPROVEMENT WILL OCCUR ON ITS OWN - THE CCC TOGETHER WITH THE CHAIR OF THE DEPARTMENT HAVE ELECTED TO PLACE YOU ON IMMEDIATE REMEDIATION EFFECTIVE TODAY.

The Committee is concerned with your serious lack of professionalism and inability to be trusted. These two negative factors are not compatible with successfully completing a residency let alone being a practicing physician who can practice independently and without supervision.

While on remediation the following Accountable Deadlines MUST be met:

Accountable Deadlines
All members of the department are expected to complete professional records promptly. For many of the following there are institutional requirements (UTMB, ACGME, RRC, and GMEC) with institutional penalties. You are responsible for

knowing these deadlines and complying with them.  Additionally, we have the following explicit expectations:

> Duty hour logs are completed daily and delinquent at one week.
> Operative logs are completed daily and delinquent at one month.
> Clinic notes and inpatient notes are completed within 24 hours, and individual faculty may set stricter requirements.
> Operative notes are completed within 24 hours, and individual faculty may set stricter requirements.
> Discharge summaries are completed within 96 hours of discharge and individual faculty may set stricter requirements.
> During regular working hours AND when you are on call during nights and weekends, pages and phone calls are returned immediately and are tardy after 5 minutes.
> If you are in the operating room and are scrubbed, the pager should be given to the circulating nurse with instructions for pages to be answered in a timely fashion while you are scrubbed.
> UTMB email is checked at least every 24 hours, even when you are rotating at another hospital. This is essential for the accurate and timely completion of required accreditation documentation for the ACGME and the ABOto. Additional email etiquette includes acknowledgement of the message and an estimate of when any request can be realistically completed.
> Any communication from the medical records office about delinquent documentation must be acknowledged and the delinquency corrected within 24 hours.

Delinquency in meeting these deadlines can result in failure to meet expectations for professionalism in your semiannual evaluation.  If egregious or chronic, delinquency can result in remediation, including stricter deadlines and standards of compliance, or even probation.  Notices of delinquency are tallied monthly and discussed at the semiannual evaluation.

You MUST complete all administrative tasks on time as assigned by Faculty or Residency support staff.

100% OF YOUR NOTES MUST BE TIMELY AND ACCURATE.

In addition to these requirements, you will be required to send a daily email at the end of the clinical or operative day to your attending with a copy to the Program Director, indicating how many patients you have seen and the status of the documentation on those patients.

Your performance while on remediation will be reviewed on a monthly basis for a minimum of 1 month and a maximum of 6 months.

Violations of any of the terms of remediation will be grounds for immediate placement on probation.

ANY OTHER EVIDENCE OF FRAUDULENT MEDICAL DOCUMENTATION WILL BE MET WITH IMMEDIATE DISMISSAL FROM THE PROGRAM.

Your signature of this document will indicate your awareness of the severity of the issues and the conditions of your remediation.

Sincerely,

Wasyl Szeremeta, MD MBA
Otolaryngology Residency Program Director

I have read the above and agree with the terms stated.

Rosandra Walker, MD



**Department of Otolaryngology—Head and Neck Surgery**

**Residency Training Program**



## 2015-2016

# RESIDENT HANDBOOK

EXHIBIT A-3

OAG-0013497

**UTMB Otolaryngology—Head and Neck Surgery**

# Resident Handbook 2015-16

| I.   | Introduction                        | 1  |
|------|-------------------------------------|----|
| II.  | Educational Goals                   | 2  |
| III. | Curriculum                          | 10 |
|      | Otolaryngology Milestones Timeline  | 10 |
|      | General Principles                  | 36 |
|      | Specific Activities                 | 46 |
| IV.  | Clinical Rotations                  | 58 |
| V.   | Resources                           | 65 |
| VI.  | Policies                            | 70 |

OAG-0013498

- You must keep an up to date, complete, and accurate operative case log on the web site developed by the ACGME. These logs will be reviewed semi-annually with the program director. You are expected to log at least weekly.  The program director audits the logs monthly.

- Stay current with your medical records.

- Obtain and maintain appropriate licensure and credentials, including CPR certification, TB tests, and mandatory on-line training.

- Follow the policies and procedures outlined in this manual

- Keep the resident work rooms clean and tidy at all times.

- Achieve and demonstrate competencies in:

  ➢ Patient care

  ➢ Medical knowledge

  ➢ Practice-based learning and improvement

  ➢ Interpersonal and communication skills

  ➢ Professionalism

  ➢ Systems-based practice

**Accountable Deadlines**

All members of the department are expected to complete professional records promptly.  For many of the following there are institutional requirements (UTMB, ACGME, RRC, and GMEC) with institutional penalties.  You are responsible for knowing these deadlines and complying with them.  Additionally, we have the following explicit expectations:

  ➢ Duty hour logs are completed daily and delinquent at one week.
  ➢ Operative logs are completed daily and delinquent at one month.
  ➢ Clinic notes and inpatient notes are completed within 24 hours, and individual faculty may set stricter requirements.
  ➢ Operative notes are completed within 24 hours, and individual faculty may set stricter requirements.
  ➢ Discharge summaries are completed within 96 hours of discharge and individual faculty may set stricter requirements.
  ➢ During regular working hours AND when you are on call during nights and weekends, pages and phone calls are returned immediately and are tardy after 5 minutes.

71

OAG-0013568

To: Rosandra Walker, MD

From: Wasyl Szeremeta, MD MBA

RE: Initiation of Remediation

Date: May 30, 2018

Dear Dr. Walker:

This letter is being written to you to inform you that as of today you have officially been placed on remediation. Upon deliberation with members of the CCC and other faculty members, your severe lapses in professional behavior have created an environment where it is difficult for the faculty to trust you in the care of our patients here at UTMB.

This was not an easy decision to make, but given the events of the last several months, the Committee and I feel that we have no alternative but to begin a period of mandatory remediation.

Prior to your beginning your MD Anderson rotation last year – you had a meeting with me and Dr. Siddiqui to comment on your performance. At that time it had been noted that your performance was falling short of what we had expected for a PGY-3 level resident. Specifically, we discussed your failure to meet expectations in the areas of professionalism, documentation, completing tasks in timely fashion and prioritization of tasks. In your defense you claimed that there had been extenuating circumstances that led to your subpar performance. At the time there was consideration for placing you on remediation, but it was decided that you should be given the benefit of the doubt and we were hoping that a change of environment and our conversation would let you perform at a much higher level.

Since that meeting, there have been several areas that lead to our continued concern that you are not making the progress that should be made not only to advance in this residency, but also to be able to graduate and become an independent and competent practicing physician.

1. Completing tasks in a timely fashion.
   Several attendings on multiple rotations have noted how your productivity continues to lag behind your peer members. Furthermore, despite the fact that you see fewer patients, what continues to be more of a concern is that your documentation continues to be late and inaccurate.

   One attending wrote, "I want to give you some feedback on your clinic performance yesterday. You saw 6 out of the 24 patients. Of those 6 patients, only 1 had a completed note at

EXHIBIT B

the end of the day.  As you know, I have sent you emails to remind you to finish these notes. [the] average resident sees between 10-12 patients on a clinic day and is able to complete the notes by the end of day.  This is goal that you should aim for."

Another attending on a different service wrote, "I just closed all her clinic notes from yesterday. And wrote two of them from scratch because they were not done. I only had 19 patients on my schedule and still saw one or two on my own during the morning session so there was no reason for her not to finish her clinic notes."

A third attending noted, "She has great skill in developing a relationship with the patients and is often very thorough, however this is also to her determinant in terms of clinical efficiency. Her encounters with patients take 2-3 times longer than her peers and as a result she also sees 2-3 times less patients. By the end of the clinic day, most of her notes have not even been started and she inconsistently places orders.

In one specific case your failure to provide accurate and timely clinical documentation of an outpatient visit caused a 19-year old patient to have her surgery cancelled.  This provided hardship for the patient as she was trying to coordinate her care with her college schedule.  Eventually the surgery was performed almost one year later, but the quality of care suffered simply because documentation was not performed in a timely fashion.

2.  Prioritization of tasks
    While you have been an active participant in meetings and mission trips, you failed on multiple occasions to complete the work at hand.  In all that we do, patient care comes first, and the patient always comes first.  Failure of timely documentation puts that responsibility in question and risks error and patient harm.

    Examples of this include the following:
    "She left for a mission trip to Vietnam and requested to leave clinic prior to completing her notes because she wanted to get home to finish getting ready for her flight. She "promised" me that she would complete the notes that evening prior to her departure. The clinic was 3/14/18, by the end of clinic she had seen 9 patients throughout the day and completed only two notes. Upon my arrival to work the following day I expected to see the remainder of her notes completed and the encounters closed, however they were not. Given that she had already departed I completed one note myself and Dr. Foon contacted Dr. Walker who informed him that the notes would be completed as soon as she arrived to her hotel that evening. The notes were completed over the next two days with the final note being signed on 3/16/18 at 18:26. She never reached out to me, prior to her departure to inform me of her delinquency and to provide me with a plan for completion."

    Another examples of this lack of prioritization can be found in your recent research presentation at the SBAS.  Although your presentation garnered an award, your approach to the presentation came at a cost to your clinical and surgical experience and at a cost to your colleagues being able to share in the quality of the actual presentation that you made at the conference.

    Your research mentor was quite critical in your approach and professionalism as it related to presenting her research to your colleagues in the department.  She sent you the following email, "Needless to say I was very disappointed in your update. I think you waited to the last minute and threw something together

that was not coherent. I placed those materials on the s-drive for you on Monday at your request. If you had simply searched in your folder by even the last date modified you would have found the folder that said research update. In there were all the slides from my recent talk at MDACC which included all of your data, the pictures I took, as well as a foundation for what the lab studies."

You also asked to leave the operating room on Thursday to attend the conference, yet your presentation was not until 2 days later on Saturday, and you were not present at the conference on Friday as was noted by Dr. McCammon.

3. Documentation
This is the most serious area of concern. Your inability to document on charts in a timely fashion creates a situation where you make significant errors. Some of these errors appear to be simple acts of omission yet others appear to be deliberate fabrications.

An example of a simple act of omission is demonstrated in the following attending's comment, "Toward the end of the clinic she was getting "on-call" pages and needed to return to Galveston to address some consults. She left clinic without finishing her notes and she completed them within 48 hours, however some were incomplete, including documentation and coding for NPL examinations. "

A much more serious documentation inaccuracy concerns your TDC charts from June 27, 2017.

In a recent review of departmental documentation a review of TDC charts revealed 5 of your notes that were incomplete from June 27, 2017. A letter from Dr. Underbrink to you stated the following:
There are 5 open encounters from 6/27/2017 that you were/are responsible for documentation and closing out your notes. Please review the attached document, address this issue, and complete it possible so that we can close out those encounters.

Your response to Dr. Underbrink stated the following:

Hello,

Thank you for the update. All of the aforementioned encounters are closed now. 4 of the 5 encounters were TDC patients that "Left without being seen" and were supposed to be removed from the schedule.

Thanks!

R. Walker, MD

A review of these encounters actually revealed that the patients did not leave without being seen and, in fact, you subsequently created notes and "documentation." A review of these notes indicate a high suspicion of a falsification of medical records as the information written in your notes with the concomitant detail would be very hard to believe. There was a note in which you indicated a procedure being performed but not billed for. The note was copied from a previous note by Dr Tignor, which had a procedure. The age of your patient in your note had not changed – indicating likely that you copied the note without making any substantial edits. One of these patients was a cancer follow up patient and you copied a note from Dr. Son who had seen the patient 2 years earlier. According to your note, there was no change in his condition nor in his age.

All these notes also had bills attached to them as well.

Falsification of a medical record for whatever reason cannot be tolerated and is potentially a criminal offense. Physicians have not only been terminated for such an infraction but also have the potential for losing their medical license as well as being criminally charged and prosecuted resulting in fines and/or imprisonment.

I cannot be more clear how important a timely and accurate and honest medical record is. There can be no deviation from this – and any deviation will not be tolerated.

4. Trustworthiness
   The care of another human being places the physician in an incredible position of needing to demonstrate unquestionable trust and reliability. This trust and reliability are developed and cultivated not only throughout our training as residents, but continues into our professional career. It takes a lifetime to build complete trust and only seconds to destroy that same trust. The example of the poor records from June 27, 2017 shows how the lack of timely documentation can create a situation where it is not possible to trust the documentation that is actually written. Furthermore, it is more worrisome that you initially wrote that the patients left without being seen and then 24-48 hours later, "documentation" appeared.
   Therefore, you were either not truthful in reporting that the patients left without being seen, or not accurate in your documentation on patients that had been seen almost one year ago.

Another troublesome event occurred on May 2, 2018. This was the day of the QI competition. You had texted me that you would not be at Grand Rounds because of "technical issues regarding your poster."

In fact your text to me at 7:05 said the following" Due to technical error at UPS on island, I had to send my QI poster to 24 spot in Houston, so I will miss didactics today as I pick it up before clinic. I am currently at VL dealing with one of my team's postop patients who has bleeding."

You were on A team at this time. The "technical error" you were speaking of resulted from your procrastination and being unable to provide the poster materials the Friday before to Cheshe as agreed. Your failure to plan created an unnecessary emergency that you tried to remedy by getting members of the support staff to do your work for you. This is not their job. Fortunately, Roxanne was able to pick up your poster and mount it for you so you could be represented at the QI competition. This is not a very professional way to deal with those who can help you but there needs to be responsibility and accountability for your actions – which was not evident in this event.

What is even more troubling is the matter of the patient you were caring for at VL. Your chief resident (Tignor) was not aware of any patient at that time. Your attending on call (Darling) was not aware of any patient. Your attendings on A team - (Watts and Coblens) were not aware of any patient.

So the question is – was there a patient that you cared for completely by yourself and did not involve your team, or was there any real patient at all?

Either way, this does not constitute professional and trustworthy behavior that is expected for any UTMB Otolaryngology resident – especially one who is about to be a senior resident in 5 weeks.

GIVEN ALL THESE EVENTS AND NO INDICATION THAT IMPROVEMENT WILL OCCUR ON ITS OWN - THE CCC TOGETHER WITH THE CHAIR OF THE DEPARTMENT HAVE ELECTED TO PLACE YOU ON IMMEDIATE REMEDIATION EFFECTIVE TODAY.

The Committee is concerned with your serious lack of professionalism and inability to be trusted. These two negative factors are not compatible with successfully completing a residency let alone being a practicing physician who can practice independently and without supervision.

While on remediation the following Accountable Deadlines MUST be met:

Accountable Deadlines
All members of the department are expected to complete professional records promptly. For many of the following there are institutional requirements (UTMB, ACGME, RRC, and GMEC) with institutional penalties. You are responsible for

knowing these deadlines and complying with them. Additionally, we have the following explicit expectations:

- ➢ Duty hour logs are completed daily and delinquent at one week.
- ➢ Operative logs are completed daily and delinquent at one month.
- ➢ Clinic notes and inpatient notes are completed within 24 hours, and individual faculty may set stricter requirements.
- ➢ Operative notes are completed within 24 hours, and individual faculty may set stricter requirements.
- ➢ Discharge summaries are completed within 96 hours of discharge and individual faculty may set stricter requirements.
- ➢ During regular working hours AND when you are on call during nights and weekends, pages and phone calls are returned immediately and are tardy after 5 minutes.
- ➢ If you are in the operating room and are scrubbed, the pager should be given to the circulating nurse with instructions for pages to be answered in a timely fashion while you are scrubbed.
- ➢ UTMB email is checked at least every 24 hours, even when you are rotating at another hospital. This is essential for the accurate and timely completion of required accreditation documentation for the ACGME and the ABOto. Additional email etiquette includes acknowledgement of the message and an estimate of when any request can be realistically completed.
- ➢ Any communication from the medical records office about delinquent documentation must be acknowledged and the delinquency corrected within 24 hours.

Delinquency in meeting these deadlines can result in failure to meet expectations for professionalism in your semiannual evaluation. If egregious or chronic, delinquency can result in remediation, including stricter deadlines and standards of compliance, or even probation. Notices of delinquency are tallied monthly and discussed at the semiannual evaluation.

You MUST complete all administrative tasks on time as assigned by Faculty or Residency support staff.

100% OF YOUR NOTES MUST BE TIMELY AND ACCURATE.

In addition to these requirements, you will be required to send a daily email at the end of the clinical or operative day to your attending with a copy to the Program Director, indicating how many patients you have seen and the status of the documentation on those patients.

Your performance while on remediation will be reviewed on a monthly basis for a minimum of 1 month and a maximum of 6 months.

Violations of any of the terms of remediation will be grounds for immediate placement on probation.

ANY OTHER EVIDENCE OF FRAUDULENT MEDICAL DOCUMENTATION WILL BE MET WITH IMMEDIATE DISMISSAL FROM THE PROGRAM.

Your signature of this document will indicate your awareness of the severity of the issues and the conditions of your remediation.

Sincerely,

Wasyl Szeremeta, MD MBA
Otolaryngology Residency Program Director

I have read the above and agree with the terms stated.


Rosandra Walker, MD

OAG-0000339

IN THE UNITED STATES DISTRICT COURT
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DR. ROSANDRA DAYWALKER<br>     *Plaintiff,*<br><br>v.<br><br>UNIVERSITY OF TEXAS MEDICAL<br>BRANCH AT GALVESTON, AND DR.<br>BEN G. RAIMER, IN HIS OFFICIAL<br>CAPACITY<br>     *Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 3:20-CV-00099 |

## DECLARATION OF DR. THOMAS A. BLACKWELL

1. My name is Thomas A. Blackwell, M.D., FACP. I have personal knowledge of the matters contained in this Declaration and am fully competent to make this Declaration.

2. I am currently employed as the Associate Dean for Graduate Medical Education ("GME") and Professor of Medicine at the University of Texas Medical Branch at Galveston ("UTMB"). I have held each of these positions for greater than fifteen (15) years.

3. My duties as Associate Dean for GME include administrative oversight over 50 plus residency programs and approximately 590 residents/fellows in training. This includes participating in actions regarding medical residents' progress, including decisions to place residents on remediation. A true and correct copy of excerpts from UTMB's GME policies are attached hereto as Exhibit C-1.

4. I reviewed and approved the decision to place Dr. Daywalker on remediation and keep her as a post graduate year ("PGY")-3for academic purposes in 2018. As Associate Dean for GME, I reviewed the CCC and faculty decisions and agreed with the actions based on my review of the Department's process and the information contained in letters, marked Exhibit A and B—which in my professional judgment warranted remediation and continuing Dr. Daywalker as a PGY-3 for academic purposes.

EXHIBIT C

5. Dr. Daywalker was never demoted while at UTMB. Instead, she simply remained a PGY-3 for academic purposes while on remediation. A medical resident's post graduate year can refer to two separate things: (1) their employment year and (2) their academic year. All residents at UTMB—regardless of academic progress—receive an annual contract that reflects the number of years the resident has been employed by the University. In situations where a resident is held back for academic purposes, their PGY years for employment and academic purposes will differ. This happened with Dr. Daywalker in 2018, where she was paid as a PGY-4 (with the same salary as other fourth year resident employees in the Department) when she entered her fourth year of employment but remained a PGY-3 for academic purposes.

6. The decisions to place Dr. Daywalker on remediation and continue her as a PGY-3 for academic purposes did not impact her pay. Likewise, the decision did not foreclose the possibility that she could have progressed to a PGY-4 academically that year. Indeed, had Dr. Daywalker stayed in the program and successfully completed her remediation, she would have been progressed to a PGY-4 academically.

7. All of my decisions related to Dr. Daywalker were made for legitimate reasons and were not motivated or caused by race discrimination or retaliation for Dr. Daywalker's complaints of discrimination, medical leave, or accommodation requests.

8. I am not aware of any other resident in the Department of Otolaryngology during this timeframe that had nearly identical competency and academic issues as Dr. Daywalker.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on *1* of October 2021

DECLARANT



# Graduate Medical Education

# Institutional Handbook

# 2017-2018

EXHIBIT C-1

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

# TABLE OF CONTENTS

**Content**                                                                                          **Page**

I.      **About This Institutional Handbook**                                                          **5**

II.     **About Residency/Fellowship**                                                                 **5**
-     Mission Statement                                                                          5
-     UTMB Sponsored Residency/Fellowship Programs                                               5
-     Major Participating Sites                                                                  6

III.    **Institutional Statement of Commitment to GME**                                               **7**

IV.     **UTMB Graduate Medical Education Organization**                                               **7**

V.      **Institutional Program Letters of Agreement**                                                 **8**

VI.     **Contacts:  Office of Associate Dean for Graduate Medical Education**                         **9**

VII.    **Appointment to UTMB Residency/Fellowship Programs**                                          **9**
-     Eligibility for Appointment                                                                9
-     Appointment/Reappointment                                                                  9
-     Resident/Fellow Orientation                                                                10
-     Resident/Fellow Workshops                                                                  11
-     Employment Certification                                                                   12
-     Veterans Administration Education Benefits                                                  12
-     Texas Medical Board Permits                                                                12
-     Licensure                                                                                  13
-     Licensure Exam Requirements                                                                13
-     Institutional DEA Number                                                                   13
-     DEA Number                                                                                 14
-     National Provider Identification                                                           14
-     Leaves of Absence                                                                          14
-     Moonlighting                                                                               14
-     Health Information Management                                                              15
-     Disaster Plan                                                                              15
-     Resident/Fellow Directory                                                                  16
-     International Medical Graduates                                                            16
-     Shriners Hospitals for Children                                                            16
-     Off-Campus Electives                                                                       16
-     Harassment Policy                                                                          17
-     Physician Impairment/Substance Abuse                                                       17
-     Residency Closure/Resident/Fellow Complement Reduction                                     17
-     Vendor Interactions                                                                        17
-     American Board of Medical Specialties                                                      17
-     Guidelines for Appropriate Use of Internet, Electronic Networking, Media                   17
-     AMA Principles of Medical Ethics                                                           18
-     National Practitioner Data Bank                                                            18
-     Communicable Disease Control                                                               18
-     Life Support Education for Healthcare Providers (CPR)                                       18

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME
Institutional Handbook 2017 - 2018.docx

| | | |
|---|---|---|
| **VIII.** | **Salary and Fringe Benefits; Vacation and Leave** | **19** |
| - | Salaries and Payroll Policies | 19 |
| - | Fringe Benefits-General | 19 |
| - | Health and Dental Insurance | 19 |
| - | Worker's Compensation | 20 |
| - | Counseling, Psychological, and Other Support Services | 20 |
| - | Retirement Benefits | 21 |
| - | Professional Liability Insurance | 21 |
| - | Vacation –Terminal Leave | 21 |
| - | Sick Leave | 21 |
| - | Maternity/Paternity Leave | 22 |
| - | Family and Medical Leave Act | 22 |
| - | Education Leaves | 22 |
| **IX.** | **Institutional Services** | **23** |
| - | Employee Identification Badge | 23 |
| - | Uniforms and Laundry Service | 23 |
| - | Access to Food Services-Meal Stipend | 23 |
| - | Field House Membership | 24 |
| - | Parking | 24 |
| - | Housing | 24 |
| **X.** | **Due Process; Grievance Policies** | **24** |
| - | General Principles | 24 |
| - | Appointment of Resident/Fellow | 25 |
| - | Training Program Oversight | 25 |
| - | Resident/Fellow Evaluation | 25 |
| - | Clinical Competency Committee (CCC) | 26 |
| - | Unsatisfactory Performance | 26 |
| - | Probation | 27 |
| - | Appeal Rights and Procedures for Termination | 27 |
| - | Grievance Procedure for Corrective Actions Other Than Termination | 28 |
| - | Non-Reappointment | 28 |
| **XI.** | **Residency/Fellowship Responsibilities** | **29** |
| **XII.** | **Transitions of Care and Hand-Offs** | **30** |
| **XIII.** | **Academic Records** | **31** |
| **XIV.** | **Supervision, Duty Hours, Alertness Management/Fatigue Mitigation** | **31** |
| **XV.** | **Email Access** | **32** |
| **XVI.** | **Institutional Resident/Fellow Association** | **32** |
| **XVII.** | **Outstanding Resident/Fellow Awards** | **32** |

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME
Institutional Handbook 2017 - 2018.docx

**XVIII.Other Important Policies and Procedures**                                          **33**

    -  Other Important UTMB Institutional Policies                               33
    -  Quality Improvement Education for Healthcare Providers Policy      33
    -  Resident/Fellow as Teacher                                          33

**ANNEXES**
    **Annex A**        **Resident/Fellow ACGME Competency**                            **35**
    **Annex B**        **UTMB GME Institutional Statement**                            **37**
    **Annex C**        **UTMB GMEC Policy and Procedures**                             **44**
    **Annex D**        **UTMB GMEC Special Review Process**                            **50**
    **Annex E**        **UTMB Policy on Passage of USMLE**                             **54**
    **Annex F**        **Guidelines for Appropriate Use of the Internet, Electronic**  **56**
                      **Networking and Other Media**
    **Annex G**        **UTMB Leave Categories for Resident/Fellow**                   **59**
    **Annex H**        **UTMB Resident/Fellow Base Salaries**                          **61**
    **Annex I**        **ACGME Resident/Fellow Duty Hours and the Working Environment** **62**
    **Annex J**        **Bylaws of the UTMB House Officers Association**                **68**
    **Annex K**        **Institutional Procedure Drug Screening for Probably Cause**    **71**
    **Annex L**        **Institutional Procedure for Post Rehabilitation Program**      **72**

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME
Institutional Handbook 2017 - 2018.docx

4

I. **ABOUT THIS INSTITUTIONAL HANDBOOK**

   A. This handbook is compiled by The University of Texas Medical Branch at Galveston (UTMB) and its Graduate Medical Education Committee (GMEC) as a guide and resource for all Residents/Fellows, Program Directors, Program Coordinators, and Clinical Chairs/Division Chiefs of UTMB.  UTMB is committed to offering residency and fellowship programs as a part of its educational mission, and to ensure that its various residency and fellowship programs comply with the Institutional and Common Program Requirements for Residency Training as promulgated by the Accreditation Council for Graduate Medical Education (ACGME).   The Handbook outlines what a Resident/Fellow needs to know about Graduate Medical Education including the ACGME six general competencies (ANNEX A, page 35), Resident development, duty hours, and the notification of any adverse accreditation action related to their specific residency and fellowship programs.

   B. These policies and procedures pertain to training requirements in all Residency/Fellowship programs.  They are not intended to replace non-training related policies and procedures of individual participating sites and clinical departments.  If areas of conflict develop, such conflicts will be evaluated by the GMEC for resolution.  In addition, the individual Residency/Fellowship programs have specific program requirements, policies, and procedures.

   C. This Handbook will be updated as necessary with the latest version posted on the UTMB GME website http://www.utmb.edu/gme/default.htm.  When additions, changes or revisions are made to this Handbook, notice will be sent to the Program Director (PD), Program Coordinator (PC), and Residents/Fellows.  Updated policies will become effective upon posting.  Residents/Fellows are expected to be familiar with and comply with all policies set forth in this Handbook and the UTMB Institutional Handbook of Operating Procedures (IHOP).  The Graduate Medical Education Committee approves all revisions to the Handbook.

II. **ABOUT RESIDENCY/FELLOWSHIP**

   A. UTMB's mission is to develop medical professionals who are competent, compassionate, team-focused and committed to life-long learning. UTMB is committed to providing excellent graduate medical education for future generations of doctors.

   B. UTMB sponsors the following Residency/Fellowship programs that are accredited by the Accreditation Council for Graduate Medical Education (except as otherwise noted):

> Allergy/Immunology
> Anesthesiology
> Anesthesiology - Adult Cardiothoracic
> Anesthesiology - Clinical (TMB Approved)
> Anesthesiology - Critical Care Medicine
> Anesthesiology - Obstetrics (TMB Approved)
> Anesthesiology - Pain Medicine
> Dermatology
> Dermatology - Dermatopathology
> Dermatology - Micrographic Surgery and Dermatologic Oncology
> Family Medicine
> Family Medicine - Integrated & Behavioral Medicine

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

5

Internal Medicine
Internal Medicine - Advanced Heart Failure (TMB approved)
Internal Medicine - Cardiology
Internal Medicine - Cardiology/Interventional
Internal Medicine - Endocrinology
Internal Medicine - Gastroenterology
Internal Medicine - Geriatrics
Internal Medicine - Infectious Diseases
Internal Medicine - Nephrology
Internal Medicine - Oncology
Internal Medicine - Pulmonary/Critical Care
Internal Medicine - Rheumatology
Internal Medicine - Preventive Medicine/General
Internal Medicine - Preventive Medicine/Aerospace
Neurology
Neurology - Clinical Neurophysiology
Obstetrics and Gynecology
Obstetrics and Gynecology - Maternal Fetal Medicine (ABOG approved)
Ophthalmology - UTMB/Methodist
Orthopaedic Surgery
Orthopaedic Surgery - Foot & Ankle
Otolaryngology
Pathology
Pathology - Cytopathology
Pathology - Forensic
Pathology - Surgical
Pediatrics
Pediatrics - Neonatal/Perinatal
Preventive Medicine/Aerospace
Preventive Medicine/General
Psychiatry
Psychiatry - Child & Adolescent
Radiation Oncology
Radiology - Breast Imaging (TMB Approved)
Radiology - Diagnostic
Radiology - Neuro
Radiology - Vascular/Interventional
Surgery - Burn Research and Clinical Fellowship (TMB Approved)
Surgery - Critical Care
Surgery - General
Surgery - Neuro
Surgery - Oral (ADA approved)
Surgery - Plastic Surgery/Integrated
Surgery - Plastic Surgery/Craniofacial
Surgery - Urology
Surgery - Vascular/Integrated

C.   Other Major Participating sites for UTMB residency and Fellowship programs include:

DaVita Healthcare Partners, Inc.
Mainland Medical Center, Texas City, Texas
NASA Johnson Space Center, Webster, Texas

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

6

Orlando Veterans Affairs Medical Center – Orlando, Florida
Shriner's Burns Hospital – Galveston, Texas
St. Joseph Medical Center – Houston, Texas
St. Luke's Medical Center – Houston, Texas
Sun Behavioral Houston – Houston, Texas
Texas Children's Hospital - Houston, Texas
Houston Methodist Hospital – Houston, Texas
M.D. Anderson Cancer Center – Houston, Texas
Wyle Integrated Science and Engineering – Houston, Texas

### III.    INSTITUTIONAL STATEMENT OF COMMITMENT TO GME

As a sponsoring institution for graduate medical education, UTMB is committed to supporting graduate medical education, and to provide the necessary educational, financial, and human resources to ensure compliance with prevailing training and educational standards.  UTMB will provide continued support towards quality graduate medical training, in an environment that is conducive, encouraging and safe, while remaining committed to providing quality care for our patients.  The UTMB Institutional Statement of Commitment to GME is found in Annex B (page 37).

### IV.    UTMB GRADUATE MEDICAL EDUCATION ORGANIZATION



APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME  WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME
Institutional Handbook 2017 - 2018.docx



### V.   INSTITUTIONAL PROGRAM LETTERS OF AGREEMENT

A.   To ensure quality and consistency of graduate medical education for UTMB Residents/Fellows provided at all participating sites, all UTMB Resident/Fellowship programs sign Program Letters of Agreement (PLA) outlining the responsibilities of the Sponsoring Institution UTMB and of the participating site toward ensuring the quality of graduate medical education for UTMB Residents/Fellows at that site. The program agreements must be fully signed before the rotations begin.

The GMEC External Training Site Subcommittee must approve all rotations at participating sites.  The DIO reviews all program letters of agreement when a participating site is added.  The GME Office ensures that all PLA's for new participating sites contain the four key components as outlined in the ACGME Institutional Requirements:

1.   Identify faculty who will assume both educational and supervisory responsibilities for Residents/Fellows.
2.   Specify faculty's responsibilities for teaching, supervision, and formal evaluation of Residents/Fellows, as specified later in this document.
3.   Specify the duration and content of the educational experience; and,
4.   State the policies and procedures that will govern Resident/Fellow education during the assignment.

B.   Each of these agreements are signed by the Program Director, DIO, Site Director (SD) and his/her DIO/Chair of Medical Staff or his/her designee for the participating site in order to ensure that both parties agree to the content.  The Program Director must submit any additions or deletions related to the required terms of the agreement for approval of participating sites for all Residents/Fellows of one month full-time equivalent (FTE) or more through the ACGME Accreditation Data System (ADS).

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

**VI.      CONTACTS: OFFICE OF ASSOCIATE DEAN FOR GRADUATE MEDICAL EDUCATION**

The ADGME Office is located at Room 5.138, Rebecca Sealy Hospital, Campus Route 0175.

| Full Name | Title | Email | Campus Phone # |
|---|---|---|---|
| Thomas A. Blackwell, MD | Designated Institutional Official and Associate Dean for GME | tblackwe@utmb.edu | 22652 |
| Christopher Thomas, MD | Assistant Dean for GME | crthomas@utmb.edu | 25284 |
| Virginia Simmons | Administrative Director for GME | vsimmons@utmb.edu | 25284 |
| Kimberly Pandanell | Institutional Program Manager, GME | kpandane@utmb.edu | 24196 |
| Colleen Capoy | Institutional Coordinator, GME | lccapoy@utmb.edu | 20798 |
| Frances Leonard | Institutional Coordinator, GME | fkleonar@utmb.edu | 20764 |
| Amanda Ripple | Institutional Coordinator, GME | adripple@utmb.edu | 25285 |
| LaVerne Douglas | Senior Administrative Secretary | lgdougla@utmb.edu | 22652 |
| Rani Hayes | Administrative Secretary | rchayes@utmb.edu | 25284 |

**VII.     APPOINTMENT TO UTMB RESIDENCY/FELLOWSHIP PROGRAMS**

A.      **ELIGIBILITY FOR APPOINTMENT**
All programs sponsored by UTMB:

1. Will select Residents/Fellows from eligible applicants on the basis of preparedness, ability, aptitude, academic credentials, communication skills and personal qualities such as motivation and integrity.

2. Will not discriminate with regards to sex, race, age, religion, ancestry, color, national origin, disability or any other applicable legally protected status.

B.      **APPOINTMENT/REAPPOINTMENT**

Resident/Fellow appointments are assigned at a postgraduate year (PGY) level commensurate with the Accreditation Council for Graduate Medical Education (ACGME) and American Board of Medical Specialties (ABMS) guidelines.  Resident/Fellow appointments are recommended by the Program Director and are subject to review and acceptance by the Associate Dean for Graduate Medical Education.  All appointments are one year in length and are renewable annually on the recommendation of the Program Director and with the concurrence of the Associate Dean for Graduate Medical Education.  Failure to be reappointed may be grieved by the Resident/Fellow as per Section X (page 24) of this document.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

9

Criminal Background Check

Level II - Criminal history record information must be obtained on applicants who are under final consideration, following normal screening and selection processes. This criminal history includes, but is not limited to, sex offender registry, terrorist watch lists and State and Federal Office of Inspector General (OIG) sanctions checks.

Pre-Employment Drug Testing

Any person who applies for employment with UTMB including without salary employees (WOS) must comply with UTMB's drug testing policy. Drug tests are not required for volunteers.  Residents and Fellows must have drug testing completed prior to employment.

Americans with Disabilities Act Policy

UTMB provides equal employment opportunities, with reasonable accommodations when appropriate, to qualified applicants and employees with disabilities. UTMB also provides to employees, students, and members of the general public who have disabilities equal access, with reasonable accommodations when appropriate, to the services, programs, and activities of UTMB. Residents/Fellows who have disabilities requiring reasonable accommodations should notify the GME Office.  This allows the GME Office to make appropriate arrangements for orientation and employment. UTMB, in compliance with applicable federal laws and regulations, strives to maintain an environment free from discrimination against individuals on the basis of race, color, national origin, sex, age, religion, disability, sexual orientation, genetic information, or veteran status. The UTMB Policy for Americans with Disabilities Act Policy can be found at http://www.utmb.edu/policies_and_procedures/IHOP/Employee/Regulatory_Compliance/IHOP%20-%2003.02.02%20-20Americans%20with%20Disabilities%20Act%20Policy.pdf.

The Essential Functions for GME programs are outlined on the GME web site at http://www.utmb.edu/gme/PDF/EssentialFunctions100907.pdf and include Observation/Sensory Modalities, Communication, Psychomotor Skills, Intellectual and Cognitive Abilities, and Professional Behavioral and Social Attributes.

C.      **RESIDENT/FELLOW ORIENTATION**

The UTMB Graduate Medical Education Office holds an orientation program for all Residents/Fellows newly appointed to UTMB's Residency/Fellowship programs regardless of the training level to which they are appointed.  Attendance is mandatory. New Residents/Fellows begin approximately a week early and are paid for those days as regular workdays.  The intent of the orientation is to provide:

1. General and specific information about the institution which will facilitate the new Resident/Fellow's entry into UTMB's residency programs.
2. Allow completion of required Human Resources processing as a new employee.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

10

3. Provide training for the electronic medical record system.
4. Comply with Employee health requirements including immunization and TB testing
5. Allow an opportunity for the new Resident/Fellow to meet each other socially.
The UTMB Graduate Medical Education Office provides specific details about the orientation to new Resident/Fellow before their arrival.

D.    **RESIDENT/FELLOW WORKSHOPS**

All new Residents/Fellows are required to attend annual Resident/Fellow workshops.

Risk Management - The Risk Management Workshop is required for all new Residents/Fellows to UTMB and completing Residents/Fellows. The workshop focuses on medico/legal aspects of practicing medicine including laws and institutional policies related to risk prevention.   Faculty supervision, drug prescribing, sexual misconduct guidelines and communication skills are emphasized within this workshop.  Attorneys from UTMB and the UT System Office of General Counsel review the UT System's Medical Liability Benefit Plan and National Practitioner Data Bank.  Local private attorneys present an advanced legal didactic for the Residents/Fellows. .  All physicians and dentists (Faculty, Fellows, and Residents) covered by the UT System Professional Medical Liability Benefit Plan (Plan) are required to complete five (5) hours of Risk Management Education (RME) each year as a condition of coverage.  To meet this requirement, physicians may take online courses provided by UT systems or faculty physicians may participate in other risk management events and activities. Department coordinators provide information about these additional activities as well as other institution-specific requirements.  About the online course:

1.   Education in Legal Medicine (ELM) Exchange, Inc. is the vendor selected by UT System to offer this course.
2.   ELM's editorial board members are primarily physicians who are also attorneys.
3.   Courses use actual cases to teach physicians to identify and manage medical-legal risk.
4.   Each course is worth 1.75 hours credit.
5.   New users must complete a specialty-specific Standard of Care unit worth 1 hour. Any excess credit earned will not roll over into the New Year.
6.   Once the specialty-specific Standard of Care course has been taken, physicians may select   courses from the menu offered in subsequent years.
7.   Credits earned through the online courses qualify for continuing medical education (CME) credit.

Medical Economics, Ethics and Professionalism

The Medical Economics Workshops is required for all new Residents/Fellows. The workshop provides training to Resident/Fellow physicians regarding managed care systems to enhance quality, accessible, and efficient health care.  Upon completion of the program, the Resident/Fellow should be able to identify and understand managed care concepts, understand how managed care impacts clinical practice at UTMB, understand the financial impact of clinical decisions as related to managed care companies, understand the managed care system in order to secure Resident/Fellow's own health care and assist patients with their health coverage.  The presentations include an ethics didactic and socioeconomic discussion.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

11

Improving Communications through Empathy

This workshop is done in small groups throughout the course of the year. Each trainee is required to attend one workshop per year, total of three workshops throughout duration of training.  Pathology, Radiology, and Fellowships are excluded from these workshops

E.   **EMPLOYMENT CERTIFICATION**

Residents/Fellows applying for mortgage loans, student loan deferments, etc., may instruct the lender to direct requests for information or certification to the UTMB Graduate Medical Education Office, Room 5.138, Rebecca Sealy Hospital, campus route 0175.

F.   **VETERANS ADMINISTRATION EDUCATION BENEFITS**

UTMB is fully approved by the Texas Education Agency to provide education and training to eligible physicians.  If Residents/Fellows are veteran's currently enrolled or anticipating enrollment in any of the graduate medical education programs offered by UTMB and are eligible to receive veteran's benefits, he/she may contact the UTMB Graduate Medical Education Office for assistance needed in the application process.

G.   **TEXAS MEDICAL BOARD (TMB) PERMITS**

The Texas Medical Board (TMB) requires an individually held Physician-in-Training Permit (PIT).  Information about this permit is sent to all applicants of GME programs.  All Residents/Fellows at UTMB are required to have an appropriate TMB issued PIT Permit or a permanent Texas medical license as a condition of appointment by the first day of employment.  If the training permit is not received within 30 days of the initial Work Agreement date, the program director may void the Work Agreement.

To expedite the PIT Permit and to ensure that all Residents/Fellows hold a valid permit, UTMB requests that all information pertaining to the permits be sent to the UTMB Associate Dean for Graduate Medical Education Office, the liaison with the Texas Medical Board on all Resident/Fellow matters. The Resident/Fellow's signature on the Texas Medical Board Credentialing waiver gives his/her approval for GME to communicate with the Texas Medical Board on the Resident/Fellow's behalf.

**PIT Reports**

UTMB Program Directors and Residents/Fellows may be asked to submit information regarding any adverse action taken against a Resident/Fellow, such as academic probation or arrests, in order to keep the TMB informed on a permit holder's progress while in the approved training program.  The Office of the Associate Dean for Graduate Medical Education will support the Residents/Fellows and Program Directors in providing the required information on forms provided by the TMB.  The required information shall include:

1.   Information regarding the permit holder's criminal and disciplinary history, professional character, mailing address, and place where engaged in training since the Program Director's last report;
2.   Certification of the permit holder's training;

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

12

3. Such other information or documentation the TMB and/or the Executive Director deem necessary to ensure compliance with Chapter 171 of the TMB Rules, all other TMB Rules, and the Texas Medical Practice Act (TEX. OCC. CODE §161, *et seq.* (Vernon 2006)).

The permits are valid in Texas training programs only.  If a Resident/Fellow does an elective rotation outside of Texas, they must obtain a permit to practice medicine from the appropriate state medical board.  Additional information can be obtained from Resident/Fellow's Program Coordinator.

It is imperative for the Resident/Fellow to be aware of the proper procedures and entities to contact when they are named in a claim or lawsuit and are completing an application for a license or permit.  The TMB verifies every PIT Permit and license renewal for the correctness of these verifications of coverage with UT System insurance carriers. Erroneously answering this question is viewed as fraud by the TMB and results in severe difficulties in obtaining a permit to practice medicine.

H.   **LICENSURE**

All eligible Residents/Fellows are encouraged to obtain valid medical licensure from the Texas Medical Board.  It is the personal financial responsibility of the Resident/Fellow to obtain or renew his/her medical license.  The UTMB Graduate Medical Education Office must be notified immediately upon medical licensure/re-licensure in Texas and a copy of the license must be   given to the GME office.

I.   **LICENSURE EXAM REQUIREMENTS**

To ensure that the Resident/Fellow completes the three steps of exams required for licensure, the UTMB Graduate Medical Education Committee adopted a policy regarding timelines to pass the three USMLE steps (ANNEX E, page 54).  It is beneficial to complete the exams within the first two years of residency because the exams cover multiple disciplines.  It ensures that the Resident/Fellow meets the exam requirements of USMLE before completion of training regardless if remaining in Texas or practicing medicine in other states.

J.   **INSTITUTIONAL DEA NUMBERS**

Residents/Fellows covered under a PIT permit will be assigned an Institutional DEA Number.  This is a five-digit suffix number to be used in conjunction with the DEA institutional number at UTMB.  This number will be assigned through the Outpatient Pharmacy and will provide the Resident/Fellow's prescription writing privileges in the UTMB Hospitals and Clinics. The contact number for Outpatient Pharmacy regarding the Institutional DEA numbers is (409) 772-1175.

IMPORTANT NOTE:  Prescription order forms should show in addition to a legal signature:
1. Prescribing physician's name printed in full and legally;
2. DEA number for controlled drugs; and
3. Patient's name and address.

Do this for your patients.  Many pharmacists will not fill prescriptions if this information is missing.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

K.      **DEA/DPS NUMBERS**

Since the UTMB Institutional DEA number cannot be used once medical licensure is obtained, all eligible Residents/Fellows are responsible for obtaining their individual Texas Department of Public Safety (DPS) number and Federal Drug Enforcement Agency (DEA) number once licensed in Texas.  There are no fees for these numbers because Residents/Fellows are state employees.  The UTMB Graduate Medical Education Office should be provided copies of these documents when obtained.

L.      **NATIONAL PROVIDER IDENTIFICATION**

All Residents/Fellows must update their National Provider Identification (NPI) address within 15 days of employment. Failure to update the NPI address within 15 days of employment will result in removal of clinical duties.

M.      **LEAVES OF ABSENCE**

The Program Director must notify the UTMB Graduate Medical Education Office of leaves of absence and conditions relative thereto.  The Resident/Fellow should be aware that completion of residency training and eligibility for Board specialty certification depend on the completion of certain "time in training" requirements specific to the medical specialty.  Extended absences from the program may require additional time and training.  This can be best clarified by discussion with the Program Director and the Associate Dean.

N.      **MOONLIGHTING**

Professional and patient care activities that are external to the educational program are called moonlighting.  Moonlighting activities, whether internal or external, may be inconsistent with sufficient time for rest and restoration to promote the Resident/Fellow's educational experience and safe patient care.  Therefore, UTMB and its program directors must closely monitor all moonlighting activities.  This includes moonlighting within UTMB.  When Residents/Fellows "moonlight," it should be with the knowledge that:

1.   Residents/Fellows are not required to moonlight.
2.   PGY-1 Residents are not permitted to moonlight.
3.   Moonlighting must not interfere with the ability of the Resident/Fellow to achieve the goals/objectives of the educational program.
4.   Time spent by Residents/Fellows in internal and external moonlighting must be counted towards the 80-hour maximum weekly hour limit.
5.   Independent licensure by the State of Texas is mandatory for practice of medicine outside of the approved program.   The Texas Medical Board rules state that a PIT permit holder is restricted to the supervised practice of medicine that is part of and approved by the training program. The permit does not allow for the practice of medicine that is outside of the approved program. Internal moonlighting shall be considered additional optional training within the scope of a training program, provided the internal moonlighting:
     (i) occurs under the direction of a faculty member that is associated with the training program;
     (ii) is in compliance with the training requirements established by an approved accrediting body, including but not limited to requirements for faculty supervision

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

14

and work hour limitations; and (iii) is in the same specialty as the training program or approved by the program director as a training area related to the specialty.

6. Within UTMB, the department to which the Resident/Fellow is assigned will assure that appropriate levels of malpractice coverage provided by the Plan is in place. Outside UTMB, UT System malpractice insurance is not provided nor will any other fringe benefits ordinarily afforded to the Resident/Fellow be in effect.

7. No Resident/Fellow may "moonlight" during assigned duty time.

8. Permission of the residency Program Director must be obtained in writing before arranging to "moonlight."  Individual Program Directors may forbid moonlighting. The Program Director must monitor the number of moonlighting hours as required by an ACGME Institutional Requirements to ensure compliance with duty hours.  The Program Director must acknowledge in writing that she/he is aware that the Resident/Fellow is moonlighting, and this information should be part of the Resident/Fellow's file. The Resident/Fellow's performance will be monitored for the effect of these activities upon performance and that adverse effects may lead to withdrawal of permission.

9. The U.S. Code of Federal Regulations clearly prohibits exchange visitors (J1 visa holders) from pursuing work outside of their training programs.  Therefore, any Resident/Fellow holding a J1 visa may not moonlight or earn extra income under any circumstances.

10. Per UTMB IHOP 6.5.3. Individual Conflicts of Interests, all Residents/Fellows are required to request prior approval in UT System's Outside Activity Portal for their outside activities, including moonlighting. This requirement is in addition to the requirements of this form. The link to the Outside Activity Portal and further explanation of the requirement can be found at www.utmb.edu/coi.

O.   **HEALTH INFORMATION MANAGEMENT**

Timely completion of medical records, signing patient orders, and general compliance with the rules and regulations of the UTMB Health Information Management Department are considered an integral component of graduate medical education.  Residents/Fellows will complete all medical record assignments in a timely manner and accept responsibility for familiarizing themselves with the medical records policy.  Failure to complete medical records, as prescribed by applicable Medical Staff Bylaws, hospital rules and regulations, clinic rules and regulations, and/or departmental policy, may result in corrective action, which may include suspension without pay.  A Certificate of Completion of residency training will not be issued until all medical record assignments are completed at the end of the training period.

P.   **DISASTER PLAN**

The Resident/Fellow should be familiar with the UTMB http://www.utmb.edu/emergency_plan/) and Departmental Disaster Plans and understand the role and responsibilities if such an event occurs.  Residents/Fellows are designated by their department as essential employees during a disaster and required to remain in the hospital until formally released by the residency program director.   If the UTMB Hospitals and Clinics are no longer open following a disaster, and Residents/Fellows must be transferred to other programs/institutions, their salary and benefits will continue as UTMB employees (I.R.IV.M.1).

If UTMB cannot provide an adequate educational experience for each of its Residents/Fellows because of a disaster, it will:

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

1. arrange temporary transfers to other programs/institutions until such time as the Residency/Fellowship program can provide an adequate educational experience for each of its Residents/Fellows, or
2. assist the Residents/Fellows in permanent transfers to other ACGME accredited programs/institutions to continue their education.

Programs will make transfer decisions expeditiously so as to ensure that each Resident/Fellow will complete the year in a timely fashion.

At the outset of a temporary Resident/Fellow transfer, the residency program director will inform each transferred Resident/Fellow of the estimated duration of his/her temporary transfer, and continue to keep each Resident/Fellow informed of such durations. If a program decides that a temporary transfer must continue through the end of a residency/fellowship year, it will so inform each transferred Resident/Fellow.

Q   **RESIDENT/FELLOW DIRECTORY**

It is essential that the UTMB Graduate Medical Education Office maintain accurate information on the Resident/Fellow including home address, cell phone number, and email address.  Any change in this data should be reported promptly to the UTMB Graduate Medical Education Office and the UTMB Human Resources Department.

R.   **INTERNATIONAL MEDICAL GRADUATES**

Residents/Fellows receiving their undergraduate medical education outside the United States must be sponsored through the Educational Commission for Foreign Medical Graduates.  Any unique circumstances requiring visa definition should be brought to the attention of the UTMB Graduate Medical Education Office well in advance of arrival on campus.

UTMB accepts only the J-1 visa.  The H1-B visa is not accepted by GME programs.  The UTMB ID badge is the only area in which the International Medical Graduate obtaining an MBBS, MBBCH, or MBCHB may choose to use "MD." All other references will reflect the "MBBS, MBBCH, OR MBCHB."

S.   **SHRINERS HOSPITALS FOR CHILDREN**

Residents/Fellows from some of the UTMB residency programs have required rotations at the Shriners Hospitals for Children at Galveston for portions of their educational and clinical experience.  UTMB faculty are also members of the Shriners Hospitals for Children's Medical Staff and provide supervision.  Although formally affiliated with UTMB, the Shriners Hospitals for Children is administratively independent and establishes its own rules and regulations for its medical staff and employees.

T   **OFF-CAMPUS ELECTIVES**

The GMEC External Training Site Review Subcommittee must approve off-campus electives in advance.  A Program Agreement or Affiliation Letter must be fully processed and signed by both facilities <u>before</u> the elective begins to ensure that appropriate criteria are met. Electives must be in an ACGME accredited program and/or count towards residency and/or specialty board requirements.   International rotations must be approved by both the

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

16

External Training Site Subcommittee and the International Oversite Committee before scheduling with an international facility.  Procedures for off-campus electives are available in the UTMB Graduate Medical Education Office.

U.   **HARASSMENT (INCLUDING SEXUAL HARASSMENT)**

Residents/Fellows are subject to the provisions and protection of UTMB IHOP Policy 3.2.4, available online at https://www.utmb.edu/Policies_And_Procedures/toc.aspx.

V.   **PHYSICIAN IMPAIRMENT/ SUBSTANCE ABUSE**

Resident/Fellow physicians are subject to the GME Institutional Procedures for House Staff Drug Screening for Probable Cause and Post-Rehabilitation, referenced in ***Appendices K and L*** (page 71-72).  Residents/Fellows must complete a mandatory educational lecture on anxiety and depression.

W.   **RESIDENCY CLOSURE/RESIDENT/FELLOW COMPLEMENT REDUCTION**

In the event that UTMB elects to reduce the size of a residency or to close a residency or fellowship program, all Residents/Fellows in training or applying to these programs and the GMEC and DIO must be informed as soon as possible.  In the event of a reduction or closure, all Residents/Fellows already in the program will be allowed to complete their GME educational program at UTMB or, if doing so would be impossible, will be assisted in enrolling in an ACGME accredited program in which they can continue their GME educational program.

X.   **VENDOR INTERACTIONS**

There are two UTMB policies for use by all employees who interact with vendor representatives.   Both policies can be found in the UTMB Handbook of Operating Procedures.  "Vendor Visitation:  UTMB Clinical Enterprise," Section 9, Policy 9.7.2.

The policy "Acceptance and/or Solicitation of Gifts or Benefits from Vendors," can be found in Section 2, Policy 2.6.5.

Y.   **AMERICAN BOARD OF MEDICAL SPECIALTIES**

The ACGME requires that institutions provide information relating to access to eligibility for certification by the relevant certifying board.  This information can be found at http://www.abms.org/verify-certification/board-eligibility-and-moc-information-for-credentialing-professionals/.

Z.   **GUIDELINES FOR APPROPRIATE USE OF THE INTERNET, ELECTRONIC NETWORKING AND OTHER MEDIA**

Guidelines for the appropriate use of the Internet, Electronic Networking, and other media apply to all residents/fellows in training.  Use of the Internet includes posting on blogs, instant messaging [IM], social networking sites, email, posting to public media sites, mailing lists and video-sites.   The details of the guidelines are found in ANNEX F (page 56).

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

17

AA.   **AMERICAN MEDICAL ASSOCIATION PRINCIPLES OF MEDICAL ETHICS**

The medical profession has long subscribed to a body of ethical statements developed primarily for the benefit of the patient. As a member of the profession, a physician must recognize responsibility to patients first, as well as to society, to other health professionals, and to self. The Principles adopted by the American Medical Association are not laws, but standards of conduct, which define the essentials of honorable behavior for the physician. The Principles can be found at http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics.page.

BB   **NATIONAL PRACTITIONER DATA BANK (NPDB)**

The NPDB is primarily an alert intended to facilitate a review of a health care practitioner's professional credentials.  The information contained in the NPDB is intended to direct discrete inquiry into, and scrutiny of, specific areas of a practitioner's licensure, professional society memberships, medical malpractice payment history, and record of clinical privileges. NPDB information is not available to the general public.  Information in a form that does not identify any particular entity or practitioner is available.  Information reported to the NPDB is considered confidential and shall not be disclosed except as specified in the NPDB regulations.  This information about NPDB can be found at http://www.npdb-.hrsa.gov.

CC.   **COMMUNICABLE DISEASE CONTROL FOR HEALTHCARE WORKERS**

The UTMB Employee Health Center (EHC) provides preventive and healthcare services to UTMB employees for occupationally-related diseases and injuries.  The EHC interacts closely with the Department of Healthcare Epidemiology to decrease the risk of communicable diseases to UTMB employees.

New Residents/Fellows must receive a health clearance from the Employee Health Center prior to employment.  Residents/Fellows will be evaluated for administration of the following vaccines:  Influenza, MMR, Varicella, and Hepatitis B.  Each new Resident/Fellow must complete a screening survey related to communicable diseases.  An immunization history is taken.  Additional information can be found in the IHOP – Employee – Health and Wellness section.

The EHC provides employee screening, surveillance and exposure follow-up for tuberculosis. An initial two-step tuberculin skin test or serum testing is required prior to employment.  An annual repeat screening is required.  Residents/Fellows will be notified when it is appropriate for this annual testing.

Residents/Fellows may be removed from clinical duties if these health clearances are not met.

DD.   **Life Support Education for Healthcare Providers**

All Residents and Fellows must hold current Basic Life Support (BLS) certification by the American Heart Association.  The certification is valid for two years.  New U.S. Residents and Fellows must provide a current BLS certificate by the first day of employment.  Residents and Fellows coming from outside the U.S. must provide BLS certification within thirty days of employment.  Each Resident/Fellow must renew their certification prior to the expiration date.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

18

Some residency programs require Advanced Cardiac Life Support (ACLS) and Pediatric Advanced Life Support (PALS) certifications. Residents/Fellows are required to have BLS certification even if they have ACLS and/or PALS certification.  If additional certifications are required by a program, those programs will be responsible for tracking compliance.

Residents/Fellows must renew BLS certification and provide a copy to the GME Office. Failure to provide proof of renewal prior to the certification's expiration date will result in removal from clinical duties.  If there is an unusual circumstance for delay in renewing certification, the Resident/Fellow must provide the reason to the GME Office to prevent removal from clinical duties.

**VIII.    SALARY AND FRINGE BENEFITS; VACATION AND LEAVE**

UTMB administers the Resident/Fellows' employment contracts and other matters including leave, medical benefits, salary, insurance coverage, etc.  The Leave Categories specific to Residents/Fellows are found in ANNEX G (page 59).  A detailed description of benefits can be found at http://hr.utmb.edu/benefits/.

**A.    SALARIES AND PAYROLL POLICIES**

Residents/Fellows' salaries are paid by UTMB on a monthly basis.  The current base salary schedule for Resident/Fellow appointment levels is listed in ANNEX H (page 61).  Checks are issued once a month for a total of twelve checks per year.  Payment is inclusive from the first to the last day of the current month.   Residents/Fellows are required to use direct deposit.  Funds can be deposited into as many as four different accounts through the Employee Self Service function in PeopleSoft.  Additional information and forms may be found online at http://www.utmb.edu/finance/payrollservices/dirdeposit/default.asp.

**B.    FRINGE BENEFITS - GENERAL**

As employees of UTMB, Residents/Fellows participate in the premium sharing benefit. Several insurance programs are available to the Resident/Fellow as a UTMB employee including health, dental, accidental death and dismemberment, and life insurance. Residents/Fellows are covered under the UTMB Resident/Fellow Long Term Disability Insurance Program.  It is designed to provide comprehensive coverage that is uniquely tailored to Resident/Fellow's needs.  A salary adjustment is provided to allow the Resident/Fellow to pay for this program to achieve a significant IRS advantage.  Specifics of each of the insurance programs can be found at http://hr.utmb.edu/benefits/.

**C.    HEALTH AND DENTAL INSURANCE**

The State of Texas, through its premium-sharing program, will pay for Resident/Fellows medical insurance coverage (employee only). UTMB GME pays for Resident/Fellow's employee only dental coverage and spouse/dependent medical coverage. The Resident/Fellow may add eligible spouse/dependents to their health plans coverage effective either:

1.    the first day of the Employee's active employment as a benefits-eligible employee, or
2.    the first of the month following the first day of such employment.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

19

However, if the newly benefits-eligible employee completes the enrollment form within 31 days of employment but after the month of hire, the effective date of spouse/dependent coverage will be either:

1. the first of the month following the first day of active employment, or
2. the first of the month following completion of the enrollment form.

Monthly premiums are not pro-rated. A full month's premium will be due for the first month of coverage if the effective date of coverage for the dependent begins on any day of the month.

Please note that you will have 31 days from your hire date (initial period of eligibility) to complete enrollment in the group insurance programs. If elections are not made within the 31 day initial period of eligibility, you will be required to wait until Annual Enrollment, which occurs in July, to be effective the following September 1st or a qualified change of status event to make changes, including adding or dropping coverage.

Examples of qualified change of status events include:
- Marriage, divorce, annulment, legal separation or spouse's death
- Birth, adoption, medical child support order, or dependent's death
- Significant change in residence if the change affects you or your dependents' current plan eligibility
- Starting or ending employment, starting or returning from unpaid leave of absence, or a change of job status (e.g. from part-time to full-time)
- Change in dependent eligibility
- Significant change in coverage or cost of other benefit plans available to you and your family.

For questions regarding status changes, please visit the Employee Benefits website or contact the HR Benefits and Business Center by phone at 409-772-2630 or by email at benefits.services@utmb.edu.

D.   **WORKER'S COMPENSATION**

Worker's Compensation Insurance covers all Residents/Fellows.  Any on-the-job injury must be reported immediately to the Resident/Fellow's supervisor.  The supervisor must complete the necessary forms and forward them to the Employee Injury/Illness Management Office.  If the on-the-job injury is such that the Resident/Fellow needs to report to the UTMB Emergency Room, the Resident/Fellow should advise the ER that the injury was received on the job.  Reimbursement for on-the-job injury cannot be considered unless an appropriate report has been filed.  This should be done immediately following the incident.

E.   **COUNSELING, PSYCHOLOGICAL, AND OTHER SUPPORT SERVICES**

Residents/Fellows, as both employees and students in a particularly stressful assignment, are eligible for the counseling and support services provided by the Employee Assistance Program at https://hr.utmb.edu/eap/.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

20

F.  **RETIREMENT BENEFITS**

Each Resident/Fellow, as an employee of UTMB and the State of Texas, is provided retirement benefits under either an Optional Retirement Program or the Teacher's Retirement System.  Specifics of these programs are provided to each employee during employee orientation and onboarding.

G.  **PROFESSIONAL LIABILITY INSURANCE**

Professional liability coverage for UTMB the Resident/Fellow is provided under the University of Texas System Professional Medical Liability Benefit Plan.  Liability is limited to $100,000 per claim.  In addition, UTMB Residents/Fellows continue to have indemnity protection up to $100,000 per claim provided by Chapter 104 of the Texas Civil Practice and Remedies Code.  Any Resident/Fellow who suspects the possibility of an incident which might provoke a malpractice suit is required to simultaneously:  1) notify the program director/department in which appointed, and (2) call the Risk Management Department at (409) 772-4775 so that the occurrence can be reported to the U.T. System and a decision may be made regarding an investigation.

Coverage as stated above shall commence on the effective date of residency/fellowship training and shall be renewed annually or cease on the date that employment is terminated, whichever occurs first.  Incidents that occur during official University of Texas System employment are covered, even though a claim or lawsuit is filed subsequent to cessation of employment.  Tail coverage is not required.

H.  **VACATION LEAVE**

Vacations are to be arranged with the Resident/Fellow's residency program office.  Advance notification guidelines will be determined by the Program Director.  The amount of vacation allowed at any one time will be the decision of the Program Director.  Any changes to the vacation schedule require written approval from the Program Director.  General policies and procedures related to Residents/Fellows' vacations are the same as for other UTMB employees and can be found in the UTMB Institutional Handbook of Operating Procedures, available online at http://intranet.utmb.edu/policies_and_procedures/toc.aspx).  Residents/Fellows will be granted vacation in accordance with institutional policies, and are encouraged to use vacation during the fiscal year in which it was earned.

Terminal Leave is a vacation type that can be granted at the end of training that allows the resident/fellow to use vacation for the last few days of training. Each Program Director determines if Terminal Leave will be permitted and the number of residents/fellows that can utilize Terminal Leave is at the sole discretion of the Program Director.  All UTMB and GME Exit requirements must be met prior to taking Terminal Leave.

I.  **SICK LEAVE**

Residents/Fellows are entitled to sick leave subject to the following conditions.
The Resident/Fellow shall earn sick leave entitlement beginning on the first day of employment and terminating on the last day of duty (last day of duty defined as termination of contract or completion of residency program).  Sick leave entitlement shall be earned by a full-time Resident/Fellow at the rate of eight hours for each month or fraction of a month of employment, and shall accumulate with the unused amount of such leave carried forward each month.  Sick leave accrual shall terminate on the last day of continuous duty.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

21

Sick leave may be taken when sickness, injury, or pregnancy and confinement prevent the Resident/Fellow's performance of duty or when a member of his/her immediate family is ill and requires the Resident/Fellow's attention.  A Resident/Fellow who must be absent from duty because of illness must notify his/her Program Director or Program Coordinator of the illness at the earliest practical time.

J.   **MATERNITY/PATERNITY LEAVE**

Maternity and paternity leave are discussed in Section K below.

K.   **FAMILY AND MEDICAL LEAVE ACT**

Eligible UTMB employees, who have been employed 12 months or more, may take up to 12 weeks paid or unpaid leave under certain qualifying conditions based on the terms of the Family and Medical Leave Act of 1993 (FMLA).

Eligible employees are entitled to a total of 12 weeks of leave time during any 12-month period for any one or more of the following qualifying reasons:  birth or adoption of a child; placement of a foster child; or a serious health condition of an employee or an employee's dependent, defined as a child, parent or spouse (excluding parent-in-law).

Employees must exhaust all sick and vacation accruals before going on "leave without pay." During pregnancy, a female Resident/Fellow may be able to continue to work as long as she is able to carry a regular schedule and fulfill the duties and responsibilities of the position in the judgment of her Program Director.  The Program Director may not require that a pregnant Resident/Fellow take the full six weeks of postpartum leave as long as a doctor's release is provided.  Additional time may be authorized by the program director if needed.  The amount of time to be made up will be determined by the Program Director, subject to residency program and specialty board requirements.

NOTE:  The Resident/Fellow should be aware that graduation from residency and Board specialty certification depends on the completion of certain length of training requirements. Extended absences from the program may require additional time and training.  For more information, the Residents/Fellows should discuss their FMLA options with their supervisor.

**FMLA References:**
**29 U.S.C. §2601, *et seq.***
     IHOP Policy Family and Medical Leave 3.6.9
     IHOP Policy Sick Leave 3.6.10
     IHOP Policy Parental Leave 3.6.8

L.   **EDUCATIONAL LEAVES**

Absence from training to attend educational conferences must be approved by the Resident/Fellow's department, and the department's administrative officer must execute an official travel request form.  Failure to do so may jeopardize certain survivor and other benefits, which may be forfeited if the Resident/Fellow is not on approved leave.  Subject to residency program requirements, such leave is granted with pay and not charged to vacation time.  Travel time must not extend beyond the dates of the meeting plus the time necessary to travel (based on direct air route), usually one day to go, and one day to return. Additional days will be considered as vacation time.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

22

IX.     **INSTITUTIONAL SERVICES**

A.     <u>**EMPLOYEE IDENTIFICATION BADGE**</u>

Employee identification badges are provided at no charge to the Residents/Fellows and must be worn while on duty.  The ID badges are used to control various Resident/Fellow benefits such as meal stipends, security access, etc.  Replacement of a lost badge requires a fee paid by the Resident/Fellow.

B.     <u>**UNIFORMS AND LAUNDRY SERVICE**</u>

All Residents/Fellows are initially furnished two lab coats.  One additional lab coat is provided each year.  The institution does not provide laundry or embroidery services for lab coats.

C.     <u>**ACCESS TO FOOD SERVICES-MEAL STIPEND**</u>

Residents/Fellows on regular assignment have access to adequate and appropriate food services 24 hours a day.  The budget is set in advance and once monies are exhausted for the year, there are no further allowances.

The GMEC Chief Resident/Fellow & HOA Officers Subcommittee developed guidelines for determining meal stipend eligibility.

Meals will be provided for Resident/Fellow assigned to clinical duties for 14 hours or greater in a 24 hour period.  Examples outlining when Resident/Fellows can be provided meal stipends are:

1.   House Staff, who work their regularly scheduled shift and logs 14 hours or greater using New Innovations Daily Duty Hour Log, are eligible for the stipend.

2.   House Staff who work their normal daytime shift and then works home call where they spent 14 hours  or greater in the hospital or clinic, cumulative in a 24 hour period, are eligible for the stipend. (If resident or fellow leaves the hospital, then returns to the hospital for home call, they are still eligible as long as they have spent  14 hours or greater at work in a consecutive 24 hour period.)

3.   House Staff who work a regularly scheduled shift and then goes on to work in house call overnight which is equal to or greater than 14 hours in a consecutive 24 hour period, they will be eligible for the stipend.

The following process will be used for obtaining the meal stipend:

Step 1)   House Staff must accurately document their work hours <u>**daily**</u> using New Innovations for the specified 24 hour period for which they worked.

STEP 2)   House Staff must Log and confirm duty/work hours in New Innovations for the prior work week of Monday through Sunday.  House Staff will have the following Monday <u>AND</u> Tuesday to log any missing duty hours for this time duration.  All duty hours for the eligible period must be logged no later than the following Tuesday so that the GME Program

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

23

Coordinator is given adequate time for preparing and submitting Meal Forms to GME by 12:00pm each Wednesday. *NOTE:* When logging hours worked please add comments to any duty hour violations. Program Coordinators cannot submit without violations being addressed by the House Staff.

STEP 3)  The GME Program Coordinator must verify duty hours using the New Innovations Report. The GME Program Coordinator will prepare and submit the *Meal Stipend Request Form* outlined in Section 5 of the GME Coordinator Handbook to the Institutional GME Office by 12:00pm each Wednesday.  All eligible duty hours not logged the Tuesday prior to Wednesdays processing time will NOT be eligible for Meal Stipend.

D.     **FIELD HOUSE MEMBERSHIP**

Arrangements have been made for a discounted rate for UTMB Field House membership for Residents/Fellows and their families.  Field House for an individual is $202.50 yearly, and $352.50 yearly for a family. For further information about this, contact the Field House at (409) 772-1304.  These fees are subject to change.

E     **PARKING**

Parking information and permits may be obtained from the Parking Facilities Office located in Room 2.756 at the Rebecca Sealy Building, (409) 266-7275.  The Resident/Fellow pays a minimal amount for parking spaces during regular work hours.  Fee for the garages  range from $20.00 - $32.50 per month and surface lots are $12.50 per month.  After-hours parking access can be obtained at no charge to Resident/Fellow in the Parking Facilities Office. These are institutionally subsidized rates and are subject to change.

F.     **HOUSING**

While housing is not provided as an institutional benefit, information about local housing is available through local realtors which can be found at www.galveston.com.

X.     **DUE PROCESS; GRIEVANCE**

A.     **GENERAL PRINCIPLES**

UTMB training programs are primarily educational, the institution vests responsibility and authority for conducting the programs and determining the success of academic achievement of the individual trainee in the Clinical Competency Committee (CCC) and the Program Directors with the departmental Chairs ultimately responsible for process management.

Program Directors and faculty responsible for the training of Residents/Fellows have an obligation to: provide appropriately organized educational opportunities to the trainees; convey clearly the educational objectives of the program and the performance required by the trainees for academic success (including those patterns of personal behavior that should positively impact patients, institutional employees and/or other trainees); and develop a regular evaluation process that alerts trainees to academic and performance deficiencies and provides direction in their correction.  These requirements are integral elements of the ACGME accreditation standards.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

The Program Directors and faculty responsible for training Residents/Fellows are obligated to apply these academic standards to each individual trainee to protect both the individual patients and the public at large who rely on the process to protect them against unqualified practitioners claiming expertise of a specific type.  This obligation includes removal from the program of (or a decision not to reappoint) those trainees who are academically unsuccessful or whose behavior creates a risk for patients, disrupts the multidisciplinary health care team, or interferes with the educational program of other trainees.

Finally, the Program Directors and faculty must attest to the satisfactory completion of the academic training program for each trainee seeking board certification to acknowledge the trainee's qualifications as a specialist or subspecialist.

Residency and Fellowship training is primarily an academic and educational process.  The development of institutional policies and procedures for due process and oversight of those policies must be based on this guiding principle.

B.   **APPOINTMENT OF RESIDENT/FELLOW**

Initial appointments of Residents/Fellows are, in general, through the applicable matching program.  Appointments at UTMB are formalized through a UTMB Resident/Fellow Work Agreement and are for one year.  Annual reappointment through the conclusion of the Resident/Fellow's program will be based on the Resident/Fellow's acceptable academic and professional performance.

Occasional appointments for less than one year may be required to address unique circumstances created by a Resident/Fellow's illness or the need for remediation.

C.   **TRAINING PROGRAM OVERSIGHT**

A process of regular institutional oversight and periodic review of each residency training program is in place through the Graduate Medical Education Committee as required by the ACGME's Institutional Requirements.  It is through this process that the institution monitors the training program's compliance with the accreditation standards including those related to the development of educational objectives, appropriate academic structure and function, and regular evaluation of trainees.

D.   **RESIDENT/FELLOW EVALUATION**

The New Innovations evaluation system is mandatory for all UTMB Residency and Fellowship programs including faculty and Residents/Fellows.  Each UTMB Residency/Fellowship training program must have a written procedure approved by the GMEC for regularly scheduled evaluations of the performance of each Resident/Fellow by the Program Director as required by the ACGME's Institutional Requirements.  The evaluations reviewed with the Resident/Fellow will be documented in the Resident/Fellow's electronic file.  The Residents/Fellows are notified by e-mail when their evaluation is completed.  A log of the Resident/Fellow viewing the evaluations is maintained.  These electronic evaluations are intended to document the strengths and weaknesses of the Resident/Fellow's knowledge and/or performance including the core competencies required by the ACGME.  The training program will notify the Resident/Fellow at the earliest time possible of significant deficiencies in knowledge or performance, document plans for

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

25

correction or improvement, and monitor success. Evaluations completed on each Resident/Fellow are retained in the electronic evaluation system permanently.

The Resident/Fellow will also be required to evaluate the program and faculty using New Innovations.

E.   **Clinical Competency Committee (CCC)**

The Clinical Competency Committee (CCC) will meet at least semi-annually, is appointed by the Program Director, and must include; at least three core faculty members, including the Program Director.  The duties of the Clinical Competency Committee include:

1.   Reviewing all training evaluations of Resident/Fellow's performance;
2.   Preparing the semiannual report of  Resident/Fellow's Milestones progress; and
3.   Making recommendations on Resident/Fellow's progress including promotion, remediation and dismissal.

 If clinical performance concerns arise, the Program Director may call a special CCC meeting to review performance and to develop a coaching or remediation plan with follow-up.

F.   **UNSATISFACTORY PERFORMANCE**

1.   All Residents/Fellows maybe subject to the UTMB Institutional Policies and Procedures related to discipline and discharge (www.utmb.edu/ihop, Policy 3.10).  If according to the guidelines established by the individual training program, a Resident/Fellow's academic performance (including patterns of personal behavior that negatively impact patients, institutional or affiliates' employees and/or other trainees), and overall progress in the training program is deemed unsatisfactory, a meeting will be held between the Resident/Fellow and the Program Director, or his/her designee, to discuss the problem and develop appropriate remedial actions.  This meeting shall not of itself constitute a corrective action and shall not preclude the Program Director from also recommending simultaneously a formal Corrective Action.  The consultation will be documented in the Resident/Fellow's file and the expected efforts at correction and timelines for carrying them out sufficiently detailed as to allow periodic assessment of the Resident/Fellow's success or lack thereof.

Residents/Fellows may be removed from clinical duties when, in the opinion of the Program Director or his/her designee, a determination is made that a Resident/Fellow's discharge of clinical  responsibilities would expose patients to medical risks and the hospital to liability.  In this case, a Resident/Fellow may be temporarily relieved of his/her clinical responsibilities with pay, reassigned to other duties with pay, or suspended with pay, pending the outcome of an investigation by the Program Director. A Resident/Fellow who has been relieved/reassigned with pay or suspended with pay pending the outcome of an investigation, will receive, within a reasonable length of time, not to exceed ten working days, a written statement from the Program Director or designee containing a description of the deficiencies in the performance of the Resident/Fellow.  Expected corrections and timelines for achieving them also should be sufficiently detailed in this statement and the Resident/Fellow's file as allow periodic assessment of the Resident/Fellow's compliance and progress.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

26

G.   **PROBATION**

1.   The Associate Dean for Graduate Medical Education must be notified in advance and approve the placement of a Resident/Fellow on probation.

2.   The decision to place a Resident/Fellow on probation for educational reasons, such as inadequate reading or lack of adequate knowledge base, generally evolves over time and is supported by evaluations of the Resident/Fellow, which reflect inadequate performance.  Interactions between the Program Director and the Resident/Fellow concerning inadequate performance should be documented and reflect that lack of improvement led to the decision for probation.

3.   The decision to place a Resident/Fellow on probation may occur abruptly because of problems in the delivery of clinical care.  These problems may be of such acuity as to require modification of clinical assignment along with probation.  In such cases, it is possible that previous documentation of inadequate performance may not exist. The Resident/Fellow maybe relieved of clinical duties over concern for patient safety during process of investigating probation.

4.   After appropriate discussion, advice, and recommendation by the Clinical Competency Committee (CCC), the recommendation to place a Resident/Fellow on probation may be made by the Program Director and Chair of the Department.  The ultimate responsibility for the decision to place a Resident/Fellow on probation rests with Program Director and advised by the Associate Dean for Graduate Medical Education.

5.   The nature of the deficiencies of the Resident/Fellow should be listed, and it should be stated whether these deficiencies might impact clinical performance.  The terms of the probation must be delineated in writing by the Program Director based on identified problems.  If a limitation of clinical duties is deemed necessary, or if there is any obligation of the Resident/Fellow to obtain extra supervision during clinical duties, these terms must be delineated.

6.   The Program Director must notify all faculty who will be working in a clinical setting with the Resident/Fellow of the probation status of a Resident/Fellow.  The decision to inform other personnel who have a need to know will be at the discretion of the Program Director.

7.   The Resident/Fellow may challenge the decision for probation using the standard policies for grievance for Resident/Fellow. If a Resident/Fellow appeals probation, probation will be delayed until the final appeal decision is reached.  Any modification in clinical assignment or privileges that was instituted in the probation will remain in effect until final disposition of the appeal. If the probation is upheld after appeal, the Texas Medical Board will be notified of the probationary status.

8.   At the end of the probationary period, documentation should be made of the satisfactory or unsatisfactory remediation by the Resident/Fellow.  The faculty supervising the Resident/Fellow will be informed.

H.   **APPEAL RIGHTS AND PROCEDURES FOR TERMINATION**

1.   The Resident/Fellow subject to the corrective action of termination shall have the option to appeal the action in writing to the Associate Dean for Graduate Medical Education within ten working days of receiving notice of the action.  Failure to appeal within the prescribed ten working days shall constitute waiver of the option of appeal.

2.   Upon timely receipt of the Resident/Fellow's written appeal of termination, the Resident/Fellow may elect to meet personally with the Associate Dean for GME to discuss the reasons for the recommended termination and to present the Resident/Fellow's response.  Regardless of whether the Resident/Fellow elects to meet with the Associate Dean for GME, the Associate Dean for GME shall, within ten working

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

27

days of receiving the appeal, conduct a thorough review of the process that led to the recommended termination, including the documentation in the Resident/Fellow's file.

3. After such review, the Associate Dean for GME shall notify the Resident/Fellow of their findings in writing by certified mail, return receipt requested, or during a face to face meeting with Associate Dean for Graduate Medical Education, with copy to the Program Director and Chair.

4. The Resident/Fellow may appeal further in writing to the Dean of the School of Medicine.  The timelines to initiate a written appeal and to deliver written decisions by certified mail, return receipt requested, at the next two steps of an appeal are the same as listed above in Section H1.

5. No compensation, whether salary or other benefit, may be withheld from a Resident/Fellow appealing his/her termination in accordance with this Section H, until a written decision at the final level appealed to is rendered upholding the termination.  A final decision to uphold a Resident/Fellow's termination shall also preclude any reappointment of the Resident/Fellow to any subsequent year of training at UTMB.

6. No specialty or sub-specialty certifying board or national state or local medical organization shall be notified of a corrective action until a final determination has been made.

I.   **GRIEVANCE PROCEDURE FOR CORRECTIVE ACTIONS OTHER THAN TERMINATION**

1. If a Resident/Fellow has a grievance related to his/her training program or has been subject to any corrective action other than termination, the Resident/Fellow should first attempt to resolve the matter informally by consulting with the applicable Chief Resident, Program Director, and/or Chair/Division Chief.

2. If the Resident/Fellow is unable to resolve the matter informally or wishes to grieve a corrective action other than termination, he/she should present his/her grievance in writing to the Associate Dean for GME within ten working days of the date the matter arose or recommendation for corrective action other than termination was made, whichever is later.  The Associate Dean for GME shall notify the Resident/Fellow in writing of his decision regarding the matter, or to uphold or rescind the corrective action other than termination, within twenty working days of receiving the written grievance, unless extended by the Associate Dean for GME and Resident/Fellow's mutual agreement.

3. Subject to the UTMB Grievance Policy (Institutional Handbook of Policies 3.1.10 the Associate Dean for GME's shall be the final level of grievance.

J.   **NONREAPPOINTMENT**

1. A decision not to reappoint a Resident/Fellow does not constitute corrective action.  If a Resident/Fellow is not to be reappointed to the next year of training, he/she should receive written notice (by certified mail, return receipt requested, or hand delivered with written acknowledgment of receipt) from the Program Director by March 1 of the current contract year, or four months prior to the last date of the current contract if the Resident/Fellow was appointed other than in the late June or early July time frame.  If the primary reason(s) for the non-renewal or non-promotion occurs within the four months prior to the end of the agreement, the Program Director will provide the Resident/Fellow with as much written notice of the intent not to renew or not to promote as circumstances will reasonably allow prior to the end of the agreement.  Please refer to Section **X.D. Resident/Fellow Evaluation** (page 25) for Clinical Competency Committee function regarding non-renewal of Resident/Fellow.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

28

2. Residents/Fellows who plan not to continue in the succeeding year of their training program should notify the Program Director in writing by March 1 of the current year, or four  months prior to the last date of the current contract.

3. The Associate Dean for GME is to be copied on the notifications of intent not to reappoint or intent not to accept reappointment referenced above.

4. If grieved in writing by the Resident/Fellow, the Associate Dean for GME will review a decision not to reappoint a Resident/Fellow.  Such grievance will be subject to the grievance procedures stated in Section I., except that the Associate Dean for GME's level shall be sole and final level of grievance.

XI.    **Residency/Fellowship Responsibilities**

A.    <u>**Residents/Fellows shall:**</u>

1. Provide patient care, under appropriate supervision, as assigned by the Program Director (PD) and his/her designee, consistent with the educational goals of the Program and the highest standards of patient care ("patient care" includes responsibility for associated documentation in the medical record, which should be completed in a timely fashion, and attendance at patient care rounds as assigned);

2. Make appropriate use of the available supervisory and support systems, seeking advice and input from faculty as and when appropriate, and in accordance with the GME  Policy on Resident/Fellow Supervision;

3. Participate fully in the educational and scholarly activities of the program as specified by the Program Director, including attendance at didactic conferences, and other responsibilities which may include a research project, completion of examinations, maintenance of procedure logs, or other items;

4. Develop a personal program of learning to foster continued professional growth, with guidance from the faculty;

5. Assume responsibility, as called upon, in teaching more junior trainees and medical students, within the scope of the program;

6. Participate in improving the quality of education provided by the program, in part by submitting at least annually confidential written evaluations of the faculty, the program and the overall educational experience;

7. Adhere to established practices, procedures and policies of the Sponsoring Institution, the Sponsoring Institution's Medical/Professional Staff, the Department and affiliated training sites;

8. Participate in institutional programs, councils or committees and other medical staff activities, as appropriate;

9. Abide by the institutional and program-specific Resident/Fellow policies on duty hours and, as scheduled by the Program Director, accurately report his/her duty hours;

10. Comply with institutional requirements for health and safety training, vaccinations and tuberculosis testing, if applicable;

11. Complete medical records in a timely manner.

B. The Program Director is responsible for overseeing the Resident/Fellow's training and rotations throughout the period of residency.  The Resident/Fellow should check with the Program Coordinator prior to beginning rotations at an affiliated site to obtain the necessary procedures for reporting to the rotation site.  Upon arrival for a rotation in an affiliated hospital, Residents/Fellows must report to the appropriate office to complete necessary paperwork.  Residents/Fellows are responsible for adhering to the policies and procedures established by the GMEC, the institutions in which they function, and their individual programs.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

29

C.  While on rotations, Residents/Fellows shall also be:
1.  Responsible to the Program Director to whom they have been assigned for all matters pertaining to the professional care of patients.  They are responsible to the Site Director and Chair of the Medical Staff at each facility to which they are assigned for matters of administrative policy and procedure;
2.  Responsible for checking with the relevant Program Director regarding any response time requirements while taking call from home.

## XII.   Transitions of Care and Hand-Offs

A.  **Introduction**

The Accreditation Council for Graduate Medical Education (ACGME) requires that each training program must have a program-specific policy addressing transitions of care that is consistent with ACGME and UTMB Policies.  With heightened awareness of the effects of hand-offs (hand-overs) on patient safety and education, the ACGME Common Program Requirements include specific mandates to design systems, ensure competency for Resident and Fellows, and monitor efficacy of hand-offs.  These, along with the Joint Commission's patient safety goals regarding hand-offs, affect all programs, departments, and clinical settings.

B.   **Design Clinical Assignments to Minimize Number of Transitions in Patient Care**

Programs and their faculty must be aware of new regulations, best practices, and the hazards of discontinuity to ensure patient safety and to role-model effective hand-offs.   Examples of strategies which have successfully minimized transitions include day/night teams, staggering of Resident/Fellow/attending switch times and/or days to maintain continuity, outpatient clinic "pods" or teams.  As there is currently no single standard for clinical scheduling assignments, all training programs must design call and shift schedules to minimize transitions in patient care.  Schedule overlaps should include time to allow for face-to-face hand-offs to ensure availability of information and an opportunity to clarify issues.

C.  **UTMB and Each Program Must Ensure and Monitor Effective, Structured Hand-over Processes**

1.  The hand-over processes of each program must facilitate continuity of care and patient safety.  Hand-offs vary considerably across programs and clinical settings.  These processes may include temporary transitions of direct patient care (e.g., day and night teams on inpatient services, scrubbing out of a procedure), complete transitions of direct patient care (e.g., emergency department shifts, end-of-rotation, end-of-training in outpatient and inpatient services), or transitions of indirect patient care (e.g., laboratory and radiology settings).
2.  Each training program must develop hand-off procedures that are structured and reflect best practices (in-person whenever possible, and occur at a time and place with minimal interruptions).
3.  Hand-offs should include at least:
    a.  Patient summary (exam findings, laboratory data, any clinical changes)
    b.  Assessment of illness severity
    c.  Active issues (including pending studies)
    d.  Contingency plans ("if/then" statements)
    e.  Synthesis of information (e.g. "read-back" by receiver to verify)
    f.  Family contacts

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

30

      g.  Any changes in responsible attending physician

      h.  An opportunity to ask questions and review historical information

  4.  Faculty oversight of the hand-off process may occur directly or indirectly, depending on trainee level and experience.  All programs should use the applicable tools (written or computerized) to assist them in this structured process.

D.  **Each Program Must Ensure that Residents and Clinical Fellows are Competent in Communicating with Team Members in the Hand-off Process**

Each training program must assess the Interpersonal and Communication Skills competency.  Hand-off skills are a specific skill within this competency.  Programs must deliver focused and relevant training to build these skills, use clear assessment strategies, and document this competency.

E.  **UTMB Must Ensure the Availability of Schedules**

UTMB must ensure the availability of schedules that inform all members of the health care team of attending physicians and Residents/Fellows currently responsible for each patient's care.  All clinical staff should have a mechanism to know which trainee and supervising physicians are responsible for patients and their contact information.  Programs should utilize the pager forwarding system (as applicable and relevant) and EPIC hand-off tools or equivalent specialty-specific tools.

XIII.    **ACADEMIC RECORDS**

A.  The Institutional GMEC upholds the highest standards regarding the management of Residents/Fellows' academic records and confidentiality in accordance with applicable federal and state law.  Faculty and administrative staff may have access to Residents/Fellows' records on a need-to-know basis during the course of training, performance improvement, research, or education/training.

B.  Disclosure of Residents/Fellows' information and requests from outside parties shall require an appropriate signed release from the Resident/Fellow specifying what information UTMB will disclose.  Exceptions to this policy may apply for requests from governmental agencies where UTMB is required to respond to requests for information, inspections, or investigations.

C.    The program director provides a copy of a final summative evaluation and will provide to credentialing authorities with  Resident/Fellow authorization of release.

XIV.    **SUPERVISION, DUTY HOURS, AND ALERTNESS MANAGEMENT & FATIGUE MITIGATION**

A.  UTMB and its residency programs are committed to abiding by Duty Hour Standards set by ACGME and responsible for:

  1.  Promoting patient safety, Resident/Fellow well-being, and providing a supportive educational environment;

  2.  Ensuring that the learning objectives of the programs are not compromised by excessive reliance on Residents/Fellows to fulfill service obligations;

  3.  Ensuring that Residents/Fellows' education and clinical training have priority in the allotment of Residents/Fellows' time and energy;

  4.  Ensuring that duty hour assignments recognize that faculty and Residents/Fellows collectively have responsibility for the safety and welfare of patients;

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

31

5.  Providing guidelines for Alertness Management and Fatigue Mitigation to all Residents/Fellows at the annual Resident/Fellow orientation and also on the GME web site.

B.  The Resident/Fellow sleep rooms are available at all times for Residents/Fellows too fatigued to drive home after in-house call.   If they choose to use the sleep rooms after completion of duty, it will not count towards their duty hours.

The ACGME Policy on Resident/Fellow Supervision and Duty Hours is attached as Annex I (page 62) for reference.  Residents/Fellows are also to refer to the program specific policies on Resident/Fellow Supervision, Duty Hours, and Alertness Management and Fatigue Mitigation, where applicable.

## XV.   E-MAIL ACCESS

All Residents/Fellows are assigned a UTMB e-mail account.  Communications to Residents/Fellows will be done via this e-mail.  Residents/Fellows are expected to check their UTMB email accounts on a regular basis.  Residents/Fellows must abide by the institutional policies and procedures related to use of the UTMB e-mail system.

## XVI.   INSTITUTIONAL RESIDENT/FELLOW ASSOCIATIONS

### A.   HOUSE OFFICERS ASSOCIATION

HOA membership includes all Residents and Fellows. Members of the HOA are in a unique position to share information with their peers and bring questions/concerns to the attention of the DIO and GMEC.  As part of their membership, they are encouraged to disseminate information to and bring forth issues from their colleagues to the DIO and GMEC.  The five officers of the HOA are voting members on the GMEC. The HOA Bylaws are found in Annex J (page 68).

### B.   GMEC CHIEF RESIDENT/FELLOW/HOA OFFICERS SUBCOMMITTEE

This subcommittee is an advisory group on matters affecting graduate medical education and the Residents/Fellows.  It is comprised of all Chief Residents, five peer selected HOA Officers, Associate and Assistant Deans of Graduate Medical Education, and Hospital Administration. Duties of this subcommittee include participation of six officers as voting members of the GMEC.  The Chair, Chief Resident and President, HOA participate as voting members of the GME Executive Committee, review and selection of Residents/Fellows for GMEC and Hospital Subcommittees.  The GMEC Chief Resident/HOA Officers Subcommittee meets quarterly or as needed.

## XVII.   OUTSTANDING RESIDENT/FELLOW AWARDS

The GMEC Working Environment/Operations Subcommittee selects annually an Overall PGY1 Resident, an Overall Resident, and an Overall Fellow.  The Residents/Fellows are nominated by the Program Director and the selection criteria includes performance during residency based on the ACGME six core competencies and service to the university and community.  The recipients receive a plaque; certificate and monetary award at an annual award ceremony.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

32

XVIII.    OTHER IMPORTANT POLICIES AND PROCEDURES

A.    Other Important UTMB Institutional Policies

Residents/Fellows are to note that the UTMB GMEC requires all UTMB Residents/Fellows to comply with the following institutional policies.  Relevant policies will apply when Residents/Fellows rotate to other participating sites.
1.    General Conduct
2.    Personal Appearance/Dress Code
3.    Attendance and Punctuality
4.    Confidentiality
5.    External Communication
6.    Secondary Employment
7.    Breach of EMR Usage
8.    Disciplinary Policies and Procedures
9.    Ethical Code and Guidelines
10.   Staff Grievance
11.   UTMB Medical Staff Bylaws
12.   Adherence to Clinic and Inpatient Unit Policies
13.   Use of Social Media

B.    Quality Improvement Education for Healthcare Providers Policy

To ensure a standardized curriculum in Quality Improvement, the GMEC requires all residency programs to complete five core modules of the Institute for Healthcare Improvement (IHI) Curriculum.

All new Residents/Fellows within the first three months of employment must complete the required IHI six modules listed below.  If an incoming Resident/Fellow has completed the IHI training prior to his/her residency, they do not have to complete the modules again but must provide a copy of certification to their program coordinator.

The modules are:
    QI 101: Introduction to Health Care Improvement Improvement
    QI 102:  How to Improve with the Model for Improvement
    QI 103: Testing and Measuring Changes with PDSA Cycles
    QI 104: Interpreting Data: Run Charts, Control Charts, and Other Measurement Tools
    QI 105: The Human Side of Quality Improvement Leading Quality Improvement

Failure to complete the modules will result in Resident/Fellow removal from clinical service until the training requirement is satisfied. At least one faculty from each program will complete the six modules, preferably the Program Director or Quality Improvement Faculty for the Department.

C.    Resident/Fellow as Teacher

1.    Introduction:
    a.    Teaching is an important skill addressed as a core competency within the framework of the ACGME. Residents/Fellows are integral to the instruction of UTMB medical students, junior residents, other health professionals and their patients. The Liaison Committee for Medical Education (LCME), as well as the ACGME, encourages

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

33

residency/fellowship programs to provide teaching skills programs within the residency/fellowship curriculum to prepare Residents/Fellows for their roles in teaching and assessment.

b. Many benefits of Resident teaching programs are suggested in the literature, including enhancement of the Resident/Fellow's knowledge base, interactive communication skills, leadership skills, and self-directed learning skills. Training Residents/Fellows to teach facilitates effective information exchange among the medical team, Residents, Fellows, patients, and families.

2. Resident/Fellow as Teacher Curriculum:
   a. Each training program must incorporate "teaching skills" into their curriculum.
   b. At least one hour should be incorporated into each program's orientation sessions within first three months.
   c. All programs should incorporate at least one additional hour into the overall curriculum.
   d. All programs should have a total of 2 hours annually.
   e. This is a minimum requirement and not meant to replace or interfere with programs that already have a more robust "teaching skills" curriculum in place.
   f. Programs should include teaching skills as a facet of Resident/Fellow assessment.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

34

**ANNEX A**

**RESIDENT/FELLOW ACGME COMPETENCIES**

The residency/fellowship program must integrate the following ACGME competencies into the curriculum:

Patient Care

Residents/Fellows must be able to provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health.

Medical Knowledge

Residents/Fellows must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social-behavioral sciences, as well as the application of this knowledge to patient care.

Practice-based Learning and Improvement

Residents/Fellows must demonstrate the ability to investigate and evaluate their care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and life-long learning.  Residents/Fellows are expected to develop skills and habits to be able to meet the following goals:

(1) identify strengths, deficiencies, and limits in one's knowledge and expertise;

(2) set learning and improvement goals;

(3) identify and perform appropriate learning activities;

(4) systematically analyze practice using quality improvement methods, and implement changes with the goal of practice improvement;

(5) incorporate formative evaluation feedback into daily practice;

(6) locate, appraise, and assimilate evidence from scientific studies related to their patients' health problems;

(7) use information technology to optimize learning; and,

(8) participate in the education of patients, families, students, residents and other health professionals.

Interpersonal and Communication Skills

Residents/Fellows must demonstrate interpersonal and communication skills that result in the effective exchange of information and collaboration with patients, their families, and health professionals. Residents/Fellows are expected to:

(1) communicate effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds;

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

35

(2) communicate effectively with physicians, other health professionals, and health related agencies;

(3) work effectively as a member or leader of a health care team or other professional group;

(4) act in a consultative role to other physicians and health professionals; and,

(5) maintain comprehensive, timely, and legible medical records, if applicable.

<u>Professionalism</u>

 Residents/Fellows must demonstrate a commitment to carrying out professional responsibilities and an adherence to ethical principles. Residents are expected to demonstrate:

(1) compassion, integrity, and respect for others;

(2) responsiveness to patient needs that supersedes self-interest;

(3) respect for patient privacy and autonomy;

(4) accountability to patients, society and the profession; and,

(5) sensitivity and responsiveness to a diverse patient population, including but not limited to diversity in gender, age, culture, race, religion, disabilities, and sexual orientation.

<u>Systems-based Practice</u>

Residents/Fellows must demonstrate an awareness of and responsiveness to the larger context and system of health care, as well as the ability to call effectively on other resources in the system to provide optimal health care. Residents are expected to:

(1) work effectively in various health care delivery settings and systems relevant to their clinical specialty;

(2) coordinate patient care within the health care system relevant to their clinical specialty;

(3) incorporate considerations of cost awareness and risk-benefit analysis in patient and/or population-based care as appropriate;

(4) advocate for quality patient care and optimal patient care systems;

(5) work in interprofessional teams to enhance patient safety and improve patient care quality; and,

(6) participate in identifying system errors and implementing potential systems solutions.

### *ACGME Common Program Requirements Effective July 1, 2016*

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

36

**ANNEX B**

**GRADUATE MEDICAL EDUCATION**

**INSTITUTIONAL STATEMENT**

**THE UNIVERSITY OF TEXAS MEDICAL BRANCH**

I.     Preamble

The University of Texas Medical Branch consists of the School of Medicine, the School of Nursing, the School of Health Professions, the Graduate School of Biomedical Sciences, the Institute for the Medical Humanities, the Neuroscience and Cell Biology, the Institute for Human Infections and Immunity, and UTMB Health comprised of the hospitals and clinics.  UTMB exists under the authority of The University of Texas Board of Regents and was established by the State of Texas by Constitutional Amendment.  It has existed in Galveston since 1891 and is the oldest of The University of Texas medical schools.  Its teaching hospitals are operated under the authority of The University of Texas System and funded by the State of Texas.  These hospitals and clinics represent the only general categorical referral hospitals operated by the State of Texas. The State of Texas, operating through the Regents of The University of Texas System and its Chancellor and Vice Chancellor for Health Affairs, establishes local authority for operations with the President of UTMB.  Through the President, Executive Vice President, Provost and Dean of the School of Medicine, and the Executive Vice President and CEO for UTMB Health System, authority is vested in the area of Graduate Medical Education to the Associate Dean for Graduate Medical Education who is the Designated Institutional Official for the UTMB residency and fellowship programs.

II.    General Institutional Mission Statement

The University of Texas Medical Branch at Galveston's mission is to improve health for the people of Texas and around the world.  UTMB is an inclusive, collaborative community of forward thinking educators, scientists, clinicians, staff and students dedicated to a single purpose of improving health.  UTMB prepares future health professionals for practice, public service and lifelong learning through innovative curricula, and individualized educational experiences.  It advances understanding and treatment of illnesses and injuries through groundbreaking research, in the lab and at the bedside, including commercialization of such research as appropriate.  UTMB delivers skilled and patient-centered health care.                Mission
           UTMB's mission is to improve health for the people of Texas and around the world.

           Vision
           We work together to work wonders as we define the future of health care and strive to be the best in all of our endeavors.

           Values


           Our values define our culture and guide our every interaction.

                 We demonstrate **compassion** for all.
                 We always act with **integrity**.
                 We show **respect** to everyone we meet.
                 We embrace **diversity** to best serve a global community.
                 We promote excellence and innovation through **lifelong learning**.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

37

III.   Specific Mission Related to Graduate Medical Education

At the completion of medical school, the student is prepared only for a career of further learning. Extended education and clinical experience is required for the student to function effectively in the practice of medicine.  The University of Texas Medical Branch has, as a component of its educational mission, the  training of graduates of medical schools approved by the LCME (or students from non-LCME approved medical schools satisfying ACGME requirements) for entry into the practice of medicine.  This is accomplished by the high quality, graduate medical education residency/Fellowship programs.

These GME programs provide training in the primary care disciplines and the medical specialties providing consultation and specialty care for the patients.  This mission in graduate medical education not only assists in providing adequate numbers and diversity of medical practitioners for the State of Texas, but also provides role models for the various students enrolled in the professional schools at UTMB, and assists in the undergraduate medical education programs  The mission in graduate medical education at UTMB is therefore seen as more than the clinical training of practitioners.  It is also the development of future faculty and researchers as well.

IV.   Process of Institutional Resource Distribution

A.   Academic

The Dean of Medicine, utilizing funds provided to the School of Medicine by the State of Texas, provides resources for the operation of the clinical academic departments and other services, including institutional support. These resources are provided on the basis of budget hearings and are related to the educational, research, and service missions of those departments, and the role that the departments play in the overall institutional mission. This provides a framework of support for the graduate medical education programs.  The Dean of Medicine/Provost and the Executive Vice President & CEO for UTMB Health Systems, through the Associate Dean for Graduate Medical Education, provides a portion of the resources for the maintenance of the Office of Graduate Medical Education and associated accreditation costs.

B.   Hospital

The UTMB Health System, through its legislative appropriation and earned income, provides the salaries and benefits for the majority of Residents/Fellows receiving their training and education at UTMB.  The Executive Vice President & Provost and Dean of Medicine, through the Associate Dean for Graduate Medical Education, allocates these positions to the various residency programs.  They are granted on a yearly basis with understood long- term commitments related to the number and length of each residency program.  All Residents/Fellows appointed at UTMB are salaried and appointed for one-year terms, renewable with progression, on the recommendation of the program directors.  Funding is granted to programs only to the extent that they are in an ACGME approved status and only for the Residency Review Committee approved number of Residents/Fellows and length of programs. Petitions for additional positions or additional length of program must be supported by documents indicating the approval of the appropriate Residency Review Committee.  Certain programs may be funded based on equivalent Specialty Board or Texas Medical Board accreditation if approved by the UTMB Office of Graduate Medical Education.  UTMB Health provides the administrative support and operating budget to maintain the residents/fellows as employees of the institution, process their records, participate as an institution in the National Residency Matching Program, and satisfy

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

38

institutional permit and other licensure and visa requirements for their legal function in the State of Texas.  Various other operational requirements of the residency programs, including personnel matters, are carried out through the Office of Graduate Medical Education.  The Associate Dean for Graduate Medical Education operates this office directly and is advised by the Graduate Medical Education Committee.  This assures regular (at least quarterly) meetings with the program directors and representatives from the Residents/Fellows as a group to facilitate communication and address problems or opportunities.

C.   Departmental

The departmental authorities and responsibilities related to Graduate Medical Education are vested in the various clinical departments through the Associate Dean for Graduate Medical Education.  Each department provides a framework for selection, review, curriculum development and implementation, as well as periodic evaluation and final certification of expected levels of proficiency of its various Residents/Fellows.  Each program is managed by a program director recommended by the department Chair and approved by the GMEC.   All training programs must have a duly constituted Clinical Competency Committee (CCC) to evaluate resident progression.

V.   Operational System

A.   Appointment of Teaching Staff

All teaching staff are full-time or part-time members of the Faculty of the School of Medicine, subject to approval of the UT System Board of Regents.  The Dean of Medicine initiates this appointment process on petition from the academic departmental Chair.

B.   Selection of Residents/Fellows

Selection of Residents/Fellows rests with the department/division through its program director in conformance with ACGME standards, and is endorsed by the institution through the Associate Dean for Graduate Medical Education.  Except in unusual circumstances requiring approval of the Associate Dean for Graduate Medical Education, Residents/Fellows enter the first postgraduate year through the National Residency Matching Program by institutional commitment.  Residents/Fellows enter at subsequent years either through the matching programs appropriate for those specialties or by appointment recommended by the program director.  Each program director has a graduate medical education advisory committee for the ranking for selection of applicants to its graduate medical programs.

Residency programs select from among eligible applicants based on their preparedness, ability, aptitude, academic credentials, communication skills, and personal qualities such as motivation and integrity.  They must not discriminate with regard to sex, race, age, religion, color, national origin, disability, or veteran status.

C.   Appointment of Residents/Fellows

The formal appointments of Residents/Fellows are made at an institutional level by the Associate Dean for Graduate Medical Education on petition from the various program directors, and as appropriate to the program status and the number of positions and length of training authorized by the ACGME Residency Review Committees.  Resident/Fellow appointments are one year in length and are renewable annually on the recommendation of the program director and concurrence by the Associate Dean for Graduate Medical

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

39

Education.  Residents/Fellows are employees of UTMB and are entitled to employee benefits and assistance programs, and they are covered by institutional personnel policies.

D.    <u>Supervision of Residents/Fellows</u>

Supervision of Residents/Fellows rests with the program director based on the mechanism established in that particular discipline and with institutional oversight and monitoring by the Associate Dean for Graduate Medical Education and the Graduate Medical Education Committee.

All patient care must be supervised by qualified faculty. The program director ensures, directs, and documents adequate supervision of Residents/Fellows at all times. Residents/Fellows are provided with rapid, reliable systems for communicating with supervising faculty.  Faculty schedules are structured to provide Residents/Fellows with continuous supervision and consultation.  Faculty and Residents/Fellows are educated to recognize the signs of fatigue, and adopt and apply policies to prevent and counteract its potential negative effects.

Certification of completion of Residency/Fellowship training is granted institutionally on the recommendation of the program director.

E.    <u>Evaluation of Residents/Fellows by Faculty</u>

All residency/fellowship programs are required to use the New Innovations evaluation system.   There are six required measures to ensure compliance of the ACGME core competencies.  ACGME specialty groups developed outcome-based milestones as a framework for determining Resident and Fellow performance within the six ACGME Core Competencies. The Milestones are competency-based developmental outcomes (knowledge, skills, attitudes, and performance) that can be demonstrated progressively by Residents and Fellows from the beginning of their education through graduation to the unsupervised practice of their specialties. Each residency/fellowship program can add performance measures specific to its rotations. The intent of the evaluation is to assist the Resident/Fellow in  meeting the educational goals established by his/her program including required technical proficiency, and to identify problems so that an effective course of corrective action is planned.  Formal evaluations of Residents/Fellows are conducted at intervals considered optimal by the program director and Clinical Competency Committee (CCC), but must be at least as frequently as required in the ACGME's Institutional Requirements and/or Program Requirements for that specific medical discipline.  The Associate Dean for GME provides institutional oversight of the evaluation of Residents/Fellows through the Graduate Medical Education Committee.

F.    <u>Evaluation of Program and Faculty by Residents/Fellows</u>

Residents/Fellows are required to evaluate the faculty and rotations anonymously using New Innovations.  The evaluations are completed after each rotation.   The Residents/Fellows evaluate the faculty using the ACGME's core competencies, and there are specific questions on each rotation regarding duty hours and faculty supervision.  This satisfies an ACGME program requirement and its effectiveness is reviewed by the GME Working Environment and Operations Subcommittee.

The Residents/Fellows completing training are required to complete an evaluation of the program before leaving UTMB.  Questions include the overall educational experience of the residency/fellowship, interactions with the faculty and staff, and clinical operations. This

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

40

annual program evaluation (APE) is reviewed annually by the GME Education Subcommittee.

G.    Evaluation of Program by Supervising Faculty

Faculty evaluates program at least three ways:

- Annual ACGME Faculty Surveys
- Participation in the Program Evaluation Committee (PEC)
- Participation in Departmental Meetings

H.    Dismissal of Residents/Fellows

Dismissal of Residents/Fellows for cause is implemented based on recommendations received from the program director and Clinical Competency Committee (CCC) indicating the reasons for such dismissal.  Any action that would be considered adverse to the Resident/Fellow has established mechanisms for appeal as noted in the Resident/Fellow Work Agreement.

I.    Assurance of Due Process

Residents/Fellows are unique among UTMB employees in that they are not only students/trainees, but they are also teachers and deliver medical care.  A specific due process procedure has been developed at UTMB to address such concerns as they apply to Residents/Fellows and is contained in the "Graduate Medical Education Institutional Handbook."

J.    Annual Review of Program

The GMEC, through its subcommittees, will annually review programs' ACGME Web Ads, ACGME Citations and Annual Program Evaluation (APE).

K.    Resident/Fellow Agreements

The Resident/Fellow Work Agreement is signed by the Program Director and the Resident/Fellow.  As employees of UTMB, the Residents/Fellows are entitled to vacation, sick leave, maternity leave, and institutional fringe benefits as other employees. Residents/Fellows are provided liability protection under the University of Texas System Professional Medical Liability Benefit Plan to a level of $100,000.  Residents/Fellows have liability protection by statute under Chapter 104, Civil Practice, and Remedies Code up to $100,000 per claim.  The Resident/Fellow is protected for issues that occurred during the residency, even though the Resident/Fellow completed the program.  Programs agree that the Resident/Fellow should be informed no later than March 1st (or four months prior to the completion of their Resident/Fellow level if appointed other than on July 1st) if the program does not plan to reappoint them with progression to the next level of training.  If non-renewal of work agreement occurs within four months prior to the end of the agreement, the Resident/Fellow is provided with as much written notice of the intent not to renew as circumstances reasonably allow.  Residents/Fellows are asked to extend the same courtesy to programs if they do not plan to accept reappointment at the next level of training.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

41

APPROVED BY:

David L. Callender, M.D., **MBA**, FACS
President

Date 1/13/17

Danny O. Jacobs, M.D., MPH
Executive Vice President and Provost
and Dean, School of Medicine

Date 2/20/17

Donna K. Sollenberger
Executive Vice President and CEO Health System

Date 1/12/17

Gulshan Sharma, M.D.
Chief Medical Officer

Date 1/12/17

Thomas A. Blackwell, M.D.
Associate Dean for Graduate Medical Education
Designated Institutional Official

Date 1/11/17

Christopher Thomas, M.D.
Assistant Dean for Graduate Medical Education

Date 11/30/16

Donald S. Prough, M.D.
Chair, Anesthesiology

Date 12/16/17

Bernard Gibson, M.D.
Interim Chair, Dermatology

Date 12/14/16

Barbara Thompson, M.D.
Chair, Family Medicine

Date 12/9/16

Randall J. Urban, M.D.
Chair, Internal Medicine

Date 12/9/16

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT & INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\APPROVED GME Institutional Handbook 2017 - 2018.docx

42

_____
Anish Bhardwaj, M.D.
Chair, Neurology

01/09/2017
_____
Date

_____
Kevin H. Merkley, M.D.
Interim Chair, Ophthalmology

12/16/16
_____
Date

_____
Vicente A. Resto, M.D., Ph.D.
Chair, Otolaryngology

12/12/2016
_____
Date

_____
C. Joan Richardson, M.D.
Chair, Pediatrics

12/9/16
_____
Date

_____
Laura L. Rudkin, Ph.D.
Chair, Preventive Medicine
and Community Health

12-12-16
_____
Date

_____
Eric M. Walser, M.D.
Chair, Radiology

12/15/2016
_____
Date

_____
Gary D.V. Hankins, M.D.
Chair, OB-Gyn

12-16-16
_____
Date

_____
Ronald W. Lindsey, M.D.
Chair, Orthopaedic Surgery

12/15/16
_____
Date

_____
Michael Laposata, M.D.
Chair, Pathology

1/10/17
_____
Date

_____
Karen D. Wagner, M.D.
Interim Chair, Psychiatry and Behavioral Sciences

12/16/16
_____
Date

_____
Martin Colman, M.D.
Chair, Radiation Oncology

01/09/17
_____
Date

_____
Douglas S. Tyler, M.D.
Chair, Surgery

12/15/16
_____
Date

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT & INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\APPROVED GME Institutional Handbook 2017 - 2018.docx

43

**ANNEX C**

**UTMB GRADUATE MEDICAL EDUCATION COMMITTEE**
**POLICY AND PROCEDURES**

I.    <u>Purpose</u>:

The Graduate Medical Education Committee is advisory to the Associate Dean for Graduate Medical Education/Designated Institutional Official in matters related to the residency and fellowship programs sponsored by the University of Texas Medical Branch. The GMEC is charged with institutional oversight of graduate medical education at UTMB including the development and implementation of GME policies and procedures.

II.   <u>Membership</u>:

A.    <u>Associate Dean for GME/DIO and Chair GMEC</u>

B.    <u>Program Directors</u>:
      Allergy and Immunology
      Anesthesiology
      Anesthesiology - Adult Cardiothoracic
      Anesthesiology - Clinical (TMB Approved)
      Anesthesiology - Critical Care Medicine
      Anesthesiology - Obstetrics (TMB Approved)
      Anesthesiology - Pain Medicine
      Dermatology
      Dermatology - Dermatopathology
      Dermatology - Micrographic Surgery and Dermatologic Oncology
      Family Medicine
      Family Medicine - Integrated & Behavioral Medicine
      Internal Medicine
      Internal Medicine - Advanced Heart Failure (TMB approved)
      Internal Medicine - Cardiology
      Internal Medicine - Cardiology/Interventional
      Internal Medicine - Endocrinology
      Internal Medicine - Gastroenterology
      Internal Medicine - Geriatrics
      Internal Medicine - Infectious Diseases
      Internal Medicine - Nephrology
      Internal Medicine - Oncology
      Internal Medicine - Pulmonary/Critical Care
      Internal Medicine - Rheumatology
      Internal Medicine - Preventive Medicine/General
      Internal Medicine - Preventive Medicine/Aerospace
      Neurology
      Neurology - Clinical Neurophysiology
      Obstetrics and Gynecology
      Obstetrics and Gynecology - Maternal Fetal Medicine (ABOG approved)
      Ophthalmology – UTMB/Methodist
      Orthopaedic Surgery
      Orthopaedic Surgery - Foot & Ankle
      Otolaryngology

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

44

Pathology
Pathology - Cytopathology
Pathology - Forensic
Pathology - Surgical
Pediatrics
Pediatrics - Neonatal/Perinatal
Preventive Medicine/Aerospace
Preventive Medicine/General
Psychiatry
Psychiatry - Child & Adolescent
Radiation Oncology
Radiology - Breast Imaging (TMB Approved)
Radiology - Diagnostic
Radiology - Neuro
Radiology - Vascular/Interventional
Surgery - Burn Research and Clinical Fellowship (TMB Approved)
Surgery - Critical Care
Surgery - General
Surgery - Neuro
Surgery - Oral (ADA approved)
Surgery - Plastic Surgery/Integrated
Surgery - Plastic Surgery/Craniofacial
Surgery - Urology
Surgery - Vascular/Integrated

C.    Resident/Fellows (11 total – 5 nominated by the UTMB House Officers Association and 6 nominated by the GMEC Chief Resident/Fellow & HOA Officers Subcommittee)

D.    Chief Quality Improvement/Safety Officer (Hospital Administration)

E.    Representative from the Institute for the Medical Humanities

F.    Ad Hoc members: Executive Vice President and Provost/Dean of Medicine, Executive Vice President/CEO UTMB Health System, Lay Member from the community, Junior and Senior Medical School Class Presidents.

III.    GMEC Meeting Frequency and Format:

Meets at least quarterly with a formal agenda developed by the GMEC Executive Committee (described in ACGME IR. IB.3). The program directors are voting members and must attend 50% of the GMEC meetings (four meetings per year).  Voting members must have a faculty alternate (Associate Program Director or Designated Faculty) if unable to attend. At least two Resident/Fellow members must attend at all times. Residents must send a proxy if unable to attend. If a Program Director is attending for another program, they must sign in for both programs.  The Chair of the GMEC communicates regularly with senior institutional administration addressing major problems/opportunities including recommendations for additional resource assignment to specific programs or GME in its entirety.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

IV.     GMEC Executive Committee and Standing Subcommittees:

To assist the decision making process, the regular discharge of mandated accreditation responsibilities, and the general effectiveness of the GME Committee, a GMEC Executive Committee and six standing subcommittees are established.

A.      GMEC Executive Committee: Chaired by the DIO/Associate Dean for Graduate Medical Education and includes the chairs of the six standing subcommittees and three other program directors selected by the DIO/Associate Dean for Graduate Medical Education. The Program Directors of the Internal Medicine, Pediatrics, and the General Surgery core residencies must be included in the above group.  The HOA President and Chair of the Chief Resident Committee serve on the Executive Committee as Resident/Fellow members.

1.      Meeting Frequency: Every three months prior to the quarterly meetings of the Graduate Medical Education Committee and additionally as necessary.

2.      Preparation of the agenda for the GMEC meetings including regular subcommittee reports and review of ACGME actions related to UTMB residency programs since the prior meeting.

3.      Oversight and direction to the subcommittees including assignment of specific tasks, timelines, and planned reports.

4.      Prepare the Sponsoring Institution's Annual Institutional Review (AIR) regarding educational quality and accreditation performance utilizing key indicators.

5.      Review credentials and approve/disapprove nominations of all new Program Directors.

6.      At the Annual Institutional Review, the GMEC Executive Committee reviews the subcommittee's membership for participation, length of service, and makes membership changes as necessary.

7.      Meetings: At least quarterly and often more frequently as needed

B.      GMEC Standing Subcommittees: The following subcommittees are responsible for the ongoing efforts required to address the responsibilities assigned to the GMEC in the ACGME's Institutional Requirements (ACGME IR-B).  The chairs of the subcommittees are selected as previously indicated and their functions overseen by the GMEC Executive Committee. The DIO/Associate Dean for Graduate Medical Education appoints additional members of these subcommittees with the input of the GMEC Executive Committee. Peer-selected Resident/Fellows are appointed to each subcommittee except the RC Citation Subcommittee. The subcommittees will meet every three months (or more often as required) prior to the meeting of the GMEC Executive Committee.  The following are the specific responsibilities of each of these subcommittees.

1.      GMEC Education Subcommittee:

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

46

a.      Establishment and implementation of institutional guidelines and policies for the selection, evaluation, promotion, and dismissal of Resident/Fellows (ACGME IV.A.B. and C.).

b.      Assurance that the Resident/Fellows' curriculum provides a regular review of ethical, socioeconomic, medical/legal, and cost containment issues that affect GME and medical practice.  The curriculum must provide an appropriate introduction to communication skills, research design, statistics, and critical review of the literature necessary for acquiring skills for lifelong learning.  There must be appropriate Resident/Fellow participation in departmental scholarly activity, as set forth in the applicable Program Requirements (ACGME IR-III.).

c.      Review the annual ACGME Resident/Fellow survey results & responses to non-compliant areas (ACGME IR.B.5.a. [2].)

d.      Review the annual ACGME Faculty survey results & responses to non-compliant areas. (ACGME IR.B.5.a. [2])

e.      Ensure compliance and quality of the 6 Month and Final Summative Evaluations of all trainees.

f.      Ensure compliance of Evaluation Completion by Faculty within two-weeks after the end of each rotation assigned as per ACGME requirement.

g.      Review ACGME Milestone Evaluations

h.      Review annual teaching skills of "Resident/Fellows as Teacher"

i.      This GMEC Subcommittee must provide evidence of quality improvement efforts by maintaining a GMEC Special Review process for programs that warrant intervention beyond the Annual Program Evaluations (APE). The GMEC Special Review protocol must outline a reporting structure, monitoring procedures and timeline, including written recommendations and procedures for follow-up to improve ACGME accredited program performance in specified areas.

j.      Meetings: At least quarterly and often more frequently as needed

2.      <u>GMEC Working Environment and Operations Subcommittee:</u>

a.      Implementation of institutional policies and procedures for discipline and the resolution of Resident complaints and grievances. These policies and procedures must satisfy the requirements of fair procedures and apply to Resident/Fellows in the UTMB residency programs (ACGME IR-IV.D).

b.      Annual Review of Resident/Fellow Salary & Benefits (ACGME IR-II.D).

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME  WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

47

c.      Monitoring and enforcement of Duty Hours (ACGME R.4IIIb.B.5. and IV.J).

d.      Implementation of policies that affect all residency programs regarding the quality of the work environment for trainees (ACGME IR-III.)

e.      Review Duty Hours Quarterly Summary Reports for all programs in addition to any other reports from Resident/Fellow. Programs with non-compliance issues are required to provide a detailed response that is also presented to the GMEC. (ACGME IR.III.B.5 and IV.J).

f.      Selects annually an Outstanding First Year Resident, Outstanding Overall Resident, and Outstanding Overall Fellow.

g.       Review and make recommendations regarding USMLE Policy

h.      Meetings: At least quarterly and often more frequently as needed

3.      GMEC Quality Improvement & GME Program Review Subcommittee:

a.      Review Annual Program Evaluations (APE). Review and follow-up to verify all action plans are implemented and deficiencies resolved.

b.      Review program's curriculum for quality improvement education. Monitor Resident/Fellows' participation in Quality Improvement and review outcomes. (ACGME IR-I.B.4.a. [2] and [3]).

c.      Monitor completion of IHI Modules as designated by GMEC.

d.      Review Program's Annual Web ADS prior to ACGME deadline.

e.      Meetings: At least quarterly and often more frequently as needed

4.      GMEC External Training Site Subcommittee:

a.      Oversight of all Resident/Fellow education at non-UTMB sites.

b.      Approval/Disapproval of all external sites are evaluated on the following:
1.      The experience is necessary for accreditation as set forth by the RC Program Requirements.
2.      The experience cannot be obtained at a UTMB site or within a private clinic.
3      The overall quality of training at the site
4.      Electives are reviewed on a case-by-case basis.

c.      Meetings: At least quarterly and as more frequently as needed

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT & INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

5.     <u>GMEC RC Citations Subcommittee:</u>

    a.     Review all RC Citations in ACGME program letters of notification and monitor action plans for correction of citations and areas of noncompliance
(ACGME IR-III.B.8).

    b.     Track action plans of RC citations to determine whether resolved or unresolved.  If unresolved, track citation until resolved.

    c.     Meetings: At least quarterly and as more frequently as needed

6.     <u>GMEC Chief Resident/Fellow & HOA Officers Subcommittee:</u>

    a.     Membership:
1.     All Chief Resident/Fellows
2.     Five selected HOA Officers
3.     Associate Dean for GME and Assistant Dean for GME
4.     Hospital Administration

    b.     Duties:
1.     Eleven voting members on GMEC
2.     Selection of Resident/Fellows to GMEC Subcommittees, Hospital Committees, and Medical Staff Committees
3.     Chair of Chief Resident/Fellow Committee and President of HOA attends GMEC Executive Committee
4.     Address any issues raised by a Resident/Fellow

    c.     Meetings: At least quarterly and as more frequently as needed

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

49

**ANNEX D**

**UTMB GRADUATE MEDICAL EDUCATION COMMITTEE POLICIES**
**QUALITY IMPROVEMENT AND GME PROGRAM REVIEW SUBCOMMITTEE**

**GME SPECIAL REVIEWS**

According to the Institutional Program Requirements section I.B.6:
*The GMEC must demonstrate effective oversight of underperforming programs through a Special Review process.*

*The Special Review process must include a protocol that:*
*(1) Establishes criteria for identifying underperformance; and,*
*(2) Results in a report that describes the quality improvement goals, the corrective actions, and the process for GMEC monitoring of outcomes.*

At UTMB, the Special Review process is developed and maintained by the GMEC Subcommittee on Quality Improvement and GME Program Review. The subcommittee continuously assesses the performance of all GME training programs with the goal of optimizing the quality of education for the trainees and the support and development of their educators. The subcommittee performs direct evaluation of program performance by reviewing every Annual Program Evaluation and every Accreditation Data System update for quality, parity and internal consistency. The subcommittee receives recommendations and referrals from the other GMEC Subcommittees that collectively provide direct oversight of graduate medical education at UTMB.

**Indication**
Underperformance by a program may be identified by a wide range of mechanisms. The criteria for identifying underperformance include, but are not limited to:
- Resident/Fellow or Faculty survey responses demonstrating noncompliance or significant variance;
- program attrition in faculty or Resident/Fellows;
- decreased board passage rate;
- external citations or warnings from the Residency Review Committee;
- internal expressions of concern from the UTMB GMEC subcommittees;
- Insufficient scholarly activity of Resident/Fellows or faculty;
- Major changes in the curriculum or participating sites;
- Insufficient or disparate clinical experience or volume;
- Duty hour violations;
- Failure to implement or document outcomes in milestones or competencies;
- Any indication of noncompliance with ACGME Common, specialty/subspecialty-specific Program, and/or Institutional Requirements; or UTMB institutional policy

A consultative special review may be requested by a Program Director or Department Chair for any reason. This may be done without implying underperformance by the program, but rather in the spirit of continuous quality improvement.

**Process**
The special review process is designed to be responsive, flexible, and nimble in providing evaluation, feedback, and oversight to GME programs. The special review may be comprehensive, addressing the effectives of the program as a whole, or it may be very specific, addressing a single area of concern.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT & INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

The special review team and process is designed to respond optimally to the identified concerns, but will comply generally with the following format.

The GMEC develops, implements, and oversees a special review process as follows:

The special review committee should include at least one faculty member chair and at least one Resident/Fellow from within UTMB but not from within GME program being reviewed. In some instances, Resident/Fellow involvement will not be indicated, but generally every effort is made to ensure Resident/Fellow participation and input in educational quality improvement. Additional internal or external reviewers may be included on the special review committee as determined by the subcommittee or the GMEC or DIO. Administrators from outside the program may also be included.

The members of the GMEC Quality Improvement and GME Program Review Subcommittee serve as the chairs of the special review committee. When the need for a special review is identified, the subcommittee discusses the indication for the special review and, in consultation with the DIO, will specify the charge for the special review committee and make recommendations about the composition of the committee and the documentation to be requested and reviewed. Based on the specific area of interest, the program being reviewed may be asked to provide information and documentation prior to the review.

A written protocol approved by the GMEC incorporates the following elements as a guideline for assessing quality and compliance. Each special review will focus on the elements most relevant to the specified area of concern.

The special review may assess the programs:

- Compliance with the Common, Specialty/Subspecialty-Specific Program, and Institutional Requirements, including:

  o Professionalism, Personal Responsibility, and Patient Safety;
  o Transitions of Care;
  o Alertness Management/Fatigue Mitigation;
  o Supervision of Resident/Fellows;
  o Clinical Responsibilities;
  o Teamwork; and
  o Resident/Fellows Duty Hours.

- Educational objectives and effectiveness in meeting those objectives;
- Educational and financial resources;
- Effectiveness in addressing areas of non-compliance and concerns in previous ACGME accreditation letters of notification and previous internal and/or special reviews;
- Effectiveness of educational outcomes in the ACGME general competencies;
- Effectiveness in using evaluation tools and outcome measures to assess a Resident/Fellow's level of competence in each of the ACGME general competencies; and
- Annual program improvement efforts in:
  o Resident/Fellow performance using aggregated Resident/Fellow data;
  o Faculty development;
  o Graduate performance including performance of program graduates on the certification examination; and
  o Quality improvement and patient safety.

Materials and data to be used in the special review process may include:

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT & INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

51

- The ACGME Common, Specialty/Subspecialty-Specific Program, and Institutional Requirements in effect at the time of the review;
- Accreditation letters of notification from previous ACGME reviews and progress reports sent to the respective RRC;
- Reports from previous internal or special reviews of the program;
- Previous annual program evaluations;
- Previous and current Accreditation Data System information;
- Results from internal or external Resident/Fellow and Faculty surveys;
- Evaluations of Resident/Fellow and faculty performance;
- Materials from the program's Clinical Competency Committee or Program Evaluation Committee; and
- Any other materials the special review committee considers necessary and appropriate.

The special review committee may conduct interviews with the program director and key faculty members. If Resident/Fellows are interviewed, at least one peer-selected Resident/Fellow from each level of training in the program will be interviewed, and other individuals deemed appropriate by the committee.

If a program has no Resident/Fellows enrolled, the following circumstances apply:

GMEC demonstrates continued oversight of those programs and may do this through a modified special review that ensures the program has maintained adequate faculty and staff resources, clinical volume, and other necessary curricular elements required to be in substantial compliance with the Institutional, Common and Specialty-Specific Program Requirements prior to the program enrolling a Resident/Fellow. After enrolling a Resident/Fellow, a special review should be completed within the second six-month period of the Resident/Fellow's first year in the program.

**Special Review Report**
The written report of the special review for a program must contain, at a minimum:
- The name of the program reviewed;
- The date of the special review;
- The names and titles of the special review committee members;
- The indication for the special review;
- A brief description of how the special review process was conducted, including the list of the groups/individuals interviewed and the documents reviewed;
- Sufficient documentation to demonstrate that a comprehensive review followed the GMEC's special review protocol and that a focused review utilized appropriate resources;
- Recommendations of the special review committee including
  - description of the quality improvement goals;
  - any corrective actions designed to address the identified concerns; and
  - The process for GMEC monitoring of outcomes.

The GMEC Quality Improvement and GME Program Review Subcommittee may, at its discretion, choose to modify the special review report before accepting a final version to be submitted to the GMEC and DIO.

The special review process at UTMB strives to incorporate the values and methodology of quality improvement into the recommendations made by each special review committee. Each reviewed program is asked to respond to the special review report with a proposed action plan including an educational quality improvement project that substantially includes Resident/Fellows in its conception and execution.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

52

The DIO and the GMEC monitors the response by the program to actions recommended by the GMEC in the special review process.  Outcomes of the special review process and associated educational quality improvement projects may be assessed by:

- Redeployment of internal Resident/Fellows and Faculty survey instruments;
- Repeat interviews with Resident/Fellows and faculty;
- Data submitted on subsequent Annual Program Evaluations or Accreditation Data System updates;
- Written progress reports submitted by the Program Director on a timeline specified by the special review committee or Quality Improvement and Program Evaluation subcommittee;
- Outcomes of educational quality improvement projects; and
- Subsequent ACGME Resident/Fellows and Faculty surveys.

The special review process is intended to ensure that every GME program at UTMB reaches its fullest potential in delivering the highest quality educational experience to its trainees and its educators.  Its goal is not mere compliance, but rather excellence.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME  WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

53

**ANNEX E**

**UTMB GMEC Policy on Passage of United States Medical Licensing Exams (USMLE)**

<u>Approved by</u>:        UTMB Graduate Medical Education Committee

<u>Approval Date</u>:   February 18, 2015

<u>Effective Date</u>:   July 1, 2015

<u>Revised Date</u>:     September 4, 2015

<u>Purpose</u>:          To ensure that Residents and Fellows complete the three steps of exams required for licensure by the Texas State Board of Medical Examiners.  It is beneficial to the Resident/Fellow if the exams are completed within the first two years of residency because the exams cover multiple disciplines.  It ensures that Residents/Fellow meet the exam requirements of USMLE before completion of training regardless if they remain in Texas or practice medicine in other states.

This policy does not apply to Residents and Fellows who hold an unrestricted Texas medical license.  They have met all exam requirements.

**Guidelines for Residents/Fellows:**   Prior to acceptance of a residency/fellowship applicant, the Program Director shall assure that the applicant has passed USMLE Step 1, or its equivalent, within the number of attempts required for Texas licensure.

Residents/Fellows-Lacking USMLE Step 2 for employment:

1.        At the end of the first year of residency/fellowship training, each resident/fellow will be required to present proof using an original notarized House Resident/Fellow Examination Verification Form accompanied with a copy of their examination results. The required document should be sent to the GME Office reflecting the passage of USMLE Step 2 Clinical Knowledge and Clinical Skills or its equivalent, within the number of attempts required for Texas Licensure.

Residents/Fellows – Lacking USMLE Step 3 for employment:

1.        Resident/Fellows must register for USMLE Step 3 within the first 18 months of employment and pass within 24 months of employment.  Each resident/fellow will be required to present proof using an original Resident/Fellow Examination Verification Form accompanied with a copy of their examination results. The required document should be sent to the GME Office reflecting the passage of USMLE Step 3, or its equivalent, within the number of attempts required for Texas Licensure.

Notification of Attempts and Instructions:

1.        If the resident/fellow fail their first attempt during the year they are in (first or second year), they must notify the Program Director and Institutional GME Office in writing immediately following notification of score.

2.        If the resident/fellow fails a second time, the resident/fellow will be removed from service for one month prior to the next earliest scheduled exam date. The resident/fellows must notify the Program Director and Institutional GME Office of the new scheduled exam date.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

54

3.      If resident/fellow fail greater than the number of attempts allowed for Texas Medial Board licensure, they may be dismissed.

Educational Leave will be granted during the time required to take the exams.

Residents/Fellows who do not complete the Steps in accordance with the above time frames may be placed on leave with pay using accrued vacation time.  Once accrued time is depleted, residents/fellows may be placed on leave without pay.  This combined form of leave will not exceed three months after which they will be dismissed from the program if the step exams are not successfully completed.  Residents/Fellows who do not complete the Steps within the number of attempts required for Texas Licensure may be dismissed from the program. Residents/Fellows who are dismissed are eligible to appeal the dismissal.

http://www.usmle.org/applicationmaterials/default.htm#usmlecd.  Sources:  www.tmb.state.tx.us

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

55

**ANNEX F**

**Guidelines for Appropriate Use of the Internet, Electronic Networking and Other Media**

*These Guidelines apply to all pre and postgraduate trainees registered at the School of Medicine at the University of Texas Medical Branch, including medical students, residents in training, postdoctoral fellows, graduate students, clinical and research fellows or equivalent.  Use of the Internet includes posting on blogs, instant messaging [IM], social networking sites, e-mail, posting to public media sites, mailing lists and video-sites.*

The capacity to record, store and transmit information in electronic format brings new responsibilities to those working in healthcare with respect to privacy of patient information and ensuring public trust in our hospitals, institutions and practices.  Significant educational benefits can be derived from this technology but trainees need to be aware that there are also potential problems and liabilities associated with its use.  Material that identifies patients, institutions or colleagues and is intentionally or unintentionally placed in the public domain may constitute a breach of standards of professionalism and confidentiality that damages the profession and our institutions.  Guidance for postgraduate trainees and the profession in the appropriate use of the Internet and electronic publication is necessary to avoid problems while maintaining freedom of expression.  The University of Texas Medical Branch is committed to maintaining respect for the core values of freedom of speech and academic freedom.  Trainees are reminded that they must meet multiple obligations in their capacity as students, residents, fellows and as members of the medical profession and as employees of hospitals and other institutions.  These obligations extend to the use of the Internet at any time—whether in a private or public forum.

Postgraduate trainees and students are also subject to all HIPAA rules and regulations.

*General Guidelines for Responsible Internet Use:*

These Guidelines are based on several foundational principles as follows:

- Privacy and confidentiality are important to the development of trust between physician and patient,
- Respect for colleagues and co-workers is an integral part of maintaining an inter-professional environment,
- The tone and content of electronic conversations should remain professional.
- Individuals must be responsible for the content they contribute to blogs.
- Published/posted material on the Web must be regarded as permanent
- All involved in health care have an obligation to maintain the privacy and security of patient records under Health Insurance Portability and Accountability Act (HIPAA) http://www.utmb.edu/compliance/hipaa/hipaa-policies.htm
- Any time an individual identifies himself or herself as being affiliated with UTMB, he or she should make it clear that the views expressed do not necessarily represent the views of UTMB and may not be used for advertising or product endorsement purposes

**a)   Posting Information About Patients**
 Never post personal health information about an individual patient.  The **Institutional Handbook of Operating Procedures (IHOP) Policy 6.2.0 General Policy on the Use and Disclosure of Protected Health Information (PHI)** defines PHI as individually identifiable

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME
Institutional Handbook 2017 - 2018.docx

56

health information transmitted or maintained in any form or medium, including oral, written and electronic.  Individually identifiable health information relates to an individual's health status or condition, furnishing health services to an individual or paying or administering health care benefits to an individual.  Information is considered PHI where there is a reasonable basis to believe the information can be used to identify an individual.  Demographic information on patients is also considered PHI.  These guidelines apply even if the individual patient is the only person who may be able to identify him or herself on the basis of the posted description.  Trainees must ensure that anonymous descriptions do not contain information that will enable *any* person, including people who have access to other sources of information about a patient, to identify the individuals described.

*Exceptions* that would be considered appropriate use of the Internet:

1. Within secure internal hospital networks if expressly approved by the hospital or institution. Please refer to the specific internal policies of your hospital or institution.
2. Within specific secure course-based environments that have been set up by The University of Texas Medical Branch <u>and</u> that are password-protected or have otherwise been made secure.
3. Even within these course-based environments, participants should
   a. Adopt practices to make individuals "anonymous';
   b. Ensure there are no patient identifiers associated with presentation materials; and
   c. Use objective rather than subjective language to describe patient behavior. For these purposes, all events involving an individual patient should be described as objectively as possible, i.e., describe a hostile person by simply stating the facts, such as what the person said or did and surrounding circumstances or response of staff, without using derogatory or judgmental language.
4. Entirely fictionalized accounts that are so labeled.

**b) Posting Information About Colleagues and Co-Workers**

Respect for the privacy rights of colleagues and co-workers is important in an interprofessional working environment.  If you are in doubt about whether it is appropriate to post any information about colleagues and co-workers, ask for their explicit permission—preferably in writing.  Making demeaning or insulting comments about colleagues and co-workers to third parties is unprofessional behavior.

Such comments may also breach the University's codes of behavior regarding harassment, including the Code of Student Conduct, the Sexual Harassment Policy, and the Nondiscrimination Policy.

**c) Professional Communication with Colleagues and Co-Workers**
Respect for colleagues and co-workers is important in an inter-professional working environment.  Addressing colleagues and co-workers in a manner that is insulting, abusive, or demeaning is unprofessional behavior.  Such communication may also breach the University's codes of behavior regarding harassment, including the Code of Student Conduct, the Sexual Harassment Policy, and the Nondiscrimination Policy.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

57

**d) Posting Information Concerning Hospitals or Other Institutions**

Comply with the current hospital or institutional polices with respect to the conditions of use of technology and of any proprietary information such as logos or mastheads.

Postgraduate trainees must not represent or imply that they are expressing the opinion of the organization.  Be aware of the need for a hospital, other institution and the University to maintain the public trust.  Consult with the appropriate resources such as the Public Affairs Department of the hospital, Postgraduate Medical Education Office, or institution who can provide advice in reference to material posted on the Web that might identify the institution.

Include a disclaimer that the views expressed do not necessarily represent those of UTMB.

Adhere to compliance policies, including those pertaining to disclosure of copyrighted or proprietary information

**e) Offering Medical Advice**

Do not misrepresent your qualifications.

Postgraduate trainees are reminded that their institutional permit only allows the practice of medicine in UTMB approved rotations.  Medical advice outside of this limitation is not protected by our malpractice plan.

*Penalties for inappropriate use of the Internet:*

The penalties for inappropriate use of the Internet could include:

-**Remediation, suspension, failure to promote, or dismissal**

-Discipline for breach of hospital or institutional policy

-Prosecution or a lawsuit for damages for HIPAA violation

-a finding of professional misconduct by the Texas Medical Board

-Civil liability, including but not limited to defamation, intentional infliction of emotional distress, and copyright infringement

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

58

**ANNEX G**

**LEAVE CATEGORIES FOR RESIDENT/FELLOW**

PURPOSE:  Define institutional leave categories for Resident/Fellow

NOTE:  Residency programs may have individual adjustments to these leave policies.

CRITERIA:  Resident/Fellow leave requests:

- regular vacation/sick leave
- requests not utilizing earned vacation time

INSTRUCTIONS:

I.    Categories simply listed as a regular work day (with covering travel request as appropriate)

a.    Educational leave for medical meeting without a Resident/Fellow presentation - maximum of five (5) days per year

b.    Additional educational leave for medical meetings at which Resident/Fellow presents - maximum of five (5) additional days per year

c.    USMLE Exam - maximum of three (3) days during program for first-time takers only

d.    Specialty certification or recertification exam - maximum of three (3) days each for oral and written components for first-time takers only

e.    Job interviews - maximum of six (6) days total during residency

f.    Departmental recruitment trips at Program Director's request - maximum of five (5) days per year

II.    Categories Requiring Specific Identification

a.    Paternity Leave - to be handled under earned time utilizing institutional guidelines

b.    Other institutional formally designated leave days (e.g. hurricane leave days)

3.    Regular Vacation/Sick Leave Requests

Leave requests for regular vacation and sick leave should be approved by the residency program director and a copy retained in the residency program's personnel file as the official file copy.

IV.    Advancing Vacation Accruals

Programs are allowed to advance vacation accruals to the Residents/Fellows.  This is for the sole purpose of assisting the programs with scheduling the new Residents/Fellows vacations and ensuring that there is sufficient service coverage during the second half of their Resident/Fellow year.  The Resident/Fellow can be advanced vacation accruals, but must not have a negative balance by the end of **the same Resident/Fellow year**.  If there is a negative balance in the final

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

59

year of residency (employment at UTMB), the department will need to do corrected HRMS FLEA forms to change the recorded time using a different type of leave or use LWOP (leave without pay) for the number of negative hours.

If a Resident/Fellow is allowed to have negative leave accruals, it is on a temporary basis and his/her leave request form should denote the reason a negative accrual is approved.

V.    <u>Terminal Leave</u>

Terminal Leave is a special type of leave for residents/fellows only and it allows the resident/fellow an opportunity to use vacation on the last day of employment, which is not permitted for other employee types. Terminal Leave is approved at the sole discretion of the Program Director. This terminal leave approval is based on patient care coverage and service needs. The resident/fellow must have vacation or holiday leave accruals to take terminal leave. If approved by the Program Director, a Terminal Leave Form must be completed. The Terminal Leave form must be fully signed by the Program Coordinator, KRONOS timekeeper, Program Director and the Associate Dean for Graduate Medical Education.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

60

**ANNEX H**

**UTMB**
**Graduate Medical Education**

BASE SALARIES
Approved Effective 7/1/2017

---

| PG Level | Salaries |
|----------|----------|
| PGY-1 | 51,681 |
| PGY-2 | 53,432 |
| PGY-3 | 55,087 |
| PGY-4 | 57,545 |
| PGY-5 | 60,195 |
| PGY-6 | 62,357 |
| PGY-7 | 63,636 |
| PGY-8 | 67,371 |

APPROVE BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME WORK AGREEMENT & INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\APPROVED GME Institutional Handbook 2017 - 2018.docx

**ANNEX I**

**Supervision, ACGME Duty Hours and the Working Environment**

**Resident Duty Hours in the Learning and Working Environment**

VI.A. Professionalism, Personal Responsibility, and Patient Safety

VI.A.1. Programs and sponsoring institutions must educate residents and faculty members concerning the professional responsibilities of physicians to appear for duty appropriately rested and fit to provide the services required by their patients. (Core)

VI.A.2. The program must be committed to and responsible for promoting patient safety and resident well-being in a supportive educational environment. (Core)

VI.A.3. The program director must ensure that residents are integrated and actively participate in interdisciplinary clinical quality improvement and patient safety programs. (Core)

VI.A.4. The learning objectives of the program must:

VI.A.4.a) be accomplished through an appropriate blend of supervised patient care responsibilities, clinical teaching, and didactic educational events; and, (Core)

VI.A.4.b) not be compromised by excessive reliance on residents to fulfill non-physician service obligations. (Core)

VI.A.5. The program director and institution must ensure a culture of professionalism that supports patient safety and personal responsibility. (Core)

VI.A.6. Residents and faculty members must demonstrate an understanding and acceptance of their personal role in the following:

VI.A.6.a) assurance of the safety and welfare of patients entrusted to their care; (Outcome)

VI.A.6.b) provision of patient- and family-centered care; (Outcome)

VI.A.6.c) assurance of their fitness for duty; (Outcome) Common Program Requirements 16

VI.A.6.d) management of their time before, during, and after clinical assignments; (Outcome)

VI.A.6.e) recognition of impairment, including illness and fatigue, in themselves and in their peers; (Outcome)

VI.A.6.f) attention to lifelong learning; (Outcome)

VI.A.6.g) the monitoring of their patient care performance improvement indicators; and, (Outcome)

VI.A.6.h) honest and accurate reporting of duty hours, patient outcomes, and clinical experience data. (Outcome)

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

VI.A.7. All residents and faculty members must demonstrate responsiveness to patient needs that supersedes self-interest. They must recognize that under certain circumstances, the best interests of the patient may be served by transitioning that patient's care to another qualified and rested provider. (Outcome)

VI.B. Transitions of Care VI.B.1. Programs must design clinical assignments to minimize the number of transitions in patient care. (Core)

VI.B.2. Sponsoring institutions and programs must ensure and monitor effective, structured hand-over processes to facilitate both continuity of care and patient safety. (Core)

VI.B.3. Programs must ensure that residents are competent in communicating with team members in the hand-over process. (Outcome)

VI.B.4. The sponsoring institution must ensure the availability of schedules that inform all members of the health care team of attending physicians and residents currently responsible for each patient's care. (Detail) VI.C. Alertness Management/Fatigue Mitigation

VI.C.1. The program must:

VI.C.1.a) educate all faculty members and residents to recognize the signs of fatigue and sleep deprivation; (Core)

VI.C.1.b) educate all faculty members and residents in alertness management and fatigue mitigation processes; and, (Core)

VI.C.1.c) adopt fatigue mitigation processes to manage the potential negative effects of fatigue on patient care and learning, such as naps or back-up call schedules. (Detail) Common Program Requirements 17

VI.C.2. Each program must have a process to ensure continuity of patient care in the event that a resident may be unable to perform his/her patient care duties. (Core)

VI.C.3. The sponsoring institution must provide adequate sleep facilities and/or safe transportation options for residents who may be too fatigued to safely return home. (Core)

VI.D. Supervision of Residents

VI.D.1. In the clinical learning environment, each patient must have an identifiable, appropriately-credentialed and privileged attending physician (or licensed independent practitioner as approved by each Review Committee) who is ultimately responsible for that patient's care. (Core)

VI.D.1.a) This information should be available to residents, faculty members, and patients. (Detail)

VI.D.1.b) Residents and faculty members should inform patients of their respective roles in each patient's care. (Detail)

VI.D.2. The program must demonstrate that the appropriate level of supervision is in place for all residents who care for patients. (Core) Supervision may be exercised through a variety of methods. Some activities require the physical presence of the supervising faculty member. For many aspects of patient care, the supervising physician may be a more advanced resident or fellow. Other portions of care provided by the

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

63

resident can be adequately supervised by the immediate availability of the supervising faculty member or resident physician, either in the institution, or by means of telephonic and/or electronic modalities. In some circumstances, supervision may include post-hoc review of resident delivered care with feedback as to the appropriateness of that care. (Detail)

VI.D.3. Levels of Supervision to ensure oversight of resident supervision and graded authority and responsibility, the program must use the following classification of supervision: (Core)

VI.D.3.a) Direct Supervision – the supervising physician is physically present with the resident and patient. (Core)

VI.D.3.b) Indirect Supervision:

VI.D.3.b).(1) with direct supervision immediately available – the supervising physician is physically within the hospital or other site of patient care, and is immediately available to provide Direct Supervision. (Core)

VI.D.3.b).(2) with direct supervision available – the supervising Common Program Requirements 18 physician is not physically present within the hospital or other site of patient care, but is immediately available by means of telephonic and/or electronic modalities, and is available to provide Direct Supervision. (Core)

VI.D.3.c) Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered. (Core)

VI.D.4. The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members. (Core)

VI.D.4.a) The program director must evaluate each resident's abilities based on specific criteria. When available, evaluation should be guided by specific national standards-based criteria. (Core)

VI.D.4.b) Faculty members functioning as supervising physicians should delegate portions of care to residents, based on the needs of the patient and the skills of the residents. (Detail)

VI.D.4.c) Senior residents or fellows should serve in a supervisory role of junior residents in recognition of their progress toward independence, based on the needs of each patient and the skills of the individual resident or fellow. (Detail)

VI.D.5. Programs must set guidelines for circumstances and events in which residents must communicate with appropriate supervising faculty members, such as the transfer of a patient to an intensive care unit, or end-of-life decisions. (Core)

VI.D.5.a) Each resident must know the limits of his/her scope of authority, and the circumstances under which he/she is permitted to act with conditional independence. (Outcome)

VI.D.5.a).(1) In particular, PGY-1 residents should be supervised either directly or indirectly with direct supervision immediately available. [Each Review Committee will describe the achieved competencies under which PGY-1 residents progress to be supervised indirectly, with direct supervision available.] (Core)

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

64

VI.D.6. Faculty supervision assignments should be of sufficient duration to assess the knowledge and skills of each resident and delegate to him/her the appropriate level of patient care authority and responsibility. (Detail)

VI.E. Clinical Responsibilities  The clinical responsibilities for each resident must be based on PGY-level, patient safety, resident education, severity and complexity of patient Common Program Requirements 19 illness/condition and available support services. (Core) [Optimal clinical workload will be further specified by each Review Committee.]

 VI.F. Teamwork Residents must care for patients in an environment that maximizes effective communication. This must include the opportunity to work as a member of effective interprofessional teams that are appropriate to the delivery of care in the specialty. (Core) [Each Review Committee will define the elements that must be present in each specialty.]

VI.G. Resident Duty Hours

VI.G.1. Maximum Hours of Work per Week Duty hours must be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities and all moonlighting. (Core)

VI.G.1.a) Duty Hour Exceptions A Review Committee may grant exceptions for up to 10% or a maximum of 88 hours to individual programs based on a sound educational rationale. (Detail)

VI.G.1.a).(1) In preparing a request for an exception the program director must follow the duty hour exception policy from the ACGME Manual on Policies and Procedures. (Detail)

VI.G.1.a).(2) Prior to submitting the request to the Review Committee, the program director must obtain approval of the institution's GMEC and DIO. (Detail)

VI.G.2. Moonlighting

VI.G.2.a) Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program. (Core)

 VI.G.2.b) Time spent by residents in Internal and External Moonlighting (as defined in the ACGME Glossary of Terms) must be counted towards the 80-hour Maximum Weekly Hour Limit. (Core)

VI.G.2.c) PGY-1 residents are not permitted to moonlight. (Core)

VI.G.3. Mandatory Time Free of Duty Residents must be scheduled for a minimum of one day free of duty every week (when averaged over four weeks). At-home call cannot be assigned Common Program Requirements 20 on these free days. (Core)

VI.G.4. Maximum Duty Period Length

 VI.G.4.a) Duty periods of PGY-1 residents must not exceed 16 hours in duration. (Core)

VI.G.4.b) Duty periods of PGY-2 residents and above may be scheduled to a maximum of 24 hours of continuous duty in the hospital. (Core)

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

VI.G.4.b).(1) Programs must encourage residents to use alertness management strategies in the context of patient care responsibilities. Strategic napping, especially after 16 hours of continuous duty and between the hours of 10:00 p.m. and 8:00 a.m., is strongly suggested. (Detail)

VI.G.4.b).(2) It is essential for patient safety and resident education that effective transitions in care occur. Residents may be allowed to remain on-site in order to accomplish these tasks; however, this period of time must be no longer than an additional four hours. (Core)

VI.G.4.b).(3) Residents must not be assigned additional clinical responsibilities after 24 hours of continuous in-house duty. (Core)

VI.G.4.b).(4) In unusual circumstances, residents, on their own initiative, may remain beyond their scheduled period of duty to continue to provide care to a single patient. Justifications for such extensions of duty are limited to reasons of required continuity for a severely ill or unstable patient, academic importance of the events transpiring, or humanistic attention to the needs of a patient or family. (Detail)

VI.G.4.b).(4).(a) Under those circumstances, the resident must:

VI.G.4.b).(4).(a).(i) appropriately hand over the care of all other patients to the team responsible for their continuing care; and, (Detail)

VI.G.4.b).(4).(a).(ii) document the reasons for remaining to care for the patient in question and submit that documentation in every circumstance to the program director. (Detail)

VI.G.4.b).(4).(b) The program director must review each submission of additional service, and track both individual resident and program-wide episodes of additional duty. (Detail) Common Program Requirements 21

VI.G.5. Minimum Time Off between Scheduled Duty Periods

VI.G.5.a) PGY-1 residents should have 10 hours, and must have eight hours, free of duty between scheduled duty periods. (Core)

VI.G.5.b) Intermediate-level residents [as defined by the Review Committee] should have 10 hours free of duty, and must have eight hours between scheduled duty periods. They must have at least 14 hours free of duty after 24 hours of in-house duty. (Core)

VI.G.5.c) Residents in the final years of education [as defined by the Review Committee] must be prepared to enter the unsupervised practice of medicine and care for patients over irregular or extended periods. (Outcome)

VI.G.5.c).(1) This preparation must occur within the context of the 80- hour, maximum duty period length, and one-day-off-in seven standards. While it is desirable that residents in their final years of education have eight hours free of duty between scheduled duty periods, there may be circumstances [as defined by the Review Committee] when these residents must stay on duty to care for their patients or return to the hospital with fewer than eight hours free of duty. (Detail)

VI.G.5.c).(1).(a) Circumstances of return-to-hospital activities with fewer than eight hours away from the hospital by residents in their final years of education must be monitored by the program director. (Detail)

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

66

VI.G.6. Maximum Frequency of In-House Night Float Residents must not be scheduled for more than six consecutive nights of night float. (Core) [The maximum number of consecutive weeks of night float, and maximum number of months of night float per year may be further specified by the Review Committee.]

VI.G.7. Maximum In-House On-Call Frequency PGY-2 residents and above must be scheduled for in-house call no more frequently than every-third-night (when averaged over a four-week period). (Core)

VI.G.8. At-Home Call

VI.G.8.a) Time spent in the hospital by residents on at-home call must count towards the 80-hour maximum weekly hour limit. The frequency of at-home call is not subject to the every-third-night limitation, but must satisfy the requirement for one-day-in-seven free of duty, Common Program Requirements 22 when averaged over four weeks. (Core)

VI.G.8.a).(1) At-home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident. (Core)

VI.G.8.b) Residents are permitted to return to the hospital while on at-home call to care for new or established patients. Each episode of this type of care, while it must be included in the 80-hour weekly maximum, will not initiate a new "off-duty period". (Detail)

**Core Requirements:** Statements that define structure, resource, or process elements essential to every graduate medical educational program.

**Detail Requirements:** Statements that describe a specific structure, resource, or process, for achieving compliance with a Core Requirement. Programs and sponsoring institutions in substantial compliance with the Outcome Requirements may utilize alternative or innovative approaches to meet Core Requirements.

**Outcome Requirements:** Statements that specify expected measurable or observable attributes (knowledge, abilities, skills, or attitudes) of residents or fellows at key stages of their graduate medical education.

*****ACGME Common Program Requirements NAS Effective July 1, 2016**

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

67

**ANNEX J**

**Bylaws of the UTMB House Officers Association (HOA)**

**Article I – Membership**

A.   Active membership shall be required of all persons holding residency appointments at UTMB, up to and including chief Residents and fellows.

B.    Active and emeritus members in good standing shall be entitled to all privileges of membership as provided in the Constitution and Bylaws of the Association, including the duty to vote and the right to hold office.

C.   Good standing shall be evidenced by
1. Consistently paid dues on time.
2. Assessments authorized by members' dues "check-off" from salary to the Associate through UTMB.
3. No outstanding issues with the member's respective

**Article II – Officers & Council**

The Officers of the Association shall be a President, Vice President, Treasurer, Secretary and Public Relations Officer.  The Vice President, Treasurer, Secretary and Public Relations Officer shall be elected annually from among the members of the Association by a democratic ballot election and shall hold office until their successors have been elected and installed. The President of HOA must have been previously an active HOA Officer and is also elected annually during the same democratic ballot election as the other aforementioned officers.

A.    The President, or in his/her absence, the Vice President, shall preside over all meetings of the association and the council.  In the absence of both, a temporary presiding officer shall be elected from among all members present.  The President shall appoint all committees of the association, unless it is specifically provided or ordered otherwise.  He/she shall exercise general supervision over all the affairs of the association.  The President shall be a member of all committees, but he/she shall not be counted in determining a quorum.

B.    The Secretary shall keep a complete record of all proceedings and correspondence of the association and council.  He/she shall send notices of meetings by mail or by alternative contact to members of the association or council as may be required.  He/she shall keep a roll of the members and shall perform all other duties usually assigned pertaining to a secretary.

C.    The Treasurer shall perform budgeting tasks and provide a financial summary for the incoming year, as well as a complete summary of finances from the previous year to be given to the incoming elected Treasurer.  He/she shall make payments only for bills properly approved, and all checks shall bear the signature of the president or president/elect in addition to that of the treasurer. In the absence or incapacity of the Treasurer, his/her power to sign checks may be delegated by the council to one of its members.

D.    Contracts and formal documents shall be signed by the President and the Treasurer, or in

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

68

the absence of either, by one of two members of the council who it shall designate.  No contract shall be entered into or debt incurred on behalf of the Association over the amount $50 (fifty-dollars), except by approval of the council or officers.  The officers or council shall not incur or authorize any debt or liability exceeding the net assets of the Association.

E.      The majority council at any regular or special meeting  may be removed from office for cause and with due process. Any officer, who shall become a disqualified person, shall immediately, on the effective date of disqualifications cease to be an officer. Any officer may resign at any time by giving written notice to the council.  Any such specified time, and unless otherwise specified, the acceptance of this resignation shall not be necessary to make it effective.

F.      Members of the Council shall be elected annually from among the members of the residency programs as specified in the constitution.  They shall hold office until their successors have been elected and installed.  Any member of the council, who shall absent herself/himself from three (3) consecutive regular meetings thereof, unless he/she shall present satisfactory reasons for such absences, shall cease to be a member thereof. He/she may be reinstated by a majority vote of the council.

The council shall act as a nominating committee for officers and shall advise the Secretary of its nominations of candidates for officers for the succeeding year and the elections to be held in order for the membership to be apprised of its choices.  Nominations will also be taken from the floor.  Any member in good standing may nominate herself/himself or another member in good standing for any position.

**Article II: Committees**

The regular (standing) Committees of the Association shall be:

a.      Committee on Organization - This committee shall have the major responsibility for enrolling, maintaining contact with, and coordinating the unified efforts of the membership.

b.      Committee for Outside Relations -   This committee shall be the main contact with the hospital administration for the handling of negotiations and the processing of members grievances.  The Officers shall be standing members of this committee.

c.      Program Committee -   This committee shall be responsible for the format, appropriate subjects and presenters of the regular or special meetings, in coordination with the duties and requirements of the President and Council, and for informal programs to foster the goodwill and interest of the members.

d.      Special Committees shall be appointed from time to time by the President to consider and report to the Officers and the Council on the subjects requiring investigation and/or action.

**Articles IV – Dues and Assessments**

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME  WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

Dues shall be kept to a minimal level as possible.  Money collected for dues shall be sufficient to maintain the association for the current year, with not more than 10% of the total collected being retained over from the previous year.  Dues or assessments may be increased only by the majority vote of the membership at a regular or special meeting and after due notice.

### Article V – Meetings of the Association, Council

A.  The annual meeting of the association for the elections of officers and members of the council shall be on the third (3rd) Thursday of September in each year.  Regular meetings shall be held at least quarterly throughout the year, with such meeting times to be established by the council.  Special meetings may be called at any time by the President or on the written request of a majority of the council or the membership.  Seven (7) days written notice must be given to all members of the association, and such notice must state the objective and reason for the reason for such meetings.  Fifty-one percent (51%) of the officers and members of the council or 10% of the members in good standing shall constitute a quorum for meetings of the membership.

B.  The council and officers shall meet regularly, at least monthly, on a date and time agreed by the council at its first meeting after installation.  Special meetings may be called at any time on not less than three (3) days' notice.  Fifty-one percent (51%) shall constitute a quorum at meetings of the council.

### Article VI – Order of Business

C.  Annual meetings.  At annual meetings, the following shall be the order of business:

1.  Roll call.  Establish quorum.
2.  Elections
3.  Report of tellers on election of new Council members, Officers, and any amendments.
4.  Reports of the outgoing President, Secretary, and Treasurer.
5.  (Optional) Presentation of and address of guest speaker and discussion.
6.  New and/or old business

D.  Regular Meetings.  At regular meetings the following shall be the order of business:

1.  Call to order; reading of minutes of previous meeting
2.  Receiving communications
3.  Reports of Officers and Committee Chairpersons
4.  Unfinished Business
5.  New Business
6.  Adjournment

### Article VII – Amendments

These Bylaws may be amended by the affirmative votes of a majority of the members voting at any regular or special meeting of the Association, provided a quorum is present, and provided further that notice of such amendment or amendments shall be given to the members of the Association at least one month prior to the date of the meeting at which said amendment or amendments are to be presented for consideration.  Members not present may vote by letter addressed to the Secretary prior to the meeting, provided further that such letter is opened only at time of counting the votes at said meeting.

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

**ANNEX K**

**Graduate Medical Education**
**Institutional Procedure for House Staff Drug Screening for Probable Cause**
**Effective April 8, 2016**
**Approved by Department of Legal Affairs and Human Resources**

**Step 1 - Program Director contacts the Associate Dean for Graduate Medical Education (ADGME):**
- ADGME will notify Employee Health Clinic during regular business hours (Kathleen O'Neill, Director of Employee Health and Wellness or Robert M. White, Clinic Manager)
- ADGME will notify the Emergency Department after business hours (Christine Wade, Director of Patient Services and Assistant CNO)
- Program Director, or faculty designee, will escort house staff member to Employee Health Clinic or the Emergency Department depending on time of event
- Assessment related to safety concerns (possible harm to self or others) may occur in the Employee Health Clinic, Emergency Department, or Department of Psychiatry when warranted
- House Staff will be placed on paid administrative leave until drug screening results become available
- House Staff who refuse drug screening will be placed on leave of absence and may result in disciplinary action up to and including termination

**Step 2 - Notifications:**
- Physician Health and Rehabilitation Committee (PHRC) is not required for initial step of drug screening
- HR will notify ADGME of any house staff issues that are brought to their attention
- ADGME will notify HR when this protocol is activated

**Step 3 - Completion of Drug Screening:**
- Negative result - House Staff returns to work and recommendations will be made for additional evaluations or assistance as necessary
- Positive result – House Staff placed on the appropriate leave status and PHRC becomes involved:
  - PHRC evaluates and makes recommendations
  - Recommendations for substance abuse treatment is arranged by PHRC with facility, insurance, and submits house staff's history to facility
  - PHRC protects reporting to the Texas Medical Board in some instances through partnership with the Texas Physician Health Program
  - PHRC defers to EAP for Post Rehabilitation Agreement

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

71

**ANNEX L**

**Graduate Medical Education**
**Institutional Procedure for Post Rehabilitation Program**
**Effective April 8, 2016**
**Approved by Department of Legal Affairs and Human Resources**

**Step 1 – Completion of House Staff Rehabilitation Program**
- Treatment facility communicates completion status to Physician Health and Rehabilitation Committee (PHRC)
- PHRC notifies Human Resources (HR), Associate Dean for Graduate Medical Education (ADGME), and Program Director (PD)
- EAP will establish a rehabilitation agreement with the house staff which will outline the drug/alcohol monitoring process
- PHRC will assist in designing an individual therapy plan for the house staff

**Step 2 – Post Rehabilitation Drug Screening:**
- Positive result – EAP notifies ADGME and PHRC
  - ADGME notifies PD and HR
  - House staff is removed from services until final determination is made which will likely result in termination and immediate notification to the Texas Medical Board

APPROVED BY GRADUATE MEDICAL EDUCATION COMMITTEE NOVEMBER 8, 2016

S:\Housestaff\GME\GME WORK AGREEMENT &  INSTITUTIONAL HANDBOOK\2017-2018 GME INSTITUTIONAL HANDBOOK\GME Institutional Handbook 2017 - 2018.docx

72



Semi-Annual Review

**Review Period:** 1/1/2018 - 6/30/2018     **Residency Period:** 6/16/2015 - 6/30/2018     Meeting Date: 7/13/2018 4:30A-6:20A

### SEMI ANNUAL REVIEW

**Walker, Rosandra Lakeisha**
PRG 3
Otolaryngology
rolwaike@utmb.edu

*Report Data was last captured on: 5/29/2018*

#### Competency by Rotation
Review Period

| Rotation | Dates | Patient Care | Medical Knowledge | Systems-Based | Practice-Based | Professionalism | Interpersonal |
|---|---|---|---|---|---|---|---|
| Scale: 1 to 9 | | | | | | | |
| DOTO:OTO:RESEARCH CLINICAL | 2017-11-01 - 2018-02-28 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| DOTO:OTO:TEAM A | 2018-03-01 - 2018-04-30 | 5.50 | 5.50 | 6.50 | 5.50 | 7.50 | 6.00 |

#### Competency by Training Year
Residency

Results from Grade Scale: to 9

| | Patient Care | Medical Knowledge | System-Based | Practice-Based | Professionalism | Interpersonal |
|---|---|---|---|---|---|---|
| PRG 1 | 6.06 | 6.54 | 6.66 | 6.54 | 7.15 | 7.29 |
| PRG 2 | 6.82 | 6.31 | 6.77 | 6.40 | 7.30 | 6.91 |
| PRG 3 | 6.49 | 6.62 | 7.11 | 7.11 | 7.76 | 7.33 |

#### Conference Attendance
Review Period

% Attended = Present / (# Required - Excused)

| Status | Department | Category | # Conferences | # Required | Present | Tardy | Excused | % Required | % Attended |
|---|---|---|---|---|---|---|---|---|---|
| **Home Department** | | | | | | | | | |
| PRG 3 | OTO- Otolaryngology | Grand Rounds | 1 | 1 | 1 | 0 | 0 | 90% | 100% |
| | | Totals | 1 | 1 | 1 | 0 | 0 | | Avg 100.00% |
| **Outside Department** | | | | | | | | | |
| PRG 3 | *GME | Empathy | 1 | 1 | 1 | 0 | 0 | 100% | 100% |
| PRG 3 | *GME | Resident Wellness | 3 | 3 | 2 | 0 | 0 | 100% | 67% |
| | | Totals | 4 | 4 | 3 | 0 | 0 | | Avg 75.00% |
| | | Grand Totals | 5 | 5 | 4 | 0 | 0 | | Avg 30.00% |

#### Duty Hour Rule Violations
Review Period

| Rotation | Start Date | End Date | Hrs/Wk | 80 Hr | 24+ | Call | Short Break | Days Off |
|---|---|---|---|---|---|---|---|---|
| DOTO:OTO:RESEARCH CLINICAL | 1/1/2018 | 2/28/2018 | 53.39 | 0 | 0 | 0 | 0 | 0 |
| DOTO:OTO:TEAM A | 3/1/2018 | 4/30/2018 | 66.20 | 0 | 0 | 0 | 0 | 0 |
| DOTO:OTO:TEAM B RA-P | 5/1/2018 | 6/30/2018 | 29.38 | 0 | 0 | 0 | 0 | 0 |

#### Evaluation Comments - All
Review Period

| Comment |
|---|

EXHIBIT D-1



| | Comment |
|---|---|

**Interpersonal and Communication Skills**

**Interpersonal Communication Skills**

Again, this area suffers due to documentation which impacts overall patient care and communication

Dr. Walker needs to improve her efficiency in the outpatient and inpatient clinical settings as this is negatively impacting her ability to work effectively within the residency and health care team structure.

Plan presentation and development of care plan are performed at a slower, deliberate pace. I would like for her decisions to be made with increased speed and confidence as an upper level. She has it within her to do this.

**Patient Care**

**Facial Trauma — Patient Care**

havent been able to evaluate this year

**Practice-Based Learning and Improvement**

The ability to investigate and evaluate the care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and life-long learning — Practice-based Learning and Improvement

Dr. Walker does not seem to accept feedback in a positive way and this has made it difficult for her to progress appropriately through her residency training.

Sometimes has noncommittal attitude and poor correction of behavior, lack of incorporation of feedback

**Professionalism**

**Professionalism**

Has had difficulty with procrastination and timely completion of tasks especially relating to documentation. Dr. Walker has been reminded many times to improve in this area. She has demonstrated ability to perform well in this area for 2-3 weeks, but then regresses back to prior patterns. Need to see continued improvement and commitment.

This has continued to be an issue. Whereas she has improved in some aspects, she is still a cut slower than her age matched peers in her pace.

**Systems-Based Practice**

**Resource Utilization — Systems-based Practice**

Dr. Walker continues to have serious issues with completion of medical documentation in a timely manner. This has on occasion negatively impacted patient care.

**Overall Comment**

Overall this resident is a team player

at level. Need to work on coding.

Dr. Walker is making great strides in overcoming some of her earlier obstacles. Dr. Walker needs to continue to work on her ability to receive feedback and criticism. She is quick to offer an excuse or explanation instead of listening to the feedback being offered. This can be rather off putting. Dr. Walker is not lacking in the attributes listed in professionalism, however, timely completion of notes, while improved from prior performance, needs to remain a top priority.

Dr. Walker is very interested in taking good care of patients and working hard in the clinic on her notes. She continues to improve.

Dr. Walker is very interested in taking good care of patients and working hard in the clinic on her notes. She continues to improve.

Difficult to assess. I have not had significant time to work with Dr. Walker since her PGY-1 year

Dr. Walker is slightly behind her resident counterparts for the same residency training year. If she improves her efficiency in patient care delivery, this discrepancy should also improve. She also must improve her interpersonal communication style to be more genuinely interested in receiving and incorporation constructive feedback from her mentors, upper level residents, and colleagues.

Getting better. However, too slow

I am seriously concerned with the progress of this resident - she has lost the trust of not only residents but faculty as well - very difficult to see how she will succeed as an upper year resident. There are multiple serious lapses in professionalism and behavior that does not engender trust

I have many thoughts and insights about your performance but most would likely be misconstrued so I will not put anything here today.

Knowledge base has never been an issue, moving forward I would like to see her be more decisive with confidence to back those decisions. This may also increase her pace.

Progressing appropriately for expected year.

When Dr. Walker is focused and committed, she performs well in terms of clinical evaluation, procedural efficiency and documentation; this is the physician we need to see all the time. Dr. Walker demonstrates slow improvement in some surgical skills, with some regression in others. However, with adequate practice and continued feedback, the areas that showed decline are improving. Her clinical skills in terms of examination/evaluation and judgement on call especially are below her PGY level. Due to continued problems with professionalism, there is lack of trust when it comes to her judgement within the healthcare team.

**Evaluation Comments by Competency**                                                          Review Period ⊕

| | Comment |
|---|---|

DOTO:OTO:RESEARCH CLINICAL (2017-11-01 – 2018-02-28)

General Comment

Overall this resident is a team player

DOTO:OTO:TEAM A (2018-03-01 – 2018-04-30)

General Comment

Dr. Walker is making great strides in overcoming some of her earlier obstacles. Dr. Walker needs to continue to work on her ability to receive feedback and criticism. She is quick to offer an excuse or explanation instead of listening to the feedback being offered. This can be rather off putting. Dr. Walker is not lacking in the attributes listed in professionalism, however, timely completion of notes, while improved from prior performance, needs to remain a top priority.

| | Comment |
|---|---|
| | Dr. Walker is very interested in taking good care of patients and working hard in the clinic on her notes. She continues to improve. |

at level. Need to work on coding.

**DOTO:OTO:TEAM B RA-P (2018-05-01 – 2018-06-30)**

- **Practice-Based Learning and Improvement**

  Sometimes has noncommittal attitude and poor correction of behavior, lack of incorporation of feedback

- **Professionalism**

  Has had difficulty with procrastination and timely completion of tasks especially relating to documentation. Dr. Walker has been reminded many times to improve in this area. She has demonstrated ability to perform well in this area for 2-3 weeks, but then regresses back to prior patterns. Need to see continued improvement and commitment.

- **Interpersonal and Communication Skills**

  Again, this area suffers due to documentation which impacts overall patient care and communication

- **General Comment**

  Getting better. However, too slow

  When Dr. Walker is focused and committed, she performs well in terms of clinical evaluation, procedural efficiency and documentation; this is the physician we need to see all the time. Dr. Walker demonstrates slow improvement in some surgical skills, with some regression in others. However, with adequate practice and continued feedback, the areas that showed decline are improving. Her clinical skills in terms of examination/evaluation and judgement on call especially are below her PGY level. Due to continued problems with professionalism, there is lack of trust when it comes to her judgement within the healthcare team.

## Procedures Logged                                                    Residency

| Procedure Name | Independent Target | Review Total Passed | Review Total Not Passed | Residency Total Passed | Residency Total Not Passed | Independent |
|---|---|---|---|---|---|---|
| No records to display. | | | | | | |

## Scholarly Activity                                                   Residency

| Activity | Total |
|---|---|
| (DO NOT USE - GME OFFICE USE ONLY) Abstract and Quality Improvement Project | 0 |
| 2015- 2016 Quality Improvement Project Form | 0 |
| Abstract | 0 |
| Chapter/Textbooks | 0 |
| Grand Rounds Presentation | 0 |
| Grant Leadership | 0 |
| Journal Club | 0 |
| Presentations, National | 0 |
| Publication, Non-Peer Reviewed | 0 |
| Publication, Peer Reviewed | 0 |
| Quality Improvement Project Form (Rev. 1/2017) | 1 |
| Quality Improvement Project Form_1 | 0 |

## Test Scores                                                          Residency

| Test Type | Date Taken | Score | Passed | Percentile |
|---|---|---|---|---|
| ABNS WRITTEN EXAM | 11/20/2014 | Pass | ✓ | |
| Otolaryngology Training Exam (OTE) | 3/4/2017 | 5.15 | ✓ | 3 |
| Otolaryngology Training Exam (OTE) | 3/5/2016 | 4.79 | ✓ | 4 |
| QI 101-OLD: Fundamentals of Improvement | 6/25/2015 | | ✓ | |
| QI 102-OLD: The Model for Improvement: Your Engine for Change | 6/27/2015 | | ✓ | |
| QI 103-OLD: Measuring for Improvement | 6/29/2015 | | ✓ | |
| QI 104-OLD: The Life Cycle of a Quality Improvement Project | 6/29/2015 | | ✓ | |
| QI 105-OLD: The Human Side of Quality Improvement | 6/29/2015 | | ✓ | |
| QI 106-OLD: Mastering PDSA Cycles and Run Charts | 8/14/2015 | | ✓ | |
| USMLE Step 1 | 6/18/2013 | 254 | ✓ | |
| USMLE Step 2 CS | 12/28/2014 | 243 | ✓ | |

## Curriculum Confirmed                                                 Review Period

| Rotation | Start Date | End Date | Reviewed Curriculum |
|---|---|---|---|

| Rotation | Start Date | End Date | Reviewed Curriculum |
|---|---|---|---|
| DOTO:OTO:RESEARCH CLINICAL | | 2/28/2018 | N/A |
| DOTO:OTO:TEAM A | | 4/30/2018 | N/A |
| DOTO:OTO:TEAM B RA-P | | 6/30/2018 | N/A |

**Milestone Progress**                                Residency

Otolaryngology



**Progress Summary**

Overall Progress          Meets Expectations    ⚠ Requires Attention

**Competency Progress**

Patient Care              Meets Expectations    ⚠ Requires Attention
Medical Knowledge         Meets Expectations    ⚠ Requires Attention
Systems-Based Practice    Meets Expectations    ⚠ Requires Attention



**Comments**

**Siddiqui, Farrah** on 7/15/2018 at 9:37 AM wrote:
With the most current milestones and evaluation comments, it was discussed with Dr. Walker that all areas of competency including medical knowledge, patient care, practice based learning, systems based practice milestones are lagging behind her level of training due to clinical inefficiency and slow documentation. She is now able to complete daily documentation on time in the majority of instances, but this is still occupying most of her day and takes her attention away from reading, self-learning and preparing for cases. She and her advocate at the meeting discussed resources for clinical efficiency and we agreed that talking to senior residents for tips would be helpful. In June, Dr. Walker & Dr. Siddiqui discussed changing studying habits and what sources would better suit her for reading/review and she is committed to improving her medical knowledge. Once clinical efficiency and medical knowledge aspects improve, her workflow and patient evaluation/care, practice based learning and systems based practice milestones are expected to improve as well. In communication, Dr. Walker is great in creating rapport with her patients, but needs improve speed of medical interviewing and prioritizing relevant information. However, when she is stressed due to poor workflow, the communication within healthcare team suffers. Discussed responding to both neg & positive feedback--improved in this and needs to continue. Dr. Walker later emailed her commitment to improve in all

**Signatures**

| **Subject** | | pending signature... | |
|---|---|---|
| **Program Director** | | Signature marked as On File by Siddiqui, Farrah on 7/15/2018 at 9:38 AM |

**Attached Files**

There are currently no files attached to this review.



Semi-Annual Review

**Review Period:** 7/1/2017 - 12/31/2017          **Residency Period:** 6/16/2015 - 12/31/2017          Meeting Date: (TBD)

### SEMI ANNUAL REVIEW

**Walker, Rosandra Lakeisha**
PRG 3
Otolaryngology
rotwalker@utmb.edu

*Report Data was last captured on: 1/29/2018*

## Competency by Rotation

Review Period ⏱

| Rotation | Dates | Patient Care | Medical Knowledge | Systems-Based | Practice-Based | Professionalism | Interpersonal |
|---|---|---|---|---|---|---|---|
| ⌄ Scale: 1 to 9 | | | | | | | |
| DOTO:OTO:TEAM C TDC/HOSPITAL | 2017-07-01 - 2017-07-31 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| DOTO:OTO:ENT-FPSA | 2017-08-21 - 2017-08-31 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 |
| DOTO:OTO:ENT-MDA-ORANGE | 2017-09-01 - 2017-10-31 | 6.50 | 6.00 | 6.50 | 7.50 | 8.50 | 8.00 |

## Competency by Training Year

Residency ⚫

Results from Grade Scale: 1 to 9

| | Patient Care | Medical Knowledge | Systems-Based | Practice-Based | Professionalism | Interpersonal |
|---|---|---|---|---|---|---|
| PRG 1 | 6.66 | 6.64 | 6.66 | 6.54 | 7.32 | 7.23 |
| PRG 2 | 6.84 | 6.31 | 6.77 | 6.46 | 6.62 | 6.92 |
| PRG 3 | 7.55 | 7 | 7.23 | 7.32 | | 7.59 |

## Conference Attendance

Review Period ⏱

% Attended = Present / (# Required - Excused)

| Status | Department | Category | # Conferences | # Required | Present | Tardy | Excused | % Required | % Attended |
|---|---|---|---|---|---|---|---|---|---|
| ⌄ - Home Department ------------ | | | | | | | | | |
| PRG 3 | OTO- Otolaryngology | Grand Rounds | 14 | 14 | 6 | 0 | 7 | 90% | 86% |
| | | Totals | 14 | 14 | 6 | 0 | 7 | | Avg 85 71% |
| ⌄ - Outside Department | | | | | | | | | |
| PRG 3 | *GME | Resident Wellness | 4 | 4 | 0 | 0 | 0 | 100% | 0% |
| | | Totals | 4 | 4 | 0 | 0 | 0 | | Avg 0.00% |
| | | Grand Totals | 18 | 18 | 6 | 0 | 7 | | Avg 54 55% |

## Duty Hour Rule Violations

Review Period ⏱

| Rotation | Start Date | End Date | Hrs/wk | 80 Hr | 24+ | Call | Short Break | Days Off |
|---|---|---|---|---|---|---|---|---|
| DOTO:OTO:TEAM C TDC/HOSPITAL | 7/1/2017 | 7/31/2017 | 46.29 | 0 | 0 | 0 | 0 | 0 |
| DOTO:OTO:TEAM C TDC/HOSPITAL | 8/1/2017 | 8/20/2017 | 56.35 | 0 | 0 | 0 | 0 | 0 |
| DOTO:OTO:ENT-FPSA | 8/21/2017 | 8/31/2017 | 29.91 | 0 | 0 | 0 | 0 | 0 |
| DOTO:OTO:ENT-MDA-ORANGE | 9/1/2017 | 10/31/2017 | 59.62 | 0 | 0 | 0 | 0 | 0 |
| DOTO:OTO:RESEARCH CLINICAL | 11/1/2017 | 12/31/2017 | 45.80 | 0 | 0 | 0 | 0 | 0 |

**Evaluation Comments - All**

Review Period ⓘ

| Comment |
| --- |

**Medical Knowledge**

**Dysphagia-Dysphonia — Medical Knowledge**

level appropriate for experience

Limited knowledge of basic and clinical sciences; minimal interest Exceptional knowledge of basic and clinical sciences; highly in learning; cannot explain mechanisms of disease. resourceful development of knowledge; understands complex relationships and skillfully develops unifying concepts.

Quite good knowledge of complex head and neck patients for an R3.

**Patient Care**

**Facial Trauma — Patient Care**

Have not done much work with her in this category

**Nasal Deformity — Patient Care**

No exposure in this setting

**Practice-Based Learning and Improvement** PRACTICE-BASED LEARNING AND IMPROVEMENTS

Fails to perform self-evaluation; lacks insight, initiative; resists or Constantly evaluates own performance; incorporates feedback ignores feedback; fails to use information technology to enhance into improvement activities; effectively uses technology to patient care or pursue self improvement. manage information for patient care and self improvement.

Very receptive of feedback and quick to implement

**Professionalism**

**Professionalism**

Marked improvement in this upon returning to UTMB for her research rotation. Great change in attitude with better organization/time management shown by completing documentation and research plans on time. Stepping up to help residents cover call on a difficult weekend also shows her renewed positive attitude and desire to change. If she can sustain this change, her professionalism feedback will continue to improve. This score is based on her improved performance for the later 1/2 of the rotation

**Overall Comment**

She did a very good job

She did a good job & was very steady

Rosandra was very excited to learn, always came prepared and read ahead and was very poised and articulate with the patients. She is an excellent resident!

She achieves to a higher level ,

Very energetic and engaged; positive can do attitude; clinically helpful and inquisitive

Dr. Watson is very personable and professional. I feel she needs more experience in the operating room and would like to see her take a more active role and handle more responsibility for patient care and management.

I would be happy to have Dr. Walker on my service anytime. She was inquisitive, receptive to feedback, and patient-centered. Her surgical skills improved greatly during her rotation with some modest direction. I'm not sure if we could recruit her to the field of head and neck surgical oncology but her combination of bedside manner, attention to detail, efficiency, and engaging personality would be most welcome.

appropriate for PGY3

Assessment made on limited exposure

Difficult to assess. I have not had significant time to work with Dr. Walker since my last evaluation

Dr. Walker demonstrates good surgical technique and manages the clinical aspects of patient care appropriately for her level of training. She seems to have some difficulty with incorporating feedback and the timely completion of medical documentation. She has improved very recently in this area however and as this becomes more easily incorporated into her training will improve her overall residency experience.

Dr. Walker had issues with documentation and accountable deadlines at the beginning of the year but these seem to have improved. I have not been in the OR with her much but her fund of knowledge is on par.

Dr. Walker has not rotated on the A-team as of yet this year. My exposure to her has been limited.

Dr. Walker has not rotated on the A-team as of yet this year. My exposure to her therefore has been quite limited.

Has adapted her approach based on feedback given and is making progress technically. Has tremendous leadership and mentorship capability. Continue to work extra hard to earn back the trust of your co residents.

Overall doing better

Renewed energy and positive, confident attitude have improved Dr. Walker's clinical efficiency/documentation. She is also developing technical skills appropriately, has good clinical judgement on call. She is independently reading and seeking out clinical knowledge to help patients & it shows. Definitely encourage her to continue this organized, on time approach to all her duties including documentation.

Right where she needs to be for workup and treatment plans. I look forward to her developing more confidence and autonomy in her plans as the year progresses so as to make a solid transition to a senior resident. She will also need to increase the speed at which these plans are developed at that level.

**Evaluation Comments by Competency**

Review Period ⓘ

| Comment |
| --- |

**DOTO:OTO:TEAM C TDC/HOSPITAL (2017-07-01 - 2017-07-31)**

**General Comment**

She did a very good job

| Comment |
| --- |

**DOTO:OTO:TEAM C TDC/HOSPITAL (2017-08-01 - 2017-08-20)**

> General Comment

She did a good job & was very steady

**DOTO:OTO:ENT-FPSA (2017-08-21 - 2017-08-31)**

> General Comment

Very energetic and engaged; positive can do attitude; clinically helpful and inquisitive

Rosandra was very excited to learn, always came prepared and read ahead and was very poised and articulate with the patients. She is an excellent resident!

**DOTO:OTO:ENT-MDA-ORANGE (2017-09-01 - 2017-10-31)**

> Medical Knowledge

Quite good knowledge of complex head and neck patients for an R3.

> Practice-Based Learning and Improvement

Very receptive of feedback and quick to implement

> General Comment

I would be happy to have Dr. Walker on my service anytime. She was inquisitive, receptive to feedback, and patient-centered. Her surgical skills improved greatly during her rotation with some modest direction. I'm not sure if we could recruit her to the field of head and neck surgical oncology but her combination of bedside manner, attention to detail, efficiency, and engaging personality would be most welcome.

Dr. Watson is very personable and professional. I feel she needs more experience in the operating room and would like to see her take a more active role and handle more responsibility for patient care and management.

## Procedures Logged

Residency ⊙

| Procedure Name | Independent Target | Review Total Passed | Review Total Not Passed | Residency Total Passed | Residency Total Not Passed | Independent |
| --- | --- | --- | --- | --- | --- | --- |
| No records to display. | | | | | | |

## Scholarly Activity

Residency ⊙

| Activity | Total |
| --- | --- |
| (DO NOT USE - GME OFFICE USE ONLY) Abstract and Quality Improvement Project | 0 |
| 2015- 2016 Quality Improvement Project Form | 0 |
| Conference Presentation | 0 |
| Quality Improvement Project Form (Rev. 1/2017) | 1 |
| Quality Improvement Project Form_1 | 0 |

## Test Scores

Residency ⊙

| Test Type | Date Taken | Score | Passed | Percentile |
| --- | --- | --- | --- | --- |
| ABNS WRITTEN EXAM | 11/20/2014 | Pass | ⊘ | |
| Otolaryngology Training Exam (OTE) | 3/4/2017 | 5.15 | ⊘ | 3 |
| Otolaryngology Training Exam (OTE) | 3/5/2016 | 4.79 | ⊘ | 4 |
| QI 101-OLD: Fundamentals of Improvement | 6/25/2015 | | ⊘ | |
| QI 102-OLD: The Model for Improvement: Your Engine for Change | 6/27/2015 | | ⊘ | |
| QI 103-OLD: Measuring for Improvement | 6/29/2015 | | ⊘ | |
| QI 104-OLD: The Life Cycle of a Quality Improvement Project | 6/29/2015 | | ⊘ | |
| QI 105-OLD: The Human Side of Quality Improvement | 6/29/2015 | | ⊘ | |
| QI 106-OLD: Mastering PDSA Cycles and Run Charts | 8/14/2015 | | ⊘ | |
| USMLE Step 1 | 6/18/2013 | 254 | ⊘ | |
| USMLE Step 2 CS | 12/28/2014 | 243 | ⊘ | |

## Curriculum Confirmed

Review Period ⊙

| Rotation | Start Date | End Date | Reviewed Curriculum |
| --- | --- | --- | --- |
| DOTO:OTO:TEAM C TDC/HOSPITAL | | 7/31/2017 | N/A |
| DOTO:OTO:TEAM C TDC/HOSPITAL | | 8/20/2017 | N/A |
| DOTO:OTO:ENT-FPSA | | 8/31/2017 | N/A |
| DOTO:OTO:ENT-MDA-ORANGE | | 10/31/2017 | N/A |





**Walker, Rosandra Lakeisha** on 3/26/2018 at 11:51 AM wrote:
I have reviewed my evaluations and will actively seek feedback as I continue to uphold the standard of excellence promulgated by our department.

**Signatures**

| | | |
|---|---|---|
| **Subject** | | Walker, Rosandra Lakeisha signed on 4/13/2018 at 5:36 PM |
| **Program Director** | | Szeremeta, Wasyl signed on 4/28/2018 at 11:02 AM |

**Attached Files**

There are currently no files attached to this review.

## Semi-Annual Review

**Review Period:** 1/1/2017 - 6/30/2017          **Residency Period:** 6/16/2015 - 6/30/2017          Meeting Date: 8/16/2017 12:00A-1:00A

### SEMI ANNUAL REVIEW

**Walker, Rosandra Lakeisha**
PRG 2
Otolaryngology
rolwalke@utmb.edu

*Report Data was last captured on: 7/17/2017*

### Competency by Rotation

Review Period

| Rotation | Dates | Patient Care | Medical Knowledge | Systems-Based | Practice-Based | Professionalism | Interpersonal |
|---|---|---|---|---|---|---|---|
| **Scale: 1 to 9** | | | | | | | |
| DOTO:OTO:TEAM C TDC/HOSPITAL | 01/01/2017 – 02/28/2017 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 |
| DOTO:OTO:TEAM B RA-P | 03/01/2017 – 04/30/2017 | 6.33 | 5.33 | 6.67 | 6.00 | 5.67 | 6.33 |
| DOTO:OTO:TEAM B RA-P | 05/01/2017 – 06/30/2017 | 5.67 | 5.33 | 5.67 | 5.33 | 5.33 | 6.33 |

### Competency by Training Year

Residency

Results from Grade Scale: 1 to 9



| | Patient Care | Medical Knowledge | Systems-Based | Practice-Based | Professionalism | Interpersonal |
|---|---|---|---|---|---|---|
| PRG 1 | 8.06 | 6.34 | 6.66 | 6.54 | 7.32 | 7.33 |
| PRG 2 | 6.52 | 6.31 | 6.77 | 6.46 | 6.62 | 6.52 |

### Conference Attendance

Review Period

% Attended = Present / (# Required - Excused)

| | Status | Department | Category | # Conferences | # Required | Present | Tardy | Excused | % Required | % Attended |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Home Department** | | | | | | | | | |
| | PRG 2 | OTO- Otolaryngology | Grand Rounds | 17 | 17 | 17 | 0 | 0 | 90% | 100% |
| | PRG 2 | OTO- Otolaryngology | Plastics Conference | 1 | 1 | 1 | 0 | 0 | 90% | 100% |
| | PRG 2 | OTO- Otolaryngology | User Conference | 1 | 1 | 1 | 0 | 0 | 90% | 100% |
| | | | Totals | 19 | 19 | 19 | 0 | 0 | | Avg 100.00% |
| | **Outside Department** | | | | | | | | | |
| | PRG 2 | *GME | Empathy | 1 | 1 | 1 | 0 | 0 | 100% | 100% |
| | PRG 2 | *GME | Resident Wellness | 2 | 2 | 2 | 0 | 0 | 100% | 100% |
| | | | Totals | 3 | 3 | 3 | 0 | 0 | | Avg 100.00% |
| | | | Grand Totals | 22 | 22 | 22 | 0 | 0 | | Avg 100.00% |

### Duty Hour Rule Violations

Review Period

| Rotation | Start Date | End Date | Hrs/Wk | 80 Hr | 24+ | Call | Short Break | Days Off | Night Float |
|---|---|---|---|---|---|---|---|---|---|
| DOTO:OTO:TEAM C TDC/HOSPITAL | 1/1/2017 | 2/28/2017 | 59.32 | 0 | 0 | 0 | 0 | 0 | 0 |
| DOTO:OTO:TEAM B RA-P | 3/1/2017 | 4/30/2017 | 49.11 | 0 | 0 | 0 | 0 | 0 | 0 |



| Rotation | Start Date | End Date | Hrs/Wk | 80 Hr | 24+ | Call | Short Break | Days Off | Night Float |
|---|---|---|---|---|---|---|---|---|---|
| DOTO:OTO:TEAM B RA-P | 5/1/2017 | 6/30/2017 | 46.25 | 0 | 0 | 0 | 0 | 0 | 0 |

**Evaluation Comments - All**                                                                                       Review Period ⏱

| | Comment |
|---|---|

**Interpersonal and Communication Skills**

   Interpersonal Communication Skills

Very caring and empathic. Excellent family communication. Superb public speaker. Challenged by timely completion of medical records.

**Interpersonal and Communication Skills** COMMUNICATIVE AND INTERPERSONAL SKILLS

   Poor listening, writing, nonverbal skills; unable to clearly explain complex problems; does not earn respect of peers; frequently unavailable to consult with patients, families, colleagues

A pleasure to work with

**Medical Knowledge**

   Dysphagia-Dysphonia — Medical Knowledge

Needs additional practice with fiberoptic laryngoscopy.

**Patient Care**

   Incomplete, inaccurate medical interviews, physical examinations, Superb, accurate, comprehensive medical interviews, physical examinations, and review of other data; incompetent performance of essential reviews of other data, and procedural skills; always makes diagnostic and procedure; fails to analyze clinical data and consider patient preferences therapeutic decisions based on available evidence, sound judgement and when making medical decisions. patient preferences.

Dr. Walker cares alot about her patients

This has improved as rotation has progressed as we try to prioritize and stress efficiency along with good judgement

Needs to develop efficiency in clinical interviewing and documentation. Has improved, discussed continued improvement in this area.

**Practice-Based Learning and Improvement**

   The ability to investigate and evaluate the care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and life-long learning — Practice-based Learning and Improvement

Dr. Walker displays variable receptiveness to feedback. Recommend proactice requests for feedback in specific situations--OR or clinic.

**Practice-Based Learning and Improvement** PRACTICE-BASED LEARNING AND IMPROVEMENTS

   Fails to perform self-evaluation; lacks insight, initiative; resists or Constantly evaluates own performance; incorporates feedback ignores feedback; fails to use information technology to enhance into improvement activities; effectively uses technology to patient care or pursue self improvement. manage information for patient care and self improvement.

Listens and understands constructive criticism during surgery and has improved on technique throughout rotation

Has improved in initiative and insight, motivated to make changes appropriate to feedback

**Professionalism**

   Lacks respect, compassion, integrity, honesty; insensitive to diversity; Always demonstrates respect, compassion, integrity, honesty; shirks responsibility; disregards needs for self assessment; places self teaches/role models responsible behavior; total commitment to interest above patient's and society. self assessment; willingly acknowledges errors; always considers needs of patients, families and colleagues.

Has improved on delinquent notes with reminders as rotation has progressed, still needs to build efficiency in clinic encounters and notes. May need better time management to prevent procrastination. Respect and compassion for others is not a problem

Dr. Walker is culturally sensitive and compassionate; needs to improve time management strategies so that she can complete all tasks especially documentation

   Professionalism

Significant challenges with timely completion of clinic notes. Does not seem to appreciate the relative importance of documentation.

Strong ethical/cultural sensitivity. Reason for lower score is persistent tardiness and procrastination of documentation/tasks such as case logs

**Overall Comment**

Overall an excellent junior resident to work with on this rotation. She progressed really well in all areas and made enormous strides in her endoscopic sinus surgery and basic soft tissue skills. She was always thoughtful and conscientious in regards to her thought process regarding patient management and treatment plans. She became quite autonomous by the end of the rotation with consults and in clinic. One thing which set her apart that I really appreciated is that she was very concerned about always doing both the right and best thing for the patient. I encouraged her to work on her efficiency skills moving forward, particularly as she takes on an increasing number of duties and responsibilities in her upper level years.

She has steadily improved & is very good.

Dr. Walker is improving technically in the clinic and OR--her surgical skills are progressing well and she has responded well to constructive criticism on technique. Very slowly building in clinic efficiency, note writing is also improving. She is compassionate and cares for patients/team.

Dr. Walker is progressing well. I have seen her surgical skills improve by the day. However, I strongly suggest that she gets more involved patient care, particularly those patients that are admitted. She sometimes appears passive and argues her point.

Keep your head up and work hard. Work on learning the things you don't know and work on becoming faster and more efficient on the things you do know so you'll have more time to learn the things you don't. You will get there!

| Comment |
| --- |
| Developing well technically. Takes feedback well in surgery/procedures. Has slowly improved clinical management of patients and on days she is performing to her full potential, she is good clinical insight and can complete documentation. She needs to continue to keep a positive attitude and perform at her full potential. We discussed this for her upcoming third year and she is motivated to have a better plan in place for research and her rotations. |
| Dr. Walker has the potential to be one of our very best residents. She has the intellect, dexterity and heart to be an outstanding physician. She will benefit from developing resilience and endurance and constancy of effort and attitude. She can let discouragement disproportionately affect her outlook and performance. Recommend reflection and mentorship and practices of self discipline which will make records completion less overwhelming. Would like to see her present at the national level and get involved in committee work. |
| Dr. Walker is a pleasure to work with! She continues to develop at the appropriate pace for her level of training and exhibits good surgical dexterity. She should continue to increase her fund of knowledge and efficiency in the clinical setting over the coming years which needs to be a focus. |
| I do not recall that Dr. Walker and I really got to spend time together much in either the outpatient or operating room. I suspect she is on level. |
| Improvement in the OR. |
| level appropriate |
| On the personal level, Dr. Walker is a pleasure to work with. However, she can get frustrated when things are not going exactly as she likes. I recommend that she sits down with faculty for continous feedback. There is room for improvement. |
| Overall good year - needs to focus and not procrastinate - at a point in her career where this can really derail her if she does not fix the time management issues. |
| Progressing appropriately |
| See previous comments. |
| Strong work this year. Technically much improved and continued positive and enthusiastic team player. Keep up the great work. Read read read. |
| Surgical technique is improving and responds well to constructive criticism in operating room/clinic procedures. Good patient rapport, kind to patients and staff. Recommend more independent reading during dedicated rotations. Needs to build efficiency and time management with clinic encounters/documentation |

## Evaluation Comments by Competency                                          Review Period ⊕

| Comment |
| --- |

**DOTO:OTO:TEAM C TDC/HOSPITAL (01/01/2017 - 02/28/2017)**

**General Comment**

Overall an excellent junior resident to work with on this rotation. She progressed really well in all areas and made enormous strides in her endoscopic sinus surgery and basic soft tissue skills. She was always thoughtful and conscientious in regards to her thought process regarding patient management and treatment plans. She became quite autonomous by the end of the rotation with consults and in clinic. One thing which set her apart that I really appreciated is that she was very concerned about always doing both the right and best thing for the patient. I encouraged her to work on her efficiency skills moving forward, particularly as she takes on an increasing number of duties and responsibilities in her upper level years.

She has steadily improved & is very good.

**DOTO:OTO:TEAM B RA-P (03/01/2017 - 04/30/2017)**

**Patient Care**

Dr. Walker cares alot about her patients

This has improved as rotation has progressed as we try to prioritize and stress efficiency along with good judgement

**Practice-Based Learning and Improvement**

Listens and understands constructive criticism during surgery and has improved on technique throughout rotation

**Professionalism**

Has improved on delinquent notes with reminders as rotation has progressed, still needs to build efficiency in clinic encounters and notes. May need better time management to prevent procrastination. Respect and compassion for others is not a problem

**Interpersonal and Communication Skills**

A pleasure to work with

**General Comment**

Dr. Walker is improving technically in the clinic and OR--her surgical skills are progressing well and she has responded well to constructive criticism on technique. Very slowly building in clinic efficiency, note writing is also improving. She is compassionate and cares for patients/team.

Dr. Walker is progressing well. I have seen her surgical skills improve by the day. However, I strongly suggest that she gets more involved patient care, particularly those patients that are admitted. She sometimes appears passive and argues her point.

Keep your head up and work hard. Work on learning the things you don't know and work on becoming faster and more efficient on the things you do know so you'll have more time to learn the things you don't. You will get there!

**DOTO:OTO:TEAM B RA-P (05/01/2017 - 06/30/2017)**

**Patient Care**

Needs to develop efficiency in clinical interviewing and documentation. Has improved, discussed continued improvement in this area.

**Practice-Based Learning and Improvement**

Has improved in initiative and insight, motivated to make changes appropriate to feedback

**Professionalism**

Dr. Walker is culturally sensitive and compassionate; needs to improve time management strategies so that she can complete all tasks especially documentation

Strong ethical/cultural sensitivity. Reason for lower score is persistent tardiness and procrastination of documentation/tasks such as case logs

**General Comment**

| | Comment |
|---|---|
| | Developing well technically. Takes feedback well in surgery/procedures. Has slowly improved clinical management of patients and on days she is performing to her full potential, she has good clinical insight and can complete documentation. She needs to continue to keep a positive attitude and perform at her full potential. We discussed this for her upcoming third year and she is motivated to have a better plan in place for research and her rotations. |
| | Improvement in the OR. |
| | On the personal level, Dr. Walker is a pleasure to work with. However, she can get frustrated when things are not going exactly as she likes. I recommend that she sits down with faculty for continous feedback. There is room for improvement. |
| | Surgical technique is improving and responds well to constructive criticism in operating room/clinic procedures. Good patient rapport, kind to patients and staff. Recommend more independent reading during dedicated rotations. Needs to build efficiency and time management with clinic encounters/documentation |

## Procedures Logged                                                                                                                                Residency ⊙

| Procedure Name | Independent Target | Review Total Passed | Review Total Not Passed | Residency Total Passed | Residency Total Not Passed | Independent |
|---|---|---|---|---|---|---|
| No records to display. | | | | | | |

## Scholarly Activity                                                                                                                               Residency ⊙

| Activity | Total |
|---|---|
| (DO NOT USE - GME OFFICE USE ONLY) Abstract and Quality Improvement Project | 0 |
| 2015- 2016 Quality Improvement Project Form | 0 |
| Conference Presentation | 0 |
| Quality Improvement Project Form (Rev. 1/2017) | 1 |
| Quality Improvement Project Form_1 | 0 |

## Test Scores                                                                                                                                      Residency ⊙

| Test Type | Date Taken | Score | Passed | Percentile |
|---|---|---|---|---|
| ABNS WRITTEN EXAM | 11/20/2014 | Pass | ✔ | |
| Otolaryngology Training Exam (OTE) | 3/5/2016 | 4.79 | ✔ | 4 |
| QI 101-OLD: Fundamentals of Improvement | 6/25/2015 | | ✔ | |
| QI 102-OLD: The Model for Improvement: Your Engine for Change | 6/27/2015 | | ✔ | |
| QI 103-OLD: Measuring for Improvement | 6/29/2015 | | ✔ | |
| QI 104-OLD: The Life Cycle of a Quality Improvement Project | 6/29/2015 | | ✔ | |
| QI 105-OLD: The Human Side of Quality Improvement | 6/29/2015 | | ✔ | |
| QI 106-OLD: Mastering PDSA Cycles and Run Charts | 8/14/2015 | | ✔ | |
| USMLE Step 1 | 6/18/2013 | 254 | ✔ | |
| USMLE Step 2 CS | 12/28/2014 | 243 | ✔ | |

## Curriculum Confirmed                                                                                                               Review Period ⊙

| Rotation | Start Date | End Date | Reviewed Curriculum |
|---|---|---|---|
| DOTO:OTO:TEAM C TDC/HOSPITAL | | 2/28/2017 | N/A |
| DOTO:OTO:TEAM B RA-P | | 4/30/2017 | N/A |
| DOTO:OTO:TEAM B RA-P | | 6/30/2017 | N/A |

**Progress Summary**

Overall Progress    ✔ Meets Expectations    ⊙ Requires Attention

**Competency Progress**

| | | |
|---|---|---|
| Patient Care | ✔ Meets Expectations | ⊙ Requires Attention |
| Medical Knowledge | ⊙ Meets Expectations | ! Requires Attention |
| Systems-Based Practice | ✔ Meets Expectations | ⊙ Requires Attention |
| Practice-Based Learning and Improvement | ✔ Meets Expectations | ⊙ Requires Attention |
| Professionalism | ⊙ Meets Expectations | ! Requires Attention |
| Interpersonal and Communication Skills | ⊙ Meets Expectations | ! Requires Attention |

**Comments**



**Szeremeta, Wasyl** on 8/16/2017 at 11:24 AM wrote:

Dr. Walker's progress was reviewed by the CCC and although overall she is doing well - there were several areas of concern. The main concerns regarded timely completion of paperwork including documentation of patient care as well as residency requirements. In addition to this was the perception of how Dr. Walker reacted to bad news or disappointment.

With regards to the paperwork - Dr. Walker verbalized an understanding of the importance of completion of the medical record in a timely fashion and feels that she has made improvements. There have been some improvements noted but there continue to be some lapses which if of concern for someone who is PGY-3 level.

With regards to the bad news - we discussed 3 incidents that had occurred - Dr. Walker felt that she had reacted appropriately in 2 of the 3, but is now aware of being sensitive to things that may create a poor perception of her true abilities.

I have asked her to focus on three specific areas in the upcoming months - timely completion of all resident paperwork including patient and non-patient care, being prepared for surgical cases including but not limited to speaking with the attending the night before to make sure a congruent plan is in place, and that operative notes be completed on the day of surgery. She will be spending some of next year in Houston - and this gives her a clean slate to show how well she can handle those aspects of care that reflect professionalism and interpersonal and Communication Skills.

**Signatures**

**Subject**                    ✐ Walker, Rosandra Lakeisha signed on 8/22/2017 at 9:39 PM

**Program Director**           ✐ Szeremeta, Wasyl signed on 8/16/2017 at 11:24 AM

**Attached Files**

There are currently no files attached to this review.

Semi-Annual Review

**Review Period:** 7/1/2016 - 12/31/2016          **Residency Period:** 6/16/2015 - 12/31/2016          Meeting Date: 2/3/2017 4:00P-4:30P

**SEMI ANNUAL REVIEW**

**Walker, Rosandra Lakeisha**
PRG 2
Otolaryngology
rolwalke@utmb.edu

Report Data was last captured on: 2/1/2017

**Competency by Rotation**                                    Review Period ⊙

| | Rotation | Dates | Patient Care | Medical Knowledge | Systems-Based | Practice-Based | Professionalism | Interpersonal |
|---|---|---|---|---|---|---|---|---|
| ⌄ | Scale 1 to 9 | | | | | | | |
| | DOTO:OTO:TEAM C PEDI | 07/01/2016 - 08/31/2016 | 7.50 | 7.50 | 7.50 | 7.50 | 8.00 | 8.00 |
| | DOTO:OTO:TEAM C PEDI | 09/01/2016 - 10/31/2016 | 6.50 | 6.50 | 6.50 | 6.50 | 7.00 | 7.00 |
| | DOTO:OTO:TEAM C TDC/HO SPITAL | 11/01/2016 - 12/31/2016 | 6.00 | 6.00 | 7.00 | 6.00 | 7.00 | 6.00 |

**Competency by Training Year**                                    Residency ⊙

Results from Grade Scale: 1 to 9



| | PRG 1 |
| | PRG 2 |

Patient Care: 6.85, 6.8 | Medical Knowledge: 6.54, 6.8 | Systems-Based: 6.86, 7 | Practice-Based: 6.54, 6.0 | Professionalism: 7.02, 7.4 | Interpersonal: 7.25, 7.2

**Conference Attendance**                                    Review Period ⊙

% Attended = Present / (# Required - Excused)

| | Status | Department | Category | # Conferences | # Required | Present | Tardy | Excused | % Required | % Attended |
|---|---|---|---|---|---|---|---|---|---|---|
| ⌄ | Home Department | | | | | | | | | |
| | PRG 2 | OTO- Otolaryngology | BIC | 32 | 32 | 31 | 0 | 0 | 90% | 96% |
| | PRG 2 | OTO- Otolaryngology | Didactics | 15 | 15 | 15 | 0 | 0 | 90% | 100% |
| | PRG 2 | OTO- Otolaryngology | Grand Rounds | 11 | 11 | 11 | 0 | 0 | 90% | 100% |
| | PRG 2 | OTO- Otolaryngology | Plastics Conference | 1 | 1 | 1 | 0 | 0 | 90% | 100% |
| | | | Totals | 59 | 59 | 58 | 0 | 0 | | Avg 98.31% |
| ⌄ | Outside Department | | | | | | | | | |
| | PRG 2 | *GME | Resident Wellness | 1 | 1 | 0 | 0 | 0 | 100% | 0% |
| | | | Totals | 1 | 1 | 0 | 0 | 0 | | Avg 0.00% |
| | | | Grand Totals | 60 | 60 | 58 | 0 | 0 | | Avg 96.67% |

**Duty Hour Rule Violations**                                    Review Period ⊙

| Rotation | Start Date | End Date | Hrs/Wk | 80 Hr | 24+ | Call | Short Break | Days Off | Night Float |
|---|---|---|---|---|---|---|---|---|---|
| DOTO:OTO:TEAM C PEDI | 7/1/2016 | 8/31/2016 | 66.50 | 0 | 0 | 0 | 0 | 0 | 0 |
| DOTO:OTO:TEAM C PEDI | 9/1/2016 | 10/31/2016 | 54.05 | 0 | 0 | 0 | 0 | 0 | 0 |



| Rotation | Start Date | End Date | Hrs/Wk | 80 Hr | 24 | Call | Short Break | Days Off | Night Float |
|---|---|---|---|---|---|---|---|---|---|
| DOTO:OTO:TEAM C TDC/HOSPITAL | 11/1/2016 | 12/31/2016 | 55.87 | 0 | 0 | 0 | 0 | 0 | 0 |

**Evaluation Comments - All**                                                                 Review Period ⊕

| | Comment |
|---|---|
| | |

**Overall Comment**

Excellent working with this resident

So far I am so extremely impressed with Dr. Walker's performance on the pediatric ENT service. She has proven herself to be dependable, conscientious and talented in the operating room. I am pleased with her technical skills placing ear tubes along with removing tonsils with the coblator. She has a positive demeanor even when tired and has a terrific bedside manner. I have no overt concerns at this time. On the contrary, I expect great things from Dr. Walker. Thanks for helping me make RAVING FANS!

Dr. Walker has made remarkable progress from her PGY-1 year. Her presentations are more succinct and crisp. Her operative skills have improved and she can perform BMT and adenotonsillectomy with little difficulty. She is not flustered in the operating room. She maintains a positive attitude in all her endeavors. She needs to be careful to accept "evidence based medicine" data as fact.

Dr. Walker is making excellent progress and is on the path to becoming a competent ENT Physician/Surgeon.

Great improvement since last year.

Great resident to work with. Smart, competent, and good with patients.

progressing appropriately

Difficult to assess. I have not had significant time to work with Dr. Walker since my last evaluation

Dr. Walker has shown marked improvement in clinical and technical skills during her transition from intern to PGY 2 year. She has a great attitude, takes feedback and constructive criticism to the next level. She is more confident on call and manages patients appropriately. Clinic efficiency has slowly improved and will continue to improve.

Dr. Walker is very reliable and is progressing at the appropriate pace for her level of residency training.

level appropriate

limited exposure

not enough exposure

Outstanding resident, progressing well.

very limited expsoure

very limited expsoure

**Evaluation Comments by Competency**                                                        Review Period ⊕

| | Comment |
|---|---|
| | |

DOTO:OTO:TEAM C PEDI (07/01/2016 - 08/31/2016)

   General Comment

Excellent working with this resident

So far I am so extremely impressed with Dr. Walker's performance on the pediatric ENT service. She has proven herself to be dependable, conscientious and talented in the operating room. I am pleased with her technical skills placing ear tubes along with removing tonsils with the coblator. She has a positive demeanor even when tired and has a terrific bedside manner. I have no overt concerns at this time. On the contrary, I expect great things from Dr. Walker. Thanks for helping me make RAVING FANS!

DOTO:OTO:TEAM C PEDI (09/01/2016 - 10/31/2016)

   General Comment

Dr. Walker has made remarkable progress from her PGY-1 year. Her presentations are more succinct and crisp. Her operative skills have improved and she can perform BMT and adenotonsillectomy with little difficulty. She is not flustered in the operating room. She maintains a positive attitude in all her endeavors. She needs to be careful to accept "evidence based medicine" data as fact.

Dr. Walker is making excellent progress and is on the path to becoming a competent ENT Physician/Surgeon.

Great improvement since last year.

Great resident to work with. Smart, competent, and good with patients.

DOTO:OTO:TEAM C TDC/HOSPITAL (11/01/2016 - 12/31/2016)

   General Comment

limited exposure

not enough exposure

**Procedures Logged**                                                                         Residency ⊚

| Procedure Name | Independent Target | Review Total Passed | Review Total Not Passed | Residency Total Passed | Residency Total Not Passed | Independent |
|---|---|---|---|---|---|---|
| No records to display. | | | | | | |



## Scholarly Activity
Residency

| Activity | Total |
|---|---|
| 2015- 2016 Quality Improvement Project Form | 0 |
| Conference Presentation | 0 |
| Quality Improvement Project Form_1 | 0 |

## Test Scores
Residency

| Test Type | Date Taken | Score | Passed | Percentile |
|---|---|---|---|---|
| ABNS WRITTEN EXAM | 11/20/2014 | Pass | ✅ | |
| Otolaryngology Training Exam (OTE) | 3/5/2016 | 4.79 | ✅ | 4 |
| QI 101-OLD: Fundamentals of Improvement | 6/25/2015 | | ✅ | |
| QI 102-OLD: The Model for Improvement: Your Engine for Change | 6/27/2015 | | ✅ | |
| QI 103-OLD: Measuring for Improvement | 6/29/2015 | | ✅ | |
| QI 104-OLD: The Life Cycle of a Quality Improvement Project | 6/29/2015 | | ✅ | |
| QI 105-OLD: The Human Side of Quality Improvement | 6/29/2015 | | ✅ | |
| QI 106-OLD: Mastering PDSA Cycles and Run Charts | 8/14/2015 | | ✅ | |
| USMLE Step 1 | 6/18/2013 | 254 | ✅ | |
| USMLE Step 2 CS | 12/28/2014 | 243 | ✅ | |

## Curriculum Confirmed
Review Period

| Rotation | Start Date | End Date | Reviewed Curriculum |
|---|---|---|---|
| DOTO:OTO:TEAM C PEDI | | 8/31/2016 | N/A |
| DOTO:OTO:TEAM C PEDI | | 10/31/2016 | N/A |
| DOTO:OTO:TEAM C TDC/HOSPITAL | | 12/31/2016 | N/A |

## Progress Summary

Overall Progress   ✅ Meets Expectations   ⭕ Requires Attention

### Competency Progress

| | | |
|---|---|---|
| Patient Care | ✅ Meets Expectations | ⭕ Requires Attention |
| Medical Knowledge | ✅ Meets Expectations | ⭕ Requires Attention |
| Systems-Based Practice | ✅ Meets Expectations | ⭕ Requires Attention |
| Practice-Based Learning and Improvement | ✅ Meets Expectations | ⭕ Requires Attention |
| Professionalism | ✅ Meets Expectations | ⭕ Requires Attention |
| Interpersonal and Communication Skills | ✅ Meets Expectations | ⭕ Requires Attention |

## Comments

McCammon, Susan * on 4/4/2017 at 10:34 AM wrote:
The CCC has reviewed your performance monthly and met on Dec. 20 for a summative review based on your NI evaluations, milestones, operative logs, OTE scores, and any correspondence received from or about you, including timeliness in record completion and institutional citizenship. The following specific recommendations are made: "has become a star," quantum leap betwee PGY1 and 2; positive energy, takes feedback really well; would like to see you engage in national leadership positions and be ambassador for us; can be a little argumentative example given about EBM and treatment recommendations; needs to ultimately follow attending's treatment plan; attend to communication styles.

## Signatures

**Subject**   ✎ Walker, Rosandra Lakeisha signed on 5/3/2017 at 4:05 PM

**Program Director**   ✎ McCammon, Susan * signed on 4/4/2017 at 10:34 AM

☀ **Attached Files**

There are currently no files attached to this review.



Semi-Annual Review

**Review Period:** 1/1/2016 - 6/30/2016          **Residency Period:** 6/16/2015 - 6/30/2016          **Meeting Date:** (TBD)

**SEMI ANNUAL REVIEW**

**Walker, Rosandra Lakeisha**
PRG 1
Otolaryngology
rosalke@utmb.edu

Report Data was last captured on: 8/15/2016

**Competency by Rotation**                                                                 Review Period ⏱

| Rotation | Dates | Patient Care | Medical Knowledge | Systems-Based | Practice-Based | Professionalism | Interpersonal |
|---|---|---|---|---|---|---|---|
| ⌄ Scale 1 to 9 | | | | | | | |
| DOTO:OTO:BIC (Basic Introductory Course) | 01/01/2016 – 01/31/2016 | 7.00 | 6.00 | 5.00 | 6.00 | 6.00 | 7.00 |
| DSG: SURG: PEDS: UTMB | 02/01/2016 – 02/29/2016 | 3.00 | 3.00 | 3.00 | 1.50 | 1.50 | 3.50 |
| Bauer/Blackwell | 03/01/2016 – 03/31/2016 | 8.00 | 7.00 | 6.00 | 6.00 | 8.00 | 7.00 |
| DNS:NS:NEUROSURG | 04/01/2016 – 04/30/2016 | 6.33 | 6.00 | 6.67 | 6.33 | 7.92 | 7.50 |
| DA:ANESCC:SICU | 05/01/2016 – 05/31/2016 | 7.80 | 7.80 | 7.80 | 7.80 | 7.57 | 7.50 |

**Competency by Training Year**                                                            Residency ◉

Results from Grade Scale: 1 to 9

| | Patient Care | Medical Knowledge | Systems-Based | Practice-Based | Professionalism | Interpersonal |
|---|---|---|---|---|---|---|
| | 6.86 | 6.04 | 6.56 | 6.54 | 7.92 | 7.25 |

■ PRG 1

**Conference Attendance**                                                                 Review Period ⏱

% Attended = Present / (# Required - Excused)

| Status | Department | Category | # Conferences | # Required | Present | Tardy | Excused | % Required | % Attended |
|---|---|---|---|---|---|---|---|---|---|
| ⌄ Outside Department | | | | | | | | | |
| PRG 1 | *GME | Empathy | 1 | 1 | 1 | 0 | 0 | 100% | 100% |
| PRG 1 | *GME | Medical Economics | 1 | 1 | 1 | 0 | 0 | 100% | 100% |
| PRG 1 | *GME | Resident Wellness | 1 | 1 | 1 | 0 | 0 | 100% | 100% |
| PRG 1 | SURG - General Surgery | Grand Rounds | 2 | 2 | 2 | 0 | 0 | 100% | 100% |
| PRG 1 | SURG - General Surgery | Morbidity and Mortality | 2 | 2 | 2 | 0 | 0 | 100% | 100% |
| | | Totals | 7 | 7 | 7 | 0 | 0 | | Avg 100.00% |
| | | Grand Totals | 7 | 7 | 7 | 0 | 0 | | Avg 100.00% |

**Duty Hour Rule Violations**                                                            Review Period ⏱

| Rotation | | | Start Date | End Date | Hrs/Wk | 80 Hr | 24+ | Cell | Short Break | Days Off | Night Float |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Rotation | Start Date | End Date | Hrs/Wk | 80 Hr | 24◇ | Call | Short Break | Days Off | Night Float |
|----------|-----------|----------|--------|-------|-----|------|-------------|----------|-------------|
| DOTO:OTO:BIC (Basic Introductory Course) | 1/1/2016 | 1/31/2016 | 55.10 | 0 | 0 | 0 | 0 | 0 | 0 |
| DSG: SURG: PEDS: UTMB | 2/1/2016 | 2/29/2016 | 66.82 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bauer/Blackwell | 3/1/2016 | 3/31/2016 | 47.65 | 0 | 0 | 0 | 0 | 0 | 0 |
| DNS:NS:NEUROSURG | 4/1/2016 | 4/30/2016 | 83.53 | 1 | 0 | 0 | 0 | 0 | 0 |
| DA:ANESCC:SICU | 5/1/2016 | 5/31/2016 | 35.90 | 0 | 0 | 0 | 0 | 0 | 0 |
| DER:ER:ER | 6/1/2016 | 6/30/2016 | 52.97 | 0 | 0 | 0 | 0 | 0 | 0 |

**Evaluation Comments - All**                                                                   Review Period ⊕

### Comment

**Interpersonal and Communication Skills** COMMUNICATIVE AND INTERPERSONAL SKILLS

⌄ Poor listening, writing, and verbal skills; unable to effectively communicate plans of care to patients, families, or staff; unable to clearly express orders or the rationale behind them, Exceptionally well spoken; documentation is clear and concise, attentive to the concerns of patients, families, and staff; highly effective educating in and counseling patients, families, and staff

Cautious in making decisions regarding treatment or POC without talking to upper level residents.

Very well spoken when conversing with families.

⌄ Poor listening, writing, nonverbal skills; unable to clearly explain complex problems; does not earn respect of peers; frequently unavailable to consult with patients, families, colleagues, Establishes a highly effective therapeutic relationship with patients and families; demonstrates excellent relationship building through listening, writing, and non verbal skills; excellent education and counseling of patients, families, and colleagues; always "interpersonally" engaged

Poor work ethic and efficiency led her to be not respected by her peers.

⌄ Rarely available or in contact with the staff; frequently unavailable to consult with patients and families; aloof, indifferent, and unapproachable, Readily available and always present; superb efforts in consultation with patients and families; always "interpersonally" engaged; welcoming to questions, advice and criticisms

Always engaged and open for new learning opportunies with neurosurgery. Makes rounds several times on the unit to see if any of the nurses have any concerns or need new orders.

Consistently called back when paged or made frequent rounds on the unit to see if there were needs that needed attention.

⌄ **Medical Knowledge**

⌄ Limited knowledge of basic and clinical sciences; minimal interest in learning; cannot explain mechanisms of disease, Exceptional knowledge of basic and clinical sciences; highly resourceful development of knowledge; understands complex relationships and skillfully develops unifying concepts

Poor fund of knowledge

⌄ **Patient Care**

⌄ Incomplete, inaccurate medical interviews, physical examinations, and review of other data; incompetent performance of essential procedure; fails to analyze clinical data and consider patient preferences when making medical decisions, Superb, accurate, comprehensive medical interviews, physical examinations, reviews of other data, and procedural skills; always makes diagnostic and therapeutic decisions based on available evidence, sound judgment and patient preferences

Consistently missed vital portions of exams and interview

always caring and on the ball

⌄ **Practice-Based Learning and Improvement** PRACTICE-BASED LEARNING AND IMPROVEMENTS

⌄ Fails to perform self-evaluation; lacks insight, initiative; resists or ignores feedback; fails to use information technology to enhance patient care or pursue self-improvement, Constantly evaluates own performance; incorporates feedback into improvement activities; effectively uses technology to manage information for patient care and self improvement

Unable to recognize when her performance is sub par and is unable to improve after being told to do so.

Was given feedback on the rotation but I did not observe improvement

⌄ **Professionalism**

⌄ Lacks respect for colleagues, staff, patients, and families; insensitive to diversity; condescending; unconscientious of the needs of colleagues, staff, patients, and families, Always demonstrates respect for others; sensitive to the needs of colleagues, staff, patients and families; empathetic and humane to patients and families

She constantly seeks feedback regarding our needs and the needs of the patients and will address concerns in an appropriate manner.

Very empathetic to patients and families.

⌄ Lacks respect, compassion, integrity, honesty; insensitive to diversity; shirks responsibility; disregards needs for self assessment; places self interest above patient's and society, Always demonstrates respect, compassion, integrity, honesty; teaches/role models responsible behavior; total commitment to self assessment; willingly acknowledges errors; always considers needs of patients, families, colleagues

Some concern from other faculty was expressed about dr. Walker arriving late to clinic or the OR.

Missed a day of work to get engaged

Showed up consistently late for rounds. Did not show up for an entire morning of rounding or clinic. See below for further information.

on time and ready to go

⌄ Sets a poor example for colleagues and students; lacks sincerity, virtue, and candor; disregards the need for self assessment; places self interest above patient's and society, Excellent role model for principle and propriety; sincere, responsible, and incorruptible; willingly acknowledges errors and accepts constructive criticism; considerate of the need of patients, families, and staff

She demonstrated her compassion and empathy with staff and patients/family. She is trustworthy and an excellent role model with the willingness to accept accountability.

| Comment |
| --- |

**Systems-Based Practice** SYSTEM BASED PRACTICE

Unable to access/mobilize outside resources independently; uses care pathways indiscriminately; actively resists efforts to improve systems of care, Effectively - accesses/utilizes outside resources; effectively uses systematic approaches to reduce errors and improve patient care; enthusiastically assists in developing systems improvement

On par for level

Unable to work efficiently in the context of the service.

**Overall Comment**

Dr. Walker was a pleasure to have on service and seems to be progressing well through the intern year. She should focus on promptness and should develop and maintain an independent reading schedule. Her presentation on sleep apnea was excellent and far exceeded expectations for her level in terms of poise and fluency in public speaking as well as content and analysis.

Dr. Walker performed quite poorly on her pediatric surgery rotation. First, she didn't show up on time for rounds one morning (came to work over an hour late) and gave the chief resident an unacceptable excuse. In addition, two days after her week off for vacation, she showed up to work for the afternoon clinic, missing the entire morning rounds and clinic, which I later found out was to get engaged the night before. These raise significant professionalism issues. During a busy clinic where I had 35 patients, she saw 4 patients during the entire clinic and was only able to write the notes for 3 of them (I had to write the other one). Despite being told that her efficiency needs to improve by our faculty, she was unable to do so during her time on the rotation. She seems to lack personal insight as to her own performance. I have serious concerns as to her ability to care for patients during her residency and beyond given these professionalism issues. Unfortunately, this is one of the worst performances I have seen on the pediatric surgery service at UTMB and I can not in good conscience pass her for this rotation. While she appears to be a nice person, I worry that when more responsibility is given to her, the results will be disastrous.

enjoyed her time on our service

Dr. Walker is a very hard working and dedicated resident. She is highly responsible and very professional. She has a great attitude and a very well liked team player by all the residents. She would complete her duties in a timely fashion and got along very well with all the staff and patients. She will no doubt perform as a highly skilled physician.

Dr. Walker is a wonderful resident. She is quick to respond to nursing concerns, and is a great patient advocate. She is friendly and always willing to speak with patients and their families. I wish we had many more residents just like her!

Dr. Walker was always very prompt at returning pages, enjoyed new opportunities to learn and was very personable with patients and families.

Dr. Walker was exceptionally friendly to all. She has great interpersonal skills and is truly compassionate to the patient and family.

She was exceptionally attentive to patient's and families. If she did not know the answer, she would seek the proper guidance and would come back with the needed information.

sincere, eager to learn, pleasant in communications

Very professional, knowledgeable and courteous. Always has a positive attitude and works well with interdisciplinary teams.

Effectively communicate with the SICU team and collaborates well with patient, families and nursing staff.

Excellent job! Dr. Walker was a strong performer in the SICU and consistently took on challenging patients. She developed a handout and gave a thorough presentation on airway management for total laryngectomy patients that was well received. Great team player and had a professional bedside manner with her patients. Gave thorough presentations on her patients.

Always cheerful. Limited exposure in the OR but looking forward to working with her.

Developing clinical and surgical skills appropriate for her level. Detail-oriented, will develop more focused, efficient clinical evaluations while on call/in clinic over time.

Dr. Walker had a good first rotation on pediatric ENT. I think she may have been slightly overwhelmed with the volume of patients and the pace of the practice - but as the rotation progressed she clearly showed improvement. She needs to work on her clinical presentations being more of a directed surgical H&P vs. a broad internal medicine type H&P. Her fund of knowledge is slightly behind where I would hope for a PGY1 resident - but I believe with her being out of the Surgery Year - she will improve. Her surgical skills need improvement both in pace and confidence - again I believe these will improve with confidence and repetition. I look forward to working with her in her 2nd year.

Dr. Walker is performing very well and as expected for her current level of residency training.

Good performance as an intern. Focus on increasing efficiency in OR and clinic. More attention to accountable deadlines (duty hour, op log, medical record completion, interpersonal and team communication.

Have not worked much with her

I have not spent a significant amount of time working with Dr Walker this year.

I spent very little time with Dr. Walker both in the office seeing patients and in the OR. From our limited interactions and the fact she is an intern, I feel as though she is progressing according to her level.

## Evaluation Comments by Competency

Review Period ℗

| Comment |
| --- |

DOTO:OTO:BIC (Basic Introductory Course) (01/01/2016 - 01/31/2016)

Systems-Based Practice

On par for level

Professionalism

Some concern from other faculty was expressed about dr. Walker arriving late to clinic or the OR.

General Comment

Dr. Walker was a pleasure to have on service and seems to be progressing well through the intern year. She should focus on promptness and should develop and maintain an independent reading schedule. Her presentation on sleep apnea was excellent and far exceeded expectations for her level in terms of poise and fluency in public speaking as well as content and analysis.



**Comment**

**DSG: SURG: PEDS: UTMB (02/01/2016 - 02/29/2016)**

**Patient Care**
Consistently missed vital portions of exams and interview

**Medical Knowledge**
Poor fund of knowledge

**Systems-Based Practice**
Unable to work efficiently in the context of the service.

**Practice-Based Learning and Improvement**
Unable to recognize when her performance is sub par and is unable to improve after being told to do so.
Was given feedback on the rotation but I did not observe improvement

**Professionalism**
Missed a day of work to get engaged
Showed up consistently late for rounds. Did not show up for an entire morning of rounding or clinic. See below for further information.

**Interpersonal and Communication Skills**
Poor work ethic and efficiency led her to be not respected by her peers.

**General Comment**
Dr. Walker performed quite poorly on her pediatric surgery rotation. First, she didn't show up on time for rounds one morning (came to work over an hour late) and gave the chief resident an unacceptable excuse. In addition, two days after her week off for vacation, she showed up to work for the afternoon clinic, missing the entire morning rounds and clinic, which I later found out was to get engaged the night before. These raise significant professionalism issues. During a busy clinic where I had 35 patients, she saw 4 patients during the entire clinic and was only able to write the notes for 3 of them (I had to write the other one). Despite being told that her efficiency needs to improve by our faculty, she was unable to do so during her time on the rotation. She seems to lack personal insight as to her own performance. I have serious concerns as to her ability to care for patients during her residency and beyond given these professionalism issues. Unfortunately, this is one of the worst performances I have seen on the pediatric surgery service at UTMB and I can not in good conscience pass her for this rotation. While she appears to be a nice person, I worry that when more responsibility is given to her, the results will be disastrous.

**Bauer/Blackwell (03/01/2016 - 03/31/2016)**

**Patient Care**
always caring and on the ball

**Professionalism**
on time and ready to go

**General Comment**
enjoyed her time on our service

**DNS:NS:NEUROSURG (04/01/2016 - 04/30/2016)**

**Professionalism**
She constantly seeks feedback regarding our needs and the needs of the patients and will address concerns in an appropriate manner.
She demonstrated her compassion and empathy with staff and patients/family. She is trustworthy and an excellent role model with the willingness to accept accountability.
Very empathetic to patients and families.

**Interpersonal and Communication Skills**
Always engaged and open for new learning opportunies with neurosurgery. Makes rounds several times on the unit to see if any of the nurses have any concerns or need new orders.
Cautious in making decisions regarding treatment or POC without talking to upper level residents.
Consistently called back when paged or made frequent rounds on the unit to see if there were needs that needed attention.
Very well spoken when conversing with families.

**General Comment**
Dr. Walker is a very hard working and dedicated resident. She is highly responsible and very professional. She has a great attitude and a very well liked team player by all the residents. She would complete her duties in a timely fashion and got along very well with all the staff and patients. She will no doubt perform as a highly skilled physician.
Dr. Walker is a wonderful resident. She is quick to respond to nursing concerns, and is a great patient advocate. She is friendly and always willing to speak with patients and their families. I wish we had many more residents just like her!
Dr. Walker was always very prompt at returning pages, enjoyed new opportunities to learn and was very personable with patients and families.
Dr. Walker was exceptionally friendly to all. She has great interpersonal skills and is truly compassionate to the patient and family.
She was exceptionally attentive to patient's and families. If she did not know the answer, she would seek the proper guidance and would come back with the needed information.
sincere, eager to learn, pleasant in communications
Very professional, knowledgeable and courteous. Always has a positive attitude and works well with interdisciplinary teams.

**DA:ANESCC:SICU (05/01/2016 - 05/31/2016)**

**General Comment**
Effectively communicate with the SICU team and collaborates well with patient, families and nursing staff.



Comment

Excellent job! Dr. Walker was a strong performer in the SICU and consistently took on challenging patients. She developed a handout and gave a thorough presentation on airway management for total laryngectomy patients that was well received. Great team player and had a professional bedside manner with her patients. Gave thorough presentations on her patients.

## Procedures Logged

Residency

| Procedure Name | Independent Target | Review Total Passed | Review Total Not Passed | Residency Total Passed | Residency Total Not Passed | Independent |
|---|---|---|---|---|---|---|

No records to display.

## Scholarly Activity

Residency

| Activity | Total |
|---|---|
| 2015– 2016 Quality Improvement Project Form | 0 |
| Conference Presentation | 0 |
| Quality Improvement Project Form_1 | 0 |

## Test Scores

Residency

| Test Type | Date Taken | Score | Passed | Percentile |
|---|---|---|---|---|
| ABNS WRITTEN EXAM | 11/20/2014 | Pass | ✅ | |
| Otolaryngology Training Exam (OTE) | 3/5/2016 | 4.79 | ✅ | 4 |
| QI 101: Fundamentals of Improvement | 6/25/2015 | | ✅ | |
| QI 102: The Model for Improvement: Your Engine for Change | 6/27/2015 | | ✅ | |
| QI 103: Measuring for Improvement | 6/29/2015 | | ✅ | |
| QI 104: The Life Cycle of a Quality Improvement Project | 6/29/2015 | | ✅ | |
| QI 105: The Human Side of Quality Improvement | 6/29/2015 | | ✅ | |
| QI 106: Mastering PDSA Cycles and Run Charts | 8/14/2015 | | ✅ | |
| USMLE Step 1 | 6/18/2013 | 254 | ✅ | |
| USMLE Step 2 CS | 12/28/2014 | 243 | ✅ | |

## Curriculum Confirmed

Review Period

| Rotation | Start Date | End Date | Reviewed Curriculum |
|---|---|---|---|
| DOTO:OTO:BIC (Basic Introductory Course) | | 1/31/2016 | N/A |
| DSG: SURG: PEDS: UTMB | | 2/29/2016 | ▮ |
| Bauer/Blackwell | | 3/31/2016 | N/A |
| DNS:NS:NEUROSURG | | 4/30/2016 | ▮ |
| DA:ANESCC:SICU | | 5/31/2016 | N/A |
| DER:ER:ER | | 6/30/2016 | N/A |

**Progress Summary**

Overall Progress    ✓ Meets Expectations    ⚪ Requires Attention

**Competency Progress**

Patient Care    ✓ Meets Expectations    ⚪ Requires Attention
Medical Knowledge    ✓ Meets Expectations    ⚪ Requires Attention
Systems-Based Practice    ✓ Meets Expectations    ⚪ Requires Attention
Practice-Based Learning and Improvement    ✓ Meets Expectations    ⚪ Requires Attention
Professionalism    ✓ Meets Expectations    ⚪ Requires Attention
Interpersonal and Communication Skills    ✓ Meets Expectations    ⚪ Requires Attention

**Comments**

**McCammon, Susan** * on 8/15/2016 at 6:20 AM wrote:

 The Clinical Competency Committee has met monthly and reviewed your clinical and academic progress. This summative semiannual evaluation includes those discussions, your New Innovations evaluations and milestones, your in-service scores and performance on other didactics, your scholarly activities, any correspondence received by or about you, and your Key Indicator Case logs. Overall you received good evaluations for the second half of your intern year with specific attention drawn to your compassion and empathy and your ability communicate well with patients and families as well as nursing staff.

 **McCammon, Susan * on 8/15/2016 at 6:21 AM wrote:**
One significant negative evaluation from pediatric surgery commented on both tardiness and lack of insight or response to feedback. While one absence was indeed excused by both ENT program director and general surgery program director and coordinator, it was not communicated to the attending and this resulted in a negative impression; however, this evaluation cited other examples of oversleeping and concerns with timeliness and professionalism in general in ways that may affect patient care. Thus, while the remainder of evaluations do not support this, we do think it is important for you to focus on professionalism in the next 6-month block and demonstrate strong performance and insight. Specific examples include being on time or early for rounds and OR, completing duty hour logs, operative log, clinic notes and other accountable documents promptly with need for reminders; thorough communication with all team members about any anticipated absences or possible changes in schedule; and actively seeking feedback on performance.

 **McCammon, Susan * on 8/15/2016 at 6:21 AM wrote:**
Your enthusiasm and energy are excellent and it is a a pleasure to have you on service. In your second year, you will want to focus on deepening your fund of knowledge and increasing your focus in clinic and your efficiency in OR procedures. Comprehensive control of floor work details is also important at this level. Your in service score was fair at the fourth stanine and we feel it does reflect your current fund of knowledge which we anticipate to improve this year with more time on ENT, a dedicated reading schedule and more scholarly activity. Your operative logs are appropriate for level and we encourage you to seek out brad experience in assisting with Key Indicator cases and learning the nuances of ACGME coding guidelines, as well as mastering junior level cases.

### Signatures



| | | |
|---|---|---|
| **Subject** | ✎ | Walker, Rosandra Lakeiha signed on 8/17/2016 at 2:50 AM |
| **Program Director** | ✎ | McCammon, Susan * signed on 8/15/2016 at 6:45 AM |

 **Attached Files**

There are currently no files attached to this review.

Semi-Annual Review

**Review Period: 7/1/2015 - 12/31/2015**   **Residency Period: 6/16/2015 - 12/31/2015**   Meeting Date: 1/29/2016 3:00P-3:30P



### SEMI ANNUAL REVIEW

**Walker, Rosandra Lakeisha**
PRG 1
Otolaryngology
rolwalker@utmb.edu

Report Data was last captured on: 1/27/2016

#### Competency by Rotation

Review Period

| Rotation | Dates | Patient Care | Medical Knowledge | Systems-Based | Practice-Based | Professionalism | Interpersonal |
|---|---|---|---|---|---|---|---|
| Scale: 1 to 9 | | | | | | | |
| DOTO:OTO:BIC (Basic Introductory Course) | 07/01/2015 - 07/31/2015 | 7.67 | 7.67 | 7.00 | 7.33 | 8.00 | 7.67 |
| DOTO:OTO:BIC (Basic Introductory Course) | 08/01/2015 - 08/31/2015 | 7.00 | 7.00 | 6.00 | 7.00 | 8.00 | 8.00 |
| DSG:SURG: SURG GENERAL 2 | 09/01/2015 - 09/30/2015 | 5.75 | 5.50 | 5.33 | 6.00 | 7.00 | 6.50 |
| DSV:VASC:VASC-SURG | 10/01/2015 - 10/31/2015 | 6.75 | 7.00 | 7.50 | 7.25 | 7.50 | 7.50 |
| OR | 11/01/2015 - 11/30/2015 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 |
| DSG:SJRG:TRANSP/HEP | 12/01/2015 - 12/31/2015 | 6.00 | 6.00 | 7.00 | 7.00 | 7.00 | 7.00 |

#### Competency by Training Year

Residency

Results from Grade Scale: 1 to 9

| Patient Care | Medical Knowledge | Systems-Based | Practice-Based | Professionalism | Interpersonal |
|---|---|---|---|---|---|
| 6.71 | 6.71 | 6.77 | 6.90 | 7.5 | 7.76 |

PRG 1

#### Duty Hour Rule Violations

Review Period

| Rotation | Start Date | End Date | Hrs/Wk | 80 Hr | 24+ | Call | Short Break | Days Off | Night Float |
|---|---|---|---|---|---|---|---|---|---|
| DOTO:OTO:BIC (Basic Introductory Course) | 7/1/2015 | 7/31/2015 | 54.98 | 0 | 0 | 0 | 0 | 0 | 0 |
| DOTO:OTO:BIC (Basic Introductory Course) | 8/1/2015 | 8/31/2015 | 59.16 | 0 | 0 | 0 | 0 | 0 | 0 |
| DSG:SURG: SURG GENERAL 2 | 9/1/2015 | 9/30/2015 | 63.80 | 0 | 0 | 0 | 0 | 0 | 0 |
| DSV:VASC:VASC-SURG | 10/1/2015 | 10/31/2015 | 72.48 | 0 | 0 | 0 | 0 | 0 | 0 |
| OR | 11/1/2015 | 11/30/2015 | 32.43 | 0 | 0 | 0 | 0 | 0 | 0 |
| DSG:SURG:TRANSP/HEP | 12/1/2015 | 12/31/2015 | 78.35 | 0 | 0 | 0 | 0 | 0 | 0 |

#### Evaluation Comments - All

Review Period

| | Comment |
|---|---|
| | MEDICAL KNOWLEDGE |

| Comment |
| --- |

Limited knowledge of basic and clinical sciences; minimal interest in learning; cannot explain mechanisms of disease, Exceptional knowledge of basic and clinical sciences; highly resourceful development of knowledge; understands complex relationships and skillfully develops unifying concepts

Well studied, well spoken and enthusiastic about learning.

**SYSTEM BASED PRACTICE**

Unable to access/mobilize outside resources independently; uses care pathways indiscriminately; actively resists efforts to improve systems of care, Effectively accesses/utilizes outside resources; effectively uses systematic approaches to reduce errors and improve patient care; enthusiastically assists in developing systems improvement

Adequate ( and as expected for her level )

**General Comment**

**All**

Excellent attitude

Excellent first month. Shows great potential. Good fund of knowledge for level.

Dr. Walker is adjusting well to a new hospital and system. Works well with different teams. Has approproatie confidence and knowledge in didactic sessions.

Dr. Walker was a breath of fresh air. Very eager to learn. Pleasant. Great team worker. Very bright future. I hope she maintains her focus on improving her craft.

good rotation for starting intern year.

I do not recall any contact with this resident

Rosandra was a great addition to the GS2 team. She was prompt and always professional in her appearance and interactions with patients, staff, peers, and students. She always has a smile on her face and is upbeat in her approach to the job at hand. Her oral presentations and clinical write ups were thorough and comprehensive.

Roseandra is performing as expected at her level of training. She would benefit from practicing suturing techniques in LSTAR. In the short time that I have worked with her in the OR, she has improved greatly by practicing in LSTAR and I would encourage her to continue.

Accurate, (but sometimes misses the important info) medical interviews, physical examinations, always makes diagnostic and therapeutic decisions based on available evidence, sound judgment and patient preferences Respect, compassion, integrity, honesty; teaches/role models responsible behavior; always considers needs of patients, families, colleagues Needs to know patients better (labs, images, history) and work more efficiently Surgical skill is expected at the level of training

Dr. Walker's overall performance on my service was superior. I look forward to working with her in the future.

It was a pleasure to work with Dr. Walker on the vascular service. She performed well on a difficult service. The faculty, residents, patients, and staff appreciated her presence.

Overall good resident, intelligent and motivated. Work to improve judgment, knowledge and operative technique.

A pleasure to work with.Daily evaluations mention that she was always well prepared, eager to assist and showed excellent manual skills in regard of successful intubations and LMA placement.

Dr. Walker was always available and prompt. She was engaged in the care of her patients and their families. She took care of the patients in a kind and very professional manner. She enjoys her role as the provider. She improved in the the OR and was a very good first assistant. She finds the time to read about her patients. She was well regarded by the resident and the staff on the units.

Excellent work as an intern so far.

**COMMUNICATIVE AND INTERPERSONAL SKILLS**

Poor listening, writing, nonverbal skills; unable to clearly  explain complex problems; does not earn respect of peers; frequently unavailable to consult with patients, families, colleagues, Establishes a highly effective therapeutic relationship with patients and families; demonstrates excellent relationship building through listening, writing, and non verbal skills; excellent education and counseling of patients, families, and colleagues; always "interpersonally" engaged

Compassionate and positive in her speaking abilities and demeanor.

## Evaluation Comments by Competency

Review Period ⏱

| Comment |
| --- |

**DOTO:OTO:BIC (Basic Introductory Course) (07/01/2015 - 07/31/2015)**

**General Comment**

Excellent attitude

Excellent first month. Shows great potential. Good fund of knowledge for level.

**DOTO:OTO:BIC (Basic Introductory Course) (08/01/2015 - 08/31/2015)**

**General Comment**

Dr. Walker is adjusting well to a new hospital and system. Works well with different teams. Has approproatie confidence and knowledge in didactic sessions.

**DSG:SURG: SURG GENERAL 2 (09/01/2015 - 09/30/2015)**

**Systems-Based Practice**

Adequate ( and as expected for her level )

**General Comment**

Dr. Walker was a breath of fresh air. Very eager to learn. Pleasant. Great team worker. Very bright future. I hope she maintains her focus on improving her craft.

good rotation for starting intern year.

I do not recall any contact with this resident

Rosandra was a great addition to the GS2 team. She was prompt and always professional in her appearance and interactions with patients, staff, peers, and students. She always has a smile on her face and is upbeat in her approach to the job at hand. Her oral presentations and clinical write ups were thorough and comprehensive.



| Comment |
| --- |
| Roseandra is performing as expected at her level of training. She would benefit from practicing suturing techniques in LSTAR. In the short time that I have worked with her in the OR, she has improved greatly by practicing in LSTAR and I would encourage her to continue. |

**DSV:VASC:VASC-SURG (10/01/2015 - 10/31/2015)**

**Medical Knowledge**

Well studied, well spoken and enthusiastic about learning.

**Interpersonal and Communication Skills**

Compassionate and positive in her speaking abilities and demeanor.

**General Comment**

Accurate, (but sometimes misses the important info) medical interviews, physical examinations, always makes diagnostic and therapeutic decisions based on available evidence, sound judgment and patient preferences Respect, compassion, integrity, honesty; teaches/role models responsible behavior; always considers needs of patients, families, colleagues Needs to know patients better (labs, images, history) and work more efficiently Surgical skill is expected at the level of training

Dr. Walker's overall performance on my service was superior. I look forward to working with her in the future.

It was a pleasure to work with Dr. Walker on the vascular service. She performed well on a difficult service. The faculty, residents, patients, and staff appreciated her presence.

Overall good resident, intelligent and motivated. Work to improve judgment, knowledge and operative technique.

**OR (11/01/2015 - 11/30/2015)**

**General Comment**

A pleasure to work with.Daily evaluations mention that she was always well prepared, eager to assist and showed excellent manual skills in regard of successful Intubations and LMA placement.

**DSG:SURG:TRANSP/HEP (12/01/2015 - 12/31/2015)**

**General Comment**

Dr. Walker was always available and prompt. She was engaged in the care of her patients and their families. She took care of the patients in a kind and very professional manner. She enjoys her role as the provider. She improved in the OR and was a very good first assistant. She finds the time to read about her patients. She was well regarded by the resident and the staff on the units.

## Procedures Logged

Residency

| Procedure Name | Independent Target | Review Total Passed | Review Total Not Passed | Residency Total Passed | Residency Total Not Passed | Independent |
| --- | --- | --- | --- | --- | --- | --- |

No records to display.

## Scholarly Activity

Residency

| Activity | Total |
| --- | --- |
| 2015- 2016 Quality Improvement Project Form | 0 |
| Conference Presentation | 0 |
| Quality Improvement Project Form_1 | 0 |

## Test Scores

Residency

| Test Type | Date Taken | Score | Passed | Percentile |
| --- | --- | --- | --- | --- |

No records to display.

## Curriculum Confirmed

Review Period

| Rotation | Start Date | End Date | Reviewed Curriculum |
| --- | --- | --- | --- |
| DOTO:OTO:BIC (Basic Introductory Course) | | 7/31/2015 | N/A |
| DOTO:OTO:BIC (Basic Introductory Course) | | 8/31/2015 | N/A |
| DSG:SURG: SURG GENERAL 2 | | 9/30/2015 | N/A |
| DSV:VASC:VASC-SURG | | 10/31/2015 | |
| OR | | 11/30/2015 | |
| DSG:SURG:TRANSP/HEP | | 12/31/2015 | |

## Milestone Progress

Residency

Otolaryngology



| PC 1 | 1.5 | PC 2 | 2.0 |
| PC 3 | 1.5 | PC 4 | 1.5 |
| PC 5 | 1.5 | PC 6 | 2.0 |
| PC 7 | 1.0 | PC 8 | 1.5 |
| MK 1 | 2.0 | MK 2 | 1.0 |
| MK 3 | 2.0 | MK 4 | 1.5 |
| SBP 1 | 2.0 | SBP 2 | 1.5 |
| PBLI 1 | 1.5 | PRO 1 | 1.5 |
| ICS 1 | 2.0 | | |

**Progress Summary**

Overall Progress    ☑ Meets Expectations    ◌ Requires Attention

**Competency Progress**

Patient Care    ☑ Meets Expectations    ◌ Requires Attention
Medical Knowledge    ☑ Meets Expectations    ◌ Requires Attention
Systems-Based Practice    ☑ Meets Expectations    ◌ Requires Attention
Practice-Based Learning and Improvement    ☑ Meets Expectations    ◌ Requires Attention
Professionalism    ☑ Meets Expectations    ◌ Requires Attention
Interpersonal and Communication Skills    ☑ Meets Expectations    ◌ Requires Attention

**Comments**

Walker, Rosandra Lakeisha on 1/29/2016 at 2:30 PM wrote:
1. I will take USMLE Step 3 within the next 6 months. This is important because it part of the requirements set forth by the institution and for licensing. This will require me to register for the exam by March 31,2016, purchase a question bank, and complete the

question bank/practice cases by April/May (depending on the test date).

2. I will improve my suture technique and overall surgical skills within the next 6 months. This is important because these are significant skills I will need throughout the rest of my career. In addition to seeking out opportunities in the OR as an assistant on my general surgery rotations, I will visit the LSTAR once a month for the next 5 months to utilize resources including suture, laparoscopic, and other simulation technology.

**McCammon, Susan *** on 1/29/2016 at 4:22 PM wrote:
The CCC has reviewed your performance over the last six months and in particular has reviewed your NI evaluations, your current milestones and progress, your operative logs, as well as any correspondence received about your performance. You are doing well and no red flags or early concerns have been identified. We recommend focusing on the following goals in the next six month block: USMLE 3, knot tying and suturing, basic soft tissue skills, learn more about milestone content.

**Signatures**

| | | |
|---|---|---|
| **Subject** | ✎ | Walker, Rosandra Lakeisha signed on 1/29/2016 at 4:25 PM |
| **Program Director** | ✎ | McCammon, Susan * signed on 1/29/2016 at 4:28 PM |

**Attached Files**

There are currently no files attached to this review.

| | |
|---|---|
| **From:** | Ongeri, Pauline N. </O=UTMB/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ONGERI, PAULINE N.1A7> |
| **To:** | Walker, Rosandra L. |
| **Sent:** | 8/7/2018 11:03:20 AM |
| **Subject:** | RE: Incident Report |

Good Morning Dr. Walker,

I am in receipt of these new concerns. I was notified that you provided Ashley Thibodeaux with your availability. Once you schedule a meeting, I would like to discuss these concerns with you further as well.

Pauline

**From:** Walker, Rosandra L.
**Sent:** Monday, August 6, 2018 10:00 AM
**To:** Ongeri, Pauline N. <pnongeri@UTMB.EDU>
**Subject:** Incident Report

July 24, 2018: Dr. Tammara Watts came to TDC ENT clinic. During this time she displayed a negative attitude and distracting conversation/interaction while I was trying to perform direct patient care. She was bringing up non-urgent requests/tasks, was verbally antagonistic, disproportionately critical, which was stopping me/slowing me down from seeing patients, but then frequently commented that we were taking too long in clinic and still had so many patients to see. The nurse, Anita Caballero, expressed concern about Dr. Watts behavior toward me, saying she was very harsh in tone towards me and disproportionately "nitpicking". The junior resident Grant Conner reported to another chief resident that Dr. Watts  "created a toxic work environment and was derisive."

July 26, 2018: Was contacted by Dr. Watts regarding a presentation that I was going to give at an upcoming conference. At first, she expressed  that I didn't have IRB clearance and would likely have to pull my presentation (it was later confirmed by the IRB office I DID NOT need this). Later, she replied that she had to report this to our competency committee (the committee that placed me on remediation) and they had to make a decision about whether I could present because I did not get clearance from faculty/department first (--which is understandable. I did not know it required this, but was informed that it is in the resident handbook). The part of this incident that was disturbing was that I was accused of purposefully hiding the presentation from the faculty, was told I needed IRB clearance when I actually didn't, and the threat to pull the presentation. I later received an email saying I could still present, but that this was considered a lapse in judgement and I was unprofessional. I don't understand how my endeavor to accomplish something academically positive was turned into something so negative. Dr. Thomas (Psychiatry) was involved in these discussions and can perhaps give insight.

Dr. Thomas was brought in by the GME to monitor our faculty competency committee for fairness. Despite this move and the current investigation, too many incidences like the ones above continue to occur. I have requested to take a leave of absence (4-6 months), effective as soon as possible. It was a most difficult decision, but I think it was necessary, especially in light of the increasing hostility of the work environment. This obviously will affect my training substantially, will likely elongate my training by another year, and likely jeopardizes my ability to apply to and match into Facial Plastic Surgery. In addition, the Facial Plastic Surgery Rotation was never reinstated. Even after the leave of absence is complete, I am concerned I may still return to a persistently hostile environment.

Looking forward to receiving the results of investigation soon.

EXHIBIT D-2

OAG-0002523

R. Walker, MD

OAG-0002524

# UNIVERSITY OF TEXAS MEDICAL BRANCH
## HOUSE STAFF WORK AGREEMENT
### Rosandra Lakeisha Walker
### Otolaryngology

On the recommendation of Program Director of the Otolaryngology residency/fellowship, The University of Texas Medical Branch at Galveston (UTMB) is pleased to renew your position as resident/fellow house officer at the PRG 4 level, hereinafter referred to as PRG 4, subject to the following terms and conditions:

1. The period of your appointment as PRG 4 in this program will begin on 07/01/2018 and end on 06/30/2019. This appointment is contingent on satisfaction of state licensure requirements and the satisfaction of requirements for a J1 visa, if applicable. More detailed information about this appointment, including licensure/institutional permits, UTMB's policy on licensure exam requirements, DEA registration, and moonlighting is available in the GME Institutional Handbook.

2. Subject to your satisfactory participation in the residency program during the term of this Agreement, you will receive salary and benefits as established by UTMB for its house staff. As a house officer at UTMB, your salary is subject to all deductions required by state and federal law and such other deductions as you may authorize. More detailed salary and benefit information is available in the GME Institutional Handbook.

3. As a house officer at UTMB, you will be expected to perform such duties and responsibilities listed in your position description and as may be assigned to you, and to use your best efforts to provide safe, effective, and compassionate patient care. This includes maintaining confidentiality and professionalism in the appropriate use of social sites and postings as stated in Annex F to the GME Institutional Handbook. You must also comply with all rules and regulations of the Board of Regents of The University of Texas System (the "Regent's Rules"), UTMB policies and procedures, the applicable program requirements of the Accreditation Council for Graduate Medical Education (ACGME) for your specific residency program, and the basic responsibilities of a house officer as further detailed in the GME Institutional Handbook.

4. Appointment as a house officer at UTMB is for one year at a time. You will be notified at least four months prior to the conclusion of this appointment if your program does not intend to offer you an appointment for the following year (this does not apply if you are in the last year of training for your program.) If your program elects not to renew your appointment during the final four months of your appointment, you will be provided as much advance notice as reasonably possible under the circumstances. You also agree that you will notify your program director at least four months prior to conclusion of this appointment if you do not plan to continue in the residency program after this appointment ends.

5. Your performance as a PRG 4 will be reviewed and evaluated by the faculty of your program. You acknowledge that you will be dismissed from the program during the term of this Agreement if your program faculty determine that your level of performance or professionalism does not meet the standards of the program and is unsatisfactory. Such dismissal shall be in accordance with the Regents' Rules and UTMB policies and procedures. More detailed information about house staff due process, including the applicable appeal and grievance policies and procedures, are available in the GME Institutional Handbook.

6. In the event any provision of this Agreement is held invalid, the remainder of this Agreement shall not be affected by such invalidity.

Please indicate your acceptance of the position as PRG 4 in Otolaryngology residency/fellowship program and the terms and conditions set forth above by signing in the space indicated below and returning the signed Agreement to the UTMB Office of Graduate Medical Education. Your signature also indicates that you have read, understood, and agreed to the requirements contained in the GME Institutional Handbook, which has been provided to you.

*Rosandra Walker*

Rosandra Lakeisha Walker
Otolaryngology
*Wasyl Szeremeta, MD MBA*

GMEC Approved November 7, 2017 - Legal Affairs Approved January 5, 2018

EXHIBIT D-3

CONFIDENTIAL

Wasyl Szeremeta
Program Director

GMEC Approved November 7, 2017 - Legal Affairs Approved January 5, 2018

CONFIDENTIAL



# Signature Certificate

Document Ref.: 3JMQ2-E5LXE-R8XEW-YEXNT

Document signed by:

**Rosandra Walker**
Verified E-mail:
rolwale@utmb.edu

*Rosandra Walker*

IP: 73.155.151.47   Date: 22 Jul 2018 20:41:16 UTC

**Wasyl Szeremeta**
Verified E-mail:
waszerem@utmb.edu

*Wasyl Szeremeta, MD MBA*

IP: 129.109.148.2   Date: 16 Aug 2018 16:04:16 UTC

Document completed by all parties on:
**16 Aug 2018 16:04:16 UTC**
Page 1 of 1

Signed with **PandaDoc.com**

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.

CONFIDENTIAL

OAG-0011302

November 7, 2018

UTMB Department of Otolaryngology
301 University Blvd.
Galveston, Texas 77555

To whom it may concern:

Please accept this letter as formal notice that I am resigning from my position in the UTMB Department of Otolaryngology, effective today. This was not an easy decision, but one that I was forced to make in light of recent events. I have conferred with legal and health professionals, and believe this is the only decision I can make before my professional reputation is damaged even more.

Thank you for the opportunities you have provided me during my time.

Sincerely,

Rosandra Daywalker, MD

EXHIBIT D-4

OAG-0006993

EXHIBIT D-5 FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

DR. ROSANDRA DAYWALKER      §
     *Plaintiff,*      §
     §
v.      §
     §
UNIVERSITY OF TEXAS MEDICAL      §      No. 3:20-CV-00099
BRANCH AT GALVESTON, AND DR.      §
BEN G. RAIMER, IN HIS OFFICIAL      §
CAPACITY      §
     *Defendants.*      §

## DECLARATION OF DR. TOMOKO MAKISHIMA

1. My name is Tomoko Makishima, M.D., PhD, FACS. I have personal knowledge of the matters contained in this Declaration and am fully competent to make this Declaration.

2. I am currently employed as an Associate Professor in the Department of Otolaryngology at The University of Texas Medical Branch at Galveston ("UTMB"). I have held the position as faculty at UTMB since September, 2005.

3. My duties as a faculty member at UTMB include training, teaching, and working with medical residents in the Department of Otolaryngology. My job also entails using my professional judgment to evaluate residents' academic and medical development as they progress through the Department's residency program.

4. I was a faculty member in 2018 while Dr. Rosandra Daywalker was a medical resident at UTMB. In those roles, I served as a decision-maker for UTMB's decisions to (1) place Dr. Daywalker on remediation and (2) have her repeat portions of her PGY-3 year as part of her remediation.

5. I voted in favor of those decisions based on concerns about Dr. Daywalker's clinical competency and her academic progress, including as reflected by the information contained in the letters marked as Exhibit A and B.

EXHIBIT E

6. I was not aware of Dr. Daywalker's June 2018 internal complaint of discrimination, her August 2018 request for Family and Medical Leave, or any request for medical accommodations at the times I voted for her to be placed on remediation or continue as a PGY-3.

7. The aforementioned votes were made based on my academic and medical judgment and were not motivated or caused by race discrimination or retaliation for Dr. Daywalker's complaints of discrimination, medical leave, or accommodation requests.

8. I have supervised residents as a faculty member since 2005. I am not aware of any other resident during this timeframe that has had nearly identical competency and academic issues as Dr. Daywalker.


I declare under penalty of perjury that the foregoing is true and correct.


EXECUTED on 30th of September 2021

_Donald Malin_ MD

DECLARANT

IN THE UNITED STATES DISTRICT COURT
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DR. ROSANDRA DAYWALKER<br>*Plaintiff,*<br><br>v.<br><br>UNIVERSITY OF TEXAS MEDICAL<br>BRANCH AT GALVESTON, AND DR.<br>BEN G. RAIMER, IN HIS OFFICIAL<br>CAPACITY<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 3:20-CV-00099 |

## DECLARATION OF DR. FARRAH SIDDIQUI

1. My name is Farrah Siddiqui, M.D., FAAOA,FACS. I have personal knowledge of the matters contained in this Declaration and am fully competent to make this Declaration.

2. I am currently employed as Associate Professor in the Department of Otolaryngology at the University of Texas Medical Branch at Galveston ("UTMB"). I have held this position since 2020 and previously was Assistant Professor in the same department since 2010.

3. I also served as associate program director for the Department from 2015 to 2019. My duties as associate program director included assisting the program director in the administrative oversight of the residency program, including supervising the resident physicians. My job also entailed using my professional judgment to evaluate residents' academic, clinical and surgical development as they progressed through the Department's five-year residency program.

4. I was associate program director, a member of the faculty, and a member of the Clinical Competency Committee in 2018 when Dr. Daywalker was placed on remediation.

5. Dr. Daywalker was a promising and talented doctor, but she struggled with certain areas in her residency. Most prominently she was habitually dilatory in completing

EXHIBIT F

clinic and inpatient notes within the 24-hour requirement. In 2017, I and Dr. Szeremeta met with Dr. Daywalker to try to informally address our concerns with her performance, including her failure to meet expectations in the areas of professionalism, documentation, completing tasks in a timely fashion, and the prioritization of tasks.

6. Unfortunately, Dr. Daywalker's performance deficiencies continued through the next year. In or around May 2018, a department-wide review of medical documents revealed significant additional deficiencies in Dr. Daywalker's performance. Attached hereto as Exhibit F-1 are true and correct copies of emails documenting some of the performance problems I considered while participating in the decision to place Dr. Daywalker on remediation.

7. Dr. Daywalker was placed on remediation on May 30, 2018. I voted in favor of placing Dr. Daywalker on remediation due to concerns over her academic and clinical competency as reflected in the May 30, 2018, letter placing her on remediation.

8. Shortly thereafter the Department Chair, Dr. Vicente Resto, assigned me to replace Dr. Szeremeta as Dr. Daywalker's day-to-day supervisor for her remediation. Dr. Daywalker continued to struggle during the first month and a half of remediation.

9. On July 13, 2018, I and Dr. Resto met with Dr. Daywalker to discuss her remediation performance and her semi-annual evaluation. I informed Dr. Daywalker that she was barely meeting the remediation requirements. She continued to have lapses in documentation, she was late on a call note, and her efficiency in clinic and medical knowledge was behind our expectations for a resident of her experience. Attached hereto as Exhibit F-2 are my notes from that meeting.

10. Shortly after that meeting, Dr. Resto replaced me as the day-to-day supervisor from Dr. Daywalker's remediation.

11. I participated in the decision to update Dr. Daywalker's remediation to retain her at a PGY-3 academic level while on remediation. The CCC and the Department faculty unanimously voted to retain Dr. Daywalker at that academic level. That decision was communicated to her in a letter on August 8, 2018.   The letter also advised Dr. Daywalker that she would be granted four months of personal leave. I voted in favor of the terms of the letter including keeping Dr. Daywalker as a PGY-3 because of concerns about her clinical competency and academic progress, as reflected by the May 30 and August 8 letters.  Neither the remediation, nor the August 8, 2018 update to the remediation, had any impact on her pay, employment status as a fourth-year employee, or the terms and conditions of her employment.

12. The aforementioned votes were made based on my academic and medical judgment and were not motivated or caused by race discrimination or retaliation for Dr. Daywalker's complaints of discrimination, retaliation, medical leave, or accommodation requests.

13. I am not aware of any other resident in the Department during the time Dr. Daywalker was at UTMB who had similar performance issues compared to Dr. Daywalker. In particular, no other resident had similar repeated issues with timely and accurately completing medical documentation.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on 11th of October 2021

_____

DECLARANT

| From: | Siddiqui, Farrah N. </O=UTMB/OU=EMAIL/CN=RECIPIENTS/CN=FNSIDDIQ> |
|---|---|
| To: | Szeremeta, Wasyl; Underbrink, Michael; Resto, Vicente A. |
| Sent: | 6/22/2018 8:14:20 AM |
| Subject: | RE: Incomplete Note from 3/11/18 |

I talked to Dr. Walker about this--since it is historical, it falls under her current remediation and does not escalate her current status.  It supports the reason why she is remediating.  I told her that although faculty did not directly see this patient and it was not billed, the encounter becomes completely unsupervised and if the patient were to have had any negative consequences, it would have been difficult to deal with.

She also thanked me for reminding her to complete her consult note on call last week with Dr. Makashima; claiming that she is often absent minded and forgets to finish her notes :(

Anyhow, encounter was unbilled and at this point, unfortunately unsupervised.

Farrah Siddiqui, M.D.
UTMB, Department of Otolaryngology

---

**From:** Walker, Rosandra L.
**Sent:** Thursday, June 21, 2018 5:57 PM
**To:** Underbrink, Michael
**Cc:** Siddiqui, Farrah N.; Resto, Vicente A.
**Subject:** Re: Incomplete Note from 3/11/18

Other screenshot

Sent from my iPhone

On Jun 21, 2018, at 5:23 PM, Walker, Rosandra L. <rolwalke@UTMB.EDU> wrote:

Hello,

On 3/11/18, I was on call and saw the patient MRN 090390M at VLED at the request of Robert Kaale, MD. I noticed the same patient was on our list today and out of curiosity went to search for my previous documentation, which is when I found it was incomplete. I have since completed it. I ascertain the information represented is accurate without any misrepresentation. I have attached screen shots from messages I sent to my chief the night of the encounter (HIPAA compliant with no identifiers or PHI).

I take absolute responsibility for this lapse in duty.  I bring it to your attention to indicate that I will never be dishonest about mistakes or lapses in duty, as well as the fact that I understand the terms of remediation. I take the remediation seriously and I am striving to make significant, timely, and lasting improvements. To my knowledge, I have no other incomplete or pending notes in EPIC. Please feel free to contact me for additional information.

Respectfully,

Rosandra Walker, MD
<111111.jpg>
<11113.jpg>

EXHIBIT F-1

OAG-0002065

| | |
|---|---|
| **From:** | Siddiqui, Farrah N. </O=UTMB/OU=EMAIL/CN=RECIPIENTS/CN=FNSIDDIQ> |
| **To:** | Walker, Rosandra L. |
| **Sent:** | 6/8/2018 6:00:31 PM |
| **Subject:** | delinquent on call consult notes |

I was just talking to Dr. Makishima—she commented that she had a good night on call Wednesday and did not receive any consult notes from you.

Since you were delayed in coming to the OR with me on Thursday due to a PTA in the ER, I know for a fact that Dr. Makishima should have received at least that one consult note from you.
It is now over 24 hours since your call, so please make sure that this is taken care of and any other consults you may have seen.
Like clinic and OR notes, all on call notes (consults, rounds) need to be completed in a timely fashion so that they can be attested by faculty.

Please make sure all these notes are taken care of before you leave for vacation. Please also send Dr. Chaaban an email when you have closed his clinic notes as to number you saw/closed
and cc me as well.

Thanks,

Dr. Siddiqui

OAG-0002478

| | |
|---|---|
| **From:** | Siddiqui, Farrah N. </O=UTMB/OU=EMAIL/CN=RECIPIENTS/CN=FNSIDDIQ> |
| **To:** | Watts, Tammara L.; Walker, Rosandra L. |
| **CC:** | Resto, Vicente A. |
| **Sent:** | 7/11/2018 6:01:42 PM |
| **Subject:** | RE: Clinic Notes |

Dear Dr. Walker,

Although this is a direct violation of your remediation terms, you will be permitted this one final allowance. Please make sure that all clinic notes are completed by 9 pm as you have asked.

Timely and accurate clinical documentation is a vital responsibility for all healthcare providers. As physicians, our patients trust us to give them the best possible care that we can. Delinquencies in documentation can impede patient care, especially when multiple teams and processes are involved (setting up surgery, imaging, labs, consultation with other specialties etc). This is a core competency that we expect even our interns and junior resident physicians to master at an early stage in their training.

Please note that any future delinquencies will not be allowed and will count as a violation of remediation, escalating the process to probation.

Thank you,
Farrah Siddiqui, M.D.
UTMB, Department of Otolaryngology

---

From: Watts, Tammara L.
Sent: Wednesday, July 11, 2018 4:24 PM
To: Walker, Rosandra L.
Cc: Siddiqui, Farrah N.
Subject: RE: Clinic Notes

It is not up to me Dr. Walker. The is a timestamp on each clinic note. I do not know the full details of your remediation plan but I think timely clinical documentation is one of them. However, as a member of the faculty, I am obligated to share with the CCC when the notes are done and not done.

Thanks
T

---

From: Walker, Rosandra L.
Sent: Wednesday, July 11, 2018 4:12 PM
To: Watts, Tammara L.
Cc: Siddiqui, Farrah N.
Subject: Clinic Notes

Hello Dr. Watts,

I would like to respectfully request an extension to complete clinic notes from yesterday 7/10/18. Some are already complete. Clinic ended at 5:10pm yesterday. I would like to be granted an extension to 9 pm tonight (they may be completed sooner). I will email you as soon as the notes are complete.

Thank you,
Rosandra Walker, MD

OAG-0002059

| From: | Walker, Rosandra L. </O=UTMB/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WALKER, ROSANDRA L.0BC> |
| --- | --- |
| To: | Siddiqui, Farrah N. |
| CC: | Szeremeta, Wasyl; Chaaban, Mohamad R. |
| Sent: | 4/19/2017 7:49:36 AM |
| Subject: | Re: Delinquent clinic notes |

Good morning,

Noted. Thank you.

RW

Sent from my iPhone

On Apr 19, 2017, at 7:38 AM, Siddiqui, Farrah N. <fnsiddiq@UTMB.EDU> wrote:

Dr. Walker—we have discussed this many times—please close all clinic notes in a timely fashion. I have given you grace period until the next day, but now I am often having open notes for 4-5 days after clinic which is not acceptable.  From this day forward, please close your clinic notes within 24 hours, ideally same day as clinic —quality of notes suffers otherwise and faculty attending has to wait around to close them as well.

I have on my own been closing a lot of your notes that I remember, but this should not be the case.

Before starting your OR cases today, please close your clinic notes from Monday. Dr. Yantis is in the same OR room so can begin cases.

Thank you,

FS

OAG-0003080

7/13/18

Remediation and Semiannual meeting with Dr. Walker & Drs. Resto, Siddiqui
     Dr. Walker brought advocate with her Dr. Winfred Frazier, APD from Family
     Medicine

*Discussed that since Dr. Frazier was in meeting, any terms of confidentiality would not apply to
him

*Discussed that Dr. Walker was barely meeting remediation requirements.  She recently had
violation that was not escalated.  Dr. Walker kept asking why wasn't she taken off remediation
when she met requirements in her first 4 weeks (last month on B rotation), kept saying she did
such a great job on B rotation.  Discussed with her that there were lapses in documentation even
on B that attendings made up for—she had late on call note and her efficiency in clinic and
decision making due to medical knowledge were still behind.

*Discussed that she is still in remediation and that she has had a violation that was not escalated
and that if any further violations occurred, then further disciplinary action would be taken.

*Kept asking if she were ever in situation again where she could not finish clinic notes on time,
what should she do? Would this automatically go to probation? Should see sit out of cases and
finish notes first?
     -discussed with Dr. Walker that she should try to complete clinic notes same
          evening, not leave it to next day
     -if real circumstance (accident/family illness/self illness), then let us know
     -discussed that she needs to build efficiency—prepare for clinic, increase
          medical knowledge, delegate to junior.  A lot of efficiency is due to
          lack of fund of medical knowledge that slows down medical decision
          making
     -asked for resources and her advocate suggested talking to co or senior
          residents who have good clinical efficiency
          Resto and I thought this was a good plan and that she should talk to
               Rana, Rawl and Reichert

*Asking for numbers to objectively see how her documentation versus other PGY 3s
     Kept asking how many patients should I see?
     Felt that comments on new innovations had showed improvement and that
          She should not have been remediated
          Says even MD Anderson comments were good
          Acknowledged the one negative email from MDA
     We gave her examples on her lapse of documentation, but she did not seem
          seem to agree and felt that she had improved and was wrongfully put
          on remediation.  She called the remediation letter slander and then
          said it was written, so that becomes libel.

EXHIBIT F-2

*Dr. Walker feels that she is under microscope and people are accusing her of things that she did not do—for example missing scope—she had nothing to do with it.
　　　She feels that she gets accused of things without her being able to defend her self.

Excuses again and again on any feedback we gave and was very defensive.
Discussed that she is concentrating on microdetails and on finding excuses when terms for remediation are very clear. We recommended that she make documentation second nature, complete the terms and focus on other areas where she needs to grow such as reading for medical knowledge, reading for surgical skills and developing technically as a surgeon.  She was asked if she could complete FESS on her own, except frontals. She replied that she still had trouble with posterior sinus work because she hand gone to St. Lukes and did not have the same experience other residents have.  It was discussed with her that many other residents without St. Lukes training junior to her are able to perform FESS (except frontal sinuses).

At the end, we talked about focusing on terms of remediation so they become second nature, then trying to spend more time with knowledge and technical skill growth.  She brought up Supa's remediation and feelings that she should have had something similar to that.

We asked her about a TDC patient she recently saw with unknown primary on Tuesday and did not understand why he was getting TORS surgery.  We asked her if she went home and read about management of unknown primary.  She replied with multiple excuses—"I am trying to just complete my remediation terms so that I don't get kicked out, it was just Tuesday, I have to finish clinic notes."  We discussed with her that clinic is only Tuesday and Friday—other days she should have time to read on interesting cases/consults that she seeing.  Further discussed that should finish her notes that very evening, get them finished, so that she can improve in other areas of residency.

Dr. Walker became very emotional and talked about obstacles that were place on her  path during her time here and that she was traumatized during residency by "X" (may be referring to supposed allegations) and that she had to deal with many intrinsic and extrinsic factors.  She disagreed that she would not make it as an otolaryngologist, but gave impression that she may not want to stay in this program.  Kept saying that she was being unfairly judged and that she was in a threatening work environment, that she could not trust all the faculty in this department.

After talking for over 90 minutes, she asked about her semi-annual evaluation.  She had reviewed her faculty comments, milestones, op logs.  Discussed that she had positive feedback on communication, but again comments on clinical inefficiency and lack of medical knowledge.  She also needs to perform more surgery as primary surgeon this year, grow technically—read about surgeries before performing them.

She again did not take any negative feedback well on semiannual review—wanted to go over every comment and contest every comment made about her.  Dr. Walker kept asking why people do not give her negative feedback directly.  We discussed that she is difficult to give feedback too—either she says very curt "Thank you," does not talk much more, or she gives lots of excuses, without really incorporating the feedback.  Dr. Walker replied to this that she says "Thank you" so that she can process the feedback then improve subsequently.

At the end of the meeting, she still did not agree to her remediation and wants to review her note closer versus other residents objectively.  Dr. Walker asked how long remediation would last for and we replied that it is 6 months—however if there are no lapses for a contiguous 3 months, then the CCC would re-evaluate and she may be able to end remediation earlier.

Dr. Walker was worried that the remediation would interfere with her future fellowship plans and that she wanted to work Dr. Kridel if possible.  We reassured her that if all goes well July-Aug-Sept, then we would have no problem in letting her go to Kridel for 4 weeks.  We also talked to her that she needs strong recommendation letters and support from core faculty in her residency program for fellowship—she should strive to complete her remediation in strong fashion.

Dr. Resto and I reiterated that the expectations of all residents are the same—Dr. Walker's remediation terms are based off the residency handbook; the only extra term she has is her daily email confirming that she closed her notes—how many patients she saw in total.  We agreed that the gravity of delinquent documentation is now higher for Dr. Walker due to the remediation, but she had been given ample warning in hopes for improvement.  Again, Dr. Walker felt that she had indeed improved and again we told her that her improvement was not meeting minimum requirements.  We counseled her to stop obsessively thinking about details—finish the documentation and concentrate on other aspects of resident training.  She agreed at the end and said she would continue trying her best.

IN THE UNITED STATES DISTRICT COURT
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DR. ROSANDRA DAYWALKER | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | No. 3:20-CV-00099 |
| BRANCH AT GALVESTON, AND DR. | § | |
| BEN G. RAIMER, IN HIS OFFICIAL | § | |
| CAPACITY | § | |
| *Defendants.* | § | |

## DECLARATION OF DR. VICENTE RESTO

1. My name is Vicente A. Resto, M.D., Ph.D., FACS. I have personal knowledge of the matters contained in this Declaration and am fully competent to make this Declaration.

2. I am currently employed as the interim Chief Physician Executive and the Vice President for Physician Integration and Strategic Alignment at the University of Texas Medical Branch at Galveston ("UTMB"). I have held these positions at UTMB since March 2021 and October 2019, respectively. I previously served as Chair of the Department of Otolaryngology at UTMB from September 2008 to March 2021.

3. My duties as the Chair of the Department of Otolaryngology at UTMB included directing a 52-person Department that supported clinical services at four campuses, seven hospitals, and four ambulatory care sites. I also oversaw the administrative operation of the Department including the faculty and residents.  The day-to-day management of the residents was overseen by our department's program director- a faculty member who in turn reported to me as chair.  My job also entailed using my professional judgment to review residents' academic and medical development as they progressed through the Department's residency program and were evaluated by the program director, our clinical competency committee, and faculty as a whole.

4. I was a Chair of the Department of Otolaryngology while Dr. Rosandra Daywalker was an otolaryngology medical resident at UTMB. During this time, residents were provided a residency handbook that set guidelines to assist the residents during their

EXHIBIT G

residency and help UTMB run an orderly and effective program. While Dr. Daywalker was at UTMB from 2015-18, the handbook required residents to complete clinic, inpatient, and operative notes within 24 hours (although individual faculty could set stricter requirements). A true and correct copy of the Department Handbook is attached hereto as Exhibit G-1.

5. I reviewed and supported the decision to place Dr. Daywalker on remediation in May 2018, based on my independent review of the evidence. The remediation plan was not discipline and was not intended to punish Dr. Daywalker. Rather it was intended to identify areas in which her performance was deficient and provide support and a plan to help correct those deficiencies.

6. In August 2018, Dr. Daywalker requested four months of personal leave. Later that month she requested FMLA leave. Both requests were accommodated.

7. I am not aware that Dr. Daywalker made any medical accommodation request prior to going out on leave that was not accommodated by UTMB.

8. I met with Dr. Daywalker shortly after UTMB placed her on remediation. In the meeting she expressed concerns about Dr. Szeremeta's treatment of her and disputed that she deserved to be placed on remediation. However, she did not request a medical accommodation at the time, nor was I aware at the time that she was disabled.

9. Later in June 2018, in response to concerns she had expressed about Dr. Szeremeta, I replaced him as her day-to-day supervisor for the remediation with Dr. Farrah Siddiqui. Dr. Daywalker subsequently complained about Dr. Siddiqui and I again changed her day-to-day supervisor—replacing Dr. Siddiqui with Dr. Christopher Thomas. I made these changes in an attempt to work with Dr. Daywalker to place her in a working environment that would best help her pass the remediation and graduate from the residency program.

10. I participated in the decision to retain Dr. Daywalker at a PGY-3 academic level while on remediation. The CCC and the Department faculty unanimously voted to retain Dr. Daywalker at that academic level. That decision was communicated to her in a letter I signed on August 8, 2018. The letter also advised Dr. Daywalker that she would be granted four months of personal leave. I voted in favor of the terms of the letter including keeping Dr. Daywalker as a PGY-3 because of concerns about her clinical competency and academic progress, as reflected by the May 30 and August 8 letters. Neither the remediation, nor the August 8, 2018, update to the remediation, had any impact on her pay, employment status as a fourth-year employee, or the terms and conditions of her employment.

11. The aforementioned votes were made based on my academic and medical judgment and were not motivated or caused by race discrimination or retaliation for Dr. Daywalker's complaints of discrimination retaliation, her medical leave, or her accommodation requests.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on _11_ of October 2021

_____

DECLARANT



Department of Otolaryngology—Head and Neck Surgery

Residency Training Program



2019-2020

# RESIDENT HANDBOOK

EXHIBIT G-1

**UTMB Otolaryngology—Head and Neck Surgery**

# Resident Handbook 2019-20

| I. | Introduction | 1 |
|----|--------------|---|

| II. | Educational Goals | 2 |
|-----|-------------------|---|

| III. | Curriculum | 10 |
|------|------------|----|
| | Otolaryngology Milestones Timeline | 10 |
| | General Principles | 36 |
| | Specific Activities | 46 |

| IV. | Clinical Rotations | 58 |
|-----|--------------------|----|

| V. | Resources | 65 |
|----|-----------|----|

| VI. | Policies | 70 |
|-----|----------|----|

1

If you want to build a ship, don't drum up the men to gather wood, divide the work and give orders. Instead, teach them to yearn for the vast and endless sea.

Antoine de Saint-Exupéry
*Citadelle*
1948

2

OAG-0013332

# Introduction

**WELCOME**

**Congratulations!** You are finally an Otolaryngology resident. You are joining the best group of residents at UTMB and we are glad to have you. We have a history of being among the top residency programs in Otolaryngology training in the country. We know that you will strive to achieve this high standard, in both your personal work habits and especially in your interactions with others here at UTMB. After all, we set a standard of excellence in this institution.

Remember, as a subspecialty, the majority of our patients come to us via referral from in-house services and community referrals. Be nice to those who consult you, whether fellow residents, other UTMB services or physicians practicing outside UTMB. Rudeness, harshness, rough treatment of patients or nursing or clerical staff is never appropriate in Otolaryngology and is not tolerated by the faculty. It also important to respect cultural, language and personal difference as we interact with patients, colleagues and support staff on a day to day basis.

The Otolaryngology service is, for the most part, well run and relaxed. We are calm and unhurried. We generally follow a predictable schedule, stick to a game plan, and work as a team. We enjoy what we do. We know that you will too.

**WHAT IT TAKES TO SUCCEED**

- Positive attitude
- Good communication skills
- Flexibility
- A head mirror
- Being the nice person
- Being a team player
- Being on time
- Being respectful to faculty, ancillary staff, patients and fellow residents!!!

This manual is meant to provide guidelines to assist you during your residency. Read and familiarize yourself with these guidelines; you are responsible and will be held accountable for this information. These requirements are necessary to allow us to run an orderly and effective residency program.

OAG-0013333

# Overall Educational Goals for the Program

The Accreditation Council for Graduate Medical Education (ACGME) via its Outcome Project has increased its emphasis on educational outcome assessment in the accreditation process. This increased emphasis is reflected in changes to Program and Institutional Requirements that require programs to:

- Identify learning objectives related to the ACGME's general competencies;

- Use increasingly more dependable (i.e. objective) methods of assessing residents' attainment of these competency-based objectives, which have recently been added to your evaluations in the form of milestones;

- Use outcome data including case logs, milestones assessments and evaluations to facilitate continuous improvement of both resident and residency program performance.

The core competencies were developed via research and a collaborative review process with broad representation. They reflect among other things an increasing recognition of our responsibility as educators of physicians to ensure the public that we are training residents in a consistent and logical manner, so that graduates are adequately prepared to practice in a rapidly changing healthcare environment. The core competencies are meant to represent what residents should know and be able to do. The ACGME has further developed objective measures in the form of milestones to help in the assessment of these core competencies. These milestones serve as a guide to measure achievement and progress, but do not encompass the total clinical, surgical or personal learning that is required during a five-year Otolaryngology program.

Your goal should be to not only progress positively in milestone development, but also learn and improve your clinical, surgical, and communication skills in all diseases and patient care processes related to Otolaryngology. Programs are still expected to determine the objectives that should guide progress toward achievement of the competencies. Subsequently, outcomes assessment will be expected to follow to assess effectiveness in meeting the objectives. The final evaluation of graduating residents is to reflect that the resident has "demonstrated sufficient professional ability to practice competently and independently." (Given the emphasis on educational outcomes assessment, it is our viewpoint that the structure of the core competencies is the best framework for achieving this landmark. Goals, objectives, assessment, and improvement can all readily be framed within the competencies.)

Therefore, the overall goal of the residency program is to develop in our graduating residents a proficiency level appropriate for a new and independent practitioner in General Otolaryngology, hence also giving those who pursue fellowship a strong core training in our field. Our program also strives to provide academic and research mentorship in order to fully support graduates who intend to pursue fellowship subspecialization. Along with providing a strong clinical and research foundation in

4

OAG-0013334

Otolaryngology, we also expect our residents to practice with compassion and respect, giving individualized attention to all their patients.

Our program has integrated the core ACGME competencies and milestones into the curriculum. These definitions and descriptions are taken directly from the *ACGME Program Requirements for Graduate Medical Education in Otolaryngology and the ACGME's The Otolaryngology Milestone Project.* The following main categories make up the curriculum and are described further in the next section as well in the detailed Otolaryngology Residency Curriculum & Milestones Timeline (page 10):

1) Patient Care
2) Medical Knowledge
3) Patient Safety—Systems Based Practice
4) Resource Utilization—Systems Based Practice
5) Practice Based Learning Improvement
6) Professionalism
7) Interpersonal Communication Skills

Milestone levels have been designated level 1 to 5 by ACGME and defined as:

| Milestone Level | Description by ACGME definitions |
|---|---|
| 1 | Demonstrates milestones expected of an incoming resident |
| 2 | Advances and demonstrates additional milestones, but is not yet performing at a mid-residency level |
| 3 | Advances and demonstrates additional milestones, consistently including the majority of milestones targeted for residency |
| 4 | Advances so that he or she now substantially demonstrates the milestones targeted for residency. This level is designed as the graduation target. |
| 5 | Advances beyond performance targets set for residency and is demonstrating "aspirational" goals which might describe the performance of someone who has been in practice for several years. It is expected that only a few exceptional residents will reach this level. |

*The ACGME Otolaryngoloy Milestones Project* further clarifies that "Level 4 is designed as the graduation target and does not represent a graduation requirement. Making decisions about readiness for graduation is the purview of the residency program director. Study of milestone performance data will be required before the ACGME and its partners will be able to determine whether milestones in the first four levels appropriately represent the developmental framework, and whether milestone data are of sufficient quality to be used for high-stakes decisions."

OAG-0013335

**PATIENT CARE:  These are the most emphasized objective measures, and hence most of the ACGME milestones come from patient care**

**Residents must be able to provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health. Residents:**

1) will use diagnosis and diagnostic methods, including audiologic, vestibular, and vocal function testing; biopsy and fine needle aspiration techniques; and other clinical and laboratory procedures related to the diagnosis of diseases and disorders of the upper aerodigestive tract and the head and neck;
2) will be proficient in therapeutic and diagnostic imaging, specifically interpreting medical images of the head and neck and the thorax, including studies of the temporal bone, skull, nose, paranasal sinuses, salivary and thyroid glands, larynx, necks, lungs, and esophagus;
3) will diagnose, evaluate, and manage congenital anomalies, otolaryngic allergy, sleep disorders, pain and other conditions affecting the regions and systems mentioned above, and the chemical senses, endocrinology, and neurology as they relate to the head and neck;
4) will manage congenital, degenerative, idiopathic, infectious, inflammatory, toxic, allergic, immunologic, vascular, metabolic, endocrine, neoplastic, foreign body and traumatic states through airway management, resuscitation, local/regional anesthesia, sedation and universal precaution techniques, operative intervention, and preoperative and postoperative care of the following major categories:
   a) general otolaryngology, including pediatric otolaryngology, rhinology, bronchoesophagology and laryngology;
   b) head and neck oncologic surgery;
   c) facial plastic and reconstructive surgery of the head and neck; and
   d) otology and neurotology.
5) will competently perform habilitation and rehabilitation techniques and procedures, including respiration, deglutition, chemoreception, balance, speech, as well as auditory measures such as hearing aids and implantable devices;
6) will diagnose and apply therapeutic techniques involving endoscopy of the upper aerodigestive tract, including rhinoscopy, laryngoscopy, esophagoscopy, and bronchoscopy, as well as the associated application of stroboscopes, lasers, mechanical debriders, and computer-assisted guidance devices.
7) will have experience with state-of-the-art advances and emerging technology in otolaryngology and head-and-neck surgery;
8) should perform a sufficient number and variety of surgical procedures to ensure education in the entire scope of the specialty. There must be adequate distribution and sufficient complexity within the principal categories of the specialty;
9) must work in a well-organized and well-supervised outpatient service. This service must operate in relation to an inpatient service used in the program. Residents must have the opportunity to see patients, establish provisional diagnoses, and initiate preliminary treatment plans. An opportunity for follow-up care must be provided so that the results of surgical care may be evaluated by the

6

OAG-0013336

responsible residents. These activities must be carried out under the supervision of appropriate faculty;

10) will function with an appropriate degree of responsibility, under adequate supervision, if they participate in preoperative and postoperative care in a private office Experience should be provided in the procedures and management of office practice;

11) must have experience in the emergency care of critically ill and injured patients with otolaryngology-head and neck conditions; and,

12) should have patient care responsibility commensurate with the individual resident's knowledge, problem-solving ability, manual skills, experience, and the severity and complexity of each patient's status. The program must provide residents with experience in direct and progressively-responsible patient management, including surgical experience as assistant to the surgeon, as residents advance through the educational program. This education must culminate in sufficient independent responsibility for clinical decision-making to evidence the fact that the graduating resident has developed sound clinical judgment and possesses the ability to formulate and carry out appropriate management plans.


**MEDICAL KNOWLEDGE**

**Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social-behavioral sciences, as well as the application of this knowledge to patient care. Residents:**

1) must learn within a comprehensive, well-organized, and effective curriculum, including the cyclical presentation of core specialty knowledge supplemented by the addition of current information. Residents must learn in a variety of educational settings—such as clinics, classrooms, operating rooms, bedsides, and laboratories—employing accepted educational principles.

2) must have a structured educational experience in basic science. Ordinarily, this should be provided within the participating sites of the residency program. Any program that provides the requisite basic science experience outside the approved participating sites must demonstrate that the educational experience provided meets these designated criteria. Faculty must participate in basic science education, resident attendance must be monitored, education must be evaluated, and content must be integrated into the educational program.

3) will become familiar with the broad scope of otolaryngology-head and neck surgery. This requires that the program provide basic science, medical, and surgical education in the following areas:

   a) basic sciences, as relevant to the head and neck and upper-aerodigestive system: anatomy, embryology, physiology, pharmacology, pathology, microbiology, biochemistry, genetics, cell biology, immunology, the communication sciences (including a knowledge of audiology and speech-language pathology and the voice sciences as they relate to laryngology), as well as the chemical senses, endocrinology, and neurology as they relate to the head and neck;

   b) basic science education which should include instruction in anatomy, biochemistry, cell biology, embryology, immunology, molecular genetics, pathology, pharmacology, physiology, and other basic sciences related to the head and neck;

7

c) communication sciences as they relate to otology and laryngology, including audiology, speech-language pathology, and voice science;

d) anatomy which should include the study and dissection of cadaver anatomic specimens, including the temporal bone, with appropriate lectures and other formal sessions; and,

e) pathology which should include formal instruction in correlative pathology in which gross and microscopic pathology relating to the head and neck area are included. The resident should study and discuss with the pathology service tissues removed at operations and autopsy material. It is desirable to have residents assigned to the Department of Pathology.

**SYSTEMS-BASED PRACTICE:   Patient Safety and Resource Utilization**

**Residents must demonstrate an awareness of and responsiveness to the larger context and system of health care, as well as the ability to call effectively on other resources in the system to provide optimal health care. Residents are expected to:**

1) work effectively in various health care delivery settings and systems relevant to their clinical specialty;

2) coordinate patient care within the health care system relevant to their clinical specialty;

3) incorporate considerations of cost awareness and risk-benefit analysis in patient and/or population-based care as appropriate;

4) advocate for quality patient care and optimal patient care systems;

5) work in interprofessional teams to enhance patient safety and improve patient care quality;

6) participate in identifying system errors and implementing potential systems solutions; and

7) be familiar with ethical, socioeconomic, and medico-legal issues that affect the provision of quality and cost-effective care and the utilization of resources within the health care system, the provision of quality and cost-effective otolaryngology care within the context of the health care system, and the use of the resources of that health care system, other medical specialists, information technology, continuing medical education, and the ongoing analysis of clinical outcomes to assure such care.

**PRACTICE-BASED LEARNING AND IMPROVEMENT**

**Residents must demonstrate the ability to investigate and evaluate their care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and life-long learning. Residents are expected to develop skills and habits to be able to meet the following goals:**

1) identify strengths, deficiencies, and limits in one's knowledge and expertise;

2) set learning and improvement goals;

3) identify and perform appropriate learning activities;

4) systematically analyze practice using quality improvement methods, and implement changes with the goal of practice improvement;

5) incorporate formative evaluation feedback into daily practice;

8

6) locate, appraise, and assimilate evidence from scientific studies related to their patients' health problems;
7) use information technology to optimize learning; and,
8) participate in the education of patients, families, students, residents and other health professionals.

## PROFESSIONALISM

**Residents must demonstrate a commitment to carrying out professional responsibilities and an adherence to ethical principles. Residents are expected to demonstrate:**

1) compassion, integrity, and respect for others;
2) responsiveness to patient needs that supersedes self-interest;
3) respect for patient privacy and autonomy;
4) accountability to patients, society and the profession; and,
5) sensitivity and responsiveness to a diverse patient population, including but not limited to diversity in gender, age, culture, race, religion, disabilities, sexual orientation

## INTERPERSONAL AND COMMUNICATION SKILLS

**Residents must demonstrate interpersonal and communication skills that result in the effective exchange of information and collaboration with patients, their families, and health professionals. Residents are expected to:**

1) communicate effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds;
2) communicate effectively with physicians, other health professionals, and health related agencies;
3) work effectively as a member or leader of a health care team or other professional group;
4) act in a consultative role to other physicians and health professionals; and,
5) maintain comprehensive, timely, and legible medical records, if applicable.

OAG-0013339

# Curriculum:  Otolaryngology Milestones Timeline

"Some milestone descriptions include statements about performing independently. These activities must occur in conformity to ACGME supervision guidelines, as well as institutional and program policies. For example, a resident who performs a procedure independently must, at a minimum, be supervised through oversight"

I. **Patient Care**
   a. **Salivary Gland Disease**
      i. Level 1 competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by reading & clinic
         1. Obtain basic history and physical
         2. Understand normal salivary gland function
         3. Know treatment of sialadenitis
         4. Knows how to scrub; performs surgical time out and maintain sterile file
      ii. Level 2 clinical exam/treatment goals should be developed by end of intern level ENT rotations  & surgical technique competencies by the end of Junior Head & Neck rotation
         1. H&P, head and neck exam, cranial nerve exam, order labs, radiology & FNA:  should be accomplished by end of first 4 weeks of intern year ENT rotation through clinic, reading and attending tumor board when possible
         2. Understands precipitating factors for inflammatory salivary disease by the end of intern ENT rotations by reading, attending clinic
         3. Discuss treatment modality options in general including adjuvant treatment by the end of intern ENT rotations by reading, attending clinic
         4. Lists some potential complications:  by the end of intern ENT rotations by reading, attending clinic
         5. Performs intraoperative patient prep; raises skin flaps in plane; close wound aesthetically by the end of Junior Head & Neck rotation
      iii. Level 3 clinical competencies should be developed by the end of Junior Head and Neck rotation & surgical technique competencies accomplished by the end of Senior Head and Neck rotation with significant progress seen during the Senior TDC rotation & MD Anderson rotations
         1. By the end of Junior Head & Neck rotation, resident should:
            a. Interpret appropriate lab, pathologic, radiologic studies
            b. Describe accurate differential diagnosis of salivary gland mass & clinically distinguish neoplastic from non-neoplastic etiologies
            c. Discuss appropriate therapeutic options and their implications
            d. Recognize common complications and obtain appropriate consultation for patient management

10

2. By the end of Senior TDC rotation and during the Senior Head & Neck rotation, resident should:
   a. Perform procedure with assistance, identify neurovascular structures, recognize and deal with intraoperative complications

iv. Level 4 clinical competency goals should develop during ENT intern level rotations, Junior Head and Neck Rotation, Junior & Senior TDC rotations as well as PGY 3 & 4 MD Anderson rotations.  Surgical technique goals should be reached by the end of the Senior Head and Neck rotation
   1. Should have knowledge of TNM staging by reading/attending clinic & tumor board by the end of intern year ENT rotations.  Should be comfortable and easily be able to stage patients during clinic and tumor board by the end of Junior Head & Neck
   2. Correct diagnosis from clinical, radiologic and pathologic information; knows histopathologic findings of common neoplastic processes by the end of Junior Head & Neck rotation—developed through clinic, reading and tumor board.  Should independently perform this process during Sr. TDC rotation as well as Sr. Head & Neck rotation.
   3. Formulates appropriate treatment for specific salivary cancer based on site, stage and patient factors:  should have knowledge of this during Head & Neck rotation, should independently perform this during Sr. TDC & Sr. Head & Neck rotations
   4. Completes procedure with oversight:  during Sr. TDC , MD Anderson & Sr. Head & Neck rotations
   5. Recognizes and is able to treat and/or develop treatment plan for common complications:  by the end of Jr. Head & Neck rotation and definitely some time during Sr. TDC/MD Anderson/Sr. Head  & Neck rotations

v. Level 5 competencies can be developed during Jr/Sr head and neck rotations as well as during fellowship
   1. Performs ultrasound guided FNA of salivary gland mass:  resident can attend, watch & learn during Head & Neck Ultrasound clinic, then perform procedure.  Academy of Oto/HNS has annual hands on ultrasound course during meeting on Saturday as well.
   2. Teaches pathophysiology by end of Sr. Head and Neck rotation—e.g. presentations during grand rounds or tumor board
   3. Performs extended dissection of parotid bed neoplasm with preservation of NV structures where appropriate—some will achieve this at end of Sr Head & Neck rotation, some during fellowship or practice
   4. Treats complex complications—should at least have knowledge of this by the end of Sr. Head & Neck rotation by reading and performing complex cases; will gain more insight during practice/fellowship

**b. Aerodigestive Tract Lesions**

11

OAG-0013341

    i.  Level 1 competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by reading & clinic
1. Obtain basic history and physical
2. Demonstrates limited understanding of normal laryngeal function
3. Demonstrates limited knowledge of treatment options

   ii.  Level 2 clinical exam/treatment goals should be developed by end of intern level ENT rotations  & surgical technique competencies by the end of Junior Head & Neck rotation
1. H&P, head and neck exam, cranial nerve exam, comprehensive ADT exam with recognition of normal vs. abnormal:  should be accomplished by end of first 4 weeks of intern year ENT rotation through clinic, reading and attending tumor board when possible
2. Understands normal laryngeal and esophageal function; understand factors precipitating inflammatory laryngeal disease by the end of PGY 2 ENT rotations by reading, attending clinic, performing flexible laryngoscopy, watching esophagoscopy
3. Discuss treatment modality options in general terms by the end of intern ENT rotations by reading, attending clinic
4. Positions patient properly for esophagoscopy and sometimes able to visualize the esophagus by the end of the Jr. Head & Neck rotation
5. Lists some potential complications (e.g. local injury from endoscopic instruments) by the end of Junior Head & Neck rotation

  iii.  Level 3 clinical competencies should be developed by the end of PGY 3 as well as the Junior Head and Neck rotation & surgical technique competencies by the end of Senior Laryngology /Head & Neck rotations with significant progress seen during the Senior TDC rotation
1. By the end of Junior Head & Neck rotation, resident should:
   a. Interpret appropriate lab, pathologic, radiologic studies
   b. Perform flexible and rigid endoscopic exam
   c. Describe accurate differential diagnosis of vocal cord lesion & clinically distinguish neoplastic from non-neoplastic etiologies
   d. Discuss appropriate therapeutic options and their implications
   e. Recognize common complications and obtain appropriate consultation for patient management
2. By the end of Senior TDC rotation and during the Senior Laryngology/ Head & Neck rotation, resident should:
   a. Perform esophagoscopy with biopsy on patients with favorable anatomy
   b. Consistently visualize larynx during laryngoscopy and perform binocular microlaryngosocpy

  iv.  Level 4 clinical competency goals should be developed during ENT intern level rotations, Junior Head and Neck Rotation, Junior & Senior TDC rotations, Sr. TDC & MD Anderson rotations.  Surgical technique goals should be reached by the end of the Senior Laryngology & Head and Neck rotation

12

1. Should have knowledge of interpreting lab work by the end of intern year ENT rotations.  Should interpret labs, function and radiologic studies by the end of Junior Head & Neck

2. Correct diagnosis from clinical, radiologic and pathologic information; knows histopathologic findings of common neoplastic processes by the end of Junior Head & Neck rotation—developed through clinic, reading and tumor board.  Should independently perform this process during Sr. TDC rotation as well as Sr. Head & Neck rotation.

3. Formulates appropriate treatment for vocal cord lesion based on site, stage and patient factors:  should have knowledge of this during Jr Head & Neck rotation, should independently perform this during Sr. TDC & Sr. Laryngology and Sr. Head & Neck rotations

4. Performs microlaryngoscopy with complete exposure of anterior commissure during Sr. Laryngology rotation

5. Recognizes and is able to treat and/or develop treatment plan for common complications:  by the end of Jr. Head & Neck rotation and definitely some time during Sr. TDC/Laryngology/Head  & Neck rotation

v. Level 5 competencies can be developed during Senior (PGY4-5) TDC, MD Anderson, head and neck, laryngology rotations as well as during fellowship

1. Performs flexible fiberoptic laryngoscopy w manipulation w oversight.

2. Teaches pathophysiology and management of complex ADT lesions by end of Sr. Laryngology & Sr. Head and Neck rotation—e.g. presentations during grand rounds or tumor board

3. Performs microlaryngoscopy in the difficult to expose patient with complete exposure of anterior commissure—some will achieve this at end of Sr Laryngology rotation, some during fellowship or practice

4. Performs esophagoscopy with complex intervention efficiently in the difficult to expose patient—some will achieve this at end of Sr Laryngology rotation, some during fellowship or practice

5. Treats complex complications—should at least have knowledge of this by the end of Sr. Head & Neck rotation by reading and performing complex cases; Performs microlaryngoscopy in the difficult to expose patient with complete exposure of anterior commissure—some will achieve this at end of Sr Laryngology rotation, some during fellowship or practice

c. **Sleep Disordered Breathing**

i. Level 1 competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by reading & clinic

1. Obtain basic history and physical

13

ii. Level 2 clinical exam/treatment goals should be developed by end of intern level ENT rotations & surgical technique competencies by the end of PGY 2 ENT rotations

1. Recognizes signs and symptoms of SDB and differences between children and adults; orders appropriate routine lab, radiologic and sleep studies by attending pediatric and adult ENT clinic as intern as well as reading
2. Demonstrates beginning understanding of treatment measures by attending pediatric and adult ENT clinic as intern as well as by reading
3. Demonstrates basic understanding of spectrum of sleep disorders in children and adults by the end of PGY 2 ENT rotations by reading, attending clinic
4. Performs tonsillectomy and/or adenoidectomy on typical pediatric or adult patient by the end of PGY 2 year
5. Lists common potential complications:  by the end of intern ENT rotations by observing/performing surgery, reading, attending clinic

iii. Level 3 clinical & surgical competencies should be developed by the end of PGY2-3 years through pediatric and adult rotations

1. By the end of PGY 2, residents should:
   a. Perform detailed examination with evaluation of upper airway anatomy and interpret basic diagnostic testing
   b. Demonstrate moderate understanding of spectrum of sleep disorders in children and adults
2. By the end PGY 3, residents should:
   a. Demonstrate deepening understanding of medical treatments, role of surveillance, and alternate therapies
   b. Perform palatopharyngoplasty on typical patient
   c. List rare complications; recognize common complications and initiate treatment in the typical patient

iv. Level 4 clinical competency goals should be developed during intern-PGY 3 pediatric & adult rotations and completed by the end of the PGY 4 pediatric & adult rotations

1. Interpret examination and advanced diagnostic testing by the end of PGY 3 by attending clinic and reading
2. Demonstrate thorough understanding of spectrum of sleep disorders and children and adults by the end of PGY 3 by attending clinic, performing surgery and reading
3. List and prioritize treatment options for SDB in complicated patients by the end of PGY 3 by attending clinic, performing surgery and reading
4. Performs T&A and palatopharyngoplasty on complex patients by the end of PGY 4
5. Recognize and is able to treat and/or develop treatment plan for common and uncommon complications in the complex patient by the

14

end of PGY 4 by performing surgery and following postoperative inpatient and outpatient

    v. Level 5 competencies can be developed during all Sr pediatric & adult rotations as well as during fellowship and practice

        1. Teach focused history and physical exam

        2. Recognize interaction between SDB and other sleep disorders in children and adults

        3. Identify indications and risks of non-surgical treatment plans for sleep disorders other than SDB/OSA and disorders of initiating and maintain sleep

        4. Teach T&A and palatopharygnoplasty by the end of PGY 4.

**d. Facial Trauma**

    **i.** Level 1 competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by reading, clinic, buddy call, & observing surgery

        **1.** Obtain basic history and physical

        **2.** Demonstrate basic knowledge of normal facial skeleton and anatomy

        **3.** Demonstrate limited knowledge of treatment options

        **4.** Know how to scrub & perform surgical time out

        **5.** Demonstrate limited familiarity with complications

    **ii.** Level 2 clinical exam/treatment goals should be developed by end of intern level ENT rotations through clinic, on call, reading experience  & surgical technique competencies by the end of PGY 2 ENT rotations

        1. Recognize signs and symptoms of mandible/facial fractures, quickly assess ABC's and need for urgent intervention

        2. Localize zones of traumatically involved facial skeleton (frontal, orbital, midface, mandible) using detailed familiarity with normal facial bony and soft tissue anatomy

        3. Discuss treatment modality in general terms; demonstrate limited knowledge of potential indications for ORIF of facial fractures

        4. Demonstrate beginning ability of applying MMF and how to perform internal and external incisions

        5. List some potential complications

    **iii.** Level 3 clinical & surgical competencies should be developed by the end of PGY2-4 years through clinic, on call and surgical experience

        1. By the end of PGY 2, residents should:

            a. Obtain focused history and exam, survey for other head and neck injuries, order routine lab and radiologic studies

        2. By the end of PGY 3, residents should

            a. Perform airway evaluation on trauma patient with accuracy, including managing the airway with senior supervision

            b. Identify common facial skeleton fracture patterns

            c. Discuss appropriate therapeutic options for major facial fracture types/patterns

15

       d.  Place MMF and establish baseline occlusion with senior supervision; able to perform surgical approach for ORIF under supervision

       e.  Recognize common complications

3. By the end PGY 4, residents should:

       a.  Perform airway evaluation on trauma patient with accuracy and be able to manage the airway with intubation, cricothyrotomy or tracheotomy

       b.  Be facile at placing MMF and establish baseline occlusion; able to perform surgical approach for ORIF to visualize fractures with adequate exposure for ORIF and identify neurovascular structures

       c.  Recognize common complications and make appropriate consultations & decisions for management

iv. Level 4 clinical competency goals should be developed during intern-PGY 3 pediatric & adult rotations and completed by the end of the PGY 4 pediatric & adult rotations

1. Interpret appropriate lab and radiologic studies; identify and order necessary adjunctive studies (e.g. angiography) during PGY 3 year through on call experience, clinic and reading

2. Accurately diagnose location and extend of specific facial trauma by the end of PGY 3 year through on call experience, clinic

3. Perform uncomplicated mandibular ORIF independently by the end of PGY 4

4. Develop appropriate treatment plan and perform ORIF for a facial fracture patient with combined mandible and midface facture by the end of PGY4/during PGY 5 year through on call, clinic and surgery experience

5. Recognizes common complications during PGY 3-4 and is able to treat common complications by the end of PGY 5

v. Level 5 competencies can be developed during all Sr rotations/on call as during fellowship and practice

1. Develop appropriate treatment plan for panfacial fracture patient

2. Perform revision/infected mandibular fracture ORIF

3. Treat complex complications

e. **Rhinosinusitis**

i. Level 1 competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by reading, clinic, buddy call, & observing surgery

1. **Obtain basic sinonasal symptom history and perform basic head and neck exam**

2. **Recognize symptoms that indicate sinonasal pathology**

16

OAG-0013346

    **3.** Demonstrate limited knowledge of treatment options

    **4.** Preoperative documentation, how to scrub, performs surgical time out

    **5.** Demonstrate limited familiarity with complications of rhinosinusitis

ii. Level 2 clinical exam/treatment goals should be developed during intern and PGY 2 rotations through clinic, reading, observing surgery. Surgical technique competencies should be completed by the end of PGY 2 ENT rotations

    1. Obtain focused H & P including detailed sinonasal symptom inventory

    2. Explain difference between viral URI and acute bacterial sinusitis

    3. Discuss treatment modality in general terms; prescribe medical therapy for simple conditions (viral URI, acute bacterial rhinosinusitis)

    4. Perform intra-operative patient nasal decongestion and local injections under endoscopic guidance; able to apply & register stereotactic surgical guidance system

    5. List some potential complications of sinus surgery

iii. Level 3 clinical & surgical competencies should be developed by the end of PGY2-4 years through clinic, surgical experience & reading

    1. By the end of PGY 2, residents should:

        a. Perform nasal endoscopy in adults with simple anatomy and recognize normal vs. abnormal anatomy

        b. Demonstrate basic understanding of lab, pathology and radiology studies

        c. Provide a differential diagnosis that includes the most common spectrum of bacterial sinusitis disease processes

    2. By the end of PGY 3, residents should

        a. Perform nasal endoscopy in adolescent and adult patients

        b. Discuss appropriate therapeutic options for chronic rhinosinusitis and chronic rhinosinusitis with nasal polyps

        c. Perform FESS procedure with guidance in adults, recognize endoscopic surgical landmarks and recognize common complications

    3. By the end PGY 4, residents should:

        a. Perform nasal endoscopy in pediatric and more complex adult patients

        b. Complete FESS with minimal supervision in nonrevision adult patients

        c. Recognize common complications and make appropriate consultations & decisions for management

iv. Level 4 clinical competency goals should be developed during PGY 3-5 rotations through clinic, surgery and reading

    1. Distinguish the pathophysiologic and clinical presentations of various subtypes of chronic rhinosinusitis by the end of PGY 3 through clinic and reading

    2. By the end of PGY 4, residents should:

17

          a.  Perform nasal endoscopy in pediatric and more complex adult patients and identify pathologic findings in the previously operated patient

          b.  Be facile with interpretation of lab tests including immunodeficiency, pathologic and radiologic studies including preoperative CT evaluation for pediatric, adult and revision cases

          c.  Formulate appropriate treatment plan for patient with acute exacerbations of CRS/recurrent polyp disease; tailor medical therapy to patient symptoms and disease level

          d.  Recognize and is able to treat or develop plan to treat complications

       3.  By the end of PGY 5 rotations residents should.

          a.  Perform nasal endoscopy in pediatric and more complex adult patients

          b.  Complete FESS with minimal supervision in pediatric and revision adult cases

          c.  Recognize common complications and  independently start treating orbital/intracranial complications appropriately with appropriate intervention and consultation

    v.  Level 5 competencies can be developed during PGY4-5 rotations as well as during fellowship/practice

       1.  Teach nasal endoscopy during PGY 4-5 including angled scopes

       2.  Recognize and diagnose possible uncommon etiologies of chronic sinusitis refractory to standard therapy

       3.  Perform workup for suspected immune deficiency independently

       4.  Provide treatment of recurrent/extensive frontal sinus disease

       5.  Complete revision and advanced endoscopic surgery independently

       6.  Treat complex complications

**f.  Nasal deformity**

    **i.**  Level 1 competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by reading, clinic, buddy call, & observing surgery

       **1.**  Obtain basic history and performs basic head and neck exam

       **2.**  Demonstrate limited knowledge of treatment options

       **3.**  Preoperative documentation, how to scrub, performs surgical time out

    ii.  Level 2 clinical exam/treatment goals should be developed during PGY 1- PGY 3 rotations through clinic, reading, participating in surgery. Surgical technique competencies should be completed by the end of PGY 3 ENT rotations

       1.  Obtain focused H & P

       2.  Demonstrate understanding of normal nasal physiology

OAG-0013348

    3. Discuss treatment modality options in general; prescribe medical therapy for simple common condition
    4. Prepare patient intra-operatively during Jr. TDC rotation including using decongestant pledgets and injecting septum/nose with local anesthetic
    5. Plan, perform under supervision the incisions and close the incisions that would be adequate for exposure for septoplasty, septorhinoplasty during Jr. TDC rotation
    6. Demonstrate limited knowledge of potential complications

iii. Level 3 clinical & surgical competencies should be developed by the end of PGY3-5 years through clinic, surgical experience & reading

    1. By the end of PGY 3, residents should:
       a. Perform limited dynamic nasal function analysis and anterior rhinoscopy to evaluate for structure, obstruction, external and internal valve
       b. Discuss appropriate treatment options for common nasal deformities by reading and clinic experience
       c. Plan and perform anterior septoplasty incision with elevation of septal mucosa in correct plane with adequate planning & addressing of structural abnormalities
       d. Recognize common complications

    2. By the end of PGY 4, residents should
       a. Differentiate between variable and fixed nasal obstruction contributors and how to address these therapeutically
       b. Plan and perform incisions that would be needed for both intranasal and external rhinoplasty during Sr. TDC rotation; is cognizant of landmarks for identifying neurovascular structures
       c. Elevate septal mucosa independently in more complex deviations

    3. By the end PGY 5, residents should:
       a. Plan and complete incisions for both intranasal and external rhinoplasty while identifying all neurovascular structures
       b. Address intraoperative complications

iv. Level 4 clinical competency goals should be developed during PGY 4-5 rotations through clinic, surgery and reading.

    1. Perform comprehensive dynamic nasal function analysis
    2. Identify aesthetic/cosmetic abnormalities
    3. Correlate exam findings with underlying structural problems
    4. Identify specific components of nasal pathophysiology in functional obstruction
    5. Formulate appropriate treatment plan for patient with fixed and/or dynamic nasal obstruction
    6. Resect or augment bony or cartilaginous framework, place and secure grafting material appropriately, perform osteotomies correctly
    7. Resect, recontour and correct septal abnormalities

19

8. Recognizes and is able to treat/develop treatment plan for complications

v. Level 5 competencies can be developed during PGY4-5 rotations as well as during fellowship/practice

1. Perform analysis in revision/postsurgical setting
2. Formulate appropriate treatment plan for revision surgery
3. Perform revision rhinoplasty including harvest and placement of grafts
4. Perform revision septal surgery including correcting complex septal abnormalities
5. Treat complex complications

**g. Chronic Ear**

**i.** Level 1 competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by reading, clinic, buddy call, & observing surgery

**1.** Perform general history and physical
**2.** Recognize common symptoms of ear infections
**3.** Demonstrate limited knowledge of chronic ear disease
**4.** Preoperative documentation, how to scrub, performs surgical time out, maintains sterile field in middle ear surgery
**5.** Demonstrate limited knowledge of medical/surgical treatment for ear disease

ii. Level 2 clinical exam/treatment goals should be developed during intern and PGY 2 rotations through clinic, reading, observing surgery. Surgical technique competencies should be completed by the end of Jr. Otology rotations or PGY 2-3

1. Obtain focused H & P including hand held otoscopy
2. Differentiate between middle ear/mastoid disease and otitis externa
3. Identify ETD and normal and abnormal physiologic contributors
4. Prescribe appropriate topical/systemic antibiotic therapy for chronic otitis media
5. Position, prep and drape patient, inject local anesthesia, make and close postauricular incision
6. Understand basics of postoperative wound care/dressing/drops
7. List potential complications of ear surgery

iii. Level 3 clinical & surgical competencies should be developed by the end of PGY2-4 years through clinic, surgical experience & reading

1. By the end of PGY 2 and Jr. Otology rotation, residents should:
   a. Perform otomicroscopic exam and order audiology, laboratory and radiologic studies
   b. Clinically differentiate otitis media, otitis externa, necrotizing otitis externa, chronic otitis media, mastoiditis and cholesteatoma by history, exam and radiology

20

OAG-0013350

    c.   Be able to identify normal structures on CT temporal bone
2. By the end of PGY 3, residents should
    a.   Perform reliable otomicroscopic exam including debridement of chronic ear disease and mastoid bowls
    b.   Recognize clinical failure of medical management and describe surgical risks, benefits, alternatives for chronic ear/middle ear surgery
    c.   Be able to identify normal and abnormal structures on CT temporal bones and utilize this for surgical planning/landmarks
    d.   Appropriately place and use NIMS monitor for facial nerve monitoring
    e.   Perform simple mastoidectomy and ear canal incisions under supervision as well as in the temporal bone lab
    f.   Able to manage routine postoperative complications
3. By the end PGY 4 and Sr. Otology rotation, residents should:
    a.   Understand concepts of recidivism and need for long-term surveillance
    b.   Be confident with identifying surgical landmarks, normal and abnormal structures on CT temporal bones as well as reading MRI scans relevant to inner ear structures
    c.   Be facile in performing postauricular & ear canal incisions, elevating tympanomeatal flap.  Perform cortical mastoidectomy and identify antrum, horizontal semicircular canal, skeletonize posterior canal wall
    d.   Recognize and treat intra/postoperative complications and make appropriate consultations & decisions for management
iv. Level 4 clinical competency goals should be developed during PGY 3-5 rotations through clinic, surgery and reading & surgical technique competency will be developed through PGY 4-5, Sr. Otology rotations
1. Accurately interpret appropriate diagnostic studies, understand the need for operative intervention and recognize acute complications of chronic otitis media
2. Understand mechanisms underlying the development of intratemporal and intracranial complications of chronic ear disease
3. Formulates appropriate treatment plan for patient with complications of chronic ear disease
4. Removes granulation tissue and/or cholesteatoma form the middle ear/mastoid, skeletonizes vertical segment of facial nerve, performs tympanoplasty
v. Level 5 competencies can be developed during PGY4-5 rotations as well as during fellowship/practice
1. Interpret less commonly utilized tests
2. Manage chronic otitis media in an only hearing ear

21

OAG-0013351

3. Perform canal wall down mastoidectomy skillfully; able to proficiently perform facial recess
4. Treat major postoperative complications independently

**h. Pediatric Otitis media**

    i. Level 1 competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by reading, clinic, buddy call, & observing surgery

        **1.** Perform general history and physical
        **2.** Recognize common symptoms of ear infections
        **3.** Understand concepts of otitis media and otitis externa
        **4.** Participates in surgical time out and patient safety/positioning

    ii. Level 2 clinical exam/treatment goals should be developed during intern Otolaryngology rotations through clinic, reading, observing surgery.  These should definitely be developed by the beginning of PGY 2 rotations

        1. Obtain focused H & P including hand held otoscope
        2. Correctly diagnose acute otitis media, otitis media with effusion and otitis externa some of the time
        3. Know how and when it is indicated to order basic audiometric testing; be able to perform tympanometry in clinic
        4. Describe the etiologic organisms most commonly associated with OM and OE & understand risk factors for both
        5. Prescribe appropriate topical/systemic antibiotic therapy for ear infections
        6. Demonstrate familiarity with effective/ineffective nonantibiotic medications and alternative treatments
        7. Insert ear speculum, safely clean cerumen from ear canal of both adults and children
        8. List potential complications from pediatric otitis media and externa
        9. Position, prep and drape patient, inject local anesthesia, make and close postauricular incision
        10. Understand basics of postoperative wound care/dressing/drops
        11. List potential complications of ear surgery

    iii. Level 3 clinical & surgical competencies should be developed by the end of PGY2 year through clinic, surgical experience & reading

        1. Perform pneumatic otoscopy and accurately diagnose acute otitis media, otitis media with effusion and acute/chronic otitis externa
        2. Identify when further diagnostic testing and/or imaging is needed for diagnosis
        3. Accurately diagnose patients with otitis media and understand the natural history and ramifications of treated/untreated OM
        4. Recognize treatment failure/refractoriness and indications for surgery

OAG-0013352

        5. Identify tympanic membrane, EAC landmark and structures and able to consistently perform appropriate myringotomy

        6. Recognize common complications; obtain appropriate consultation

   iv. Level 4 clinical competency goals should be developed during PGY 2-4 rotations through clinic, surgery, on call experience and reading

        1. Skilled pneumatic otoscopy in children of all ages

        2. Recognize complications of acute otitis media, otitis media with effusion, otitis externa

        3. Diagnose intra and extracranial complications of ear infections

        4. Treat complications of ear infections

        5. Place tympanostomy tubes safely in patients with easy anatomy and in some patients with difficulty anatomy

        6. Recognize and treat/develop treatment plan for common complications

   v. Level 5 competencies can be developed during PGY4-5 rotations as well as during fellowship/practice

        1. Skilled pneumatic otoscopist in syndromic children

        2. Place tympanostomy tube safely in patients with difficult anatomy


## II. Medical Knowledge

  **a. Upper Aerodigestive Tract (UADT) Malignancy**

    i. Level 1 competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by reading, clinic and attending Basic introductory course lectures

        **1.** Basic understanding of UADT and neck anatomy as well as function: mastication, deglutition, respiration, phonation

        **2.** Knowledge on basic H & P

    ii. Level 2 knowledge goals should develop in PGY 1 year and should be completed by the end of PGY 2 as well as the Jr. Head & Neck rotations by attending clinic, tumor board conferences, clinic, inpatient rounds, surgery

        1. Moderate knowledge of UADT and neck anatomy: teach anatomy to medical students during surgery

        2. Know abnormal UDT physiologic function and locoregional manifestations;

        3. Risk factors including tobacco, alcohol

        4. Common presentations for UADT malignancy

        5. Perform focused H & P including flexible fiberoptic laryngoscopy

        6. Interpret appropriate labs, FNA and radiology for workup

OAG-0013353

7. Able to perform TNM staging in clinic and tumor board for common UADT malignancy
8. Describe basic treatment algorithm for UADT malignancy and describe these according to relevant TNM staging

iii. Level 3 knowledge competencies should start developing during the end of Jr. Head and Neck rotation (PGY 2-3) & be developed by Sr. TDC & MD Anderson rotations (PGY 4)

1. Demonstrate proficient knowledge of normal anatomy; teaches anatomy to junior residents during Senior TDC rotation
2. Know major risk factors of UADT cancer according to cancer type
3. Know common disease progression routes for UADT malignancy and how to monitor
4. Interpret appropriate lab, pathology and radiology studies & is able to present/discuss pathology during Tumor Board Conference
5. Understand concepts of neoadjuvant therapy
6. Knowledge on options for securing difficult airway in OR

iv. Level 4 knowledge competency goals should be developed during Sr. TDC, MD Anderson and Sr. Head & Neck rotations (PGY 4-5)

1. Correlate anatomic knowledge with disease physical exam and radiologic findings
2. Understand molecular basis of UADT cancer
3. Knowledge on benign and malignant differential diagnoses of common site presentations
4. Knowledge on appropriate staging system for more complex and uncommon UADT cancers by Sr. TDC rotation/Tumor board presentations.  Should be good at straightforward TNM staging by the end of PGY 2 and should have knowledge about staging even during intern year
5. Understand prognostic indicators of tumor pathology including molecular markers
6. Describe treatment options correctly based on primary site, disease stage and patient factors in simple and complex tumors

v. Level 5 competencies can be developed during Sr TDC, MD Anderson and Sr. head and neck rotations as well as during fellowship

OAG-0013354

      1. Gives lectures on anatomy of head and neck and correlation with UADT lesions

      2. Strong knowledge on specific treatment protocols for chemoradiation therapy

**b. Hearing Loss**

    i. Level 1 knowledge competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by attending basic introductory courses, reading, clinic

      **1.** Demonstrate limited knowledge of temporal bone and cochleovestibular anatomy

      **2.** Demonstrate limited understanding of the physiology of hearing

      **3.** Demonstrate limited understanding of the natural history of hearing loss

    ii. Level 2 knowledge goals should be developed during intern and PGY 2 rotations through Otology and General otolaryngology clinic, observing surgery, self-study/reading, and participating in temporal bone lab (with appropriate preparation prior to temporal bone lab sessions)

      1. Demonstrate proficient knowledge of temporal bone and cochleovestibular gross anatomy and embryology:  this will involve reading and self-study and should be demonstrated by the end of PGY 2

      2. Understand normal middle ear mechanics and cochlear physiology by the end of PGY 1 year

      3. Understand natural history of presbycusis and noise-induced hearing loss

      4. Recognize normal ear exam and audiometry with ability to identify basic hearing loss classification on audiogram by beginning of PGY 2 year

      5. Demonstrate limited knowledge of options for diagnostic workup of hearing loss by the end of PGY 1 year

      6. Demonstrate awareness of non-surgical aural rehabilitation options and understand importance of hearing surveillance by the end of Jr. Otology rotation

    iii. Level 3 knowledge competencies should be developed throughout PGY2-4 years through clinic, surgical experience & self-study/reading

25

OAG-0013355

1. Demonstrate proficient knowledge of normal temporal bone and cochleovestibular histopathology by end of PGY 3
2. Generate differential diagnosis for hearing loss in adult patients during PGY 2
3. Understand the natural history of adult onset hearing loss during PGY 2
4. Recognize abnormal ear exam/audiogram and order appropriate audiometry, lab and imaging work up during PGY-3 Otology and General Otolaryngology clinics
5. Demonstrate comprehensive awareness of aural rehabilitation options including surgical management of hearing loss during/by the end of the Sr. Otology rotation.
6. By the end PGY 4 and Sr. Otology rotation, residents should:
   a. Understand concepts of recidivism and need for long-term surveillance
   b. Be confident with identifying surgical landmarks, normal and abnormal structures on CT temporal bones as well as reading MRI scans relevant to inner ear structures
   c. Be facile in performing postauricular & ear canal incisions, elevating tympanomeatal flap.  Perform cortical mastoidectomy and identify antrum, horizontal semicircular canal, skeletonize posterior canal wall
   d. Recognize and treat intra/postoperative complications and make appropriate consultations & decisions for management

iv. Level 4 knowledge competency goals should be developed during PGY 3-5 rotations through clinic, surgery and self-study/reading.  These may develop earlier in residents with special interest in Otology.
1. Understand congenital variations of temporal bone and cochleovestibular anatomy
2. Generate differential diagnosis as well as natural history for hearing loss in children and identify uncommon causes of hearing loss in adults & natural history of these
3. Consider unusual causes of hearing loss and orders/interprets appropriate advanced audiometry, lab and imaging studies
4. Describe indications/contraindications and complications of the surgical aural rehabilitation techniques
5. Tailor aural rehabilitation to patient-specific needs

OAG-0013356

    v.  Level 5 competencies can be developed by self/study reading as well as managing complex pediatric/adult patients in clinic including observing an actual audiology protocol for central auditory processing

        1.  Demonstrate knowledge of central auditory pathways and is an expert in anatomy/embryology of external/middle/inner ear and how this relates to central auditory processing

        2.  Teach embryology/anatomy of cochleovestibular system to medical students and junior residents/peers in Grand Rounds or anatomy lectures

**c. Dysphagia-Dysphonia**

    i.  Level 1 competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by attending basic introductory course, self-study/reading & clinic

        1.  Obtain basic history and physical

        2.  Demonstrates limited understanding of normal laryngeal function

        3.  Demonstrates limited knowledge of treatment options

    ii.  Level 2 knowledge goals should be developed throughout PGY 1-2 years through attending Laryngology and General Otolaryngology clinics, didactics, self-study/reading, observe speech pathologist perform modified barium swallow/FEES

        1.  Understand basic anatomy and physiology of voice and swallowing by the end of PGY 1

        2.  Demonstrate basic understanding of common voice and swallowing disorders by the end of PGY 2

        3.  Understands age-related changes to voice and swallowing during PGY 2

        4.  Obtains focal history and physical, including flexible laryngoscopy by the beginning of PGY 2

        5.  Knows diagnostic modalities for work-up of voice and swallowing disorders by the end of PGY 2

        6.  Demonstrate beginning understanding of treatment options/rationale and risks/benefits of each during PGY 2

    iii.  Level 3 knowledge competencies should develop throughout PGY 2-4 years by attending Laryngology/General

OAG-0013357

Otolaryngology clinic, didactics, reading/self-study and participating in clinic and OR procedures

1. By the end of PGY 3, resident should:
    a. Demonstrate mid-level understanding of anatomy and physiology of voice and swallowing
    b. Demonstrate mid-level understanding of common voice and swallowing disorders
    c. Demonstrate knowledge of disease progression and sequelae of untreated voice and swallowing disorders
2. By the beginning of PGY 4 year resident should:
    a. Order and interpret appropriate diagnostic tests (regular barium swallow versus modified barium swallow), lab, pathologic and radiologic
    b. Demonstrate mid-level understanding of treatment options and rationales, risks and benefits of each

iv. Level 4 knowledge goals should be developed during PGY 3-PGY 5 years and solidified during Senior Laryngology rotation by attending clinic, procedures as well as reading/self-study and teaching in didactics/grand rounds
1. Demonstrate thorough knowledge of anatomy and physiology of voice and swallowing
2. Demonstrate comprehensive understanding of most voice and swallowing disorders, including voice and swallowing manifestations of systemic disease (autoimmune, sarcoidosis, neuromuscular)
3. Articulate comprehensive understanding of risk factors and timeframe for malignant transformation of premalignant conditions (LPRD, Barrett's, dysplasia/leukoplakia, recurrent respiratory papillomatosis)
4. Correlate lab and radiology workup with clinical diagnosis
5. Demonstrate thorough understanding of treatment options/rationale, risks/benefits of each treatment option
6. Strong knowledge of surveillance algorithm for malignant disease

v. Level 5 knowledge competencies can be developed during Senior Laryngology rotation as well as during practice/fellowship
1. Teaches pathophysiology of dysphagia/dysphonia including strong knowledge in all types of swallow studies and endoscopic findings

28

OAG-0013358

**d. Inhalant Allergy**
  i. Level 1 competencies are goals for entering intern after first month of Otolaryngology; these can be accomplished by attending basic introductory course lecture on allergy as well as reading & clinic
   1. Demonstrate familiarity with basic nasal anatomy and normal respiratory mucosa histology
   2. Demonstrate familiarity with normal functions of nasal mucosa and nasal cavities
   3. Demonstrate limited knowledge of allergy workup
  ii. Level 2 knowledge goals should begin to develop in PGY 1 and be accomplished by end of PGY2 by attending pediatric/adult clinics and self-study/reading as well as attending Allergy didactics & practical
   1. Basic understanding of derangements in nasal anatomy and mucosal
   2. Pathophysiology of allergic rhinitis (AR)
   3. Comorbidities of AR
   4. Clinical presentations of allergic disease
   5. Prescribe basic medical treatment for AR in both children and adults
  iii. Level 3 knowledge competencies should develop throughout PGY3-4 years especially when working in Otolaryngic Allergy clinics as well as with self-study/reading and Allergy didactics & practical
   1. By the end of PGY 3 rotations, resident should:
      a. Demonstrate knowledge of histopathology of allergic rhinitis and anatomic factors affecting the nasal airway
      b. Know pathophysiology of non-allergic rhinitis
      c. Describe the natural history and components of severity in allergic disease
      d. Demonstrate knowledge of testing methods, including skin prick testing, intradermal testing, modified quantitative testing, in vitro testing in allergic disease.  This includes knowledge on possible side effects and being able to identify patients who have comorbidities/medication that would make it unsafe to proceed with skin testing, as well

29

OAG-0013359

as being able to counsel patients on which medications need to be stopped and when prior to skin testing as they may affect test results.

2. By the end of PGY 4 and when starting their PGY 5 rotation in Otolaryngic Allergy, residents should:
    a. Prescribe advanced medical treatment for allergic disease independently
    b. Interpret allergy tests including skin prick testing, intradermal testing and in vitro testing independently and be familiar with process of creating treatment vials from the tests for both sublingual and subcutaneous immunotherapy

iv. Level 4 knowledge competency goals should be developed during PGY 3-5 years and can be developed more quickly in residents with interest in Allergy by attending more Otolaryngic Allergy clinics & actively writing "pretend" prescriptions on all tested patients, observing the nurse give allergy shots as well as physician interaction with nurse to adjust therapy protocol in different circumstances, attending the AAOA Basic Allergy Course, self-study/reading, helping attending physicians teach during Allergy practical/didactics
    1. Demonstrate thorough understanding of anatomic impact of allergic inflammation on the nasal airway
    2. Distinguish presentations of allergic and non-allergic rhinitis
    3. Demonstrate knowledge of cellular and molecular features of inhalant allergy
    4. Describe systems for AR subtype and severity (seasonal/perennial as well as new ARIA classification)
    5. Incorporate knowledge of severity and natural history into patient management
    6. Combine clinic features and test results to correctly diagnose allergic disease
    7. Demonstrate working knowledge of immunotherapy for allergic disease including protocols for both sublingual and subcutaneous immunotherapy, as well as knowledge on which patients to recommend immunotherapy to, escalation versus maintenance, how to manage comorbid illness (asthma, pregnancy, URI) as well as the socioeconomics of treatment.

OAG-0013360

8. Demonstrate strong knowledge of how to manage local and systemic reactions to allergy testing/immunotherapy including anaphylaxis.  Know correct dosage and use of epipen, know ACLS protocols for emergent anaphylaxis.  Senior resident on otolaryngic allergy should participate on anaphylaxis protocol training in clinic.

v. Level 5 knowledge competencies can be developed during Senior Otolaryngic Allergy rotation in residents who have attended extra Otolaryngic Allergy clinic year-round for follow up of selected patients as well as dedicated Allergy self-study, which can include extra AAOA courses.  These skills can also be developed during practice after attending AAOA courses or completing AAOA fellowship requirements
   1. Demonstrate advanced understanding of allergy diagnostic testing including workup for anaphylaxis and food allergies
   2. Facile with both sublingual and subcutaneous immunotherapy which includes being able to prescribe immunotherapy safely for both escalation and maintenance vials, being able to adjust protocol for specific patient depending on comorbidity/illness, local/systemic reactions as well as being facile in management of complications including local/systemic reactions as well as anaphylaxis
   3. Teaches management of anaphylaxis to clinic personnel/nurses as well as junior residents
   4. Has knowledge on molecular testing for allergy especially when treating severe anaphylaxis (eg peanut allergy)
   5. Has knowledge on immunotherapy protocols for venom immunotherapy as well as aspirin desensitization and can counsel patients appropriately on when to get treated

OAG-0013361

**Patient Safety, Resource Utilization, Practice-Based Learning, Professionalism and Interpersonal Communication Skills**

Competency in these milestones is expected to develop throughout the 5-year Otolaryngology curriculum through participation in clinics, surgery, inpatient and outpatient care, ethics discussions/ talks, cultural competency discussions/talks, participation in interdisciplinary tumor board, participation in different resident committees and quality improvement projects

### III. Patient Safety—Systems Based Practice

*All residents are expected to develop and improve these skills throughout the 5-year residency with different levels of growth expected in different individuals*

a. Level 1 competency should develop in the first month of intern year: understand the need for formal patient safety measures and participated in these (e.g. surgical timeout)

b. Level 2 competency should develop as early as PGY 1 and continue throughout all years of residency:  participate in the use of tools to prevent adverse events (patient checkout/transition of care lists) & understand the chain of command to develop and implement patient care plan

c. Level 3 competency should develop by PGY 2 and definitely continue to improve through PGY 3-5 including the consistent use of tools to prevent adverse events, identify potential patient safety issues (OR positioning), presenting at M&M with relevant data/ literature search & discussion

d. Level 4 competency should develop in the PGY 3-4 years and definitely be present in the graduating resident with advocacy for quality patient care, optimal patient care systems, analysis of M&M findings with relevant feedback to improve patient safety

e. Level 5 competency may develop in some senior residents as well as practicing attendings/fellows including education of other services about patient safety issues in otolaryngology

OAG-0013362

IV. **Resource Utilization—Systems Based Practice**
   *All residents are expected to develop and improve these skills throughout the 5-year residency with different levels of growth expected in different individuals*
   a. Level 1 competency should develop in the first year of residency with resource utilization to coordinate patient care (social work, patient care manager)
   b. Level 2 competency should develop as early as PGY 1 and continue throughout all years of residency:  actively function and part of interdisciplinary team for patient care, develop awareness of socio-economic issues in patient care and take these into consideration when developing patient care plan
   c. Level 3 competency should start to develop by PGY 2 and definitely continue to improve through PGY 3-5 including incorporating cost issues into care decisions, contribution to leadership of interdisciplinary care team, use of technology and other resources in patient care
   d. Level 4 competency should develop in the PGY 3-4 years and definitely be present in the graduating resident with practicing cost-effective care (manage length of stay, surgical efficiency) and leadership of interdisciplinary team
   (present at tumor board, care for complex head & neck cancer patients)
   e. Level 5 competency may develop in some senior residents as well as practicing attendings/fellows including designing measurement tools to monitor and provide feedback to providers/teams on resource consumption to facilitate improvement


V. **Practice Based Learning Improvement**


   *All residents are expected to develop and improve these skills throughout the 5-year residency & beyond:  the ability to investigate and evaluate the care of patients, to appraise and assimilate scientific evidence and to continuously improve patient care based on self-evaluation and lifelong learning*

   a. Level 1 competency should develop in the first month of intern year & definitely in the first year of residency:  is aware of one's own level of knowledge and uses feedback from teachers, colleagues and patients; identifies learning resources.
   b. Level 2 competency should develop as early as PGY 1 and continue throughout all years of residency:  continuously seek and incorporate feedback to improve performance; develop learning plan including using review articles and guidelines along with appropriate textbook/resources
   c. Level 3 competency should develop by PGY 2 and definitely continue to improve through PGY 3-5 including demonstration of improvement in clinical thought and action through continual self-assessment; select appropriate evidence-based tools to answer specific questions

33

d. Level 4 competency should develop in the PGY 3-4 years and very beneficial if present in the graduating resident with demonstration of consistent behavior of incorporating evidence based information in common practice areas; organize educational activities at program level such as didactics, journal club, grand rounds

e. Level 5 competency may develop in some senior residents as well as practicing attendings/fellows including competence at performing meta-analyses to answer complex patient care questions, sophistication in use of learning resources

## VI. Professionalism

*All residents are expected to develop and improve these skills throughout the 5-year residency with different levels of growth expected in different individuals*

a. Level 1 competency should develop in the first month of intern year: demonstrate behavior that conveys caring, honesty, genuine interest in patients/families; exhibit professional behavior (reliability, industry, integrity, confidentiality); maintain respect for patient confidentiality

b. Level 2 competency should develop as early as PGY 1 and continue throughout all years of residency:  awareness about ethical issues in patient care (autonomy, end of life care, research ethics); recognize individual limits in clinical situations and ask for help when needed; understand and manage issues related to fatigue/sleep deprivation; complete paperwork, administrative tasks and assignments in timely manner

c. Level 3 competency should develop by PGY 2 and definitely continue to improve throughout PGY 3-5 including sensitivity and responsiveness toward all patient populations as well as the ability to recognize ethical issues in practice as well as the ability to discuss, analyze and manage common ethical situations

d. Level 4 competency should develop in the PGY 3-4 years and should strive to achieve by graduation including analyze/manage ethical issues in complicated/challenging situations; develop mutually agreeable care plan in the context of conflicting physician and patient values/beliefs

e. Level 5 competency may develop in some senior residents as well as practicing attendings/fellows including organizing and/or taking part in the leadership of an institutional ethics program

## VII. Interpersonal Communication Skills

*All residents are expected to develop and improve these skills throughout the 5-year residency with different levels of growth expected in different individuals*

34

OAG-0013364

a. Level 1 competency should develop in the first month of intern year: develop positive relationship with patients, understand patients and families, utilize interpreters as needed.

b. Level 2 competency should develop as early as PGY 1 and continue throughout all years of residency:  effective communication during transitions of care, communicate with patients and family while taking into account socioeconomic & cultural backgrounds, ensure that medical record is timely, accurate and complete

c. Level 3 competency should develop by PGY 2 and definitely continue to improve through PGY 3-5 including sustaining effective relationships with services requesting otolaryngology consultation, working effectively as member of health care team, using multiple forms of communication (e-mail, patient portal social media) ethically and with respect for patient privacy

d. Level 4 competency should develop in the PGY 3-4 years and should strive to be achieved by graduation including development of working relationships across specialties and systems of care; organize and facilitate family/health care team conferences

e. Level 5 competency may develop in some senior residents as well as practicing attendings/fellows including the development of models/approaches to managing difficult communications and coaching others to improve communication skills

35

# Curriculum: General Principles

Our educational curriculum is based on the values of

- Responsibility
- Progression
- Parity

In short, this means that every member of our team has a defined level of responsibility (described below) which progresses during their five years of training in a predictable way, resulting in comparable experience and competence for all residents.

**RESPONSIBILITY**

The workload associated with optimal clinical care of surgical patients is a continuum from the moment of admission to the point of discharge.  During the residency education process, Otolaryngology teams will be made up of attending surgeons, residents at various PGY levels, medical students (when appropriate), and other health care providers.  The work of the caregiver team will be assigned to team members based on each resident's level of education, experience, and competence.

Members of the caregiver team will receive instruction in the following skills:
1. Recognition of and sensitivity to the experience and competency of other team members;
2. Time management;
3. Prioritization of tasks as the dynamics of a patient's needs change;
4. Recognition of when an individual becomes overburdened with duties that cannot be accomplished within an allotted time period;
5. Communication, so that if all required tasks cannot be accomplished in a timely fashion, appropriate methods are established to hand off the remaining task(s) to another team member at the end of a duty period;
6. Signs and symptoms of fatigue not only in oneself, but in other team members;
7. Compliance with work hours limits imposed at the various levels of education; and,
8. Team development.

A typical Otolaryngology patient care team consists of one or more Attending Faculty, a Senior and/or Chief Resident, and a Junior Resident.  There will sometimes also be visiting residents from Plastic Surgery, Family Medicine, or another discipline, as well as Senior Medical Students who function as Acting Interns.  Additional team members include the nurses, social workers, etc.  In general, the roles of the caregivers on these teams are:

1) **Intern (PGY1):  The intern will function as the junior resident on the services they are assigned to during their intern year, with the understanding that much of this is new to them and that they deserve deliberate instruction and supervision above and beyond what a PGY2 or 3 would require. The Intern:**

   a) Is responsible for initiating a personalized plan of study

36

b)  Is responsible for becoming familiar with the institution and team members
c)  Performs medical histories and physical examinations in the outpatient clinics, emergency departments, and for inpatient consultations
d)  Rounds with attending physicians
e)  Participates in all assigned surgical cases in the operating room
f)  Follows up on patient care data and issues

2)  **Junior Resident (PGY-2, PGY-3): The junior residents are expected to learn to perform appropriate history and physical examinations.  Appropriate management of the postoperative patient is emphasized.  In addition, they are expected to make basic diagnoses and formulate appropriate treatment plans.  A resident at this level should receive a basic understanding of the pathophysiology of disease processes.  An understanding of basic surgical techniques is promoted. The Junior Resident:**

a)  Is responsible for the daily care of the inpatient services
b)  Performs medical histories and physical examinations in the outpatient clinics, emergency departments, and for inpatient consultations
c)  Sees and evaluates consults as requested and discusses the case with the senior resident and attending physicians
d)  Performs common bedside procedures
e)  Rounds with attending physicians
f)  Assures that patients are ready to go to the operating room
g)  Participates in all assigned surgical cases in the operating room
h)  Follows up on patient care data and issues
i)  Communicates with patients and family members if assigned this duty by attending physicians
j)  Shares relevant patient data with senior residents and attending physicians
k)  Calls consultants
l)  Presents cases at multidisciplinary patient management conferences
m)  Teaches students, sometimes teaches resident and faculty

3)  **Senior Resident (PGY-4): Senior level residents are expected to progress in their ability to arrive at appropriate diagnoses and institute treatment plans to the point that they could be expected to practice independently at the end of their residency.  The senior resident is expected to gain proficiency with all surgical techniques utilized in the clinical areas outlined for each service.  The resident is involved in progressively more difficult and sophisticated diagnostic and surgical procedures as their skills and knowledge grow.  They have progressively greater responsibilities in decision making as well.  Emphasis is placed on functioning as a consultant and communicating effectively with referring physicians, parents and families.  The Senior Resident:**

a)  Has mastered the duties of the junior residents above
b)  Assists with the supervision and teaching of junior residents and medical students
c)  Assists with the coordination and scheduling of the activities of the service
d)  Ensures appropriate history and physical examination for each admitted patient
e)  Communicates with patient's referring physicians, by phone or in writing
f)  Leads work rounds by evaluating the junior resident's treatment plan
g)  Reviews and documents proper patient consent procedures for surgery
h)  Writes the preoperative note on surgical patients
i)  Teaches junior residents, students, and sometimes faculty

37

OAG-0013367

4) **Chief Resident (PGY-5):** Often there will be either a PGY4 or PGY5 as the only upper level resident on a team.  The PGY5 performs all the duties of the senior resident, and in addition has additional responsibilities and higher expectations in his or her role as a Chief Resident.  Chief level residents are expected to round out their exposure to these subspecialty areas.  A greater level of understanding is obtained through teaching more junior residents.  The residents at this level are afforded the opportunity to improve their administrative and teaching skills as they take an active role in the administration of the service and education of junior residents and medical students.  A major goal is to allow enough exposure to all aspects of Otolaryngology so that at a chief resident level they could function independently even with most complex problems in this area.  The Chief Resident:

   a)  Has mastered the duties of the senior residents above
   b)  Assists Senior Resident in any manner possible
   c)  Takes primary 'resident as teacher' role
   d)  Coordinates resident coverage of surgical procedures
   e)  Develops the resident call schedules in concert with the program director
   f)  Is directly accountable to the attending for the entire service
   g)  Assigns Grand Rounds topics
   h)  Monitors vacation and leave requests, ensuring compliance with the department leave policies


5) **Attending Faculty:**
   a)  Oversees team function and overall patient care
   b)  Teaches housestaff and medical students
   c)  Monitors and oversees surgical and discharge planning
   d)  Supervises surgical procedures
   e)  Accepts ultimate legal responsibility for the patient's welfare
   f)  Learns from other team members
   g)  Assures attendance of team members at all required conferences

**REQUIRED COMMUNICATION WITH FACULTY REGARDING PATIENT CARE**

While open communication is encouraged at every level of patient care, the following circumstances require that the responsible attending be notified in the time frame specified:

- all admissions must be discussed with the responsible faculty member (and the on-call faculty as well, if they are not the same) as soon as feasible and within 12 hours;
- all consults must be discussed with the responsible faculty member (and the on-call faculty as well, if they are not the same) as soon as feasible and within 12 hours;
- all notes routed to an attending for co-signature must be discussed with that attending as soon as feasible after the note is entered.  The note must specify the level of supervision provided by the attending (see below);
- any significant change in a patient's condition must be discussed with the responsible faculty member (and the on-call faculty as well, if they are not the same) immediately.  Specific conditions requiring such communication are as follows:

38

OAG-0013368

- Deterioration of a known condition
- Development of a new condition
- Transfer to a higher level of care (floor to ICU, consulting teams recommendation for intervention, especially if operative)
- Request for de-escalation or withdrawal of care
- Intent to leave against medical advice (AMA)

**Daily inpatient rounding should be done before conferences, surgeries or clinics and attendings should be updated on their patients before 8 am**.  Each faculty member has personal preferences for the means of such communication; however, it is best to err on the side of immediate, two-way communication—in person or by telephone—so that decision-making and teaching are optimized**.**  In particular, one-way communication such as voice mail, texting, or unanswered email, is considered insufficient.  Note also that Personal Health Information (PHI) may not be communicated via smart phone or text pages.  Upon beginning a rotation or a call period with a new team, the team should discuss explicitly their plan for communicating different levels of information.

The level of responsibility and independence will progress for each year of training with demonstrated competency.  While the operating faculty member and the on-call faculty member should be made aware of all of the above, the following progression of competency is expected.

At the INTERN LEVEL, all of the above situations must be communicated to the directly supervising physician at once and all patient and staff interactions should be directly supervised to facilitate learning.

At the JUNIOR RESIDENT LEVEL, the PGY2 or PGY3 resident is expected to be able to make the initial assessment and communicate the findings accurately to the supervising physician.  They may also have initial fact-finding conversations with patients or family in order to better inform the supervising physician (particularly in decision-making scenarios such as de-escalation of care.)  The Basic Introductory Course includes modules on palliative care and talking to patients about DNR and levels of care, so all residents have didactic background in this area and will be exposed to such situations in a supervised setting in the intern year.  However, the nature of these conversations can be difficult, so the junior resident is expected to confine him or herself to fact-finding, exploration and accurate and prompt presentation.  As the resident progresses and demonstrates these skills, it will be expected that the resident will begin to formulate appropriate plans for referrals, interventions and use of hospital systems such as care management, chaplaincy, and patient services.

At the SENIOR RESIDENT LEVEL, the PGY4 or PGY5 will have demonstrated competence in recognizing and communicating emergent situations in both the clinical and the psychosocial realm, and increasing ability to propose safe and reasonable plans.  These residents should be able to supervise the JUNIOR LEVEL RESIDENTS in the above competencies, to provide thoughtful trouble shooting of proposed plans, and to communicate promptly and effectively with the ATTENDING with decreasing need for alteration of the plan.

39

At the CHIEF LEVEL, the PGY5 resident should be able to assess the competence of the JUNIOR RESIDENTS and SENIOR RESIDENTS in all of these activities and delegate responsibility appropriately, bringing remedial issues or concerns to the attention of the Program Director.  At this level it is expected that the CHIEF RESIDENT will be both competent and comfortable interacting with distraught and grieving families, including the recognition of anticipatory grief.  Additionally, we pride ourselves on having consult residents teams that are calm and competent in emergency situations and bring a level head and good interpersonal skills to stressful clinical situations.  While it is expected that the competent CHIEF LEVEL RESIDENT will be able to formulate and carry out complex and correct plans of care, the expectation is not that there will be decreased responsibility for communicating with the ATTENDING; rather, the ATTENDING will then serve in more of an advisory role, with prompt personal presence as needed, depending on the acuity of the situation and the personalities involved.

**TRANSITIONS OF CARE**

- All residents and faculty members must demonstrate responsiveness to patient needs that supersedes self-interest. Physicians must recognize that under certain circumstances, the best interests of the patient may be served by transitioning that patient's care to another qualified and rested provider.

- Our clinical assignments are designed to minimize the number of transitions in patient care.
  - We schedule our block rotations so that teams change only every three or four months, and stagger the teams so that not everyone changes at the same time.  We limit the attendings and the specialties on each team so that there is congruity of cross coverage and minimal discordance between clinic and operative subject matter.
  - The transitions that we identify are:
    - Day to night teams.  Most of our faculty will answer calls on the patients whom they have operated regardless of whether they are on call.  The residents are expected to hand over care of these patients to the call team in order to ensure that all residents have adequate rest and relaxation and do not experience the stress of being available 24/7.  This transfer of care is effected daily by phone or by email and when feasible, by joint rounding in the afternoon.  This is mandatory for complex patients such as free flap patients.
    - Week to weekend teams.  We have carefully considered the pros and cons of having one or two weekend teams, and strongly believe that the continuity of care afforded by one weekend team is far superior.  The workload of the service and the composition of the team (JR, SR, Attending, and Backup Attending) are such that this can be done without violating duty hours requirements or overworking any member of the team.  The protocols for team fatigue assessment and mitigation are below.  The weekend sign-out occurs on Friday mornings at Planning Conference, which is attended by all campus residents and at least one faculty member.  Thus the sign out is supervised by CHIEF and SENIOR RESIDENTS and ATTENDINGS.  Current inpatients, Friday surgical patients, and any anticipated outpatient issues are reviewed and proactive plans formulated.  If any member of the weekend call team is not present, this information is communicated to him or her via email that morning so that questions can be answered before the weekend.

40

- ▪ Block to Block transfers.  This is done in a person-to-person meeting with review of the current inpatients, currently active outpatient issues, upcoming operations, and review of faculty preferences and protocols.  In the Didactic Day that precedes each block transfer, one team is chosen to demonstrate a real-time sign out for instruction, role modeling, and feedback.
  - ▪ Consult to primary team transfers.  At times, a consult will require the expertise of a faculty member other than the one who staffed the consult.  This will usually entail transferring that patient into the care of that attending and the residents working with that attending.  We strive to minimize the discontinuity in this by having one resident (the TDC Campus Chief) receive and delegate and follow up on all the consults during his or her four month rotation on the D Team during their PGY4 year.

- • Effective, structured hand-over processes are monitored to facilitate both continuity of care and patient safety.  Residents must demonstrate competency in communicating with team members in the hand-over process.  The schedules that inform all members of the health care team of attending physicians and residents currently responsible for each patient's care are readily available at the institutional level.
  - ○ The attendings responsible for each patient's care are readily available to all members of the health care team:
    - ▪ On the white board in each patient's room
    - ▪ On the nursing chart at each station
    - ▪ On the patient's EPIC electronic medical record
    - ▪ On the composite ENT patient list the EPIC electronic medical record.
  - ○ The residents responsible for each patients care are readily available to all members of the health care team:
    - ▪ On the monthly call schedule which delineates which residents are working full time with the attendings
    - ▪ On the monthly call schedule which delineates which faculty and residents are on call together on nights and weekends.  While faculty often continue to manage their patients through the nights and weekends, we acknowledge the crucial role that the call teams play in being immediately and always available for all ENT patients, consults and questions during these hours.
    - ▪ Additionally, the EPIC electronic medical record makes available all of the progress and procedure notes on each patient so that the operating surgeon or the physician who has most recently assessed the patient can be immediately identified.

- • The Chief Residents and faculty monitor the hand-over process by direct observation and by audit of consultation notes and subsequent progress notes.

**ALERTNESS MANAGEMENT AND FATIGUE MITIGATION**

Our program:
- • educates all faculty members and residents to recognize the signs of fatigue and sleep deprivation;

41

OAG-0013371

- educates all faculty members and residents in alertness management and fatigue mitigation processes; and,
- adopts fatigue mitigation processes to manage the potential negative effects of fatigue on patient care and learning, such as naps or back-up call schedules.

Our program has a process to ensure continuity of patient care in the event that a resident may be unable to perform his/her patient care duties.   There are always three levels of back up for any resident duty (JR, SR, Attending, and Backup Attending.)

UTMB provides adequate sleep facilities for residents who may be too fatigued to safely return home. *** There are 35 private sleep rooms on the twelfth floor of John Sealy Towers for this purpose.  ***

The Otolaryngology department provides housing in Houston for the residents rotating there in order to optimize opportunities for rest and minimize the need for extensive driving.

## PROGRESSION

Residents beginning their otolaryngology training begin a closely supervised, stepwise progression through learning surgical procedures.  The PGY1 will spend six months on our services, getting acquainted with the institution and teams.  The PGY2 is closely supervised and performs less complex procedures such as upper airway endoscopy, tonsillectomy, adenoidectomy, myringotomy with tube insertions.  Common surgeries for a typical PGY3 resident would include nasal reconstruction, tympanoplasty, sinus surgery and other oral and oropharyngeal procedures.  For a PGY4, procedures would include major head and neck cancer resections with neck dissection, parotidectomy, thyroidectomy, surgery for sleep apnea, and mastoidectomy.   For a PGY5, these would include major head and neck reconstructive procedures, complex ear surgery, pediatric airway surgery, and cosmetic procedures.  The progression of an individual resident, however, may be slower or more rapid than this, depending on faculty assessment of surgical judgment and technical capability.  The end result of this process is a graded, individualized progression of responsibility and independence during the five years of otolaryngology residency training.

### Conditional Independence

- "Conditional independence" is an intermediate level of progressive responsibility based on documented achievement of milestones and development of competency.  Your demonstration  of competencies is discussed and recorded in your semiannual evaluation with the Program Director.

## PARITY

According to the *ACGME Program Requirements for Graduate Medical Education in Otolaryngology,* the program must "demonstrate that residents have essentially equivalent and adequate distribution of case categories and procedures.  Significantly unequal experience in volume and/or complexity of cases managed by the residents will be considered serious noncompliance with these requirements."

Following the spirit of that mandate, we view the individualization of learning experiences to be a means to ensure comparable competence in all of our graduating residents, not an avenue to the development

42

of significant subspecialty expertise.  We are committed to graduating excellent Otolaryngologists who are prepared for any further training they wish to pursue.

We will attempt to identify any inequities in the experience of similar level residents. If any level resident has had less experience with certain categories of procedures, we will try to supplement the resident's experience in this area to allow progression at what we consider to be a normal pace for this level of resident.  We also try to progress the junior residents according to their individual capabilities.

**SUPERVISION**

Every admitted patient has a designated faculty member who is responsible for that patient's care.  The attending of record for each patient is kept up to date in the EPIC electronic medical record and is prominently displayed in each patient's room on the Plan of Care white board.  Residents are given increasing responsibility in a progressive fashion as they are observed to be prepared to accept additional responsibility over the five-year period of their training.  The chief resident or senior resident on a service is expected to report any significant events or problems to the faculty who are involved and responsible.  More senior residents are also expected to have a broad general responsibility for many aspects of the service upon which they are rotating.  These general responsibilities will include the daily evaluation of patients, the evaluation of laboratory and imaging information, interaction with the patient and the patient's family and the supervision and assignment of duties and educational activities for the junior residents on the service.  In the operating room, the chief resident or senior resident has usually reached a point at which he or she may participate in complex procedures, always under the supervision of the faculty who is involved and responsible.  Over the years of an otolaryngology residency, the residents are offered progressively increasing responsibility and participation in surgical procedures based upon their performance.  Faculty on a service will be in the operating room for every operation performed by a resident and the decisions for delegating aspects of an operative procedure will be made by the faculty.  The chief resident or senior resident may also participate in relatively less complex operative procedures along with the junior residents and serve as instructors and teachers of junior residents with the faculty present to assure quality of care.

Residents who have achieved an appropriate level of competence in the opinion of their faculty may serve as consultants for patients who are referred from other services as well as serving actively in the outpatient clinics and actively in the management of patients on the surgical services.  They are expected at all times to refer problems or questions to the senior resident or to the chief resident and simultaneously to refer all appropriate issues to the faculty involved and responsible.  In each event, this supervision is simultaneously supervised by the faculty for that service.

The more junior residents are advised that they should always err on the side of caution and that referral of all questions and uncertainties to senior level residents and faculty is mandatory.  Junior level residents are observed for their ability to assess patients and to collect clinical information, laboratory information and imaging information about their patients.  It is expected that over time these individuals will gain skills at interpreting this information and as their interpretation and problem-solving skills improve it is anticipated that they will progress and be provided further independence.  During the intern rotations and at the beginning of the PGY2 year, it is understood that the independence of

43

OAG-0013373

residents will be minimal and that referral of important issues and information to more experienced residents and to faculty will be the norm.

Thus, all clinical activity is ultimately supervised and is the ultimate responsibility of the faculty on the service.  Each of the levels of otolaryngology residents is provided increasing amounts of responsibility on clinical services and in the operating rooms, and the decision to allow increasing levels of responsibility is based on direct faculty observation in order to ensure a high quality of patient care under the watchful supervision and monitoring of the faculty on each clinical service.

**Levels of Supervision**

To ensure oversight of resident supervision and graded authority and responsibility, we use the following classification of supervision:

- **Direct Supervision**

The supervising physician is physically present with the resident and patient.

- **Indirect Supervision**

With direct supervision immediately available – the supervising physician is physically within the hospital or other site of patient care, and is immediately available to provide Direct Supervision.

With direct supervision available – the supervising physician is not physically present within the hospital or other site of patient care, but is immediately available by means of telephonic and/or electronic modalities, and is available to provide Direct Supervision.

- **Oversight**

The supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered.

**IN EVERY PATIENT ENCOUNTER, THE SUPERVISING PHYSICIAN AND LEVEL OF SUPERVISION MUST BE DOCUMENTED.**

**Supervision of PGY1 Residents**
In accordance with the Otolaryngology RRC's guidelines, we have defined those physician tasks for which PGY-1 residents may be supervised indirectly with direct supervision available.  "Direct supervision" in the context of our program means supervision by another physician who has achieved documented competency in the task in question.  Usually this will be a more senior resident or an attending.

Examples of defined tasks for which PGY-1 residents may be supervised indirectly and examples of defined tasks that PGY-1 residents should have direct supervision until competency is demonstrated are:

44

OAG-0013374

**Indirect supervision is allowed for:**
    a. Patient Management Competencies
        1. Evaluation and management of a patient admitted to the hospital, including initial history and physical examination, formulation of a plan of therapy, and necessary orders for therapy and tests
        2. Pre-operative evaluation and management, including history and physical examination, formulation of a plan of therapy, and specification of necessary tests
        3. Evaluation and management of post-operative patients, including the conduct of monitoring, specifying necessary tests to be carried out, and preparing orders for medications, fluid therapy, and nutrition therapy
        4. Transfer of patients between hospital units or hospitals
        5. Discharge of patients from the hospital
        6. Interpretation of laboratory results
    b. Procedural Competencies
        1. carry–out of basic venous access procedures, including establishing intravenous access
        2. Placement and removal of nasogastric tubes and Foley catheters
        3. Arterial puncture for blood gases

**Direct supervision is required until competency is demonstrated for:**
    a. Patient Management Competencies
        1. Initial evaluation and management of patients in the urgent or emergent situation, including urgent consultations, trauma, and emergency department consultations (ATLS required)
        2. Evaluation and management of post-operative complications, including hypotension, hypertension, oliguria, anuria, cardiac arrythmias, hypoxemia, change in respiratory rate, change in neurologic status, and compartment syndromes
        3. Evaluation and management of critically-ill patients, either immediately post-operatively or in the intensive care unit, including monitoring, ventilator management, specification of necessary tests, and orders for medications, fluid therapy, and enteral/parenteral nutrition therapy
        4. Management of patients in cardiac arrest (ACLS required)
    b. Procedural Competencies
        1. carry-out of advanced vascular access procedures, including central venous catheterization, temporary dialysis access, and arterial cannulation
        2. Repair of surgical incisions of the skin and soft tissues
        3. Repair of skin and soft tissue lacerations
        4. Excision of lesions of the skin and subcutaneous tissues
        5. Tube thoracostomy
        6. Paracentesis
        7. Joint aspiration
        8. Advanced airway management
    c. endotracheal intubation
    d. tracheostomy

OAG-0013375

# Curriculum: Specific Activities

Beyond the general principals, the curriculum of our residency program comprises:

- Scholarly activities
- Didactic activities
- Clinical activities
    - Competency-Based Goals and Objectives for each assignment at each educational level are available on Blackboard and are reviewed at the beginning of each rotation.

**SCHOLARLY ACTIVITES**

**Resident Reading Program**

Graduate medical education is largely self-directed, guided by the principles of the Practice-Based Learning and Improvement Competency.  Our residents are expected to commit to a lifetime of rigorous study that includes both mastery of established knowledge and contribution to new investigation.  To cultivate this, we maintain, through the Moody Medical Library and the departmental s drive, access to extensive educational and research resources.  The initial allocation of resources to each entering intern is intended to provide either textbooks or the electronic media for accessing educational materials.

It is essential, in order to progress in your Otolaryngology residency, that you pursue an active course of independent reading.  You will, of course, be reading for Journal Club, for the Home Study Course, and for the weekly didactic schedule.   You will develop great facility in locating information online and judging the quality of current literature.  You need, however, to form a firm foundation for these readings from standard texts.

1. During the first two years you are required to read a comprehensive otolaryngology text. The official texts of our Department are either the comprehensive textbooks by Bailey or Cummings.

2. In your last two years you should read from the following types of subspecialty texts: head and neck oncology, otology, pediatrics, laryngology, and facial plastics. The Goals and Objectives for each rotation include specific bibliographic sources and reading assignments.

In addition to scheduled independent study, you should read for individual surgical cases and patient management issues.

You should focus on committing yourself to your personal education over the next four years rather than worrying about being disciplined for not completing the above stated reading curriculum.  There will be no formal mechanism for documenting your compliance.  However, if it is apparent from your participation in didactic events or from your in-service scores that you are not keeping pace with your training level, you will be assigned specific reading assignments with follow-up testing.  If you follow these reading guidelines, you will emerge as one of the best-educated residents in the country.

46

**Resident Research Program**

In order to engage residents in research, a structured Research Program exists and is governed by the following guidelines.  The Director of Resident Research and the Chair of the Resident Research Committee is Dr. Tomoko Makishima.  All questions about the Resident Research Program should be addressed to Dr. Makishima and will be addressed by the Committee.

The Resident Research Program is an important required aspect of the Department's training program. Opportunities are provided in time, facilities, and personnel for all residents to conduct significant research during their residency program.  The protected time in the third year for the research rotation is but one part of the research program, and is provided in order to facilitate the residents' ability to meet expectations for scholarship.

Each resident is required to complete a minimum of two clinical or basic science projects suitable for presentation at a scientific meeting and/or suitable for publication.  Submission of a publication to a peer-reviewed journal is a requirement for graduation.  Residents are expected to be active in research for the entirety of their residency, and are required to present at the annual Byron Bailey Surgical Society at the completion of the PGY3 and PGY5 years.

During the PGY3 year, a three-month research rotation is allotted for protected research time.  The purposes of this rotation are twofold:  to learn to analyze, in a critical fashion, problems that are most successfully addressed by the scientific method; and to enhance one's ability to ask questions, formulate methods to test hypotheses, and analyze the results of those tests.  Pragmatically, this gains importance in the assessment of a variety of clinical tests, and more importantly, in the evaluation of scientific literature related to the clinical practice of otolaryngology.  Professionally, another benefit of research training is in enhanced abilities and opportunities to satisfy the membership requirement of professional groups, such as the Triological Society.  Another more obvious advantage of research training is for those residents planning a career oriented toward academic medicine.

The range of topics for research in recent years has been quite broad, including both clinical and basic science studies.  The Department is equipped with extensive facilities that are either directly available to the resident or can be used in conjunction with ongoing research through arrangement with the faculty investigator in charge of that research.   Interdisciplinary projects are encouraged.   The active participation of the faculty mentor is highly valued and their presence is required at significant milestones in the research development process as specified by the Resident Research Committee.

**Research Conference**

There is a dedicated quarterly research conference as part of the weekly Didactic Schedule which will alternate between assigned resident updates according to the committee schedule and lectures or learning activities directed to exposing residents to the research of departmental faculty and collaborators as well as to broadening their exposure to research methodology.  Residents also have the opportunity to practice oral presentations and posters in front of the Otolaryngology faculty and their peers before the final presentation and local or national conferences.

**Resident Research Documentation**

47

Dr. Makishima will maintain a grid of research goals and expectations as well as a research portfolio for each resident.  Prompt completion of these documents is a requirement of the residency and materially contributes to the competency of Professionalism.  The Resident Research Portfolio must be updated by all residents by December 31 and May 31 of each year.

**Resident Research Presentations**

The PGY3 and PGY5 residents will present 8-minute research presentations at the Byron Bailey Surgical Society meeting in June of each year.  Residents in other years who wish to present or to be considered for the annual resident research award may apply to the Research Committee for approval.

**Resident Research Award**

Each year, an award is given for the best research project. The award is voted on by the attendees of the Byron Bailey Society using a predetermined scoring process developed by the Resident Research Committee.

**Biostatistics**

The department fully supports residents' use of the Core Facility in Biostatistics for approved projects.

**Funding**

Funding for resident research projects is available from the department, but every effort will be made to submit requests for outside funding when available and appropriate.  The budget submitted must be approved by the Director of Resident Research and the Program Director for the research to go forward.

**Submission of Proposals and Presentations**

**NO GRANT APPLICATIONS, IRB PROPOSALS, ABSTRACTS, OR MANUSCRIPTS ARE TO BE SUBMITTED WITHOUT WRITTEN PERMISSION OF THE PRIMARY FACULTY MENTOR, ALL AUTHORS, AND THE DIRECTOR OF RESIDENT RESEARCH.**

**Failure to Comply**

Failure to comply with the revised guidelines may result in forfeiture of your research time and potential for probationary status.  This does not release you from the responsibility of completing your research project.

**DIDACTIC ACTIVITIES**

While the majority of your study will be self-directed, the department does sponsor a number of didactic activities which bring residents and faculty together to learn and teach in a collaborative environment.  Our didactics comprise:

- Conferences
- Courses
- Labs
- Examinations

**Didactic Conferences**

48

Conferences will be held weekly and monthly according to a published schedule to provide didactic and interactive teaching. All residents are expected to attend and to arrive early enough so that we can start exactly on time. This does not mean that you should arrive right at the starting time but rather means you arrive before the starting time. You should stay until the end of conference unless you are given prior approval from the faculty in charge to leave early. Non-emergency patient care is not an acceptable reason for being late to or leaving conference. All resident education conferences are mandatory. They should not be missed unless a patients' life or health would be threatened by the resident's absence. Reasons for such absence must be communicated to Dr. Szeremeta as soon as it is feasible. Resident promptness, presence, attentiveness, and participation in all teaching sessions are mandatory. The conference room should be left clean and in order after each use. The AV equipment should be turned off and the last person out should lock the door. No equipment is to be removed from the conference room without permission from the faculty.

Our didactic schedule includes the weekly conferences beginning at 7 AM and concluding at 8:45 every Wednesday morning. The first Wednesday of the month is a combined lecture with Plastic Surgery. The third Wednesday is M&M at 7 AM with a formal Grand Rounds at 8 AM. For those months with 5 Wednesdays, the fourth Wednesday will be devoted to QI. Every Monday there is Tumor Board and there is a quarterly Endocrinology conference. Quinn Rounds are held every Thursday afternoon at 3:45 PM and will include didactic material as well as rounding on inpatients with practical didactics.

All residents (except the one PGY3 and PGY4 in Houston) are required and supported to attend and weekly departmental and multidisciplinary conferences on the main campus.

**ALL PARTICIPANTS IN THE INTELLECTUAL LIFE OF THE DEPARTMENT HAVE EXPLICIT EXPECTATIONS FOR THEIR CONTRIBUTIONS.**

The residents are responsible for

- preparing and presenting two Grand Rounds a year with topics assigned by the Administrative Chief Resident  from the two-year Basic Science curriculum, direct faculty mentorship, and online publication in Dr. Quinn's Online Textbook;
- preparing and presenting one Multidisciplinary Conference a year, with direct faculty mentorship. These conferences can include:
  - ➤ Facial Plastics (ENT, Plastic Surgery, Oromaxillofacial Surgery)
  - ➤ Head and Neck Endocrinology (ENT, Endocrinology, Nuclear Medicine)
  - ➤ Quinn Rounds

- preparing and presenting cases at M&M Conference, Tumor Board, and Planning Conference;
- preparing and presenting research updates at Research Conference and a final presentation at Resident Research Day;
- presenting brief evidence-based reviews and recommendations assigned at the previous week's Planning Conference;
- participating fully in the Site Specific Conference(s) at each site when they are rotating there;
- teaching in the Basic Introductory Course and Anatomic Dissection Course as asked;
- The Chief Administrative Resident is responsible for assigning Grand Rounds topics; and
- The UTMB D Team Senior Resident is responsible for assigning and confirming topics for Multidisciplinary Conferences.

49

OAG-0013379

**EVERY RESIDENT PRESENTATION IS INTENDED PRIMARILY AS AN EDUCATIONAL OPPORTUNITY FOR THAT RESIDENT.**
**EVERY RESIDENT PRESENTATION REFLECTS DIRECTLY ON THE EDUCATIONAL INTEGRITY OF THE DEPARTMENT AS A WHOLE AND THE FACULTY MENTOR SPECIFICALLY.**
**THEREFORE, EVERY RESIDENT PRESENTATION MUST BE MENTORED AND APPROVED BY A FACULTY MEMBER ACCORDING TO THE GUIDELINES BELOW.**

The faculty members are responsible for:

- Serving as Faculty Mentor for at least two lectures per year.  This responsibility comprises:
    a.  Providing oversight to ensure an integrated and productive educational experience
    b.  Being present, or having a co-faculty-mentor present for the lecture to moderate and provide leadership
    c.  Working with the residents assigned to give Grand Rounds on that day to ensure appropriate topics and timely interaction with their faculty mentors
    d.  Identifying a guest lecturer (either from another department within UTMB or from another institution) to be invited to participate
    e.  Researching and piloting novel educational activities (debates, competitions, labs etc)
    f.  Working with the residents assigned to that month to develop the monthly Journal Club (whether it occurs on Conference Day or another day during the month.)
- preparing and presenting at least two Faculty Lectures a year;
- mentoring or moderating  at least one Multidisciplinary Conference a year;
- actively mentoring residents in their Grand Rounds preparation and acting as an expert respondent after the presentation;
- actively suggesting and recruiting Visiting Professors;
- contributing cases to the Mock Orals file, and giving Mock Orals when asked;
- choosing articles and moderating Journal Club at least once a year;
- teaching in the Basic Introductory Course and Anatomic Dissection Course as asked;
- the Director of Resident Research, Dr. Tomoko Makashima, is responsible for moderating Research Conference;
- the Program Director, Dr. Szeremeta, is responsible for moderating Resident Meeting and Op Log Review; the Program Director is also responsible for the design and implementation of the Multidisciplinary Conference schedule.

**Weekly Grand Rounds**

This weekly conference represents the core of the didactic education program for the residents and is structured around a 2 year cycle as described by COCLIA.  The 7 AM lectures should all be considered formal Grand Round Lectures. On the third Wednesday of the month, M&M Conference takes place at 7 AM and the Grand Rounds lecture is at 8 AM. In months where there are 5 Wednsedays, the 4th Wednesday will be devoted to QI.  It is the faculty's responsibility to make every effort to attend all the formal Grand Round Lectures.  This is mandatory for M&M and any lecture where the faculty is serving as the mentor for the resident lecture.  The other protected hours for Wednesday mornings will be devoted to COCLIA questions, Board review questions, case discussions, and Mock Oral Boards. The interactive nature of these other hours are dependent on the faculty input expertise and mentorship for

OAG-0013380

they time to be used effectively, thus faculty should make every effort to attend as many of these conferences as possible.

> The lecture topics will be assigned by the Program Director at the beginning of the year and the Grand Rounds topics are assigned by the Administrative Chief at the beginning of the year according to a two-year repeating schedule of topics drawn from Dr. Bailey's textbook.  Faculty Mentors will also select lectures they wish to give or mentor at the beginning of the year as well. Grand Rounds presentations are to be 30-45 minutes. Each resident is to prepare these Grand Rounds using the computer.  The "handout" file (Microsoft Word file) and the slide presentation file (Microsoft PowerPoint file) must be placed on the Department's computer network for access by faculty for publishing on the Internet and for archival purposes.

> The teaching skills necessary to nurture collegial education and life-long learning are taught most explicitly in the residents' preparation of their Grand Rounds presentations. While the topics are assigned from a two-year repeating curriculum, the resident is required to formulate a specific question related to that topic that is of current interest or addresses an active controversy, rather than giving a broad overview.  **THE RESIDENT PREPARES AN INITIAL BIBLIOGRAPHY AND APPROACHES A FACULTY MENTOR NO LESS THAN ONE MONTH AHEAD OF TIME TO CONFIRM THE FOCUS AND DIRECTION OF THE TALK.  A FORMAL SLIDE PRESENTATION IS PREPARED AND REVIEWED WITH THE FACULTY MENTOR NO LESS THAN ONE WEEK AHEAD IN ORDER TO MAKE ADDITIONS AND CORRECTIONS AND TO ALLOW THE FACULTY MENTOR TO PREPARE RESPONDENT'S REMARKS.**  The presentation is given to all the residents, faculty, and medical students in such a way as to engage all those levels of learners.  The respondent's remarks are made and the resident moderates a general discussion. Subsequently, the presentation and an accompanying text manuscript are submitted to Dr. Quinn for final editing and approval for posting in the *Online Textbook of Otolaryngology.*  These presentations receive feedback online from all over the world. The formality of finalizing their Grand Rounds in this way teaches them the value of soliciting ongoing formative feedback and gauging the effect of their educational efforts on others.

- **Mock Orals**
  > Periodically as part of the Wednesday morning conference as well as Quinn Rounds – Mock Orals will be held to allow residents to practice the oral presentation skills.

Monthly conferences that are not included in the normal Wednesday morning schedule

- **Morbidity and Mortality Conference**

51

OAG-0013381

➤ The goal of the M & M conference is to review unfavorable/unexpected outcomes so we can continually improve our patient care.  Cases to be presented at M&M include: those in which death, either expected or unexpected, resulted; and those that resulted in an unexpected morbidity which led to patient dissatisfaction, increased hospital stay, another operative procedure, an unfavorable outcome or extended medical care.  If in doubt about whether a case should be discussed, consult the attending responsible for the case.   The Administrative Chief Resident is responsible for maintain a list of all of the cases performed by the department members each month, actively soliciting cases to be presented each month, and co-coordinating the documentation with Dr. Underbrink.

The primary surgical resident involved in the M & M case should be prepared to discuss the case in detail.  He or she should have available at the time of presentation the following (when applicable to the discussion):  pathology results, imaging studies, pre-, intra-, and post-operative photographs, and pertinent laboratory information.  The discussion should include whether (and how) an improvement in the process of patient care could help prevent this outcome in the future.  It is critical that the resident presenting the complications have reviewed the literature and present a concise erudite discussion.  Appropriate literature might be provided to attendees.

All discussions at M & M Conference should be considered confidential.  The cases should not be discussed outside of the M & M Conference.  It is the duty of the individual in charge of the conference to dispose of the forms after the conference.  At no time should the information discussed in M & M conference be made part of the patient's chart.

- **Quality Improvement Course**
  - ➤ All Otolaryngology residents are integrated and actively participate in interdisciplinary clinical quality improvement and patient safety programs.
  - ➤ We believe in the importance of teamwork and choose to focus each year on a department wide Quality Improvement Project in which all of the residents and faculty are expected to be active participants.  This increases the sense of ownership and accountability.  Recent QI projects have included the use of the Nerve Integrity Monitor in endocrine surgery; and the Development and Deployment of standardized equipment carts and pharmacy carts for the on call and consult teams.
  - ➤ Residents are educated in Quality Improvement research methodology and must participate in an interdisciplinary Quality Improvement project during their residency.
    - All residents are required to participate in the Institute for Healthcare Improvement (IHI) Open School.  Sample modules such as "Fundamentals of Improvement" and "Measuring Improvement" are done as a group during Wednesday morning didactics in order to familiarize the residents with the site.  All residents are required to obtain the IHI Open School Certificate during their

OAG-0013382

first two years of residency.  The IHI Open School can be accessed at
http://www.ihi.org/Pages/default.aspx.

- ➢ Quality Improvement is an integral part of the goals and objectives for Practice Based
Learning and Improvement in each rotation and is assessed in the formative evaluations
from each rotation.
- ➢

- **Journal Club.**
  - ➢ Monthly Journal Clubs will be held from September – May (excluding February to allow
  for inservice study)
  - ➢ Articles will be selected from the chosen Home Study Book
  - ➢ Each Journal Club will have at a minimum one faculty mentor / facilitator who will assist
  the Chief Residents in selecting appropriate articles from the Home Study Course

  - ➢ The evidence in each article must be categorized by the following system:
    - ▪ Level 1.  Randomized controlled trials or a systematic review (meta-analysis) of
    randomized controlled trials.
    - ▪ Level 2.  Prospective (cohort or outcomes) study with an internal control group
    or a systematic review of prospective, controlled trials
    - ▪ Level 3.  Retrospective (case-control) study with an internal control group or a
    systematic review of retrospective, controlled studies
    - ▪ Level 4 Case series without an internal control group (retrospective reviews;
    uncontrolled cohort or outcome studies)
    - ▪ Level 5. Expert opinion without explicit critical appraisal, or recommendation
    based on physiology/bench research.

  A resident will then summarize the high points of each article and offer a critique of the
  study design or the conclusions.  The floor will then be open for discussion.  All residents
  must read all of the assigned articles.

Weekly conferences will vary according to site.  On the Houston rotations at MDA and Methodist,
residents assigned to those sites will attend the didactic lectures at those institutions and be excused
from didactic activities at UTMB. They also are expected to attend the monthly Houston Society of
Otolaryngology meeting and guest lecture.  This meeting provides dinner at a nice restaurant, so it is
important to R.S.V.P. promptly and accurately.   The MDACC rotation has a rich, almost daily schedule of
didactics which the residents rotating there are required to attend.

On the UTMB campus, weekly recurring conferences include:

- **Tumor Board, A-Team Case Management and Teaching Rounds  (MONDAY 4:00-6:00PM)**

53

➢ Tumor Board takes place on Monday afternoon at 4:00 PM in the Vaughn Center and is followed immediately by Head and Neck Management Meeting in which Case Management notes and orders are entered in EPIC. Following that, A Team teaching Rounds are held.   All residents and faculty submit their cancer patients (excluding well differentiated thyroid cancer patients) for presentation at Tumor Board.  These names must be submitted by the preceding Wednesday at 5:00 PM to allow Pathology ample time to pull and review slides. The submitting resident will prepare and present these patients.

This resident presents the case in a concise manner, starting with history and pertinent physical findings, and then displays and reads any pertinent x-rays or other laboratory evaluations.  The resident should accurately describe the location and dimensions of the lesion and stage it according to the most recent edition of the Manual for Cancer Staging by the AJCC.  The resident should also be prepared to state the histology of the tumor and its differentiation, and propose a plan for treatment, which is consistent with NCCN guidelines.

Additionally, a significant number of our head and neck cancer patients are receiving their adjuvant therapy from non-UTMB facilities.  This requires considerable data management and ongoing communication with the outside consultants.  The senior resident on the UTMB A Team will assist with this as a major part of the Systems-Based Practice, Interpersonal Skills and Communication, and Professionalism goals and objectives for the A Team rotation. This exposure to different treatment and management algorithms requires increased vigilance in understanding outcomes literature and NCCN guidelines.

- **Planning Conference and Evidence-Based Update (FRIDAY 6:30-7:30 AM))**
  ➢ The residents on the UTMB services are responsible for working with the surgery schedulers to finalize an accurate schedule for the upcoming week.  The administrative chief reviews the number and level of the cases and makes sure that they are distributed in order to optimize our priorities of Responsibility (patient ownership, continuity of care), Progression (level-appropriate cases and case-appropriate roles), and Parity of resident experience.

  Prior to the Planning Conference, the resident who will be doing the case (the Presenting/Operating resident) is responsible for reviewing the chart, confirming that the procedure is indicated and that all necessary information has been obtained and is available (imaging, audiogram, outside records.)  This often requires finding and reviewing the paper chart, the electronic medical record, and both textbook and journal literature.  The resident has to not just collect what information there is, but appraise it for sufficiency and quality. Evidence for treatment plans must be known.  Should there be missing or unclear information, the resident is expected to contact the resident who saw the patient in clinic and attending faculty prior to Planning Conference to discuss.  This serves a dual purpose: it obtains information and it provides feedback to both residents and faculty about omissions in the history and physical or the medical decision making parts of the preoperative clinic note.

OAG-0013384

One of the principal goals of this activity is to teach the nuances of transferring information about a patient from the clinic to the OR, via the medical record and interpersonal communication.  Continuity of longitudinal care is a critical component of our residents' education; however, we acknowledge that the reorganization of our services means that sometimes residents will be responsible for a patient they have not seen themselves in clinic, and may not see postoperatively.  While we strive to minimize this, we address the challenges inherent in a clinical "hand off" in this Planning Conference and have found it beneficial.

By the time of Planning Conference, the Presenting/Operating resident should be completely prepared to present the patient and explain the treatment plan.  If there are questions or controversies, the resident is assigned a focused review project to be presented at the following week's Planning Conference.  These are brief updates based on a critical review of the available literature and should conclude with an evidence-based answer to the question, a summary of the controversy, and a specific recommendation about how the information should be used to improve care for the patient and practice for the residents and faculty.  Often faculty will volunteer to do an update the following week as well if there are questions that they cannot answer fully during the current conference.

Planning Conference begins with a brief multiple-choice quiz on a topic that has been clinically important on service in the previous week and a discussion of the answers.  It proceeds to the brief evidence-based updates, and concludes with presentation of the next week's surgical patients, and assignment of the next week's updates.

**Didactic Courses**

- **Basic Introductory Course (BIC)**
  - ➢ A series of lectures is offered to incoming interns and PGY2residents during July highlighting important topic areas.  Lectures are given by members of both the Clinical faculty and upper-level residents of the Department and by invited faculty.  The purpose of the course is to provide a general introduction to material that will be presented in more extensive detail throughout the year in conferences, grand rounds, and other didactic sessions.  There will be a final exam at the conclusion of the July lectures.   Subsequently, an anatomic dissection course is held in the surgical skills lab during august and September.  The importance of the course is not only to serve as an introduction to a residency in Otolaryngology, but also as an opportunity to become acquainted with the range of interests and activities of the Department.   The lecture topics range from those that focus on basic physiology and anatomy of the head and neck to hands-on experience in clinical evaluation such as the audiology testing procedures.  The week following the final lecture of the series, an examination is given.

- **Home Study Course**

OAG-0013385

➢ All residents are **REQUIRED** to take the Continuing Education Course (Home Study Course) which is offered on a two-year basis as a sequence of reading assignments and tests in each of the major sub-categories of our specialty.  The department purchases a subscription for each resident. It is required that the resident reads each Home Study in a timely manner and successfully completes and submits the 50 item quiz from each home study.

An enormous amount of effort goes into the preparation of this material on a national basis. It is felt to be key material for otolaryngology/head and neck surgery and the references and concepts are frequently found in later years on the Annual Otolaryngology Examination and the Examination of the American Board of Otolaryngology.

You are expected to read all of the references completely and you may anticipate being tested on the material during the course of the Didactic month dedicated to the relevant topic.

In addition to the Home Study – the department purchases the Home Study + option which allows the residents to access the Academy's vast library of videos and other didactic material to be used in their study and preparation for the inservice and life long learning.

- **Board Vitals**
  - The department purchase a subscription every year for Board Vitals – which is a collection of approximately 600 Board type questions for use in preparation for the Inservice Examination as well as the Written Boards.

**Off-campus Didactic Courses and Scientific Meetings**

Based on the educational needs and overall performance of the residents, the department may sponsor attendance at course such as the American Academy of Otolaryngic Allergy (AAOA) Resident Course, AO Foundation sponsored maxillofacial trauma courses, the Dallas Temporal Bone Course, or the Houston Rhinoplasty Course.  **Eligibility for these courses (time away and costs) requires a score at or above the fifth stanine on the  Otolaryngology training Exam (OTE.)**

It is the resident's responsibility, during the five years of specialty training, to acquire not only the traditional, time-honored skills and knowledge in otolaryngology, but to develop what should be a lifelong habit of actively seeking new knowledge and new skills which will advance his own professional competency.  Although the major means of doing this involves a regular program of critical reading of journal articles and other assorted professional literature, attendance at professional scientific or clinical meetings is also important.  Such meetings provide a unique opportunity to not only see and hear firsthand what is new in the field, but to also exchange new ideas and information with colleagues.

OAG-0013386

The otolaryngology faculty believes it is important for residents to attend one state or national meeting per year to acquire new information.  Financial support for attending meetings is provided by the departmental incentive points plan.  Again, poor performance may result in loss of protected time and "points" for attendance at these meetings.

**Didactic Labs**

- **Temporal Bone Lab**
  - ➢ The Temporal Bone Laboratory in the Department of Otolaryngology is set up to provide laboratory facilities to teach and study temporal bone surgery.  This laboratory utilizes human temporal bones and gives practical experience for the residents in otolaryngology to: review temporal bone anatomy; perform surgical procedures on the temporal bone; and perform middle cranial fossa and base of skull approaches.

    A temporal bone anatomy and dissection course will be provided every year for the appropriate level residents. Residents will be assigned laboratory sessions based on their level of training and satisfactory completion of fundamental exercises.  All residents are expected to utilize the lab to refine their dissection techniques throughout their training.  A dissection manual will be provided to you at the beginning of the course.  This delineates the course objectives and provides guidelines on how to meet these objectives.

- **Anatomic dissection Lab**
  - ➢ The surgical dissection lab is located adjacent to the Temporal Bone Lab, and is kept locked at all times.  A formal dissection course is held each year.  We also perform cadaver dissections in the Medical School's Gross Anatomy lab.

**Didactic Examinations**

In addition to the examinations following BIC and the HSC, all residents are required to take the Annual Otolaryngology Training Exam ("The In-Service," or the "OTE.")

Each year, usually the first weekend in March, the American Academy of Otolaryngology sponsors an examination taken by nearly all of our residents in training in our specialty on the same day.  This is a multiple-choice examination and usually contains three hundred questions, with half of them being provided in the morning and half of them provided in the afternoon.  This is a closed-book examination and the sharing of information is not permitted.  You are required to take this examination each year.

This is an extremely important activity for you, as it will give you considerable insight into your academic progress generally and in certain specific key areas.  You will find it a very helpful guide to assist you in the design of your study program, pursuit of your individual interests, and the correction of your weak

OAG-0013387

spots.  You will gain experience with this type of examination, which is quite similar to the written examination given by the American Board of Otolaryngology.

About six weeks after you have taken the examination, you will receive a detailed scoring that will appear in stanine format for each individual and for the performance of our resident group as a whole. The stanine is explained in detail in the "Understanding Your Score Report" supplement that you will receive with your score.  **Residents are expected to score at or above the fifth stanine (the fifth stanine comprises 40th -60th percentile) for their group.**  Failure to do so is an early indicator of ineffective educational efforts and will result in a review of that resident's learning style and a targeted study program.  Moreover, the OTE serves as an overall evaluation of the effectiveness of the department's didactic curriculum and these results are taken seriously in yearly efforts to revise and update the educational curriculum.  Repeated scores below the fifth stanine overall for group are concerning for increased likelihood of failure of the ABOto, or Board, exams and are therefore grounds for mandatory remediation and possible probation or termination.  On the other hand, residents achieving higher scores are eligible for increased academic leave and support for supplementary conference or courses. This is not designed to be punitive; however, the faculty feels strongly that a resident scoring below the fifth stanine has still not optimized the educational value of the resources on campus.

There is no particularly easy way to prepare for the examination, but it contains questions derived primarily from the major journals in our specialty, with most of the items coming from article written between one to five years prior to the date of the examination.  Standard textbooks, old Home Study Course Tests, the Otolaryngology Clinics of North America and the Self-Instructional Packets (SiPAC) of the American Academy of Otolaryngology-Head and Neck Surgery are good study aids, as are the maintenance of Certification (MOC) modules which have been developed by the ABOto to assist professional otolaryngologists to pass the MOC exam.

# Clinical Rotations

The Educational Program comprises one Sponsoring Institution (UTMB) and Participating Sites which are organized into Teaching Services, or Rotations.  Some of these Rotations are designed to provide intense education in two or more affiliated subspecialties of Otolaryngology—Head and Neck Surgery, and some are designed as General Otolaryngology Rotations in which the full spectrum of ENT Surgery is practiced and taught.  The educational rationale for this is to provide dedicated education in the clinical subspecialties and to provide an opportunity for the residents, working with the faculty, to identify and

58

focus on areas in which they require more work or attention in order to be on par with their peers. Should there be no need for a special focus, the resident benefits from learning how to manage a general ENT service and doing a broad spectrum of surgical cases as the only resident working with several attendings. The flexibility of the General Otolaryngology services is designed not to provide extra experience in a special interest, but rather to provide resources to ensure that all residents have equivalent educational outcomes.

The UTMB Rotations are:

| Main Team | Subteam | Faculty | Residents |
|---|---|---|---|
| | | | |
| A | Head & Neck | Coblens, Joshi, Resto | 5, 3, 2, 1 |
| | | | |
| B | Rhinology and Allergy | Siddiqui | 5, 4 , 2 |
| | | | |
| C | Pediatrics | Daran, Pine, Szeremeta | 2, 1 |
| | | | |
| D | Otology | Makishima, McKinnon, Young | 5, 4, 3 |
| | | | |
| TDC | TDCJ | Darling, faculty on consults | 4, 2 |
| | TDC, med students, consults | | |
| | | | |
| MDACC | | Nader et al | 4, 3 |
| Methodist | | Mohyuddin et al | 4, 3 |
| Research | | Makishima | 3 |
| Plastics | | Kridel, Sturm | 3 |

The Participating Site providing a General Otolaryngology experience with affiliated faculty is: Methodist Hospital

| Abbr. | General Focus | Faculty | Location |
|---|---|---|---|
| METHODIST | General Otolaryngology – specific focus on Laryngology and Facial and Reconstructive Plastics | Mohyuddin et al | Houston, TX<br><br>Housing provided |

The Participating Site providing subspecialty experience is MDACC.

| Abbr. | General Focus | Faculty | Location |
|---|---|---|---|
| KRIDEL | Cosmetic Facial Plastic Surgery | Kridel, Sturm | Houston, TX |
| MDACC | Head and Neck Surgical Oncology | Nader, et al | Houston, TX |

59

OAG-0013389

|  | inpatient |  | Housing provided |
|---|---|---|---|

The residents rotate on these services in teams with the explicit intent to develop our department's educational priorities of responsibility, progression, and parity.  Each team typically has one junior and / or one senior resident to cultivate progressiveness in the educational experience. The curriculum is designed for three residents in each year and is adjusted for years in which there are fewer than three residents in a class.

**Chronological Description**

The PGY1 residents do five months of general surgery, one month each of Neurosurgery, Critical Care, OMFS, and Emergency Medicine, and six months of ENT.  The months on ENT include an introductory month in July with exposure to all teams and participation in the Basic Introductory Course, two months on the A Team, and four months on one of the Pediatric Team.

The PGY2 residents do four months on Peds, 4 months on TDC, 2 months on A team and 2 months on B team.

The PGY3 residents spend 2 months at Methodist, 2 months at MDA, 2 months on A team and 2 months on D team. One month is spent with Drs. Kridel and Sturm.  The PGY 3 also completes the three-month research block.

The PGY4 residents do 2 months of  D-team , four months of UTMB TDC, 2 months at Methodist and 2 months at MDA.   The PGY4 residents on the TDC Team are responsible for fielding, assigning and managing inpatient and ER consults.

The PGY5s are Chief Residents and as such they have increased responsibilities and opportunities.  They rotate four months each on A team, B team and D Team. The UTMB B chief serves as the administrative chief and is thus responsible for making the didactic, clinical, and call schedules and working directly with the Program Director to ensure the integrity and quality of the resident education as well as the clinical care provided by the residents.

The chief residents are expected to work closely with the Program Director to plan an educational and clinical course for their final year of training.  In order to complete and round out their surgical training, they are encouraged to identify cases of significant educational merit on all rotations and to participate in those cases as appropriate.  Such cases are prioritized according to any deficits remaining in the resident's operative log, particularly for Key Indicator cases.

In 2012, the Otolaryngology RRC made a major change in the documenting and reporting of operative case numbers, moving from normative data reported as national averages, to minimum threshold numbers for Key Indicator Cases.  These include cases done either as primary resident surgeon or resident supervisor, but not assistant.  The ACGME further qualifies that minimum numbers are an indication of operative experience, but do not define operative competence.  Competency in procedures

OAG-0013390

is evaluated by supervising attendings on an individual basis, with additional feedback from standardized milestones.  The minimum key indicator numbers are summarized in the table on the next page.

| Key Indicator Category | Procedure | Minimum Number |
| --- | --- | --- |
| Head & Neck | Parotidectomy (all types) | 15 |
| | Neck Dissection (all types) | 27 |
| | Oral Cavity Resection | 10 |
| | Thyroid/Parathyroidectomy | 22 |
| Otology/Audiology | Tympanoplasty (all types) | 17 |
| | Mastoidectomy (all types) | 15 |
| | Stapedectomy/Ossiculoplasty | 10 |
| Facial-Plastic-Reconstructive | Rhinoplasty | 8 |
| | Mandible/Midface fractures | 12 |
| | Flaps and Grafts | 20 |
| General/Pediatric | Airway—pediatric and adult | 20 |
| | Congenital Neck Masses | 7 |
| | Ethmoidectomy | 40 |
| | Bronchoscopy | 22 |

**ORGANIZATION OF TEACHING SERVICES AND CLINICS**

***Subspecialty Rotations at UTMB***

UTMB provides advanced tertiary care in most subspecialties.  It is the site fo r our highest acuity procedures: difficult airway management, microvascular reconstruction, complex facial trauma, open and endoscopic skull base procedures.  It includes the Jenny Sealy Hospital and the Texas Department of Criminal Justice--Galveston Hospital.  UTMB clinics are located on the island and on the mainland.  The

OAG-0013391

principal inpatient services are the UTMB A and UTMB D Teams.  The UTMB B is largely an outpatient experience.

**UTMB A Team – Head & Neck**

This rotation provides multidisciplinary exposure to patients with tumors of the upper aerodigestive tract.  It integrates the subspecialties of Head and Neck Surgical Oncology, Reconstructive Surgery, Pathology, Neuroradiology, Radiation Oncology and Medical Oncology, and Speech Pathology and Rehabilitation.  Residents attend the multidisciplinary cancer clinic with Dr. Coblens and Joshi.  Surgical cases are assigned by resident level.  Strong emphasis is placed on the longitudinal care of individual patients. Additionally, significant emphasis is placed on the complementary roles of Resident Surgeon and Assistant Surgeon in the performance of soft tissue dissection and oncologic and reconstructive surgery.  Thus, often both A Team residents will be in the operating room together. The upper level resident directs the preparation and presentation of cancer patients to the Multidisciplinary Head and Neck Conference.

**UTMB B Team – Rhinology and Allergy**

This rotation focuses on Rhinology and Allergy in an outpatient setting.  The residents attend Allergy/General Otolarynoglogy Clinic with Dr. Siddiqui.   Surgical cases are assigned by resident level.  The residents work with Dr. Siddiqui and DR. Darling , developing general, Rhinology and allergy skills and following patients from pre-op planning through post-op care. Elements of the Allergy and Immunology goals and objectives are met on this rotation.  Strong emphasis is placed on the responsible communication of knowledge among and between team members in order to ensure continuity of excellent care.

**UTMB Peds ENT Team**

This rotation focuses on Pediatric Otolaryngology.  The residents attend Pediatric ENT Clinic with Drs. Daran, Pine and Szeremeta.  Surgical cases are assigned by resident level.  The PGY 1 and 2 works primarily with the three Pediatric ENT attendings, mastering most elements of the Pediatric ENT Goals & Objectives. More advanced cases—typically airway cases—will be managed by upper year residents as determined by the Faculty and the Chief Residents.  Elements of the Speech Pathology goals and objectives are met on this rotation.  Strong emphasis is placed on the responsible communication of knowledge among and between team members in order to ensure continuity of excellent care.

**UTMB D Team**

This rotation focuses on the goals and objectives for Otology and Trauma, while providing exposure to an advanced General Otolaryngology service for the Correctional Managed Care population.    More advanced elements of the Audiology Practicum, including vestibular testing, are fulfilled on this rotation.

*C-TDC*

OAG-0013392

The PGY4 resident manages the TDC service and runs the TDC Clinic two days a week with Dr. Darling. Other residents, including the research resident at times, are available to help with the TDC clinic and OR. Strong emphasis is placed on the longitudinal care of individual patients. This team is also responsible for the performance or delegation of on-campus consults.

*D-Otology*

This rotation consists of training in otology and neuro-otology. The educational goals are to provide a strong background in the basic and clinical sciences related to otology and neuro-otology and to assist in the development of clinical and surgical expertise by facilitating an orderly progression from mastery of more simple knowledge and skills, to becoming adept at managing more complex clinical and surgical problems.

The PGY2s spend two months on the otology rotation. During the second of these months, they complete the goals and objectives of the Audiology practicum, under the guidance of Dr. Carlson and the audiology staff. The PGY2s are also expected to participate fully in the annual temporal bone course. These experiences lay an important groundwork in the care of patients with otologic disorders. Additionally, the PGY2 resident gains valuable exposure to the set up and orderly performance of otologic surgical procedures.

The PGY4s spend four months on the otology rotation. In addition to their previous PGY2 otology rotation, they have also spent six months on Pediatric ENT in their PGY-2 year, learning the basics of the ear exam and tympanostomy tube placement, and 3 months in their PGY-3 Year at Memorial Herman Southwest, learning about chronic ear surgery and becoming familiar with cochlear implantation.

**UTMB Research**

The intent of this three-month protected research rotation is to acquaint PGY3 residents with the protocols used to create, plan, implement, and collect data relative to a hypothesis being tested. Each resident selects a research mentor to assist them with development and completion of a prospective or experimental research project. The monthly research meeting enhances this rotation. Each resident presents a progress report on ongoing or proposed projects, and the primary resident on the research rotation gives a more formal slide presentation on current results. The research resident may participate in clinical duties no more than one day a week and this should be limited as much as possible in order to preserve the protected nature of the research time.

***Participating Site Subspecialty Rotation***

**MDACC Head and Neck Service**

Each PGY4 spends two months on the head and neck service at MDACC gaining experience with a high-volume, quaternary care of head and neck cancer patients at an NCI-designated Comprehensive Cancer Center. The rotation is under the direction of Dr. Nader. The Goals & Objectives and the block

OAG-0013393

assignments are distributed at the time of the rotation.  The MDACC resident is not required to return to campus for Didactic Day, but is expected to participate fully in the conference curriculum at MDCACC.

***Participating Site General Otolaryngology Rotation***

**St. Luke's Episcopal Health System, Houston, TX**

St. Luke's is one of the major tertiary care hospitals in the Texas Medical Center in downtown Houston. Through its relationships with Baylor, UT Houston, and UTMB, St. Luke's participates in the training of residents rotating through the hospital.  While there are 48 otolaryngologists, six audiologists and five speech pathologists, the UTMB resident experience is designed as a structured academic service with five principal faculty supervising the management of an inpatient service, a consult service for inpatients and emergency department patients, outpatient clinics and in- and outpatient surgical procedures.  Site-specific didactics may include attendance at the UT Houston Department of Otolaryngology weekly Grand Rounds and a site-specific Journal Club.  Housing is provided.

The rotation-specific, competency-based, level-specific goals and objectives for each rotation are distributed at the beginning of each rotation.

64

# Resources

**RESIDENT OFFICES AND CALL ROOM**

- Call Room, (Room # 7.102) of John Sealy Annex;
  Telephone  extensions:  2-9939/2-9940

- Workstations are located in Room 7.318A of John Sealy Annex;
  Telephone extension:  2-1770

- Workstations are located in Room 7.318B of John Sealy Annex;
  Telephone extension:  2-1387

- Workstations are located in Room 7.318C of John Sealy Annex;
  Telephone extension:  2-1393

- Workstations are located in Room 7.320 of John Sealy Annex;
  Telephone extension:  2-3727


**RESIDENCY CO-ORDINATOR**

**Patricia (Tricia) Garza: 2-4688**

- keeps in close contact with the ACGME and its requirements for the department. Makes sure residents are in compliance with ACGME guidelines and procedures.

- Is responsible for the ERAS PDWS program. Downloads applicants for Program Director to review, sends invitations to applicants, sends resident applicant information packages out to requesters interested in Otolaryngology, schedules interviews & luncheons.

- is responsible for sending out 360 Resident Evaluations in New Innovations and monitoring compliance and completion

- Maintains all Medical Liability forms.

- Keeps track & schedules all BCLS, and ACLS courses, along with other certificates and expirations for house staff.

- Processes and schedules all credentialing rotation documents

- Schedules Semiannual Evaluations with Program Director.

65

OAG-0013395

- Processes leave request, inputs residents leave, holiday, job interviews, etc. in KRONOS system.

- Maintains resident Risk Management hours.

- Processes Program, Affiliation and Work Agreements.

- Assists in scheduling BIC, Grand Rounds, M&M, Didactic Days and weekly Conferences with Program Director. Types and distributes weekly conference schedules.

- Schedules Otolaryngology Training Exam with the American Board of Otolaryngology.

- Is responsible for resident compliance for UTMB Online Training.

- Processes travel authorizations, reimbursements, orders books and supplies, cadavers, etc.

- Is responsible for monthly billing for off-site rotations.

- Proctors for BIC examination.

- Updates and maintains Resident Handbook.

- Is responsible for sending reminders to residents about various deadlines, obtaining NPI numbers, etc.

- Completes work agreements and reappointments yearly for residents for the House Staff Office.

- Maintains/updates House Staff Reappointments for House Staff Office.

- Works closely and attends monthly Coordinator meetings with GME House Staff Office.

- Provides clearance paperwork to the TDCJ

- Registers all residents into TER-Electronic Death Certificate

- Liaises with the American Board of Otolaryngology (ABOto)


**Library**

The Department maintains a small library in the Vaughn Center for resident use.  No books are allowed to leave Vaughn Center for any reason.  New books will be added to the collections as we are able.  The residents should present a list of desired books to the residency director annually, who will decide on the new volumes purchased, depending up fund availability.

**Textbooks**

OAG-0013396

Most of the textbooks recommended in the Syllabi and Goals and Objectives for each rotation are available electronically through the Moody Medical Library. Thus, instead of buying textbooks for the entering residents, we provide each entering resident with sufficient funds (in points) to purchase an electronic reader of their choice. Each year we invest in additional textbooks based on resident and faculty requests.

**Attire**

- The House Staff Office issues one new lab coat each year to UTMB residents. The resident is responsible for maintaining the coat and presenting a clean, professional appearance.

- Everyone shall dress professionally when seeing patients. Specific requirements for attire may vary by rotation. The attendings on each service may define appropriate attire for attendance on their patients in their clinics.

- In general, UTMB OR scrubs should not be worn in the outpatient setting for regularly scheduled activities. They are permissible outside the OR on days when the resident is in the OR and is not scheduled to see patients in the outpatient setting. Lab coats or jackets should be worn over scrubs at all times when the resident is not in the OR, particularly if the resident is outside the hospital.

- All faculty members have discretion over their own attire and that of their team. At the beginning of each rotation, the resident should ask the attendings on their new team what their preferences and requirements are for attire.

- In the most general terms, you should dress as if you care what your patients think about you.

- Operating room head covers, booties and masks should never be worn outside of the OR.

**Salary and Benefits**

As these are changing annually, the resident is referred to the House Staff Office for full description of salary and benefits.

**Educational Fund and Travel Expenses**

Every resident will be given an educational fund. This fund consists of "points" which are equivalent to dollars that can be used to fund travel to national, state, or local meetings and for books and other educational materials. Each resident receives 250 points at the beginning of each academic year. Each intern gets an additional one-time allocation of 500 points which is intended to be used for either basic textbooks or an electronic reader to access the textbooks available on our website and through the Moody Medical Library. All items purchased with UTMB points are governed by UTME property policy. Additional point incentives are allocated for the research award, high in-service scores, and peer-reviewed publications.

67

**RESEARCH-RELATED TRAVEL**

Travel expenses for the presentation of resident research are reimbursed directly.  These presentation reimbursements are not cumulative.  These monies are provided to allow you to attend the meeting for the amount of time required to present your research; if you wish to attend the rest of the conference, points and educational leave may be used to do so, as long as you are compliant with policies about leave and performance.

**ALL LEAVE MUST BE PRE-APPROVED.**

**ALL AIRLINES RESERVATIONS MUST BE ARRANGED THROUGH TRICIA GARZA OR DELILAH HYMAS AND ACCORDING TO UTMB POLICIES TO ENSURE REIMBURSEMENT.**

**ALL TRAVEL ARRANGEMENTS MUST BE MADE PROMPTLY (WITHIN 4 WEEKS) AFTER NOTIFICATION OF ACCEPTANCE IN ORDER TO QUALIFY FOR EARLY-BIRD REGISTRATION RATES.**

**RESIDENTS ARE EXPECTED TO APPLY FOR AVAILABLE TRAVEL GRANTS WHENEVER POSSIBLE.**

Reimbursement is limited to hotel, meeting registration, airfare, and state per diem for food.   Hotel costs will not be reimbursed above the rate at the conference hotel.  Residents are expected to share hotel rooms when possible.  Reasonable parking and local transportation costs such as taxi and subway may be reimbursed as well.  Receipts are required for these items.  Meals will not be reimbursed above the state per diem for any resident travel.  Priority for attending desired meetings will be given based on whether you are presenting, seniority and whether or not you went the year before.  When attending educational meetings, you are expected to attend the meeting sessions in their entirety.  Residents who travel to but do not attend meetings may find reimbursement withheld and vacation time charged.

The 2019-20 points allowances are as follows:

| Annual Points | PGY1-5 | | | | 250 |
|---|---|---|---|---|---|
| | PGY1 | | | | 500 |
| | | | | | |
| Award Points | Resident Research Award | | | | 250 |
| | Highest In-service Award - Senior Resident | | | | 200 |
| | Highest In-service Award - Junior Resident | | | | 200 |
| | | | | | |
| Publication Points | Case Report article | | | | 150 |
| | Retrospective Review article | | | | 250 |
| | Prospective Study/Basic Science/Chapter Review article | | | | 500 |

OAG-0013398

69

OAG-0013399

# Policies

In addition to the policies outlined below, you are to comply with all applicable policies and procedures of the University of Texas Medical Branch and any other affiliated clinical facilities.

**Resident Selection, Promotion, and Evaluation Process**

**Selection**

Applications are received through the National Resident Matching Program (NRMP) and Electronic Residency Application Service (ERAS.)  All applications are reviewed by the Program Director.  We select approximately 40 applicants to be interviewed.  The selection is on the basis of academic performance, personal statement and letters of reference.  Applicants are interviewed by the faculty and resident representatives.  At the end of each day, the candidates are reviewed by all of the interviewers as a group and an initial ranking is made.

After the last interview day, the faculty convenes for discussion and the preparation of a rank list which is submitted to the NRMP for the Match.

**Expectations for Residents**

- Perform all assigned operating room, clinic and ward duties for your level of training in a reasonable fashion.

- Participate in all otolaryngology teaching conferences.  Arrive in time to start on time.

- Complete at least two clinical or basic science research projects and submit for publication and presentation during your residency, adhering to the research guidelines.

- Meet all mutually agreed upon deadlines for manuscript preparation and submission.

- Complete all evaluations and surveys, including the annual ACGME resident survey in a timely and professional manner.

- Read all weekly assignments, Home Study Courses, Journal Club articles, and bibliography for each rotation.

- Achieve a score of at least fifth stanine for your year on the Annual Otolaryngology Examination. If you do not achieve this goal, you may be placed on a mandatory reading program.

- Pursue an active course of independent reading.

OAG-0013400

- You must keep an up to date, complete, and accurate operative case log on the web site developed by the ACGME. These logs will be reviewed semi-annually with the program director. You are expected to log at least weekly.  The program director audits the logs monthly.

- Stay current with your medical records.

- Obtain and maintain appropriate licensure and credentials, including CPR certification, TB tests, and mandatory on-line training.

- Follow the policies and procedures outlined in this manual

- Keep the resident work rooms clean and tidy at all times.

- Achieve and demonstrate competencies in:

  - ➢ Patient care

  - ➢ Medical knowledge

  - ➢ Practice-based learning and improvement

  - ➢ Interpersonal and communication skills

  - ➢ Professionalism

  - ➢ Systems-based practice

**Accountable Deadlines**

All members of the department are expected to complete professional records promptly.  For many of the following there are institutional requirements (UTMB, ACGME, RRC, and GMEC) with institutional penalties.  You are responsible for knowing these deadlines and complying with them.  Additionally, we have the following explicit expectations:

  - ➢ Duty hour logs are completed daily and delinquent at one week.
  - ➢ Operative logs are completed daily and delinquent at one month.
  - ➢ Clinic notes and inpatient notes are completed within 24 hours, and individual faculty may set stricter requirements.
  - ➢ Operative notes are completed within 24 hours, and individual faculty may set stricter requirements.
  - ➢ Discharge summaries are completed within 96 hours of discharge and individual faculty may set stricter requirements.
  - ➢ During regular working hours AND when you are on call during nights and weekends, pages and phone calls are returned immediately and are tardy after 5 minutes.

71

OAG-0013401

- ➢ When you are not on call during night or weekend hours, you are not required to keep your pager on.  We appreciate the benefits of "down time."  However, in the profession of medicine, it can be very helpful to communicate with each other about patient care and so we encourage you to remain available by phone.
- ➢  UTMB email is checked at least every 24 hours, even when you are rotating at another hospital. This is essential for the accurate and timely completion of required accreditation documentation for the ACGME and the ABOto, as well as courteous to Aurora.  Additional email etiquette includes acknowledgement of the message and an estimate of when any request can be realistically completed.
- ➢ Evaluations in New Innovations are completed by the assigned deadline.  For routine rotation evaluations, this is done within two weeks after the completion of the rotation.
- ➢ ACGME Survey is completed annually by 100% of the residents by the given deadline.
- ➢ The resident research portfolio is updated biannually by December 31 and May 31 of each year.  Additional research deadlines are communicated by Dr. Underbrink and the Resident Research Committee.
- ➢ Any communication from the medical records office about delinquent documentation must be acknowledged and the delinquency corrected within 24 hours.
- ➢ Annual Compliance Training: per UTMB deadline
- ➢ BLS certification: per UTMB GME Handbook policy

Delinquency in meeting these deadlines can result in failure to meet expectations for professionalism in your semiannual evaluation.  If egregious or chronic, delinquency can result in remediation, including stricter deadlines and standards of compliance, or even probation.  Notices of delinquency are tallied monthly and discussed at the semiannual evaluation.

**Evaluation Tools**

The goals and objectives of the program for residents at each level are achieved through resident participation in clinical and research rotations, didactic lectures, clinical conferences, journal reading, and independent reading. The success of goal and objective achievement is monitored by a set of outcome assessment tools including:

- Global Evaluations (done online, at the end of every rotation, typically every three months)

- Multisource evaluations by nursing staff and support staff (previously known as 360° evaluations, also done online at the end of each rotation.)

- Basic Introductory Course Examination

- Annual Otolaryngology Examination (OTE)

- AAO-HNS Home Study Course Examinations

- Review of Goals and Objectives at the beginning and end of each rotation

72

OAG-0013402

- Direct Observation of performance at conferences, courses, labs, and on rounds

- Direct Observation of clinical and surgical skills

- Observation of cadaver dissections

- Global Rating for Technical Skills in proctored Key Indicator cases

- Operative Logs, which are assessed for parity with peers overall as well as ratio of Assistant Surgeon to Resident Surgeon over the course of each rotation

- Summative evaluations are performed semiannually when each resident meets with the Program Director and reviews all of the above.  The resident will have the opportunity to provide feedback about their progress at that time.  A written summary will be reviewed with the resident and kept in their file.

During December of every year, a resident-on-resident peer evaluation will be conducted by Dr. Quinn, using the standardized evaluation forms.  Each resident will then meet with Dr. Quinn to review the resident's evaluation by the other Otolaryngology residents.  These evaluation forms are then destroyed.  No record is kept, nor is other faculty permitted at any time to see these evaluations.  This aspect of 360° evaluations is an important window into how one's behaviors, attitudes, and work style affects their peers.

**Evaluation Committees**

The Clinical Competency Committee (CCC) is appointed by the Program Director and includes all faculty members of the Education Committee. The duties of the Clinical Competency Committee include:

> ➢ Review all training evaluations of resident performance;

> ➢ Preparation of the semiannual report of all residents' Milestones progress; and

> ➢ Recommendations on resident progress including promotion, remediation and dismissal.

The CCC includes the Program Director (Dr. Szeremeta) and the Education Committee members (currently Drs. Szeremeta, Pine, Siddiqui, Darling, Coblens and Young, as well as a resident member who is peer-selected each year).

The education committee meets monthly the week prior to the departmental faculty meeting and presents a summary of resident issues.

**Program Evaluation**

73

Every year there is Program Improvement Retreat.  All faculty and residents are invited and are expected to attend.  At a minimum, the Program Director, Residency Coordinator, Department Chair, Clinical Competency Committee, a peer-selected junior resident and a peer-selected senior resident must attend.  The attendees of the retreat comprise the Program Evaluation Committee (PEC) and the result of the retreat is the Annual Program Evaluation (APE.)  These elements are defined and mandated by the RRC Program Requirements and are reviewed annually by the UTMB GME subcommittees on education and quality improvement in education.

Crucial to this review will be the annual confidential written review of the program and faculty by the residents, and the confidential written review of the program by the faculty.  This review is done in June annually.  The results of this review will be discussed with the entire faculty as well as the residents after the results are confidentially collated.  Additional material considered will include: board pass rates; Annual Otolaryngology Examination scores; attainment of fellowships, academic positions, and suitable private practice positions; and operative case experiences.  Resident representatives will include at least one junior (PGY 2 or 3) and one senior (PGY 4) resident.  The final product of this meeting will be a Written Plan for Improvement.

**Promotion of Residents**

Those residents that have been successful in reaching the above expectations and goals at the end of the year will be promoted to the next level as appropriate.   Promotion occurs year by year, with the requirement that all faculty feel that the year has been completed satisfactorily and that performance has been appropriate in order to progress to the next year**.**

**Discipline and Termination**

When issues requiring disciplinary action arise, the severity of the incident is assessed.  Minor disciplinary steps and counseling are instituted quickly and managed by the immediately responsible team faculty member.  Intermediate level offenses are addressed by an appropriately constituted appropriately constituted *ad hoc* faculty committee.  If the committee can manage the situation successfully, they do so and file a report with the Program Director.

Serious offenses will be brought to the attention of the Program Director and Chairman after review by the *ad hoc* committee.  If the committee and the Program Director and Chairman feel that it is necessary to consider formal probation or termination, the matter will be brought to the Associate Dean for GME (Dr. Blackwell) and UTMB policies for these matters will be followed.  Residents will be afforded the protection of due process in such matters.

- The following items are some but not all grounds for immediate suspension, probation, or dismissal:
  - Abandonment of a patient or patient care duties.

  - Illegal or grossly unprofessional conduct; dishonesty

  - Malperformance of duties with potential for serious harm to patients.

74

➢ Performance of duties while under the influence of drugs or alcohol.

➢ Insubordination to faculty members or staff.

➢ Absence from the program without prior approved leave.

➢ Breach of contract.

➢ Misconduct as listed in the UTMB Employee Handbook Rules.

**Moonlighting**

Unauthorized patient care activities (moonlighting) are not allowed by the department and may be the basis for severe disciplinary action up to and including dismissal from the program.  Residents scoring in the ninth stanine (96th-99[th] percentiles) for their group may apply for permission to moonlight, but each opportunity will be assessed on a case-by-case basis.  If such a resident is approved for a specific moonlighting activity, he or she will be subject to the rules in the Institutional Handbook, section VII. L.  Be aware that low academic performance as determined by the faculty or a single serious event in which a patient suffers ill consequences because of poor resident performance (or non-performance) related to moonlighting activities may be grounds for dismissal from this training program.  Understand also that UTMB provides no liability coverage for moonlighting activities.  In general, the only moonlighting opportunity approved by the Program Director is work in the UTMB Emergency Department.  This is because it is an environment in which the resident has worked before; there is UTMB faculty level supervision of the patient care provided as well as the work environment; the experience is felt to be educationally valuable to the moonlighting resident and professionally favorable to the work and image of the department.  The number of hours of moonlighting is limited to 24 hours a month, typically in two twelve-hour shifts or three eight-hour shifts.  Everything about moonlighting privileges is at the discretion of the Program Director.

**Licensure**

Each resident will be notified when his or her license will expire.  At this time, the residency coordinator will issue GME Post Graduate Permit/ Renewal applications to be completed and returned with the application fee.  Those residents who have Permanent Texas Licenses must take care of the paperwork themselves and provide us with a copy as soon as the renewed license is received.

**Memberships**

Residents will obtain and maintain resident membership in the American Academy of Otolaryngology—Head and Neck Surgery in order to register for the OTE.

**Leave**

**STATE OF TEXAS LEAVE POLICY**

75

All State employees accrue vacation at the same rate, depending on the length of service.  For the first two years you accrue 8 hours per month.   That, in addition to the liberal holiday schedule, equals three work weeks per year; however, you do not accrue the entire three weeks until the twelfth month.  After two years you accrue 9 hours per month.  If you are scheduled to work on a holiday, you will get "credit" for that holiday and can use it to round out the "3 weeks" of vacation (which is really 12.5 days).  Accrued holiday time and unused vacation time will be compensated at the end of your residency.  It does not extend either the duration or timing of allowable vacation from residency.

**DEPARTMENTAL LEAVE POLICY**

It is the policy of the department that all residents acquire approval/signatures from their attending faculty, Administrative Chief Resident and Program Director prior to submitting their leave request forms to the Residency Coordinator. Residents must also enter their leave request into KRONOS. **VACATION REQUESTS SHOULD BE SUBMITTED AT LEAST SIX WEEKS PRIOR TO THE START OF THE ROTATION IN WHICH YOU WISH TO TAKE THE VACATION.**

The Participating Sites may have vacation request policies that are stricter than the UTMB policies.  They may not allow vacation policies that are more lenient than the UTMB policies.  You must still meet the notification requirements for UTMB when you are taking vacation during an off-campus rotation.

Two weeks of vacation must be taken in blocks of one calendar week each.  The weekends on either end are not included in the vacation time and must be cleared of responsibility separately should the resident wish to be off work for either or both of the weekends.

One week of vacation may be subdivided into smaller increments, including single days, or "sprinkle" days.  Individual faculty or teams may apply restrictions—i.e., you can't take five three-day weekends on a rotation; you can't take all your sprinkle days on the busiest clinic day of the week, etc.  In other words, the sprinkle days still have to be approved by the team faculty.  These sprinkle days should not disproportionately affect a rotation in which you are already taking one of your block weeks of vacation.  This will be left to the discretion of the individual teams.

All other leave requests should be submitted as early as possible to facilitate manpower planning.  **AT THE BEGINNING OF EACH ROTATION, ALL OF THE RESIDENTS MUST COMMUNICATE TO ALL OF THE ATTENDINGS ON THAT TEAM ANY VACATION TIME THAT THEY HAVE SCHEDULED.** The leave request form must be signed by all of the attendings on the service affected by your vacation leave; the administrative chief resident; and the Program Director.  The Administrative Chief makes the decision to approve or disapprove the leave request and then submits it to the residency Program Director for final approval and signature.  Leave requests include educational leave, sick leave, and vacation.  Paternity and maternity leave must also be submitted on a leave form and are charged as sick leave or vacation.

Only one on-campus resident may be on vacation at a given time and only two residents may be gone (from the main campus) for any reason (including educational leave) at any time, except during COSM or the Academy meeting, or at the winter holidays.  Other exceptions will be made only for extreme circumstances.

76

Vacations will not be approved for:

- The first 2 weeks of July

- The last two (2) weeks of June <u>except</u> for graduating residents, who may take the last five weekdays off as their one week of vacation (for the last 3-month block.)  Graduating residents are otherwise required to work up until June 30.

- The week of the AAO-HNS Fall Meeting, except for attendance at the meeting

- The week of COSM Spring Meeting, except for attendance at the meeting

No more than one five-day block of vacation is permitted on any given rotation, so residents must distribute their vacation time evenly throughout the year.

Each resident scoring at or above the fifth stanine for group on the OTE will be allowed a baseline of five days educational leave per year to attend meetings, seminars and/or courses beyond their vacation allotment; this time is not cumulative.  For residents scoring in the sixth stanine or above for group, up to five additional days of educational leave are permitted for presentations at meetings, with the expectation that the resident will minimize the amount of time away.

There is no automatic additional "administrative leave" for the purpose of job or fellowship placement and interviews, though individual requests will be considered on a case-by-case basis.

For a score in the ninth stanine for group on the OTE, a significant educational reward is granted, e.g., time and support for a course of the resident's choice (on this continent and within reason.)  This must be done within one academic year of the high in-service score.

It is understandable that we all at some time or other have to have time off for dentist, doctor or other appointments or for campus meetings and so forth.  You are responsible for notifying Residency Coordinator and the administrative chief resident about the illness.  Notification of appointments and meetings need a week in advance.

**Weekends**

From time to time educational events will be scheduled on weekends.  Resident attendance at these events is required.   You may assume that your weekends are free:

- If you have not been given notice that your attendance is required.

- All resident call is covered.

- All patients on your team have been checked out to the on-call residents.

- If the weekend does not conflict with the annual OTE, the Academy meeting, the COSM meetings, or the holiday schedule.

77

OAG-0013407

- Otherwise, you should not assume that you are free without asking specific written permission for having the days free from duty.

**Sick Leave**

If, for whatever reason, you must take sick leave, you must call the office and inform the Residency Coordinator as soon as possible.  When you return, you will need to submit the appropriate paperwork detailing the exact dates that you were out and enter request into KRONOS.  The full sick leave policy is available from the in the <u>Faculty</u> <u>and Staff Handbook</u> and <u>General Information for House Staff</u>.

**Duty Hours**

ACGME Common Program Requirements become effective July 1, 2011.  Among other things, the Duty Hour rules have been revised as follows:

**Resident Duty Hours**

*Our department does not allow moonlighting and does not assign in-house call, with rare exceptions.  Residents (PGY2 and above) scoring in the ninth stanine for group on the OTE may apply for pre-approval for specific moonlighting opportunities.  If approved, such residents are subject to these rules.   Residents who live outside a 30-minute, door-to-door response time may not take call from home.  If this situation should arise, such a resident will take in-house call.*

**Maximum Hours of Work per Week**

Duty hours must be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities and all moonlighting.

**Duty Hour Exceptions**

*Our department does not have such an exception.*

A Review Committee may grant exceptions for up to 10% or a maximum of 88 hours to individual programs based on a sound educational rationale.

In preparing a request for an exception, the program director must follow the duty hour exception policy from the ACGME Manual on Policies and Procedures.

Prior to submitting the request to the Review Committee, the program director must obtain approval of the institution's GMEC and DIO.

**Moonlighting**

Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program.

78

Time spent by residents in Internal and External Moonlighting (as defined in the ACGME Glossary of Terms) must be counted towards the 80-hour Maximum Weekly Hour Limit.

PGY-1 residents are not permitted to moonlight.

**Mandatory Time Free of Duty**

Residents must be scheduled for a minimum of one day free of duty every week (when averaged over four weeks). At-home call cannot be assigned on these free days.

**Maximum Duty Period Length**

Duty periods of PGY-1 residents must not exceed 16 hours in duration.

Duty periods of PGY-2 residents and above may be scheduled to a maximum of 24 hours of continuous duty in the hospital. Programs must encourage residents to use alertness management strategies in the context of patient care responsibilities. Strategic napping, especially after 16 hours of continuous duty and between the hours of 10:00 p.m. and 8:00 a.m., is strongly suggested.

It is essential for patient safety and resident education that effective transitions in care occur. Residents may be allowed to remain on-site in order to accomplish these tasks; however, this period must be no longer than an additional four hours.

Residents must not be assigned additional clinical responsibilities after 24 hours of continuous in-house duty.

In unusual circumstances, residents, on their own initiative, may remain beyond their scheduled period of duty to continue to provide care to a single patient. Justifications for such extensions of duty are limited to reasons of required continuity for a severely ill or unstable patient, academic importance of the events transpiring, or humanistic attention to the needs of a patient or family.

The Otolaryngology RRC has further specified that the circumstances appropriate for a resident in the final years of training remain beyond their scheduled period of duty as:
- required continuity of care for a severely ill or unstable patient, or a complex patient with whom the resident has been involved;
- events of exceptional educational value; or,
- humanistic attention to the needs of a patient or family.


**UNDER THOSE CIRCUMSTANCES, THE RESIDENT MUST:**

- **APPROPRIATELY HAND OVER THE CARE OF ALL OTHER PATIENTS TO THE TEAM RESPONSIBLE FOR THEIR CONTINUING CARE; AND,**

79

- **DOCUMENT THE REASONS FOR REMAINING TO CARE FOR THE PATIENT IN QUESTION AND SUBMIT THAT DOCUMENTATION IN EVERY CIRCUMSTANCE TO THE PROGRAM DIRECTOR.**
    - **THE DUTY HOUR EXCEPTION JUSTIFICATION FORM IS AVAILABLE ON BLACKBOARD IN THE DUTY HOURS FOLDER.  IN ADDITION, WHERE FEASIBLE (I.E., NOT IN AN ACUTE EMERGENCY), THE RESIDENT SHOULD CALL THE PROGRAM DIRECTOR DIRECTLY TO DISCUSS WHATEVER EXTRAORDINARY THING IS OCCURRING SO THAT LEARNING CAN BE OPTIMIZED AND DEBRIEFING OR COUNSELING OFFERED AS NEEDED.**
- **THE PROGRAM DIRECTOR MUST REVIEW EACH SUBMISSION OF ADDITIONAL SERVICE, AND TRACK BOTH INDIVIDUAL RESIDENT AND PROGRAM-WIDE EPISODES OF ADDITIONAL DUTY.**

**Minimum Time Off between Scheduled Duty Periods**

PGY-1 residents should have 10 hours, and must have eight hours, free of duty between scheduled duty periods.

Intermediate-level residents (defined as PGY2 and PGY3 by the Otolaryngology RRC) should have 10 hours free of duty, and must have eight hours between scheduled duty periods. They must have at least 14 hours free of duty after 24 hours of in-house duty.

Residents in the final years of education (defined as PGY4 and PGY5 by the Otolaryngology RRC) must be prepared to enter the unsupervised practice of medicine and care for patients over irregular or extended periods.

This preparation must occur within the context of the 80-hour, maximum duty period length, and one-day-off-in seven standards. While it is desirable that residents in their final years of education have eight hours free of duty between scheduled duty periods, there may be circumstances [as defined by the Review Committee] when these residents must stay on duty to care for their patients or return to the hospital with fewer than eight hours free of duty.

Circumstances of return-to-hospital activities with fewer than eight hours away from the hospital by residents in their final years of education must be monitored by the program director.

**Maximum Frequency of In-House Night Float**

***Our department does not assign in-house night float.***

Residents must not be scheduled for more than six consecutive nights of night float.

[The maximum number of consecutive weeks of night float, and maximum number of months of night float per year may be further specified by the Review Committee.]

80

**Maximum In-House On-Call Frequency**

PGY-2 residents and above must be scheduled for in-house call no more frequently than every-third-night (when averaged over a four-week period).

**At-Home Call**

Time spent in the hospital by residents on at-home call must count towards the 80-hour maximum weekly hour limit. The frequency of at-home call is not subject to the every-third-night limitation, but must satisfy the requirement for one-day-in-seven free of duty, when averaged over four weeks.

At-home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident.

Residents are permitted to return to the hospital while on at-home call to care for new or established patients. Each episode of this type of care, while it must be included in the 80-hour weekly maximum, will not initiate a new "off-duty period".

**Adequate Rest**

It is essential that residents have adequate rest between their daily duty periods and after in-house call. The need and capacity for this kind of rest and regeneration will vary by year of training.  As one kind of stress abates with the acquisition of knowledge and skill, new kinds of stressors will emerge related to increased responsibility and foresight.

Our department does not have in-house call; however, the demands of home call should not be underestimated.

- INTERNS should respect the letter and the spirit of the sixteen hour rule.  After working sixteen hours, they should go home and relax and not think about work or service related obligations.  Studying and preparing for upcoming didactics are acceptable.  It is considered most undesirable for interns to be required or requested to handle phone calls from home after completing their duty period as this increases their stress about things they may not be able to control from home.  Should this occur, please notify the Program Director at once.
- JUNIOR RESIDENTS (PGY2 and PGY3) work hard on call, frequently coming in to the hospital to asses and treat patients, as their skills at remote management are yet undeveloped.  Moreover, they carry most of the responsibility for suturing lacerations on face call, which can be time consuming and often occurs in the middle of the night.  This it is important for them also to be able to truly "go home" when they are not on call.  While they may choose to respond to phone calls and pages, for easy or informational questions, they are encouraged to relinquish work responsibilities to the

81

call team.  This also helps build team spirit and camaraderie and trust among the residents.

- SENIOR RESIDENTS (PGY4 and PGY5) have less physical activity and routine phone calls when they are on call, but we acknowledge that that allows them the space of mind and resilience to think proactively about all the patients in the hospitals and to respond sharply and wisely when urgent or emergent decisions are required.  Additionally, we acknowledge the stress that accompanies supervising and teaching junior residents, especially the tendency of new senior residents to "just do it all themselves" when they are uncomfortable delegating to their junior resident.  This has the potential to overtire the senior resident and is discouraged.  Should there be concerns about the competence of the junior resident; the senior resident should discuss this with the attending on call, so that supervision and responsibility can be assigned appropriately.  At the SENIOR level, residents may begin to take a longer view of patient care, and more patient ownership, coming in to round on individual patients or communicating directly with families or consulting teams.  This is encouraged within the context of thorough communication with the on call team members.  Senior residents will be expert in fatigue recognition and mitigation and must begin to be prudent in their commitment to self care and rejuvenation.  The faculty takes this seriously and strives to serve as role models.

- During call periods, all members of the call team should consult with each other at least every twelve hours (morning rounds and afternoon phone call) to check in for work load, fatigue, and any special circumstances.  Should any member of the team become fatigued, they will pass their pager one level up for the next 8 hours in order to take a strategic nap and/or do some invigorating exercise.  This is true for all levels, including the Backup faculty system that ensures that should there be an astronomical catastrophe that exhausts everyone on the team, there is another responsible adult available to help.

OAG-0013412

IN THE UNITED STATES DISTRICT COURT
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

DR. ROSANDRA DAYWALKER     §
       *Plaintiff,*             §
                          §
v.                             §
                          §
UNIVERSITY OF TEXAS MEDICAL   §      No. 3:20-CV-00099
BRANCH AT GALVESTON, AND DR.   §
BEN G. RAIMER, IN HIS OFFICIAL    §
CAPACITY                     §
       *Defendants.*           §

---

## DECLARATION OF DR. DAYTON YOUNG

---

1. My name is Dayton Young, M.D. I have personal knowledge of the matters contained in this Declaration and am fully competent to make this Declaration.

2. I am currently employed as an ~~Assistant Professor~~ Associate Professor in in the Department of Otolaryngology at The University of Texas Medical Branch at Galveston ("UTMB"). I have held that position at UTMB since 9-1-2019. I was an Assistant Professor from 12-6-2010 to 8-31-2019.

3. My duties as a faculty member at UTMB includes training, teaching, and working with medical residents in the Department of Otolaryngology. My job also entails using my professional judgment to evaluate residents' academic and medical development as they progress through the Department's residency program.

4. I was a faculty member and a member of the Clinical Competency Committee in 2018 while Dr. Rosandra Daywalker was a medical resident at UTMB. In those roles, I served as a decision-maker for UTMB's decisions to (1) place Dr. Daywalker on remediation and (2) have her repeat portions of her PGY-3 year as part of her remediation.

5. I voted in favor of those decisions based on concerns about Dr. Daywalker's clinical competency and her academic progress, including as reflected by the information contained in the letters marked as Exhibit A and B.

EXHIBIT H

6.  I was not aware of Dr. Daywalker's June 2018 internal complaint of discrimination, her August 2018 request for Family and Medical Leave, or any request for medical accommodations at the times I voted for her to be placed on remediation or continue as a PGY-3.

7.  The aforementioned votes were made based on my academic and medical judgment and were not motivated or caused by race discrimination or retaliation for Dr. Daywalker's complaints of discrimination, medical leave, or accommodation requests.

8.  I have supervised residents as a faculty member since _12-6-20'_. I am not aware of any other resident during this timeframe that has had nearly identical competency and academic issues as Dr. Daywalker.


I declare under penalty of perjury that the foregoing is true and correct.


EXECUTED on __ of September 2021

_____

DECLARANT

IN THE UNITED STATES DISTRICT COURT
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DR. ROSANDRA DAYWALKER | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | No. 3:20-CV-00099 |
| BRANCH AT GALVESTON, AND DR. | § | |
| BEN G. RAIMER, IN HIS OFFICIAL | § | |
| CAPACITY | § | |
| *Defendants.* | § | |

---

## DECLARATION OF DR. ROBERT DARLING

---

1. My name is Robert Darling, M.D. I have personal knowledge of the matters contained in this Declaration and am fully competent to make this Declaration.

2. I am currently employed as an Assistant Professor in the Department of Otolaryngology at The University of Texas Medical Branch at Galveston ("UTMB"). I have held this position at UTMB since August 2017.

3. My duties as a faculty member at UTMB include training, teaching, and working with medical residents in the Department of Otolaryngology. My job also entails using my professional judgment to evaluate residents' academic and medical development as they progress through the Department's residency program.

4. I was a faculty member and a member of the Clinical Competency Committee in 2018 while Dr. Rosandra Daywalker was a medical resident at UTMB. In those roles, I served as a decision-maker for UTMB's decisions to (1) place Dr. Daywalker on remediation and (2) have her repeat portions of her PGY-3 year as part of her remediation.

5. I voted in favor of those decisions based on concerns about Dr. Daywalker's clinical competency and her academic progress, including as reflected by the information contained in the letters marked as Exhibit A and B.

EXHIBIT I

6. I was not aware of Dr. Daywalker's June 2018 internal complaint of discrimination, her August 2018 request for Family and Medical Leave, or any request for medical accommodations at the times I voted for her to be placed on remediation or continue as a PGY-3.

7. The aforementioned votes were made based on my academic and medical judgment and were not motivated or caused by race discrimination or retaliation for Dr. Daywalker's complaints of discrimination, medical leave, or accommodation requests.

8. I have supervised residents as a faculty member since 2017. I am not aware of any other resident during this timeframe that has had nearly identical competency and academic issues as Dr. Daywalker.


I declare under penalty of perjury that the foregoing is true and correct.


EXECUTED on _12_ of October 2021

_____
DECLARANT

EXHIBIT J FILED UNDER SEAL

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ___ FEPA<br>_X_ EEOC | 460-2018-04343 |

Texas Commission on Human Rights Act (TWC) and EEOC
*State or local Agency, if any*

| Name *(indicate Mr. Ms. Mrs.)*<br>Dr. Rosandra Daywalker | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Street Address | City, State and ZIP Code | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>UTMB-Galveston | No. Employees, Members<br>501+ | Phone No. (Include Area Code)<br>409-772-2222 |
|---|---|---|
| Street Address<br>301 University Blvd., Galveston, Texas 77555 | City, State and ZIP Code | |
| Name | No. Employees, Members | Phone No. (Include Area Code) |
| Street Address | City, State and ZIP Code | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)*<br><br>_X_ RACE  __ COLOR  _X_ SEX  __ RELIGION  __ NATIONAL ORIGIN<br><br>_X_ RETALIATION  __ AGE  __ DISABILITY  __ OTHER (Specify below.) | DATE(S) DISCRIMINATION TOOK PLACE<br>Earliest            Latest<br>2017              Continuing<br><br>_X_ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE *(If additional paper is needed, attached extra sheet(s)):*

I.  I became a medical doctor in May 2015.  In June 2015, I matched to University of Texas Medical Branch at Galveston ("UTMB") to complete a 5-year residency program in Otolaryngology ("the Program").  I am the only Black resident in the Program for all 5 years.  When I began the Program, Dr. Susan McCammon was the Program Director.   In or about April 2017, Dr. Wasyl Szeremeta (Caucasian) became the new Program Director.  Dr. Szeremeta had been with UTMB for a year or so.

II.  During an Otolaryngology Retreat in June 2016, Dr. Szeremeta made certain comments or generalizations about race that I felt were inappropriate in a group environment.  Specifically, Dr. Farrah Siddiqui (Asian/Middle Eastern), then Assistant Program Director, commented that Otolaryngology was the least favorite specialty among Black medical students.  Dr. Szermeta replied, "If they (Blacks) are not interested, we cannot force them to apply." To me, his reply was unnecessary and showed his lack of interest in making Otolaryngology more diverse and made others think I was there for reasons that had nothing to do with my achievements.  For example, Dr. Robert Darling (Caucasian), a Resident then and now Attending Physician, texted me during the Retreat that since Black Otolaryngologists were so scarce, I should feel basically bulletproof at UTMB.

III.  At times, Dr. Szeremeta made statements or comments that revealed a racial bias toward or insensitivity against Black residents, patients, or people.  He asked me on multiple occasions my opinion when it came to the topics related to Black culture or conduct.  For instance, he asked me why do Black people use the emergency room for their health care.  He also made hostile comments before or during surgery about Hispanics and illegal immigrants.  He said Hispanics felt entitled and did not want to learn English.  In a Morbidity and Mortality Conference, Dr. Yang was giving a presentation on a child who was a patient.  As background, I have never been present where the race of a patient or relative of a patient was mentioned in a M&M presentation.  During or after Dr. Yang's presentation, Dr. Szeremeta interrupted and stated that the mother of the child accused him of not giving enough pain medication because the child was Black.  Dr. Yang did not comment.  I later informed the group that literature and studies showed there was a disparity in

EXHIBIT K

OAG-0000525

medication and treatment for Black patients.

IV. Dr. Szeremeta became my Program Director in or about April 2017. I noticed that he started scrutinizing my performance more than others. The prior Program Director, Dr. McCammon, had always been helpful in providing constructive feedback on my overall progress. I was doing well, and my performance evaluations reflected the same. In contrast, Dr. Szeremeta manufactured reasons to reprimand me. On multiple occasions, he accused me of not closing my notes fast enough. At that time, there was no set time period to close notes. However, my notes were completed within a reasonable period of time (usually no later than 72 hours) after the clinic or surgery. When I asked another resident about the time period for completion of notes he stated that he would complete his notes within three days. When I applied for leave, Dr. Szeremeta stated the leave was done improperly. He told me that leave should be placed in UTMB's Kronos time system. When I asked two other residents if they had requested leave through Kronos, they both stated that they had not. Dr. Szeremeta did not reprimand them to my knowledge. He appeared to try to cast me into an "angry Black woman" stereotype by falsely accusing me of being angry and looking like I wanted to assault him. I have never had any temper related issues at work and many have stated that I speak softly and am mild mannered. Dr. Szeremeta also unnecessarily delayed my facial plastic surgery rotation which caused me to miss the majority of the rotation. I lost the opportunity to learn more about the subspecialty (i.e., facial plastic surgery), to network and receive information that could advance my career.

V. Under Dr. McCammon, I was rated "meets expectations" in every area. However, under Dr. Szeremeta in August 2017, I was rated "requires attention" in multiple areas including medical knowledge, professionalism and interpersonal and communication skills. Many of the alleged accusations by Dr. Szeremeta were inconsistent with the comments he made. By the end of 2017, I still was not rated "meet expectations" in all areas.

VI. In May 2018, I was placed on remediation. Remediation is similar to a performance improvement plan. Even though there was not objective basis for the remediation, I still adhered to the remediation terms as requested. However, I did not receive a resources or assistance for improvement or concrete length of time for remediation. After receiving the remediation plan, I reported harassment and discrimination based on race and gender to UTMB for an internal investigation. During the alleged investigation, Dr. Siddiqui completed my performance evaluation and rated me as "require attention" in every area. I felt this was blatant retaliation for reporting Dr. Szeremeta.

VII. My health began to decline in 2017 and worsened in or about July 2018 after I received the remediation reprimand and the worst performance evaluation since I had been in the program. I was seeing a therapist due to the hostile workplace environment and ongoing discrimination and retaliation. Due to my health, I requested personal leave. I did not know at the time that this may have been an FMLA qualifying illness. Even after knowing my need for leave, UTMB did not inform me of my FMLA rights. Instead, it used my requests for leave as punishment. It drafted the terms of my leave in a letter in August 2018. If I wanted UTMB to approve leave, I would have to agree to repeat my third year of residency. As background, Dr. Lara Reichert left on maternity leave and was not required to repeat an entire year. By that time, I was a fourth-year resident. UTMB also demanded that I complete assignments related to work while on leave. UTMB also denied me a complete facial plastic rotation. This will be my subspecialty when I complete residency. Without a complete rotation, I will likely miss opportunities to obtain a fellowship in facial plastic surgery. I believe this will adversely affect my career opportunities in the long-run.

VIII. Dr. Harold Pine (Caucasian) brought the leave of absence letter to a local restaurant. The letter was drafted by Dr. Vicente Resto (Hispanic). My husband was present at the meeting with Dr. Pine. During the meeting, Dr. Pine told me that if I did not sign the leave letter, I could be terminated. He also stated that management did not believe that I would perform well enough to return as a 4th year resident. When I asked for the reason, he said it was just how management felt, and there was a sizeable group that did not think I would finish the program. He admitted that there could be individuals who did not want me to finish. He encouraged

OAG-0000526

me to sign the leave letter to avoid any additional harassment and discrimination. I specifically remembered him saying, "It is what it is." He also stated it was not a good situation for me, but the letter permits me to complete the residency. This only made my situation worse, as I was under extreme duress to sign the agreement or risk losing my job. I was in no condition to work, but I reported to work the next day in fear of losing my job.

IX. I also spoke with Dr. Christopher Thomas a few days after my meeting with Dr. Pine in August 2018. I mentioned Dr. Pine's comments. He said that I had not been promoted to a PGY4 (resident year 4) because Dr. Szeremeta did not sign the required documents. However, I called the American Board of Otolaryngology in October 2018 and was told that I was a PGY4. He explained the tense situation and said that he "was trying to put a silver lining to a dark cloud for me." He discussed a facial plastic fellowship and told me that it would be better for me to repeat the third year. When I asked if this was the fairest way to handle the leave, he did not answer, say yes, or say no; instead, he said it was a way I could "get a break from being in the midst of all of this." He said this would permit that faculty to get a chance to "reflect and for everything to cool off." I told him that I felt the leave letter was punitive. He did not deny this comment. When I stated that I wanted FMLA, he pushed back and started discouraging FMLA leave. He started stating all the hurdles I must jump through to get FMLA leave. I believe this was an attempt to make my leave legally unprotected to terminate me or cause future adverse actions against me. Clearly, this showed he was fully aware of the harassment, retaliation, and discrimination.

X. After speaking with my attorney, she intervened on my behalf and drafted a letter requesting FMLA, among other things. Shortly afterward, I completed the FMLA paperwork, and ultimately FMLA was approved. I will return on November 6, 2018 and will be requesting accommodations under the ADAAA.

XI. I believe that I have been harassed, discriminated and retaliated against by UTMB due to my race, gender and engaging in protected activity.

| I declare under penalty of perjury that the above is true and correct. | NOTARY — When necessary for State and Local Agency Requirements |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLANANT |
| 10/29/2018 _____<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)   10/29/2018 |

NICHOLE C. HOWARD
Notary Public, State of Texas
Comm. Expires 06-17-2021
Notary ID 131135083

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

DR. ROSANDRA DAYWALKER,     *
     Plaintiff,          *
                         *
v.                       *
                         *  Civil Action
UNIVERSITY OF TEXAS      *     No. 3:20-CV-00099
MEDICAL BRANCH AT        *
GALVESTON, AND DR. BEN G.  *
RAIMER, IN HIS OFFICIAL    *
CAPACITY,               *
     Defendant.         *


VIDEOTAPED, VIDEOCONFERENCED ORAL DEPOSITION

OF

DR. ROSANDRA DAYWALKER

Friday, August 27, 2021


VIDEOTAPED, VIDEOCONFERENCED ORAL DEPOSITION

OF DR. ROSANDRA DAYWALKER, produced as a witness at the

instance of the Defendants, and duly sworn, was taken

in the above-styled and numbered cause on Friday,

August 27, 2021, from 9:33 a.m. to 5:19 p.m., before

Debbie D. Cunningham, CSR, remotely reported via Machine

Shorthand, pursuant to the Federal Rules of Civil

Procedure and/or any provisions stated on the record or

attached hereto.

--ooOoo--

EXHIBIT L

Rosandra Daywalker - 8/27/2021

23

1  my cursory understanding of legal -- the legal

2  terminology, no, not -- retaliation didn't place me on

3  remediation; but it might have kept me on it for more

4  than I should have been on it.

5      **Q.   Fair enough.   Thank you.   Thank you for**

6  **clarifying that.**

7      A.   Yeah, I reported the behavior the day after I

8  was given the retaliation -- I mean -- sorry -- the day

9  after I was given the remediation letter.

10     **Q.   I can plainly see that.**

11     A.   Got it.

12     **Q.   I just want to clarify a couple of these --**

13  **these claims.**

14     A.   Thank you.

15     **Q.   So what I think is a final kind of claim is**

16  **disability discrimination.   Are you claiming that**

17  **disability discrimination is what caused UTMB to place**

18  **you on remediation?**

19     A.   Disability discrimination?   Not disability

20  discrimination.   Maybe disability retaliation later.

21     **Q.   So you're not claiming -- again, there's**

22  **multiple claims.   I just kind of want to, at the outset,**

23  **clear up kind of what the issues are.**

24     A.   No, I do not claim disability discrimination

25  for being why -- a reason I was put on remediation.

Rosandra Daywalker -- 8/27/2021

24

1     Q.   For your constructive discharge I'm going to

2  ask you the same questions.

3     A.   Okay.

4     Q.   Are you alleging that you were constructively

5  discharged because of your race?

6     A.   Yes, that played a part.

7     Q.   Are you alleging that you were constructively

8  discharged because of retaliation for protected

9  activity?

10    A.   Yes, that played a part.

11    Q.   For constructive discharge, are you alleging

12 that you were constructively discharged because of your

13 disability?

14    A.   Because of my disability?  No.

15    Q.   You're not alleging that -- that UTMB

16 constructively discharged you based on your disability?

17    A.   Not that they did because of my disability,

18 but that I put them on notice that I would be applying

19 for accommodations prior to returning and was still --

20 still faced retaliation when I came back.  So I feel

21 maybe that was part of the retaliation.

22    Q.   Thank you for that.  That clarifies -- that

23 clarifies that.

24    A.   Uh-huh.

25    Q.   And just to wrap up -- hopefully, this will be

Rosandra Daywalker - 8/27/2021

25

1    my last question; and we can move on -- the disability

2    discrimination, is that claim essentially that you felt

3    like you were retaliated against for requesting a

4    reasonable accommodation?

5         A.   Yes, but I think I would call it maybe -- I

6    mean, I don't know the difference between disability

7    discrimination and disability retaliation.  Are those

8    the same thing?

9         Q.   In my view it's not, but I'm happy to try and

10   tease out what your understanding --

11        A.   Yeah, can you help me to understand the

12   difference so that I can answer this most accurately?

13        Q.   Absolutely, and maybe we can kind of take it

14   step by step.  You mentioned before that you didn't

15   believe you were constructively discharged because of

16   disability, correct?

17        A.   Right.

18        Q.   Is there any other action you believe UTMB

19   took against you that was because of your disability?

20        A.   I feel they failed to protect me.  They failed

21   to protect me from additional retaliation in light of

22   knowing that I was applying for an accommodation.

23        Q.   So -- okay.  Anything else related to that?

24        A.   If I think of anything else, I will let you

25   know.

Rosandra Daywalker - 8/27/2021

44

1  Again, that's something we did consistently from first

2  year on, where we would go to clinic and help the

3  attendings see patients.  You know, complete in-office

4  procedures, complete documentation notes for them,

5  surgery, and call.

6            But as a fourth year, I guess, additional

7  duties would involve a little bit more supervisory of

8  other residents, still supervising medical students,

9  taking backup call, so being available to the junior

10  resident for call.  There might be more, but this is

11  what I can kind of tell you.

12            But at that time I didn't receive, like,

13  some general, like, you know:  This is what you're going

14  to do for the whole fourth year or anything like that.

15      Q.   So I want to kind of segue and talk a little

16  bit about medical notes.  When I refer to medical notes,

17  do you know what I'm talking about?

18      A.   I believe you're talking about documentation

19  that we do on the electronic medical records, for the

20  most part, unless it's down and we have to go back to

21  paper, like old school, for, like, clinic and consults

22  and surgical op notes is what I'm thinking you're

23  referring to.

24      Q.   That's what I'm referring to.

25      A.   Okay.

Rosandra Daywalker -- 8/27/2021

45

```
1        Q.    So help me out.  Can you explain to me why

2   these notes are important?

3        A.    Why these notes are important?

4        Q.    Yes.

5        A.    Uh-huh.  So that is sort of -- well, it's

6   important for a few different reasons, I guess.  To me,

7   the primary objective is to sort of document, you know,

8   for example, a patient's progress, how they're doing,

9   or, you know, what the -- what the course of clinical

10  care was, has been, or will be.

11              I know from my understanding of the

12  business side of it, as it pertains, you know,

13  especially here, in the United States, it is very

14  heavily used as a way of doing, like, billing, for

15  billing purposes, billing insurance, billing Medicaid,

16  Medicare, whoever is paying for the TDC.  In other

17  countries they actually use it more so for public health

18  and research purposes, not so much -- not as heavy on

19  the billing side of things.

20        Q.    Could they also be important as evidence if a

21  doctor were ever sued for malpractice?

22        A.    Could they be important if a --

23              MS. PLANTE-NORTHINGTON:  Objection if it

24  calls for her to speculate as to what would be necessary

25  in a medical malpractice lawsuit.
```

1    to shut down a conversation about much-needed diversity

2    in otolaryngology, where he stated -- basically, they

3    were starting a discussion about the dearth of diversity

4    in ENT, specifically as it relates to black physicians

5    and black female physicians; and he basically tried to

6    shut the conversation down by saying, "Well, if they" --

7    referring to black people -- "they" -- or black medical

8    students, "If they're not interested, well, we can't

9    force them to apply."  And that sort of just shut the

10   conversation down.

11                    In addition, there were multiple

12   instances where he would come into the room while I was

13   doing clinical work, like, in an actual clinic setting,

14   seeing patients, doing notes.  He would interrupt me to

15   give me some kind of negative critique or feedback.  He

16   would close the door behind him and say, "I'm just

17   telling you this," you know, and come over me.  Like, a

18   lot of times I'd be sitting at a desk; and he would

19   stand over me, hover over me, and start telling me these

20   negative critiques that weren't necessarily true or in a

21   gaslighting fashion.  He would do this multiple times

22   during my time there in the middle of me trying to do

23   clinical work.

24                    In addition, there were the times where

25   he told me things, like, gave me, like, negative

Rosandra Daywalker - 8/27/2021

72

1  feedback that he didn't give to the other residents.

2  So, for example, if there was a conference we attended

3  as a group of residents and it was known because the

4  Department sent us to this, like, weekend or one-day

5  conference and he made a point to tell me that I had not

6  followed policy by not submitting some kind of -- some

7  kind of paperwork or something, leave in the Kronos, the

8  leave system for UTMB.  And when I asked the two other

9  residents if they had received the same feedback or if

10  they needed to do the same thing, both of them answered

11  no.  They were both from my same year, and they both had

12  attended the conference.

13            He would -- I got wind or he would

14  tell -- either he told me or another attending told me

15  about during times when I would be finishing my notes,

16  prior to even being on remediation, that he would be

17  spying on me from another room, watching to see how long

18  it was taking me to close my notes.  And this was before

19  any remediation or anything was happening.  He was

20  already, like, hyperfixated on me when he was supposed

21  to be supervising residents in his own clinic but,

22  instead, was hyperfixated and spying on me.

23            There was a time where he told me -- he

24  texted me to tell me that I wasn't where I was supposed

25  to be for my research rotation, and he told me that the

Rosandra Daywalker - 8/27/2021

73

1   policy was that I was supposed to be in the lab every

2   day from a certain hour to a certain hour.  And when I

3   asked two other residents, neither of them -- they both

4   said that was not true, to their knowledge; and they had

5   just finished their research rotations and that that was

6   not a real thing.

7          And I also -- I had -- the reason I was

8   asking is because it was not stated in the official

9   research policy at the time; and it was not the

10  agreement I had with my actual research mentor.  And so

11  when I asked these other residents, either they were

12  never told that, never abided by that, not in the rules;

13  they did their own thing.  And one of them was actually

14  his research resident, was Szeremeta's research

15  resident; he just said, "Oh, yeah, I spent most of my

16  time at home."

17          So it was just really interesting that he

18  was telling one resident one thing and telling me

19  something else.  And the way he told me in a very

20  accosting sort of text, in a nasty text -- I think it

21  may be, you know, in our -- produced in our documents --

22  but it was just -- it wasn't like, "Oh, where are you?

23  Did you know you're supposed to be somewhere?"

24          It was like, "You know you're supposed to

25  be there, and you're" -- you know, almost like, "You're

Rosandra Daywalker - 8/27/2021

74

1  going to get in trouble; how could you do this," in that

2  sort of tone.  It was just really accusatory and

3  accosting and just -- you know, it's intimidating, you

4  know, coming from -- like, me, I'm, like, this little,

5  petite, you know, female resident; and, like, if you've

6  seen him, he's kind of a big guy.  And he's a very --

7  like, naturally his disposition is just really angry and

8  ornery.  It just -- I didn't -- I didn't grow up in that

9  kind of environment.  I didn't grow up in a hostile

10 environment; and it was just foreign to me.  Like, I was

11 so...

12      Q.   And, again, I don't mean to cut you off.

13      A.   Yeah, I'll continue.

14      Q.   I just wanted -- I just wanted to note, again,

15 without going too far into detail --

16      A.   Sure.  I'll continue.

17      Q.   -- just tell me what happened.

18           Is there any more --

19      A.   Yes.

20      Q.   -- instances of things he did that you -- that

21 you contend were --

22      A.   Yes.  In one of the instances where he pulled

23 me into a room or pulled me into a private room and

24 closed the door to give me, you know, what I -- to

25 gaslight me, basically, to tell me I did something wrong

Rosandra Daywalker - 8/27/2021

75

1  and to find out later it wasn't real or to give me bad

2  news, again, in the middle of clinic.  He came to tell

3  me that my facial plastics rotation was still being

4  delayed.

5              And at that time I kind of knew, like,

6  you know, something was amiss -- like, was amiss, wasn't

7  adding up; but I didn't, you know, make a big deal out

8  of it.  I just remember him saying, "Oh, it's delayed

9  once again," or something to that effect; and the

10 rotation was basically almost over.  Like, the time I

11 was supposed to be there was almost over by that time.

12             And I just got quiet.  I just got quiet

13 in my face, like, this.  And he told me I looked like --

14 oh, what's that?  Oh -- and he told me I looked like I

15 wanted to slug him in the face.  And that was so

16 disturbing to me because there's, you know, this

17 stereotype of black women being angry, you know, and a

18 lot of other things.  You know, the angry black woman

19 stereotype.  And, first off, that stereotype is -- it's

20 a stereotype; and it's inappropriate.  But if you can't

21 tell from interacting with me -- or anybody can tell

22 you -- I've never had, like, a violent outburst at work,

23 you know, never tried to hit anyone.

24             (Simultaneous speakers.)

25        Q.   I don't mean to interrupt.  I just --

1         A.   So he tried to paint me in a violent way, like

2    I was an angry and violent black woman or black person.

3         Q.   **Is there any other comments or actions that**

4    **Dr. Szeremeta took that you are --**

5         A.   He --

6         Q.   **-- harassment other than what you've testified**

7    **about?**

8         A.   He significantly shortened my facial plastics

9    rotation.  I was supposed to go there at the beginning

10   of third year; and he basically used -- like, switched

11   my rotation around in a discriminatory way.  So part of

12   it was that, one, there was a resident on leave; but I

13   was the -- it wasn't completely clear that that was the

14   whole reason.  He tried to make it seem like it was some

15   paperwork that wasn't done; but he basically shortened

16   the rotation from eight weeks to, like, maybe two weeks.

17   And nobody else had this done to them.

18              What else?  He was soliciting a lot of

19   feedback in a very unusual way.  So we're supposed to

20   get evaluations through New Innovations, which is the

21   software online or something that attendings use and

22   residents use to submit evaluations and do some other

23   things.  And, again, prior to me ever being on

24   remediation, he was -- I don't know the exact nature of

25   their conversation; but I know the outcome.  The result

1    was another attending, when I was at an outside

2    rotation, then e-mailed me to tell me that I had not

3    finished the notes; and they had not -- I had worked

4    with this same attending just maybe a day before and had

5    received no feedback on if I was doing poorly, if I was

6    seeing patients too slowly, nothing like that.

7                  And I know Dr. Szeremeta and that person

8    had a conversation that evening because I was supposed

9    to take leave soon for my wedding at that time; and the

10   next day I received a flurry of e-mails saying:  This

11   note isn't done.  This note isn't done.  This note isn't

12   done.  And it was unusual because it hadn't even been 24

13   hours yet since the clinic had ended, and I wasn't even

14   on remediation.  So I was confused by that.

15                 And he took that -- Szeremeta used that

16   as example of why I should be on remediation.  Even

17   though I hadn't been on remediation, he wanted me to

18   adhere to remediation terms before I was ever on

19   remediation.

20                 There's more.  He chastised me.  I went

21   on a medical mission trip to Vietnam with Dr. Pine in

22   March of 2018, and one evening we had a social event to

23   go to.  And I guess he communicated -- again, he was

24   just so obsessed with me and hyperfocused on me; and it

25   didn't matter if I was at UTMB or halfway across the

Rosandra Daywalker - 8/27/2021

78

1  world in Vietnam.  And when I came back, he told me --

2  he chastised me for being a few minutes late to get on

3  the van ride to go to this social dinner.  Again, I was

4  not on remediation.  This was a social event, like,

5  outside of anything to do with resident duties or work.

6  It was just these things; and it was just constant,

7  constant, constant.

8              Dr. Szeremeta was the one who told

9  faculty that I was -- that I needed to be put on

10  remediation.  It wasn't like it came from another

11  individual.  It came from Dr. Szeremeta.

12              My evaluations changed abruptly the

13  moment Dr. Szeremeta took over as program director; and

14  not my evaluations from my actual faculty, the summative

15  evaluation that the program director puts at the end, as

16  well as, if there's any areas that need or require

17  attention changed completely abruptly, like, 180 from

18  the last one Dr. McCammon completed to the one that

19  Dr. Szeremeta completed.  And the one that he completed

20  was not congruent with the actual feedback that the

21  attendings who actually worked with me had given.

22       Q.   Is there any other instances where you -- and

23  to be clear --

24       A.   Yes.

25       Q.   Okay.  Please go ahead.  And, please, just --

Rosandra Daywalker -- 8/27/2021

79

1  **just note what it was without going into detail; and we**

2  **can get into the details later.**

3       A.   Yes, sir.  Thank you for the reminder.

4            And then, you know, sort of the big one

5  that I finally said, "Okay" -- because by this time I

6  had already been seeing a therapist for hostile work

7  environment through the EAP; but this was sort of the

8  last thing, where I was, like, "Okay.  Now, I have" --

9  if it wasn't apparent to me, because I could be a little

10 naive, too; I try to give people benefit of doubt -- the

11 remediation letter was -- it -- it was so inflammatory

12 and disrespectful, unprofessional, and unethical, that

13 remediation letter that he put together, not to mention

14 just -- just sloppy.

15           So he put a lot of very damaging things

16 in there that were not true or had been hyperbolized or

17 just purely fabricated or taken out of context and used

18 that to place -- to convince the other faculty that I

19 needed to be placed on remediation and possibly

20 terminated and possibly sent straight to probation.  And

21 those were the comments he was making in meetings with

22 the CCC, saying, basically:  Back in the day, we could

23 just put a resident straight to probation; but that's

24 illegal now.  So we have to do it this way, as if he

25 wished that he could do illegal things to me.

Rosandra Daywalker - 8/27/2021

80

1            And he never spoke to me at all at any

2    point about any of the incidents that he put in

3    remediation to actually see what happened or to get my

4    side of things, just threw in all the lies he could.

5            So those are the majority.  If I think of

6    any more, I will tell you, Mr. Soto.  Thank you for this

7    opportunity.

8        Q.   Yes, please do.

9            So I want to kind of talk about some of

10   these, and I tried to write them all down.

11       A.   Oh, Mr. Soto?

12       Q.   Yes.

13       A.   Sorry, because, you know, I'm looking at

14   the -- my interrogatories; but there was also his

15   comments -- and this, to me, is hostile on race because

16   I do have some, like, Hispanic heritage, as well.  And

17   I'm from Miami, which is very diverse and a lot of

18   Hispanic people in my culture.  And he made comments

19   about Hispanic people, as well, where he would say --

20   one time he came in from a patient's room and ranted in

21   front of myself and a medical student about how

22   Hispanics were so entitled and did not want to learn

23   English and they should learn English and it was -- went

24   on and on.

25            It was just a really uncomfortable thing,

Rosandra Daywalker -- 8/27/2021

81

1   especially, at that time, the medical student,

2   unbeknownst to him, was Hispanic.  She just had white

3   skin; and so I guess he assumed, maybe, that she was

4   white and that it would be okay to say something like

5   that in front of us.

6           And then he came into the OR one time and

7   ranted about how he had heard of Mexicans coming into

8   the country; and they kept coming in and out because,

9   you know, that weird story about how they came in and

10  out of the country multiple times and finally they

11  killed a woman, an American woman.  It just -- it just

12  was not, to me, appropriate conversation at the start of

13  an operation.

14          And then...

15      **Q.   Okay.  Anything else?**

16      A.   And then, of course, there's all of his

17  Facebook posts, just very racially based, hyperfixated

18  on race but in a very, like, negative -- the opposite of

19  equity; the opposite of diversity, like, just very --

20  things about Aunt Jemima, things about, like -- what was

21  it?  It was weird.  Like, trying to show -- it was a

22  weird cartoon made from the Peanuts comic, just a lot of

23  weird race hating.  There was one about white lives

24  matter.  There was one about -- oh, my God, so many.  I

25  mean, we could -- I could go on and on about this; but

Rosandra Daywalker - 8/27/2021

82

1   all of those contributed to the hostile work environment

2   and harassment.

3       Q.    Any other instances you remember right now?

4       A.    In this moment, let me think.  That was

5   really disturbing.  There were a lot.

6              One I remember -- oh, this one was

7   another one that could be considered race and

8   retaliation was when I was operating with Dr. Chaaban

9   one time -- and at this point Szeremeta was under

10  investigation, internal investigation -- and he came

11  into the operating room during that time.  And at that

12  time, he had been -- I believe he had been removed as --

13  as -- temporarily as my, sort of, evaluator -- well, at

14  the beginning of the investigation.

15             And he made a point to come into the

16  operating room three different occasions.  The first

17  time he stared from outside the door.  Another time he

18  came in while Dr. Chaaban was in there and pretended to

19  ask a question about the procedure; but then, the final

20  and third time was the most disturbing, where

21  Dr. Chaaban was not present.  He came into the room and

22  just stood there with his legs wide open in that sort of

23  stance and put his arms across his chest and just stared

24  me down for several minutes and said nothing.  And I was

25  operating on an unconscious patient at their skull base,

Rosandra Daywalker - 8/27/2021

83

1    which is extremely dangerous; and he's just standing

2    there, just staring me down.  Eventually, the nurse, you

3    know, she could sense that something was wrong; and so

4    she went over and kind of -- you know, kind of

5    encouraged him to leave.

6         Q.   Any other -- I'm going to ask you about some

7    of these, but I want to make sure we -- we tie a bow on

8    this.  Any other instances in which you are alleging in

9    this lawsuit Dr. Szeremeta harassed you?

10        A.   Then there was all the stuff that happened in

11   the retaliatory period.  Do you want me to go into that

12   as well, to list those?

13        Q.   I'm asking for race-based harassment.

14        A.   Okay.  Okay.  It could be.  I'm not sure, you

15   know, how to separate them out; but I guess for the

16   purpose of your questioning and this conversation, if

17   you want to keep -- want me to stop here, I can.

18             MS. PLANTE-NORTHINGTON:  No.

19        Q.   (BY MR. SOTO)  I don't want you to stop.  I

20   want you to --

21        A.   Okay.  Because, I mean, you know, it's hard to

22   say that the stuff he did during the retaliation period,

23   as well, weren't also race-based discrimination.  I

24   can't, like, separate -- people don't just stop being

25   racist, you know, all of a sudden.  So there could be

Rosandra Daywalker - 8/27/2021

84

1  some element, as well, for him in the decisions he made.

2     Q.   And, again, I'm not looking for an

3  explanation.  I'm just looking for:  On this date, he

4  did this.  On this date, he did this.  So, again, I

5  think this would go quicker if you'd just tell me what

6  other incidents of harassment you're alleging are race

7  based.

8     A.   I don't want to confuse things; but I guess

9  you could say, basically, making -- so I think -- I

10  think he turned the rest of the faculty against me, sort

11  of like, there's a phrase, like, somebody can tell me,

12  like, muddying the waters or something like that.  But

13  he constantly was saying so many false negative things

14  about me that it was a character assassination,

15  basically.

16          And the feedback I got from multiple

17  faculty was -- like Dr. Watts, was that perception is

18  reality at this point; and when I asked her, I said,

19  "What about the truth or, you know, what if that

20  perception is being falsely drawn of me by

21  Dr. Szeremeta," she said it didn't matter.

22          The same thing with Dr. Pine.  He said,

23  you know, "The truth is irrelevant."  And so, you know,

24  him and the things he was saying in the CCC, as well as

25  in the remediation in turning the faculty against me and

Rosandra Daywalker - 8/27/2021

85

1  especially -- and after, while during the investigation.

2              And then all the things that happened,

3  you know, essentially during the retaliatory period, as

4  well, may have racial-discrimination basis to it, as

5  well.  I don't -- I think he may -- would have probably

6  treated me differently or better, you know, if not for

7  my race.  And, you know, that is the things he did,

8  including writing falsified verification statements,

9  changing my -- my PGY year with the Otolaryngology Board

10 after -- either during my FMLA leave or after I had

11 already been constructively discharged.

12             Those are the things I mostly can say.

13 Not removing the fake information from the remediation,

14 even though I asked, and planting that in my permanent

15 file, training file, which was then submitted to the

16 Texas Medical Board with false information.

17     Q.   I think you've already mentioned your

18 remediation --

19     A.   And the remediation was not supposed to be

20 reportable; but, for some reason, between Dr. Szeremeta

21 and whoever else, they made sure to submit to the Texas

22 Medical Board, knowing that it was not vetted, knowing

23 that it contained multiple fabrications.  Okay.

24     Q.   Anything else?

25     A.   If I think of anything, Mr. Soto, I'll let you

1   know.

2        Q.    Thank you.

3              Then let me -- let me go back and talk

4   about some of these.  Did Dr. Szeremeta ever use a

5   racial slur when referring to African-Americans?

6        A.    Like nigger?

7        Q.    Any racial slur.

8        A.    See, not to my face; but I don't know what he

9   was doing behind closed doors.  He might as well have

10  said it the way he acted to me.  The way he acted to me

11  and knowing his -- what he -- you know, the sort of

12  things he did later on with KKK imagery, I wouldn't be

13  surprised --

14       Q.    But to be --

15       A.    -- but, fortunately, not to my face.

16       Q.    To be clear -- to be clear, he never used a

17  racial slur when referring to black people in your

18  presence?

19              MS. PLANTE-NORTHINGTON:  Objection.  What

20  do you mean by "racial slur"?

21       Q.    (BY MR. SOTO)  I mean any -- anything you

22  consider to be a racial slur in referring to --

23       A.    I mean, if you're going to talk about -- well,

24  I guess -- I guess by the definition of a racial slur --

25       Q.    Well, let me -- let me ask it this way,

1  referring to was, like, people coming illegally or

2  without documentation; but he considered -- you know,

3  whatever this news report or group he was talking about,

4  that they were gang members of some sort, according to

5  him; but it was, like, around that discussion of, like,

6  you know, of people coming from Mexico without

7  documentation --

8       Q.   In --

9       A.   -- what he would call, like, illegal people or

10 something.

11      **Q.   In that context did he use any term to refer**

12 **to people of Latino origin that you consider to be a**

13 **racial slur?**

14      A.   Of what -- can you say that one more time,

15 sir?

16      **Q.   Sure.  During -- during this context, did he**

17 **refer to people -- to Latinos or people of Hispanic**

18 **descent by using any racial slur or ethnic slur?**

19      A.   Other than -- I can't say for sure how he

20 described them in that conversation other than he was,

21 like, saying they were gang members.  I don't know if

22 he used other words because I didn't record that

23 conversation, and it's been years.  I'm sorry.

24      **Q.   When you -- you referred -- the first two**

25 **things you referred to were comments related to why**

Rosandra Daywalker - 8/27/2021

90

1   black people use the ER and comments in the M&M

2   conference, correct?  Do you remember that?

3        A.   I mentioned those two incidents, yes, sir.

4        Q.   Was that -- was that before or after he became

5   program director?

6        A.   Those two were prior to him becoming program

7   director.

8        Q.   Were there other of the -- I have 22 kind of

9   instances of harassment that I kind of wrote down.  Are

10  there other instances that you referenced that took

11  place before he became program director?

12       A.   The one regarding if they aren't interested --

13  if the black people aren't interested, we can't force

14  them to apply, that happened before he became program

15  director.

16       Q.   Anything else you recall?

17       A.   The M&M about black people not feeling pain as

18  strongly or not needing pain medication.

19       Q.   So my understanding is that you may --

20       A.   The ER comment -- sorry.  I wasn't finished.

21  The ER comment.

22            There was also the -- the microaggression

23  where he told me that I was so well-spoken.  When I said

24  what I said about the literature around black people

25  being undertreated for pain in the medical setting, he

 1   Dr. Szeremeta's treatment of that patient, which you

 2   were not involved in that patient care, was harassment

 3   against you, correct?

 4        A.   At the end of the day, it affected me just the

 5   same.

 6        Q.   So you mentioned a number of things that took

 7   place before Dr. Szeremeta was program director,

 8   including the ER comments, the M&M -- the comments at

 9   the M&M conference, the comments about diversity, among

10   others.  Did you report any of these comments at the

11   time to UTMB?

12        A.   No, I spoke of them to my therapist that I got

13   through the UTMB EAP.

14        Q.   You eventually -- you eventually filed an

15   internal complaint, correct?

16        A.   Correct.

17        Q.   That was in approximately June of 2018,

18   correct?

19        A.   Yes, sir.  It was at that time that I had

20   finally something more tangible that people could see,

21   could look at, because those comments, while of a

22   racially discriminatory and harassing nature, as you

23   are kind of alluding to, if it -- if they didn't say

24   nigger or lyn- -- actually lynch me, like, people just

25   let it -- they just let it go and sweep it under the

Rosandra Daywalker - 8/27/2021

246

1  know, I'm just trying to move on at this point; and it's

2  like I still cannot, like, get from this -- this horror

3  story.

4      Q.  So let me ask you this specifically about your

5  alleged harassment that's retaliation based:  Are you

6  alleging at any time during this point -- and I don't

7  think I've heard it, but I just want to -- want to make

8  sure -- that you were ever -- ever physically assaulted

9  by Dr. Szeremeta?

10      A.  Is that -- my God, is that -- is that it?

11  Like...

12      Q.  I'm sorry.  Is that -- is that a funny

13  question?

14      A.  It's not funny.  It's sad.  It's disturbing.

15  It almost, to me, feels like that I have to be punched

16  in the face or something or called a nigger to like --

17  for this to arise to, like, the seriousness that it was.

18              (Simultaneous speakers.)

19      A.  I know that's probably not your intention, but

20  that's how it feels.

21      Q.  Well, that was not my intention; and I am

22  asking questions based on the allegations and the claims

23  you've made in the lawsuit.

24      A.  Uh-huh.

25              MS. PLANTE-NORTHINGTON:  She's never made

Rosandra Daywalker - 8/27/2021

247

1   any allegation of any physical abuse.  Move on.

2                   (Simultaneous speakers.)

3                   THE WITNESS:  Yeah, I did not.

4                   MS. PLANTE-NORTHINGTON:  She never made

5   any allegation of that.  That would have been in the

6   pleadings.

7       Q.   (BY MR. SOTO)  So can I -- can I ask my

8   question and you answer it and we can move on?

9       A.   Go ahead.

10                  MS. PLANTE-NORTHINGTON:  You're harassing

11  her at this point.

12                  MR. SOTO:  Victoria, thank you for your

13  contribution.

14                  MS. PLANTE-NORTHINGTON:  Yeah, you

15  know --

16                  (Simultaneous speakers.)

17      Q    (BY MR. SOTO)  Dr. Daywalker, you're not

18  alleging that you --

19                  MR. SOTO:  Excuse me, Ms. Plante-

20  Northington.  Can I ask my question?

21                  MS. PLANTE-NORTHINGTON:  I didn't say

22  anything.

23                  THE WITNESS:  She didn't say anything.

24  Go ahead.

25      Q.   (BY MR. SOTO)  Dr. Daywalker, isn't it true

Rosandra Daywalker - 8/27/2021

248

1    that you are not alleging as part of your hostile work

2    environment that you were ever physically assaulted or

3    accosted in any way, correct?

4        A.   No, I'm not alleging that I was physically

5    assaulted.

6        Q.   And we already talked about in your race-based

7    harassment claims, whether there was any -- whether

8    there was any racial slurs.  Do you remember that?

9             MS. PLANTE-NORTHINGTON:  Objection, asked

10   and answered.  And she said it was insulting that you

11   would ever even say that you have to have some racial

12   slur for there to be some conclusion of race

13   discrimination.  That's very offensive to black people.

14            MR. SOTO:  Ms. Plante-Northington, no

15   one's ever said that.  I wish you would stop

16   misrepresenting --

17            MS. PLANTE-NORTHINGTON:  But you keep

18   going to that.  You keep going to that.  You said that

19   earlier.  You're harassing on it.

20            MR. SOTO:  To be clear I have never said

21   that, and to be clear --

22            MS. PLANTE-NORTHINGTON:  You did ask her

23   were there racial slurs.

24            MR. SOTO:  Can you please -- can you

25   please stop talking once you make your objection?  Keep



JANE ROSE REPORTING

800-825-3341

74 FIFTH AVENUE NYC 10011
JANE ROSE REPORTING.COM
JANE ROSE @ JANE ROSE REPORTING.COM

## *US District Court - Texas*

---

## Dr. Rosandra Daywalker
## v.
## University of Texas Medical
## Branch at Galveston, et al.

---

## *Remote Deposition of:*
## Dr. Harold Pine
## September 3, 2021

EXHIBIT M

US District Court - Texas                    FINAL - September 3, 2021
Daywalker v. University of Texas                          Dr. Harold Pine

---

                                                    Page 201

 1    blanked out.  No decision to be made yet on out of

 2    research block change for, and blank and blank.

 3              I don't know who those are, but, again,

 4    the focus is on Dr. Daywalker returning from FMLA.

 5              When the other person was out on a

 6    pregnancy -- I believe there is a mention of someone

 7    being out pregnant, and that doctor might not be in

 8    this particular.

 9              Do you remember a resident being pregnant?

10         A.   Yes.

11         Q.   And she took FMLA leave?

12         A.   I'm not sure what leave she took or how

13    long she was out.

14         Q.   She had the baby, I'm assuming, during her

15    residency?

16         A.   Yes, I believe so.

17         Q.   And did she graduate with her class?

18         A.   I believe so, yes.

19         Q.   Were you over the group that decided they

20    would reorganize the Jolly Bone Jugglers?

21         A.   When you say "over the group," what does

22    that mean?

23         Q.   Were you the attending that was supposed

24    to be in charge of the Jolly Bone Jugglers?

25         A.   The medical student and three of our

---

US District Court - Texas                    FINAL - September 3, 2021
Daywalker v. University of Texas                          Dr. Harold Pine

```
                                            Page 202
 1   residents asked me to be the faculty adviser for the
 2   group, yes.
 3        Q.   Did you ask them what it was about, or did
 4   you already know?
 5        A.   No, I asked them.
 6        Q.   What did they say?
 7        A.   They told me it was a group to facilitate
 8   wellness.  Everyone around here knows I'm a big
 9   champion for physician wellness, and they thought
10   this would be a cool thing to get students from all
11   the four schools to come share their hobbies.
12        Q.   Why would they call it Jolly Bone
13   Jugglers?  Did you ask them that?
14        A.   I did.
15        Q.   What did they say?
16        A.   Well, one of the residents was a medical
17   student here and he had heard about the Jolly Bone
18   Jugglers during his anatomy class, and then they
19   actually took me by to show me a picture in the
20   lobby of UTMB of an old picture that they had around
21   1897 of the Jolly Bone Jugglers, so they thought it
22   would be kind of cool to bring back an old social
23   group.
24        Q.   Did you do any research on them?
25        A.   Yeah.  I asked the gang, that it would be
```

US District Court - Texas                FINAL - September 3, 2021
Daywalker v. University of Texas                      Dr. Harold Pine

```
                                                    Page 203
 1    cool to see what these guys were about, so I went
 2    over with ████████████ (phonetic) and ████████████
 3    (phonetic), two of the officers to the library and
 4    we asked the librarian to pull all of the
 5    information she could find about the Jolly Bone
 6    Jugglers.
 7         Q.   What's the librarian's name?
 8         A.   I don't remember.
 9         Q.   Of course.
10              So the librarian pulled it, and did you
11    see a skull and crossbones?
12         A.   Yeah.  On some of the robes that the
13    students were wearing they had a skull and looked
14    like femur bones, yeah.
15         Q.   You did not recognize that as a KKK
16    symbol?
17         A.   No.  It looked like the Jolly Roger pirate
18    symbol.
19         Q.   Were you aware that when the -- did you do
20    history on the Jolly Bone Jugglers and its racial
21    and gender make-up?
22              MR. SOTO:  Objection to "history" as
23         ambiguous.
24    BY MS. PLANTE-NORTHINGTON:
25         Q.   I mean, did you look it up to see what
```

US District Court - Texas                    FINAL - September 3, 2021
Daywalker v. University of Texas                        Dr. Harold Pine

Page 204

 1    type of group it was --
 2          A.   Yeah.
 3          Q.   -- before you start naming yourself out
 4    about them, what type of group it was?
 5          A.   Yeah.  I mean, the group was designed to
 6    break down class prejudices and to promote a feeling
 7    of universal brotherhood.  That's from their
 8    original --
 9          Q.   In 1896?
10          A.   That's exactly what it was in the primary
11    literature that they found for me, yes.
12          Q.   Did you provide this literature to the EEO
13    office when they were investigating this allegation
14    based on Dr. Heman-Ackah's complaint?
15          A.   I presented people with everything they
16    asked me for.
17          Q.   Dr. Szeremeta, was he involved?
18          A.   Not particularly, no.
19          Q.   "Particularly."  I don't know what that
20    means.  Was he involved in the presentation and
21    presenting it to the people on a Zoom conference?
22          A.   No, ███████ was the only one presenting.
23          MR. SOTO:  Dr. Pine, and to the extent
24    that you were asked about any information that
25    would identify medical residents, again, I

JANE ROSE REPORTING                 National Court-Reporting Coverage
1-800-825-3341                      janerose@janerosereporting.com

US District Court - Texas                    FINAL - September 3, 2021
Daywalker v. University of Texas                          Dr. Harold Pine

Page 205

 1        would ask you not to reveal it.
 2              MS. PLANTE-NORTHINGTON:  I already have
 3        that information, sir.  You remember I
 4        represented Dr. Heman-Ackah.
 5              MR. SOTO:  Is that a question to Dr. Pine?
 6              MS. PLANTE-NORTHINGTON:  No.  I just said
 7        do you remember that.  I'm asking you did you
 8        know that.  I think you knew that.
 9              MR. SOTO:  Are you asking me?
10   BY MS. PLANTE-NORTHINGTON:
11        Q.   Okay.  Did they initially exclude blacks
12   and women?
13        A.   I don't think women were admitted into
14   medical school at that time.
15        Q.   Is that your excuse?
16              MR. SOTO:  Objection.  Harassing.
17              THE WITNESS:  There wasn't a membership
18        requirement in the data I got.  It was said it
19        was open to all students.
20   BY MS. PLANTE-NORTHINGTON:
21        Q.   And the people that you saw in the
22   picture, were they all white males?
23        A.   I believe so, yes.
24        Q.   Once Dr. Heman-Ackah brought it to the
25   attention of the faculty that it was a KKK symbol

US District Court - Texas                    FINAL - September 3, 2021
Daywalker v. University of Texas                        Dr. Harold Pine

Page 206

1    and it was offensive to black people, what did you
2    tell her?
3        A.   I didn't tell her anything.  I was
4    horrified that it could have been.
5        Q.   Well, did you go and apologize to her,
6    since you were the person that was overseeing this,
7    as the -- I think you said the sponsoring -- I've
8    forgotten what you called yourself.  The faculty
9    adviser?
10               MR. SOTO:  Objection.  Form.
11               THE WITNESS:  I didn't apologize because I
12          hadn't done anything malicious or with any
13          intent to hurt anybody or exclude anybody.
14   BY MS. PLANTE-NORTHINGTON:
15       Q.   It doesn't matter if it's done with
16   intent.  Whether you step on someone's foot by
17   mistake or you step on it on purpose, it still
18   hurts, doesn't it?
19       A.   It does, and I tried to make it right by
20   immediately saying let's shut this down.
21       Q.   Did you apologize to Dr. Heman-Ackah?
22               MR. SOTO:  Objection.  Asked and answered.
23   BY MS. PLANTE-NORTHINGTON:
24       Q.   Why didn't you apologize to her?
25               MR. SOTO:  Objection.  Asked and answered.



JANE ROSE REPORTING   800-825-3341

74 FIFTH AVENUE NYC 10011
JANE ROSE REPORTING.COM
JANE ROSE @ JANE ROSE REPORTING.COM

## *US District Court - Texas*

---

# Dr. Rosandra Daywalker
# v.
# University of Texas Medical
# Branch at Galveston, et al.

---

## *Remote Deposition of:*
## Vicente Resto, MD - Volume 1
## September 15, 2021

EXHIBIT N

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 15, 2021
Vicente Resto, MD - Volume 1

Page 17

1  around maybe February/March?
2      A.  Yeah.
3      Q.  Of this year?
4      A.  Yep.  We are in the middle of a national
5  search for that.
6      Q.  Okay.  So you are just interim now?
7      A.  Correct.
8      Q.  Are you going to apply for that position,
9  seek that position, or you don't know?
10     A.  Yes, I am part of the search.
11     Q.  You are part of the search.  Oh, you are
12  part of their search to find someone?
13     A.  Yes.
14     Q.  I thought you were saying you were
15  searching for yourself?
16     A.  No.  No.  I'm a candidate in the national
17  search.
18     Q.  Right.  All right.  And as professor you
19  are teaching medical students, I assume?
20     A.  Rarely.
21     Q.  Okay.
22     A.  You know, deployments and teaching vary
23  and do determine locally, so I personally have done
24  direct medical student education, but has not been a
25  large part of what I do.

Page 18

1      Q.  So do you do mostly residency training?
2      A.  At this point I actually do little of that
3  as well.
4      Q.  When did you stop doing residency
5  training?
6      A.  I've never stopped.  It's mostly
7  commensurate with when I see patients, who tend to
8  participate with me in when I do provide care.  That
9  is a much reduced amount these days, and most of the
10  time today I don't have a resident assigned.
11         So it's residents get deployed as part of
12  the program assignments, and more often than not,
13  although I still on occasion do get resident
14  coverage, I more often than not do not.
15     Q.  Okay.  So are you not performing
16  surgeries, and things like that?  You are in a more
17  admin role?
18     A.  The majority of my role is administrative,
19  yes.  I do still on occasion perform surgery.  I do
20  tend to have a resident with me then, but, like I
21  said, it is truly a minor component of what I do
22  today.
23     Q.  Okay.  And as -- we are going to talk
24  about your chair duties for otolaryngology from 2008
25  to 2021.  Can you just give me a brief synopsis of

Page 19

1  what you were responsible for?
2      A.  As chair of the program, one is
3  responsible for all things otolaryngology.  That
4  includes the clinical practice, delivery of care
5  around that specialty area.
6         It includes any research programs that are
7  directly ascribed to the department, and, lastly, it
8  includes education around otolaryngology, which is
9  both at the resident and the medical school level as
10  a department.
11     Q.  Do you have final decision-making
12  authority for the residency program?
13     A.  I do not.
14     Q.  Who has final decision-making authority?
15     A.  It's sort of an additive, you know,
16  step-wise escalation.  Generally, for most actions,
17  particularly significant actions, it generally
18  starts at a local level with the program director,
19  which, depending what department you assess, how
20  heavy-handed or hands-on a chair may be in a
21  program, versus a program director, is very much
22  variable between departments.
23     Q.  Okay.  Just speaking about otolaryngology.
24  Let's just --
25     A.  Okay.  So in our department I was not very

Page 20

1  hands-on with the residency.  It is a delegation
2  that I gave to our program director.
3         So I certainly participated.  I was
4  informed.
5         My largest contribution, aside from the
6  day-to-day exposure to residents, as every other
7  faculty would have when they were exposed to
8  residents, was really around resource gathering,
9  resource allocation, faculty recruitment.
10        When it came to the day-to-day operational
11  details of the residents and the residency, that
12  tended to be heavily managed by the program
13  director.
14     Q.  Did you and the program director have
15  regular meetings to update you on what was going on
16  with the residents?
17     A.  Generally, those were ad hoc mostly
18  because we had standing faculty meetings, and as a
19  standing item in the faculty meeting we would always
20  review resident affairs.
21        So not only was I kept abreast of what the
22  happenings were in the residency training program,
23  so were the other faculty members.
24     Q.  Okay.  And the faculty meetings would be
25  different than the CCC, which is the -- I think it

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 15, 2021
Vicente Resto, MD - Volume 1

---

Page 21

1   is the clinical competency committee?
2       A.  That is correct.
3       Q.  Okay.  Who is responsible for the CCC?
4       A.  For the CCC, it is a body aimed at
5   supporting the program director's work around the
6   resident, and the residents and residency program
7   management.
8           The program director, it's a de facto
9   chair of that committee.  It is made up of faculty
10  members in the department.  Not all, but a subset.
11          Although the meetings were never closed,
12  me or a faculty member allowed any member to attend
13  any meeting and to participate at any time.
14          Naming individuals to the committee was
15  more aimed at ensuring that there was some presence
16  and engagement more so than anything else.
17      Q.  So was the CCC, to your knowledge,
18  hand-picked or was it a voluntary thing or both?
19      A.  It was both.  You know, there was always a
20  request for who wanted to participate.  There was
21  always, you know -- you know, there was some
22  grassroots understanding of the folks that were
23  highly interested, and that was always desirable.
24  You know, people who were interested in putting in
25  the time in and into the affairs of the residents.

Page 22

1       Q.  Were you chair at the time that Dr.
2   McCammon was the program director?
3       A.  I was.  She became program director at the
4   same time I became interim chair for the department.
5       Q.  So 2008, or about?
6       A.  That is correct.
7       Q.  And did she serve in that role until Dr.
8   Szeremeta took over in what I believe is April of
9   '17?
10      A.  That is correct.
11      Q.  Do you know of any complaints of
12  discrimination, harassment or retaliation that was
13  lodged against Dr. McCammon?
14      A.  Certainly none that were substantiated.
15  I'm trying to remember if there may have been any.
16  So many years ago.
17          I can't -- honest, I can't remember.
18      Q.  Okay.  That's fine.
19          Under Dr. Szeremeta, do you remember at
20  least three?
21      A.  Approximately.  Again, all fully
22  investigated, and I believe that discrimination
23  claims were not substantiated.
24      Q.  I'm asking you the number, not the
25  outcome.

Page 23

1       A.  Oh, I'm sorry.  Three.
2       Q.  Three.  That would be a resident, Dr.
3   Daywalker in this present suit, and Dr. Heman-Ackah,
4   correct?
5       A.  I don't know.  We don't always -- in fact,
6   we are not privy to who presents the complaint.
7   That's managed centrally through the DII office, and
8   what I end up getting is, essentially, a report as
9   the chair.
10          There's a notification that there has been
11  a complaint, and they generally sort of disclose the
12  high-level nature of the complaint, not details, and
13  then I get a follow-up letter that tells me what the
14  conclusion of the investigation has been, so --
15      Q.  I'm sorry.  Go ahead.
16      A.  I was going to say that they don't
17  identify the person who places the complaint.
18      Q.  Okay.  Didn't you tell Dr. Daywalker to
19  place a complaint, if she felt she was harassed or
20  discriminated against by Dr. Szeremeta, with the
21  internal complaint office, the DII?
22      A.  That would have been a matter of
23  procedure.  If Dr. Daywalker -- and I believe she
24  may have -- I'm trying to remember.  I think she
25  did.

Page 24

1           That would have been a response as a
2   matter of process.  It is the recommendation and the
3   guidance that we give anybody, whether it be a
4   resident, faculty or an employee.  If there's any
5   kind of concern regarding any of these issues, the
6   DII office is our formal process to independently
7   assess these.
8       Q.  Do you remember her saying that she didn't
9   want you to proceed because she feared retaliation?
10      A.  I don't remember that, but that's usually
11  part of a discussion around this process.  In fact,
12  it's a discussion that the DII office also has with
13  complainants and it is something that, as a leader
14  of the group and, in fact, the faculty all together,
15  because I certainly have made myself clear to them,
16  we are all aware that that is something that is
17  highly monitored and not tolerated.
18      Q.  Okay.  When you say it's "highly
19  monitored," in what way do you monitor that as a
20  chair?
21      A.  There's no direct way, but there's a very
22  low threshold for anybody to raise any kind of
23  question, whether it be the individual who feels
24  that they are being retaliated against.
25          This has been brought to previous

---

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 15, 2021
Vicente Resto, MD - Volume 1

---

Page 53

1  core faculty members, including the program
2  director, and the duties of the CCC or the program
3  director would include, and the third one would be making recommendations,
4  including promotion, remediation and dismissal.
5      Do you see that?
6  A.  I do.
7  Q.  Okay.  At this point is there any
8  parameters under which the CCC or the program
9  director would implement or would know this
10  particular issue is a remediation issue?
11      MR. SOTO:  Objection.  Form.
12      THE WITNESS:  They would identify a
13  remediation issue as a gap, and a gap -- we can
14  talk about what a gap means or what I mean by a
15  gap.
16      It's a gap that has been communicated
17  informally, coached informally, failed, you
18  know, to be addressed, and --
19  BY MS. PLANTE-NORTHINGTON:
20  Q.  You said -- can you slow down just a
21  minute, because I'm trying to get this?
22  Communicated informally, coached informally, and
23  what did you say?
24  A.  And remains an issue that has failed to
25  improve.

Page 54

1      And remediation is still a formative
2  intervention.  It's still an intervention that is
3  really aimed at improving --
4  Q.  Okay.
5  A.  -- in performance, and that's when it
6  gets -- you know, it is really an exercise for
7  formalizing, you know, that plan.
8  Q.  Where do you have this policy?  You named
9  three things that is supposed to be formally
10  communicated, coached -- no.  Informally
11  communicated, coached informally, and remains an
12  issue.
13      Where is that in any type of document on
14  the CCC and remediation, to your knowledge?
15      MR. SOTO:  Objection.  Argumentative.
16  BY MS. PLANTE-NORTHINGTON:
17  Q.  Go ahead.
18  A.  I'm not aware that it is articulated
19  anywhere, but neither is the way that we entertain
20  our residents on a day-to-day basis, which would
21  take a very similar, you know.
22  Q.  Well, this is a form of if it's not
23  corrected it will lead to worse things happening,
24  correct?
25  A.  It is.

Page 55

1      MR. SOTO:  Objection.  Form.
2  BY MS. PLANTE-NORTHINGTON:
3  Q.  Okay.  So if it's not an egregious offense
4  like someone, you know, literally doing something
5  that was totally unethical and you would just say
6  that's just grounds for termination, physically,
7  things like deficiencies in the resident's
8  performance would go through this process or they
9  all go through this process?  Would it be coached or
10  would it be remediation, or are they both?
11      MR. SOTO:  Objection.  Form.
12  BY MS. PLANTE-NORTHINGTON:
13  Q.  Is remediation and being coached the same
14  thing?
15  A.  There's a component of overlap of
16  remediation is different in the sense that it seeks
17  to further formalize, you know, the problem, so it's
18  a problem that has been discussed, you know, and
19  unable to be addressed, again, less formally so.
20      Then, if it needs to be articulated -- and
21  why remediation is different is not only an
22  articulation of the problem, but it's also a
23  definitive articulation of a proposed plan to
24  address.
25      Generally, there are some metrics that are

Page 56

1  identified, and there may be a timeline, you know,
2  that is introduced, you know, to assess.
3  Q.  Why is it an informal communication?  It
4  seems like it would be more of a formal
5  communication, so if that person ever stated, I'm
6  shocked by this remediation, I didn't even know this
7  was an issue, why is it an informal communication
8  process?
9      MR. SOTO:  Objection.  Form.
10  BY MS. PLANTE-NORTHINGTON:
11  Q.  Go ahead.
12  A.  Why is -- I'm sorry.  You are saying
13  remediation is informal?
14  Q.  Yes.  You said the first step is
15  communication informally.  Why would the process be
16  informal if it is a step toward getting to a
17  document that perhaps could be detrimental to that
18  person's career?
19      MR. SOTO:  Objection.  Form.
20      THE WITNESS:  So, two things.  There are
21  documentations in the form of evaluations.
22      When I refer to interventions and
23  coaching, are basically discussions, you know,
24  around the issues that may happen.
25      But there is documentation in the form of

---

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 15, 2021
Vicente Resto, MD - Volume 1

Page 53

1  core faculty members, including the program
2  director, and the duties of the CCC would include,
3  and the third one would be making recommendations,
4  including promotion, remediation and dismissal.
5      Do you see that?
6      A.  I do.
7      Q.  Okay.  At this point is there any
8  parameters under which the CCC or the program
9  director would implement or would know this
10  particular issue is a remediation issue?
11      MR. SOTO:  Objection.  Form.
12      THE WITNESS:  They would identify a
13  remediation issue as a gap, and a gap -- we can
14  talk about what a gap means or what I mean by a
15  gap.
16      It's a gap that has been communicated
17  informally, coached informally, failed, you
18  know, to be addressed, and --
19  BY MS. PLANTE-NORTHINGTON:
20      Q.  You said -- can you slow down just a
21  minute, because I'm trying to get this?
22  Communicated informally, coached informally, and
23  what did you say?
24      A.  And remains an issue that has failed to
25  improve.

Page 54

1      And remediation is still a formative
2  intervention.  It's still an intervention that is
3  really aimed at improving --
4      Q.  Okay.
5      A.  -- in performance, and that's when it
6  gets -- you know, it is really an exercise for
7  formalizing, you know, that plan.
8      Q.  Where do you have this policy?  You named
9  three things that is supposed to be formally
10  communicated, coached -- no.  Informally
11  communicated, coached informally, and remains an
12  issue.
13      Where is that in any type of document on
14  the CCC and remediation, to your knowledge?
15      MR. SOTO:  Objection.  Argumentative.
16  BY MS. PLANTE-NORTHINGTON:
17      Q.  Go ahead.
18      A.  I'm not aware that it is articulated
19  anywhere, but neither is the way that we entertain
20  our residents on a day-to-day basis, which would
21  take a very similar, you know.
22      Q.  Well, this is a form of if it's not
23  corrected it will lead to worse things happening,
24  correct?
25      A.  It is.

Page 55

1      MR. SOTO:  Objection.  Form.
2  BY MS. PLANTE-NORTHINGTON:
3      Q.  Okay.  So if it's not an egregious offense
4  like someone, you know, literally doing something
5  that was totally unethical and you would just say
6  that's just grounds for termination, physically,
7  things like deficiencies in the resident's
8  performance would go through this process or they
9  all go through this process?  Would it be coached or
10  would it be remediation, or are they both?
11      MR. SOTO:  Objection.  Form.
12  BY MS. PLANTE-NORTHINGTON:
13      Q.  Is remediation and being coached the same
14  thing?
15      A.  There's a component of overlap of
16  remediation is different in the sense that it seeks
17  to further formalize, you know, the problem, so it's
18  a problem that has been discussed, you know, and
19  unable to be addressed, again, less formally so.
20      Then, if it needs to be articulated -- and
21  why remediation is different is not only an
22  articulation of the problem, but it's also a
23  definitive articulation of a proposed plan to
24  address.
25      Generally, there are some metrics that are

Page 56

1  identified, and there may be a timeline, you know,
2  that is introduced, you know, to assess.
3      Q.  Why is it an informal communication?  It
4  seems like it would be more of a formal
5  communication, so if that person ever stated, I'm
6  shocked by this remediation, I didn't even know this
7  was an issue, why is it an informal communication
8  process?
9      MR. SOTO:  Objection.  Form.
10  BY MS. PLANTE-NORTHINGTON:
11      Q.  Go ahead.
12      A.  Why is -- I'm sorry.  You are saying
13  remediation is informal?
14      Q.  Yes.  You said the first step is
15  communication informally.  Why would the process be
16  informal if it is a step toward getting to a
17  document that perhaps could be detrimental to that
18  person's career?
19      MR. SOTO:  Objection.  Form.
20      THE WITNESS:  So, two things.  There are
21  documentations in the form of evaluations.
22      When I refer to interventions and
23  coaching, are basically discussions, you know,
24  around the issues that may happen.
25      But there is documentation in the form of

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 15, 2021
Vicente Resto, MD - Volume 1

Page 57

1   evaluations.  That generally is the type of
2   written documentation that is required to
3   support a remediation plan.
4   BY MS. PLANTE-NORTHINGTON:
5       Q.  Okay.  Is there a -- sorry.
6       A.  I was going to say remediation plan does
7   not have such written documentation.  It doesn't
8   achieve approval.
9       Q.  Okay.  So are you saying that the resident
10  that's put on remediation has previously been
11  notified that you -- if this doesn't improve, you
12  are going on remediation?
13      A.  They have been notified that there has
14  been a problem on account of review and their
15  evaluations.
16      Q.  No, that wasn't my question.  My
17  question -- do you remember my question?  There is
18  no what, now?
19      A.  That you suggest that remediation is
20  something that is thrown out there as a threat.  The
21  answer is it's really a next step.  It is --
22      Q.  No.
23      A.  -- there's a gap.  It's documented.
24  There's discussions.  There's conversations about,
25  you know, how it can happen.  If it fails to happen,

Page 58

1   remediation, you know, then gets brought in to bear.
2       Q.  I didn't say remediation was a threat.  I
3   said is the person put on notice that if they do not
4   fulfill certain deficiencies they will be considered
5   for remediation?
6       MR. SOTO:  Objection.  Form.
7   BY MS. PLANTE-NORTHINGTON:
8       Q.  Go ahead.
9       A.  Not as a formal step, but, generally, that
10  does get communicated.  I don't know that for a fact
11  other than --
12      Q.  Okay.  That's all I need to know.
13      MR. SOTO:  I'm sorry.  Can he answer the
14  question, please?
15      MS. PLANTE-NORTHINGTON:  He's speculating
16  now.
17      Okay.  Go ahead and speculate.
18      MR. SOTO:  Object.
19      You can finish answering.
20      THE WITNESS:  And so -- sorry?
21      MR. SOTO:  You can finish, Doctor.  You
22  can answer, Doctor.
23      THE WITNESS:  Okay.  So what I say is, you
24  are exactly correct.  That discussion is not
25  documented, per se.  That is precisely what the

Page 59

1   remediation plan is.
2       It's a formal documentation that is when,
3   basically, ultimately, things get fully
4   formalized.  I mean...
5   BY MS. PLANTE-NORTHINGTON:
6       Q.  Okay.  Dr. Daywalker was first notified
7   that she was going to be on remediation or that
8   remediation was even considered the day she received
9   the remediation.  Were you aware of that?
10      MR. SOTO:  Objection.  Argumentative.
11      THE WITNESS:  I'm not aware of that.
12      But I also do recall that Dr. Daywalker
13  had been brought to understand that there was
14  some issues that were brought up that
15  ultimately made the basis of the remediation
16  plan, so the problems were not new to Dr.
17  Daywalker.
18  BY MS. PLANTE-NORTHINGTON:
19      Q.  That's not the question I'm asking you,
20  because you understand that if you are going to be
21  penalized or some adverse action is going to be
22  taken against you, you want to know in -- upfront
23  what gets you there.
24      Do you understand that question?
25      MR. SOTO:  Objection.  Form.

Page 60

1   BY MS. PLANTE-NORTHINGTON:
2       Q.  Let me withdraw the question.  Let me stay
3   in line with what I'm discussing with you.
4       So we have discussed that there's no
5   formal written document that puts the employee or
6   the resident on notice that they are in risk of
7   being on remediation if they don't correct these
8   deficiencies, correct?
9       A.  That is correct.
10      Q.  Okay.  So, at that point, how is a person
11  to correct it if it has not been brought to their
12  attention that this may lead to remediation, so we
13  want you to correct that so we don't have to place
14  you on remediation?
15      MR. SOTO:  Objection.  Form.
16      THE WITNESS:  That, again, usually is the
17  content of discussions surrounding evaluation
18  commentary.
19  BY MS. PLANTE-NORTHINGTON:
20      Q.  Well, if it was never listed in Dr.
21  Daywalker's performance evaluations, would you agree
22  that she wouldn't be put on notice that she was
23  going to face remediation?  Would you agree to that?
24      MR. SOTO:  Objection.  Argumentative.
25      Speculation.

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 15, 2021
Vicente Resto, MD - Volume 1

Page 61

1  BY MS. PLANTE-NORTHINGTON:
2      Q.  Go ahead.
3      A.  So there were faculty who put forth
4  written evaluations and comments, you know, around
5  some of the professionalism issues.  That's --
6      Q.  No.  Yeah, I think you are getting off
7  track a little bit.  I'm talking about where
8  remediation is actually a term put in the
9  evaluation, because that would, indeed, put the
10  person on notice because they would have that
11  documentation of the appraisal.
12      So I'm asking you, since you are relying
13  on these performance evaluations, why isn't there
14  something in the performance evaluation that said
15  that continued deficiencies that are not corrected
16  may lead to remediation?
17      MR. SOTO:  Objection.  Form.
18      THE WITNESS:  I don't know that I have an
19      answer for you.  At some point it needs to be
20      introduced.
21  BY MS. PLANTE-NORTHINGTON:
22      Q.  Okay.  Yep.  Might be a good idea.
23      So do you feel it is a good idea to sort
24  of let that person know before they are given a
25  remediation document, oh, we already put it in your

Page 62

1  evaluation that if this wasn't corrected you were
2  going to go on remediation, and we are just
3  following through with that?
4      A.  You are asking my personal opinion?
5      Q.  Yes.
6      MR. SOTO:  Objection.  Form.
7  BY MS. PLANTE-NORTHINGTON:
8      Q.  I'm asking your professional opinion as
9  the chair of otolaryngology.
10      A.  Okay.  My opinion -- my professional
11  opinion, you know, we are executing at a level that
12  is very, very high.  It is already a privilege and
13  one that comes with a tremendous burden, you know,
14  to do the kind of things that we do, really laden
15  with safety and responsibility toward the public.
16      I think when we come in at this level,
17  there is a sense of responsibility.  There is a
18  review of what the ultimate deliverables are, in
19  detail.
20      There are policies around what we do,
21  which are many local, but many others federal, and I
22  believe that at a professional level of training it
23  is individual's and individual's responsibility
24  primordially to move forward, you know, to,
25  essentially, fulfill those discussed details.

Page 63

1      So the idea that one has to repeatedly
2  introduce to any more than we did, because there is
3  a process here --
4      Q.  I didn't say you repeatedly had to
5  introduce anything.  I don't know where you are
6  getting that from, but I did not say that.
7      A.  Well, you asked me for an opinion, and I
8  shared the opinions.
9      Q.  Oh, okay.  I thought you were saying I
10  said something like that.
11      You understand that in your profession
12  also you talk about residents should know what they
13  need to do.  They are given their information.  They
14  know what they need to do, this, that and the other.
15      You understand physicians, attendings and
16  heads of departments, need to know what they need to
17  do, correct?
18      A.  Um-hum.
19      Q.  Is that "yes"?
20      A.  I do, yes.
21      Q.  Okay.  And your industry, the medical
22  industry, is heavily documented, correct?
23      A.  Indeed it is.
24      Q.  Okay.  So you specialize in making sure
25  there is documentation of things, because if there's

Page 64

1  not documentation of things it could cause some kind
2  of other issue to arise, correct?
3      MR. SOTO:  Objection.  Ambiguous.
4  Compound.
5      THE WITNESS:  It can, particularly around
6  the medical record.
7  BY MS. PLANTE-NORTHINGTON:
8      Q.  Okay.  Around the medical record.
9      Around a call that's missed that was
10  important regarding a person's health?  Would you
11  agree to that?
12      A.  I do.
13      Q.  Okay.  So documentation has always been a
14  keystone of medicine in general, correct?
15      A.  I would agree, at least recently, so, yes.
16      Q.  Okay.  And even more so in information
17  technology where you are now doing everything by
18  computer, correct?
19      MR. SOTO:  Objection.
20      THE WITNESS:  I don't know that EMR has
21  anything to do with it, but documentation has
22  always been important.  It's the way that
23  information gets transmitted.
24  BY MS. PLANTE-NORTHINGTON:
25      Q.  Okay.  But what you are saying is

Page 181

1    hard-wired process.  This contract is -- you know,
2    it is not otolaryngology specific other than the
3    title at the top, which really relates to her.
4          Every house staff in this organization is
5    under the same contractual agreement, under the same
6    terms.
7          Q.  So would you like to correct your
8    testimony on the record because that sort of threw
9    me off?
10         A.  Yes.  My apologies.
11         So from what you shared with me here,
12   clearly it's signed by Dr. Szeremeta, who was at the
13   time the program director for this particular
14   contract renewal, and this is just a standard
15   year-long contract for employment.
16         Q.  Okay.  And when is the latest contract
17   can be returned from the resident?
18         A.  So I can't give you a specific date, but
19   there is a deadline that is put, mostly because we
20   want to -- or we would like to organizationally have
21   everybody under a contract without interruption.
22   The transition from one year to the next, as
23   articulated over here, is July -- let me verify
24   that.  That is July 1st, I think.
25         Q.  Okay.

Page 182

1          A.  So -- yep, July 1st.
2          So we would want to have all renewals
3    signed and on file prior to.
4          Q.  Okay.  And the latest date that it can be
5    signed on behalf of UTMB, which is Dr. Szeremeta, of
6    course -- when is the latest date?
7          A.  Well, generally, we would want, in an
8    ideal setting, a fully executed contract prior to
9    7/1 of the relevant year.  You know, the new year
10   coming on.
11         Q.  Okay.
12         A.  Sometimes I'm sure that there's some delay
13   or, you know -- but that wouldn't be by plan.  It
14   would be...
15         Q.  Be by what?
16         A.  Meaning just it may have been a delay, but
17   it's certainly not by plan.  By plan, we would want
18   everybody under fully executed renewal contract by
19   seven.
20         Q.  Okay.  Now, as relates to Dr. Daywalker,
21   this contract appears to be signed by Dr. Daywalker
22   on July 22nd and Dr. Szeremeta on August 16th,
23   electronically.  Do you see that on page six?
24         A.  I do.
25         Q.  Okay.  So this created a binding contract

Page 183

1    between UTMB and Dr. Daywalker, correct?
2          A.  For a year's term.  And generally, of
3    course, there's some, you know, extenuating
4    circumstances that are associated with termination
5    for cause, so on and so forth, but, yes, it is
6    otherwise a year-long contract.
7          Q.  What does PG -- PRG-4 mean?
8          A.  I'm sorry.  Where are you?
9          Q.  I'm at the top here.  It's an acronym.
10         MR. SOTO:  Objection.  It's outside the
11   scope.
12         THE WITNESS:  At the top of what page?
13   BY MS. PLANTE-NORTHINGTON:
14         Q.  Page four at the top of the work
15   agreement.
16         A.  You have to -- your position of residence.
17   Officer at the PGR.  Okay.  That, basically -- what
18   does that stand for?  It is, essentially, PGY-4.
19         Q.  Thank you.
20         Okay.  We can move on from there to number
21   two.  Explain all steps for reporting the PGY levels
22   for fourth-year resident to the American Board of
23   Otolaryngology from 2018 to 2019 residency year.
24         A.  So those are two separate events.  Lines,
25   if you will.  One is the scholastic, you know,

Page 184

1    progression, I suppose, through, like, residency
2    training, which is measured and quantified by or
3    assessed by milestone accomplishments year over
4    year.
5          And then the other one is an employment
6    contract with University of -- UTMB, and it is,
7    essentially, you know, your paycheck, and so on and
8    so forth.
9          The latter is based on tenure.  The former
10   line is based on successful, you know, promotion,
11   and that's done so by acquisition and delivery of
12   milestones as described by the National Board and
13   articulated in the student handbook.
14         Q.  Okay.  I'm asking you about the names of
15   documents that are sent to the board relating to --
16   I really don't care about how you split it.  How
17   would Exhibit -- would Exhibit, I think it is, 15,
18   be sent to the otolaryngology board or would some
19   other document be sent?
20         A.  No.
21         MR. SOTO:  Objection.
22         THE WITNESS:  It generally would be
23   another document.  It's an online certification
24   form that program directors need to submit for
25   every resident year over year, and there needs

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 15, 2021
Vicente Resto, MD - Volume 1

---

Page 281

1    listen to the conversation involving Dr. Pine, Dr.
2    Daywalker and her husband?
3         A.  No.
4         MR. SOTO:  And just for the record, this
5    is not something he was designated.
6         MS. PLANTE-NORTHINGTON:  I thought you
7    said 40 through 43.
8         MR. SOTO:  Forty-one through 43.
9         MS. PLANTE-NORTHINGTON:  Okay.
10        MR. SOTO:  Dr. Pine was 40.
11        MS. PLANTE-NORTHINGTON:  Okay.  Yeah, we
12   did talk about that.  Okay, 41.
13        MR. SOTO:  And I think 41 was something we
14   had withdrawn.
15        MS. PLANTE-NORTHINGTON:  Okay.  Forty-one,
16   okay.  Yeah, that's right.
17        MR. SOTO:  I'm sorry.  Forty-two is Ongeri
18   could speak to that.
19        MS. PLANTE-NORTHINGTON:  Okay.
20   BY MS. PLANTE-NORTHINGTON:
21        Q.  Okay.  Forty-three, the physician
22   statement, have you reviewed it?
23        A.  The EOC statement, yes.
24        Q.  Okay.  And I'm not asking you about the
25   legal part of it, but the factual part, is that

---

Page 282

1    accurate, true and correct?
2         A.  Yes, to the best of my knowledge.
3         Q.  Is there anything you would like to change
4    in the EEOC position statement?
5         MR. SOTO:  Objection.  Form.
6         THE WITNESS:  Not at this time.
7    BY MS. PLANTE-NORTHINGTON:
8         Q.  Were all the documents attached to the
9    position statement true and correct?
10        A.  To the best of my knowledge.
11        MS. PLANTE-NORTHINGTON:  Okay.  We are
12   going to go off the record.  I think I'm
13   finished, but I want to check with my client.
14   Thank you.
15        THE REPORTER:  Off the record.
16        (Break taken from 7:45 p.m. to 7:59 p.m.)
17   BY MS. PLANTE-NORTHINGTON:
18        Q.  Dr. Resto, you understand you are still
19   under oath?
20        A.  Yes, ma'am.
21        Q.  I have placed in the chat Exhibit 21.  I
22   think you testified earlier that you weren't aware
23   of the stress or hostile work environment that Dr.
24   Daywalker was experiencing and that she was seeing a
25   therapist?

---

Page 283

1         A.  I don't have that in the chat.
2         (Plaintiff's Exhibit Number 21 was marked
3    for purposes of identification.)
4         MR. SOTO:  I just don't have that in the
5    chat.
6         MS. PLANTE-NORTHINGTON:  Okay.  Maybe you
7    had to be on, because I posted it while you
8    were off.
9         MR. SOTO:  Yeah.
10   BY MS. PLANTE-NORTHINGTON:
11        Q.  There we go.
12        A.  Okay.  Well, there's the answer.  I got a
13   letter.
14        MR. SOTO:  There isn't a question in front
15   of you, Doctor.
16   BY MS. PLANTE-NORTHINGTON:
17        Q.  Okay.  The middle part of it that's boxed,
18   I think it is page two.
19        A.  Um-hum.
20        Q.  Now, this letter is dated, just to put
21   context to it, is to you from Dr. Walker, which is
22   now Daywalker, about resident concerns, starting --
23   it says June 1, 2018.
24        Do you see that?
25        A.  I'm sorry.  I'm at the box.

---

Page 284

1         Q.  Okay.  I'm sorry.
2         A.  Where?
3         Q.  At the top.
4         A.  Okay.
5         Q.  Memo.
6         A.  Yeah, June 1, 2018.
7         Q.  Do you remember receiving this document
8    from her on June 1st?
9         A.  Honestly, no, but I'm not saying I didn't.
10   I just don't remember it.
11        Q.  Could this document have been what
12   made you go tell her she needed to go to the DII?
13        A.  It could be.  Again, a document like this
14   I would never have ignored.
15        Q.  Okay.
16        A.  So I would have recommended and maybe
17   chatted with her a little bit about, Hey, you know,
18   there's -- let's talk about this.  Is there
19   something that DII needs to look into?  Is there
20   something you can get some counseling for?
21        Oh, I mean, but there's no question, I
22   mean, that I would never ignore, you know, something
23   like this.
24        Q.  Did you ever ask her if she needed an
25   accommodation?

---

To: Vicente Resto, MD

From: Rosandra Walker, MD

RE: Resident Concern

Date: June 1, 2018

Dear Dr. Resto:

I regret to inform you of my less-than-optimal experience in our program. During the first 1.5-2 years, I felt supported and, at multiple formal semi-annual evaluations, I was informed I was performing at an excellent level. However, over the past 1.5 years, my experience has not been what it used to be. The recent developments and call for remediation have solidified impressions that I am not being evaluated in an entirely objective, equitable manner. The document detailing the basis of the call for my remediation is only the latest in a 1+ year-long series of events, of which I will give specific examples below:

- Remediation Letter: Most recently, the document from 5/30/18 detailing the basis of the initiation for remediation contains highly suggestive language, inaccuracies, inflammatory accusations, and misrepresentation of information. Most of the incidences reported do not differentiate whether they occurred before or after discussions about needs for improvement in performance. Many are taken from informal emails, as opposed to formal New Innovations evaluations. Many reports are isolated incidences that are lacking context. There is an episode highlighted to demonstrate that I, the resident in question, either engaged in egregiously poor patient care or was lying about caring for a patient at all—this information was inaccurate and no clarification was obtained prior to utilizing it as an example of need for remediation. There is another instance accusing me of intentional fabrication and fraudulent behavior in documentation, which was also described inaccurately. Much of the language is suggestive, with serious allegations that can be used to derail a physician's career. I am preparing a separate document detailing the discrepancies and/or necessary clarifications that can be attached as an addendum to the document.

- Impromptu, informal semi-annual evaluation meetings: There was no advanced notice given to me for the semi-annual evaluation meeting in Summer 2017. Instead, I was pulled in a spontaneous manner from the resident lounge and into the Vaughn Center with the current program director (PD) alone. For the semi-annual evaluation meeting for Spring 2018, residents were told that only those who had "areas for improvement" indicated on their overall evaluation would need to meet with the PD. When I approached the PD about setting a date for this, I was taken into a clinic patient room (Brittany Bay) spontaneously in the midst of active clinical duty for a few minutes for my "semi-annual evaluation."

- Discrepancies in feedback/evaluation: In my Spring 2018 evaluations (covering TDC/Consults, FPRS with Dr. Kridel, and MD Anderson) my highest competency scores were interpersonal communication skills and professionalism, 7.83 out of 9 and 8 out of

9, respectively. More notably, I received 8.5 out of 9 in professionalism from MD Anderson. Multiple evaluators stated that my clinical efficiency and documentation improved. However, in overall evaluation by PD, he indicates "needs attention" in both areas. In a different episode, I am told by PD that I was inappropriate for not placing a leave request or paperwork for a sinus conference that department approved. I agree. However, I asked two other residents who attended if they placed said request or received similar feedback—the answer is "no." This is an example of giving different expectations to different residents.

- Multiple meetings for "feedback" or "updates" in inappropriate settings: There were many instances where the PD took me into rooms alone, most commonly clinic patient room or teleconference room, to give me negative feedback about performance or "bad news" updates. I was uncomfortable in these situations and these interactions affected my emotional state negatively. As many of them occurred during active clinical duty, it also affected my performance and ability to focus (I would become physically ill and shaken afterward). One example included him revealing to me that the Plastics rotation would not be starting for me for several weeks (I can give you more details about this separately). My face was neutral and I pressed my lips together. He tells me "I look like I want to slug him in the face." On November 15, 2017, I asked someone to stand by as a chaperone because I knew he wanted to meet with me in this way and I did not feel comfortable with this. The UTMB Otolaryngology employee that I asked can attest to my request.

I have documented these and other instances of this kind of behavior for the past year. In essence, I have felt harassed, targeted, isolated, and intimidated for a long time. This persistent behavior produced undue fear and anxiety in me for my work environment. It definitely affected my performance in the immediate settings and chronically. In the initiation of remediation meeting, I did not feel safe or empowered to truly speak up for myself. I attended multiple counseling sessions through the Employee Assistance program for this months ago.

I recognize and take responsibility for my challenges in efficiency or organization in the past. I have attached my New Innovations Evaluations from throughout residency for review and to demonstrate the true trends in my performance, as well as citations that I have indeed improved in timeliness of documentation and efficiency (which is where the opportunities for improvement have previously lied). I have frequently been lauded for my professionalism, work ethic, attention to detail, interpersonal communication skills, responsiveness to constructive feedback, and reliability, which you will find in the formal evaluations.

I am amenable to remediation for two reasons: 1) this will be a great exercise to continually improve my performance and efficiency, and 2) it will give me an opportunity to gather objective data on a daily basis to corroborate the positive formal evaluations I have been receiving, and to demonstrate consistency in performance.

While I am greatly saddened by this turn of events, I am profoundly hopeful that my feedback will be used to improve delivery of resident education and to create a more fair, supportive

environment. I love this program and look forward to continuing my growth into the best clinician, surgeon, team mate, and person that I can be.

Most respectfully submitted,


Rosandra Walker, MD
House Staff Officer
Department of Otolaryngology, Head and Neck Surgery
University of Texas Medical Branch



JANE ROSE REPORTING   800-825-3341

74 FIFTH AVENUE NYC 10011
JANE ROSE REPORTING.COM
JANE ROSE @ JANE ROSE REPORTING.COM

## *US District Court - Texas*

---

## Dr. Rosandra Daywalker
## v.
## University of Texas Medical
## Branch at Galveston, et al.

---

## *Remote Video Deposition of:*
## Dr. Wasyl Szeremeta
## September 7, 2021

EXHIBIT O

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION
-------------------------------------------
DR. ROSANDRA DAYWALKER,
          Plaintiff,
v.
UNIVERSITY OF TEXAS MEDICAL
BRANCH AT GALVESTON, et al.,

          Defendant.
Case No. 3:20-CV-00099
-------------------------------------------

REMOTE VIDEO DEPOSITION OF
Dr. Wasyl Szeremeta
September 7, 2021
Lead: Victoria Plante-Northington, Esquire
Firm: Plante Law Firm

FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

---

Page 2

ATTORNEYS FOR PLAINTIFFS
  VICTORIA PLANTE-NORTHINGTON, Esquire
  PLANTE LAW FIRM, P.C.
    5177 Richmond Avenue
    Suite 1140
    Houston, Texas  77056
    713.526.2615
    Victoria@plantelawfirm.com

ATTORNEYS FOR DEFENDANTS
  ESTEBAN SOTO, Esquire
  SHEKEIRA WARD, Esquire
  ASSISTANT ATTORNEYS GENERAL
  OFFICE OF THE ATTORNEY GENERAL
  TRANSPORTATION DIVISION
    300 West 15th Street
    14th Floor
    Austin, Texas  78701
    512.936.1124
    Esteban.soto@oag.texas.gov
    Shekeira.ward@oag.texas.gov

---

Page 3

ALSO PRESENT REMOTELY
  Rosandra Daywalker
  Sean Flammer, UTMB
  Lauren Beamon, UTMB
  Glorieni Azeredo, OAG

JANE ROSE REPORTING
  74 Fifth Avenue
  New York, New York  10011
  1-800-825-3341
  Marie Foley, RMR CRR, Court Reporter
  Marvin Oltman, Videographer

---

Page 4

TABLE OF CONTENTS

Witness:
DR. WASYL SZEREMETA

Examination By Ms. Plante........... Page 7

Reporter Certificate ................ Page 409

Notice to Read and Sign  ............ Page 411

Index of Exhibits   ................. Page 413

---

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 5

1                      - - -
2              10:03 a.m. EST
3                      - - -
4        THE VIDEOGRAPHER:  This
5   deposition is being taken via remote
6   connection, and all participants are
7   attending remotely, including the
8   court reporter and videographer.
9        The deposition video quality is
10  relying on the witness's individual
11  bandwidth.
12       Here begins media number 1,
13  volume 1 in the deposition of Dr.
14  Wasyl Szeremeta in the matter of
15  Daywalker versus the University of
16  Texas Medical Branch at Galveston.
17       Today's date is September 7th,
18  2021.  The time is now 9:03 a.m.
19       My name is Marvin Oltman, a
20  legal video specialist.  The court
21  reporter is Marie Foley.  We are both
22  from Jane Rose Reporting, New York,
23  New York.
24       Will counsel please identify
25  themselves and state who they

Page 6

1   represent, beginning with the party
2   noticing this proceeding.
3        And please speak slowly for the
4   court reporter.
5        MS. PLANTE:  Thank you.
6        Victoria Plante-Northington for
7   Dr. Rosandra Daywalker, the plaintiff.
8        MR. SOTO:  And Esteban Soto on
9   behalf of defendants.
10       Also with me here today is
11  Shekeira Ward from the Attorney
12  General's Office, also appearing on
13  behalf of defendants, and Sean Flammer
14  with -- in-house counsel with the
15  University of Texas system, and Lauren
16  Beamon, an in-house counsel with UTMB.
17       THE STENOGRAPHER:  Doctor, if I
18  could ask you to raise your right
19  hand, please.
20                    - - -
21  DR. WASYL SZEREMETA,
22       having been duly sworn, was examined
23       and testified as follows:
24                    - - -
25       THE VIDEOGRAPHER:  Very quickly

Page 7

1   before we begin, I just want to remind
2   everybody that you have to have one
3   speaker at a time today and you can't
4   really make too much noise in the
5   background because it will bleed into
6   the person speaking.
7        So, please proceed with your
8   day.
9        Thank you.
10       MS. PLANTE:  Thank you so much.
11  We're ready?  Has he been sworn?
12       THE STENOGRAPHER:  Yes.
13       MS. PLANTE:  Thank you.  Totally
14  missed that.
15  EXAMINATION BY
16  MS. PLANTE:
17       Q.   Dr. Szeremeta, my name is
18  Victoria Plante-Northington.  I represent
19  Dr. Rosandra Daywalker in a lawsuit
20  against UTMB involving race
21  discrimination, hostile work environment,
22  and retaliation.
23       Do you understand those claims
24  have been made in this lawsuit?
25       A.   Yes, I do.

Page 8

1        Q.   Do you understand that you have
2   specifically been named in the facts of
3   the lawsuit?
4        A.   Yes, I do.
5        Q.   Have you ever given a deposition
6   before?
7        A.   Yes, I have.
8        Q.   When?
9        A.   Several years ago.  A
10  malpractice case.
11       Q.   Was that malpractice case
12  against you or against someone else?
13       A.   It was against me.
14       Q.   And what did the plaintiff
15  allege you had done?
16       A.   That I had injured her child
17  during surgery.
18       Q.   Where was that lawsuit brought?
19  Was it brought in Texas or in
20  Philadelphia?
21       A.   It was in New York.
22       Q.   New York.
23       Who did you work for at the
24  time?
25       A.   SUNY Downstate Stony Brook

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 9

1   University Medical Center.
2       Q.   Did you disclose that on your
3   application for the medical licensing
4   board for Texas?
5       A.   Yes, I did.
6           MS. PLANTE:  Okay.  Just one
7       moment.  I'm going to have to bring
8       that up.
9       Q.   I'm going to come back to that.
10  Let's just go over a few rules and
11  regulations of the deposition, and I think
12  since you've been through one, you have a
13  general knowledge of it, but to refresh
14  your recollection I'll go over a few
15  instructions.
16          You understand today is
17  testimony you will give as though you were
18  testifying before a judge or jury?
19      A.   Yes, I do.
20      Q.   You understand that you're under
21  the penalty of perjury?
22      A.   If I don't tell the truth, yes.
23      Q.   Okay.
24          And you understand that this is
25  a question-and-answer period where I ask

Page 10

1   you questions and you give me answers,
2   truthful answers.
3           Okay?
4       A.   Yes, I do.
5       Q.   Is there any reason why you
6   cannot give truthful answers today?
7       A.   No.
8       Q.   Are you on any medication that
9   would impair your testimony?
10      A.   No.
11      Q.   Can we agree that if I ask you a
12  question and you answer it, that you
13  understand it?
14      A.   Yes.
15      Q.   If you do not understand it,
16  just let me know and I will try to
17  rephrase it or clarify it.
18          Okay?
19      A.   Okay.
20      Q.   Please let me know if you want
21  to take a break.  I'm very liberal with
22  breaks.  We're going to probably be here
23  all day.  So, let me know and I will
24  permit that freely.  I just ask that you
25  permit me to finish a subject matter that

Page 11

1   we are discussing at the time.
2       Okay?
3           MR. SOTO:  And defendants object
4       to -- to that.
5           MS. PLANTE:  Okay.  That's fine.
6       Noted.
7   BY MS. PLANTE:
8       Q.   Do you understand, Dr.
9   Szeremeta?
10      A.   I understand.  I'll answer --
11  I'll answer what question you're giving me
12  at the time.  I won't -- I won't take a
13  break in the middle of a question.
14      Q.   Okay.
15          And if I am on, per se,
16  remediation and I'm going through
17  documents and stuff, would you agree that
18  unless it's an emergency that you will not
19  request a break?
20          MR. SOTO:  Defendants are not
21      going to agree to that.
22          MS. PLANTE:  Okay.  I didn't ask
23      you what you were going to agree to.
24          The question is to Dr.
25  Szeremeta.

Page 12

1       A.   I will do the best of my ability
2   to answer the questions, but if I need to
3   take a break, I'll take a break.
4       Q.   Okay.
5           And if I -- if you do take a
6   break when I am in the process of going
7   through a set of questions on a topic I
8   have, you can take that break, but I will
9   note that you're taking the break in the
10  middle of a topic that I am discussing.
11          Okay?
12      A.   Okay.  Noted.
13      Q.   Witnesses at times will state
14  they do not know, they do not recall, they
15  do not remember, and that is perfectly an
16  honest answer if it is, indeed, true.
17  However, if it is to evade answering a
18  question that may not be in your favor, do
19  you understand that that is -- that could
20  be brought before the judge or jury?
21      A.   I understand that.
22      Q.   Okay.
23          The court reporter is remote.
24  We are dealing with streaming.  So at
25  times there may be a delay sometimes in my

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                         Dr. Wasyl Szeremeta

Page 13

1    question and your response, and we may
2    talk over each other, but I will try to
3    make sure I allow you to answer a question
4    responsively.
5         Okay?
6    A.   Okay.
7    Q.   And I will do likewise to permit
8    you to finish your answer to the question.
9         And also the opposing counsel,
10   Mr. Soto, will make objections.  You are
11   to allow him to make that objection and
12   then begin to answer.
13        Okay?
14   A.   Understood.
15        MR. SOTO:  Victoria, before we
16   get started, can I amend, kind of, add
17   another counsel of record is who's
18   appearing here and that's Glorieni
19   Azeredo with the Attorney General's
20   Office, also here on behalf of
21   defendants.
22        MS. PLANTE:  We have five
23   attorneys present on this -- in this
24   deposition for the defendant?
25        I think I want to keep a running

Page 14

1    total.
2         MR. SOTO:  Okay.
3         MS. PLANTE:  Are there five?
4         MR. SOTO:  So, I am defending
5    the deposition.  There are four
6    other -- two other attorneys with the
7    Attorney General's Office who are
8    counsel of record who are appearing.
9    There are also two in-house counsel
10   for defendants that are appearing,
11   yes.
12        MS. PLANTE:  Okay.
13   BY MS. PLANTE:
14   Q.   What is your date of birth?
15   A.   June 8th, 1962.
16   Q.   And your address and telephone
17   number?
18   A.   3084 Camden Park Lane, League
19   City, Texas 77573.
20        Phone number (215) 740-6574.
21   Q.   What college did you attend?
22   A.   I attended Harvard University.
23   Q.   And what degree did you earn?
24   A.   AB in chemistry.
25   Q.   What does AB mean?

Page 15

1    A.   It's the Latin form of a
2    bachelor's degree.
3    Q.   Okay.
4    A.   Backwards.
5    Q.   And you graduated there.
6         Did you graduate with honors?
7    A.   Yes, I did.
8    Q.   And did you attend any, other
9    than medical school thereafter, did you
10   attend any other schools between Harvard
11   and the medical school that you attended?
12   A.   Between Harvard and medical
13   school, no.
14   Q.   Okay.
15        What medical school did you
16   attend?
17   A.   Jefferson Medical College at
18   Thomas Jefferson University.
19   Q.   And what years?
20   A.   1985 to 1989.
21   Q.   Did you graduate the top five of
22   your class?
23   A.   No.
24   Q.   Do you hold any other degrees
25   other than the medical doctor degree and

Page 16

1    the AB?
2    A.   Yes, I do.
3    Q.   What other degrees do you hold?
4    A.   MBA.
5    Q.   From where?
6    A.   Temple University.
7    Q.   When did you obtain that degree?
8    A.   2002.
9    Q.   When you finished at Jefferson
10   Medical College, did you match to a
11   residency program?
12   A.   No, I did not.
13   Q.   What happened after you finished
14   medical school in '89?
15   A.   When I did not match into ENT, I
16   scrambled into a general surgery program,
17   and I immediately went to a general
18   surgery residency in my PGY-1 and
19   reapplied for otolaryngology.
20   Q.   What school did you attend when
21   you were scrambling to get into medical --
22   to a residency program?
23   A.   Jefferson.
24   Q.   Okay.
25        So, just so I'll understand, you

JANE ROSE REPORTING                      National Court-Reporting Coverage
1-800-825-3341                           janerose@janerosereporting.com

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                      Dr. Wasyl Szeremeta

Page 17

1   com -- you participated in the match.  You
2   just were not matched to any residency
3   program after you graduated from medical
4   school, correct?
5       A.   No, I did not match on match
6   day.  And before the match, I obtained a
7   general surgery spot.  So when I
8   graduated, I had a spot in general
9   surgery.
10      Q.   Was the general surgery and the
11  year that you took to do that sort of
12  remedial to prepare you to match to an
13  otolaryngology residency?
14      A.   Not intentionally.
15      Q.   Okay.
16           What was your GPA at Jefferson
17  Medical School?
18      A.   I don't remember.
19      Q.   Was it a 3.5 or better?
20      A.   I don't remember.
21      Q.   And you said what residency
22  program did you attend?
23      A.   I did my general surgery at the
24  Medical Center of Delaware at the
25  Christiana Health Center, and then I did

Page 18

1   my ENT residency at Henry Ford Hospital in
2   Detroit.
3       Q.   Was that residency program in
4   otolaryngology for five years or four
5   years?
6       A.   Four years.
7            Let me -- it's a five-year
8   residency, but there was a vacancy and I
9   was matched into the second year.  So it
10  was four years otolaryngology, one year of
11  general surgery.
12      Q.   Okay.
13      A.   But I did not have to repeat
14  general surgery since I'd already done it.
15      Q.   Okay.
16           How long have you been an
17  otolaryngologist?
18      A.   Graduated my residency in 1994.
19  So '04, '14.
20           27 years.
21      Q.   27 years.
22           Do you have a subspecialty under
23  otolaryngology?
24      A.   Yes, I do.
25      Q.   What is it?

Page 19

1       A.   It's pediatric otolaryngology.
2       Q.   Did you do a fellowship in
3   pediatric otolaryngology?
4       A.   Yes, I did.
5       Q.   Where did you do that
6   fellowship, and for how long?
7       A.   Children's Hospital of
8   Pittsburgh for two years.
9       Q.   Okay.  You gave out.  When you
10  said a Children's Hospital, I didn't hear.
11      A.   Pittsburgh.  Sorry.
12      Q.   Pittsburgh?
13      A.   Pittsburgh, Pennsylvania, yes.
14      Q.   Okay.  Thank you.
15           Where were you originally born?
16      A.   I was born in Wilmington,
17  Delaware.
18      Q.   Are you of Ukrainian ancestry?
19      A.   Yes, I am.
20      Q.   Were your parents born here?
21      A.   No, they were not.
22      Q.   Where were they born?
23      A.   They were both born in Ukraine.
24      Q.   When did they -- did they come
25  to the U.S.?

Page 20

1       A.   They immigrated legally to the
2   United States in 1959.
3            I'm sorry.  19 -- let me think.
4   Let me think.
5            They immigrated 1961.
6       Q.   And they immigrated because
7   someone sponsored them, or that someone
8   hired them?  How did they immigrate to the
9   U.S.?
10      A.   I'm not --
11           MR. SOTO:  Objection; form.
12  BY MS. PLANTE:
13      Q.   Go ahead.
14      A.   I'm not sure.  I know they
15  immigrated legally.  I'm not sure the
16  details of their immigration.
17      Q.   Well, if you're not sure of the
18  details of their immigration, how are you
19  sure that it was -- it was legally
20  obtained?
21      A.   Because I know it was legally
22  obtained.  They had to sit for
23  naturalization.  Back then they would have
24  been deported if they were illegal, and
25  they weren't deported.

US District Court - Texas                      FINAL - September 7, 2021
Daywalker v. University of Texas                    Dr. Wasyl Szeremeta

Page 21

1    Q.   That's your -- you're
2  speculating that they would have been
3  deported.
4    A.   Ma'am, you asked if they were
5  sponsored or if they were -- came over for
6  a job. I don't know the answer to those
7  two questions.
8    Q.   Okay.
9        And I'm saying as it relates to
10 you assuming that they were legally
11 brought here, you're not basing that on
12 what someone told you. You're basing that
13 on just you want to believe the best of
14 your parents, that they legally got here,
15 correct?
16   A.   They --
17       MR. SOTO:  Objection.
18   Objection; compound; argumentative.
19 BY MS. PLANTE:
20   Q.   Okay. You can go on and answer.
21   A.   They legally immigrated.
22   Q.   But you have no basis to support
23 that, correct?
24   A.   They legally immigrated.
25   Q.   Is that yes or no?

Page 22

1    A.   They legally immigrated.
2    Q.   So, that's yes?
3    A.   Yes, they legally immigrated.
4    Q.   You have no basis to -- my
5  question was do you have a basis to
6  support that they legally immigrated here?
7    A.   There are documents to support
8  they legally immigrate. I don't have --
9  they legally immigrated.
10       Next question, please.
11   Q.   You won't tell me --
12       MR. SOTO:  Excuse me, Victoria.
13   Q.   You won't tell --
14       MR. SOTO:  Excuse me, Victoria.
15   Q.   Let's get some -- let's get some
16 ground rules. I thought I had made my
17 ground rules clear in the instructions,
18 but I am to give you -- I'm to ask you
19 questions and you are to give me answers.
20 You will not tell me to move on.
21       Do you understand?
22   A.   I will answer the question.
23       MR. SOTO:  Victoria, you've
24   asked him questions four times. He's
25   answered those.

Page 23

1        MS. PLANTE:  He will --
2        MR. SOTO:  I'm asking you to
3  please move on.
4        MS. PLANTE:  Well, I would ask
5  you to tell your client to be more
6  respectful and not tell me to move on
7  because that is disrespectful.
8        MR. SOTO:  Victoria, the way
9  you've conducted yourself --
10       MS. PLANTE:  You're not going to
11 do it? Okay. That's fine. I don't
12 need anything else other than you're
13 not going to instruct your client that
14 he cannot tell me to move on. That's
15 inappropriate. That's unprofessional
16 and it's rude.
17       MR. SOTO:  Okay. Can you move
18 on, Victoria, please, and ask a
19 question?
20       MS. PLANTE:  Yeah.
21       I'll note that your answers to
22 the question that I asked were you --
23 what was the basis of you believing
24 that they were legally here when they
25 came, I will note that your answer was

Page 24

1  non-responsive. So I'll move to
2  strike it.
3  BY MS. PLANTE:
4    Q.   Are you a part of any political
5  organizations?
6    A.   No.
7        MR. SOTO:  Objection; form.
8  BY MS. PLANTE:
9    Q.   Okay.
10       Do you understand what political
11 organizations are?
12   A.   Yes.
13   Q.   Okay.
14       So you're not a part of any
15 political organizations?
16   A.   No.
17   Q.   What about social organizations?
18       MR. SOTO:  Objection; ambiguous.
19 BY MS. PLANTE:
20   Q.   Are you a part of any
21 fraternity, any type of club that you may
22 attend that you're -- maybe it's Boy
23 Scouts, maybe it's a different -- do you
24 know what social organizations are?
25   A.   Yes.

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                             Dr. Wasyl Szeremeta

Page 25

1    Q.   Okay.
2         Are you a part of any of those?
3    A.   The only organization I'm part
4    of is the Ukrainian National Association.
5    Q.   When did you become a part of
6    that?
7    A.   When my parents bought insurance
8    for me through the organization.  So,
9    20 -- 25 -- 30, 35 years.  Most of my
10   life.
11   Q.   Have you ever held office for
12   this organization?
13   A.   Yes.
14   Q.   What office have you held?
15   A.   I was an advisor and I was also
16   an auditor.
17   Q.   And what year was that?
18   A.   I don't remember.  At least 15
19   years ago.
20   Q.   Are you still a part of that
21   organization now?
22   A.   Actually, since I don't have
23   insurance, no, I'm not part of it.
24   Q.   Have you ever contributed
25   financially to that organization?

Page 27

1    Church in the greater Houston area.
2    Q.   You said there is no church,
3    okay.
4    A.   There's no Ukrainian Orthodox
5    Church.
6    Q.   Okay.
7    A.   I do attend church in the area,
8    but not a Ukrainian Orthodox Church.
9    Q.   What church do you attend there?
10   MR. SOTO:  Objection; harassing
11   at this point.
12   BY MS. PLANTE:
13   Q.   Please answer.
14   A.   I attend either the Ukrainian
15   Catholic Church or the Serbian Orthodox
16   Church.
17   Q.   Do you attend, or are you a
18   member of that body?
19   A.   I attend.
20   Q.   Do you financially support the
21   church in any way, like give donations or
22   charitable contributions?
23   MR. SOTO:  Objection; harassing.
24   BY MS. PLANTE:
25   Q.   Move forward.

Page 26

1    A.   No.
2    Q.   Your answer --
3    A.   Other than -- other than buying
4    insurance from them.  I bought their
5    insurance product.
6    Q.   So you're saying there would be
7    no documentation on the website that you
8    gave any amount to a Ukrainian
9    organization?
10   MR. SOTO:  Objection;
11   speculation.
12   BY MS. PLANTE:
13   Q.   Go ahead.
14   A.   I don't -- I don't recall
15   donating to the Ukrainian National
16   Association.
17   Q.   What about any religious
18   organizations?
19   A.   Yes.
20   Q.   What are you a member of?
21   A.   I'm a member of the Ukrainian
22   Orthodox Church.
23   Q.   Are you a local member of a
24   church body there in the Galveston area?
25   A.   There is no Ukrainian Orthodox

Page 28

1    A.   Yes.
2    Q.   Okay.
3         Are you a registered Republican?
4    A.   Yes.
5    Q.   Did you vote for Donald Trump in
6    2016 and 2020?
7    MR. SOTO:  So, I am instructing
8    the witness not to answer this
9    question on the grounds of privilege,
10   both in Texas and federal law as to
11   his --
12   MS. PLANTE:  Privilege?  What
13   privilege are you talking about?
14   MR. SOTO:  Both the privilege
15   that's in I think it would be 506 of
16   Texas Rules of Evidence and the
17   additional federal common law
18   privilege relating to political
19   beliefs.
20   MS. PLANTE:  I don't know of
21   that.  You're going to have to cite
22   your authority.
23         And we're not under the Texas
24   Rules of Civil Procedure.  We're under
25   the Federal Rules of Civil Procedure.

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                      Dr. Wasyl Szeremeta

Page 29

1          MR. SOTO:  And under Federal
2   Rules of Civil Procedure it's
3   privileged as well.
4          I'm going to instruct him not to
5   answer.
6          MS. PLANTE:  Well, I think his
7   Facebook post will, sort of, let me
8   know how he voted for.  So we can get
9   around it another way.
10         Let's move on.
11  BY MS. PLANTE:
12     Q.   Would you agree that your
13  Facebook page has multiple posts regarding
14  then-President Trump?
15     A.   If you say so, I believe so.
16     Q.   Have you not looked at your
17  Facebook page?
18         MR. SOTO:  Objection.
19  BY MS. PLANTE:
20     Q.   Have you not looked at your
21  Facebook page recently?
22         You said "I believe so if you
23  said so."  I don't want it to be what I
24  said.  I want it to be based on your
25  knowledge.

Page 30

1      A.   I don't spend time reviewing
2   Facebook for years and years.  I look at
3   today's posts and I move on.
4      Q.   Isn't it true that you stopped
5   posting regularly around the middle part
6   of last year?  I think September of 2020
7   you stopped posting on Facebook?
8      A.   No, I posted on Facebook since
9   then.
10     Q.   Have you posted weekly since
11  then?
12     A.   Yes.
13     Q.   When did you come to work for
14  UTMB?
15     A.   September 2015, I believe.
16     Q.   Who interviewed you?
17     A.   There were multiple people who
18  interviewed me, but I do recall that Dr.
19  Resto interviewed me.
20     Q.   Did Dr. Resto send you an offer
21  letter with the terms of your employment,
22  or did someone else author that letter?
23     A.   Dr. Resto sent me that letter.
24     Q.   And Dr. Resto is, or was the
25  head of otolaryngology at the time?

Page 31

1      A.   He is the chairman of the
2   department.
3      Q.   And you were hired at what
4   position for UTMB?
5      A.   Initially hired as an assistant
6   professor.
7      Q.   And I assume that's of
8   otolaryngology?
9      A.   Yes, ma'am.
10     Q.   Did you have any, at that time
11  when you were hired, did you have the
12  ability to hire, fire, or discipline any
13  employees?
14     A.   No.
15     Q.   What were your job duties as
16  associate professor of otolaryngology when
17  you first arrived?
18     A.   It was assistant professor and I
19  got eventually promoted to professor, but
20  I -- my duties were -- there was a
21  clinical responsibility to take care of
22  pediatric patients -- I'm sorry, my
23  pediatric otolaryngology.  There was an
24  educational component to teach the
25  residents.  And I don't think I had a

Page 32

1   research component.  It was just clinical
2   research.  There was no formal research
3   component on it.
4      Q.   So you didn't write any type of
5   papers during the time you first got there
6   in 2015?  Publish any papers, rather?
7      A.   Say -- I would only participate
8   in clinical research.  I don't remember if
9   I wrote any papers the first couple years
10  I was there.  I'd have to look at my CV.
11     Q.   Okay.
12         When you applied to UTMB, did
13  you -- did you apply through a résumé or
14  CV?
15         MR. SOTO:  Objection; form.
16  BY MS. PLANTE:
17     Q.   Go ahead.
18     A.   I -- I answered a general letter
19  that Dr. Resto had sent to the community.
20  The letter was pointed out to me.  I
21  answered the letter with a cover letter
22  and sent the CV as requested.
23     Q.   And at any point, were you
24  promoted at UTMB?
25     A.   Yes, I was promoted to

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 33

1    professor.
2       Q.   Were your job duties the same as
3    associate -- or, as assistant professor, I
4    believe?
5       A.   Job duties were identical.
6       Q.   Job duties were identical, but
7    that was a pay increase, correct?
8       A.   Yes, it was.
9       Q.   At that time, had you interacted
10   with Dr. Daywalker in any of your clinical
11   duties?
12           That would be 215 -- 2015
13   through 2016.
14      A.   She would have rotated with me
15   on pediatric ENT rotation, with myself and
16   Dr. Pine.
17      Q.   And did she successfully
18   complete that rotation?
19      A.   To the best of my recollection,
20   she did.
21      Q.   What resident number was she
22   when you first started working with her in
23   the rotation?  Do you know if it was first
24   or second year?
25      A.   She would have been, I believe,

Page 34

1    first year.
2       Q.   Now, she had already matched to
3    UTMB by the time you were employed by
4    UTMB, correct?
5       A.   That is correct.
6       Q.   So you had no involvement in
7    whether she was hired on at UTMB, correct?
8       A.   None whatsoever.
9       Q.   In your rotation for 2015 and
10   2016, did you have any problems with her
11   and any deficiencies in notes?
12      A.   I don't recall that I did.
13      Q.   So, if she said you didn't,
14   would you have any recollection to refute
15   that?
16           MR. SOTO:  Objection; form.
17   BY MS. PLANTE:
18      Q.   Go ahead.
19      A.   What was the question?
20      Q.   I said if she said she didn't
21   have any problems with timely closing her
22   notes, would you have any evidence to
23   refute that?
24           MR. SOTO:  Objection; form.
25      A.   I don't have -- I don't recall.

Page 35

1       Q.   So, I assume the answer is no?
2       A.   You ask -- can you repeat the
3    question?
4            You said would I have any
5    evidence.  I don't have any evidence.
6       Q.   Okay.  So the answer is no.
7            Okay.  Thank you.
8            Dr. Resto -- I'm sorry.  Dr.
9    Pine was your peer?
10      A.   Yes.
11      Q.   Is that correct?
12      A.   That is correct.
13      Q.   But he had been at the UTMB
14   longer than you had, correct?
15      A.   That is correct.
16      Q.   Did you hear anything deficient
17   about Dr. Daywalker's performance when you
18   got there anywhere from 2015 to 2016?
19      A.   I don't recall.
20      Q.   Did you hear anything that was
21   complimentary of Dr. Daywalker's
22   performance 2015 to 2016?
23      A.   I don't recall other than she
24   did well on my rotation.
25      Q.   You said she did well on your

Page 36

1    rotation?
2       A.   PGY-1 year, PGY-2 year she did
3    well.
4       Q.   Do you own a company called Lone
5    Star Capital Solutions LLC?
6       A.   Yes, I do.
7       Q.   Is it still currently in
8    existence?
9       A.   It's in existence.
10      Q.   Are you the sole member of this
11   LLC?
12      A.   Yes, I am.
13      Q.   What services or goods do you
14   provide for Lone Star Capital?
15      A.   None whatsoever.
16      Q.   What was the purpose of you
17   organizing this company?
18      A.   I thought I might make some real
19   estate investment, and it didn't pan out.
20      Q.   Is it true that you filed for
21   bankruptcy?
22      A.   Yes, it is.
23      Q.   When did you file?
24      A.   2013.
25      Q.   Was that a personal bankruptcy,

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 37

1 or was that a bankruptcy through any type
2 of business organization?
3     A.   Personal bankruptcy.
4     Q.   Was that here in Texas, or was
5 that in another state?
6     A.   It was in New York.
7     Q.   Was it a Chapter 13, a
8 Chapter 7?  Do you know?
9     A.   It was Chapter 7.
10    Q.   So that meant you gave up all
11 the -- you gave up all your property to be
12 released from the obligation of payment;
13 is that correct?
14    A.   Yes.
15    Q.   And you were how many years out
16 of -- as in otolaryngology, you had -- you
17 were an otolaryngologist how many years at
18 the time you filed for bankruptcy?
19    A.   So, '96 to 2013.  So 17 years.
20    Q.   Just one moment.
21    A.   I think my math is correct.
22    (Pause.)
23    MS. PLANTE:  Can we go off the
24 record for a minute?
25    THE VIDEOGRAPHER:  We are now

Page 38

1 going off the record at 9:38 a.m.
2    (Recess taken.)
3    THE VIDEOGRAPHER:  We are now
4 going back on the record at 9:47 a.m.
5 BY MS. PLANTE:
6    Q.   Dr. Szeremeta, you understand
7 you're still under oath?
8    A.   Yes, ma'am.
9    Q.   Okay.
10    Earlier you said that you had
11 reported a malpractice claim to the
12 medical board for Texas; is that correct?
13    A.   Yes, ma'am.
14    Q.   Okay.  I have Exhibit 20 listed
15 in the chat.
16    Can you open that up?
17    A.   Yes.
18    MR. SOTO:  And, Doctor, you're
19 going to have to save it.
20    And why don't you review it and
21 then tell us when you've had a chance
22 to look over the document.
23    THE STENOGRAPHER:  Ms. Plante,
24 do you want that marked as an exhibit
25 at this time?

Page 39

1    MS. PLANTE:  Yes, ma'am.  Thank
2 you.
3    MR. SOTO:  Victoria, this is not
4 Bates stamped.
5    Has this been produced?
6    MS. PLANTE:  No, my client just
7 got it to me today, as you can see
8 from the e-mail.
9    Actually, I didn't even think he
10 would -- I would need it, but it
11 serves as a, sort of, impeachment type
12 evidence that would not normally be
13 produced.
14    ---
15    (Wasyl Szeremeta Exhibit 20,
16 Texas Medical Board Public
17 Verification/Physician Profile Wasyl
18 Szeremeta, MD 09/04/2021, was marked
19 for identification.)
20    ---
21    THE WITNESS:  (Perusing document.)
22 Okay.
23    MS. PLANTE:  Okay.
24 BY MS. PLANTE:
25    Q.   Within that Exhibit 20, would

Page 40

1 you go down to "Medical Malpractice
2 Information."
3    And you see that, I believe, on
4 page 4 of the pdf on Exhibit 20?
5    A.   Mm-hm.
6    Q.   And it asks, it says "Section
7 154.006(b)(16) of the Act requires that a
8 physician profile display a description of
9 any malpractice -- medical malpractice
10 claim against the physician, not including
11 a description of any offers by the
12 physician to settle the claim for which
13 the physician was found liable, a jury
14 awarded monetary damages to the claimant,
15 and the award has been determined to be
16 final and not subject to further appeal.
17 The physician has the following reportable
18 claims."
19    You stated "none."
20    Is there any reason why you
21 stated "none"?
22    MR. SOTO:  Objection.  I don't
23 think that's -- objection;
24 argumentative.
25    MS. PLANTE:  I don't know what

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 41

1   objection, but okay.
2         The question still stands.
3   BY MS. PLANTE:
4     Q.   Is there any way -- any reason
5   why you did not disclose the medical
6   malpractice case that you had against you?
7         MR. SOTO:  Objection;
8   argumentative; assumes facts not in
9   evidence.
10  BY MS. PLANTE:
11    Q.   Please answer the question.
12    A.   I believe it asked me for
13  malpractice that was after the last --
14  within the five years.  Every application
15  I filled out for the Texas board I
16  disclosed that malpractice case.
17    Q.   Does this say five years under
18  the discrimination of what you were to
19  disclose on Exhibit 20?
20    A.   I think -- I can only remember
21  what I filed when I did the application.
22  I did everything correctly.
23    Q.   Well, you will agree that the
24  document will speak for itself in that it
25  does not state five years, correct?

Page 42

1     A.   I only know what I filled out.
2     Q.   So, would you like to change
3   this information, or would you like for it
4   to remain the same with the medical
5   licensing board?
6         MR. SOTO:  Objection.
7   BY MS. PLANTE:
8     Q.   Go ahead.
9         MR. SOTO:  Objection; form.
10    A.   I'm not changing my answer.  I
11  told you what I remember truthfully.
12    Q.   Did you put it on the
13  application when you applied, the medical
14  malpractice claim?
15    A.   I put down -- I don't remember
16  when I put down.  I put down what was
17  asked on the application, and I filled it
18  out accurately.
19    Q.   Okay.  Well, we'll contact the
20  board regarding that.
21        When did you apply for the Texas
22  Medical Board to get licensed?
23    A.   2015.
24    Q.   2015 when you came to UTMB?
25    A.   Yes, ma'am.

Page 43

1     Q.   So, that was within the
2   five-year period, correct?
3         MR. SOTO:  Five-year period of
4   what?
5         Objection.
6         MS. PLANTE:  Five-year period of
7   2015.  I believe he follows me.
8     A.   I don't remember.
9         I've told you that I filled out
10  the paperwork accurately.
11    Q.   Did you say the medical
12  malpractice injury, or claim came back in
13  2013?
14    A.   I think so.  I'm not sure the
15  exact date, but that sounds about right.
16    Q.   So that would be within
17  five-year span of 2015 when you applied,
18  correct?
19    A.   I filled out the forms
20  correctly.
21    Q.   I mean, you can say you filled
22  out the forms correctly, but you would
23  agree the document appears as though
24  you have falsified a very important
25  document?

Page 44

1         MR. SOTO:  Victoria, that's not
2   what the document reflects.
3         MS. PLANTE:  Well, you're not
4   the witness here.
5         MR. SOTO:  And he's answered
6   your question.
7         MS. PLANTE:  I understand that
8   you're not the witness.
9         MR. SOTO:  Objection; asked and
10  answered.
11        MS. PLANTE:  Okay.
12        I understand this information
13  does not fare well for your potential
14  witness -- your witness, rather.
15        So, if you would calm down, I
16  let you make your running objection.
17        MR. SOTO:  Victoria, can you
18  ask --
19        MS. PLANTE:  It's been noted.
20        MR. SOTO:  Victoria, can you ask
21  a question?
22        MS. PLANTE:  I am not asking a
23  question, but I'm going to ask you,
24  and I'm not going to deal with this
25  during this deposition because we're

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

US District Court - Texas                                      FINAL - September 7, 2021
Daywalker v. University of Texas                                        Dr. Wasyl Szeremeta

Page 45

1    getting it not only on video, but
2    we're getting it on the record.  And
3    if you continue to interfere with me
4    asking questions, I am going to move
5    for sanctions, but I'm going to do it
6    after Dr. Szeremeta's deposition.
7        Do you understand, Mr. Soto?
8        MR. SOTO:  Victoria, you're not
9    asking me questions here.
10       Would you stop with the
11   sidebars?
12       Please continue.
13       MS. PLANTE:  Well, I'm just
14   telling you what I'm going to do.
15       You don't have to understand.
16   It's noted.
17       MR. SOTO:  Can you please
18   continue with your deposition,
19   Victoria?
20       MS. PLANTE:  I will continue
21   when I get ready.  Just one moment.
22       (Pause.)
23   BY MS. PLANTE:
24       Q.  Do you think you need to go back
25   and correct that, Dr. Szeremeta?

Page 46

1        A.  No, I don't.
2        Q.  Okay.  Wonderful.
3        MR. SOTO:  Can we take a quick
4    break here?
5        MS. PLANTE:  No.  We just took a
6    break, like, two minutes ago.
7        What do we keep taking a break
8    for?
9        You went to the restroom.  What
10   are we taking a break for?
11       MR. SOTO:  Victoria, I don't
12   need to explain.
13       MS. PLANTE:  No, we're not going
14   to go off the record.  I have a lot of
15   information to cover, and if we had
16   not just taken a break five minutes
17   ago for about seven or eight minutes,
18   I wouldn't mind, but --
19       MR. SOTO:  Can we go off the
20   record just to have a discussion?
21       I think there's a discussion
22   where you're mischaracterizing this
23   question.
24       MS. PLANTE:  No, I don't want to
25   have a discussion.

Page 47

1        MR. SOTO:  I want to explain
2    that to you.
3        MS. PLANTE:  Well, you can
4    explain it through cross-examination
5    of Dr. Szeremeta.
6        MR. SOTO:  Okay.
7        MS. PLANTE:  Okay.  Wait your
8    turn.
9    BY MS. PLANTE:
10       Q.  Okay.  So, let's move on in the
11   deposition.
12       When Dr. Daywalker was under
13   your supervision for the pediatric
14   rotation, do you recall telling her that
15   you got behind on your notes?
16       A.  Yes.
17       Q.  So, you as a physician,
18   otolaryngologist for 20-plus years at the
19   time, still have occasion when you get
20   behind on your notes, correct?
21       A.  I did earlier in my career, but
22   not now.
23       Q.  Okay.
24       Not now, what do you mean?  Not
25   at this present moment, or are you talking

Page 48

1    about over the last ten years?
2        A.  Over the last ten years.
3        Certainly over the time at UTMB.
4        Q.  Okay.  So, UTMB.
5        But prior to those years, you
6    state you had no problems -- you did have
7    some problems with note taking, in keeping
8    up with your notes, correct?
9        A.  Yes.
10       Q.  Were you put on remediation?
11       A.  No.
12       Q.  Were you reprimanded in any way
13   by your employer?
14       A.  It's hard to answer that
15   question.
16       Q.  Why is it hard to answer?
17       A.  Because I feel I lost my job at
18   Temple University because I didn't keep up
19   with my medical records.  It's not stated,
20   but that's the feeling I got.
21       Q.  And when you said you lost your
22   job, did you -- were you terminated from
23   Temple?
24       A.  Contract was not renewed.
25       Q.  You would agree that's sort of a

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 49

1  soft termination, correct?
2       MR. SOTO:  Objection.
3       A.   No, I would not agree with that.
4       Q.   Well, if they don't renew it,
5  they don't want you anymore, correct?
6       MR. SOTO:  Objection; form.
7       A.   Non-renewal and firing are
8  different things.
9       I was not fired.
10      Q.   Now, you had a person at Temple
11 file a claim of discrimination against
12 you, correct?
13      A.   I don't remember.
14      Q.   You don't remember the person's
15 name?
16      A.   No.
17      Q.   Okay.
18      A.   You could feel free to refresh
19 my memory.
20      Q.   I just know that a complaint was
21 filed.  So I'm asking you did you --
22      A.   I don't remember.
23      Q.   Okay.
24      Do you remember what it was
25 involving at least, even if you don't

Page 50

1  remember?
2       A.   I don't even remember a claim.
3       Q.   Okay.
4       What was your job title at
5  Temple?
6       A.   Professor of otolaryngology.
7       Q.   Were you, at any time, a program
8  director for the residency program for
9  otolaryngology for Temple?
10      A.   Yes, I was.
11      Q.   How long?
12      A.   I want to say 10 or 11 years.
13      Q.   Was that the final position you
14 held before you were non-renewed?
15      A.   Yes.
16      Q.   Was your non-renewal based on
17 any conduct of yours during the time you
18 were a program director for Temple?
19      A.   No.
20      Q.   So, do you know -- you said the
21 reason you felt they did not renew you was
22 because your medical records, the notes,
23 keeping up with your notes, I think.
24      A.   That was -- that was one reason.
25      Q.   What other reason do you believe

Page 51

1  you were not renewed?
2       A.   Temple -- I was pediatric
3  otolaryngology.  Temple University had
4  sold its pediatric business to one of the
5  rival hospitals.  I was no longer
6  performing surgeries at the main hospital,
7  and financially it was a burden for Temple
8  University to keep me unless I started
9  taking care of adult patients, which I
10 refused to because it's a pediatric
11 otolaryngologist.
12      Q.   Where were you hired after
13 Temple?
14      A.   Stony Brook.
15      Q.   Did you con -- did you continue
16 to receive only otolaryngology pediatric
17 patients?
18      A.   I was hired as a pediatric
19 otolaryngology patient -- I only saw
20 pediatric otolaryngology patients except
21 when I was on-call, when I took call for
22 the rest of the department, including
23 adults.
24      Q.   When you were on-call at UTMB,
25 did you take patient calls that were not

Page 52

1  pediatric?
2       A.   Yes.
3       Q.   Did you believe that being
4  behind on your medical records while you
5  were at Temple caused a risk of patient
6  safety?
7       A.   Yes.
8       Q.   How did you believe that?
9       A.   If there was no patient record,
10 it was hard for other people to discover
11 information that I would have had in my
12 chart.
13      Q.   So, were you behind by days or
14 just by hours?
15      A.   In days.
16      Q.   Did anyone ever lodge a
17 complaint or their patient lodge a
18 complaint regarding any kind of safety
19 violation by you?
20      MR. SOTO:  Objection; form;
21 ambiguous.
22 BY MS. PLANTE:
23      Q.   Go ahead.
24      A.   Not that I recall.
25      Q.   Do you believe you were

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                    Dr. Wasyl Szeremeta

Page 53

1    deficient in the care of your patient when
2    you went days without completing notes?
3              MR. SOTO:  Objection; form;
4    ambiguous.
5    BY MS. PLANTE:
6        Q.   Go ahead.
7        A.   My care was perfect.  My
8    documentation was deficient.
9        Q.   When you say "perfect," you mean
10   without error at all?
11       A.   To the best of my ability, it
12   was perfect.
13       Q.   So, you're saying that you were
14   able to not complete notes and still
15   administer care in a perfect way?
16       A.   I administered care.  The
17   documentation was deficient.  So anyone
18   following me would have a tough time
19   knowing what I did.
20       Q.   When Dr. Daywalker came on to
21   your service -- rotation, rather, did you
22   have a written rule that notes had to be
23   completed within a specific time?
24       A.   Yes.
25       Q.   What written rule was there?

Page 54

1        A.   I believe it was in the
2    residency handbook that notes had to be
3    done within four hours, and Dr. Pine and I
4    specifically wanted our charts done the
5    same day.
6        Q.   Okay.
7             You said you believe it was in a
8    policy manual?
9        A.   It was in the residency.
10       Q.   What residency manual?  The GME
11   or otolaryngology?
12       A.   Otolaryngology.
13            MS. PLANTE:  Okay.  I'm going to
14   have to check that on recess.
15            And for the record, I believe we
16   were not provided the otolaryngology,
17   Mr. Soto, handbook from 2017 or 2018.
18   We have 2018 to 2019 and perhaps 2015
19   to 2016, but we are missing 2017 and
20   2018 for otolaryngology only.  So if
21   you'll get that to me, I can --
22            MR. SOTO:  I'm not sure if
23   that's correct.  I'll look at that.
24            MS. PLANTE:  Yeah, you can look
25   at it.  That's fine.

Page 55

1    BY MS. PLANTE:
2        Q.   So, you have been at UTMB for
3    how many years before you were promoted to
4    program director of residency?
5        A.   I think I was there for two
6    years.
7        Q.   Two years?
8        A.   In a document count as program
9    director there when I started.
10       Q.   Okay.
11       A.   Then at some point I took over.
12       Q.   Okay.
13       A.   I think it was two years, but
14   I'd have to look at my CV to refresh my
15   memory.
16       Q.   Did you ever go weeks without
17   completing notes in -- at Temple?
18       A.   Yes.
19       Q.   You understand that going
20   without -- going weeks without completing
21   notes would be different than going a day
22   without completing notes?
23            MR. SOTO:  Objection; form;
24   ambiguous.
25

Page 56

1    BY MS. PLANTE:
2        Q.   Go ahead.
3        A.   I think they're both bad.
4        Q.   Which is worse?
5             MR. SOTO:  Objection; form.
6        A.   They're both bad.
7        Q.   You can't tell me -- can't tell
8    the jury which is worse?
9             Because that's going to come up
10   in the dep -- in the trial testimony if
11   you try to say something differently at
12   trial.  So I'm trying to get your
13   answer --
14            MR. SOTO:  Can we leave the
15   sidebar comments out, Victoria?
16            MS. PLANTE:  Yeah.  Objection;
17   non-responsive.
18   BY MS. PLANTE:
19       Q.   Is it worse for you to go weeks
20   without completing your notes or one day?
21   That's either yes or no.
22            MR. SOTO:  And objection to the
23   form; ambiguous.
24   BY MS. PLANTE:
25       Q.   Go ahead.

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

---

Page 57

1    A.   I've already answered they're
2    both bad.
3    Q.   So, in essence, you're saying
4    that one day, in your mindset, equals one
5    week, or weeks?
6         MR. SOTO:  Objection; form.
7    A.   I didn't say that.  I said
8    they're both bad.
9    Q.   How often is a patient's chart
10   pulled to -- if you go weeks without
11   documenting a record properly, that
12   patient's chart may be pulled within that
13   two weeks.
14        Would you agree?
15        MR. SOTO:  Objection; form.
16   BY MS. PLANTE:
17   Q.   You're nodding "yes."
18   A.   No, I'm think -- I'm thinking.
19   Q.   Okay.
20   A.   I'm ready.
21        I'm trying to answer the
22   question so that it's in proper context
23   because the way you're asking the
24   question -- when I was at Temple
25   University, there were paper charts.  So,

---

Page 58

1    to answer your question when there are
2    paper charts, yes, charts can be pulled at
3    various times.
4         When we were at UTB, it's an
5    EMR.  So charts can be pulled continuously
6    and immediate access.
7    Q.   Okay.
8         Were you able to ascertain
9    whether Dr. Daywalker's charts were pulled
10   by any physician at a time she had not
11   completed the notes?
12   A.   I can only know which notes were
13   not completed with me, and I was -- then
14   from the record whatever faculty reported
15   in their comments, but I didn't -- I
16   didn't pull her charts.
17   Q.   Okay.
18        Didn't you testify earlier that
19   when she was under you, she completed her
20   notes timely --
21   A.   Because that --
22   Q.   -- in '15 and '16?
23   A.   Because that was our rule to get
24   them done timely.  So we stayed there
25   until the charts were completed.

---

Page 59

1    Q.   Okay.
2         Did you have like you had an
3    explanation at Temple for not completing
4    your charts in timely manner?
5    A.   Yes.
6         MR. SOTO:  Objection.
7    BY MS. PLANTE:
8    Q.   What explanation do you want to
9    provide?
10   A.   I had personal issues.
11   Q.   So, you agree that there are
12   personal issues that can make a physician
13   not complete their notes on time?
14        MR. SOTO:  Objection; form.
15   BY MS. PLANTE:
16   Q.   Go ahead.
17   A.   There can be.
18   Q.   What type personal issues were
19   you having?
20   A.   I was depressed.
21   Q.   Okay.  You were depressed.
22        Were you clinically depressed
23   where you had been seen by a physician, or
24   were you just situationally depressed as
25   in sad and, sort of, somber?

---

Page 60

1         MR. SOTO:  Objection; form.
2         And for this part of the
3    deposition, we're going to designate
4    this as confidential under the
5    protective order since it's getting
6    into medical information.
7         Victoria, I think this would be
8    a time to revisit.  I know your
9    client's there.  Has she had an
10   opportunity to sign the protective
11   order?
12        MS. PLANTE:  We're not going to
13   get on that.
14        MR. SOTO:  We are if you're
15   going to get into --
16        MS. PLANTE:  I'm not getting on
17   that.  We're in the middle of a
18   question and you're asking me about a
19   protective order.
20        MR. SOTO:  Yes.
21        MS. PLANTE:  My client has not
22   violated any protective order --
23        MR. SOTO:  That's not my
24   question.
25        MS. PLANTE:  Stop interrupting

---

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                             Dr. Wasyl Szeremeta

Page 61

1    me.
2         Nor do you have any evidence
3    that she has violated it.  So until
4    you have evidence, it's really not
5    material.
6         We can handle this after the
7    deposition, okay.
8         MR. SOTO:  We're not going to --
9         MS. PLANTE:  You've already
10   asked me about that before.  You've
11   already asked me.
12        I don't believe Dr. Szeremeta --
13        MR. SOTO:  Can we go off the
14   record to discuss this, Victoria?
15        MS. PLANTE:  No, we're not going
16   off the record.  I'm moving forward.
17        MR. SOTO:  So you know, if she
18   has not executed the protective order,
19   the exhibit, she has violated the
20   protective order and we're not letting
21   her --
22        MS. PLANTE:  She has not
23   violated the protective order.
24        MR. SOTO:  We are not letting
25   her sit in on confidential information

Page 62

1    until she agrees to abide by the --
2         MS. PLANTE:  You are not the
3    judge.  I'm going to let the judge
4    decide.
5         MR. SOTO:  I'm just letting you
6    know that, Victoria.
7         MS. PLANTE:  Okay.  Whatever.
8    Whatever you want to think, I don't
9    care.
10        MR. SOTO:  And is your client
11   saying that she's not --
12        MS. PLANTE:  Let's move on.  I
13   just want to move on because you are
14   beating a dead horse.
15        I've already told you my
16   position on it.  Accept it.  Move on.
17   And file whatever you need to do with
18   the court, okay.
19        MR. SOTO:  We're going to get
20   the court involved on this.
21        MS. PLANTE:  Okay, that's fine.
22   I know the court will be involved.
23   You already said that.  You're
24   repetitive.  You don't need to
25   continue.

Page 63

1         Let's move forward.
2         MR. SOTO:  I just want to
3    clarify your client is not agreeing
4    to --
5         MS. PLANTE:  Yeah, I didn't say
6    my client was not agreeing to.  I told
7    you my client would if your client
8    provided documents.  It's a quid pro
9    quo type of situation.  You declined
10   to do anything or say anything that
11   your client would provide.  So you're
12   expecting my client to produce stuff
13   that your client won't produce.  So
14   no, I don't think that's fair.
15        MR. SOTO:  I'm asking your
16   client to comply with the order.
17        MS. PLANTE:  I'm moving on.  I'm
18   moving on.
19        I don't care what you have to
20   say at this point, Mr. Soto.  You've
21   been very disruptive and rude and
22   unprofessional.
23        MR. SOTO:  Marie, can you mark
24   this --
25

Page 64

1    BY MS. PLANTE:
2         Q.   Dr. Szeremeta, can you tell me
3    how --
4         MR. SOTO:  Excuse me, Victoria.
5    Marie, can you mark this part of
6    the deposition?
7    BY MS. PLANTE:
8         Q.   Okay.
9         Going into your depression, how
10   long did it last?
11        MR. SOTO:  I am instructing --
12   let's -- I'm discontinuing the
13   deposition if you're going to continue
14   to get into this topic without
15   providing your client's exhibit or at
16   least a confirmation that she is going
17   to abide by the protective order.
18        MS. PLANTE:  Okay.
19        I'm going to have my client
20   state on the record she has and will
21   abide by the protective order.
22        Go ahead, Ms. -- Dr. Daywalker.
23        MR. SOTO:  Can she get sworn?
24        MS. PLANTE:  I'm not swearing
25   her in.  She can do the statement

JANE ROSE REPORTING                          National Court-Reporting Coverage
1-800-825-3341                               janerose@janerosereporting.com

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 65

1    without being sworn in.  It's just a
2    statement that has to be signed.  It
3    does not require her to be sworn in.
4         You are harassing at this point.
5         MR. SOTO:  I'm not harassing
6    her.
7         MS. PLANTE:  Dr. Daywalker, I'm
8    going to ask you to just state you
9    will abide by the protective order in
10   place.
11        DR. DAYWALKER:  Yes.  To my
12   knowledge, I will abide by the
13   protective order in place.
14        MS. PLANTE:  Thank you.
15        Let's move on.
16   BY MS. PLANTE:
17        Q.   Okay.  Let's talk about the
18   depression.
19        How long did it last?
20        A.   I don't know.
21        Q.   Were you under the doctor's care
22   at the time?
23        A.   I'm not going to answer that.
24        Q.   Why aren't you going to answer
25   it?

Page 66

1        A.   It's not --
2        MR. SOTO:  At this point, what
3    is -- this is harassing at this point.
4        MS. PLANTE:  It's not harassing
5    if it's relevant as to why he did not
6    have notes completed.  He told me why
7    there was --
8        MR. SOTO:  It also gets into not
9    just confidential information, but
10   personal information that I don't
11   think is relevant to the case.
12        MS. PLANTE:  I have not asked
13   him his physician --
14        MR. SOTO:  We would object to
15   this.
16        MS. PLANTE:  You can object, but
17   it's not privileged information.
18   BY MS. PLANTE:
19        Q.   I've asked you were you under
20   the doctor's care.  He said --
21        MR. SOTO:  Can we take a break
22   and let me talk to the doctor and see
23   if this is actually privileged
24   information?
25        MS. PLANTE:  Well, that he saw a

Page 67

1    doctor's not privileged.  What the
2    doctor told him, that is privileged.
3         So, I'm asking him --
4         MR. SOTO:  Are you asking if he
5    saw a doctor?
6         MS. PLANTE:  Yes, that's what I
7    asked him.
8    BY MS. PLANTE:
9         Q.   Did you see a physician for the
10   depression?
11        A.   I'm not going to answer that.
12        Q.   Okay.
13        Well, it will be noted that
14   you're not answering, and you understand
15   that you could be sanctioned by the court
16   for not answering?
17        MR. SOTO:  Victoria, can you not
18   make threats to the witness?
19        MS. PLANTE:  No, I'm just saying
20   he needs to know the consequences.
21   It's not a threat.  It's a consequence
22   of if a witness does not answer a
23   question.
24        A.   I'm not answering.  My medical
25   information is protected.

Page 68

1         Q.   I didn't ask you about medical
2    information.  I asked you had you seen a
3    physician or healthcare provider.
4         A.   And I am not answering that.
5         Q.   Fine.  I will note it with the
6    judge.
7         Do you know Judge Brown?
8         A.   I don't know Judge Brown.
9         Q.   Okay.
10        Do you know Judge, I think his
11   name is, Andrew Edison?
12        A.   I don't know Dr. Ed -- Judge
13   Edison.
14        Q.   Did you ask for a reasonable
15   accommodation as it relates to the
16   depression that you experienced at Temple?
17        A.   No.
18        Q.   How long would you say the note
19   issue occurred?  How long would you say
20   the timespan of the note taking issue was?
21        A.   I don't know.  Couple months.
22        Q.   Was there a lapse between --
23   well, let me ask you this way.
24        Did you shadow Dr. McCammon in
25   any way in her job duties as a program

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 69

1  director at UTMB?
2      A.   No.
3      Q.   Did you ever ask her about the
4  residents and her view of the residents at
5  UTMB?
6      A.   Yes.
7      Q.   Did you ask her that as you were
8  taking on the program director position
9  that she would be leaving from?
10     A.   Yes.
11     Q.   And did she say that Dr.
12  Daywalker was a deficient resident?
13         MR. SOTO:  Objection; form;
14     ambiguous.
15  BY MS. PLANTE:
16     Q.   Go ahead.
17     A.   I don't think she ever used the
18  specific word "deficient."
19     Q.   Did you look at the evaluations
20  that she received, Dr. Daywalker received
21  under Dr. McCammon?
22     A.   Eventually, yes.
23     Q.   When did you look at them?
24     A.   During her third year.
25     Q.   And based on your assessment of

Page 70

1  what you saw, did she seem like a solid
2  resident?
3      A.   Based on what -- not only what I
4  saw, but the CCC saw that we had basically
5  a resident that was doing well and that
6  performance was dropping off.
7      Q.   Was this as Dr. McCammon was the
8  program director, or did this occur after
9  you took over that you saw this?
10     A.   There was some comments from Dr.
11  McCammon that indicated there were some
12  areas of concern that needed watching.
13     Q.   What -- what comments did she
14  make to you about Dr. Daywalker?
15     A.   She made the comment of -- she
16  made the comments of in the context of a
17  CCC meeting, not directly to me.
18     Q.   What CCC meeting?
19     A.   Whatever CCC means -- a CCC.  I
20  know that we did not have a specific
21  conversation about this.
22     Q.   Was she program director during
23  this a CC meeting, or were you?
24     A.   She was.
25         MS. PLANTE:  Okay.

Page 71

1          Let me pull up --
2          (Pause.)
3          MS. PLANTE:  Okay.
4          I've placed what's been marked
5      as Exhibit 2 in the chat.  If you
6      could open that up.
7          ---
8          (Wasyl Szeremeta Exhibit 2,
9      Semi-Annual Review Walker, Rosandra
10     Review Period 7/1/2016 - 12/31/2016,
11     Bates OAG-0011666-670, was marked for
12     identification.)
13         ---
14         THE WITNESS:  Okay.  Give me two
15     seconds.
16         MR. SOTO:  This is a document
17     that's been marked confidential under
18     the protective order.  We would also
19     designate that this exhibit and any
20     questions related to this exhibit as
21     confidential.
22         MS. PLANTE:  Well, this is Dr.
23     Daywalker's actually.  So she'll
24     consent to it being used.
25         I don't know how you have the

Page 72

1  right to mark it as confidential.
2  It's regarding --
3          MR. SOTO:  Well, it's under the
4      court's order we do that.
5          MS. PLANTE:  Okay.
6  BY MS. PLANTE:
7      Q.   You see the -- you see the
8  document, and that's for what period,
9  review period, does it say July 1st, 2016
10  to December 31st, 2016?
11     A.   That would be correct.
12     Q.   And does it say the meeting date
13  to, I guess, discuss this with Dr.
14  Daywalker was February 3rd, 2017?
15         It's going to be to your right
16  there on the top.
17     A.   That's what it appears to say,
18  yes.  Report data was last captured on
19  February 1.
20     Q.   Okay.  One minute, please.
21         (Pause.)
22     Q.   Okay.
23         You've had time to review that?
24     A.   Mm-hm.
25     Q.   Would you consider that a

US District Court - Texas                                  FINAL - September 7, 2021
Daywalker v. University of Texas                            Dr. Wasyl Szeremeta

Page 73

1   overall good performance evaluation?
2       A.   Yes, this was a good
3   performance.
4       Q.   Okay.
5           And you said Dr. McCammon
6   mentioned something to you about Dr.
7   Szeremeta -- I mean, I'm sorry.  Dr.
8   Daywalker that was not -- that was maybe a
9   weakness in her performance?
10      A.   It was mentioned in a CCC
11  meeting.
12      Q.   Okay.
13          What was mentioned in the CCC
14  meeting, does it appear on Exhibit 2?
15      A.   No.
16      Q.   Okay.
17          And was this CCC meeting, you
18  said it was made at the time she was
19  program director, correct?
20      A.   I -- I think so.
21      Q.   Okay.
22      A.   Or it was -- I think so.
23      Q.   Okay.
24          And it looks like Dr. McCammon
25  has put a -- an entry in here at the

Page 74

1   bottom.  I believe it's on page 5 of the
2   pdf, that is dated April 4th, 2017.
3       A.   Mm-hm.
4       Q.   And was there anything in there
5   that caused you concern?
6       A.   No, not what was -- not what was
7   written in her comments.
8       Q.   Okay.
9           So, her comments may not have
10  been consistent, her comments in
11  Exhibit 2, if she, you know, made anything
12  contrary to that, they were not consistent
13  with what document -- with the
14  Exhibit 6 -- Exhibit 2, rather, says,
15  correct?
16      A.   I'm sorry.  Say that again.
17      Q.   Yeah, that was sort of choppy.
18          Her comments that she allegedly
19  made that were not favorable to Dr.
20  Daywalker is not included in Exhibit 2?
21      A.   No.
22          At this point, the evaluation
23  seemed to be pretty good.
24      Q.   Okay.
25      A.   Based on what -- based on this

Page 75

1   report.
2       Q.   Okay.
3           And did you have any reason to
4   contend, as being a person who saw her in
5   a pediatric rotation, that this was not an
6   accurate review of her performance?
7       A.   No, it was -- no.
8       Q.   Okay.
9           In the comments portion, do you
10  see any comments that you made about Dr.
11  Daywalker that were favorable or not
12  favorable?
13      A.   All the comments seem to be
14  favorable.
15      Q.   Okay.
16          And there is a comment that
17  states Dr. Daywalker, or Dr. Walker here.
18  It's the same as Dr. Daywalker, just for
19  the record.
20          But:  Dr. Daywalker has made
21  remarkable progress from her PGY-1 year.
22          Do you see that part?
23      A.   Mm-hm.
24      Q.   Did you make that comment?
25      A.   I may have.  It looks like

Page 76

1   something I would have written.
2       Q.   Okay.
3       A.   Because it's under -- it's
4   listed under OTO Team C PD.  So there's
5   two comments from PD.  Since there's only
6   two pediatric ENTs and I for a fact know
7   that I don't write "raving fans" in my
8   notes, so I probably wrote the second one.
9       Q.   You don't write "raving"?
10          Oh, okay.  Okay.  You're talking
11  about that one.  I see what you're saying.
12          Would that have been Dr. Pine,
13  the other pediatric ENT?
14      A.   I don't know that for sure, but
15  I do know that's a favorite expression of
16  his.
17      Q.   Okay.
18          So, you became program director,
19  do you believe it was April of '17?
20      A.   It's listed on my CV.  I don't
21  remember the exact date.
22          I mean, I could look it up if
23  you want me to.
24      Q.   No, that's fine.
25      A.   I don't want to give you a wrong

JANE ROSE REPORTING                          National Court-Reporting Coverage
1-800-825-3341                               janerose@janerosereporting.com

US District Court - Texas                           FINAL - September 7, 2021
Daywalker v. University of Texas                       Dr. Wasyl Szeremeta

| | |
|---|---|
| Page 77 | Page 79 |

Page 77

1   date.  I don't remember the exact date.
2       Q.   That's fine.  You don't have to
3   remember the exact date.
4            Did Dr. McCammon ever tell you
5   anything about Dr. Daywalker being
6   dishonest?
7       A.   I don't recall.
8       Q.   What about being untruthful?
9       A.   I don't recall.
10      Q.   What about accepting
11  responsibility for her obligations?
12      A.   I don't recall any comments from
13  Dr. McCammon.
14      Q.   All right.
15           Was -- did you rewrite the
16  program director -- let me ask you this.
17           Was there a program director
18  handbook that you had that you, sort of,
19  governed yourself by?
20      A.   Yes.
21      Q.   What was it called?
22      A.   The Otolaryngology Residency
23  Handbook.
24      Q.   And did you author that
25  handbook?

Page 79

1       A.   I believe there was.
2       Q.   Do you remember what it stated?
3       A.   I don't remember.  I'd have to
4   look it up.
5       Q.   Did residents not complete their
6   notes in time, similar to Dr. Daywalker?
7           MR. SOTO:  Objection; form.
8   BY MS. PLANTE:
9       Q.   Go ahead.
10      A.   I believe that although --
11  residents would occasionally not complete
12  their notes on time, but not to the
13  consistent -- not as much as Dr. Daywalker
14  was where it became noticeable.
15      Q.   Okay.
16           What records did you review in
17  coming up with this conclusion?
18           MR. SOTO:  Objection; form.
19  BY MS. PLANTE:
20      Q.   Go ahead.
21      A.   The records was based on
22  commentary at the CCC meetings from other
23  faculty who at that point were observing
24  Dr. Daywalker's work because I -- at that
25  point, she was no longer on my rotation.

| | |
|---|---|
| Page 78 | Page 80 |

Page 78

1       A.   I updated the pre-existing one.
2       Q.   So, you did that when you came
3   on as program director?  Or when did you
4   do that?
5       A.   I did it shortly after I became
6   program director.
7       Q.   What kind of updates did you
8   make?
9       A.   I removed faculty that were no
10  longer present.  I re -- realigned the new
11  rotations that we had.  We had lost St.
12  Luke Hospital, so took that out from the
13  handbook because it no longer existed.
14  Basically just made the changes so that it
15  would be consistent with our rotations and
16  our educational objectives, but everything
17  else would be the same.
18      Q.   Okay.
19           Was -- did you make any edits to
20  any requirements for residents?
21      A.   No.
22      Q.   In that handbook, was there
23  already a specific time that was listed as
24  to when residents were to complete their
25  notes?

Page 80

1       Q.   And, so, what year was this?
2       A.   PGY-3.
3       Q.   Okay.
4           And were these notations about
5   her not completing her notes stated to you
6   in writing?
7       A.   I think they were part of
8   discussion in the -- in the meeting.  They
9   were definitely part of the discussion in
10  the meeting.  I don't recall whether they
11  were in writing or not.  I'd have to
12  review all the e-mails.
13      Q.   What e-mails were you talking
14  about?
15      A.   The e-mails over the last four
16  years.  I -- I don't know -- I haven't
17  memorized all the e-mails.  So I can't
18  tell you for sure they were in writing or
19  they weren't in writing.  But I do know it
20  was discussed in the CCC meeting.
21      Q.   You would agree something that
22  important that is becoming a problem would
23  be documented to Dr. Daywalker in writing,
24  correct?
25           MR. SOTO:  Objection; form.

JANE ROSE REPORTING                          National Court-Reporting Coverage
1-800-825-3341                              janerose@janerosereporting.com

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 81

1    BY MS. PLANTE:
2       Q.   Go ahead.
3       A.   Well, I do know that at one
4    point that when she was at MD Anderson,
5    Dr. Gidley did write her an e-mail to that
6    effect.
7       Q.   Did you ask Dr. Guidry [sic] to
8    write that?
9       A.   No, I asked Dr. Gidley to, as
10   part of site director, to evaluate all the
11   residents and make commentary.
12      Q.   Okay.
13           And did he put that in writing?
14      A.   I believe he did.
15      Q.   And did that E -- was it an
16   e-mail to you?
17      A.   It may have been.
18      Q.   Do you think this was in
19   writing, or do you think you just maybe
20   had a conversation with him about it?
21      A.   No, there was definitely
22   something written.
23      Q.   Okay.
24           So, this is an e-mail to you,
25   you believe, from Dr., can you spell his

Page 82

1    name?
2       A.   Gidley, G-I-D-L-E-Y.
3       Q.   And Dr. Idley [sic] had made no
4    notations for any other resident who was
5    behind at that time --
6       MR. SOTO:  Objection.
7       Q.   -- only Dr. Daywalker.
8       MR. SOTO:  Objection;
9    argumentative.
10   BY MS. PLANTE:
11      Q.   Dr. Gidley, I'm sorry.
12           Go ahead.
13      A.   The only e-mail I received --
14   the only communication I received was from
15   Dr. Gidley -- was regarding Dr. Daywalker
16   from Dr. Gidley.
17      Q.   Did she successfully perform --
18   did she successfully complete that
19   rotation?
20      A.   I believe that their final
21   evaluation was that she completed the
22   rotation successfully.
23      Q.   Thank you.
24      A.   But I'd have to -- I'd have to
25   review the records, but I believe that she

Page 83

1    did.
2       Q.   So, the issue was not so
3    substantial that it made her not complete
4    the rotation successfully.
5           Would you agree with that
6    statement?
7       A.   No, I wouldn't agree with that.
8       Q.   Why wouldn't you agree?
9           If you -- they said it was
10   successful and you're saying it was not
11   successful.  Is that your testimony?
12      MR. SOTO:  Objection.  I think
13      he said he wasn't sure.  He needed to
14      review the record.
15      MS. PLANTE:  Okay.
16   BY MS. PLANTE:
17      Q.   Based on your knowledge, are you
18   saying that you believe she did not
19   complete the rotation successfully under
20   Dr. Gidley?
21      MR. SOTO:  Objection; asked and
22      answered.
23      MS. PLANTE:  I said him.  His
24      personal belief.
25      A.   I don't know what Dr. -- I don't

Page 84

1    know what Dr. --
2       MS. PLANTE:  I don't need you
3       testifying, Soto.  Just allow your
4       witness to testify.
5       MR. SOTO:  I haven't said
6       anything.
7       MS. PLANTE:  Okay.  Thank you.
8       A.   I don't --
9       MR. SOTO:  I would object to
10      asked and answered to this question.
11      MS. PLANTE:  You said you hadn't
12      said anything, okay.
13   BY MS. PLANTE:
14      Q.   Go ahead, Mr. -- go ahead, Dr.
15   Szeremeta.
16      A.   I don't know what Dr. Gidley was
17   thinking or state of his mind.  I mean, I
18   know what was -- I recall what was written
19   in the e-mail.  The reason that I would
20   feel -- if they say that she's completed
21   successfully, then I have to take their
22   word for it.
23           The -- one of the -- or, one of
24   the comments in the e-mail was that other
25   residents saw more patients and completed

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                    Dr. Wasyl Szeremeta

|  | Page 85 |
|---|---|

1  more notes.  We learned -- the residents
2  learn by seeing as many patients as they
3  can.  That's their textbook; that's their
4  teaching.  If you see fewer patients, you
5  don't learn as much.  You can still
6  successfully --
7      Q.   Okay.
8      A.   Let me finish this question.
9          You can still successfully
10  complete the rotation, but that doesn't
11  necessarily say that you're competent or
12  ready to move on.
13     Q.   Okay.
14         So now you're bringing in her
15  not not only completing notes, but you're
16  saying that she didn't see enough patients
17  is why you disagreed with Dr. Gidley's
18  assessment that she successfully completed
19  that rotation?
20     A.   I'm just --
21         MR. SOTO:  Objection; form.
22     A.   I am just saying what I recall
23  from the e-mail.
24     Q.   Okay.
25         Did Dr. Gidley tell you any good

|  | Page 86 |
|---|---|

1  thing about Dr. Daywalker in the rotation?
2      A.   I only recall the communication
3  from the e-mail.
4      Q.   So, that was negative, to your
5  knowledge?
6      A.   To my knowledge, no.
7      Q.   It wasn't negative?
8      A.   To my recollection, the only
9  communication was what was in that e-mail.
10  So, if there was something good in that
11  e-mail too, then -- then the answer would
12  be yes.  I don't remember.
13     Q.   Do you understand that the
14  e-mail has not been produced?
15         MR. SOTO:  Objection.  Victoria,
16  I --
17  BY MS. PLANTE:
18     Q.   Do you have the e-mail?
19         Let me ask you, do you have the
20  e-mail?
21         MR. SOTO:  Have you reviewed
22  your -- the production?
23         MS. PLANTE:  I'm not going to
24  ask him for that.  I'm going to ask
25  him have you --

|  | Page 87 |
|---|---|

1          MR. SOTO:  Well, he's not going
2  to -- he doesn't have any knowledge
3  about what was produced.
4          MS. PLANTE:  Let me preface my
5  question.  I'm going to something
6  else.
7  BY MS. PLANTE:
8      Q.   Were you ever asked to review
9  your e-mails to see whether there was
10  documentation to support your views of Dr.
11  Daywalker and produce to your attorneys?
12         MR. SOTO:  We're not going to
13  get into communication about what his
14  attorney --
15         MS. PLANTE:  No, I'm not talking
16  about attorneys.  I'm saying was he --
17  he -- did he ever review his e-mails
18  and turn them over to anyone.
19         Let's get the attorney/client
20  out of here because you are blocking
21  all of this testimony, and it's going
22  to be apparent.
23  BY MS. PLANTE:
24     Q.   Dr. Szeremeta, did you ever look
25  through your e-mails after claims were

|  | Page 88 |
|---|---|

1  made that some of the statements in your
2  remediation were not true?  Did you ever
3  go back and look to see if you had that
4  e-mail from Dr. Gidley?
5          MR. SOTO:  Objection; compound.
6      A.   I was, at the beginning of this
7  case, I was sent a letter from Legal to
8  save all documents and to send over any
9  documents I had, which I complied with.  I
10  sent whatever I had and they probably
11  looked through my computers to get
12  whatever they wanted.
13     Q.   Okay.
14         You're assuming that they looked
15  through your computer; you don't know?
16     A.   UTMB has a right to everything
17  that's on my computer.  It's a UTMB
18  computer.
19     Q.   I understand that, but that's
20  based upon assumption that they actually
21  did that, correct?
22     A.   Couldn't tell you.
23     Q.   Okay.
24         Would it be surprise you that
25  we, Dr. Daywalker and her counsel, to date

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 89

1  have not received any e-mail re -- from
2  Dr. Gidley?
3       MR. SOTO:  Objection; form.
4    A.   I don't know.  I don't know how
5  the legal process works, how all this
6  stuff works.
7    Q.   Did you produce it?
8       MR. SOTO:  Objection; form.
9  BY MS. PLANTE:
10   Q.   Did you provide it?  Did you
11  provide it?
12   A.   I provided any e-mail that was
13  on my computer.  They could search for it.
14   Q.   Okay.  You provided any e-mail
15  on your computer.
16      We're talking about Dr.
17  Daywalker.
18      So, did you provide information
19  regarding Dr. Daywalker's either good
20  performance or bad performance that was
21  listed in e-mail format?
22   A.   I think I've asked --
23  answered -- I said I was asked to produce
24  all documents in --
25      MR. SOTO:  And just to be clear,

Page 90

1    Doctor, we're not -- please don't
2    discuss any communications with Legal
3    with you.  So even that request,
4    please don't answer the question and
5    disclose attorney/client privilege.
6       MS. PLANTE:  He's not doing
7    that.  But we can move on.  We're
8    going to get it any other way.  We're
9    going to get it.
10      Mr. Soto, you don't understand
11   that we got forces behind us that's
12   greater than this case.
13      MR. SOTO:  Victoria, please move
14   on.
15      MS. PLANTE:  So we're going to
16   get it.
17      You make your statements.  I get
18   to make mine because it is my
19   deposition and I am paying for it.
20      MR. SOTO:  Please move on.
21  BY MS. PLANTE:
22   Q.   Did you have a phone
23  conversation with Dr. Gidley prior to him
24  sending you that e-mail regarding Dr.
25  Daywalker?

Page 91

1    A.   I don't recall such a
2  conversation.
3    Q.   Okay.
4       Prior to -- at UTMB, were there
5  other people that you placed on
6  remediation other than Dr. Daywalker?
7       You don't have to give names --
8    A.   Yes.
9    Q.   -- but were there other
10  residents?
11      How many?
12   A.   One.
13   Q.   One resident in addition to Dr.
14  Daywalker?
15   A.   Yes, ma'am.
16   Q.   Do you remember if there was
17  conversation about putting another
18  resident on remediation, but they were not
19  placed on remediation?
20   A.   There was never such a
21  conversation.
22   Q.   So, the CCC notes would not note
23  any other party that would have been --
24  any other resident, rather, that would
25  have been considered for remediation but

Page 92

1  that was not ultimately put on
2  remediation?
3       MR. SOTO:  Objection;
4    speculation.
5  BY MS. PLANTE:
6    Q.   Go ahead.
7       MS. PLANTE:  He doesn't
8    speculate if he was a program
9    director.
10   A.   There were only two residents
11  during my tenure that were placed on
12  remediation.
13   Q.   Okay.
14      Based on your observation, did
15  you believe that Dr. Daywalker had what it
16  took to be an otolaryngologist at the time
17  that you were not program director?
18   A.   I believe that at the time that
19  I was not program director, she was
20  performing an appropriate level for her
21  education.
22   Q.   Were you aware she graduated top
23  five of her medical class, medical school?
24   A.   No, I was not.
25   Q.   Did you ever ask her?

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                               Dr. Wasyl Szeremeta

Page 93

1    A.   No, I did not.
2         MS. PLANTE:  Now, let's go
3    through the remediation document.  And
4    I'm going to put it in the chat.
5         THE WITNESS:  Can I ask for a
6    quick bathroom break before we start
7    the remediation?
8         MS. PLANTE:  Sure.  Sure.  Go
9    ahead.
10        How many minutes do you need?
11        THE WITNESS:  Five minutes.
12        MR. SOTO:  And, Doctor, when you
13   get back, can you come to the breakout
14   room quickly?
15        MS. PLANTE:  Okay.
16        We're going to reconvene in five
17   minutes.  Let's just say 10:52, 53,
18   okay?
19        THE WITNESS:  Okay.
20        THE VIDEOGRAPHER:  We are now
21   going off the record at 10:46 a.m.
22        (Recess taken.)
23        THE VIDEOGRAPHER:  We are now
24   going back on the record at 10:57 a.m.
25        MR. SOTO:  Victoria, my client

Page 94

1    wants to amend an answer to a prior
2    question.
3         MS. PLANTE:  After speaking to
4    his counsel, sure.
5         MR. SOTO:  Dr. Szeremeta.
6    A.   Yes.
7         I indicated before that I -- I
8    indicated that I completed the
9    applications correctly.  The actual, the
10   application asks for any cases where there
11   was a verdict of a jury trial and I was
12   found liable by a jury trial in the case,
13   so, and payment made.
14        The case never went to a jury
15   trial.  It just settled prior to that.  So
16   it was not a reportable case.
17   Q.   Okay.
18        But it settled.  So you believe
19   that at some point it had merit?
20        MR. SOTO:  Objection; form.
21   BY MS. PLANTE:
22   Q.   Your attorneys at the time
23   believed that the case was susceptible to
24   a verdict, correct?
25        MR. SOTO:  Objection; form;

Page 95

1    calls for a legal conclusion; calls
2    for speculation.
3    BY MS. PLANTE:
4    Q.   Go ahead.
5    A.   I thought the case was without
6    merit.
7    Q.   Okay.
8         Isn't that the case where you
9    burned a -- a child's mouth during
10   surgery?
11   A.   Yes.
12   Q.   And how did that happen?
13        That seemed very abnormal.
14   A.   I was given an instrument that I
15   was told was insulated and would protect
16   the mouth from burns.  It was insulated
17   electrally -- electrically, but not by
18   heat.  It was a faulty instrument.
19   Q.   Did you sue the manufacturer of
20   the company that -- of the instrument?
21   A.   I did not sue the company.
22   Q.   Were they brought into the
23   lawsuit at any time?
24   A.   They were brought into the
25   lawsuit.

Page 96

1    Q.   Okay.
2         Did you ever ask Dr. Daywalker,
3    when you perceived or when you believe
4    others perceived she was having note
5    taking problems or closing her notes
6    timely, did you ask any -- did you ask
7    her, Are you having any personal problems?
8    A.   I don't recall.
9    Q.   Okay.
10        Since you had gone through
11   similar thing, would that be something in
12   compassion you would ask someone since
13   they were doing things properly and all of
14   a sudden it's alleged that she was not
15   closing notes?  Would that be something
16   you would ask?
17   A.   I'm not allowed to ask someone
18   has personal problems.
19   Q.   Okay.
20   A.   Or medical problems.
21   Q.   Not medical problems.
22        I'm saying, Is there anything
23   going on in your life.  You're not allowed
24   to ask that?
25   A.   She wasn't on my rotations

Page 97

1  anymore.
2      Q.   But you were program director at
3  the time you put her on remediation,
4  correct?
5      A.   Correct.
6      Q.   Did you ever get her version of
7  what happened as it relates to the
8  incidents in the remediation?
9      A.   I think Dr. Siddiqui and I had a
10  conversation with her at one point.
11     Q.   Conversations.
12          Again, did you put it in
13  writing?
14     A.   I believe Dr. Siddiqui
15  documented the conversation.
16     Q.   When was this?
17     A.   Before she went to her rotations
18  at MD Anderson.
19     Q.   Was this in 2018, 2017?
20     A.   Either toward the end of her
21  PGY-2 year or beginning of her PGY-3 year,
22  but before she went to MD Anderson.
23     Q.   Just for the record, you stated
24  you were perfect in your care when you
25  were deficient in notes.  I believe that

Page 98

1  was your prior testimony.  It didn't
2  affect your care?
3      A.   Yes, I believe I was.
4      Q.   Now, that was at the time that
5  you received a medical malpractice lawsuit
6  against you, correct?
7      A.   Mm-hm, yes.
8      Q.   So, you still stand by you were
9  perfect in your care in burning a child's
10  mouth?
11         MR. SOTO:  Objection; form.
12  BY MS. PLANTE:
13     Q.   Go ahead.
14     A.   I was perfect in my care.  The
15  burn was an accident of the instrument.
16     Q.   Okay.
17          It had nothing to do with you?
18         MR. SOTO:  Objection; form.
19  BY MS. PLANTE:
20     Q.   Correct?
21     A.   No.
22     Q.   So, you are the only physician
23  that I know would admit that they're
24  perfect in their care.
25          When you say "perfect," are you

Page 99

1  saying 100 percent perfect?  Because
2  perfect to me means 100 percent perfect.
3  I just want to make sure if that means the
4  same to you.
5          MR. SOTO:  Objection; compound;
6  ambiguous.
7  BY MS. PLANTE:
8      Q.   Go ahead.
9      A.   You have to -- can you ask the
10  question a different way?  'Cause I don't
11  understand the question.
12     Q.   Okay.
13          I want to make sure I understand
14  your definition of "perfect."
15     A.   My --
16     Q.   When you say "perfect" you're
17  meaning that you were correct in every
18  assessment and every evaluation and every
19  procedure that you performed ever within
20  that ten-year span?
21         MR. SOTO:  Objection; form.
22  BY MS. PLANTE:
23     Q.   Go ahead.
24     A.   My definition of "perfect" is to
25  the best of my ability, knowledge that I

Page 100

1  had, and given the fact that my diagnosis
2  and interact -- intervention was correct.
3      Q.   Okay.
4          But you understand that there
5  are no perfect people.  Do you understand
6  that?
7      A.   I never said I was a perfect
8  person.
9      Q.   Well, you said you were a
10  perfect physician.
11         MR. SOTO:  Objection.
12  BY MS. PLANTE:
13     Q.   Do you understand that there
14  were --
15     A.   I did not say I was a perfect
16  physician.  My care and assessment was
17  perfect.
18     Q.   At this time, what is not
19  perfect about you as it relates to you
20  assessing yourself as to what you don't do
21  well or your strengths and weaknesses?
22         MR. SOTO:  Objection; harassing.
23  BY MS. PLANTE:
24     Q.   Go ahead.  It's not harassing.
25         MR. SOTO:  Ambiguous.

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 101

1  BY MS. PLANTE:
2      Q.   Go ahead.
3           MR. SOTO:  Irrelevant.
4      A.   I don't know.
5           MS. PLANTE:  I'm noting that you
6  have speaking objections, which you
7  told me I could not make at all.  You
8  profusely said that during my client's
9  deposition and Dr. Mark Daywalker's
10  deposition.
11          Now, like I noted before, you
12  are totally hypocritical in it.  I ask
13  that you live by what you preach.
14  That's all I want you to do.
15          MR. SOTO:  Is that a question
16  for the witness?
17          MS. PLANTE:  I'm moving on.
18          MR. SOTO:  Is that a question
19  for the witness?
20          MS. PLANTE:  I'm moving on.
21          MR. SOTO:  Would you please keep
22  your sidebar comments off the record.
23          MS. PLANTE:  I'm not keeping my
24  sidebar comments off the record
25  because it's related to you continuing

Page 102

1  to have speaking objections.
2          And I will move for sanctions.
3  That's definitely coming.
4          MR. SOTO:  Victoria, I don't
5  want to get into this with you.
6          MS. PLANTE:  Yeah, I'm not
7  trying to get into it.  I'm just
8  letting you know that this is not
9  going to go unnoticed and
10  undocumented.
11          MR. SOTO:  Please continue the
12  deposition.
13  BY MS. PLANTE:
14      Q.   When you're getting medical
15  malpractice insurance, do you have to
16  disclose that 2013 incident?
17      A.   Yes, I believe I do.
18      Q.   Have you?
19      A.   I believe I have.
20      Q.   You believe you have, or do you
21  know you have?
22      A.   I believe I have.
23      Q.   This conversation that you said
24  you had with Dr. Siddiqui at some point
25  before she went to, Dr. Daywalker went to

Page 103

1  MD Anderson, where were you when you had
2  the conversation?
3      A.   I think we were up at our
4  Brittany Bay Clinic, but I'm not 100
5  percent sure.
6      Q.   You were up at a clinic, you
7  said?
8      A.   At our Brittany Bay Clinic.
9      Q.   Brittany Bay, okay.
10      A.   I believe, but I'm not 100
11  percent sure.
12      Q.   And you said Dr. Siddiqui was
13  writing during this meeting?
14      A.   I believe that she documented
15  the conversation.
16      Q.   Did you ask Dr. Daywalker to
17  sign that she had received the information
18  included in the meeting?
19          MR. SOTO:  Objection; form.
20  BY MS. PLANTE:
21      Q.   Go ahead.
22          MR. SOTO:  Ambiguous.
23      A.   I don't think -- I don't think
24  we did, but I'm -- we may have, but I
25  don't think we did.

Page 104

1      Q.   If Dr. Daywalker says she never
2  signed anything regarding any meeting that
3  she had with, alleged meeting she had with
4  you and Dr. Siddiqui, do you have any
5  evidence to refute that?
6          MR. SOTO:  Objection; ambiguous.
7      A.   Not in front of me, no.
8      Q.   Do you know of any to exist?
9          MR. SOTO:  Same objection.
10      A.   Not that I know of.
11      Q.   You would agree that if a person
12  is going to be placed on remediation, they
13  should be warned in writing that, You're
14  going to be placed on remediation if this
15  thing or this conduct is not improved?
16      A.   This conversation was not about
17  remediation.
18      Q.   Well, did you ever, at any
19  point, tell her, You're facing remediation
20  if you do not correct these problems we're
21  having with you?
22      A.   I don't recall if we did or
23  didn't.
24      Q.   If she said she never had a
25  conversation before she was given the

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                        Dr. Wasyl Szeremeta

|                                       | Page 105 |
|---|---|

1  remediation letter by you, would you have
2  any evidence to refute that?
3          MR. SOTO:  Objection; asked and
4  answered.  I think he --
5  BY MS. PLANTE:
6     Q.   Go ahead.
7          MR. SOTO:  Asked and answered.
8     A.   I don't recall whether we did or
9  didn't.
10    Q.   You were made aware that
11 documentation was essential before writing
12 her up on a remediation, correct?
13         MR. SOTO:  Objection; form.
14 BY MS. PLANTE:
15    Q.   Go ahead.
16    A.   I was reminded by whom?
17    Q.   I said were you made aware of
18 it, based on your memory.
19         I can pull the document up.  But
20 were you made aware of it?
21    A.   Yeah, we had to document events,
22 yes.
23    Q.   Okay.
24         And, so, if documentation is
25 necessary to support the remediation,

|                                       | Page 106 |
|---|---|

1  you're telling the jury that you had no
2  document preceding the remediation that
3  told Dr. Daywalker that if this didn't
4  improve, she would be placed on
5  remediation?
6     A.   I don't recall whether we did or
7  didn't.
8          MS. PLANTE:  Okay.
9          I've placed what's been marked
10 as Exhibit 1 into the chat.  If you
11 could open it.
12         ---
13         (Wasyl Szeremeta Exhibit 1,
14 initiation of remediation May 30,
15 2018, Bates OAG-0000333-339, was
16 marked for identification.)
17         ---
18 BY MS. PLANTE:
19    Q.   Have you had an opportunity to
20 review the document?
21    A.   I'm reviewing it right now.
22    Q.   Okay.
23    A.   (Perusing document.)
24         Okay.
25    Q.   Did you draft this document,

|                                       | Page 107 |
|---|---|

1  Exhibit 1?
2     A.   Yes, I did.
3     Q.   Did you receive any
4  modifications by any physician that you
5  made in Exhibit 1?
6     A.   The document was reviewed by the
7  CCC, and any edits that they recommended
8  were made.
9     Q.   Do you remember them making any
10 edits?
11    A.   There were some edits, some
12 typographical errors and some, just,
13 phrases that were changed, but the
14 final --
15    Q.   Were these -- I'm sorry.
16    A.   But the final letter met the
17 approval of the CCC.
18    Q.   Were these typographical errors
19 sent to you in writing by e-mail?
20    A.   No.  The letter was presented at
21 the CCC meeting.  People had a chance to
22 review it at the meeting and then the
23 edits were made.
24    Q.   Okay.
25         Were the edits made, other than

|                                       | Page 108 |
|---|---|

1  typographical errors, were they made as
2  relates to the substance of your letter?
3     A.   There were several changes made
4  to the letter, but this was the final
5  letter that was approved.
6     Q.   What changes were made to the
7  letter that you recall being in the first
8  letter --
9     A.   I don't --
10    Q.   Other than typos, what changes
11 were made?
12    A.   I don't remember.
13    Q.   Now, would you agree that this
14 letter starts out the same as Dr.
15 Devarajan's remediation letter?
16         MR. SOTO:  Objection.  We're not
17 going to -- that's protected
18 information.
19         MS. PLANTE:  Whatever.  We can
20 go into it.  She can redact it later,
21 but I have to get the testimony.
22         MR. SOTO:  Doctor, I'm
23 instructing you not to answer that
24 question based on our --
25         MS. PLANTE:  Why are you

JANE ROSE REPORTING                        National Court-Reporting Coverage
1-800-825-3341                             janerose@janerosereporting.com

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                  Dr. Wasyl Szeremeta

Page 109

1    instructing him not to?
2        It's not any type of secret that
3    Dr. Devarajan was placed on
4    remediation by Dr. Szeremeta.
5        MR. SOTO:  Victoria, can you
6    move on, please?
7        MS. PLANTE:  No, I'm moving
8    forward with this, and I'll just get
9    the judge on the line.
10       We'll go off the record and get
11   the judge on the line because if I
12   don't get this information, then I
13   can't move forward as far as
14   getting -- I can't get his deposition
15   later on.  So we're going to have to
16   get this settled now.
17       We can go off the record.
18       THE VIDEOGRAPHER:  I need both
19   parties to agree.
20       MR. SOTO:  I agree to go off the
21   record.  That's fine.
22       THE VIDEOGRAPHER:  We are now
23   going off the record at 11:15 a.m.
24       (Recess taken.)
25       THE VIDEOGRAPHER:  We are now

Page 110

1        going on the record at 11:34 a.m.
2    BY MS. PLANTE:
3        Q.   Okay.  Going back to something,
4    and we'll get back to the letter of
5    remediation, but going back to something.
6        In 2017 and 2018, did you miss a
7    cancer diagnosis on a pediatric patient?
8        A.   No.
9        Q.   So you're saying that there
10   would be no testimony that within this
11   patient who went to see someone and found
12   out that you hadn't -- they had gone
13   through a procedure with you where you did
14   not see cancer and then when they came
15   back, they were -- they had a diagnosis of
16   cancer?
17       MR. SOTO:  Objection; compound;
18   speculation.
19   BY MS. PLANTE:
20       Q.   Go ahead.
21       A.   I -- I don't recall missing a
22   diagnosis of cancer.
23       Q.   As it relates to the
24   remediation, are you looking at Document
25   1?

Page 111

1        I'm sorry.  Yeah, Document 1.
2        A.   Yes, I pulled it up again
3    citizen.
4        Q.   Okay.  Your first sentence you
5    said, in essence, this is you have
6    officially been placed on remediation.
7        Correct?  Do you see that?
8        A.   Yes, I do.
9        Q.   Is there any other designation
10   as unofficial, or does official mean this
11   is the only means by which she can be
12   placed on a remediation?
13       A.   It just means that it is
14   starting right now.  We're not discussing
15   it.  It has already been discussed.  It's
16   starting now.
17       Q.   Okay.
18       And prior to writing this letter
19   up, you talked about documents that you
20   believe Dr. -- Dr. Siddiqui had relating
21   to a meeting you had with Dr. Walker about
22   notes.
23       Did you obtain that document to
24   verify whether you had spoken to her
25   before placing her on remediation?

Page 112

1        A.   Her being?
2        Q.   Dr. Daywalker.
3        A.   I just know that Dr. Siddiqui
4    and I had the meeting, and it's clearly
5    listed in the third paragraph of this
6    letter.
7        Q.   I understand that it's listed in
8    the third paragraph of the letter.
9    Anybody can write anything in a letter.
10       I'm asking you what document
11   were you relying on when you put this
12   information in Exhibit 1?
13       MR. SOTO:  Objection; form.
14   BY MS. PLANTE:
15       Q.   What document related to Dr.
16   Siddiqui that you were relying on?
17       MR. SOTO:  Objection; form.
18   BY MS. PLANTE:
19       Q.   Go ahead.
20       A.   The three of us had a meeting
21   together.  That's what I was referring to
22   in this letter.
23       Q.   Did you ask Dr. Siddiqui, since
24   you already testified she was making notes
25   during this alleged meeting, did you ask

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 113

1  Dr. Siddiqui for the notes to verify what
2  had been discussed in the meeting?
3       A.   No.
4            Dr. Siddiqui was at the CCC
5  meeting.  She saw this letter.  If she had
6  objection to it, she would have mentioned
7  it.
8       Q.   You're assuming facts regarding
9  Dr. Siddiqui and what she would have done.
10       Is that true?
11       A.   No.  I'm saying Dr. Siddiqui was
12  part of the CCC, so she would have seen
13  this letter.  If this paragraph were
14  factually incorrect, she would have spoken
15  up.
16       Q.   Okay.
17            You believe she would have
18  spoken up, correct?
19       A.   I know she would have.
20       Q.   How do you know she would have
21  if you don't know what's in her mind?
22       A.   I know Dr. Siddiqui.  Dr.
23  Siddiqui's not going to agree with
24  something that's incorrect in the letter
25  that's got her name attached to it.

Page 114

1       Q.   Okay.
2            So, you didn't ask for the
3  document, correct?
4       A.   I don't recall asking for it or
5  not.
6       Q.   Okay.
7       A.   It was not material at the time.
8       Q.   It is material to the extent
9  you're documenting something --
10       MR. SOTO:  Objection;
11  argumentative.
12       Q.   -- that occurred and you're
13  putting it in an official document,
14  correct?
15       MR. SOTO:  Objection;
16  argumentative.
17       A.   I think I've answered the
18  question.
19       Q.   I don't believe you have
20  answered the question.
21            You said you didn't believe it
22  was material.  I said you don't believe
23  it's material to something you're putting
24  in a document as a factual statement?
25       A.   I already said --

Page 115

1       MR. SOTO:  Objection; asked and
2  answered; argumentative.
3  BY MS. PLANTE:
4       Q.   Go ahead.  You have to answer it
5  again even if it's asked/answered.
6       A.   Okay.  I give the same answer.
7       Q.   What is that?
8       A.   Whatever I just said.
9            I said that I -- Dr. Siddiqui
10  was part of this meeting.  She was aware
11  of this meeting.  The three of us were at
12  that meeting, Dr. Daywalker, Dr. Siddiqui
13  and myself.  This was written in the
14  letter.  She saw this letter before it was
15  going to be sent out.  If it was
16  factually incorrect, she would have
17  objected.  She didn't.
18       Q.   Dr. Siddiqui was in the
19  remediation meeting?
20       A.   She was in the CCC meeting.
21       Q.   Okay.
22            Was she in the remediation
23  meeting?
24       A.   No.
25       MR. SOTO:  Objection; ambiguous.

Page 116

1       MS. PLANTE:  He said "no."  And
2  there's nothing ambiguous about that.
3            Let me just pull up another
4  document because we'll have to go in
5  between these documents.
6       THE WITNESS:  I can --
7       MS. PLANTE:  Hold on just one
8  minute.
9       MR. SOTO:  Hold on, Doctor.
10  There's not a question pending before
11  you.
12       THE WITNESS:  No, I'm saying it.
13       MS. PLANTE:  Okay.
14            I've placed in the chat Exhibit
15  16.
16            Would you open up that, please,
17  and review it?
18            ---
19            (Wasyl Szeremeta Exhibit 16, CCC
20  Meeting Minutes, Bates OAG-007483-495,
21  was marked for identification.)
22            ---
23       THE WITNESS:  Okay.
24       MR. SOTO:  And before you get
25  started questioning, I just want to

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

---

Page 117

1    state for the record that we have
2    designated in an e-mail last night
3    this exhibit as confidential under the
4    protective order, and we would
5    designate this exhibit and any
6    questions related to this exhibit as
7    confidential under the court's
8    protective order.
9    BY MS. PLANTE:
10       Q.   Now, looking at this document
11   from the beginning, I think the first page
12   of the document is what purports to be CCC
13   meeting minutes dated February 22nd, 2018.
14       Do you see that?
15       A.   Yes, I do.
16       Q.   And would you agree there's no
17   reference to Dr. Walker having
18   deficiencies in notes that would lead to a
19   remediation?
20       A.   (Perusing document.)
21       Q.   Can you find that in there,
22   Doctor?
23       A.   I'm reading the note.  Give me a
24   chance.
25       Q.   Sure.

---

Page 118

1        A.   I'm sorry.  I didn't mean to
2    raise my voice.  I apologize.  I'm just
3    trying to read the note.
4        Q.   Okay.
5        A.   (Perusing document.)
6        Well, in looking at the -- so,
7    there's actually a couple CCC notes here.
8    There's --
9        Q.   I'm looking at the February
10   22nd.  That's the only one I'm asking you
11   to look at.
12       A.   Okay.
13       So, February 22nd, I assume
14   there's -- there's stuff that's redacted
15   here.  So I assume that somewhere in the
16   middle of the page that says, under Walker
17   it says:  Szeremeta and Siddiqui had
18   talked with her and that seems to have
19   made a difference in her, something.  She
20   seems to be engaged particularly slow in
21   clinic, has had to have PA see some of her
22   patients.  Gidley also observed that she
23   is slow in clinic.  There is concern about
24   her dishonesty and accountability.  Will
25   need to watch her closely.  Will address

---

Page 119

1    it on her mid-year evaluation.  She will
2    be going to Vietnam with Pine and Young.
3    Send her to MDA first next year.
4        Q.   So, your plan was to address all
5    these allegations at this point in the
6    mid-year eval, correct?
7        A.   Will address -- that's what the
8    summary appears to say, yes.
9        Q.   And the mid-year eval would have
10   been in June or July of 2018, correct?
11       A.   That's the end of year eval.
12       Q.   The midyear.
13       A.   Midyear, midyear of academic
14   year.
15       Q.   Okay.
16       So, what was -- in February
17   22nd, what would be the mid-year eval for
18   her third year?  Wouldn't that have
19   already passed?
20       A.   No, this is the CCC meeting that
21   happens before the mid-year evaluation so
22   that we put -- we evaluate everyone every
23   six months.
24       Q.   Okay.
25       So, when would the mid-year eval

---

Page 120

1    occur after the February 22nd, 2018 CCC
2    meeting?
3        A.   Ideally as soon as possible.
4        Q.   Okay.  We don't have any minutes
5    for that.
6        Were there minutes for the
7    evals?
8        A.   I don't believe so.
9        Q.   Is that common practice not to
10   have minutes for meetings where a
11   resident's performance and conduct are
12   discussed?
13       A.   The evaluation is the six-month
14   evaluation of the resident.  You've
15   already shown me one of those documents.
16   It's the document that's discussed with
17   the resident.
18       Q.   Yes, I understand that.
19       So, are you saying that there --
20   I mean, if you said you will address it on
21   her mid-year eval, I'm trying to see what
22   that means.
23       Tell the jury when this was
24   going to be addressed.
25       MR. SOTO:  Objection; asked and

---

US District Court - Texas

FINAL - September 7, 2021

Daywalker v. University of Texas

Dr. Wasyl Szeremeta

Page 121

1    answered.
2        A.   Again, this is -- this is Dr. --
3    I mean, this is Trish Garza's summation of
4    the meeting.  So I'm just reading how she
5    recorded it.
6            We would be having discussion
7    with all of the residents as soon as the
8    CCC meeting was over to discuss it.
9        Q.   I'm asking you when was this
10   mid-year eval to occur.
11       A.   As soon as possible after this
12   meeting.
13       Q.   So, did it occur with Dr.
14   Daywalker before she was placed on
15   remediation?
16       A.   I'm pretty sure it was since
17   there's another -- there's another CCC
18   meeting after that that shows that we are
19   putting her on remediation.
20       Q.   Where is that the mid-year evaluation
21   that notes in here that this information
22   included in this particular excerpt you
23   read earlier?
24           MR. SOTO:  Objection; form.
25           He doesn't have access to the --

Page 122

1    to the production, Victoria.
2            MS. PLANTE:  Well, I mean, when
3    was it?  I mean, he's in the best
4    position.  He wrote the letter.  So
5    I'm asking him when was -- and let me
6    go back.
7    BY MS. PLANTE:
8        Q.   Are you saying that Ms. Garza's
9    documentation is not accurate?
10       A.   No, I didn't say that.
11       Q.   Okay.
12           How was Ms. Garza taking notes?
13       A.   There was an audio recording
14   made of the meeting, and she transcribed
15   the summary of the meeting.
16       Q.   Do you know whether that audio
17   recording was kept?
18           (Noise interference.)
19           MS. PLANTE:  Okay.  We're
20   getting something.  I'm not sure where
21   that's from.
22           Does anybody know where that's
23   from?
24           THE VIDEOGRAPHER:  It's from
25   Lauren.

Page 123

1            MS. PLANTE:  Ms. Beamon?
2            THE VIDEOGRAPHER:  I'll just
3    mute her.
4            MS. PLANTE:  Thank you.
5            THE VIDEOGRAPHER:  There she
6    went.  Excuse me.
7            Please proceed.
8            MS. PLANTE:  Okay.  Thank you.
9            Can you repeat back my last
10   question from me, Marie?
11           (The requested portion of the
12   record was read back by the court
13   reporter.)
14       A.   I don't know.
15       Q.   You would agree this is an
16   important audio recording to keep if
17   you're putting someone on remediation that
18   could lead to something else worse?
19           MR. SOTO:  Objection; form.
20   BY MS. PLANTE:
21       Q.   Go ahead.
22       A.   You asked the question of was a
23   recording kept.  I don't know whether it
24   was kept or not.  You'd have to ask Trish
25   Garza that.

Page 124

1        Q.   Did you ever go back to listen
2    to the recordings prior to preparing for
3    this deposition?
4        A.   No.
5        Q.   Would you agree that in the CCC
6    minutes, May 1st, and you can turn to May
7    1st, is the first time remediation is
8    brought up as it relates to something
9    being in writing regarding note keeping
10   and other items?
11           MR. SOTO:  Objection; form.
12   BY MS. PLANTE:
13       Q.   Go ahead.
14           You understand the question?
15       A.   It seems that from the documents
16   you're showing me, yes, May 1st has a --
17   language regarding remediation, the
18   February does not.
19       Q.   Okay.
20           And if we look at any other
21   documents that were produced for CCC
22   meetings in '17, which if you look through
23   this, August 10th, 2017, do you see those
24   CCC minutes?
25       A.   August?

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                              Dr. Wasyl Szeremeta

|  | Page 125 |
|---|---|

1     Q.   10th, 2017.
2          It's probably going to be --
3   it's not in chronological order, I don't
4   believe.  So maybe four pages from the
5   last -- yeah, four pages from the last
6   page or so.
7     A.   August 10, okay.  I see August
8   10, 2017.  Let me review.
9          (Perusing document.)
10         I see the comments by Walker.
11  Spirits are better.  Showed some passive
12  aggressive tendencies.  She exhibits
13  really, really high energy then low
14  energy.  Very slow in clinic and with
15  notes.  She does not follow through with
16  ideas and projects.  Will look to adjust
17  her schedule next year to give her back
18  some time with Kridel.
19    Q.   Okay.
20         My question to you was there any
21  statements in there about placing her on
22  remediation?
23    A.   Not in that one.
24    Q.   Okay.  Okay.
25         Now, let's go down to someone,

|  | Page 126 |
|---|---|

1   we don't have their name, but we do know
2   remediation is listed.
3          Do you see the entry just before
4   Dr. Walker on that August 10th, 2017 CCC
5   minutes?
6     A.   August -- August 10?
7     Q.   Yes.  The one you just read is
8   going to be in the comments just before
9   hers.
10    A.   Mm-hm.
11    Q.   The name is blackened out, but
12  apparently it's related to resident
13  issues.  So I assume this is a resident.
14    A.   Let me see which.
15         (Perusing document.)
16         Yes, these are all -- it's a
17  resident issue, so yes, it is about a
18  resident.
19    Q.   Okay.  Apparently it's about a
20  female resident because it says:  Her
21  clinical insight has improved.
22         Do you see that?
23    A.   Yes.
24    Q.   Okay.
25         And it gives three options going

|  | Page 127 |
|---|---|

1   forward.
2          Do you see that?
3     A.   Yes.
4     Q.   And do you see remediate and
5   have her repeat a year?  Do you see that?
6     A.   Yes.
7     Q.   Was this particular resident
8   remediated, and did she repeat a year?
9     A.   No.
10    Q.   Was she non-renewed?
11    A.   No, she was not non-renewed.
12    Q.   Did she go on to graduate with
13  her class?
14    A.   Yes, she did.
15    Q.   Her problem was related to what?
16  Was it more clinical issues, based on this
17  notes?
18         I'm not sure what the basis of
19  the problem was.  Can you tell me?
20    A.   Based on the fact that it says
21  UTMB surgical training course, I'm
22  surmising that it's surgical skills.
23    Q.   Okay.
24         And that would be something
25  that's very important in patient care,

|  | Page 128 |
|---|---|

1   correct?
2     MR. SOTO:  Objection; form.
3   BY MS. PLANTE:
4     Q.   Go ahead.
5     A.   It is very important for an
6   otolaryngology resident, yes.
7     Q.   Is it important for patient
8   care, was my question.
9          I assume yes, but I need you to
10  answer.
11         MR. SOTO:  Objection; asked and
12  answered.
13  BY MS. PLANTE:
14    Q.   Go ahead.
15         Is it important for patient
16  care?
17    A.   Yes, it's important for patient
18  care.
19    Q.   And if she's in the operating
20  room performing procedures and she doesn't
21  know what she's doing, she could risk a
22  person's life, correct?
23         MR. SOTO:  Objection; form.
24  BY MS. PLANTE:
25    Q.   Go ahead.

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 129

1       MR. SOTO:  Speculation.
2    A.   Well, she's not in the operating
3  room by herself.  She's under supervision.
4  Residency training program, residents are
5  allowed to do portions of the procedure
6  that they show competency and show skill
7  at.  We have some progress faster than
8  others.  No resident is allowed to perform
9  any procedure that they're not feel safe
10  or competent in.
11       MS. PLANTE:  Okay.
12       I'm going to object to the
13  latter part of that as non-responsive.
14    Q.   Isn't a resident under the
15  supervision of an attending when
16  completing notes?
17    A.   No.
18    Q.   The attending does not have to
19  approve the notes?
20    A.   It's that's not what you asked,
21  I believe.  I believe I -- I may have
22  misunderstood the question.
23    Q.   Okay.  Let me clarify.
24       After the resident makes the
25  notes, the physician or the attending

Page 130

1  physician has to come and approve the
2  notes, correct?
3    A.   Correct.  The resident -- the
4  patient is seen with the -- with the
5  resident and the attending, the findings
6  are discussed, and then the resident
7  documents the notes and writes the note.
8  Attending may be seeing another patient at
9  that point, but ultimately, at the end of
10  the day, the attending has to sign off on
11  those notes and --
12    Q.   Whatever happened to this
13  patient that was one of the options was
14  remediation?
15       MR. SOTO:  Objection; form.
16       To the extent we're asking about
17  patients now --
18       MS. PLANTE:  Resident.
19  Resident, I'm sorry.
20       MR. SOTO:  Objection; form.
21       MS. PLANTE:  Let me go back and
22  re -- reword the question.
23  BY MS. PLANTE:
24    Q.   Whatever happened to this
25  resident?  They went on and graduated, but

Page 131

1  did they receive any form of reprimand?
2    A.   No.
3    Q.   Is that person Caucasian?
4       MR. SOTO:  Objection; form.
5       We're not identifying the --
6  BY MS. PLANTE:
7    Q.   Was the person --
8       MR. SOTO:  We're not --
9       MS. PLANTE:  That's fine.  I
10  understand what your objection is.
11  BY MS. PLANTE:
12    Q.   Was the person black?
13    A.   No.
14       MR. SOTO:  Don't answer a
15  specific question.
16       MS. PLANTE:  He said "no."
17  BY MS. PLANTE:
18    Q.   I believe Dr. Daywalker was the
19  only black resident at the time, correct?
20    A.   Yes.
21    Q.   Thank you.
22       Okay.  I want to make sure I go
23  through all notes before May 1st, 2018
24  when remediation is first addressed as it
25  relates to Dr. Daywalker.

Page 132

1       Let me make sure I have -- while
2  I'm looking through this, can you tell me
3  how often the CCC met?
4    A.   When I was program director, we
5  tried to meet on a monthly basis, or at
6  least every other month.
7    Q.   Okay.  Monthly.
8       And based upon Exhibit 16, do we
9  have all the minutes from your CCC
10  meetings --
11       MR. SOTO:  Objection; form.
12    Q.   -- in this particular document?
13       MR. SOTO:  Objection; form.
14  BY MS. PLANTE:
15    Q.   Go ahead.
16    A.   I would assume you have
17  everything in writing.
18    Q.   So, you're going back to not all
19  CCC meetings were in writing?
20    A.   No.
21       MR. SOTO:  Objection; form.
22    A.   Every CCC meeting had minutes.
23    Q.   Okay.  Every CCC -- okay.  Thank
24  you.
25       Do you remember Ms. Garza

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                    Dr. Wasyl Szeremeta

Page 133

1    recording all the meetings for CCC?
2        A.    To the best of my recollection,
3    she did.
4        Q.    Okay.
5            July '17, that's listed in --
6    that's one of the meeting minutes in
7    Exhibit 16.
8            Can you look at that?
9        A.    Which one?  I'm sorry.
10       Q.    July 13th, 2017.
11       A.    Okay.
12           MR. SOTO:  That's on page 7 of
13   the pdf.
14           THE WITNESS:  I have it.
15           (Noise interruption.)
16           MS. PLANTE:  What's that
17   dinging?
18           THE WITNESS:  I'm sorry.  I
19   occasionally have a message from my
20   son.  My son is trying to text me.
21           MS. PLANTE:  Okay.
22           THE WITNESS:  I told him that
23   we're not -- he has to wait.
24           MS. PLANTE:  Can you put it on
25   vibrate, or do you need to, maybe for

Page 134

1    medical reasons, you need to know when
2    someone texts you?  I understand that.
3            THE WITNESS:  My texts I have,
4    because I still am -- I'm not on-call
5    today, but I do need to have that
6    message.  I'm just ignoring those.
7            MS. PLANTE:  Okay.
8            THE WITNESS:  Unless it's
9    patient care.  I'm sorry.
10           MS. PLANTE:  Okay.  No problem.
11   BY MS. PLANTE:
12       Q.    July 13th, do you see that in
13   Exhibit 16?
14       A.    Yes, ma'am.
15       Q.    And if you go down, do you see
16   resident -- I don't think there are any
17   resident issues on this particular -- in
18   this particular meeting.
19           Do you see resident issues
20   listed as one of the topics?
21       A.    No.
22       Q.    Okay.
23           However, it is noted that Dr.
24   Daywalker will be taking over the role of
25   TDC while another resident is out.

Page 135

1            Do you see that?
2        A.    Yes, I see it.  It's under
3    Special Notes.
4        Q.    And do you understand that -- is
5    it your understanding that TDC rotation is
6    one of the most challenging rotations?
7            MR. SOTO:  Objection; form;
8    ambiguous.
9        A.    Yes.
10       Q.    Okay.
11           And isn't it true that at the
12   beginning of her fourth year of residency,
13   she was specifically put on TDC as her, I
14   think it was, her first rotation?
15           MR. SOTO:  Objection; form.
16       A.    Yes.
17       Q.    Yes, thank you.
18           And while she's on remediation,
19   you felt it a good idea to put her on the
20   most challenging rotation in the residency
21   program?
22       A.    Actually, in the fourth year I
23   think the residents will tell you that the
24   toughest rotation is the MD Anderson
25   rotation.

Page 136

1        Q.    But she didn't get to complete
2    that, did she?
3        A.    No, she did not.  Not in her
4    fourth year.
5        Q.    Okay.
6            Now, okay.  Related to UTMB
7    rotations, not outside rotations, is it
8    the toughest rotation to be on at UTMB?
9            MR. SOTO:  Objection.  You're
10   asking about the criminal justice --
11           MS. PLANTE:  TDC.  That's what
12   we've been talking about.
13           MR. SOTO:  You mentioned
14   outside.  I object to this as
15   confusing and ambiguous.
16           MS. PLANTE:  Well, I think he'll
17   let me know if he's confused.  I've
18   told him to let me know if he doesn't
19   understand the question.  You don't
20   have to coach him into trying to make
21   sure he understands the question.
22           MR. SOTO:  I'm not trying to --
23           MS. PLANTE:  No, just stop the
24   objection.  That's all I ask you to
25   do.

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                    Dr. Wasyl Szeremeta

Page 137

1        MR. SOTO:  I'm going to
2    object --
3        MS. PLANTE:  If he -- if he --
4    you just said ambiguous and whatever
5    objection you want.  It's a speaking
6    objection, but whatever.
7        I'm letting you do this because
8    I'm going to get a record of it.  But
9    I just want you to know that it --
10       MR. SOTO:  You --
11       MS. PLANTE:  Let me talk.  You
12   have been totally disrespectful when I
13   talk.
14       MR. SOTO:  Can you please
15   continue, Victoria?
16       MS. PLANTE:  No, I'm talking to
17   you now.  So just listen.
18       You have consistently made
19   speaking objections and I've allowed
20   you to make them, but when you go into
21   coaching the witness and telling him
22   is it TDC, is it not, he knew what I
23   meant.  And I've told him if he does
24   not know what I mean, to let me know
25   and I will rephrase it.  That is

Page 138

1    sufficient.
2        I will move forward, and I don't
3    need you to say one other thing.
4        MR. SOTO:  Well, let me say
5    this.
6        MS. PLANTE:  I don't need you to
7    say one other thing.
8        MR. SOTO:  I think that it
9    mischaracterizes --
10       MS. PLANTE:  Let's just move
11   forward.
12       MR. SOTO:  I think it
13   mischaracterizes --
14       MS. PLANTE:  The record will
15   speak for itself.
16       MR. SOTO:  Let me just say -- I
17   gave you an opportunity to speak.  Let
18   me just say that it mischaracterizes
19   the record and that we have limited
20   our objections to form objections and
21   I would ask --
22       MS. PLANTE:  No, no, no.
23       MR. SOTO:  -- you to not have
24   sidebar on the record and that you
25   please continue your questions of him.

Page 139

1        MS. PLANTE:  Okay.  And this is
2    my deposition.  Let that be noted.
3    BY MS. PLANTE:
4    Q.   Okay.  Let's get back to the
5    remediation letter.
6    A.   Okay.  That would be Exhibit 1?
7    Q.   Correct.
8    A.   Okay.  I've pulled that up.
9    Q.   Now, you state that there
10   were -- you said:  Specifically we
11   discussed.
12       Do you see this in paragraph 3
13   on Exhibit 1?
14   A.   Paragraph -- yes.
15   Q.   It says:  Specifically we
16   discussed your failure to meet
17   expectations in the area of
18   professionalism.
19       What did you know
20   professionalism to be?
21   A.   Professionalism, it's
22   communication, timely performance of
23   charts, performing all the -- the --
24   performing all the nonmedical parts of the
25   residency.

Page 140

1    Q.   Does it mean anything else, that
2    you know of?
3        (Pause.)
4    Q.   Are you reading something?
5    Because your eyes are going down.
6    A.   I'm just -- I'm going down in
7    the same letter to see if I address it
8    later until the letter.
9        MR. SOTO:  Can you allow him to
10   review the document?
11       MS. PLANTE:  Yeah, I have no
12   problem.  I just wanted to make sure
13   that he was not reading from anything
14   else.
15       MR. SOTO:  While we have a
16   pause, what's -- are we going to break
17   for lunch any time soon?
18       MS. PLANTE:  Probably the next
19   30, 35 minutes.
20       Go ahead.
21   A.   Professionalism would also be
22   validity of one's word, honesty.
23   Q.   Okay.
24   A.   Keeping one's word.
25   Q.   Okay.  Just one minute.

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                          Dr. Wasyl Szeremeta

Page 141

1        Let me look at something.
2        Did you review the GME handbook
3   before you started to see what the
4   definition of "professionalism" was before
5   you wrote this Exhibit 1?
6   A.   No.
7   Q.   Okay.  Well, let's go to it.
8        Hold on just one minute.
9        (Pause.)
10       MS. PLANTE:  Okay.  I've put in
11  the chat Exhibit 21.
12       Can you open that up and review
13  it?  It's just parts of the GME
14  policy, not the entire part, not the
15  entire GME policy.
16            ---
17       (Wasyl Szeremeta Exhibit 21,
18  excerpt of GME handbook, Bates
19  OAG-0013058-075, was marked for
20  identification.)
21            ---
22       THE WITNESS:  (Perusing document.)
23       MS. PLANTE:  And I would like to
24  direct your attention, because it is
25  18 pages, to professionalism

Page 142

1   definition, which is going to be on
2   page 11 of the pdf.
3       THE WITNESS:  (Perusing document.)
4   Okay.
5   BY MS. PLANTE:
6   Q.   And would you read the fifth
7   bullet points there that professionalism
8   includes, according to the GME handbook?
9   A.   Compassion, integrity, and
10  respect for others; responsiveness to
11  patient needs that supersedes
12  self-interest; respect for patient privacy
13  and autonomy; accountability to patients,
14  society and the profession; and
15  sensitivity and responsiveness to a
16  diverse patient population, including but
17  not limited to diversity in gender, age,
18  culture, race, religion, disabilities, and
19  sexual orientation.
20  Q.   As it relates to 1:  Compassion,
21  integrity, and respect for others.
22       Are you saying that she was
23  deficient in that?
24  A.   Deficient in integrity and
25  respect for others.

Page 143

1   Q.   In what way?
2   A.   Not telling the truth, not
3   complete -- not telling -- not telling her
4   coworkers what she was going to do, not
5   keeping her word on research projects, on
6   notes.  It's specified in the remediation
7   letter.
8   Q.   Okay.  We'll get to that in a
9   minute.  That was loaded.
10       So let me -- I'll go to number
11  2:  Responsiveness to patient needs that
12  supersedes self-interest.
13  A.   I think she probably met that.
14  Q.   Respect for patient privacy and
15  autonomy, number 3.
16  A.   I don't think that plays in
17  here.  So I think she met that.
18  Q.   Accountability to patients,
19  society and the profession.
20  A.   That appears to be okay.
21  Q.   Sensitivity and responsiveness
22  to a diverse patient population, including
23  but not limited to diversity in gender,
24  age, culture, race, religion,
25  disabilities, and sexual orientation.

Page 144

1   A.   Meets that.
2   Q.   She meets that, okay.
3       So, other than number 1, you
4   believe that she meets the remaining four?
5   A.   Yes.
6   Q.   Thank you.
7       Would it surprise you that Dr.
8   Pine said the exact opposite?
9       MR. SOTO:  Objection; form.
10  BY MS. PLANTE:
11  Q.   Go ahead.
12  A.   I don't know what Dr. Pine
13  thinks.
14  Q.   Okay.
15       You will agree that it's a lot
16  of subjectivity that plays into these
17  assessments?
18       MR. SOTO:  Objection; form.
19  BY MS. PLANTE:
20  Q.   Go ahead.
21  A.   Not to number 1.  You either
22  tell the truth or you don't.
23  Q.   Okay.
24       Were you able to listen to a
25  recording of Dr. Resto in this case with

US District Court - Texas                                      FINAL - September 7, 2021
Daywalker v. University of Texas                                      Dr. Wasyl Szeremeta

Page 145

1  Dr. Daywalker?  Were you made aware of
2  that recording?
3      A.   I was not made aware of any
4  recording.  I have not listened to any
5  recording.
6      Q.   On that recording, Dr. Resto
7  states that if Dr. Daywalker had truly
8  falsified documentation, that there would
9  be no remediation.  She wouldn't even be
10 at UTMB.
11     Are you aware that to be the
12 policy of UTMB?
13         MR. SOTO:  Objection; compound;
14     argumentative.
15 BY MS. PLANTE:
16     Q.   Do you believe that the policy
17 of UTMB is to allow a person to falsify
18 documents and retain them?
19     A.   I -- I don't know the policy
20 specifically.
21     Q.   If you believe that she was
22 falsifying documents, genuinely believe
23 that she was falsifying documents or
24 medical records, that would be direct
25 grounds for termination, correct?

Page 146

1         MR. SOTO:  Objection; form.
2      A.   That would be correct.
3      Q.   So, apparently, you did not
4  believe totally that she had falsified any
5  documents?
6      A.   I was given information that she
7  had.
8      Q.   Okay.
9         Who were you given this
10 information from?
11     A.   Dr. Underbrink.
12     Q.   And did you ask for that in
13 writing?
14     A.   I asked him -- he was head of
15 the CDC, and he was in charge of
16 interacting with compliance.
17     Q.   Did he show you the documents
18 wherein he believes she had falsified,
19 like bringing you actual evidence and
20 showing you this is where she falsified
21 documents?
22     A.   I don't recall he did.
23     Q.   Did you ever ask him let, you
24 know, Let me confirm that, Dr. Underbrink,
25 to make sure that's true because that's a

Page 147

1  pretty serious allegation?
2      A.   No, I did not.
3      Q.   Why not?
4      A.   'Cause what he had told me was
5  that compliance was ready to terminate
6  her, and I wanted to give Dr. Daywalker a
7  chance to -- if there was an explanation
8  for this and I wanted to protect my
9  resident.
10     Q.   Compliance was ready.  So, she
11 had been officially -- it was a complaint
12 made against her for falsification of
13 documents with ethics?
14     A.   Dr. Underbrink went to
15 Compliance and showed them the records
16 that he indicated that there was
17 suspicious activity and he wanted to file
18 formal investigation and he -- and I asked
19 him not to do that because I felt that we
20 had still fixed the problem and because I
21 didn't want her to lose her job.
22     Q.   Okay.  Okay.
23         Suspicious activity.  Does that
24 suspicious activity amount to
25 falsification of documents?

Page 148

1         MR. SOTO:  Objection; form.
2  BY MS. PLANTE:
3      Q.   What do you mean by "specific
4  activity" -- I mean "suspicious activity"?
5      A.   That is what Compliance told me.
6  You'd have to ask them.
7      Q.   You said you told him not to
8  report it to Compliance?
9         MR. SOTO:  Objection; form.
10     Q.   Correct?
11     A.   No, I did not do that.  Dr.
12 Underbrink went to Compliance himself.
13     Q.   And did Compliance ever come
14 back to you regarding an investigation of
15 whether she had violated any ethical rule?
16     A.   They did not.
17     Q.   Okay.
18         So, did you ever go to
19 Compliance and say, This has been lodged
20 against Dr. Daywalker.  What is your
21 finding?
22     A.   No.
23         MR. SOTO:  Objection; form.
24 BY MS. PLANTE:
25     Q.   Why not if you're going to put

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 149

1  it in her remediation?
2      A.   Because I trust my fellow
3  faculty members.  Dr. Underbrink had no
4  reason to lie.
5      Q.   You trust that more than you
6  trust an investigation of the actual
7  investigation?
8          MR. SOTO:  Objection; form.
9  BY MS. PLANTE:
10     Q.   Go ahead.
11     A.   I trust Dr. Underbrink.
12     Q.   I said did you trust that, his
13  word, more than you trust the
14  investigation of the allegation?
15     A.   I trusted his word, and
16  investigation would have cost Dr.
17  Daywalker her job.
18     Q.   Okay.
19          So, he went, you said
20  Dr. Underbrink went to Ethics, correct?
21     A.   He went to Compliance.  I'm not
22  sure he --
23     Q.   Compliance.  Okay.  He went to
24  Compliance.
25          And did he tell you what -- did

Page 150

1  you ask him what did Compliance tell you?
2      A.   He told me that Compliance has
3  an algorithm to look at charts and they
4  know what things are cut and paste, and
5  they were very concerned about the -- the
6  charts in question.
7      Q.   Okay.
8          Isn't it true you never received
9  any information related to Compliance and
10  the falsification of documents before
11  writing this document?
12     A.   I think I've already answered
13  that.
14          Yes, I have not.
15     Q.   Okay.
16          So, you, in essence, put --
17  whatever Dr. Underbrink said you made
18  factual, correct?
19     A.   Yes.
20     Q.   And you didn't even get Dr.
21  Daywalker's position before you made it
22  factual, correct?
23     A.   No, that's not true.  She had no
24  explanation.
25     Q.   No, I'm talking about before the

Page 151

1  remediation.
2      A.   And I'm talking about this
3  incident.
4      Q.   What incident?
5      A.   The charts in question at TDC.
6      Q.   What page are you on of the --
7  of Exhibit 1?
8      A.   I didn't realize we went back to
9  Exhibit 1.
10     Q.   Yeah, because we're talking
11  about what's included in Exhibit 1, and
12  I'm assuming Dr. Underbrink reporting her
13  to Compliance was one of the things that
14  you put in there.  But you let me know if
15  not.
16          MR. SOTO:  I'm sorry.  What is
17  the question before the witness?
18          MS. PLANTE:  I told him to go
19  back to Exhibit 1 and let me know
20  where this statement that
21  Dr. Underbrink went to Compliance on
22  this issue of falsification of
23  documents.
24     A.   Actually, to be correct, you did
25  not tell me to go back to Exhibit 1.  We

Page 152

1  were just talking, but --
2      Q.   Okay.
3          So you're just talking in
4  general about something that you put in an
5  official document, as you state, correct?
6          MR. SOTO:  Objection; form.
7      A.   There is in document 3 and
8  documentation a letter from Dr. Underbrink
9  to you, Dr. Daywalker, stating the
10  following:  There are five open encounters
11  from June 27th, 2017 that you are
12  responsible for documentation in closing
13  out your notes.  Please review the
14  attached document.  Address this issue and
15  complete if possible so that we can
16  closeout those encounters.
17          Dr. Daywalker responded, they
18  said that four of the five encounters were
19  TDC patients that left without being seen
20  and were supposed to be removed from the
21  schedule, but then eventually those notes
22  were -- there were notes present --
23     Q.   Where are the notes, sir?  Where
24  are the notes?
25          MR. SOTO:  Objection; form.

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

US District Court - Texas                           FINAL - September 7, 2021
Daywalker v. University of Texas                       Dr. Wasyl Szeremeta

Page 153

1    BY MS. PLANTE:
2        Q.   Where are the notes that you're
3    referencing in the excerpt you just
4    referenced from Exhibit 1?
5        A.   They're in the medical record of
6    those five charts.
7        Q.   Okay.
8            And did you go back to the
9    medical records before you documented this
10   to make sure that is what, in fact,
11   happened?
12       A.   I think I --
13       Q.   Yes or no.  Yes or no.
14           MR. SOTO:  Excuse me.  Let him
15       answer the question.
16       A.   I think I explain that in the
17   next paragraph.
18       Q.   You're talking about -- I'm
19   talking about what you did.  Not what
20   Dr. Underbrink and what you're relying on
21   hearsay information.
22           I'm asking you your personal
23   knowledge of what you did as it relates to
24   going back and making sure that this
25   allegation was factual.

Page 154

1            MR. SOTO:  Objection; compound;
2        ambiguous.
3    BY MS. PLANTE:
4        Q.   Did you go back to look at these
5    records to see if that, in fact, happened?
6        A.   I think I just answered.  It's
7    written in the next paragraph.  I reviewed
8    these notes.
9        Q.   I asked you did you -- you
10   reviewed the notes?
11       A.   A review of these notes indicate
12   a high suspicion of falsification of
13   medical records.  There was a note --
14       Q.   Where is -- where are you
15   reading into the record?  Because I don't
16   know what you're reading into.  What page?
17       A.   I'm in -- I'm in Exhibit 1.
18       Q.   Exhibit 1, what page?
19       A.   In Exhibit 7 -- actually, page 4
20   of 7.
21       Q.   Page 4.  Is it under
22   documentation 3, or is it under --
23       A.   It's under documentation 3.
24       Q.   Okay.
25           Review of these encounters,

Page 155

1    okay.
2            Did you review these encounters?
3        A.   I reviewed them with
4    Dr. Underbrink.
5        Q.   No.
6            I'm asking you did you go back
7    and a review them independent of
8    Dr. Underbrink?
9            MR. SOTO:  Objection; asked and
10   answered.
11   BY MS. PLANTE:
12       Q.   Go ahead.
13       A.   I reviewed them with
14   Dr. Underbrink.
15       Q.   That is "no" then.
16       A.   No, that is --
17       Q.   Right?
18       A.   I reviewed them with
19   Dr. Underbrink.
20           It's not a yes-or-no question.
21       Q.   Okay.
22           So, how many patients was this?
23       A.   Five.
24       Q.   Five patients.
25           MS. PLANTE:  One moment.

Page 156

1            (Pause.)
2            MS. PLANTE:  Okay.  I'm going to
3    put another document into the chat.
4            I'm placing -- well, not placing
5    before you.  I'm so used to doing
6    in-person depositions.  But I've put
7    in the chat Exhibit 19.
8            Can you open that up?
9            ---
10           (Wasyl Szeremeta Exhibit 19,
11   Initiation Remediation letter July 9,
12   2018, Bates P-001845-889, was marked
13   for identification.)
14           ---
15           THE WITNESS:  Mm-hm.
16       I have that.
17           MS. PLANTE:  Is that "yes"?
18           THE WITNESS:  Yes.  I have that.
19   BY MS. PLANTE:
20       Q.   Okay.
21           And if you'll go to page 6 of
22   that deposition -- I'm sorry.  Of that
23   exhibit.
24           MR. SOTO:  And, Doctor, feel
25       free to take time to actually review

US District Court - Texas                    FINAL - September 7, 2021
Daywalker v. University of Texas                    Dr. Wasyl Szeremeta

Page 157

1   the document.
2        MS. PLANTE:  I actually just
3   need her to go to page 6 that speaks
4   to it, the issue.
5   A.   Yes, I'm on page 6.
6   Q.   Okay.
7        Can you read into the record
8   where it says "Further clarification and
9   proof"?
10  A.   Further clarification/proof is
11  needed regarding the accusations of
12  deliberate fabrication of medical records
13  mentioned on pages 3-4.  The meeting on
14  5/30/18 was the first time I was ever
15  notified of any discrepancy in these
16  notes.  I reviewed two notes where I did
17  miss edits prior to signing them and I
18  acknowledge and take responsibility for
19  the inaccuracies.  No proof was provided
20  regarding an accusation that I signed
21  notes falsely as left without being seen,
22  but then later revised in documents on the
23  same charts.  I was asked recently via
24  e-mail to close open TDC encounters and I
25  closed them in the standard fashion as I

Page 158

1   always do, including the signing of level
2   service if applicable.  There were also
3   encounters in my in-basket with patients
4   that were indicated as left without being
5   seen per patient status which the clinic
6   nurse enters.  I closed those and marked
7   the level of service, quote/unquote,
8   error.  I was not made rather that there
9   was an alternative way to close any of the
10  encounters in question and I did not know
11  that I needed to do it differently.  The
12  encounters were from one year ago and
13  there's no evidence that this kind of
14  performance persisted into current times.
15  Q.   Okay.
16        So, Dr. Underbrink was giving
17  you something that had occurred back in
18  2017?
19  A.   The note -- the patients were
20  seen in 2017.  We were made note of it --
21  aware of it almost a year later.
22  Q.   Why did it take you so long, as
23  program director or him as the attending
24  person, to determine that there had been a
25  deficiency?

Page 159

1        MR. SOTO:  Objection; form;
2   speculation.
3   BY MS. PLANTE:
4   Q.   Go ahead.
5        MS. PLANTE:  He can speak for
6   himself.
7   A.   The deficiency was identified by
8   our department administrator just in a --
9   they were looking for charts that hadn't
10  been billed or open notes to try to
11  collect any possible revenue.  That was
12  what was explained to me.  And when -- and
13  when our administrator contacted me about
14  these ten charts at TDC I said, Please
15  contact Dr. Underbrink, he's in charge of
16  TDC.  I don't do anything with the TDC,
17  but he would under -- he would know
18  whether the notes -- you know, the status
19  of those notes.
20  Q.   Now, this involved then more
21  than just Dr. Daywalker, correct?
22  A.   There were ten charts.  Five of
23  them were open -- the residents --
24  Q.   This involved more than just Dr.
25  Daywalker?

Page 160

1        MR. SOTO:  Can you let him
2   answer the question?
3        MS. PLANTE:  Yeah.  I just want
4   to keep him on track because he's
5   giving me non-responsive answers.
6        MR. SOTO:  I understand.
7        MS. PLANTE:  And he's eating up
8   my time.
9        MR. SOTO:  I understand you --
10  BY MS. PLANTE:
11  Q.   So, if you would listen to the
12  question, Dr. Szeremeta, before you give
13  me an answer to make sure it's responsive
14  to the question I'm asking.  Would you
15  please do that?
16  A.   I think I --
17        MR. SOTO:  Doctor, I think you
18  were giving an answer --
19        MS. PLANTE:  He said he thinks
20  he can do that.  So let's move
21  forward.
22  A.   If there were --
23  Q.   Were there any other --
24        MR. SOTO:  Excuse me.  I think
25  he was saying something.

JANE ROSE REPORTING                    National Court-Reporting Coverage
1-800-825-3341                    janerose@janerosereporting.com

US District Court - Texas                              FINAL - September 7, 2021
Daywalker v. University of Texas                       Dr. Wasyl Szeremeta

Page 161

1        Doctor.
2        A.    There were ten notes that were
3    identified.  Five were residents other
4    than Dr. Daywalker.  Five were Dr.
5    Daywalker.  The five that were not Dr.
6    Daywalker, the notes were open, but they
7    weren't open because the resident's note
8    wasn't completed.  There was a nursing
9    note added, a pathology, a lab entered,
10   that made the note open.
11       Q.    Okay.  We don't have the records
12   so we can't verify what you're saying.
13       MR. SOTO:  Can -- are you done,
14   Doctor, or do you have anything to
15   add?
16       THE WITNESS:  I am.
17   BY MS. PLANTE:
18       Q.    Okay.
19       So, you would agree that other
20   residents hadn't closed their notes for
21   over a year, correct?
22       A.    No, I do not agree with that.
23       Q.    Was it near a year?
24       A.    No.
25       Q.    Okay.

Page 162

1        So, you're saying Dr. Daywalker
2    was the only one that erred in this
3    situation?
4        A.    The notes were open because --
5        Q.    That's a -- that's a yes-or-no
6    question.
7        MR. SOTO:  Can you let him
8    answer the question?
9        MS. PLANTE:  It's being
10   non-responsive.
11       Q.    You're not being responsive.
12   You're not answering the question.
13       MR. SOTO:  Can we not speak over
14   each other?
15       MS. PLANTE:  Yeah, I'm trying
16   to.
17       Okay.  Just let your witness
18   talk.  Just let him talk because
19   you're coming in debating it with him
20   only makes the record even worse.
21   BY MS. PLANTE:
22       Q.    I'm asking you are you stating
23   for the record that only Dr. Daywalker was
24   in error as it relates to these open notes
25   that were in 2017?

Page 163

1        A.    Dr. Daywalker was the only
2    resident who did not complete her note.
3        Q.    Okay.
4        And this is something, if you
5    had been on your job, you would have
6    known, correct?
7        MR. SOTO:  Objection
8    speculation; argumentative.
9        A.    I don't know that.
10       Q.    Had you done your job and you --
11   you're over the program, aren't you?
12       A.    I don't review every note in the
13   program.
14       Q.    Well, I mean --
15       A.    That is not my job to review
16   every note in the program.
17       Q.    Okay.
18       But if Dr. Underbrink hasn't --
19   did he close out the notes?  Isn't he
20   supposed to actually sign off on the
21   notes?
22       A.    The -- the note would be closed
23   out by the attending who was covering TDC
24   at that time.
25       Q.    So, it would have been that

Page 164

1    attending's responsibility to see that the
2    note hadn't been properly done and to go
3    to Dr. Daywalker and let her know that
4    this note hadn't been done?
5        A.    That's a fair assessment.
6        Q.    Okay.
7        So, the attending also dropped
8    the ball, correct?
9        A.    I would say so in that case.
10       Q.    Who was the attending?
11       A.    I don't know.
12       Q.    Okay.
13       Do you know if that attending
14   was written up?
15       A.    I don't know.
16       MR. SOTO:  It's 12:34, Victoria.
17   When do you plan on breaking for
18   lunch?
19       MS. PLANTE:  We started at 9.
20   So, I'm not hungry.
21       Are you hungry?
22       MR. SOTO:  Doctor --
23       THE WITNESS:  I'm getting there.
24       MS. PLANTE:  Okay.  We can break
25   for 45 minutes.

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                    Dr. Wasyl Szeremeta

Page 165

1        Is that okay?
2        THE WITNESS:  45 minutes, so
3    meeting back at 1:20?
4        MS. PLANTE:  Yeah, that's about
5    right.  That's good.
6        THE WITNESS:  I think 1:20 is a
7    good time.
8        MS. PLANTE:  Okay.  Thank you.
9        THE WITNESS:  Thank you.
10       THE VIDEOGRAPHER:  We are now
11   going off the record at 12:34 p.m.
12       (Luncheon recess taken.)
13                - - -
14       A F T E R N O O N   S E S S I O N
15                - - -
16       THE VIDEOGRAPHER:  We are now
17   going on the record at 1:22 p.m.
18   BY MS. PLANTE:
19       Q.   Dr. Szeremeta, you understand
20   you're still under oath?
21       A.   Yes, ma'am.
22       Q.   Okay.
23       We were talking about --
24       MS. PLANTE:  Marie, can you give
25   me the last question on the record?

Page 166

1    Because I want to make sure I get my
2    point completed.
3        (The requested portion of the
4    record was read back by the court
5    reporter.)
6        MS. PLANTE:  Okay.
7    BY MS. PLANTE:
8        Q.   Getting to number 4 on
9    Exhibit 1.
10       A.   I'm sorry.  You may need to put
11   that up again.  It disappeared once the
12   chat --
13       MS. PLANTE:  Okay.  All right.
14       That's what happened last time.
15   So, okay.
16       (Pause.)
17       MS. PLANTE:  Okay.  It should be
18   in there.
19       THE WITNESS:  Got it.
20       MS. PLANTE:  Okay.  And I think
21   it's going to be the fourth page under
22   "Trustworthiness."
23       THE WITNESS:  Okay.  Got it.
24   BY MS. PLANTE:
25       Q.   Okay.

Page 167

1        The trustworthiness allegation
2    was based upon the same 2017 issue with
3    not closing the notes and falsification of
4    documents?
5        A.   Yes.
6        Q.   So, you have her written up for
7    two things that really fall under one
8    violation; wouldn't you agree?
9        A.   No, I think they're different.
10       Q.   Okay.
11       Well, they're based on the same
12   facts, correct?
13       A.   They're based on the same facts,
14   but they go to two problems.
15       Q.   Okay.
16       I notice here you have this,
17   unlike what I saw in the other resident
18   that was placed on remediation, you have
19   this bold print just before you get to
20   trustworthiness relating to falsification
21   of medical records for whatever reason can
22   be -- cannot be tolerated and is
23   potentially a criminal offense.
24       Do you know the elements of --
25       MR. SOTO:  Where are we,

Page 168

1    Victoria?  Just so I can read along.
2        MS. PLANTE:  It's Bates stamp
3    '336.  It's page, I believe, 4 in the
4    pdf just above "Trustworthiness."
5        MR. SOTO:  Thank you.
6        MS. PLANTE:  It's two paragraphs
7    above "Trustworthiness."
8        MR. SOTO:  Okay.
9    BY MS. PLANTE:
10       Q.   What made you think this was a
11   criminal offense?
12       A.   Because potentially fraud.
13       Q.   Were you aware Dr. Heman-Ackah
14   talked about several incidents of fraud as
15   it relates to UTMB?
16       A.   I'm not --
17       MR. SOTO:  Objection; form.
18       THE WITNESS:  Sorry.
19       A.   I'm not aware.
20       Q.   You're not aware, okay.
21       Would you agree that there's
22   fraud that goes on at UTMB?
23       MR. SOTO:  Objection; form.
24   BY MS. PLANTE:
25       Q.   Go ahead.

US District Court - Texas                           FINAL - September 7, 2021
Daywalker v. University of Texas                      Dr. Wasyl Szeremeta

Page 169

1     A.   I'm not aware there's any fraud.
2          MS. PLANTE:  Okay.
3          And I don't know what that
4    objection is, but it's definitely
5    coaching, Mr. Soto, and you know that,
6    'cause that was a direct question.
7          MR. SOTO:  I'm sorry.  How is
8    that coaching the witness?
9          MS. PLANTE:  That was a direct
10   question.
11        I said there's no reason for you
12   to do form.  That alerts him to say
13   no.  I already know that.
14        MR. SOTO:  Victoria --
15        MS. PLANTE:  Please stop doing
16   it.
17        MR. SOTO:  Victoria, I'm going
18   to make objections --
19        MS. PLANTE:  Let's move on to
20   trustworthiness.  I don't want to get
21   it on the record.  Move on to
22   trustworthiness.  I know what you're
23   going to say.
24        MR. SOTO:  Can you please stop
25   with the sidebar comments?

Page 170

1    BY MS. PLANTE:
2     Q.   Trustworthiness you said is
3    based upon the same facts, correct?
4     A.   Yes.
5     Q.   Something false and
6    trustworthiness to me would be the same,
7    correct?
8          MR. SOTO:  Objection; form.
9     A.   I don't understand your
10   question.
11        No, they're different.
12    Q.   Okay.  Fine, they're different,
13   if you say so.
14        What's the difference?
15    A.   Something can be false, but
16   the -- if you -- if then it's -- if there
17   was a coverup or there was a change in
18   story, it leads to it not being
19   trustworthy.
20    Q.   What made you think there was a
21   coverup and change in story when you
22   haven't even gotten Dr. Daywalker's point
23   of view at the time that Exhibit 1 was
24   written?
25    A.   Dr. Daywalker -- in e-mail

Page 171

1    either to -- I think it was to
2    Dr. Underbrink said that initially that
3    the patients were left without being seen.
4    So if the patients truly had been left
5    without being seen, then there would be no
6    note.  Would be a blank note.  But then --
7     Q.   Okay.
8     A.   But then a note appeared.  So,
9    which was it?
10    Q.   Okay.
11        Do you understand that you
12   commit errors in notes sometimes?
13    A.   Writing a note on a patient that
14   never showed up is not an error.
15    Q.   I asked you do you understand
16   that errors are committed in writing notes
17   sometimes?
18    A.   Yes.
19    Q.   Okay.
20        And because a error is
21   committed, you wouldn't deem that as
22   necessarily falsification of documents,
23   correct?
24    A.   No, because you can correct the
25   error.

Page 172

1     Q.   Okay.
2          And, so, you would have to know
3    the context in which the whole incident
4    occurred to surmise that this was a
5    falsification of documents, correct?
6     A.   I believe I had enough
7    information to say that was a
8    falsification of documents.
9     Q.   Yeah, you had enough information
10   from Dr. Underbrink, correct?
11    A.   Yes.
12    Q.   That is the only source of your
13   information, correct?
14        MR. SOTO:  Objection; form.
15    A.   That's as far as I know.
16    Q.   Okay.
17        All right.  Let's move on.
18        And then you get into something
19   about a poster.  When I saw it, I was
20   astonished that something would be in a
21   remediation on getting a poster to
22   someone.
23        Is that what it was about?
24    A.   It was more than just a -- it's
25   clearly explained in the next paragraph,

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 173

1  yes.
2     Q.   You mean the poster was so
3  significant it required it as a point in a
4  remediation, in an official document?
5     A.   Yes.
6     Q.   Are you saying it was that
7  important?
8     A.   It was.
9     Q.   Okay.
10        That's not something that could
11  have brought -- been brought to Dr.
12  Daywalker's attention outside of a
13  remediation, is what you're saying?
14        MR. SOTO:  Objection; form.
15     A.   She was placed on remediation
16  for multiple lapses.  Any single event is
17  not enough to put you on probation -- or,
18  sorry, remediation.
19     Q.   Okay.  I'm glad you said that.
20        So, if we negate all of them but
21  one, you're saying that remediation would
22  not be necessary?
23     A.   I would find it hard to negate
24  any of them given --
25     Q.   Well, I'm saying if we're able

Page 174

1  to do that with the evidence we have, you
2  would agree that the remediation would not
3  be necessary?
4        MR. SOTO:  Objection;
5  speculation.
6  BY MS. PLANTE:
7     Q.   Go ahead.
8        MS. PLANTE:  He said it.
9     A.   I've already stated my answer.
10     Q.   Okay.  And I believe your answer
11  was if it was just one, she wouldn't be on
12  remediation.
13        Is that what you said?
14     A.   But there isn't just one.
15     Q.   No.  I said if you agree.
16        I just want you to just
17  stipulate to one.
18     A.   There's -- no, I'm not going to
19  stipulate.  There's seven pages of
20  remediation here.
21     Q.   No.  I said if we dwindle it
22  down to one after we produce evidence, and
23  we do have it, produce evidence, you will
24  agree with the judge that one would not
25  substantiate a remediation?

Page 175

1        MR. SOTO:  Objection; ambiguous;
2  speculation.
3  BY MS. PLANTE:
4     Q.   Go ahead.
5     A.   I'll make that assessment after
6  I see your evidence.
7     Q.   You can't make that assessment.
8  You just made the statement that if it was
9  just one incident --
10        MR. SOTO:  Objection;
11  argumentative.
12     Q.   -- that she wouldn't have been
13  on remediation, correct?
14        MR. SOTO:  Objection;
15  argumentative; asked and answered.
16  BY MS. PLANTE:
17     Q.   Go ahead.
18     A.   I've already stated my answer.
19     Q.   Okay.  We'll let your answer
20  stand.  Fine.
21        Now, you say she was on Team A.
22     A.   Yes.
23     Q.   Was that factually correct?
24     A.   I believe so.
25     Q.   If she told you she was on Team

Page 176

1  B, would that -- would you have any
2  evidence to refute that?
3        MR. SOTO:  Objection; ambiguous;
4  speculation.
5     A.   My evidence was that she was on
6  Team A.
7     Q.   What evidence did you -- where
8  did you gather this evidence, Dr.
9  Szeremeta?
10     A.   From the schedule.
11     Q.   What schedule?
12     A.   The rotation schedule.
13     Q.   Rotation schedules don't change?
14     A.   Not to that degree.
15     Q.   You're saying a rotation does
16  not change from A to B and somebody's
17  placed on, never?
18        MR. SOTO:  Objection.
19     A.   I'm not sure where -- where
20  you're heading with this question, what
21  you're trying to ask.
22     Q.   Well, I'm trying to ask if she
23  says she wasn't even on Team B -- I mean,
24  she wasn't even on Team A and she was on
25  Team B, you couldn't even get that fact

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 177

1   right, correct?
2        MR. SOTO:  Objection;
3   argumentative; speculation.
4   BY MS. PLANTE:
5        Q.   Go ahead.
6        A.   She was on Team A.
7        Q.   Okay.
8        I'm going to point you to I
9   think it is rebuttal Exhibit 19.
10       Do you have it before you, or
11  has that been removed?
12       A.   I think actually that one got
13  saved.
14       Q.   Okay.
15       A.   19.
16       Okay.  Go ahead.
17       MR. SOTO:  What page are you on,
18  Victoria?
19       MS. PLANTE:  Just one minute.
20  BY MS. PLANTE:
21       Q.   Let's go back to an issue.  She
22  requested documentation of the fraudulent
23  claims.
24       Did you provide her the medical
25  records that she had not allegedly closed

Page 178

1   for almost a year?
2        A.   She didn't -- she didn't ask me
3   of those records.
4        Q.   Did you not receive Exhibit 19,
5   which is her rebuttal to your remediation
6   letter?
7        A.   I may have received it.  I
8   receive lots of documents.
9        Q.   Okay.
10       You received lots of documents,
11  but this relates to a lawsuit and claims
12  made against you.
13       You understand that, correct?
14       MR. SOTO:  Objection.  I don't
15  think so.
16       I don't think there's any claims
17  made against me.
18       MS. PLANTE:  There are claims
19  made against him in the lawsuit.
20  BY MS. PLANTE:
21       Q.   In the factual pattern of the
22  lawsuit, there are claims made against
23  you.
24       Do you understand that, Dr.
25  Szeremeta?

Page 179

1        MR. SOTO:  Objection; form.
2   BY MS. PLANTE:
3        Q.   Go ahead.
4        A.   I understand UTMB is being sued.
5   That's all I --
6        Q.   Did you look at the fact pattern
7   to realize you are one of the agents for
8   UTMB that has been named as a
9   discriminator, harasser, and retaliator?
10       MR. SOTO:  Objection; calls for
11  legal conclusion.
12  BY MS. PLANTE:
13       Q.   Go ahead.
14       A.   That's the allegation.
15       Q.   Yes.
16       And like you said, she's got to
17  prove them, correct?
18       MR. SOTO:  Objection; calls for
19  legal conclusion.
20  BY MS. PLANTE:
21       Q.   Does she have to prove her
22  allegations, as far as you know?
23       A.   I'm not --
24       MR. SOTO:  Objection.  Same
25  objection.

Page 180

1   BY MS. PLANTE:
2        Q.   Go ahead.
3        A.   I'm not a lawyer.
4        Q.   Okay.
5        So, you don't believe when you
6   go into court you have to prove anything?
7        MR. SOTO:  Objection; calls for
8   legal conclusion.
9   BY MS. PLANTE:
10       Q.   Do you believe you have to prove
11  something when you go into court?
12       A.   I think you --
13       MR. SOTO:  Asked and answered.
14  BY MS. PLANTE:
15       Q.   Go ahead.
16       A.   I think you're innocent until
17  proven guilty.
18       Q.   That's a criminal standard.  But
19  I'll give you that, innocent until proven
20  guilty.
21       Did you allow Dr. Daywalker to
22  be innocent before you proved her guilty?
23       MR. SOTO:  Objection; form.
24       A.   It's not the same.
25       Q.   Okay.  Well, you just said "I

US District Court - Texas                                          FINAL - September 7, 2021
Daywalker v. University of Texas                                        Dr. Wasyl Szeremeta

Page 181

1   believe you're innocent til proven guilty"
2   when I asked you when you go to court --
3       A.   In a court.
4       Q.   -- do you believe -- yes.
5       A.   This is not a court of law.
6       Q.   We're in a court of law now.
7   We're in a lawsuit.
8            Do you understand that?
9       A.   You need to be clearer with your
10  questions.  You're bouncing from court of
11  law to remediation.
12      Q.   Okay.
13      A.   I don't know what you're
14  talking -- maybe you're not --
15      Q.   And I don't need you pointing
16  and directing at me because I take that as
17  an aggressive move, okay?
18           MR. SOTO:  Victoria, I object at
19      this point to the harassing with these
20      questions --
21           MS. PLANTE:  Well, I'm telling
22      him --
23           MR. SOTO:  Can I please state my
24      objection?
25           I object to the harassment

Page 182

1       nature of these questions.
2            MS. PLANTE:  Okay.
3            All of this lawsuit's harassing
4       to you.  So it doesn't matter what I
5       say.
6            MR. SOTO:  Can you please not
7       make sidebar comments?
8   BY MS. PLANTE:
9       Q.   Let's go back to your --
10           MS. PLANTE:  You can make
11      sidebar comments, but I can't.  What a
12      double standard you set, Mr. Soto.
13           You can do it.  What separates
14      you from me?  I'm a woman, you're a
15      man?  I'm black, you're a Caucasian
16      Hispanic?  Is that it?
17           MR. SOTO:  I am not Caucasian.
18      But in any event, Victoria.
19           MS. PLANTE:  Are you
20      Caucasian -- you don't know your race?
21           MR. SOTO:  Excuse me?
22           MS. PLANTE:  Do you not know
23      your race?
24           MR. SOTO:  Why is any of this
25      relevant to anything that's --

Page 183

1            MS. PLANTE:  Well, I'm just
2       saying you said you're not Caucasian
3       Hispanic.
4            MR. SOTO:  Victoria, can you
5       please stick to the questions in
6       this --
7            MS. PLANTE:  Well, I am.
8       I asked him about innocent until
9       proven guilty, and he said in a court
10      of law you're innocent until --
11           MR. SOTO:  Can we go off the
12      record?  Can we go off the record?
13           MS. PLANTE:  No, we can't go off
14      the record because there is a question
15      on the floor and he agreed that he --
16      we just went on -- got back on the
17      record.
18           MR. SOTO:  I don't think any of
19      this is appropriate, to be honest.
20           MS. PLANTE:  I don't care
21      whether you feel it's appropriate.  He
22      brought it up.  He brought it up, so
23      I'm able to ask him questions about
24      it.
25           You're using up my time, and I'm

Page 184

1       going to go off the record in a minute
2       to make my note known to you, but
3       rather than waste time, I'm going to
4       move on.
5            I'm not going to move on past
6       the innocent til proven guilty.
7   BY MS. PLANTE:
8       Q.   So, when you said that, what did
9   you mean?
10      A.   You said in a court of law, if
11  you go into court, you believe you need to
12  prove something, and I said I believe
13  you -- you need to prove something because
14  you're innocent until proven guilty.
15      Q.   Okay.
16      A.   A remediation is not a court of
17  law.
18           MR. SOTO:  Marie, can you mark
19      this discussion, including the
20      comments Ms. Plante, Victoria made
21      just a few minutes ago directed at me.
22           MS. PLANTE:  Mark them?  I don't
23      think she can mark anything, but to
24      the extent she can, Victoria stands
25      right by them.  She is not afraid to

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 185

1    talk about race and gender.
2         Please know that.  You will not
3    intimidate me because that's the hot
4    button issue in this case.
5         MR. SOTO:  Victoria, can we just
6    stick to the issues in this case?
7         MS. PLANTE:  Yeah, well, you
8    wanted to go off the record and note
9    and all of this.  It's unnecessary.
10   Leave it alone and let me question Dr.
11   Szeremeta.
12        MR. SOTO:  I would hope you
13   would --
14        MS. PLANTE:  Now let's move
15   forward.
16   BY MS. PLANTE:
17   Q.   Innocent til proven guilty.  So,
18   you believe that you're innocent til
19   proven guilty.
20        Did you believe that in that
21   particular scenario, another person gets
22   to tell their side before a conclusion is
23   made?
24   A.   In which --
25        MR. SOTO:  Objection.

Page 186

1    Objection; ambiguous.
2    BY MS. PLANTE:
3    Q.   I said you legally --
4         MR. SOTO:  Calls for a legal
5    conclusion.
6    BY MS. PLANTE:
7    Q.   In the system that you just
8    explained, innocent until proven guilty,
9    you believe that another party should be
10   able to tell their side as to what
11   happened before any judgment is made about
12   them, correct?
13        MR. SOTO:  Objection; ambiguous;
14   calls for legal conclusion.
15   BY MS. PLANTE:
16   Q.   Keep going.
17   A.   In a court of law or within
18   the --
19   Q.   Yes.
20   A.   -- confines of the residency?
21   Q.   I'm talking about in a court of
22   law.
23        MR. SOTO:  Objection; legal
24   conclusion.
25        MS. PLANTE:  He said you're

Page 187

1    innocent until proven guilty.
2    BY MS. PLANTE:
3    Q.   Well, let's put it in the
4    residency.
5         If you believe this is a
6    standard for residency, innocent until
7    proven guilty, is that what you're saying?
8    Or are you saying in a court of law?
9    A.   Residency has different rules.
10   I mean --
11   Q.   Okay.
12        So, when you made that
13   statement, you were talking about in a
14   court of law, correct?
15   A.   Because you had asked me about
16   that I'm being sued right now, you realize
17   you're in court.  So I thought we were
18   talking about the court.
19   Q.   Yeah.  So, that's -- that's what
20   I'm trying to go back to.  That's what I
21   thought you were saying too.
22        So, if you're innocent, and I'm
23   going to ask this question because I've
24   asked it two times, maybe even three, if
25   you are innocent until proven guilty, you

Page 188

1    understand that before you can be deemed
2    guilty, that someone has to prove that you
3    did something, correct?
4         MR. SOTO:  Objection; calls for
5    legal conclusion; ambiguous.
6    BY MS. PLANTE:
7    Q.   Go ahead.
8    A.   In a court of law or in the
9    residency?
10   Q.   I said court of law.
11   A.   And I've answered that.
12   Q.   Okay.
13   A.   Yes, in a court of law.
14   Q.   Okay.  Now let's follow that
15   reasoning.
16        You believe there are two sides
17   to every story, correct?
18        MR. SOTO:  Objection; ambiguous.
19   A.   Usually.
20   Q.   Usually, okay.
21        What were you think -- because,
22   I'll tell you this.  We have the plaintiff
23   and we have the defendants in this case,
24   which is UTMB and Dr. Raimer versus Dr.
25   Daywalker, two opposing people.  One is a

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                              Dr. Wasyl Szeremeta

Page 189

1  party called the plaintiff.  The other's a
2  party called defendant.
3         So, you would agree that you
4  wouldn't want a jury to conclude you are
5  guilty of something or liable for
6  something until they have heard both
7  sides, correct?
8     A.   In a court of law, yes.  I
9  already said that.
10    Q.   Okay.
11        So, in remediation, you feel
12 like that should not apply.  You do not
13 have to hear both sides; you can come to a
14 conclusion immediately?
15    A.   It's a -- it's a different rules
16 of engagement and there are things were
17 not made immediately.
18    Q.   Yeah.  Well, I'm asking you the
19 question.
20        Do you believe that both sides
21 have a right to give their opinion before,
22 or their facts, before a conclusion is
23 made?
24    A.   In remediation?
25    Q.   In remediation, in life.

Page 190

1     A.   They're two different standards.
2     Q.   Okay.
3         What -- what standards do you
4  have for remediation?  Because evidently,
5  there are different standards.  Evidently
6  allegations only have to be made and then
7  it's deemed factual?
8         MR. SOTO:  Objection; form.
9  BY MS. PLANTE:
10    Q.   Tell me what standards are for
11 remediation.
12    A.   Remediation is not -- the
13 decision to place someone on remediation
14 or probation or non-renewal is made on the
15 basis of the CCC and the faculty because
16 we are the assessors of how someone is
17 doing in their residency.  It's not done
18 because someone makes one mistake or two
19 mistakes, but when there's a certain
20 pattern of things happening that are
21 potentially detrimental to someone's
22 residency, faculty -- I mean, the person
23 that's on that rotation, there's feedback,
24 but eventually if there's enough in
25 evidence to place someone on remediation,

Page 191

1  there's remediation to try to correct
2  those actions.
3     Q.   Okay.
4         So, you would not agree that Dr.
5  Daywalker was, you know, entitled to give
6  her view of what occurred before you
7  placed her on remediation?
8     A.   Her view is not consistent with
9  the evidence that was --
10    Q.   I said was she -- you're not
11 answering the question.
12        MR. SOTO:  He's trying to answer
13    the question.
14        MS. PLANTE:  Objection;
15    non-responsive.
16        MR. SOTO:  That's fine if you
17    want to make the objection.
18        MS. PLANTE:  He already
19    finished.
20 BY MS. PLANTE:
21    Q.   The question is --
22        MR. SOTO:  Stop, Victoria, for a
23    second.
24        Dr. Pine, have you finished your
25    answer to that question?

Page 192

1         THE WITNESS:  Dr. Pine?
2         MR. SOTO:  I'm so sorry.  Dr.
3    Szeremeta.
4         THE WITNESS:  Yes, I finished.
5         MR. SOTO:  All right.
6         Sorry about that.
7         MS. PLANTE:  I mean, he can give
8    me more if he needs to because as he
9    gives me information, it's helping me.
10   Let's keep going.
11        MR. SOTO:  Victoria, I'm just
12   asking that you please allow him to --
13        MS. PLANTE:  Okay.  I have
14   allowed him to finish --
15        MR. SOTO:  Can you not speak
16   over me?
17        MS. PLANTE:  Okay.  So we're
18   moving forward.
19        MR. SOTO:  Can you not speak
20   over me?
21        I'm just saying can you please
22   let him answer to your question before
23   you interrupt him.
24        MS. PLANTE:  He said he was
25   finished, and I have.

US District Court - Texas                              FINAL - September 7, 2021
Daywalker v. University of Texas                              Dr. Wasyl Szeremeta

Page 193

1   BY MS. PLANTE:
2       Q.   So, let's go back to this whole
3   your standard of remediation.
4            You said, and I want to make
5   sure I get this clear, because you have
6   avoided the question.  You have not
7   answered the question yes or no.
8            MR. SOTO:  Objection.
9   BY MS. PLANTE:
10      Q.   So, I'm asking you for the third
11  or fourth time, do you believe that
12  it's -- that Dr. Daywalker was entitled to
13  give you her version of what occurred to
14  explain before you concluded that you were
15  going to place her on remediation?
16           MR. SOTO:  Objection;
17  argumentative.
18  BY MS. PLANTE:
19      Q.   Go ahead.
20      A.   No.
21      Q.   Okay.
22           So, this was -- it didn't matter
23  whether it was true or not.  She didn't
24  have a chance --
25           MR. SOTO:  Objection.

Page 194

1   BY MS. PLANTE:
2       Q.   Her rebuttal --
3            MS. PLANTE:  Let me withdraw
4   that.
5       Q.   The rebuttal, which is Exhibit
6   19, meant nothing to you, correct?
7            MR. SOTO:  Objection; form.
8       A.   The rebuttal, as I read right
9   now, was not consistent with the facts
10  that we had.
11      Q.   Did it mean anything to you, is
12  what I asked you?
13           MR. SOTO:  Objection; ambiguous.
14      A.   The fact, it did not -- it
15  didn't mean anything to me 'cause it
16  wasn't consistent with the facts.
17      Q.   Thank you.  It didn't mean
18  anything to you.
19           I want to make sure I go through
20  this final -- accountability on deadlines.
21  If you go to page 4.
22           Again you have caps.  What's
23  this bold and caps for?  What's the bold
24  and all caps for?  What were you trying to
25  convey?

Page 195

1            MR. SOTO:  Objection.
2   Victoria, what page are you on?
3   Page 4?
4            MS. PLANTE:  I believe it's page
5   4.  It's just -- it has bold caps
6   right there.  You can see it.
7            MR. SOTO:  I don't see anything
8   in bold caps.
9            Where in the page?
10           MS. PLANTE:  It's going to be on
11  page 1, 2, 3, 4, 5.
12           MR. SOTO:  Thank you.
13  BY MS. PLANTE:
14      Q.   Do you see that, Dr. Szeremeta?
15      A.   Yes, I do.
16           MS. PLANTE:  We have Dr.
17  Daywalker here in the -- the video
18  now.
19      Q.   Do you -- can you tell the jury
20  why you're putting these words in caps and
21  bolded?
22      A.   They were important and the CCC
23  felt they needed additional emphasis.
24      Q.   Okay.
25           Who in the CCC?

Page 196

1       A.   It was a collective effort.  It
2   was all the people in the CCC at the time
3   of the meeting.
4       Q.   Can you name those in the CCC at
5   the time --
6       A.   No, I --
7       Q.   -- of this meeting?
8       A.   No, I cannot.
9       Q.   Okay.
10           You say:  Given all these events
11  and no indication that improvement will
12  occur on its own.
13           How could you make that
14  assessment when you have not even told her
15  that she was going to be subject to
16  remediation, that improvement would not
17  occur on its own?
18      A.   That's not what the letter says.
19  The letter says --
20      Q.   Well, look at it.
21      A.   No, that's how you're reading
22  it.
23           The letter says that you have
24  been --
25      Q.   What indication --

Page 197

1        MR. SOTO:  Excuse me.  Can you
2   let him finish, please?
3        A.   You are being placed on
4   remediation.  These are the things that
5   need to be fixed.  If there's no
6   improvement on your own.
7        Q.   No.  Just read.  I want you to
8   read it so I won't get it mixed up because
9   I'm thinking of several questions probably
10  two or three minutes ahead of you.
11       So, if you would just read it
12  into the record where it starts "Given all
13  these events."
14       A.   (Reading) Given all these events
15  and no indication that improvement will
16  occur on its own, the CCC together with
17  the chair of the department have elected
18  to place you on immediate remediation
19  effective today.
20       Q.   Okay.
21       So, you assumed no improvement
22  will occur on its own without the
23  remediation, correct?
24       A.   Not an assumption.  It already
25  had not improved.

Page 198

1        Q.   Well, you had not told her that
2   these issues arose to the level of
3   remediation, had you?
4        A.   We had a meeting with Siddiqui
5   and her --
6        Q.   I asked the question was had you
7   told her about a possibility of
8   remediation.
9        A.   Every resident knows there's a
10  possibility of remediation.
11       Q.   If a resident is doing well and
12  they just come up with a remediation, do
13  you think they're shocked?  If they're
14  doing well and they've been given good
15  evaluations, you believe that they would
16  automatically believe that, Oh, this
17  remediation is warranted?
18       MR. SOTO:  Objection;
19       argumentative; compound; speculation.
20  BY MS. PLANTE:
21       Q.   Go ahead.
22       A.   But she was not doing well.
23       Q.   Okay.
24       Well, you never put it in
25  writing as it relates to it being a issue

Page 199

1   for remediation, correct?
2        A.   It doesn't have to be.
3        Q.   Okay.
4        Well, you did put it in the
5   young lady in the CCC minutes as to
6   remediation being an option for her,
7   didn't you?
8        A.   Different circumstances.
9        Q.   Well, I'm asking you did you put
10  it in there for her?
11       MR. SOTO:  Objection.
12       A.   I did not write the minutes.
13       Q.   Okay.
14       Do you remember it being stated,
15  or are you saying that Tricia did not
16  transpose the meeting -- what happened in
17  the meeting --
18       A.   I don't remember.  I couldn't
19  tell you.
20       Q.   Okay.
21       A.   A hundred percent certainty.
22       Q.   Okay.  Let's move on.
23       You required her to be one
24  hundred -- hundred percent of your notes
25  must be timely and accurate.

Page 200

1        Would that be for a whole
2   six-month period of time?
3        A.   It was for the time of the
4   remediation.
5        Q.   Wasn't the remediation for six
6   months?
7        A.   I believe it said one to six
8   months.
9        And I can correct that if I can
10  pull it up again.
11       It said --
12       Q.   It said one to six months.  You
13  don't have to --
14       A.   Reviewed on a monthly basis for
15  a minimum of one month and a maximum of
16  six months.
17       Q.   Wasn't it six months?  Because
18  in a demotion meeting you told her she was
19  still going to be on remediation, correct?
20       MR. SOTO:  Objection; form.
21  BY MS. PLANTE:
22       Q.   Go ahead.
23       A.   She was held back, not demoted.
24       Q.   You can call it whatever you
25  want it.  Potato, potato (different

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                   Dr. Wasyl Szeremeta

Page 201

1   pronunciation).
2         MR. SOTO:  Objection;
3   argumentative.
4   BY MS. PLANTE:
5         Q.   It doesn't matter.  It doesn't
6   matter.
7         She was held back.  It doesn't
8   mean she was -- she had already
9   matriculated to the fourth year, correct?
10        A.   No, that's not correct.
11        Q.   Okay.
12        Why would you sign the document
13  then?
14        MR. SOTO:  Objection; ambiguous.
15        A.   There are two -- there are two
16  levels of --
17        Q.   Why did you sign the document?
18        MR. SOTO:  Can you let him
19  finish the -- he's answering the
20  question.
21        MS. PLANTE:  I'm not asking
22  about two levels.  I'm asking --
23        MR. SOTO:  He's answering your
24  question.
25        MS. PLANTE:  Okay.  I'm going to

Page 202

1   move on to another subject.
2         MR. SOTO:  Can you --
3         MS. PLANTE:  Okay.  I've placed
4   what's been included in the chat as
5   Exhibit 4.  Can you open that
6   document?
7         ---
8         (Wasyl Szeremeta Exhibit 4,
9   University of Texas Medical Branch
10  House Staff Work Agreement Rosandra
11  Lakeisha Walker Otolaryngology, Bates
12  OAG-0011300-302, was marked for
13  identification.)
14        ---
15        THE WITNESS:  Yes.
16  BY MS. PLANTE:
17        Q.   Is this a document you signed?
18        A.   Yes, it is.
19        Q.   This is a resident 4 agreement,
20  correct?
21        A.   This is the financial part of
22  it, yes.
23        Q.   The financial part of it.
24        So, is there a difference that
25  you make where there's a financial part

Page 203

1   and then there is another part that you
2   and Dr. Walker would sign that relates to
3   the duties?
4         MR. SOTO:  Objection; form.
5         A.   There -- there is -- this one is
6   done for the GME office so that the
7   residents can be advanced and paid for
8   their time as an employee.  They still
9   have to complete their rotations and be
10  promoted by the CCC, or advanced by the
11  CCC.
12        Q.   By March 1st, aren't you
13  supposed to indicate when a person is
14  going to move on to the next year?
15        A.   For the financial portion, yes.
16  But they still have to fulfill their --
17        Q.   Okay.
18        A.   -- March, April, May and June.
19  That's four months.  That's a third of the
20  year.
21        Q.   Tell me where you're getting the
22  financial part from.  Just tell me in the
23  GME where that is listed.
24        MR. SOTO:  Objection; form;
25  compound.

Page 204

1         A.   It's what they get paid at as a
2   salary.
3         Q.   No, I'm asking you that you're
4   sort of talking both ways.  You're saying
5   there's a financial part and then there is
6   some non-financial part that you have not
7   articulated yet.
8         What is the non-financial part
9   of this?
10        A.   Completing your rotations and
11  being assessed as competent to move to the
12  next year by the CCC.
13        Q.   Okay.
14        So, did you believe she was
15  entitled to year 4 salary?
16        A.   She was there --
17        Q.   And she had not completed it
18  properly?
19        A.   She was there for her fourth
20  year, she would get the salary.
21        Q.   Okay.  She would get the salary.
22        So you're saying this was only
23  sent for salary purposes?
24        A.   Yes.
25        Q.   Wow.  Okay.

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 205

1        That's a new one for me there.
2        MR. SOTO:  And just for the
3    record --
4        MS. PLANTE:  Let me wrap my head
5    around that one.
6        MR. SOTO:  Just for the record,
7    and can you mark that, please, Marie?
8        Just for the record, this is
9    designated as confidential.  We would
10   also designate --
11       MS. PLANTE:  It's not
12   confidential.  You can designate it
13   all you want to because I'm going to
14   object to it.
15       MR. SOTO:  We would also
16   designate this portion of the
17   deposition, along with any questions
18   related to this document, as
19   confidential pursuant to the
20   protective order.
21       MS. PLANTE:  This is my client's
22   information.  She can talk about it
23   all day long.  This is her
24   information.  She was given this
25   outside any confidential setting.  So

Page 207

1        What information is sent to the
2    board?
3        A.   That they have been advanced to
4    the fourth year level or the third year
5    level or the next level or --
6        Q.   Is that --
7        MR. SOTO:  Can you let him
8    finish?
9        A.   Or that they've graduated and
10   can practice independently and
11   competently.
12       Q.   Okay.
13       And that's a letter sent to I'm
14   assuming the American Otolaryngology
15   Board, is what you're talking about?
16       A.   It's not a letter.  It's a form
17   that's filled out online.
18       Q.   Okay.  It's a form that's filled
19   out online.
20       And wasn't the form filled out
21   online designating her as a fourth year?
22       A.   No.
23       Q.   You, at no point, had to go back
24   to the Otolaryngology Board and say, Oh,
25   there was a mistake, after she was forced

Page 206

1    I don't know you're trying to mark it
2    as confidential when she had a copy of
3    it herself.  It's not confidential.
4        So, I don't know what your
5    meaning of confidential is, but
6    designate all day long.  That doesn't
7    mean it's so.  You do what you need
8    to.
9        MR. SOTO:  Victoria, if you
10   could move on, please.
11       MS. PLANTE:  Yeah, I'm moving
12   on.
13   BY MS. PLANTE:
14       Q.   Is there another document that I
15   have not seen wherein the CCC signs to
16   certify this person's moved on to the
17   fourth year?
18       MR. SOTO:  Objection;
19   speculation.
20   BY MS. PLANTE:
21       Q.   Go ahead.
22       A.   The CCC, once they voted to
23   advance the residents, that information is
24   sent to the board.
25       Q.   Okay.

Page 208

1    to leave UTMB?
2        A.   I don't believe so.
3        Q.   Okay.  We're going to let that
4    sit for where it is.
5        Are you certain, or you don't
6    believe so?
7        A.   I don't believe so.
8        Q.   Why do you say you don't believe
9    so?
10       A.   Because I don't think I ever --
11   I don't think I ever advanced her to a 4.
12       Q.   Okay.
13       How don't you think you advanced
14   her to a 4?  Didn't you say that -- let me
15   get my other document out, because I
16   can't -- I -- I am just amazed.  Just one
17   minute.
18       MR. SOTO:  Victoria, can you
19   please stop with the comments?
20   Amazed, wow, stuff like that.
21       MS. PLANTE:  I can do whatever I
22   want to do.  If you want to go to the
23   judge on it, then fine.
24       MR. SOTO:  It's harassing.
25       MS. PLANTE:  But I can't keep up

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                      Dr. Wasyl Szeremeta

Page 209

1    with this.  I just didn't expect this
2    type of testimony.
3        But I got the documents.  Just
4    one minute.
5        (Pause.)
6        MS. PLANTE:  I don't have some
7    of these documents because I didn't
8    think they would be really disputed,
9    but I have to pull them up from
10   another place.  So just one minute.
11       (Pause.)
12       MS. PLANTE:  Okay.  I think it's
13   the policies and procedures.
14   BY MS. PLANTE:
15       Q.   Were you aware that by March --
16   hold on.  It's the CCC minutes.
17       There's so much information here
18   I'm getting confused here.
19       The CCC minutes, which is
20   Exhibit 16.  Do you have it there?
21       A.   Yes, I do.
22       (Pause.)
23       (Noise interruption.)
24       MS. PLANTE:  Okay.  I'm getting
25   ready to put up --

Page 210

1        Q.   Where is the document that is
2    sent to the American Board of
3    Otolaryngology?  Where would that document
4    be found?
5        MR. SOTO:  Objection; form;
6    speculation.
7        A.   I believe that would be on the
8    American Board website.
9        Q.   And you would have to -- they
10   would have possession of that document?
11       A.   I believe they would.
12       Q.   Okay.
13       When did you notify Dr.
14   Daywalker she had not officially been
15   promoted to resident 4?
16       A.   When she returned back from her
17   leave.
18       Q.   Okay.
19       Why didn't you notify her
20   before?  She worked there at least two
21   months in that from July to maybe
22   mid-August.
23       For 45 days she worked as a
24   fourth year resident, correct?
25       MR. SOTO:  Objection; form.

Page 211

1        A.   Hold on a second.
2        (Pause.)
3        A.   I don't have the letter that Dr.
4    Pine gave her.
5        Q.   I have it.
6        A.   Is that one up?
7        Q.   No.  I'll have your attorney put
8    it up.  And I'll produce it when I need
9    to.  It's just going to take me out of my
10   thought process right now.
11       (Pause.)
12       Q.   So, you told her five months
13   into the PGY-4 status that she had not
14   been promoted; is that correct?
15       A.   I know that when she came back
16   from her leave that we told her that she
17   would be coming back as a 3.
18       Q.   When was that decision made that
19   she would come back as a 3?
20       A.   According to the CCC minutes, it
21   was made back on August 6th.
22       Q.   On August 6.
23       Okay.  Great.
24       (Pause.)
25       MS. PLANTE:  Okay.  I'm putting

Page 212

1    in what's been marked as Exhibit 22,
2    which is from Ms. Ongeri's
3    investigation.
4        ---
5        (Wasyl Szeremeta Exhibit 22,
6    UTMB Health Department of Internal
7    Investigations Investigation Report,
8    Date of Complaint: July 15, 2018, Date
9    Completed: October 2, 2018, Bates
10   OAG-0010499-521, was marked for
11   identification.)
12       ---
13   BY MS. PLANTE:
14       Q.   Are you familiar with Ms.
15   Ongeri?
16       A.   Yes, I am.
17       Q.   She was responsible for
18   investigating some of Dr. Daywalker's
19   claims.
20       Is that what you recall?
21       A.   That's what I recall, yes.
22       Q.   Okay.
23       So, I want you to open up 22,
24   and I want you to look at page -- this was
25   as of October 2nd when this was drafted.

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                    Dr. Wasyl Szeremeta

Page 213

1           Do you see that on the first
2   page?
3       A.    Is that on the date completed?
4       Q.    Yes.
5       A.    It's yellowed out on me.
6       Q.    Yes.
7           It says October 2nd, 2018,
8   doesn't it?
9       A.    I don't see that.  It's yellowed
10  out on my page.
11          I have date of complaint July
12  15, 2018.
13      Q.    Okay.
14      A.    Date completed in a yellow bar.
15          MS. PLANTE:  Okay.  Hold on.
16  Okay.  Let me -- okay.  Okay.
17          Let me re-post that.  Or put it
18  in the chat again.  And then let me do
19  the entire thing because I believe
20  it's -- it's marked that way later.
21          (Pause.)
22          MS. PLANTE:  Okay.  I'm getting
23  ready to put it back in the chat
24  without the marks on it, since you
25  can't.

Page 214

1           Okay.  It's 22 without marks.
2   So I'll just take the first 22 out
3   with the marks.
4   BY MS. PLANTE:
5       Q.    Do you see that?
6       A.    I see it.
7       Q.    You see October 2nd.  And if
8   you'll go down to page -- page 3 under
9   undisputed facts by Ms. Ongeri and read
10  the first sentence.
11      A.    Dr. Walker is a resident PGI-4
12  in the otolaryngology residency training
13  department.  She was hired on June 16,
14  2015 as a resident PGI-1.
15          Dr. Walker --
16      Q.    Okay.  That's all I need you to
17  read.
18          So, even the investigator as of
19  October 2nd, 2018 believed her to be a
20  PGY-4.
21          So, did you communicate to her
22  at any point Dr. Walker is a PGY-3?
23      A.    Communicate to whom?  Sorry.
24      Q.    To Ms. Ongeri.
25      A.    No.

Page 215

1       Q.    To anyone.
2           Ms. Thibodeaux?
3       A.    No.
4       Q.    Okay.
5       A.    She was -- I think the
6   question -- again, it's the same thing.
7   She was paid at a PGY-4 level.
8       Q.    Okay.  I understand what you're
9   saying she was paid as a PGY-4.
10          Didn't she ask you in the
11  conversation regarding the demotion, she
12  said, So, this is demotion.  You said, I
13  don't care what you call it.
14          Do you remember what you said in
15  that return to work meeting?
16      A.    To whom?  To Dr. Daywalker?
17      Q.    Daywalker, yes.
18      A.    This was in the November meeting
19  when she came back?
20      Q.    Correct.
21      A.    She was coming back as a PG --
22  to do PGY-3 rotations.
23      Q.    She said to you, do you recall
24  her saying to you, So you're saying that
25  I've been demoted?  And you said, I don't

Page 216

1   care what you call it?
2       A.    I don't remember exactly what I
3   said, but it wasn't a demotion.
4       Q.    Okay.
5           Well, tell me what gives you the
6   right to have in the GME handbook to make
7   a person repeat it, repeat a year?  What
8   gives you that right in the GME?
9       A.    What gives me personally the
10  right or the department?
11      Q.    The department, UTMB, the right
12  to have a resident repeat the year.
13      A.    If we feel that they have not
14  reached --
15      Q.    I asked you in the GME.  The GME
16  document.
17          MR. SOTO:  Can you let him
18  answer the question, Victoria?
19          MS. PLANTE:  Yeah, but it's
20  non-responsive.  I specifically said
21  GME, not his own view.  GME is what
22  I'm interested in.
23      A.    It's the same as the GME.
24      Q.    Okay.
25          Where does it state that in the

US District Court - Texas                         FINAL - September 7, 2021
Daywalker v. University of Texas                        Dr. Wasyl Szeremeta

Page 217

1  GME?
2       MR. SOTO:  Can you let him
3  answer the question, Victoria?
4       MS. PLANTE:  I have.
5       A.    The faculty are responsible for
6  successful advancement of the residents
7  through competency and -- and -- and
8  assessment.  If a resident falls behind,
9  they can be asked to be repeating those
10  elements.  So those --
11      Q.    Where are you reading that from?
12      A.    I'm not reading from anywhere.
13  It's the GME.
14      Q.    Okay.
15            I'm trying to ask where in the
16  GME --
17      A.    Well, I don't have the GME in
18  front of me, but I know that's true.
19      Q.    Okay.
20            Do you know that it says that
21  specifically, or you're just sort of
22  thinking what it may say?
23      MR. SOTO:  Objection; form.
24      A.    I'm not answering that question.
25      Q.    Yeah, you're answering that

Page 218

1  question.
2       MR. SOTO:  Can you -- if you're
3  going to ask him what's in the GME,
4  can you show him?
5       MS. PLANTE:  No, he said it's in
6  the GME.  He should know.  I shouldn't
7  have to refresh his recollection.  He
8  said he knew.  Why should I have to
9  refresh his recollection if he already
10  said he knew?
11      I'm not letting him see the GME
12  because it's not in there.  We can go
13  through the GME.  You want me to put
14  the whole thing, the GME in here, just
15  for satisfaction?
16      MR. SOTO:  I am saying --
17      MS. PLANTE:  I'm not going to do
18  through my deposition wasting time
19  when I know it doesn't say that in the
20  GME.
21      I'm asking him he says he knows
22  it's in the GME.  So I don't need to
23  refresh his recollection.  He recalls
24  that he knows it's in the GME.  We'll
25  leave it at that.

Page 219

1       MR. SOTO:  And I would object to
2  that portion as harassing.
3  BY MS. PLANTE:
4       Q.    Show me a document other than
5  what you tell her that she's a PGY-3, show
6  me a document that says she's a PGY-3?
7       MR. SOTO:  Objection; form.
8       A.    I don't have any document to
9  show you today.
10      Q.    Okay.
11            And, so, if I don't have that
12  document and you don't have that document,
13  you would agree there's likely no
14  document?
15      MR. SOTO:  Objection; form;
16  speculation.
17      A.    No, that's not what I said.  I
18  said I don't have any document to show you
19  today.
20      MS. PLANTE:  Mr. Soto, is there
21  a document that we haven't been
22  produced?
23      MR. SOTO:  Victoria, can you ask
24  questions?
25      MS. PLANTE:  No, I want to know

Page 220

1  if there's a document out because
2  we're entitled to.
3       Is there a document that says
4  that?
5       MR. SOTO:  Victoria, we're not
6  going to get into this on the record.
7       MS. PLANTE:  Yeah, I have
8  requested that.
9       Is there a document?
10      MR. SOTO:  We're not going to
11  get into this on the record.
12      MS. PLANTE:  No, we are getting
13  into that on the record --
14      MR. SOTO:  No, we're not.
15      MS. PLANTE:  -- because it's
16  relevant to him adding some type of
17  credence to his testimony.
18      MR. SOTO:  If you have an actual
19  issue, bring it up at the time --
20  BY MS. PLANTE:
21      Q.    Okay.  Let me ask you something
22  about this.
23            Let me ask you did you ever say
24  in the CCC meetings, the minutes, that all
25  residents would pass?

JANE ROSE REPORTING                          National Court-Reporting Coverage
1-800-825-3341                                janerose@janerosereporting.com

US District Court - Texas                                FINAL - September 7, 2021
Daywalker v. University of Texas                              Dr. Wasyl Szeremeta

Page 221

1        MR. SOTO:  Objection; form;
2    ambiguity.
3    BY MS. PLANTE:
4        Q.   Go ahead.
5        A.   I don't recall I ever said that.
6        MS. PLANTE:  Okay.  I'm going to
7    find it because I know it's in there.
8    I just couldn't find the actual
9    statement.
10        (Pause.)
11        Q.   Why would you give the resident
12   the pay of a fourth year if they're doing
13   third year work?
14        A.   Again, third year rotations
15   because they've been there for four years.
16        Q.   No.
17        But pay is determined by what
18   year you are, correct?
19        A.   Pay is determined by how many
20   years you're there.
21        Q.   Yes.
22        And so, if pay is determined by
23   how many years you're there, then you
24   would assume that they're not going to pay
25   you more each year if you repeat the same

Page 222

1    year?
2        MR. SOTO:  Objection; compound;
3    speculation.
4        A.   I don't --
5        Q.   Go ahead.
6        A.   I don't know how Dr. Blackwell
7    and the GME does it, but that was my
8    understanding.
9        Q.   Okay.
10        So, you want the jury to believe
11   not what they see, but what you're telling
12   them?
13        MR. SOTO:  Objection; harassing
14   him.
15   BY MS. PLANTE:
16        Q.   Go ahead.
17        MR. SOTO:  Don't answer.
18        MS. PLANTE:  That's a fair
19   question.
20        MR. SOTO:  Don't answer.
21        MS. PLANTE:  That is a fair
22   question.
23   BY MS. PLANTE:
24        Q.   You have -- I have sat here and
25   showed you three or four documents --

Page 223

1        MR. SOTO:  Objection; harassing.
2        MS. PLANTE:  Would you allow me
3    to finish?
4    BY MS. PLANTE:
5        Q.   I have showed you three or four
6    documents that says PGY-4, and you're
7    saying that is not to be believed because
8    she wasn't promoted at that time.
9        MR. SOTO:  And let me get my
10   objection on the record.
11   BY MS. PLANTE:
12        Q.   Is that what you're saying?
13        MR. SOTO:  Let me get my
14   objection on the record.
15        I object that it's harassing,
16   and I am instructing the witness not
17   to answer because we are moving -- we
18   will move for a limitation on this
19   portion of the deposition pursuant to
20   Rule 30 of the Federal Rules of Civil
21   Procedure.
22        MS. PLANTE:  Rule 30 of what?
23        MR. SOTO:  The Federal Rules of
24   Civil Procedure.
25        MS. PLANTE:  What type of rule?

Page 224

1        We're going to -- he's going to
2    answer this question or there's going
3    to be sanctions.
4        MR. SOTO:  I'm instructing him
5    not to answer.
6        And, Marie, can you mark this
7    exchange in the deposition transcript,
8    please?
9        MS. PLANTE:  Yeah, we'll mark
10   it.
11        Just one moment.
12        (Pause.)
13        MR. SOTO:  Are we going off the
14   record?
15        MS. PLANTE:  No.  We're just
16   silent right now.  I don't think we'll
17   be more than a minute.
18        MR. SOTO:  We've been going for
19   about an hour now.  Do you think it's
20   a good time to break for about five,
21   Victoria?
22        (Pause.)
23        MS. PLANTE:  Okay.  We're going
24   to go off the record to try to make
25   sense of his testimony.

US District Court - Texas                                  FINAL - September 7, 2021
Daywalker v. University of Texas                              Dr. Wasyl Szeremeta

Page 225

1          Thank you.
2          MR. SOTO:  Okay.  We're --
3          MS. PLANTE:  Let's go off for
4    five minutes.
5          THE VIDEOGRAPHER:  We are now
6    going off the record at 2:17 p.m.
7          (Recess taken.)
8          THE VIDEOGRAPHER:  We are now
9    going back on the record at 2:29 p.m.
10   BY MS. PLANTE:
11        Q.   Dr. Szeremeta, you understand
12   you're under penalty of perjury still?
13        MR. SOTO:  Objection; form.
14        A.   I understand I'm -- I understand
15   I'm still under oath.
16        Q.   Yeah.
17        You're still under the penalty
18   of perjury if you don't tell the truth,
19   correct?
20        MR. SOTO:  Objection; harassing.
21   BY MS. PLANTE:
22        Q.   Yes or no?
23        A.   Yes.
24        Q.   Okay.  Great.
25        Are you saying to the jury that

Page 226

1    you promoted Dr. Daywalker to a PGY-4 at
2    UTMB as it relates to the GME process?
3          MR. SOTO:  Objection; form.
4          A.   She was advanced to the PGY-4
5    level in March and there was --
6          Q.   Okay.
7          A.   And there was a CCC meeting to
8    decide prior to July of that year whether
9    she should be doing fourth year rotations
10   or third year rotations.
11        Q.   Okay.
12        Before being placed on
13   remediation, in Document 16, can you point
14   me to where -- where, before May 2018,
15   before she's placed on remediation, can
16   you show me where she, I think what you
17   said was she was officially promoted to a
18   fourth year?
19        MS. PLANTE:  Just let me strike
20   that because I'm so confused by this
21   maze of excuses.  Just one minute.
22        MR. SOTO:  And I object to the
23   sidebar comment there.  That's
24   harassing.
25

Page 227

1    BY MS. PLANTE:
2          Q.   Let me ask you what happened
3    between March 1st and the May 1st meeting,
4    before the May 1st meeting, to get you to
5    change your mind, that she was no longer
6    going to be a PGY-4?
7          MR. SOTO:  Objection; form.
8    BY MS. PLANTE:
9          Q.   Go ahead.
10        A.   May 1st, are you referring to a
11   CCC document?
12        Q.   Yeah.  I'm referring to all the
13   remediation.
14        Prior to the remediation, you
15   just stated that by March 1st, and I can
16   pull up the document for the GME, you have
17   to let the resident know whether they're
18   going to go on to the next level, correct?
19        A.   You have to let GME know if
20   they're going to the next level.
21        Q.   Okay.
22        So, did you let GME know she was
23   going to the next level on March 1st?
24        A.   Yes.
25        Q.   Okay.

Page 228

1          So, between March 1st and May
2    1st, we exclude the remediation.
3          What made you change your mind?
4          MR. SOTO:  Objection; form.
5    BY MS. PLANTE:
6          Q.   You look like you're reading
7    something.
8          A.   I'm reading from the CCC
9    minutes, if I may.
10        Q.   Okay.  Okay.  I see your eyes
11   going like you're reading, so I just want
12   to make sure --
13        A.   I am reading.  I'm trying to
14   give you an accurate answer.
15        Q.   Okay.  Wonderful.
16        A.   (Perusing document.)
17        Okay.  So, according to --
18   there's two CCC -- there's CCC minutes
19   from May 1st.
20        Q.   I don't want to talk about
21   anything yet May 1st.  I want to talk
22   about before remediation was on the table.
23        What made you -- so, let's say
24   April 30th, or between March 1st and April
25   30th, what made you change your mind that

Page 229

1  she would not be promoted to a fourth year
2  resident with all terms and conditions?
3      A.   Well, it's stated in the note on
4  the summary on May 1st why she was placed
5  in remediation.
6      Q.   Does it state in there why she
7  was demoted or she would not move on to
8  the next year, the fourth year?
9      A.   No.  That would have been on May
10 29th probably.
11     Q.   No, it's not on May 29th.  Let's
12 look at that one too.
13         You can go through them and
14 review them.
15         MS. PLANTE:  Let's go off the
16 record because I don't know how long
17 it will take you, and I am trying to
18 preserve my time while you review it.
19         MR. SOTO:  That's fine.
20         THE STENOGRAPHER:  We want to go
21 off the record, counsel?
22         MS. PLANTE:  Yes.
23         THE VIDEOGRAPHER:  We are now
24 going off the record at 2:35 p.m.
25         (Recess taken.)

Page 230

1          THE VIDEOGRAPHER:  We are now
2  going back on the record at 2:36 p.m.
3  BY MS. PLANTE:
4      Q.   I believe my last question to
5  you, Dr. Szeremeta, was where in the May
6  29th, 2018 notes does it say that Dr.
7  Daywalker would be held back to the third
8  year?
9      A.   It doesn't.
10     Q.   Okay.  Thank you.
11         So, when did you -- it couldn't
12 have been during the CCC meetings, at
13 least in May of 2018.
14         It doesn't mention it in the
15 remediation, does it?  That would be
16 Exhibit 1.
17         Do you have that before you?
18     A.   I'm looking at May 29th right
19 now.
20     Q.   No, 8/29 you're going too far
21 because she would have already started in
22 the fourth year.
23         I just want to look at documents
24 that precede that year, that precede that
25 academic year, or residency year.

Page 231

1          Do you understand what I'm
2  trying to do is look at what occurred
3  before July 1st, 2018 to see why she
4  wouldn't be a PGY-4 in all respects?
5      A.   The answer's in the discussion
6  on May 29th when we looked at the
7  milestones.
8      Q.   Okay.
9      A.   There was a discussion during
10 that -- in this discussion.  I mean, it --
11 you can see it's a very long paragraph.
12     Q.   I understand that, but I
13 didn't -- you just admitted that it didn't
14 say that she would be retained to the
15 third year, or she would have to repeat
16 the third year, correct?
17     A.   May I finish my answer?
18     Q.   Yeah, but I'm not sure what it's
19 responsive to.
20         What's your -- what's your
21 answer responsive to?
22         MR. SOTO:  No, stop.  No, no,
23 no.
24         Can you answer the question?
25 Give your full answer, Doctor.

Page 232

1          MS. PLANTE:  Well, I'm asking
2  what it's responsive to because I
3  don't think there's an answer on the
4  floor.
5          MR. SOTO:  You can ask that
6  question when he completes his answer.
7          Can you continue, Dr. Szeremeta?
8  BY MS. PLANTE:
9      Q.   Yeah, give me more information.
10 I'm writing.
11     A.   On May -- prior to July 1st of
12 the year, so May 29th, in this discussion
13 of the milestone where we look at the
14 overall performance of all the residents,
15 there was discussion among the faculty
16 whether Dr. Daywalker was ready to do
17 PGY-4 level work or she was still should
18 be at the PGY-3 level rotations.  The main
19 difference is that the 4's become senior
20 residents and have residents underneath
21 them.
22         There was concern on both sides
23 whether she should be allowed to do a
24 PGY-4 level rotation or do a PGY -- or 3.
25 There was a vote taken.  I don't remember

US District Court - Texas                              FINAL - September 7, 2021
Daywalker v. University of Texas                              Dr. Wasyl Szeremeta

Page 233

1   the results of the vote, but I know there
2   were -- the feeling was she should be
3   allowed to do PGY-4 level rotations come
4   July and hopefully she would do well.
5          It did not go well.
6   Necessitating the meeting in August,
7   holding her back to PGY-3 in terms of
8   rotations, not in terms of pay.
9   Q.   Is that your final answer?
10  A.   Yes.
11  Q.   Okay.  Okay.
12         Let's unpack that a little bit.
13         You're stating that there was a
14  bunch of conversation on May 29th.
15         Did you say May 29th or May 1st?
16  A.   I believe May 29th 'cause that's
17  when we discussed the milestones.
18  Q.   Okay.
19         On May 29th, you said that there
20  was a lot of discussion about her not
21  being able to go to the next level and
22  some people wanted her to have the
23  opportunity to go.
24         And is that listed in any of the
25  meeting notes for that May 29th, 2018 CCC

Page 234

1   notes?
2   A.   I believe the notes are what you
3   have here.
4   Q.   And it's not listed in there,
5   correct?
6   A.   I don't see it in there.
7   Q.   Okay.
8          And you have a recording that
9   you could produce, correct, that would
10  have it in there?
11         MR. SOTO:  Objection; form.
12  A.   I do not have a recording.
13  Q.   Okay.
14         Was there a recording of this
15  meeting, if you recall?
16  A.   I believe there was.
17  Q.   Okay.
18         So, the recording should be able
19  to say whether there was discussion about
20  whether she should go to a PGY-3 -- I
21  mean, PGY-4 be retained to a PGY-3,
22  correct?
23  A.   I would think so.
24  Q.   Do you know so or you think so?
25         MR. SOTO:  Objection.

Page 235

1   A.   I said I would think so.
2   Q.   Okay.  Thinking so is different.
3   Knowing so is another thing.
4          So, when you say you think, that
5   means there's a possibility you may be
6   wrong.  When you know, that means I am
7   firm that there was discussion regarding
8   her being retained as a PGY-3 in that May
9   29th meeting.
10  A.   I think so.
11  Q.   You still think so, okay.
12  A.   I know -- I know the --
13  Q.   Do you know --
14  A.   Okay.  Go ahead with the
15  question.
16  Q.   Do you know -- do you know when
17  you communicate this information to the
18  American Otolaryngology Board?
19  A.   It was --
20         MR. SOTO:  Objection; ambiguous.
21  A.   I don't know.  It was after July
22  1st.
23  Q.   Wouldn't you be the person
24  responsible for communicating that to the
25  otolaryngology -- I mean, to the American

Page 236

1   Board of Otolaryngology?
2   A.   Yes, I would.
3   Q.   Okay.
4          Do you recall ever sending them
5   information that she was, indeed, a PGY-4?
6   She had been certified as a PGY-4?
7   A.   I don't remember sending that.
8   Q.   Okay.
9          MS. PLANTE:  I'm placing in the
10  chat what's been marked as Exhibit 23.
11         Can you open it and tell me what
12  it is?
13         ---
14         (Wasyl Szeremeta Exhibit 23,
15  letter October 30, 2018, Bates
16  P-001844, was marked for
17  identification.)
18         ---
19  BY MS. PLANTE:
20  Q.   Can you see the highlighted
21  portion?
22  A.   Yes.
23  Q.   It's not blanked out, is it?
24  A.   No, I could read it.
25  Q.   Okay.  I see you under certain

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 237

1    pdf's I can do that, but some I cannot.
2        Okay.
3        MR. SOTO:  Can you just give me
4    one second until I can get the
5    exhibit?
6        MS. PLANTE:  Yeah.
7    Q.   It's dated October 30th,
8    correct?
9    A.    October 30th, 2018, yeah.
10   Q.    And this is to -- this is from
11   the American Board of Otolaryngology,
12   correct?
13   A.    Yes, ma'am.
14   Q.    And can you read what the letter
15   states?
16   A.    The entire letter or just the
17   highlighted portion?
18   Q.    You can read the entire letter
19   for the record.
20   A.    (Reading) To whom it may
21   concern.  This letter is to confirm that
22   Dr. Rosandra Walker is currently enrolled
23   in the Otolaryngology Program at the
24   University of Texas Medical Branch in
25   Galveston, Texas.  She is a resident who

Page 238

1    is in her 4th year of a 5-year program.
2    She began the program in July 2015 and is
3    on course to graduate in June 2020.  If
4    you need any additional information,
5    please feel free to reach out to me at
6    713-850-0399 or by e-mail at
7    sll@aboto.org.
8    Q.    Okay.
9        Now, is there any reason for you
10   to dispute the accuracy of the American
11   Board of Otolaryngology certifying her as
12   a fourth year?
13   A.    Absolutely 100 percent.
14   Q.    Okay.  100 percent.
15       What happened?
16   A.    When I was made aware of this
17   letter, I actually went to the board who
18   have their offices in Houston.  I spoke to
19   Shannon Lamkin and they admitted they made
20   an error.  This was not a correct letter.
21   Q.    What letter did you send them?
22   A.    I don't send them a letter.  It
23   was a form on the Internet.
24   Q.    Okay.  I'm going to have to find
25   the letter because I'm certain I've seen

Page 239

1    the letter.  I've lived with these
2    documents for a while, so I know there's a
3    letter, but we'll do that on a break.
4        So, you're saying that nobody
5    sent them any information that would lead
6    them to believe that Dr. Daywalker was in
7    her fourth year of a five-year program?
8        MR. SOTO:  Objection;
9    argumentative.
10   BY MS. PLANTE:
11   Q.    Go ahead.
12   A.    I don't believe there is such a
13   letter.
14   Q.    Okay.
15       Any communication at all?
16       MR. SOTO:  Objection; asked and
17   answered.
18   A.    Regarding?
19   Q.    Her being a fourth year in
20   her -- I mean being a fourth year in a
21   five-year program.
22       MR. SOTO:  Objection; also
23   speculation and confusing.
24   A.    I am not aware of any such
25   communication.

Page 240

1    Q.    So, you believe -- does the
2    Otolaryngology Board, the American
3    Otolaryngology Board make mistakes like
4    this before with you?  Have they made a
5    mistake like this before with you?
6    A.    No.
7    Q.    Okay.
8        So, this is the first time that
9    they have made this mistake in certifying
10   this a fourth year of a five-year program.
11       Is that what your testimony is?
12   A.    Yes, it is.
13   Q.    And this document is sent to --
14   let me know who was it sent to.
15       Was it information that all
16   residency programs could have access to if
17   they wanted to see what her current status
18   was at a particular school?
19   A.    I'm not sure.
20   Q.    Okay.
21       So you don't know -- what --
22   what does the purpose, or what purpose
23   does the American Board of Otolaryngology
24   serve?
25   A.    My understanding is that the

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                    Dr. Wasyl Szeremeta

Page 241

1   otolaryngology -- American Board of
2   Otolaryngology only issues letters for
3   residents who have completed a program or
4   who have withdrawn from programs.
5        Q.   Okay.  And, so, that's -- that's
6   your understanding.
7             Is that -- you don't --
8        A.   That is --
9        Q.   Okay.  I'll just accept that as
10  what it is.
11            So, we looked at, like, four or
12  five documents that either don't reference
13  that she'll be retained to a third year or
14  that reference she is a fourth year.
15            Do you agree with that?
16       A.   That's what you've shown me,
17  yes.
18       Q.   And you're saying that the jury
19  should disregard all of those documents
20  and listen to what you have to say and
21  believe you that she was indeed not a
22  fourth year and she was never demoted?
23       MR. SOTO:  Objection; harassing;
24  argumentative.
25

Page 242

1   BY MS. PLANTE:
2        Q.   Go ahead.
3        A.   Yes, they should.
4        Q.   Okay.  Thank you.
5        MS. PLANTE:  I'm going to put
6   another document in the chat.
7             Okay.  Exhibit 3 I've marked and
8   put it in the chat.  And this is
9   the -- I believe the first evaluation
10  she may have received.
11       THE WITNESS:  I'm looking at it.
12  It's 1 -- review period 1/1/17 to
13  6/30/17?
14       MS. PLANTE:  Yes.
15       ---
16            (Wasyl Szeremeta Exhibit 3,
17       Semi-Annual Review Walker, Rosandra
18       Review Period 1/1/201 - 6/30/2017,
19       Bates OAG-0011656-664, was marked for
20       identification.)
21       ---
22  BY MS. PLANTE:
23       Q.   And as you look through this
24  document, I want you to see whether you
25  recommend remediation in Exhibit 3.  If

Page 243

1   there's any reference to remediation,
2   rather.
3        A.   (Perusing document.)
4             I don't believe there's anything
5   to remediation here.
6        Q.   Okay.  There's nothing to
7   remediation.
8             But she has now after her, I
9   think this would have been coming out of
10  her -- going into her third year?  Would
11  this have been the second half of her
12  second year?
13       A.   That's probably correct.
14            Let me see.
15            Yeah.  So, she's finishing here
16  at PGY-2.  Yeah, 'cause there's her TDC
17  rotation, there's B RA-P.  There's her
18  other rotations.
19            Yeah, so this should be the end
20  of her second year.
21       Q.   Okay.  And now she's come from
22  Dr. McCammon.
23            Within -- you'd agree that Dr.
24  McCammon supervised her in her first half
25  of her second year, correct?

Page 244

1        A.   First half of second year, that
2   would be -- yes, I think if she was on A
3   Team, she would have been on head and
4   neck, so she would have been on Dr.
5   McCammon's service.
6             Is she -- no, she's --
7        Q.   We're talking about as program
8   director.  She would have supervised her
9   as program director?
10       A.   Is that for the year?  Sure.
11       Q.   Okay.
12            And, so, the next evaluation she
13  gets is from you and you go from what Dr.
14  McCammon has stated in a prior evaluation
15  as "meet expect" -- "meets expectations"
16  to "requires attention in medical
17  knowledge, professionalism, and
18  interpersonal and communication skills."
19            Is that correct?
20       A.   Yes.
21       Q.   Do you know of another resident
22  that has taken, under your supervision,
23  has taken a downward turn this substantial
24  in a matter of six months?
25       A.   There are residents that -- I

JANE ROSE REPORTING                          National Court-Reporting Coverage
1-800-825-3341                               janerose@janerosereporting.com

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 245

1   can only speak to Dr. Daywalker on this --
2   in this evaluation.
3       Q.   Okay.
4           Are you saying that this is the
5   only one you know of?
6       A.   I don't remember all the other
7   rotations.
8       Q.   Do you have any reason to
9   believe that any other person fell
10  deficient from a prior "meets
11  expectations" to now she requires
12  attention of the three of the seven
13  categories?
14      A.   The progress summary and the
15  comments are reflective of what the CCC
16  has said.  They're not my personal
17  statements.
18      Q.   Okay.
19          You have a personal statement
20  down here though, correct?
21      A.   No.  The comments is I try to
22  summarize the discussion that we had with
23  Dr. Daywalker and also discuss the
24  findings of the CCC.
25      Q.   Okay.  Well, let's see if we can

Page 247

1           Is your assessment -- one says
2   interpersonal skills, very caring and
3   empathetic, excellent family
4   communication, superb public speaker,
5   challenged by timely completion of medical
6   records.
7           So, what about that did you feel
8   to mark her in communications deficient
9   since her actual note on that particular
10  area seem to be somewhat favorable as it
11  relates to her oral and written
12  communication skill?
13      MR. SOTO:  Objection; ambiguous;
14  compound.
15      A.   I would refer you to:  On a
16  personal level, Dr. Walker is a pleasure
17  to work with.  However, she can get
18  frustrated when things are not going
19  exactly as she likes.  I recommended that
20  she sits down with faculty for continuous
21  feedback.  There is room for improvement.
22      Q.   Okay.
23          Where is that?
24      A.   That's in the comments -- let's
25  see.  This is page 1.  Number 2 through 3.

Page 246

1   find a document responsive to that in
2   Exhibit 16, since that is actually the CCC
3   minutes.
4           Now, this would have been 1/1 to
5   6/30.  So January 1st to June 30th, 2017.
6           I don't think we have any
7   documents for CCC minutes within that time
8   in Exhibit 16.  The closest I see is a
9   July 13th, 2017.
10      A.   But that would be afterwards.
11      Q.   Yeah, that's what I'm saying.
12  That's the closest I see.
13          Do you see one?
14      A.   That I'm looking right now.
15          (Perusing document.)
16          I don't see it in the documents
17  you forwarded me.
18      Q.   Yeah.  These are the only
19  documents I have, just for the record.  So
20  I would give you more for you to look at,
21  but this is all I have.
22          Let's go to the competency
23  training.
24          Is your -- let me ask you
25  something.

Page 248

1   It's 3 sort of in the overall comments.
2       Q.   Okay.  But I'm talking about how
3   she ranked in interpersonal and
4   communication skills as it relates to the
5   comment that's directly on point with
6   that.
7           Interpersonal and communication
8   skills.
9       A.   Right, but there are also
10  comments that go to other things.
11      Q.   I understand that, but you have
12  "requires attention" in that area below
13  here.  So I'm saying --
14      A.   That was the will of the CCC.
15  It said that she --
16      Q.   Okay.  You're -- yeah, I don't
17  know whether you're telling the truth
18  because I don't have any CCC documents for
19  that time period.
20          Do you understand?
21      MR. SOTO:  Victoria, don't
22  accuse my client of lying.
23      MS. PLANTE:  Well, the jury will
24  conclude that.  I don't think we'll
25  have a problem with that.

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                       Dr. Wasyl Szeremeta

Page 249

1      MR. SOTO:  Can you mark that,
2  Marie?
3      MS. PLANTE:  Yeah, you can mark
4  that.
5      THE WITNESS:  I need a break.
6      MS. PLANTE:  What do you need a
7  break for?
8      THE WITNESS:  I need break.
9      MS. PLANTE:  Why?
10      THE WITNESS:  I need to go to
11  the bathroom.
12      MS. PLANTE:  Okay.  I'll give
13  you five minutes.
14      Is that -- you're just walking
15  out.
16      Dr. Szeremeta, you're out of
17  order.  You're walking out of the
18  deposition.
19      MR. SOTO:  Victoria, please
20  stop.  He asked you to go to the
21  bathroom.
22      MS. PLANTE:  Yeah, that's going
23  to be known.  He's upset to the point
24  where he's walking out of the
25  deposition.

Page 251

1  related to the facts of this case and
2  the claims in this case, that's
3  perfectly fine.  That's what we're
4  here today to answer.  But I'm not
5  going to allow you to harass UTMB,
6  myself, or the witness any longer.  If
7  you continue that, we will be
8  suspending the deposition pursuant to
9  Rule 30.
10      MS. PLANTE:  Okay.  Well, you
11  can suspend the deposition if you want
12  to at your own peril.
13      I will note I have not been
14  unprofessional.  I have been firm with
15  Dr. Szeremeta.  He has been, sort of,
16  unprofessional and getting up and
17  leaving the room without going off the
18  record.
19      So, I think you have been
20  unprofessional in interfering with
21  this entire deposition.  I think you
22  have an objection practically for
23  every question, and that will be
24  noted.
25      We see things differently, and

Page 250

1      MR. SOTO:  Victoria, your
2  conduct here has been egregious and
3  harassing.
4      MS. PLANTE:  No, my conduct has
5  been fine.
6      And you are just making it worse
7  for your client.  I don't know why you
8  would do that.  Just sit back and let
9  him testify.
10      MR. SOTO:  Victoria.
11      MS. PLANTE:  We're off the
12  record.
13      MR. SOTO:  No, we're not off the
14  record.
15      MS. PLANTE:  We are off the
16  record.
17      THE VIDEOGRAPHER:  We are now
18  going off the record at 3:00 p.m.
19      (Recess taken.)
20      THE VIDEOGRAPHER:  We are now
21  going on the record at 3:06 p.m.
22      MR. SOTO:  Victoria, I just want
23  to state for the record you've now
24  made personal attacks on me, on my
25  client.  If you want to ask questions

Page 252

1  so let's just agree to disagree what
2  the record will reflect, and we'll let
3  the judge determine that at another
4  time.
5      Okay?
6      MR. SOTO:  That's fine,
7  Victoria.  I'm just saying you've
8  personally attacked --
9      MS. PLANTE:  I heard what you're
10  saying.  I have not personally
11  attacked him.
12      This is a credibility issue that
13  a jury will have to make.  I can make
14  it in summation.  I can make it in
15  open argument.  I can make it when
16  he's on the stand.  I can say, "Aren't
17  you lying, Dr. Szeremeta?"  That's
18  clearly within the grounds, the ground
19  rules.  I mean, that you would think
20  that this is not, I hope you practice
21  that same way with my client.
22      Let's move forward.
23  BY MS. PLANTE:
24      Q.  You understand you're still
25  under oath?

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                        Dr. Wasyl Szeremeta

Page 253

1      A.   Yes, ma'am.
2      Q.   What reason would you have to
3  call the Otolaryngology Board after Dr.
4  Daywalker left on November 6th, 2018?
5      A.   I was made aware of that letter,
6  and I wanted to find out how the letter
7  came into existence.
8      Q.   How were you made aware of the
9  letter?
10      A.   The GME office let me know.
11      Q.   Why would the GME office let you
12  know?
13      A.   I don't know.
14      Q.   Okay.
15          Would you say that her
16  performance in 2017, that last document I
17  think it's Exhibit 3, you promoted her
18  PGY-3; is that correct?
19      A.   This was the one we just
20  reviewed, correct?
21      Q.   Yes, that is correct.
22      A.   Yes.  She went on to PGY-3, yes.
23      Q.   Okay.
24          And so even though it had some
25  alleged deficiencies in it based on your

Page 254

1  assessment, or you say the CCC's
2  assessment, correct?
3      A.   Yes, ma'am.
4      Q.   So, did you have to send a
5  separate letter, or was it sufficient that
6  she signed the contract for the PGY-3 year
7  to be enough for her to be at the PGY-3
8  level?
9      A.   No, I still have to certify with
10  the board that the residents are advanced.
11  It's two separate processes.  There's the
12  GME process with UTMB and there's the
13  process with the board.
14      Q.   Okay.  Okay.
15          I understand you say it's a
16  process, and I'm going to the actual
17  exhibit.
18          Do you see the -- I think it
19  might be -- no, maybe I hadn't put it in
20  chat yet.
21          (Pause.)
22          MS. PLANTE:  I think it is in
23  chat, but it may have been so early on
24  that it may not be in there anymore.
25  I think it's the policy -- policies

Page 255

1  and procedures.  I think I have to put
2  a new one in there anyway 'cause it
3  had some -- it had some -- some
4  yellowed out parts.  It had some
5  yellowed out parts and I just want to
6  make sure those yellowed out parts do
7  not appear.
8  BY MS. PLANTE:
9      Q.   Okay.
10          Do you see that Exhibit 21?
11      A.   Yes.
12      Q.   Can you open that up and go to,
13  this is just portions of the GME policy
14  for 2017/2018?
15      A.   Okay.
16      Q.   And would you go to
17  non-reappointment, which is page 3.
18          If you were going to retain --
19  let me know when you've read it.
20          MR. SOTO:  And just for the
21  record, it goes 3 to 4.
22          THE WITNESS:  Okay.  Give me two
23  seconds to read it.
24          (Perusing document.)
25

Page 256

1  BY MS. PLANTE:
2      Q.   Are you --
3      A.   Yes.
4      Q.   Okay.  You're finished, okay.
5          If you weren't going to appoint
6  her to a fourth year residency, you were
7  supposed to notify her by March 1st of her
8  not going to a PGY-4 in writing, certified
9  mail return receipt requested, or hand
10  delivery, correct?
11      A.   That's the first part of the
12  paragraph.  The second paragraph says:  If
13  the primary reason for non-renewal occurs
14  within the four months prior to the end of
15  the agreement, the Program Director will
16  provide the Resident/Fellow with as much
17  written notice of the intent no to renew
18  or not to promote as circumstances will
19  reasonably law prior to the end of the
20  agreement.
21      Q.   Okay.
22          But you were still supposed to
23  notify the resident, correct?
24      A.   But we had made that decision in
25  the CCC meeting to allow her to go to the

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                       Dr. Wasyl Szeremeta

Page 257

1   PGY-4 rotations.
2       Q.   Okay.
3           When were you going to let Dr.
4   Daywalker, who is the resident, know she
5   had not been promoted to a PGY-4?
6       A.   If she had done -- continued to
7   do well on the PGY -- on her PGY-4
8   rotations, then she would have been a
9   PGY-4, and I would have certified that to
10  the board.
11      Q.   Well, I'm asking you when were
12  you going to -- you knew as of, you said,
13  August of 2018 that you were going to
14  retain her to the third year.
15          When were you going to let her
16  know that she had, in fact, been retained
17  to the third year?
18      A.   I believe that was in the letter
19  that she -- that Dr. Pine gave her.
20          Are we talking about --
21      Q.   No.  Yeah, you probably think it
22  says that, but let's bring that up.
23          And I believe it's a Resto
24  letter, isn't it?  You said Pine letter.
25          MR. SOTO:  I believe Pine

Page 258

1       delivered the letter.
2           MS. PLANTE:  Okay.  Pine
3       delivered.
4           That's fine.  I just want to
5       make sure there's no letter from Dr.
6       Pine that I didn't know about.
7           (Pause.)
8           MS. PLANTE:  Okay.  I'm going to
9       put this in the chat.
10          I've placed in the chat what's
11      been marked as Exhibit 23.
12          ---
13          (Wasyl Szeremeta Exhibit 25,
14      letter August 8, 2018, from Dr. Resto
15      to Dr. Daywalker, was marked for
16      identification.)
17          ---
18  BY MS. PLANTE:
19      Q.   Is this the letter you were
20  referring to?
21          MR. SOTO:  Can you give us a
22      second to open it and look at it?
23          MS. PLANTE:  Yes.
24          (Pause.)
25      A.   Yes, this is the letter.

Page 259

1       Q.   Okay.
2           Did the letter say that she
3   would be going back to PGY-3, or did they
4   ask her would she return in her providing
5   a -- that she read and agreed with the
6   terms?
7       A.   No, it states in the second
8   page, second sentence:  You will also
9   return as a PGY-3 and have clinical
10  rotations on A team, B team, TDC and the
11  rotation with Dr. Kridel as a junior
12  resident to ease back into clinical
13  rotation to build confidence and to gain
14  the skills needed to be a successful PGY-4
15  in July.
16      Q.   Okay.
17          What I'm saying is why would you
18  need her to sign an agreement if you
19  already had the evidence to retain her to
20  a PGY-3?
21          MR. SOTO:  Objection; form.
22  BY MS. PLANTE:
23      Q.   Go ahead.
24      A.   Which agreement are you talking
25  about?

Page 260

1       Q.   It says "Acceptance" below:  I
2   have read the above and agree with the
3   terms stated.
4           And it has her name Rosandra
5   Walker.
6           Do you see that?
7       A.   Yes, I do.
8       Q.   And you sent her to Dr. Pine to
9   get her to sign this document, correct?
10      A.   Yes.
11          MR. SOTO:  Objection.
12  BY MS. PLANTE:
13      Q.   Go ahead.
14          Did you send Dr. Pine to get her
15  to sign it?
16          MR. SOTO:  Objection; ambiguous.
17      A.   The CC --
18      Q.   To sign exhibit -- Exhibit 23.
19  I don't know how I can term it.
20      A.   The CCC decided that Dr. Pine
21  would be the best person to deliver the
22  letter to Dr. Daywalker.
23      Q.   Okay.  Well, that's neither here
24  nor there.
25          My issue is you needed Dr.

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                        Dr. Wasyl Szeremeta

Page 261

1   Daywalker to agree to be a PGY-3 or else
2   you would not have asked her to sign it
3   and agree to it, correct?
4        MR. SOTO:  Objection;
5   argumentative.
6   BY MS. PLANTE:
7     Q.   Go ahead.
8     A.   The signature was just that she
9   received the letter.
10    Q.   No, it doesn't say that she
11  received the letter.
12       Read that in the record again,
13  Dr. -- Dr. Szeremeta.  Under "Acceptance."
14    A.   Well, if she -- if she --
15    Q.   Can you just read it in the
16  record, as I've requested?
17    A.   "I have read the above and agree
18  with the terms stated."
19    Q.   Okay.
20       So, she would have to agree to
21  the terms of PGY-3 or else you wouldn't
22  need her --
23       MS. PLANTE:  Well, let me
24  rephrase it.
25    Q.   You wouldn't need her signature

Page 262

1   if you were firmly -- if --
2        MS. PLANTE:  Let me see if I can
3   make this succinct.
4     Q.   Why would you need her signature
5   in agreement to the terms?
6     A.   In the body of the letter it
7   says "your signature of this document will
8   acknowledge your acceptance of the terms
9   of your leave and the continued conditions
10  of your remediation."
11    Q.   Okay.
12       It said "acceptance of your
13  leave."
14       So they were putting her back in
15  a PGY-3 position because she had requested
16  leave, correct?
17    A.   She went on leave for four
18  months.
19    Q.   Yes.
20       I said were they using that as a
21  grounds for not reinstating her to a 3?
22    A.   No.
23       MR. SOTO:  Objection.
24  BY MS. PLANTE:
25    Q.   What grounds was she -- what

Page 263

1   grounds were you using in putting her back
2   in a PGY-3?
3        MR. SOTO:  Objection; form;
4   ambiguous.
5     A.   The grounds were that she was
6   already having difficulty.  She was
7   already showed difficulty in her PGY-4
8   level rotations.  She was going to be gone
9   for four months, coming back -- and coming
10  back as a PGY-4, it would have been very
11  difficult for her to succeed, if not
12  impossible.
13    Q.   Well, you didn't even give her
14  the opportunity to succeed because you put
15  her back to PGY-3.  So you don't know what
16  4 would have done.
17       MR. SOTO:  Objection.
18  BY MS. PLANTE:
19    Q.   Maybe the -- you don't know --
20  you're speculating as to what putting her
21  back, or retaining her at a 4 would have
22  done --
23    A.   No, that's --
24       MR. SOTO:  Objection; compound.
25

Page 264

1   BY MS. PLANTE:
2     Q.   Go ahead.
3        MR. SOTO:  Argumentative.
4     A.   We're not speculating anything.
5   We saw what she was doing in July on the
6   TDC rotation.
7     Q.   Okay.
8        And didn't Dr. Siddiqui say that
9   she was passing remediation?
10    A.   In which document?
11    Q.   Dr. Siddiqui told her she was
12  passing remediation in a meeting where Dr.
13  Fraser, I believe, was a witness.  So if
14  we need to get his testimony, we'll get
15  it.
16       But Dr. Siddiqui will testify as
17  well.  She said she was passing
18  remediation.
19       MR. SOTO:  Is that a question?
20       MS. PLANTE:  Yeah.
21  BY MS. PLANTE:
22    Q.   So, Dr. Siddiqui didn't talk to
23  you about her passing remediation since
24  she had been now the person who was
25  responsible for her remediation at this

US District Court - Texas                                      FINAL - September 7, 2021
Daywalker v. University of Texas                               Dr. Wasyl Szeremeta

Page 265

1   time?
2       A.   I don't recall any conversation
3   with Dr. Siddiqui.
4            And furthermore, the only one --
5   the only time someone comes off of
6   remediation is the same way they come on
7   remediation: discussion at the CCC, a
8   vote, or the recommendation of the CCC
9   which is then made to the faculty.
10      Q.   Okay.
11           Well, then you would need -- you
12  would not need her signature at all to do
13  this, correct?
14      A.   No.
15      Q.   Okay.
16           Why did you ask for it?
17      A.   I just wanted to know if she
18  received it.
19      Q.   No, you wanted to know if she
20  agreed with it.
21      A.   I wanted to know if she received
22  it.
23      Q.   Why does it say "agreed" then?
24      A.   That's what I was -- this was
25  the final form of the letter that -- that

Page 266

1   we crafted.
2       Q.   In this exhibit, which is 23,
3   you never say Dr. Daywalker, or Dr.
4   Walker, you're not passing remediation,
5   does it?
6       A.   No, it doesn't.
7       Q.   Okay.
8            And it would have been the prime
9   opportunity in writing to let her know,
10  You're not passing remediation and
11  therefore we're going to take these steps,
12  correct?
13           MR. SOTO:  Objection; form.
14  BY MS. PLANTE:
15      Q.   Go ahead.
16      A.   Can you repeat the -- I missed
17  that question.
18      Q.   I said -- well, now you're going
19  to have to have --
20           MS. PLANTE:  Marie, would you
21      please repeat the question for me?
22           (The requested portion of the
23      record was read back by the court
24      reporter.)
25      A.   Okay.

Page 267

1            Well, the paragraph that begins:
2   During the leave you will be expected --
3   the terms of remediation asks you to
4   perform on a consistent basis the daily
5   routines which are expected of all the
6   residents.  We feel at this time will
7   allow you to find the strength to be able
8   to be successful in accomplishing all
9   these tasks.
10      Q.   Okay.  It doesn't state that.
11  You can read it all day long.
12           It doesn't state in the letter
13  she is not passing remediation?
14      A.   That clearly states she is not
15  passing.
16      Q.   It clearly states it?  Where
17  does it clearly state it?  Because you got
18  to infer a lot.
19           MR. SOTO:  Objection;
20  argumentative.
21  BY MS. PLANTE:
22      Q.   I want, you know, you to tell me
23  what sentence.  You're inferring a lot,
24  but what sentence can you show to the jury
25  that you tell her she is not passing

Page 268

1   remediation?
2       A.   That she's -- the terms of her
3   remediation ask that she perform on a
4   consistent level, and she's not performing
5   on a consistent level.
6       Q.   Where does it say she was not
7   performing on a consistent level?
8            I don't get that.  You're
9   reading stuff that I don't see.
10      A.   It's clearly in there.
11      Q.   Where does it say she has not
12  been performing on a consistent level?
13           It said:  You have been asked to
14  perform a consistent -- to perform on a
15  consistent level, correct?
16      A.   Mm-hm.
17      Q.   Consistent basis, actually.
18           Correct?
19      A.   Mm-hm.
20      Q.   It doesn't say she has not been
21  performing on a consistent basis, does it?
22           MR. SOTO:  Objection.  At this
23  point, it's harassing, Victoria.
24           MS. PLANTE:  Well, he keeps
25  saying that it's saying something it

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                          Dr. Wasyl Szeremeta

Page 269

1   does not say.  And I'm asking him
2   based on the black and white document,
3   does it ever tell her she is not
4   passing remediation or that she is
5   failing remediation.
6         MR. SOTO:  And I think he's
7   answered is that.
8         Objection.
9   BY MS. PLANTE:
10      Q.   Go ahead.
11      A.   I've answered that question.
12      Q.   You have not.
13           It's not in the letter, would
14  you agree?
15      A.   I have answered the question.
16      Q.   You have to answer it again.
17  You can't just tell me you answered.
18         MR. SOTO:  Objection; asked and
19  answered.
20         MS. PLANTE:  I understand that,
21  but he as a witness cannot tell me
22  because perhaps he didn't answer the
23  question and the judge does not
24  sustain your objection, sir.  So I'm
25  asking him.

Page 270

1         MR. SOTO:  Does the letter not
2   speak for itself, Victoria?
3         MS. PLANTE:  No, but he's
4   inferring a lot.  And I get to
5   understand his state of mind when he
6   gets on the -- on the stand as to
7   whether -- he's twisting and turning a
8   lot of stuff.  So I'm just trying to
9   go on what the black and white
10  document says.  That's the only thing
11  we can go on is what the black and
12  white document says.  At the end of
13  the day, he can provide a lot of
14  explanation as to why it doesn't
15  appear, why is it not as though it
16  appears.  That's fine.  He can do that
17  and maybe you can rehabilitate him at
18  some point, but I'm able to ask him
19  this question, and he -- he can't say
20  "I don't have to answer."
21         MR. SOTO:  Well, I think he's
22  already answered it.  It may not be
23  the answer you like, but --
24         MS. PLANTE:  I don't think my
25  witnesses ever told you they were not

Page 271

1   going to answer the question.  They
2   may have said this is a repeat
3   question.
4         MR. SOTO:  They absolutely did.
5         MS. PLANTE:  No, they said it
6   was a repeat question, but they did go
7   on and answer it.  They said, "I think
8   you asked me that earlier.  This is my
9   answer."
10          So, it was definitely different.
11        MR. SOTO:  I don't think that's
12  true.
13        MS. PLANTE:  Well, we'll let the
14  transcripts speak for themselves.
15          Let's move on.
16  BY MS. PLANTE:
17      Q.   Have you listened to the
18  recording between Dr. Resto -- I mean, I'm
19  sorry.  Between Dr. Pine, Dr. Daywalker
20  and her husband?
21      A.   No, I have not.
22      Q.   Okay.
23           You're aware of the existence of
24  the letter?
25      A.   Of the letter?

Page 272

1       Q.   I mean, I'm sorry.  Of the
2   recording.
3       A.   No, I was not.
4       Q.   Okay.
5            Dr. Pine in the recording says
6   what you did as it relates to not
7   promoting you and the promotion issue that
8   came up in the letter that we just looked
9   at was atypical.
10           Do you agree with that if he
11  said it?
12      A.   I don't know what that means.
13      Q.   That means that it's not common.
14  Atypical means that it's not typical.
15           Do you understand --
16      A.   I know what atypical means.
17           I'm not sure what Dr. Pine meant
18  by it.
19      Q.   He said that he -- that you
20  would not sign off on her being a PGY-4
21  was atypical?
22        MR. SOTO:  Objection;
23  argumentative.
24      A.   Again, I don't know what Dr.
25  Pine was thinking.

JANE ROSE REPORTING                          National Court-Reporting Coverage
1-800-825-3341                                janerose@janerosereporting.com

US District Court - Texas                                      FINAL - September 7, 2021
Daywalker v. University of Texas                                     Dr. Wasyl Szeremeta

Page 273

1     Q.   Okay.
2         So, if something's atypical, you
3   would believe that it's not normal,
4   correct?
5         MR. SOTO:  Objection
6   speculation.
7     A.   Again, I don't know what Dr.
8   Pine was thinking, what he was referring
9   to.
10    Q.   What's your definition of
11  "atypical"?
12    A.   Not usual, not normal.
13    Q.   Thank you.
14        She was receiving pay for -- is
15  Pine --
16        MS. PLANTE:  Let me rephrase the
17  question.
18    Q.   Is Dr. Pine the chairman of the
19  CCC?
20        MR. SOTO:  Objection; form.
21  BY MS. PLANTE:
22    Q.   At that time when the
23  remediation occurred and the demotion
24  occurred.
25    A.   I believe that he was the chair

Page 274

1   of the CCC, yes.
2     Q.   Okay.
3         Did he vote for her to be
4   retained?
5         MR. SOTO:  Objection; form.
6     A.   At which point?  Retained as
7   a -- as a resident?
8     Q.   As a -- well, she's never been
9   retained other, in life, other than in
10  this particular situation.  The residency
11  year 3 she was being retained at.
12    A.   The decision to, well, keep her
13  back as a 3 was unanimous.
14    Q.   Okay.
15        And when I say "retained,"
16  please know I am not stipulating that she
17  was retained.  We believe it was, in fact,
18  a demotion.  So I just want you to know,
19  and for the record to reflect, that when I
20  say "demoted" or "retained," I am saying
21  that so I won't get an objection that I'm
22  assuming facts not in evidence.  But
23  that's why I'm doing that.  I just wanted
24  to put that on the record.
25        She went out on FMLA leave,

Page 275

1   correct?
2     A.   Yes.
3     Q.   Dr. Daywalker, yeah.
4     A.   Yes.
5     Q.   And when she was out on FMLA
6   leave -- let me ask you this.
7         Were you aware that even though
8   you had not signed the agreement that you
9   say was only for financial purposes, she
10  was still getting the pay of a fourth year
11  prior to you signing?
12        MR. SOTO:  Objection; compound.
13  BY MS. PLANTE:
14    Q.   Go ahead.
15    A.   I'm only assuming that she was
16  getting paid as a 4.
17    Q.   Yeah.  If she says she was
18  getting paid a 4 as of July 1st, 2018 --
19    A.   As a 4.
20    Q.   Yeah, she was being paid as a 4.
21        What significance would it be
22  for you to sign off on a letter if it's
23  just for financial purposes if it's after
24  the fact?
25        MR. SOTO:  Objection; form.

Page 276

1   BY MS. PLANTE:
2     Q.   Go ahead.
3     A.   I think I've already explained
4   that.  Part of it is the financial as an
5   employee she gets paid as a 4, but then
6   there's also the clinical competency to do
7   the work and to be able to a senior
8   resident.
9     Q.   But she was already getting paid
10  as a 4.  That was already in the work.
11  She had been being paid as a 4 since July
12  1st.  And she'll testify to that effect.
13        So, what -- I'm asking you what
14  significance would it have on her pay if
15  it -- if you didn't sign the document or
16  if you did?
17        MR. SOTO:  Objection:
18  speculation; ambiguous.
19  BY MS. PLANTE:
20    Q.   Go ahead.
21    A.   My understanding is it shouldn't
22  have any effect on her pay.
23    Q.   So, what is -- why did you need
24  to sign the document, is what I'm asking,
25  if she was already receiving the pay of a

JANE ROSE REPORTING                           National Court-Reporting Coverage
1-800-825-3341                                 janerose@janerosereporting.com

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                             Dr. Wasyl Szeremeta

Page 277

1   4?
2       A.   Which document?  The one signed
3   in March?
4       Q.   No, let me pull up the document.
5       I'm talking about the document
6   that is the contract.
7           You have the contract before
8   you?
9       A.   Yeah, that was -- which one is
10  that?  Is that Exhibit 4?
11      Q.   Let me see.  It is Exhibit 4,
12  yes.
13      A.   Yeah, this is what UTMB requires
14  us to advance them to the next salary
15  grade.
16      Q.   Okay.
17          Does it say salary -- this is
18  what is required to advance you to the
19  next salary grade?
20      A.   Yes.
21      Q.   Where does it say that at?
22      A.   It doesn't say it on there, but
23  that's what it is.
24      Q.   Okay.
25          So, again you want the jury to

Page 278

1   believe something that you're saying over
2   what the black and white document says,
3   correct?
4           MR. SOTO:  Objection; harassing.
5   BY MS. PLANTE:
6       Q.   Go ahead.
7       A.   Yes, I do.
8       Q.   Okay.
9           I'm reading through this.
10          (Pause.)
11          Did she receive a job
12  description for a PGY-4?
13      A.   The job description would be
14  what's in the residency handbook.
15      Q.   Okay.  I'm just looking at it
16  says that:  As a house officer at UTMB,
17  you would be expected to perform such
18  duties and responsibilities listed in your
19  position description and as may be
20  assigned to you and to use your best
21  efforts to provide safe, effective and
22  compassionate patient care.
23          Do you see that?
24      A.   Which paragraph?  I'm trying to
25  find you.

Page 279

1       Q.   3.  Paragraph 3 of Exhibit 4.
2       A.   I see it.  I see it.
3           And your question is?
4       Q.   I said did she receive a job
5   description or some type of duties that
6   would lay out what her job duties were for
7   a 4?
8       A.   Yes, she would because she would
9   have the residency handbook.  Where the
10  residents are required to be familiar with
11  the residency handbook and the last
12  sentence here says rules and regulations
13  of --
14      Q.   Okay.  You don't have to read it
15  into the record.  I don't know what you're
16  responding to.
17      A.   Or your specific residency
18  program.
19      Q.   Okay.  I understand that.
20          And it also says in number 5:
21  Your performance as a PRG-4 will be
22  reviewed and evaluated by the faculty of
23  your program.  You acknowledge that you
24  will be dismissed from the program during
25  the term of this agreement if your program

Page 280

1   faculty determine that your level of
2   performance or professionalism does not
3   meet the standards of the program and is
4   unsatisfactory.
5           Did I read that correctly?
6       A.   Yes, you did.
7       Q.   Okay.
8           So, she was performing at a
9   PGY-4 level, correct?  Based on Exhibit 4,
10  number 5?
11      A.   She was starting to perform at a
12  level 4 in July, and for the first six
13  weeks she was not doing well.
14      Q.   Okay.
15          She actually was on the TDC
16  rotation her first assignment, correct?
17      A.   She was the TDC chief, yes.
18      Q.   Chief.
19          And actually, in the end of her
20  second year, she stood in place for a
21  senior level resident, which I believe was
22  a PGY-4 at the time, while that resident
23  took, I think, maternity leave.
24          Do you recall that?
25      A.   Yes.

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                  Dr. Wasyl Szeremeta

Page 281

1      Q.    So, you permitted her as a 2 to
2  perform the duties of a 4, but yet in that
3  same year, you mark her as "needs
4  attention" under three of the seven
5  requirements.
6           Is that what you're saying?
7      A.    No.
8      Q.    Okay.
9           Why did you ask her to as a
10  PGY-2 to perform the duties of a PGY-4?
11  That's my question.
12     A.    We had someone on maternity
13  leave, and we had a junior resident that
14  was stronger than her and actually ran the
15  service.
16     Q.    Pardon me?
17     A.    The other was close faculty
18  supervision.
19     Q.    I don't understand what you're
20  saying.
21          You said what?
22     A.    There were always two residents
23  on the TDC service, an upper year and a
24  lower year, and in that case when she was
25  asked to cover for the resident that was

Page 282

1  on maternity leave, the junior resident
2  was actually doing better than she was in
3  running the service, together with close
4  faculty supervision.
5      Q.    Okay.
6           So you're trying to dismiss
7  something that would appear to be
8  something that would be complimentary of
9  her?
10          MR. SOTO:  Objection.
11  BY MS. PLANTE:
12     Q.    Is that what you're trying to do
13  with that?
14          MR. SOTO:  Objection;
15      argumentative; harassing.
16          MS. PLANTE:  That's fine.
17  BY MS. PLANTE:
18     Q.    With that second part of your
19  answer are you trying to do that?
20     A.    No.
21     Q.    Okay.
22          Well, you could have asked any
23  other PGY-2 to do that, but you asked Dr.
24  Daywalker to do that, correct?
25     A.    Yes, we did.

Page 283

1      Q.    You could have asked a PGY-3 to
2  do that, correct?
3      A.    No, 'cause PGY-3s were assigned
4  to do something else.
5      Q.    They didn't work TDC?
6      A.    TDC is a PGY-4 and a PGY-2
7  rotation.
8      Q.    Okay.
9           And, so, you're saying that she
10  failed after you put her in that position?
11          MR. SOTO:  Objection; form.
12  BY MS. PLANTE:
13     Q.    Is there any document -- are you
14  saying she failed to live up to your
15  expectations when you put her in the
16  position of a PGY-4 as a 2?
17          MR. SOTO:  Objection; form.
18     A.    She did not meet expectations
19  for the faculty that were running TDC at
20  the time.
21     Q.    Didn't you say that she
22  performed well, in your prior testimony,
23  in her first and second year of residency?
24     A.    On her pediatric otolaryngology
25  rotations.

Page 284

1      Q.    Okay.
2           And what other evidence would
3  you have, since you didn't start really
4  overseeing her until her PGY -- to the end
5  of her PGY-2, I think it was her PGY-2
6  year, residency year?
7          MR. SOTO:  Objection; form.
8  BY MS. PLANTE:
9      Q.    Go ahead.
10     A.    I'm sorry, but what was -- what
11  was the question?
12          MS. PLANTE:  Would you repeat
13      the question, Marie?
14          (The requested portion of the
15      record was read back by the court
16      reporter.)
17  BY MS. PLANTE:
18     Q.    What evidence would you have
19  that she was not performing in the clinic
20  well?
21     A.    Again, my -- my assessment of
22  her in her first two years was only in my
23  clinics.  Any other assessment would have
24  been from any faculty --
25     Q.    Okay.

US District Court - Texas                                FINAL - September 7, 2021
Daywalker v. University of Texas                                Dr. Wasyl Szeremeta

Page 285

1    A.   -- whose rotations she was on.
2    Q.   Okay.
3         And when did you learn she did
4  not perform well, allegedly, in the TDC
5  when she was sitting in for a 4 as a
6  PGY-2?
7    A.   I don't know the exact date.
8         That would most likely be a
9  question for Dr. Underbrink.
10   Q.   Okay.
11   A.   Or Dr. Brindley, who's passed
12 away.
13   Q.   I'm sorry to hear that.
14        PGY -- she passed the rotation,
15 the TDC rotation, correct?
16   A.   She passed it, yes.
17   Q.   Okay.
18        So, you're just trying to take
19 away from her accomplishments because she
20 was able to do something as a 2 that 4's
21 were doing?
22        MR. SOTO:  Objection; form;
23    argumentative.
24 BY MS. PLANTE:
25   Q.   Go ahead.

Page 286

1    A.   That's not what I said.
2    Q.   Well, it's how it sounded.
3    A.   It's not what I said though.
4    Q.   Okay.
5         Let's go to the part of the
6  exhibit which is page 3 of Exhibit 4.
7    A.   Okay.
8    Q.   If you had made the decision to
9  demote her or retain her to a PGY-3, why
10 would you sign this document on the 16th
11 2018 when she, I believe, was out on FMLA
12 leave?
13   A.   The decision with the GME office
14 was that she still would get paid as a
15 PGY-4, and that's all that this was.  That
16 she would do PGY-3 rotations until she got
17 back to a level where we felt she could
18 continue as the PGY-4.
19   Q.   But you agree that she had
20 already started out doing PGY-4 rotations
21 as of July 1st, 2018 --
22   A.   And she --
23   Q.   Would you allow me to finish?
24 Thank you.
25        You would agree that she was

Page 287

1  already performing, at least
2  satisfactorily, based on any documentation
3  we have, from July 1st up until she
4  requested leave in mid-August, she was
5  performing her PGY-4 at a satisfactory
6  level, correct?
7         MR. SOTO:  Objection; form.
8    A.   No, incorrect.
9    Q.   Okay.
10        So, did you observe her at any
11 time during her PGY-4 rotations?  I mean
12 personally observe her?
13   A.   No.
14   Q.   Okay.
15        So you're going on hearsay of
16 other faculty, correct?
17        MR. SOTO:  Objection.
18    Objection; ambiguous; calls for
19    speculation.
20 BY MS. PLANTE:
21   Q.   Go ahead.
22   A.   I'm going on the evaluation of
23 other faculty member who worked with her
24 in the clinic, in TDC clinic, and also
25 on-call.

Page 288

1    Q.   Has she received an evaluation
2  at this time for the -- for the fourth
3  year yet?
4    A.   Not yet.
5    Q.   No.
6         You didn't even wait to retain
7  her or demote her, whatever you want to
8  call it, until after you had actually
9  evaluated her on how she was doing in P --
10 as PGY-4, correct?
11   A.   It was clear it was not going
12 well.
13   Q.   It is clear that you did not
14 evaluate her in the fourth year, correct?
15   A.   It is clear she wasn't doing
16 well from the other faculty.
17   Q.   Are you going to answer --
18        MS. PLANTE:  That's I'm going to
19    object as non-responsive.
20   Q.   Did you -- I've said the
21 question so many times.
22        Are you going to answer the
23 question, Doctor?  Because if you're not
24 going to answer, I'll move on.
25        MR. SOTO:  What was the

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                      Dr. Wasyl Szeremeta

Page 289

1      question?
2          MS. PLANTE:  Okay.  I'll have my
3   court reporter repeat the question
4   because I -- I think I said it twice.
5          But please, Marie.  I'm sorry.
6          (The requested portion of the
7      record was read back by the court
8      reporter.)
9          MR. SOTO:  I object to that as
10  confusing and ambiguous.
11         MS. PLANTE:  Okay.
12  BY MS. PLANTE:
13     Q.   Keep -- you can testify, Dr.
14  Szeremeta.
15     A.   We evaluated at that CCC meeting
16  because the evidence was overwhelming that
17  she was not doing well.
18     Q.   Okay.  You evaluated her.
19         Aren't evaluations shared with
20  the resident?
21     A.   The evaluation was a discussion
22  in the CCC.
23     Q.   I asked you were -- are
24  evaluations shared with the resident, not
25  whether she was evaluating by the CCC.

Page 290

1   I'm asking you whether the evaluation that
2   you had of her was shared with her as you
3   would any other performance evaluation
4   where you sit down and meet, correct?
5          MR. SOTO:  Objection; compound;
6      ambiguous.
7          MS. PLANTE:  Okay.
8          Well, I'm going to break that
9      down a little bit.
10  BY MS. PLANTE:
11     Q.   Did you meet with her and tell
12  her she was not performing well as a
13  PGY-4?
14     A.   As part of a formal evaluation,
15  no.
16         As informal evaluation in terms
17  of feedback from the faculty, I can't
18  speak which faculty talked to her.
19     Q.   Okay.
20         Well, if you're recommending her
21  to be retained to the third year and you
22  don't know what faculty told you as to why
23  she needed to be retained, then what are
24  you basing it on?
25     A.   That's not what I said.

Page 291

1          I said I don't know what
2   conversations the faculty had with her in
3   terms of feedback.  The faculty certainly
4   spoke up at CCC.
5      Q.   Yes, but you are not supposed to
6   be evaluating her, correct?
7      A.   I'm still a program director.
8      Q.   You're the program director, but
9   you had been removed by Dr. Resto to
10  evaluate her, correct?
11         MR. SOTO:  Objection; form.
12     A.   And Dr. --
13     Q.   Is that yes or no?
14         MR. SOTO:  Can you let him
15  answer the question, Victoria?
16         MS. PLANTE:  He's not answering
17  the question.
18     A.   I'm trying to.
19         MS. PLANTE:  It's
20  non-responsive.
21  BY MS. PLANTE:
22     Q.   It's either a yes-or-no
23  question.
24     A.   No, it's not.
25     Q.   Why is it not a yes-or-no

Page 292

1   question?
2          I said did you --
3      A.   Dr. Thomas was evaluating her at
4   that point.
5      Q.   Dr. Thomas.
6          So, did you speak to Dr. Thomas?
7      A.   Dr. Thomas was at the CCC
8   meeting.
9      Q.   And did he tell you that he ever
10  told her that she was not performing
11  satisfactorily as a PGY-4?
12         MR. SOTO:  Objection; asked and
13  answered.
14     A.   Dr. Thomas had private meetings
15  with Dr. Daywalker.
16     Q.   I know.  We have some on
17  recording.  And he never stated that she
18  was performing unsatisfactorily.  That's
19  why I want to know what did Dr. Thomas
20  tell you.
21         MR. SOTO:  Objection;
22  argumentative.
23  BY MS. PLANTE:
24     Q.   Go ahead.
25     A.   The discussion was in the CCC

US District Court - Texas

FINAL - September 7, 2021

Daywalker v. University of Texas

Dr. Wasyl Szeremeta

Page 293

1  from Dr. Thomas and the rest of the
2  faculty.
3      Q.   I'm asking you who told you -- I
4  mean, I keep going over the same thing and
5  you -- you can make this easy or you can
6  make it hard.  You're making it hard, but
7  that's okay.
8      MR. SOTO:  Victoria, please stop
9  harassing him.
10     MS. PLANTE:  I'm not harassing
11 the witness.
12     MR. SOTO:  Yes, you are.
13     MS. PLANTE:  The witness is
14 actually harassing me.  So I would let
15 you know that.  He's harassing me.
16     His total disposition, his
17 entire non-responsiveness is going to
18 be known to the court that he can't
19 give an answer to a yes-or-no question
20 at some point is -- is suspicious of
21 covering up something.
22     MR. SOTO:  Victoria, can you
23 move on, please?  And not make
24 personal --
25     MS. PLANTE:  I'll move on when I

Page 294

1      get ready to move on, yeah.
2      You just have to sit and watch
3  or you can punch out.
4      MR. SOTO:  Is that a question?
5      MS. PLANTE:  Mr. Soto.
6      MR. SOTO:  Is that a question to
7  the witness?
8      MS. PLANTE:  Yes, there are many
9  more questions to the witness.
10 BY MS. PLANTE:
11     Q.   The prior person you put on
12 remediation, without saying his name, we
13 all know who he is, but without saying his
14 name, he had been accused of no call/no
15 show, correct?
16     MR. SOTO:  Objection; ambiguous.
17     Prior person?
18 BY MS. PLANTE:
19     Q.   No call/no show, he didn't show
20 up for work, correct?
21     A.   Yes.
22     Q.   And he didn't call, correct?
23     A.   Yes.
24     Q.   And you placed that person on
25 remediation because he violated policy,

Page 295

1  correct?
2      MR. SOTO:  Objection; form as to
3  "you."
4  BY MS. PLANTE:
5      Q.   I mean did you refer to this
6  person as being on the shit list?
7      A.   No.
8      Q.   Were you aware that this person
9  complained about your behavior to him?
10     A.   I wasn't aware.
11     Q.   Dr. Blackwell never came and
12 spoke to you about him complaining about
13 how you treated him?
14     A.   No.
15     Q.   You were aware and you were in a
16 faculty meeting wherein you talked about
17 his return to UTMB, correct?
18     MR. SOTO:  Objection; ambiguous.
19     A.   When?
20     Q.   You returned to -- this would
21 have been December of last year when this
22 resident was supposed to return.
23     A.   I was -- I was participating in
24 a faculty meeting, yes.
25     Q.   And you made comments in that

Page 296

1  faculty meeting specifically that you
2  didn't believe a leopard could change its
3  spots.
4      Do you remember making that
5  statement?
6      A.   I don't remember that statement.
7      Q.   If it was made by you, why
8  would -- do you know is that something you
9  would normally say, or is that something
10 inconsistent?
11     A.   That's inconsistent with what I
12 would say.
13     Q.   Great.
14     (Pause.)
15     MS. PLANTE:  I'm just going
16 checking off things right now.
17     THE WITNESS:  I don't want to
18 run out on you again, but I am going
19 to need a bathroom break in a second.
20     MS. PLANTE:  Okay.  It's good to
21 take a bathroom break.  I just need to
22 see where I am in my notes.  Thank
23 you.
24     We can go off for ten minutes.
25 Thank you.

US District Court - Texas                    FINAL - September 7, 2021
Daywalker v. University of Texas                      Dr. Wasyl Szeremeta

Page 297

1       THE VIDEOGRAPHER:  We are now
2    going off the record at 3:51 p.m.
3       (Recess taken.)
4       THE VIDEOGRAPHER:  We are now
5    going back on the record at 4:11 p.m.
6    BY MS. PLANTE:
7       Q.   Dr. Szeremeta, you understand
8    you're still under oath?
9       A.   Yes, ma'am.
10       MS. PLANTE:  Okay.
11    I want you to open Exhibit 24.
12    It's already been placed in the chat.
13       ---
14       (Wasyl Szeremeta Exhibit 24,
15    American Board of Otolaryngology
16    screen shot, Bates P-0001700, was
17    marked for identification.)
18       ---
19       THE WITNESS:  Okay.
20    BY MS. PLANTE:
21       Q.   Do you recall -- and this is a
22    otolaryngology snapshot of a -- of a
23    website that shows the completion years
24    for Dr. Daywalker.
25       Do you understand that residents

Page 298

1    have access to their information that's
2    reported to the American Board of
3    Otolaryngology?
4       A.   Yes, that's correct.
5       Q.   Okay.
6       And, so, this is what she took a
7    snapshot of, and if you'll see years --
8    residency years training it shows that she
9    completed three years of training.
10       Do you see that?
11       A.   Mm-hm.
12       Q.   And if we go to the next
13    picture, it's been modified.
14       Did you have anything to do with
15    the modification removing year 3 from her
16    residency completion?
17       A.   I think I probably did.
18       Q.   Okay.
19       A.   Either directly or indirectly, I
20    would have to sign off on it.
21       Q.   Okay.
22       So, you, in essence, took a year
23    off of her residency completion years?
24       A.   She never completely finished
25    the third year.  She was supposed to come

Page 299

1    back and do a sub-rotations on PGY-3
2    rotations so she could advance to the
3    fourth year.  So technically, no, she had
4    not completed the third year
5    satisfactorily.
6       Q.   She completed the third year.
7       You're saying she did not
8    complete three entire years of residency
9    as of June -- when did her residency -- I
10    think it was June 30th, 2018?  You're
11    saying that she did not complete that from
12    July 1st, 2017?
13       A.   She completed three calendar
14    years of residency, and when she was
15    advanced in July of 2018 to PGY-4
16    rotations at TDC, had she sat -- had she
17    continued in that vein and continued
18    successfully, then she would have
19    completed three years successfully.
20       Q.   Okay.
21       What --
22       A.   But she went back to the third
23    year, so she really only had completed two
24    years.  She had not really completed three
25    years competency-wise.

Page 300

1       Q.   So, which third year rotation
2    had she not completed?
3       A.   She had -- we wanted her to come
4    back and do a --
5       Q.   No, I asked you what third year
6    she had not completed.
7       MR. SOTO:  Can you let him
8    answer the question?
9    BY MS. PLANTE:
10       Q.   Not -- not we wanted her to come
11    back.
12       MS. PLANTE:  Non-responsive.
13       MR. SOTO:  Can you let him
14    answer the question?
15    BY MS. PLANTE:
16       Q.   I'll ask you a different way.
17       Would she be repeating the same
18    courses she had taken and completed in
19    year 3 of her residency when she was told
20    that she would return back to a PGY-3 in
21    November 2018?
22       MR. SOTO:  Objection; form.
23    BY MS. PLANTE:
24       Q.   Go ahead.
25       A.   No, she would not be -- she

Page 301

1  would not be doing the same rotation
2  schedule.  She would not be repeating the
3  entire third year rotation schedule.
4      Q.   So, was she repeating only a
5  half a year or a full year?
6          MR. SOTO:  Objection;
7  argumentative.
8  BY MS. PLANTE:
9      Q.   Okay.
10     A.   She was going to repeat A
11 rotation, B rotation, and the Kridel
12 rotation because I believe the Kridel
13 rotation got cut short for her.  So --
14     Q.   Okay.
15     A.   So, we want -- the faculty felt
16 that she didn't need any more pediatric
17 training.  She didn't need research
18 training.  She needed to be on A and B
19 team to show that she could function as,
20 you know, meet all of her things of
21 remediation and function well so we could
22 put her back to the fourth year.
23         MS. PLANTE:  Okay.
24         Objection; non-responsive.
25         Let me just let the document

Page 303

1      A.   I never posted such a picture.
2      Q.   Okay.
3          So, her testimony that you
4  posted it would be inaccurate?
5      A.   Factually inaccurate, yes,
6  ma'am.
7      Q.   Okay.
8          Did you find the picture, when
9  you saw it, offensive?
10         The crossbones with the skull,
11 did you see it at some point?
12     A.   I saw it as part of the
13 presentation.  I thought it was part of
14 the presentation being presented by the
15 residents.  So I wasn't sure what context
16 it was being presented in, other than this
17 was part of the society they were
18 proposing.
19     Q.   Were you aware that this was a
20 known KKK emblem?
21     A.   Absolutely not.
22     Q.   If you were not aware that it
23 was a KKK emblem, why would you say to the
24 only black person in the meeting, I put it
25 up to shut you up?

Page 302

1  speak for itself.
2          Let me put in the chat, we're
3  going to get into some racial issues
4  so I know you might be a little
5  uncomfortable.  I know Mr. Soto is.
6          MR. SOTO:  Can you not make
7  comments like that, Victoria?
8          MS. PLANTE:  Well, you have been
9  and you've been disruptive.  So I'm
10 just letting you know I'm getting
11 ready to go there.
12         MR. SOTO:  Can you please not
13 make any personal attacks when you go
14 there?
15         MS. PLANTE:  I'm not making any
16 personal attacks towards you.  You're
17 very sensitive.  I'm not making any
18 personal -- I didn't call you
19 anything.  I just made a statement.
20         Okay.
21 BY MS. PLANTE:
22     Q.   Do you remember posting a
23 picture -- a picture in a virtual meeting that included
24 Dr. Yolanda Heman-Ackah on December 2nd,
25 2021 of a skull and some crossbones?

Page 304

1      A.   I never made --
2          MR. SOTO:  Objection;
3  argumentative.
4  BY MS. PLANTE:
5      Q.   Go ahead.
6      A.   I never made that statement.
7      Q.   Okay.
8          Are you a part of the KKK?
9          MR. SOTO:  Objection harassing.
10         Don't answer that.
11         MS. PLANTE:  Answer it.  It is
12 relevant as to what he has stated and
13 what Dr. Heman-Ackah have stated.  I
14 can ask him that question.
15         MR. SOTO:  Do not answer.
16 BY MS. PLANTE:
17     Q.   Are you a member --
18         MS. PLANTE:  In him not
19 answering it, I'm going to bring it
20 out.
21         So, don't answer.  Fine with me.
22         MR. SOTO:  And we're moving to
23 limit -- we will move to limit this as
24 part of the deposition pursuant to
25 Rule 30.

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 305

1        MS. PLANTE:  Whatever.  I don't
2   care.  It's a part of the deposition.
3   I don't care how offensive.  It can't
4   be more offensive to you, Mr. Soto,
5   than it is to me.
6        MR. SOTO:  Victoria, can you
7   please move on?
8        MS. PLANTE:  I am moving on.
9        He won't answer if he's a member
10   of the KKK.  So that's fine.  Let's
11   move forward.
12   BY MS. PLANTE:
13     Q.   When did you know about the
14   Jolly Bone Jugglers?
15     A.   What did I know what?  I'm
16   sorry, I didn't hear the first.  What or
17   when?
18     Q.   What did you know about the
19   Jolly Bone Jugglers?
20     A.   Nothing until that presentation
21   on I think it was December 2nd.
22     Q.   You weren't aware that they were
23   trying to create some kind of secret
24   society?
25     A.   No, I was not aware that they

Page 306

1   were creating -- I don't think it was a
2   secret society.  And no, I wasn't aware.
3     Q.   Okay.
4        So, the first time you heard of
5   it was December 2nd, 2020?
6     A.   I may have the date wrong, but I
7   know it was a Wednesday morning Zoom
8   conference.  I think that -- I think
9   that's the right date.
10        Forgive me if I have the wrong
11   date.
12     Q.   Had you never seen that emblem
13   before?
14        MR. SOTO:  Objection; form;
15   ambiguous.
16   BY MS. PLANTE:
17     Q.   The KKK emblem, the skull device
18   with the crossbones?
19        MR. SOTO:  Objection;
20   argumentative.
21     A.   I have never seen that emblem,
22   no.
23     Q.   Well, how did you not see it
24   when you told Dr. Heman-Ackah you saw it
25   in the UTMB hospital, or facility?

Page 307

1        MR. SOTO:  Objection;
2   argumentative.
3   BY MS. PLANTE:
4     Q.   Go ahead.
5     A.   I saw the robes and then when I
6   went back later to -- I mean, I saw the
7   picture -- once they presented it and they
8   told that it was an old society and they
9   showed pictures of it -- pictures of the
10   society, I recognized the picture in the
11   hallway and I went back to the hallway to
12   look at it to see if it was still there
13   and I guess I never really noticed the
14   skull and crossbones.  I noticed the
15   robes.
16     Q.   Okay.
17        Well, you -- you knew where to
18   go to look for that picture though before
19   the Jolly Bone Juggler meeting occurred,
20   correct?  You had seen it before, correct?
21     A.   I had seen the picture, but I
22   wasn't sure what it was.  I mean, there's
23   a picture, historical pictures.  I walk
24   down that hallway.  I've seen it.
25     Q.   Okay.

Page 308

1     A.   But I didn't know what it was.
2     Q.   And what -- these people were in
3   black robes, white robes?
4     A.   I don't remember.  I think
5   they're black robes.
6     Q.   Did you see any black people in
7   the picture?
8     A.   I don't remember seeing any
9   black people.
10     Q.   This particular organization,
11   did you ever do any research on Jolly Bone
12   Jugglers?
13     A.   The only research I did was that
14   morning during the conference.  I did a
15   quick search to see, you know, what was
16   going on and only found one article
17   referring to the Jolly Bone Jugglers and
18   UTMB because it was presented as an old
19   fraternity.  So I wanted to find out a
20   little more information about that.
21     Q.   And were you aware that they
22   were organized at a time when blacks could
23   not be a part of that organization, nor
24   could females?
25     A.   That's what the monograph said,

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 309

1  yes, that I read.
2      Q.   Do you believe that could be
3  offensive to a black person looking at it?
4          MR. SOTO:  Objection; form.
5      A.   I -- I honestly don't know.
6      Q.   Do you believe a confederate
7  flag is something that could be offensive
8  to a black person looking at it?
9          MR. SOTO:  Objection; form;
10 harassing.
11 BY MS. PLANTE:
12     Q.   Go ahead.
13         MR. SOTO:  Is there a
14 confederate flag in the picture?
15         MS. PLANTE:  I'm trying to see
16 what his level of sensitivity is to
17 race and what he perceives to be
18 perhaps racial and derogatorily
19 racial.
20         MR. SOTO:  Okay.
21         Look, Victoria --
22         MS. PLANTE:  So that's why I
23 asked him the question.  I know what
24 I'm doing.
25

Page 310

1  BY MS. PLANTE:
2      Q.   You can answer the question.
3          MR. SOTO:  Objection to
4  harassing and --
5          MS. PLANTE:  Okay.
6          We understand you have a ongoing
7  objection to harassment and -- and
8  probably a lot of other things, but
9  this is just the history of America.
10 So, I'm sorry that you're offended,
11 but I'm more offended.
12         MR. SOTO:  Can you focus on the
13 questions, please, and not --
14         MS. PLANTE:  Yeah, I am, if
15 you'll allow him to ask some -- answer
16 some.
17 BY MS. PLANTE:
18     Q.   Now, did Dr. Heman-Ackah provide
19 you some literature that showed that Bone
20 Jugglers and the KKK had an affiliation?
21     A.   Yes, she did.  Quite convincing
22 evidence.  And shocking.
23     Q.   And it was so shocking, did you
24 ask the dean to take the -- the picture
25 down?

Page 311

1      A.   I did not ask the dean to take
2  the picture down.  I -- I know I spoke to
3  Dr. Pine afterwards.  I said, You can't
4  have this organization.
5      Q.   Okay.
6      A.   I didn't -- I didn't have any
7  official power, but I said, You can have
8  an organization, but you certainly can't
9  call it this.
10     Q.   Okay.
11         And why didn't you ask that it
12 be removed, is the question?
13     A.   I didn't think it was my place
14 to do that.  I was no longer program
15 director.  I'm just a faculty person.
16     Q.   Okay.
17         But as a faculty person, does
18 that mean that you have to be a program
19 director to be concerned about racially
20 sensitive matters?
21         MR. SOTO:  Objection; harassing.
22 BY MS. PLANTE:
23     Q.   Go ahead.
24     A.   I -- I take care of my patients
25 and I work in my department.

Page 312

1      Q.   That wasn't --
2      A.   By the afternoon, it had already
3  run up to the level of the dean, and Dr.
4  Resto had called me three hours later when
5  I was in clinic and I already -- he said,
6  What -- what's going to be done about
7  this?  I said, It's already taken care of.
8  I already talked to Dr. Pine.  This
9  organization's dead.  Dead in the water.
10 Can't be called this.  Can be called
11 something else, not this.  'Cause -- and
12 he told me that it had already gotten to
13 the level of dean.
14         As far as why the picture's
15 still up there, you can ask the dean.
16     Q.   And you believe it's okay
17 because the dean is actually black, is
18 that --
19         MR. SOTO:  Objection; harassing.
20         Don't answer that.
21 BY MS. PLANTE:
22     Q.   Do you believe that's okay?
23         MS. PLANTE:  That's a perfectly
24 normal question.
25     A.   That what's okay?

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

US District Court - Texas                           FINAL - September 7, 2021
Daywalker v. University of Texas                    Dr. Wasyl Szeremeta

---

Page 313

1      Q.    That the picture be up there.
2          MR. SOTO:  Objection; harassing.
3      A.    It's not my decision if that
4  picture is not -- it's the dean's
5  decision.
6      Q.    But you never asked that it be
7  removed, correct?  We've already got
8  that --
9          MR. SOTO:  Objection; asked and
10  answered.
11         MS. PLANTE:  Okay.  We got that.
12     A.    I never asked for it to stay
13  either.
14     Q.    Well, you never asked for it to
15  go either?
16         MR. SOTO:  Objection; asked and
17  answered.
18  BY MS. PLANTE:
19     Q.    And you said that you were just
20  shocked that it happened and that it would
21  be perceived it this way and you didn't
22  think you could use the name and you and
23  Dr. Resto said you couldn't use the name
24  and you absolutely did not remove the
25  picture?

---

Page 314

1          MR. SOTO:  Objection; harassing;
2  asked and answered.
3  BY MS. PLANTE:
4      Q.    Go ahead.
5      A.    I've already answered the
6  question.
7      Q.    Do you remember asking Dr.
8  Daywalker about black issues?
9      A.    I remember asking her about a
10  variety of issues.
11     Q.    A variety of issues?
12     A.    Of healthcare disparity.
13     Q.    Healthcare disparity.  Okay.
14         What else did you ask her about
15  as relates to black?
16     A.    You're going to have to be more
17  specific.
18     Q.    Well, did you ask her why do
19  black people go to the emergency room for
20  their healthcare?
21     A.    Yes, I did.
22     Q.    Would you not find that
23  offensive?
24     A.    No.
25     Q.    Well, if she found it --

---

Page 315

1          MR. SOTO:  Can you let him
2  answer the question, please?
3      A.    It's actually a disturbing
4  question and not because of a racial
5  thing, but because of why people have to
6  use the emergency room for their
7  healthcare, which is a very inefficient
8  way of using health -- health resources.
9          And she's not the only question
10  I -- she's not the only resident I asked
11  that question to.
12     Q.    Okay.
13         You said that white people have
14  to use the emergency room too.
15     A.    No.
16     Q.    Did you say that?
17         MR. SOTO:  Objection; form;
18  argumentative.
19         MS. PLANTE:  No, did -- I'm
20  trying to get what he said.
21         Can you repeat his answer to me?
22  Because I'm thinking -- I don't know
23  what he said.
24         (The requested portion of the
25  record was read back by the court

---

Page 316

1  reporter.)
2  BY MS. PLANTE:
3      Q.    Is that a stereotypical view, or
4  have you actually done research on matter?
5      A.    We did research on it at Temple
6  University in Philadelphia.
7      Q.    Okay.
8          Well, why are you asking her
9  about it if you've already done research
10  on it?
11     A.    Because I wanted to have her
12  opinion.  I wanted to have her residents'
13  opinion.
14         We discussed social issues.
15     Q.    Okay.
16     A.    And I wanted to know what her --
17  what her perception was.  We had done the
18  research.  I wanted to know if someone
19  else thought differently.  Maybe it's
20  different in Texas than it is in
21  Pennsylvania.
22         We're an academic center.  We
23  ask questions.
24     Q.    Why did you generalize a whole
25  race of people as to them --

---

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                             Dr. Wasyl Szeremeta

Page 317

1          MR. SOTO:  Objection.
2     Q.   -- going to the emergency room?
3          MR. SOTO:  Objection; form.
4     A.   Because in North Philadelphia,
5     the majority of people who use the
6     emergency room disproportionately are
7     African-American.  Again, for a variety of
8     reasons.
9     Q.   But are you -- was it your
10    position that people in Texas did that as
11    well?
12    A.   That's why I was asking her.
13    Q.   Okay.
14         Why -- how could she know when
15    she had only been in Texas two years?
16    A.   She had been a resident.  She's
17    in the emergency room more than I am.
18    Q.   Okay.
19         So, she would be able to --
20    A.   I wanted to know her opinion.
21    Q.   Okay.  You wanted to know her
22    opinion.
23         Did you ever say, Let's do a
24    study on it, Dr. Daywalker?
25    A.   No.  We were just discussing.

Page 318

1     Q.   Okay.
2          So, you were just commenting
3     about this and you thought it was proper
4     to do so?
5     A.   I thought it was an interesting
6     question, yes.
7     Q.   Now, Dr. Daywalker took it
8     offensively, but because --
9          MS. PLANTE:  Let me withdraw the
10    question.
11    Q.   You understand that Philadelphia
12    is a inner city type of structure than
13    Galveston, correct?
14         MR. SOTO:  Objection; form.
15    BY MS. PLANTE:
16    Q.   Do you understand Philadelphia
17    to be very inner city and urban?
18    A.   It's inner city.  It's urban.
19    But the socioeconomic demographics are
20    actually in some way very dissimilar.
21    Q.   Okay.
22         How is that connected, the city
23    of the Philadelphia and the city of
24    Galveston connected in your theory that
25    all black people use the emerge -- or why

Page 319

1     black people use the -- why don't --
2          MS. PLANTE:  Well, let me say it
3     this way.  Let me take back that
4     question.
5     Q.   Who published the research on
6     black people using the ER in Temple -- at
7     Temple?
8          MR. SOTO:  Objection;
9     argumentative.
10    A.   I don't remember.
11    Q.   So, you weren't a part of the
12    writing or the research, correct?
13    A.   No.  We just took care of the
14    patients in the emergency room.
15    Q.   What was the name of the
16    article?
17    A.   I don't remember.
18    Q.   How do you know the results then
19    if you don't remember?
20    A.   I remember we read the article
21    at a journal club, but I don't remember
22    the name of the article.  We actually
23    discussed it amongst the residents at our
24    journal club at some point.
25    Q.   And have you had a desire to

Page 320

1     open up a clinic in a inner city black
2     area to provide them the healthcare they
3     need since you believe they go to the
4     emergency room for their healthcare?
5     A.   I've provided quality healthcare
6     to inner city areas for most of my career.
7     Q.   And so that's how you were able
8     to come up with that stereotypical view
9     that black people use the emergency room
10    for their healthcare?
11         MR. SOTO:  Objection; form.
12    A.   This is what the article
13    concluded.  I was just asking whether the
14    same thing happens down here.
15    Q.   You understand that a article is
16    limited in the data that it draws from.
17    So it's not pooling from the entire black
18    population.
19         Do you understand that?
20    A.   I understand that.
21    Q.   Okay.
22         So, if you were politically
23    correct, perhaps you would have said why
24    do some black people use the emergency
25    room for their healthcare, correct?

JANE ROSE REPORTING                                         National Court-Reporting Coverage
1-800-825-3341                                              janerose@janerosereporting.com

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 321

1     MR. SOTO:  Objection; form.
2     A.   I guess I'm still learning.
3     Q.   Do you remember asking her, or
4   making a statement that a black mother of
5   a pediatric patient who is black told you
6   that you were not giving her child the
7   same amount of pain medication?
8     A.   I do recall that, yes.
9     Q.   Why would that be an issue of
10   concern in a seminar -- M&M, rather?
11     A.   M&M we talk about morbidity,
12   mortality, near misses and interesting
13   cases.  This was an interesting case.  It
14   was an example how to take a potentially
15   explosive situation and use education and
16   communication to diffuse the situation.
17     Q.   Why did you consider it
18   explosive?
19     A.   I had a mom accuse me of being
20   racist for not giving her child narcotics
21   after a tonsillectomy.
22     Q.   And she had that right to do if
23   she felt it was racially based, correct?
24     MR. SOTO:  Objection; form.
25     A.   It -- if she felt it was

Page 322

1   racially based, of course she has her
2   right to do.  We all have our First
3   Amendment rights.
4     But my job is to either admit
5   that I was incorrect or show her the data
6   that shows that why the medical decision
7   was made and it was not racist.
8     Q.   Okay.
9     Did her daughter receive pain
10   medication?
11     A.   Her daughter received Tylenol
12   and Motrin alternating, like all the other
13   patients do.
14     Q.   All the patients that you care
15   for receive only Tylenol and Ibuprofen?
16     MR. SOTO:  Objection;
17   argumentative.
18     A.   Yes.
19     Q.   You don't prescribe any
20   narcotics for any patient that you've
21   seen?
22     A.   The only patients that get
23   narcotics are teenagers who have recurring
24   tonsillitis and don't have any obstructive
25   sleep apnea.  If a child has obstructive

Page 323

1   sleep apnea, the FDA warning is that we
2   not give Tylenol with codeine or any
3   narcotics anymore.  And the standard of
4   care is Tylenol and Motrin alternating.
5     Q.   I've had an opportunity to look
6   at your Facebook posts.
7     Have you looked at your Facebook
8   posts lately?
9     A.   I've looked at my Facebook posts
10   for the last week.
11     Q.   There were a bunch of Facebook
12   posts produced in this case.
13     Were you able to review those
14   Facebook posts?
15     A.   No.
16     MS. PLANTE:  Okay.
17   I'm in the chat here.
18     MR. SOTO:  Is this the same file
19   we tried to work with Pine on?
20     MS. PLANTE:  No, I do not
21   believe it is, sir.
22     Stop trying to anticipate what
23   I'm going to do.
24     MR. SOTO:  I'm just saying that
25   because you had a lot of trouble

Page 324

1   sharing that last time.
2     MS. PLANTE:  No, it's not.
3   It's a picture.  So it's going
4   to have a little bit more megabytes
5   than the normal.
6     MR. SOTO:  Okay.
7     MS. PLANTE:  If you'll open that
8   up.
9     MR. SOTO:  And can you just have
10   a, Dr. Szeremeta, can you just review
11   it and let us know when you're done?
12     THE WITNESS:  Okay.
13     ---
14     (Wasyl Szeremeta Exhibit 7,
15   Wasyl Szeremeta Facebook post, Bates
16   P002064-066, was marked for
17   identification.)
18     ---
19   BY MS. PLANTE:
20     Q.   Is this a repost that you made
21   on June --
22     MR. SOTO:  Excuse me.  I haven't
23   had a chance to download it.  It's a
24   large file.
25     I'm not sure if the doctor has

US District Court - Texas                              FINAL - September 7, 2021
Daywalker v. University of Texas                          Dr. Wasyl Szeremeta

Page 325

1    had a chance as well.
2        MS. PLANTE:  Okay.
3        Well, let me know when you're
4    ready.
5        (Pause.)
6        THE WITNESS:  Okay.
7        Yeah, I reposted this.
8    BY MS. PLANTE:
9        Q.   Okay.
10       And somebody commented that it
11   was not factual.
12       Do you see that?  I think it's
13   on page 3 of Exhibit 7.
14       A.   The fact-checkers claimed that
15   it was not factual and that's what Martha
16   Tecca said that what I shared was
17   inaccurate.
18       Q.   Okay.
19       Why -- do you know a Martha Boyd
20   Tecca?
21       A.   Yeah, I went to college with her
22   husband.  And, actually I went to college
23   with her.
24       Q.   So, she was not actually doing
25   the fact checking for Facebook.  You're

Page 327

1    somewhere in the middle.
2        Q.   Okay.
3        Do you believe that a slave made
4    to work as a cook is a good image to be
5    portrayed by a company?
6        MR. SOTO:  Objection; form;
7    calls for speculation; and is
8    irrelevant.
9        MS. PLANTE:  His belief.
10       A.   As a -- as a corporation
11   believes -- if the product sells, then
12   it's probably fine.
13       Q.   I'm asking you.
14       A.   I'm not -- I'm not -- I don't
15   make Aunt Jemima syrup.
16       Q.   Well, you posted it, sir.  You
17   posted it.
18       A.   Correct.  I thought it was all
19   right to post and it was --
20       Q.   Were you -- did you realize that
21   it's a racially derogatory term for a
22   black person?
23       A.   No, I didn't.
24       Q.   That can be found in Wikipedia.
25       Did you look in Wikipedia?

Page 326

1    not saying that --
2        A.   No.
3        Q.   -- are you?
4        A.   Apparently --
5        Q.   Okay.
6        A.   Apparently it -- apparently it
7    says, the posting you put up here says
8    that independent fact-checkers say this
9    information has no basis in fact.
10       Q.   Okay.
11       A.   Fact-check from USA Today.  Aunt
12   Jemima model Nancy Green didn't create the
13   brand.
14       Q.   Okay.
15       So, did you take it off your
16   Facebook post because it was inaccurate?
17       MR. SOTO:  Objection; form.
18       A.   I probably didn't.
19       Q.   After you saw that it was
20   possibly wrong, did you go and look up
21   Nancy Green and Aunt Jemima?
22       A.   I did look up some history on
23   Nancy Green and there was enough evidence
24   to suggest that she was part of the
25   likeness.  So, I guess the truth is

Page 328

1        MR. SOTO:  Objection to form.
2        A.   I didn't think to look in it.  I
3    already considered that term was
4    derogatory.
5        Q.   Well, in your research, where
6    did you look?
7        A.   I looked up Nancy Green.
8        Q.   Nancy Green and that would have
9    led you to where?  Did she have her own
10   page in the encyclopedia, or was -- did
11   you look at her on Wikipedia?
12       A.   I looked at several sources.  I
13   don't remember what I looked at.  I just
14   thought it was an interesting story.
15       Q.   Well, to you it might be
16   interesting.  To others it might be
17   offensive.
18       Do you understand that?
19       A.   I thought it was interesting.
20   And if it's not true, unfortunate because
21   it would have been a great story.  If it
22   is true, it is a great story.
23       Q.   What would be any way a great
24   story about a slave who was made to work
25   without pay and be a cook, a position she

JANE ROSE REPORTING                              National Court-Reporting Coverage
1-800-825-3341                                    janerose@janerosereporting.com

US District Court - Texas                           FINAL - September 7, 2021
Daywalker v. University of Texas                       Dr. Wasyl Szeremeta

Page 329

1    did not choose but that was forced on her,
2    and then they use her image to make money?
3          MR. SOTO:  Objection.
4    BY MS. PLANTE:
5       Q.   What would be -- what would be
6    noble about that?
7          MR. SOTO:  Hold on.
8          Objection; compound; harassing.
9          Are we going to spend a lot of
10   time on Aunt Jemima?
11   BY MS. PLANTE:
12      Q.   Go ahead.
13         MS. PLANTE:  Yes, we are.
14      A.   My understanding is she got paid
15   for it.
16      Q.   So, your understanding is she
17   got paid?
18      A.   From the articles that I read,
19   yes.
20      Q.   Okay.
21         So, as long as she got paid, it
22   was okay to have this Mammy-like figure on
23   a pancake box?
24         MR. SOTO:  Objection; form;
25   harassing; and argumentative.

Page 330

1    BY MS. PLANTE:
2       Q.   Do you know she represented a
3    Mammy-like figure?
4       A.   No.
5       Q.   Did you know -- do you know what
6    a Mammy is?
7       A.   No, I don't.
8       Q.   Well, I can't teach you black
9    history, but I'll bring up Exhibit 8.
10         MR. SOTO:  Can you not make
11   sidebar comments like that, Victoria,
12   please?
13         MS. PLANTE:  I will do whatever
14   I choose to do at this point.
15         (Pause.)
16         MS. PLANTE:  Okay.
17         I've placed what's been marked
18   as Exhibit 14.
19         ---
20         (Wasyl Szeremeta Exhibit 14,
21   Aunt Jemima Wikipedia page, was marked
22   for identification.)
23         ---
24         MS. PLANTE:  When you have an
25   opportunity to review that, let me

Page 331

1    know.
2          MR. SOTO:  And this has not been
3    produced to us before, Victoria?  Is
4    that correct?
5          MS. PLANTE:  No, it's not been
6    produced.  You can get it off
7    Wikipedia though.
8          I'll produce it.  It's not some
9    type of trade secret.
10         MR. SOTO:  It's a long article.
11         Do you want him to read the
12   entire thing?
13         MS. PLANTE:  No.  I've
14   highlighted some points he can read.
15   There is a part on the first page that
16   states --
17         MR. SOTO:  And this looks like
18   it's incomplete because if you go to
19   page 8 --
20         MS. PLANTE:  Well, he can
21   actually go to -- I can produce the
22   final.  I don't have to produce the
23   complete document.
24         MR. SOTO:  Well, you're asking
25   him questions about an incomplete

Page 332

1    document that's never been produced.
2          MS. PLANTE:  Well, he can say
3    that he'd like to review it on his --
4    I mean, it's clearly available to him.
5    It's not something that's unique to
6    me.  I pulled this off yesterday.  So,
7    it's not something that's new.
8          He said he was doing research.
9    Perhaps he already knows about it.
10         MR. SOTO:  And I --
11         MS. PLANTE:  I'm not going to
12   argue this with you.  I'm moving on
13   with the deposition.
14         MR. SOTO:  The exhibit says
15   there's 27 pages and there are 8 of
16   them.
17         MS. PLANTE:  Okay.  He can look
18   at the other eight whatever copies
19   there are.
20   BY MS. PLANTE:
21      Q.   Do you see where it says --
22         MR. SOTO:  Do you want to print
23   out this letter and let him review it?
24         MS. PLANTE:  Okay.  That's fine.
25   Let me move on with my

JANE ROSE REPORTING                    National Court-Reporting Coverage
1-800-825-3341                         janerose@janerosereporting.com

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 333

```
1      deposition.
2   BY MS. PLANTE:
3      Q.   Do you see where it says that
4   the character of Aunt Jemima has been
5   criticized as an example of exploited
6   black women?
7         MR. SOTO:  Where are we looking
8   at?  Excuse me.
9         MS. PLANTE:  The bottom part of
10  1.  It's highlighted.
11  BY MS. PLANTE:
12     Q.   Aunt Jemima is sometimes used as
13  a female version of the derogatory epithet
14  Uncle Tom or Rastus?
15     A.   I see that.
16     Q.   Okay.
17        You understand that the
18  terminology "Uncle Tom" is not perceived
19  to be --
20     A.   That one I do know.
21     Q.   Okay.
22        So, you were praising Ms. Green
23  for coming out of slavery and becoming a
24  Mammy-like figure for a pancake company?
25        MR. SOTO:  Objection; form;
```

Page 334

```
1      harassing; misstates his testimony.
2   BY MS. PLANTE:
3      Q.   Go ahead.
4      A.   I already said I thought it was
5   an interesting story.  I thought it was a
6   good story.
7         I didn't associate Aunt Jemima
8   with Mammy.  I didn't even know what Mammy
9   was.  I didn't see that article.
10        Thank you for your education.
11     Q.   Did you see about that they
12  subsequently, as a result of Black Lives
13  Matter, they actually removed her face
14  from the Aunt Jemima pancake box as well
15  as, I believe, some syrup?  Were you aware
16  of that?
17     A.   I hear -- I remember reading
18  they removed that.
19        And I think the same thing with
20  Uncle Ben's Rice.
21     Q.   What is your view on them
22  removing all statutes as it relates to
23  racial -- racial-based --
24        MS. PLANTE:  Well, let me -- let
25  me rephrase that.
```

Page 335

```
1      Q.   What is your position on Black
2   Lives Matter?
3         MR. SOTO:  Objection;
4   irrelevant; argumentative.
5         MS. PLANTE:  Well, he's got a
6   lot of it on his Facebook page.  So I
7   think it's relevant.
8      A.   I think all lives matter.
9      Q.   Okay.
10        Do you understand the definition
11  of Black Lives Matter?
12        MR. SOTO:  Objection.
13     A.   I understand there's an
14  organization called Black Lives Matter.
15        And I understand that all lives
16  matter.
17     Q.   Do you understand that nobody's
18  saying that all lives don't matter?  Do
19  you -- did you -- why do you feel like
20  it's a personal attack as to maybe
21  non-blacks not getting the recognition
22  they need?
23        MR. SOTO:  Objection;
24  argumentative.
25     A.   I've already stated clearly I
```

Page 336

```
1   think all lives matter and everyone should
2   be treated with respect.
3      Q.   Well, did you ever post anything
4   on your Facebook page related to Black
5   Lives Matter?
6      A.   I don't recall if I did or
7   didn't.  I'm sure you'll tell me.
8      Q.   Are you a subscriber to right --
9   Right Patriots?
10     A.   I don't know that organization.
11     Q.   You don't know that to be a
12  Facebook page that you've liked at some
13  point?
14     A.   I don't think I'm -- I don't
15  think I'm subscribed to it.
16        I can check.  It's not
17  intentional.  If I am, it's not
18  intentional.  I don't remember actively
19  subscribing to anything like that.
20     Q.   Yeah, never intentional.
21        MR. SOTO:  Victoria, can you not
22  make sidebar comments like that?
23        MS. PLANTE:  I -- I can -- this
24  is personal to me.  So I'm trying to
25  cut out a lot of disdain at this
```

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                    Dr. Wasyl Szeremeta

|  | Page 337 |
|---|---|

1     point, and it's taking some restraint.
2        This is personal to me and I've
3     told you that.  So I am -- I am being
4     restrained.  You wouldn't want to know
5     how I really feel.
6        (Pause.)
7        MS. PLANTE:  I placed in the
8     chat Exhibit 11.
9     ---
10       (Wasyl Szeremeta Exhibit 11,
11    Wasyl Szeremeta Facebook post, Bates
12    P002117, was marked for
13    identification.)
14    ---
15    BY MS. PLANTE:
16       Q.   Did you repost this on August
17    22nd, 2020, what's in Exhibit 11?
18       A.   Apparently I did.
19       Q.   Okay.
20       And if you'll read that to the
21    jury, what it says, the repost?
22       A.   "It's been 7 years since Black
23    Lives Matter was formed.  They have raised
24    over a billion dollars.  They haven't had
25    1 neighborhood cleanup, sent 1 poor black

|  | Page 338 |
|---|---|

1     child to college, bought school supplies,
2     fed the hungry, donated to a food bank or
3     provided housing to 1 poor black family."
4        Q.   Did you believe that to be true?
5        A.   I know they've raised a lot of
6     money.  I don't know what they've done
7     with it.
8        Q.   Okay.
9        Well, why would you put
10    something up there as though they were
11    just committing some type of fraud and
12    gaining money from this and hadn't helped
13    others when you didn't know that?
14       A.   Subsequently as leaders of Black
15    Lives Matter have been found guilty of
16    embezzling funds.
17       Q.   What members?  Tell me what
18    members and tell me what court.
19       MR. SOTO:  Objection; form.
20       A.   Also on Facebook.
21       Q.   Well, I mean, you're talking
22    about a Black Lives Matter organization.
23    I'm talking about black lives matter in
24    general.  There are many.
25       I'm about black lives matter.

|  | Page 339 |
|---|---|

1     I'm sure my client is about black lives
2     matter.  So, it doesn't necessarily say
3     that all lives don't matter.  Of course
4     they do.  But black lives continually
5     don't matter, and so that's why we need
6     special attention because we don't get the
7     attention that white males get.
8        Do you understand that?
9        MR. SOTO:  Objection; form.
10    BY MS. PLANTE:
11       Q.   Go ahead.
12       MR. SOTO:  Objection; form;
13    compound.
14       I'm confused what the question
15    is, Victoria.
16    BY MS. PLANTE:
17       Q.   Well, I don't think he's
18    confused.  He didn't say he was confused.
19    So if you're, sort of, trying to trigger
20    him to say he's confused, I guess now --
21       MR. SOTO:  I'm not doing that.
22       MS. PLANTE:  Okay.
23       A.   I don't associate the
24    organization Black Lives Matter with the
25    Black Lives Matter movement.

|  | Page 340 |
|---|---|

1        Q.   This doesn't say Black Lives
2     Matter movement or Black Lives Matter
3     organization.  It says Black Lives Matter,
4     correct, BLM?
5        A.   The organization is the one that
6     raises money.
7        Q.   And do you not know that there
8     are many organizations out there that are
9     raising money on behalf of black lives and
10    trying to see that they have the things
11    that may not be given to them in other
12    parts of America?
13       A.   And there are some very good
14    organizations, like the NAACP, for
15    example.  Very good organization.
16       Q.   Why is that such a good
17    organization and Black Lives Matter isn't?
18       A.   Because I've seen scholarships
19    based on that.  I've seen money go back to
20    the community and help.
21       Q.   Okay.
22       Again you're making these
23    generalizations about Black Lives Matter
24    that you did with the healthcare system
25    and blacks going to emergency rooms again.

US District Court - Texas                           FINAL - September 7, 2021
Daywalker v. University of Texas                        Dr. Wasyl Szeremeta

Page 341

1        MR. SOTO:  Objection;
2    argumentative; harassing.
3    BY MS. PLANTE:
4        Q.   Do you understand that it is
5    important -- do you understand that a part
6    of racism is stereotypical views of a race
7    group?
8        MR. SOTO:  Objection; form;
9    argumentative; harassing.
10   BY MS. PLANTE:
11       Q.   Go ahead.
12       A.   I understand that.
13       Q.   Okay.  And so --
14       A.   But I don't have to like every
15   organization that comes across my table
16   either.
17       Q.   Well, did you not post white
18   lives matter?
19       A.   Did I?
20       Q.   Yeah, I'll show you, since
21   you -- you don't remember, apparently.
22       (Pause.)
23       MS. PLANTE:  Who's laughing?
24   Because this is not a laughing matter.
25       MR. SOTO:  No one's laughing,

Page 342

1    Victoria.
2        MS. PLANTE:  I heard someone
3    laughing.  Maybe it's just my ears.
4    BY MS. PLANTE:
5        Q.   Do you think the NAACP would be
6    interested in this case?
7        MR. SOTO:  Objection; form;
8    speculation.
9    BY MS. PLANTE:
10       Q.   Go ahead.
11       A.   Would the NAACP be interested in
12   this case?
13       Q.   Yeah.  Based upon KKK symbols,
14   based upon --
15       MR. SOTO:  Objection.
16       Q.   -- Aunt Jemima type references
17   on Facebook posts?
18       MR. SOTO:  Objection.
19       Q.   Based upon you generalizing --
20       MS. PLANTE:  Let me say what I
21   got to say.
22       Q.   Based upon you general rising
23   all black people going to emergency rooms
24   for treatment when I, for instance, don't
25   go to an emergency room for my medical

Page 343

1    treatment.
2        So, based upon you saying in a
3    morbid and -- a morbidity and mortality
4    meeting that a black person accused you of
5    not getting -- being a racist because you
6    didn't give her child pain meds, that
7    didn't even need to be included in the
8    whole morbidity/mortality.
9        When do you ever have a --
10       MR. SOTO:  Okay.  This question
11   is --
12       MS. PLANTE:  That's fine.
13       A.   That's --
14       MS. PLANTE:  I'm moving on.
15       MR. SOTO:  Excuse me.
16       A.   That's your opinion and we
17   decide what goes in M&M.
18       Q.   Okay.  That's fine.
19       If you think race is important,
20   then fine.
21       A.   It is --
22       Q.   Did you --
23       MR. SOTO:  Okay.  Doctor,
24   there's not a question before you.
25

Page 344

1    BY MS. PLANTE:
2        Q.   Yeah.
3        My initial question was do you
4    think the NAACP would be interested in
5    your statements regarding black people.
6        MR. SOTO:  Objection; calls for
7    speculation; is harassing.
8        And, Doctor, don't answer that
9    question.
10   BY MS. PLANTE:
11       Q.   Yeah, you can.
12       Do you think that?  Yeah, you
13   have to answer that question because you
14   said the NAACP is a good black
15   organization, but BLM has a bunch of
16   criminals, is what you commented on.
17       Did you say that they were
18   criminals?
19       A.   I don't think that word ever
20   came out of my mouth.  The only person who
21   said "criminals" is you.
22       Q.   Okay.
23       Well, what did you describe them
24   as?  You said criminal activity, some type
25   of making a bunch of money off the

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                        Dr. Wasyl Szeremeta

Page 345

1  Black Lives Matter movement, embezzlement,
2  I think.
3          That's a crime, don't you
4  understand that?
5     A.   Yeah.
6     Q.   You used the term
7  "embezzlement."
8          So, you understand embezzlement
9  can happen in anything.  Can be unrelated
10 to race.
11         Do you understand that?
12         MR. SOTO:  Objection; form;
13  harassing.
14 BY MS. PLANTE:
15    Q.   Go ahead.
16    A.   The FBI investigated several
17 Black Lives Matter leaders for
18 misappropriating funds.
19    Q.   Okay.  The FBI investigated.
20         How do you know this?
21    A.   There was an article.
22    Q.   Where at?
23         MR. SOTO:  I just want to say
24  what is the relevance of any of this,
25  Victoria?

Page 347

1          MR. SOTO:  Can we take a break?
2  Can we go off the record and take a
3  break?
4          MS. PLANTE:  Well, I'm sort of
5  in the middle of a question.
6          MR. SOTO:  And what is the
7  question?
8          MS. PLANTE:  And we had
9  agreed --
10         MR. SOTO:  Fine.  What's the
11  question?  And he could answer that
12  and then we can take a break.
13         MS. PLANTE:  Well, I asked him
14  about what -- about the FBI.  If he
15  can't tell me off the cuff, then he's
16  got to look at it, then he's
17  speculating as to what the FBI did as
18  it relates to embezzlement charges
19  against Black Live Matter.
20    A.   No, you've asked me elements and
21  I'm trying to give them to you.
22    Q.   Well, you didn't do that for any
23 other thing.
24         MR. SOTO:  Doctor.
25    Q.   So that's why I'm asking you

Page 346

1          MS. PLANTE:  He's opened the
2  door.  He's telling me these issues
3  are --
4          MR. SOTO:  No one opened the
5  door.
6          MS. PLANTE:  I'm going on what
7  he says.  He said the NAACP.  He said
8  the FBI.  He said Black Live Matter
9  people, the leaders, were embezzling.
10 He's volunteered this information.  I
11 haven't asked him that.
12         MR. SOTO:  You haven't asked
13  questions about the Black Lives Matter
14  movement, Victoria?
15         MS. PLANTE:  I told him I'm on
16  something else.  We're not on Black
17  Lives Matter right now.  We're on FBI
18  and what he states that they have --
19  are you looking up something on your
20  website to see?
21         THE WITNESS:  Yeah.
22         MS. PLANTE:  Because you're
23  studying something.
24         You're not supposed to be
25  looking at something on your website.

Page 348

1  why.
2          MR. SOTO:  Can we take a quick
3  break, Victoria?
4  BY MS. PLANTE:
5     Q.   Do you understand that all Black
6  Lives Matter organizations aren't
7  affiliated?
8          THE WITNESS:  Are we taking a
9  break?
10         MR. SOTO:  Can you answer that
11  question?
12    Q.   I'm asking you a question.
13         MR. SOTO:  Can you answer that
14  question?  Then we'll take a break.
15    A.   Can you repeat the question,
16  please?
17    Q.   I said do you understand that
18 all Black Lives Matter movement, whether
19 it's an organization or whether it's a
20 community-driven thing, everybody that
21 says black lives matter is not affiliated
22 with the same organization?
23    A.   There are different black lives
24 matter organizations.
25    Q.   Okay.

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 349

1        MR. SOTO:  Can we take a five
2    minute break?
3        MS. PLANTE:  I have one more
4    question.
5    BY MS. PLANTE:
6        Q.   You made no differentiation when
7    you reposted that --
8        MR. SOTO:  Objection.
9        Q.   -- defamatory information
10   because it was deemed to be not factual by
11   Facebook, correct?
12       MR. SOTO:  Objection; form;
13   ambiguous; argumentative.
14       A.   According to their experts, who
15   I don't believe.
16       Q.   Why don't you believe the
17   experts?
18       MR. SOTO:  Okay.  You said one
19   more question, Victoria.
20       MS. PLANTE:  Well, he said "Who
21   I don't believe."  So I get to ask him
22   why doesn't he believe it.
23       MR. SOTO:  We're going off the
24   record.
25       Can you join us in the breakout

Page 350

1    room, Dr. Szeremeta?
2        I'll be back in five minutes,
3    Victoria.
4        MS. PLANTE:  Off the record.
5        THE VIDEOGRAPHER:  We are now
6    going off the record at 5:00 p.m.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  We are now
9    going back on the record at 5:06 p.m.
10   BY MS. PLANTE:
11       Q.   Dr. Szeremeta, you understand
12   you're still under oath?
13       A.   Yes, ma'am.
14       Q.   Would you agree that you take
15   false information, you don't vet it to see
16   if it's factual, and then you disseminate
17   it?
18       MR. SOTO:  Objection; harassing;
19   argumentative.
20   BY MS. PLANTE:
21       Q.   Go ahead.
22       MR. SOTO:  Ambiguous as well.
23       A.   At times I have.
24       Q.   And you did so with Dr.
25   Daywalker, didn't you?

Page 351

1        A.   No.
2        MR. SOTO:  Objection; form.
3    BY MS. PLANTE:
4        Q.   You did not?
5        A.   No.
6        Q.   Okay.
7        You didn't take what other
8    people said and you said Underbrink was
9    telling you the truth, you had no reason
10   to believe he was lying.  So you put it in
11   the document.
12       Correct?
13       A.   That's correct.
14       Q.   You didn't vet it and you
15   disseminated it, correct?
16       MR. SOTO:  Objection; form.
17   BY MS. PLANTE:
18       Q.   You didn't vet it and you
19   disseminated it, correct?
20       A.   I trust Underbrink and I trust
21   him to tell me the truth.
22       Q.   Okay.  Fair enough.  That gives
23   me the answer I need.
24       Same situation with the Black
25   Lives Matter and the Aunt Jemima Facebook

Page 352

1    post where you didn't vet it.
2        After you were told it was not
3    factual, you did not remove it, correct?
4        A.   I didn't remove it.
5        Q.   So, that's falsely disseminating
6    information that's racially charged.
7        Would you agree?
8        MR. SOTO:  Objection; form.
9        A.   Not intentionally.
10       Q.   Okay.
11       It's racially charged, but you
12   didn't mean it to be racially charged?
13       MR. SOTO:  Objection; form.
14       A.   I didn't know it was racially
15   charged.
16       Q.   Okay.
17       Were you terminated from UTMB?
18       A.   No, I was not.
19       Q.   How did you leave UTMB?
20       A.   I was resigned my position.
21       Q.   Resigned in lieu of termination,
22   or resigned because you wanted to do
23   something else?
24       A.   No, my contract was renewed.  I
25   just decided to do something else.

US District Court - Texas                     FINAL - September 7, 2021
Daywalker v. University of Texas                    Dr. Wasyl Szeremeta

Page 353

1    Q.   Your contract was not renewed?
2    A.   It was renewed.
3    Q.   Oh, contract was renewed and you
4  decided to do something else.
5         Were you tenured at UTMB?
6    A.   No, I was not.
7    Q.   Were you looking to be tenured?
8    A.   No, I was not.
9    Q.   So, where do you currently work?
10   A.   I work at Children's ENT of
11 Houston.
12   Q.   Do they pay you more money than
13 UTMB?
14   A.   Yes, they do.
15   Q.   Okay.
16        Did you leave for the money?
17   A.   Partly.
18   Q.   You leaving had no correlation
19 to three people accusing you of
20 discrimination?
21   A.   None whatsoever.
22   Q.   You believe that's -- at some
23 point, you have to assess within yourself
24 if three people have stated that, I have
25 re -- have discriminated against them on a

Page 354

1  protected class, that maybe I need to
2  self-evaluate?  Have you ever thought
3  about that?
4         MR. SOTO:  Objection; form.
5    A.   I was cleared of any wrongdoing.
6    Q.   Yeah, by UTMB.  We don't know
7  what a jury will find.
8         But you understand UTMB, I don't
9  know that I've seen anything where they
10 have actually found any form of
11 discrimination.  So, is that why you feel
12 you were not discriminatory, because
13 UTMB's black staff determined that you had
14 not discriminated?
15        MR. SOTO:  Objection; form;
16    argumentative; harassing as to the
17    black staff comment.
18 BY MS. PLANTE:
19   Q.   Well, it was black staff, wasn't
20 it?
21        It was Miss -- Ms. Thibodeaux
22 and Ms. Ongeri are black, correct?
23   A.   I believe so.
24   Q.   Ms. Beamon's black, correct?
25        MR. SOTO:  Objection.

Page 355

1         Don't answer that.
2         MS. PLANTE:  Well, I know she's
3    black.  So I've already spoken with
4    her.  She's black.
5  BY MS. PLANTE:
6    Q.   So, you believe because black
7  people have exonerated you, then you're
8  not -- you're not responsible or liable
9  for any kind of discrimination?
10        MR. SOTO:  Objection; harassing;
11    argumentative.
12        Don't answer the question,
13    Doctor.
14 BY MS. PLANTE:
15   Q.   You can answer.
16        MR. SOTO:  Or --
17 BY MS. PLANTE:
18   Q.   If you don't answer the
19 question --
20        MR. SOTO:  I'm instructing
21    him -- can I give my instruction?
22        MS. PLANTE:  No, you're not
23    going to instruct him.
24        If you're going to instruct him
25    not answer, then I'm going to take

Page 356

1  whatever answer that works in my
2  favor.  Because he could just deny it,
3  but he'd rather not deny it.  You'd
4  rather rely on an objection.
5         You don't have any -- any legal
6  reason, unless it's privileged, unless
7  you told him some racist stuff or he
8  told you some racist stuff, there's no
9  privilege.
10        MR. SOTO:  Excuse me.
11    I am instructing him not to
12 answer as this question is harassing.
13        MS. PLANTE:  It's not harassing.
14        MR. SOTO:  Pursuant to --
15 pursuant to Federal Rule of Civil
16 Procedure 30.
17        MS. PLANTE:  Okay.
18        You -- no, I don't think you
19 can -- you can --
20        MR. SOTO:  And we will be moving
21 to limit the deposition related to
22 this pursuant to that rule.
23        MS. PLANTE:  Whatever you want
24 to do, you do.  You don't have to keep
25 telling me that.  You just go into the

JANE ROSE REPORTING                      National Court-Reporting Coverage
1-800-825-3341                           janerose@janerosereporting.com

US District Court - Texas                    FINAL - September 7, 2021
Daywalker v. University of Texas                  Dr. Wasyl Szeremeta

Page 357

1    court and you file whatever motion.
2    You don't have to continue to tell me
3    that.
4         Thank you.
5         You are -- let me just move on.
6    BY MS. PLANTE:
7         Q.   Okay.
8         Are you a supporter of President
9    Trump?
10        MR. SOTO:  Objection; harassing;
11   irrelevant.
12        MS. PLANTE:  It is -- it's very
13   relevant as to race because black
14   people think President Trump, a lot of
15   them think he's a racist.
16        MR. SOTO:  Are you generalizing
17   all black people?
18        MS. PLANTE:  I said a lot of
19   black people.  Did you hear me?
20   BY MS. PLANTE:
21        Q.   You can answer, sir.
22        A.   Yes, I'm a supporter of
23   President Trump.
24        Q.   You have a lot of posts on your
25   Facebook page regarding President Trump,

Page 358

1    former President Trump, correct?
2         A.   Correct.
3         Q.   Would you consider yourself a
4    nationalist, as he has?
5         MR. SOTO:  Objection; form.
6         A.   No.
7         Q.   Why wouldn't you consider
8    yourself a nationalist?
9         A.   I don't identify myself with any
10   political party.
11        Q.   It's not a political party.
12   It's actually a -- a thought process, a
13   theory of what your position is about
14   America.
15        MR. SOTO:  Objection; ambiguous.
16        A.   I don't --
17        MR. SOTO:  Objection; ambiguous.
18   BY MS. PLANTE:
19        Q.   Do you not know what a
20   nationalist is?
21        A.   Yes, I know what a nationalist
22   is.
23        Q.   Okay.
24        What's your definition?
25        A.   A nationalist is someone who

Page 359

1    puts the nation first.
2         Q.   Someone who puts the nation
3    first over, would you say, discrimination?
4         MR. SOTO:  Objection; form.
5         A.   I don't know again.
6         Q.   A nationalist would put the
7    nation first over racism?
8         MR. SOTO:  Objection;
9    speculation.  He's already said he
10   doesn't identify as a nationalist.
11        A.   I don't know.  I already told
12   you I'm not a nationalist.
13        Q.   You said the nationalists put
14   the country first.
15        Do you not put your country
16   first?
17        MR. SOTO:  He said he wasn't a
18   nationalist, Victoria.
19        MS. PLANTE:  I asked him did he
20   not put his country first.  So that's
21   not saying he's a nationalist.
22        MR. SOTO:  Harassing.
23        Objection; harassing.
24   BY MS. PLANTE:
25        Q.   Go ahead.

Page 360

1         A.   I haven't had a reason to put
2    America first.
3         Q.   Okay.
4         Do you take any position with
5    someone kneeling at the flag or national
6    anthem?
7         MR. SOTO:  Objection; form;
8    irrelevant.
9         Where are we going with this,
10   Victoria?
11        MS. PLANTE:  This goes to a race
12   case.
13        Do you understand that racism
14   doesn't exist in a vacuum?  It
15   comes --
16        MR. SOTO:  But what does it have
17   to do with the facts in this case?
18        MS. PLANTE:  It does have to do
19   generalizations about black people.
20        MR. SOTO:  Victoria, I mean --
21        MS. PLANTE:  He definitely made
22   them about Dr. Daywalker, so.
23        MR. SOTO:  Okay.
24        MS. PLANTE:  I think it has
25   something to do.  If it doesn't, you

JANE ROSE REPORTING                    National Court-Reporting Coverage
1-800-825-3341                         janerose@janerosereporting.com

US District Court - Texas                      FINAL - September 7, 2021
Daywalker v. University of Texas                      Dr. Wasyl Szeremeta

Page 361

1    can save that for later.  Depositions
2    is discover in -- to discover
3    information.
4         MR. SOTO:  But they're not for
5    harassing the witness.
6         MS. PLANTE:  I'm sure Judge
7    Brown will be very liberal in
8    sustaining your objections.
9         So why don't you just rely on
10   that, and we can move forward, okay.
11   BY MS. PLANTE:
12   Q.   Do you believe black people have
13   to work twice as hard to be equal to?
14        MR. SOTO:  Objection; form;
15   harassing.
16   A.   No.
17   Q.   Why do you say that?  You're not
18   black.
19   A.   You asked me what I believe.
20        MR. SOTO:  Objection; form.
21   A.   And that's what I believe.
22   Q.   So you don't believe it's harder
23   for a black person in America than it is
24   for a non-black person?
25        MR. SOTO:  Objection; form.

Page 362

1    That's not what you asked him,
2    Victoria.
3         MS. PLANTE:  Well, he can answer
4    this question.
5    A.   You asked me what I believe.  I
6    told you what I believe.
7    Q.   I don't think you answered my
8    last question.
9         MS. PLANTE:  Can you repeat it,
10   Marie?
11        (The requested portion of the
12   record was read back by the court
13   reporter.)
14   A.   No.
15   Q.   Do you believe racism exists?
16   A.   Yes.
17   Q.   In America?
18   A.   Worldwide.
19   Q.   Do you believe the killing of
20   George Floyd was racist?
21        MR. SOTO:  Objection.
22   A.   I don't know --
23        MR. SOTO:  Argumentative.
24        Doctor, just let me get my
25   objection on.  I'm sorry.

Page 363

1         Objection; argumentative;
2    harassing.
3    A.   I don't know the full details of
4    the case to make a valid comment.
5    Q.   Do you believe that George Floyd
6    was murdered by a cop?
7    A.   I don't know the full details of
8    the case to make a valid statement.
9    Q.   Do you realize he was convicted
10   by a jury to have murdered George Floyd?
11   A.   They had more information than I
12   did.  So I have to trust the findings of
13   the jury.
14   Q.   Okay.
15        You trusted the findings of the
16   embezzlement FBI allegations and you said
17   that they were firm.  You were firm on
18   that.
19        Now you're saying that the
20   George Floyd thing you would need more
21   information?
22        MR. SOTO:  Objection.
23        Objection; mischaracterizes the
24        testimony.
25

Page 364

1    BY MS. PLANTE:
2    Q.   Did you not say earlier that
3    Black Lives Matter people associated with
4    Black Lives Matter, they had been found to
5    have embezzled money?
6    A.   Yes, there was a story about
7    that.
8    Q.   Okay.
9         And you read that just -- and
10   you accepted it for face value based upon
11   whatever information was told, you believe
12   that to be true because you told me about
13   it, correct?
14        MR. SOTO:  Objection.
15   A.   I believe the FBI will
16   investigate it, and if they're exonerated,
17   that will be public too.
18   Q.   Okay.
19        So, you need to see more
20   evidence to know that George Floyd was
21   murdered by the cop that kneeled on his
22   neck?
23   A.   I don't know the details of the
24   case intimately.
25   Q.   Okay.

US District Court - Texas                     FINAL - September 7, 2021
Daywalker v. University of Texas                        Dr. Wasyl Szeremeta

Page 365

1     A.   You can ask me as many times as
2   you want.  I didn't follow the case
3   closely.  I don't know all the details of
4   the case to make an intelligent answer.
5     Q.   What do you need to see?
6         MR. SOTO:  Objection; calls for
7   speculation.
8         MS. PLANTE:  I mean, it's his
9   opinion.  He said he doesn't know
10   enough details.  So I'm saying what do
11   you need to see.
12     A.   I need to see more information
13   to investigate.
14     Q.   Did you look at any of the
15   trials on TV?
16     A.   No.
17     Q.   Okay.  Well, that would have
18   provided you information and that was from
19   the court.
20     A.   I was --
21     Q.   You didn't look at anything
22   related to George Floyd?
23     A.   Nope.
24         MR. SOTO:  Objection.
25

Page 366

1   BY MS. PLANTE:
2     Q.   Matter of fact, you didn't post
3   one thing about George Floyd other than he
4   was a thug.
5         Do you remember that?
6     A.   No, I don't.
7         MS. PLANTE:  Okay.
8         I'm placing before you what's
9   been put in the chat as Exhibit 12.
10         ---
11         (Wasyl Szeremeta Exhibit 12,
12   Wasyl Szeremeta Facebook post, Bates
13   P002122, was marked for
14   identification.)
15         ---
16         MS. PLANTE:  Can you -- you can
17   download it, sorry.
18         (Pause.)
19         THE WITNESS:  I just want to
20   make -- clarify because I have a
21   Exhibit 12 and I have Exhibit 13.
22   When I click --
23         MS. PLANTE:  Exhibit 12.
24         THE WITNESS:  When I click on
25   Exhibit 12 the same thing comes up.

Page 367

1   Is it the one where --
2         MS. PLANTE:  No, 12 -- 13, I
3   don't even know if it's in there.
4         Hold on one minute.
5         MR. SOTO:  13 is a larger.
6         MS. PLANTE:  Yeah, it's a
7   children's lives matter.
8         THE WITNESS:  So, the --
9         MS. PLANTE:  The 12 is white
10   lives matter, correct?
11         You reposted that?
12         THE WITNESS:  Let me --
13         MR. SOTO:  He hasn't had a
14   chance to look at it yet.
15         MS. PLANTE:  Okay.
16         THE WITNESS:  I'm getting the
17   same thing come up.  So I'm just
18   pulling up the same thing.
19         MR. SOTO:  Can you just look at
20   12, Doctor?
21         THE WITNESS:  I'm sorry?
22         MR. SOTO:  Can you just look at
23   Exhibit 12?  I think it's a one-page
24   document.
25         THE WITNESS:  When I click on

Page 368

1   12, 13 keeps popping up.
2         Let me close 13 completely and
3   let me click on 12.
4         Okay.  Here we go.  Here we go.
5   BY MS. PLANTE:
6     Q.   So, you reposted this on August
7   14th 2020.  This is when there is a lot
8   of, you know, George Floyd stuff going on
9   and protests.  And you put a repost "white
10   lives matter."
11     A.   Yes.
12     Q.   Why did you put that?
13     A.   I felt bad for the kid.
14     Q.   But you could have said, you
15   know, this child's life was taken.
16         Are you borrowing something from
17   Black Lives Matter?  Or, what is the --
18   the reason why you would use "White Lives
19   Matter," a repost of it?
20     A.   I reposted it.
21     Q.   Yeah.
22         Why would you do that?
23     A.   Because that's what I felt.
24     Q.   So, you believe it's black
25   against white lives matter?

JANE ROSE REPORTING                     National Court-Reporting Coverage
1-800-825-3341                          janerose@janerosereporting.com

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 369

1    MR. SOTO:  Objection; form.
2    A.    I already stated all lives
3    matter.
4        In this case, the child's white.
5    White lives matter.
6    Q.    But you never posted black lives
7    matter.  The only thing you posted about
8    them was something negative.
9        Had you posted black lives
10   matter, then it would seem sort of even
11   because you posted white lives matter and
12   I believe you posted blue lives matter.
13       I don't understand why you
14   wouldn't post black lives matter just like
15   you posted white lives matter.
16   A.    Because I chose not to.  There's
17   a lot of things I don't post.
18   Q.    Okay.
19       But you see the disparity?
20       MR. SOTO:  Objection to form.
21   BY MS. PLANTE:
22   Q.    I just want you to see it.
23       You can answer.
24   A.    I don't see the disparity.  I
25   post what I want.

Page 370

1    Q.    And you just didn't feel like
2    posting anything about black lives matter
3    unless --
4        MR. SOTO:  Objection; asked and
5    answered.
6    BY MS. PLANTE:
7    Q.    Yeah, unless it was negative,
8    correct?
9        MR. SOTO:  Objection; asked and
10   answered; harassing.
11   BY MS. PLANTE:
12   Q.    Go ahead.
13   A.    I posted what I posted.
14   Q.    You don't want to answer that
15   question?
16       MR. SOTO:  He's already answered
17   it.
18   A.    I answered it.
19   Q.    Well, no, I don't believe you
20   answered it because I didn't ask it like
21   that.
22       Every question has a nuance to
23   it.  I think we were talking about black
24   lives matter, but I don't think I asked
25   you in connection with white lives matter

Page 371

1    because I hadn't even brought up the
2    exhibit at that time.
3        So, I'm asking you since you
4    proclaim in your repost white lives
5    matter, why couldn't you say the same for
6    black lives matter?
7        MR. SOTO:  Objection; asked and
8    answered; harassing.
9    A.    Because I posted this.
10   Q.    That doesn't really answer the
11   question.
12       Do you just not have an answer?
13   That's fine.
14       MR. SOTO:  Objection; harassing.
15   A.    I've already answered the
16   question.
17       MS. PLANTE:  Objection;
18   non-responsive.
19       And it will be noted you refused
20   to answer the question.
21   BY MS. PLANTE:
22   Q.    Have you been instrumental in
23   getting any black residents into the UTMB
24   otolaryngology residency program?
25   A.    Define what you mean by

Page 372

1    "instrumental"?
2    Q.    Are there any black
3    otolaryngology residents since Dr.
4    Daywalker was forced to leave?
5    A.    There have been none since she
6    resigned.
7    Q.    Okay.
8        And have you gone to any kind of
9    black universities or black, rather,
10   medical schools to recruit, as a program
11   director, any residents who would be
12   interested in otolaryngology?
13   A.    I don't go to any --
14       MR. SOTO:  Objection.
15   A.    I don't go to any universities
16   to recruit any residents.
17   Q.    Okay.
18       You made the statement that if I
19   think Dr. Siddiqui or someone had
20   mentioned that there were very few blacks
21   in otolaryngology and you stated, Well, we
22   can't make them apply.
23       Do you remember making that
24   statement in the presence of Dr.
25   Daywalker?

US District Court - Texas

FINAL - September 7, 2021

Daywalker v. University of Texas

Dr. Wasyl Szeremeta

Page 373

1    A.   I'm not sure if it's in the
2 presence of Dr. Daywalker, but yeah, I
3 made that statement because you can't --
4    Q.   Okay.
5    A.   You can't make anyone apply to
6 any residency they don't want.
7    Q.   Okay.
8    But you understand that the
9 purpose of inclusion and diversity is to
10 literally purposely go out and help the
11 dynamics change and whatever that means,
12 whether that means going to a job fair or
13 whatever it means in your career, you're
14 trying to diversify.
15    Do you understand that?
16    A.   That's the responsibility of the
17 medical schools and the deans to get their
18 medical students to diversify.
19    Q.   Okay.
20    A.   We -- our job is to pick the
21 best students.
22    Q.   Your job is to get the best
23 students, and doctor -- Dr. Daywalker when
24 she came in to UTMB was a high achiever.
25    Would you agree?

Page 374

1    A.   I never -- I never saw her
2 application, but from what you told me,
3 yes.
4    Q.   Now, you didn't get into ENT
5 initially, did you?
6    MR. SOTO:  Objection; asked and
7    answered.
8 BY MS. PLANTE:
9    Q.   Well, you didn't get into UT, it
10 was your prior testimony, correct?
11    A.   I did not get into ENT the first
12 time, yes.
13    Q.   So, are you the best to come
14 into the program if you had to do remedial
15 work to get into a residency program?
16    MR. SOTO:  Objection as to the
17    comment about remedial work as
18    mischaracterizing his testimony.
19    A.   I didn't do remedial work.
20    Q.   Well, you weren't high enough in
21 your class to be considered an
22 otolaryngology resident when you first
23 applied, correct?
24    MR. SOTO:  Objection.
25    Objection; asked and answered.

Page 375

1    Harassing at this point,
2 Victoria.
3    Can you move on?
4    MS. PLANTE:  Okay.  I'll move
5 on.
6    MR. SOTO:  How much time do we
7 have left?
8    MS. PLANTE:  I'm getting ready
9 to go off the record to see how many
10 more questions I have to ask, but I
11 think I've -- I've gotten everything
12 covered.
13 BY MS. PLANTE:
14    Q.   I think I wanted to ask you, you
15 have strong heritage in Ukrainian
16 community, correct?
17    MR. SOTO:  Where is this going,
18 Victoria?  This seems completely
19 inappropriate.
20    MS. PLANTE:  I don't -- this --
21 like I said, just say "relevancy" and
22 you object later.  You don't police my
23 deposition.
24    MR. SOTO:  Well, I'm not going
25 to let you harass the witness.

Page 376

1    MS. PLANTE:  I'm not harassing
2 him.
3    MR. SOTO:  What does his
4 heritage --
5    MS. PLANTE:  I'm asking him
6 about a heritage of -- he is a --
7 he -- he can say he doesn't want to
8 answer if he doesn't want to answer,
9 but I thought he said he was -- I
10 thought he talked about being
11 associated with Ukraine organizations
12 and being a I believe he said a -- in
13 a officer role.
14    So, why is this off-limits?  I
15 don't understand why you're trying to
16 gag me.
17    MR. SOTO:  I'm not trying to gag
18 you.  I'm trying to stop you from
19 harassing the witness.
20    MS. PLANTE:  Yeah, you will not
21 gag me.
22    MR. SOTO:  So, just to let you
23 know, I'm fine with you asking
24 questions related to the facts of this
25 case, but to the extent you're going

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                         Dr. Wasyl Szeremeta

Page 377

1    to go off about his heritage or --
2        MS. PLANTE:  No, I'm not talking
3    about any -- you don't even know where
4    I'm going.  You won't even let me get
5    started.
6        So why don't you just try to
7    chill for a minute and then let me ask
8    my question and then --
9        MR. SOTO:  I'm calm, Victoria.
10   I just want to know --
11       MS. PLANTE:  You're just wasting
12   my time.
13   BY MS. PLANTE:
14   Q.   Dr. Szeremeta, are you proud of
15   your Ukrainian ancestry?
16   A.   Yes.
17   Q.   So much so you've become a part
18   of an organization that is about, you
19   know, I guess helping other Ukrainian
20   people in America?
21   A.   Yes.
22   Q.   Do you believe Ukrainian lives
23   matter?
24   A.   Yes.
25       MS. PLANTE:  I'm going to go off

Page 378

1    the record.  And I'm almost done.
2        I'll take ten minutes.  Thank
3    you.
4        THE VIDEOGRAPHER:  We are now
5    going off the record at 5:32 p.m.
6        (Recess taken.)
7        THE VIDEOGRAPHER:  We are now
8    going back on the record at 5:44 p.m.
9        MS. PLANTE:  I think I had
10   Exhibit 19, which is Dr. Daywalker's
11   rebuttal to your remediation in the
12   chat.
13       Can you still see it?
14   I could still bring it up, but
15   I'm not sure if you can.
16       THE WITNESS:  Yes, I have it.
17       MS. PLANTE:  Okay.
18   BY MS. PLANTE:
19   Q.   Okay.
20       Now, if you will take Exhibit 1
21   out, I had you look at that, but I wanted
22   to just ask you did you con -- did you
23   ever change your position as it relates to
24   her remediation based on the rebuttal
25   evidence that she submitted?

Page 379

1    A.   Did I change my --
2    Q.   Did you change the remediation
3    in any way, the document, amend it to
4    correct some things that --
5    A.   No.
6    Q.   Why not?
7    A.   The remediation was -- letter
8    was issued for the CCC.
9    Q.   I mean, but the CCC could have
10   gotten the -- what's Exhibit 19 and gone
11   through it.
12       Did you ever go to a meeting at
13   the CCC where you said, Let's look at Dr.
14   Daywalker's rebuttal evidence to determine
15   whether these statements in the
16   remediation are true?
17   A.   No, we did not.
18   Q.   Why not?
19   A.   We didn't.  We had already made
20   our decision.
21   Q.   So it didn't matter about
22   facts --
23       MR. SOTO:  Objection.
24   Q.   -- in this case?
25       MR. SOTO:  Objection.

Page 380

1    A.   We had -- we had the facts.
2    Q.   Okay.
3        Didn't she provide electronic
4    records to negate the allegation that --
5    hold on just one minute.
6        (Pause.)
7        It looks like on page Exhibit 1,
8    page 5.
9    A.   Page 5.
10   Q.   And it starts in the middle.  It
11   says:  What is even more troubling is the
12   matter of the patient you were caring for
13   at VL.
14       Do you see that?
15   A.   The matter of the patient you
16   were taking care of at VL, you're chief
17   resident, yes.
18   Q.   Okay.
19       She provided the electronic
20   medical records negating this statement,
21   correct?
22   A.   Where would that be?
23   Q.   Did you read the rebuttal?
24   A.   Yeah, a while ago.
25       MR. SOTO:  Can you let him --

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                        Dr. Wasyl Szeremeta

Page 381

1   BY MS. PLANTE:
2       Q.   Okay.  Open it up.
3           MS. PLANTE:  Yeah, he can open
4   up the rebuttal 'cause it's there.
5           MR. SOTO:  Aware the rebuttal
6   is --
7           MS. PLANTE:  Just one minute.
8       A.   Okay.  I'm looking at the
9   paragraph.
10          (Pause.)
11      Q.   Okay.  Look at Appendix B, as in
12   bravo, on the attachments to the rebuttal.
13      A.   Appendix --
14      Q.   B.
15      A.   B.
16          Okay.
17      Q.   Okay.
18          Is this the patient you were
19   talking about in that paragraph we just
20   read?
21      A.   I don't know.  I -- I'd have to
22   look at it carefully.
23      Q.   Okay.
24          Well, I want you to look at it
25   carefully, because a person's career was

Page 382

1   lost because of this.
2           MR. SOTO:  Objection; form to
3   that sidebar statement.
4       A.   (Perusing document.)
5       Q.   Okay.
6           Did you see the electronic data
7   that she provided to refute that statement
8   regarding "what is even more troubling is
9   the matter of the patient you were caring
10   for at VL"?  Is this the patient she was
11   caring for at VL, which is Appendix
12   Exhibit B attached to exhibit -- I mean,
13   Appendix B attached to Exhibit 19?
14          (Pause.)
15          MS. PLANTE:  Okay.  I'm going to
16   go off the record while he reviews it
17   because I don't want to waste my time.
18      Q.   Are you finished?
19      A.   Yeah, it appears to be the same
20   patient.
21      Q.   Okay.
22          And what about this document did
23   not satisfy you where you would go back
24   and amend the remediation at least to
25   remove that violation?

Page 383

1       A.   Presented to the -- it would be
2   presented to the CCC.  If the CCC wanted
3   to remove that, they would.
4       Q.   Okay.
5           You're passing the buck to the
6   CCC, but you're the program director,
7   correct?
8       A.   Right, but I --
9           MR. SOTO:  Objection; harassing
10   to the sidebar.
11          MS. PLANTE:  Okay.
12      A.   I don't make decisions on my
13   own.  It's always done through the CCC.
14      Q.   Didn't you recommend to the CCC
15   that she be placed on remediation?
16      A.   As part of a discussion in the
17   CCC, yes.
18      Q.   Yes.
19          It was your idea she be placed
20   on remediation and then they took it from
21   there, correct?
22      A.   No.
23          MR. SOTO:  Objection.
24   Objection; argumentative; harassing.
25

Page 384

1   BY MS. PLANTE:
2       Q.   Okay.  Go ahead.
3       A.   We were discussing her
4   performance and the question was do we --
5   what do we keep doing because we kept
6   kicking the can down the road, as it were,
7   and at some point, we had to, you know,
8   step up, and remediation was a
9   possibility.  It's -- it was proposed and
10   then it's discussed.  And if they decided
11   not to do it, then we wouldn't have done
12   it.
13      Q.   Was Dr. Pine in agreement?
14          MR. SOTO:  Objection; asked and
15   answered.
16      A.   I don't remember.
17      Q.   Okay.
18          Okay.  Let's go to the other
19   information that we may not have gotten
20   through in this remediation letter.
21          So we've addressed that.
22          What about this accusation she
23   didn't attend a conference on page 3 of
24   Exhibit 1?
25      A.   Exhibit 1, that's the other

JANE ROSE REPORTING                        National Court-Reporting Coverage
1-800-825-3341                             janerose@janerosereporting.com

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                  Dr. Wasyl Szeremeta

Page 385

1   exhibit.
2       (Pause.)
3       A.   Page 3.
4           Conference.
5           Are you talking about the
6   paragraph that says:  You also asked to
7   leave the operating room on Thursday to
8   attend the conference.  Your participation
9   was not until two days later on Saturday
10  and you were not present at the conference
11  on Friday as was noted by Dr. McCammon.
12      Q.   Now, were you present at the
13  conference?
14      A.   No.  The conference was out of
15  town.
16      Q.   Okay.
17          Again you're relying on what
18  allegedly Dr. McCammon stated, correct?
19          MR. SOTO:  Objection as to
20  "you."  Ambiguous.
21  BY MS. PLANTE:
22      Q.   The -- the letter is from you,
23  correct?  It's signed by you, correct?
24      A.   Dr. McCammon, just like
25  Dr. Underbrink, I trust their information.

Page 386

1   Dr. McCammon was the former program
2   director and the vice-chair of the
3   department.
4       Q.   Okay.
5           Did she put it in writing?
6       A.   I'd have to check if there's an
7   e-mail.  I know she told it -- she told
8   us.
9       Q.   She told you that Dr. Daywalker
10  was not present at the conference on
11  Friday?
12      A.   Yes.
13      Q.   Okay.
14          And if Dr. Daywalker told you
15  she was present, if you had to believe her
16  or Dr. -- if you had to believe Dr.
17  McCammon or Dr. Daywalker, you're saying
18  you chose to believe Dr. McCammon?
19      A.   Yes.
20      Q.   Did you vet it with anyone else
21  that attended the conference?
22      A.   I don't know if anyone else
23  attended the conference.
24      Q.   Dr. Watts attended the
25  conference, didn't she?

Page 387

1       A.   I don't remember if she did or
2   didn't.
3       Q.   Okay.
4           But I assume because if you
5   didn't know if she didn't attend that you
6   didn't vet it through her?
7           MR. SOTO:  Objection; form.
8   BY MS. PLANTE:
9       Q.   Correct?
10      A.   I got information from Dr.
11  McCammon, as the letter says.
12      Q.   Do you understand why Dr.
13  Daywalker found this to be defamatory and
14  libelist?
15          MR. SOTO:  Objection;
16          speculation; calls for legal
17          conclusion.
18  BY MS. PLANTE:
19      Q.   Weren't you aware that Dr.
20  Daywalker found this to be defamatory, the
21  entire remediation to be defamatory and
22  slanderous?
23      A.   Dr. Daywalker was placed on
24  remediation to improve her performance.
25      Q.   Are you not going to answer my

Page 388

1   question?
2       A.   I answered your question.
3       Q.   You did not answer your -- my
4   question.
5       A.   I gave the reason why I --
6           MS. PLANTE:  Objection;
7           non-responsive.
8       A.   -- replaced her on remediation.
9           MS. PLANTE:  Objection;
10          non-responsive.
11      Q.   Dr. Pine stated he had zero
12  input in the letter.
13          Is that true?
14      A.   That's not true.
15      Q.   Okay.
16          Was this -- remediation is a
17  corrective tool, correct?
18      A.   Yes, it is.
19      Q.   It's not to punish, correct?
20      A.   Correct.
21      Q.   Do you have any reason to --
22  reason why Dr. Chaaban would put in an
23  e-mail we need to punish -- I mean, Dr.
24  Coblens, I'm sorry.  Would put in an
25  e-mail that Dr. Daywalker needed to be

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 389

1  punished?
2      MR. SOTO:  Objection;
3  speculation.
4      A.   You would have to ask Dr.
5  Coblens.
6      Q.   Did she ever tell you that she
7  believed that she was to be punished?
8      A.   I don't --
9      MR. SOTO:  Objection; ambiguous.
10 BY MS. PLANTE:
11     Q.   Pardon me?
12     A.   I don't recall.
13     Q.   Okay.  I have the e-mail.  I'll
14 bring it up.  Just one minute.
15     (Off-the-record discussion in
16     the proceedings.)
17     MS. PLANTE:  Okay.
18     I've placed in the chat what's
19     been marked as Exhibit 26.
20     ---
21     (Wasyl Szeremeta Exhibit 26,
22     e-mail chain 5/28/2018, Bates
23     OAG-0003171, was marked for
24     identification.)
25     ---

Page 390

1  BY MS. PLANTE:
2      Q.   Can you tell me if this is an
3  e-mail -- well, let me let you.  Sorry.
4      A.   I'll pull it up.
5      Q.   Okay.
6      (Pause.)
7      A.   So, this looks like an e-mail
8  from Dr. Coblens.
9      Q.   Do you see "we need some kind of
10 punishment" down there highlighted?
11     A.   There is something blocked out.
12     Q.   Okay.  I'm going to have to
13 remove it.  Hold on.
14     I didn't know this from the last
15 deposition, so I highlighted it there.
16     (Pause.)
17     MS. PLANTE:  Okay.
18     This is 26 with the
19     un-highlighted portion.  I know the --
20     sorry about that, Marie.
21     A.   Okay.  Yeah, I see it.
22     Q.   Okay.
23     We'll just have -- I'll just
24 note that the first 26 has a part of it
25 redacted because of highlights, but the --

Page 391

1  the 26 we're referencing now in the record
2  does not have the part missing.
3      Do you remember receiving this
4  e-mail from Dr. Coblens?
5      A.   I don't remember it, but you've
6  clarified my recollection.  This looks
7  like recommendations for changes.
8      Q.   Okay.
9      And do you know why Dr. Coblens
10 would feel comfortable e-mailing something
11 like this to you?
12     MR. SOTO:  Objection
13 speculation.
14     A.   I don't have --
15     Q.   Okay.
16     A.   I don't know.  You have to ask
17 Dr. Coblens.
18     Q.   Okay.  That's fine.
19     That number 5 is what I'm
20 discussing.
21     What -- what we were addressing
22 previously.  If you'll read it into the
23 record, 5, from Dr. Coblens to you in an
24 e-mail?
25     A.   It says:  5.  We need some kind

Page 392

1  of punishment.  I feel like the
2  expectations are the same that we expect
3  from all residents.
4      Q.   Okay.
5      Was she deviating from the
6  purpose of the remediation by making it
7  punitive?
8      A.   Yes.
9      Q.   Did you question her objectivity
10 at that point?  If she is coming to you
11 asking that you make it punitive, would
12 you consider any information that she's
13 provided to you?
14     MR. SOTO:  Objection; form.
15     A.   No, not necessarily.
16     Q.   Did you rely on any information
17 that you received in the remediation from
18 Dr. Coblens?
19     A.   I'm sure I probably did, but I
20 don't remember what.
21     Q.   Okay.
22     And you had -- you would have
23 received this e-mail prior to giving the
24 remediation letter to Dr. Daywalker,
25 correct?

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                                 Dr. Wasyl Szeremeta

Page 393

1    A.   I believe so.
2    Q.   Now, there is a reference, and
3  we can go back to page 2 of Exhibit 1,
4  which is the remediation.  And it is the
5  fourth section down.  Sort of like the
6  third paragraph, but the fourth section
7  down.
8    A.   Page 2, okay.
9    Q.   It says:  In one specific case
10 your failure to provide accurate and
11 timely chemical documentation for an
12 outpatient visit caused a 19 year old
13 patient to have her surgery cancelled.
14       Did you vet this to be true?
15   A.   This is what Dr. Underbrink told
16 me.  I believe it was Dr. Underbrink's
17 patient.
18   Q.   Okay.  I want you to turn to
19 page Appendix A of Exhibit 19, which is
20 the rebuttal.  Okay.  I think it's going
21 to be 17 on the pdf.  That will probably
22 get you there quickly.
23   A.   You mean appendix A?
24   Q.   Yes.  And it's 17 in the pdf.
25 If you just put 17 in there, you should

Page 394

1  get to the appendix that I'm referencing.
2    A.   Okay.  Because I've got page 11.
3    Q.   Are you looking at Exhibit --
4    A.   19.
5    Q.   -- 19?
6    A.   Yeah.
7         Appendix A is a blank page.  And
8  then I've got two black marks.  Telephone
9  8/18/17 conversation medication concerning
10 Latifa Jefferson 19 year old female.
11   Q.   Yes.
12   A.   Okay.  So this is what we're
13 looking at.
14   Q.   Yeah.  This is the 19 year old
15 female.
16       Are you on page 17 of the pdf?
17 I'm actually talking about the actual page
18 number of the pdf, not the actual page
19 number in the document or the Bates
20 number.
21       It's going to be date of service
22 11/17/2017.
23   A.   Okay.  Looks like a note from
24 Dr. Underbrink?
25   Q.   Yes.  That's it.

Page 395

1         Now, the highlighted portion,
2  can you see in there Dr. Underbrink gave
3  you Dr. Daywalker the patient MRN and you
4  pulled the EMR and Dr. Walker pulled the
5  EMR.  I'm trying to understand all this
6  medical terminology.
7         Is that what it was regarding?
8    A.   I would assume so.  It looks
9  like she was originally a patient with
10 Underbrink, and then I ended up doing her
11 surgery, or rescheduled with me.
12   Q.   Who wrote the clinic note?
13   A.   That note would have been
14 written by --
15   Q.   Underbrink at the top maybe?
16   A.   I don't -- I don't know whether
17 Underbrink wrote it or I wrote it and he
18 signed it or a scribe wrote it and he
19 signed it.
20   Q.   Well, if he signed it, he
21 approved it, correct?
22   A.   Correct.
23   Q.   Okay.
24       You trusted Dr. Underbrink, is
25 your prior testimony?

Page 396

1    A.   Yes.
2    Q.   Okay.
3         Now, in the highlighted areas it
4  gives you, the highlighted area, do you
5  see it sort of highlighted and sort of
6  boxed in with red information -- I mean
7  with the red box?
8    A.   Yes.
9    Q.   Okay.
10       What does it tell you about the
11 patient in question?
12   A.   The highlighted box, or the
13 entire note?
14   Q.   The highlighted box.
15   A.   Looks like she was scheduled for
16 surgery that got cancelled because of
17 Hurricane Harvey.
18   Q.   Okay.
19       So you're faulting Dr. Daywalker
20 for Hurricane Harvey and it being
21 postponed?
22   A.   No, I didn't do that.
23   Q.   Okay.
24       Well, why is it included in the
25 remediation?

US District Court - Texas                    FINAL - September 7, 2021
Daywalker v. University of Texas                    Dr. Wasyl Szeremeta

Page 397

1      A.    This was part of the evidence
2  that was given to me.
3      Q.    Well --
4      A.    Given to the CCC.
5      Q.    Okay.  Well --
6      A.    Dr. Underbrink was part of the
7  CCC.
8      Q.    Okay.
9            Well, you understood that
10  Dr. Underbrink was telling the truth maybe
11  at the time that you re -- you know, at
12  the time that you wrote the remediation,
13  but you later learned that -- is this your
14  first time learning that this was
15  postponed it was due to Hurricane Harvey
16  or -- okay.
17            It looks like she is here for
18  pre-op and reschedule with Dr. Szeremeta.
19            So, you were directly connected
20  to this case, correct?
21      A.    When it was rescheduled, yes.
22      Q.    Yes.  And, so, you could look at
23  the history and see what any -- what
24  caused any delays, correct?
25      A.    Yeah, I could apparently.

Page 398

1      Q.    Okay.
2            And you didn't, correct?
3      A.    Scheduled her for surgery, took
4  care of the patient.
5      Q.    You didn't vet it to see if,
6  even when Dr. Daywalker gave you Exhibit
7  19, that either negated what was
8  referenced or explained what was
9  referenced.  You still didn't consider
10  that in removing it from the remediation,
11  correct?
12      A.    It was not presented to the CCC
13  and we didn't remove it.
14      Q.    Okay.
15            So, the document upon which you
16  rely to demote her is partially, if you
17  would agree, false, correct?
18            MR. SOTO:  Objection; form.
19  BY MS. PLANTE:
20      Q.    Go ahead.
21      A.    I still stand by her
22  remediation.
23      Q.    I understand you stand by her
24  remediation regardless of what the facts
25  show.  You've proven that to me.

Page 399

1            MR. SOTO:  Objection to the
2  sidebar comment.
3  BY MS. PLANTE:
4      Q.    Yeah.
5            I just want it to go on the
6  record that regardless of the evidence
7  that was presented by Dr. Daywalker in
8  Exhibit 19, you still maintain that
9  position to this day?
10            MR. SOTO:  Objection; ambiguous
11  as to what position.
12  BY MS. PLANTE:
13      Q.    You maintain the remediation was
14  correct and accurate.
15      A.    Yes.
16      Q.    Great.
17            Did Dr. Resto ever tell you he
18  was in the process of, allegedly, of
19  pulling all the records on, I believe,
20  Epic to see when notes were closed to make
21  sure that Dr. Daywalker was not being
22  accused of something she did not do?  Did
23  Dr. Resto ever tell you that?
24      A.    No, he did not.
25      Q.    Were you aware that there is a

Page 400

1  audio recording where he specifically
2  tells her, and a staff member specifically
3  tells her, they're going to pull that
4  information from Epic to make sure that
5  those records that you had in the
6  remediation and not closing notes was
7  accurate?
8      A.    I'm not aware of such
9  information or a recording.
10            MR. SOTO:  Can we get a time?  I
11  think we're pretty close to being
12  done.
13            Marvin, how much time do we have
14  left?
15            MS. PLANTE:  Yeah, I'm almost
16  done.
17            THE VIDEOGRAPHER:  She has until
18  6:25 p.m.
19            MS. PLANTE:  Okay.  Worked out
20  perfectly.
21            Let me just go over some -- you
22  state -- it states in some
23  interrogatories that -- hold on.  Let
24  me get to the interrogatories.
25            (Pause.)

US District Court - Texas                        FINAL - September 7, 2021
Daywalker v. University of Texas                      Dr. Wasyl Szeremeta

Page 401

1        MS. PLANTE:  I'm going to go off
2    the record.  I got to pull a document.
3        THE VIDEOGRAPHER:  We are now
4    going off the record at 6:13 p.m.
5        (Recess taken.)
6        THE VIDEOGRAPHER:  We are now
7    going on the record at 6:19 p.m.
8        MS. PLANTE:  Okay.
9        I'm putting what's been marked
10   as Exhibit 27, which is Defendant's
11   First Set of Interrogatories to --
12   Amended Answers to Our
13   Interrogatories.
14       ---
15       (Wasyl Szeremeta Exhibit 27,
16   Defendants' First Amended Objections
17   and Responses to Plaintiff's First
18   Interrogatories to UTMB, was marked
19   for identification.)
20       ---
21   BY MS. PLANTE:
22   Q.   Do you have it open?
23   A.   Yes, I do.
24   Q.   Okay.  And I just want you to
25   focus on interrogatories number 7.

Page 402

1        I mean, I'm sorry.  The
2    interrogatory number 1.
3        I said please identify the final
4    decisionmakers who made the decision to
5    demote Daywalker from PGY4 to PGY3.  And
6    please state the date the decision was
7    made.
8        Okay.  You said this was made on
9    August 6th or 7th, correct?
10       MR. SOTO:  I'm sorry.  Did he
11   verify these interrogatories?
12       MS. PLANTE:  I don't know if he
13   verified them.
14       MR. SOTO:  Well, then can you
15   ask him that?  We're assuming he's the
16   one who --
17       MS. PLANTE:  I'll stipulate he
18   didn't verify them.  So I'm moving on.
19   BY MS. PLANTE:
20   Q.   Exhibit -- I mean, 1.  Let's
21   look at this meeting on August 6th.
22   A.   Are we on the interrogatories,
23   or are we on the CCC?
24   Q.   Well, the interrogatories
25   I'll -- it will speak for itself.  Your --

Page 403

1    the position of UTMB is that you were
2    involved, Dr. Resto was involved, Dr.
3    Makishima, Dr. Siddiqui, Dr. Chaaban, Dr.
4    Coblens, Dr. Darling, Dr. Pine,
5    Dr. Underbrink, Dr. Watts and Dr. Young.
6    Correct?
7    A.   Yes.
8    Q.   Okay.
9        And I want you to look at the
10   August 6, 2018 CCC notes, which would be
11   exhibit --
12   A.   16.
13   Q.   16.  Thank you.
14   A.   August -- that's not it.
15       MR. SOTO:  I'm sorry.  Where are
16   we looking, Victoria?
17       MS. PLANTE:  It's probably going
18   to be page, you know, maybe 6 --
19       THE WITNESS:  Page 9 of 13.
20       MS. PLANTE:  Okay.
21   A.   August 6, 2018, correct?
22   Q.   Yes.
23   A.   Yes.
24   Q.   You will note that some of these
25   people are not in this meeting, correct?

Page 404

1    A.   Correct.
2    Q.   Dr. Tammara Watts was not in
3    this meeting, correct?
4    A.   Correct.
5    Q.   So, how was she involved in the
6    decision-making on August 6th and 7th?
7    A.   So, after the CCC met and made
8    the recommendation, there was an e-mail
9    vote taken to the rest of the department.
10   Q.   So there's an e-mail out there
11   that exists that it includes a vote?
12   A.   Yes.
13       MS. PLANTE:  Okay.
14       I need that information.  Mr.
15   Soto, we have not received it.
16       MR. SOTO:  I'm not sure about
17   that, Victoria.  But we could talk
18   about that after.
19       MS. PLANTE:  Yeah, I haven't
20   received it.  I received nothing
21   regarding a vote.
22   BY MS. PLANTE:
23   Q.   Okay.
24       The verification is a document
25   that my client drafted.

US District Court - Texas                          FINAL - September 7, 2021
Daywalker v. University of Texas                        Dr. Wasyl Szeremeta

Page 405

1         MS. PLANTE:  I'm sorry.  Hold on
2    just one minute.
3         (Pause.)
4         MS. PLANTE:  Going off the
5    record for a minute.  We had the wrong
6    exhibit.
7         THE VIDEOGRAPHER:  We are now
8    going off the record at 6:24 p.m.
9         (Recess taken.)
10        THE VIDEOGRAPHER:  We are now
11   going on the record at 6:26 p.m.
12   BY MS. PLANTE:
13   Q.   Dr. Szeremeta, do you recall
14   when you testified earlier that you went
15   to the American Board of Otolaryngology
16   because the GME department of UTMB had
17   notified you that, I guess, someone had
18   contacted them?
19        MR. SOTO:  Objection; form.
20   BY MS. PLANTE:
21   Q.   Do you remember testifying to
22   that?
23   A.   I remember the GME notified me.
24   I'm not sure what the -- what the
25   pretenses of the notification were.

Page 406

1    Q.   Were you aware that Dr.
2    Daywalker was trying to get into another
3    ENT program at that time?
4    A.   I believe so.
5    Q.   Okay.
6    A.   That sounds familiar.
7    Q.   Okay.
8         And, so, at that point, you
9    changed the record to reflect that she had
10   only completed three years, correct?
11        MR. SOTO:  Objection.
12   BY MS. PLANTE:
13   Q.   Two years?
14        MR. SOTO:  Objection; form.
15   A.   That she had not completed
16   three, yes.
17   Q.   Okay.
18        So, you, in essence, blocked her
19   from going to another otolaryngology
20   program?
21        MR. SOTO:  Objection; form.
22   A.   No.  She hadn't completed the
23   requirements for me to certify three
24   years.
25   Q.   But it came from your changes

Page 407

1    that you made with the American Board of
2    Otolaryngology, correct?
3         MR. SOTO:  Objection; ambiguous.
4    A.   Because that's what -- that's
5    what the reality was.
6         MS. PLANTE:  Pass the witness.
7         MR. SOTO:  We request to read
8    and sign.
9         We'll reserve our questions to
10   trial.
11        MS. PLANTE:  Thank you, Dr.
12   Szeremeta.
13        Have a good evening.
14        THE VIDEOGRAPHER:  We are now
15   going off the record at 6:28 p.m.
16        (Off the video record.)
17        MR. SOTO:  Marie, just to talk
18   about ordering stuff.
19        We do want an expedited
20   transcript of this, but like a week is
21   fine.
22        But is it possible to get like a
23   rough draft?
24        THE STENOGRAPHER:  Sure.
25        MS. PLANTE:  You need a rough

Page 408

1    draft to prep your witness?
2         MR. SOTO:  And how soon could we
3    get a rough draft of this?
4         THE STENOGRAPHER:  Probably by
5    tomorrow, if that's okay.
6         MR. SOTO:  Yeah, this would be
7    great.
8         (Deposition adjourned at
9    approximately 7:28 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

---

Page 409

CERTIFICATE

STATE OF NEW YORK
COUNTY OF NEW YORK

I, Marie Foley, RMR, CRR, a
Certified Realtime Reporter and Notary
Public within and for the State of New
York, do hereby certify:
THAT WASYL SZEREMETA, the witness
whose deposition is hereinbefore set
forth, was duly sworn by me and that such
deposition is a true record of the
testimony given by the witness.
I further certify that I am not
related to any of the parties to this
action by blood or marriage, and that I am
in no way interested in the outcome of
this matter.
IN WITNESS WHEREOF, I have
hereunto set my hand this 15th day of
September, 2021.

MARIE FOLEY, RMR, CRR

---

Page 410

INSTRUCTIONS FOR ERRATA

NOTARY PUBLIC SIGNATURE
Not required unless agreed upon by counsel
that notary public signature is required.

Please return a copy of the signed errata
within 30 days of receipt, unless otherwise
agreed upon by counsel.  Once we receive the
signed errata, we will distribute an electronic
copy to all parties.

RETURN A SIGNED COPY VIA FAX OR EMAIL TO:
   FAX:  1-800-825-3341
   EMAIL: janerose@janerosereporting.com

Jane Rose Reporting
Administrative Offices
309 S. Main Street
P.O. Box 542
Luck, WI  54853

---

Page 411

NOTICE TO READ AND SIGN

This transcript was electronically
distributed to OFFICE OF THE ATTORNEY GENERAL
to forward to the witness.

ACKNOWLEDGEMENT OF DEPONENT

I, DR. WASYL SZEREMETA, do hereby
certify that I have read the foregoing
pages and that the same is a correct
transcription of the answers given by
me to the questions therein propounded,
except for the corrections or changes
in form or substance, if any, noted in
the attached Errata Sheet.

_____   _____
DATE      DR. WASYL SZEREMETA

Signed and subscribed to before me
this _____ day of _____, 2021.

---

Page 412

E R R A T A
PAGE / LINE / CHANGE  /  REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

---

US District Court - Texas                                    FINAL - September 7, 2021
Daywalker v. University of Texas                               Dr. Wasyl Szeremeta

Page 413

1        I N D E X   E X H I B I T S
2
3        EXHIBIT        DESCRIPTION        PAGE
4        Wasyl       Texas Medical Board Public    39
5        Szeremeta    Verification/Physician
6        Exhibit 20   Profile Wasyl Szeremeta, MD
7                     09/04/2021
8
9        Wasyl       Semi-Annual Review Walker,    71
10       Szeremeta    Rosandra Review Period
11       Exhibit 2    7/1/2016 - 12/31/2016,
12                    Bates OAG-0011666-670
13
14       Wasyl       Initiation of remediation    106
15       Szeremeta    May 30, 2018,
16       Exhibit 1    Bates OAG-0000333-339
17
18       Wasyl       CCC Meeting Minutes,         116
19       Szeremeta    Bates OAG-007483-495
20       Exhibit 16
21
22       Wasyl       Excerpt of GME handbook,     141
23       Szeremeta    Bates OAG-0013058-075
24       Exhibit 21
25

Page 415

1        EXHIBIT        DESCRIPTION        PAGE
2        Wasyl       Semi-Annual Review Walker,   242
3        Szeremeta    Rosandra Review Period
4        Exhibit 3    1/1/201 - 6/30/2017,
5                     Bates OAG-0011656-664
6
7        Wasyl       Letter August 8, 2018, from  258
8        Szeremeta    Dr. Resto to Dr. Daywalker
9        Exhibit 25
10
11       Wasyl       American Board of            297
12       Szeremeta    Otolaryngology screen shot,
13       Exhibit 24   Bates P-0001700
14
15       Wasyl       Wasyl Szeremeta Facebook     324
16       Szeremeta    post, Bates P002064-066
17       Exhibit 7
18
19       Wasyl       Wikipedia page re:           330
20       Szeremeta    Aunt Jemima
21       Exhibit 14
22
23
24
25

Page 414

1        EXHIBIT        DESCRIPTION        PAGE
2        Wasyl       Initiation Remediation       156
3        Szeremeta    letter July 9, 2018,
4        Exhibit 19   Bates P-001845-889
5
6        Wasyl       University of Texas Medical  202
7        Szeremeta    Branch House Staff Work
8        Exhibit 4    Agreement Rosandra Lakeisha
9                     Walker Otolaryngology,
10                    Bates OAG-0011300-302
11
12       Wasyl       UTMB Health Department of    212
13       Szeremeta    Internal Investigations
14       Exhibit 22   Investigation Report, Date
15                    of Complaint: July 15,
16                    2018, Date Completed:
17                    October 2, 2018,
18                    Bates OAG-0010499-521
19
20       Wasyl       Letter October 30, 2018,     236
21       Szeremeta    Bates P-001844
22       Exhibit 23
23
24
25

Page 416

1        EXHIBIT        DESCRIPTION        PAGE
2        Wasyl       Wasyl Szeremeta Facebook     337
3        Szeremeta    post, Bates P002117
4        Exhibit 11
5
6        Wasyl       Wasyl Szeremeta Facebook     366
7        Szeremeta    post, Bates P002122
8        Exhibit 12
9
10       Wasyl       E-mail chain 5/28/2018,      389
11       Szeremeta    Bates OAG-0003171
12       Exhibit 26
13
14       Wasyl       Defendants' First Amended    401
15       Szeremeta    Objections and Responses to
16       Exhibit 27   Plaintiff's First
17                    Interrogatories to UTMB
18
19
20
21
22
23
24
25

JANE ROSE REPORTING                          National Court-Reporting Coverage
1-800-825-3341                               janerose@janerosereporting.com

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 417

```
 1          DIRECTION NOT TO ANSWER
 2          PAGE   LINE
 3           28      7
 4          223     15
 5          224      4
 6          304     10
 7          312     20
 8          344      8
 9          355      1
10
11
12
13          MARKED BY COUNSEL
14          PAGE   LINE
15          108     13
16          182     10
17          184     18
18          205      4
19          248     16
20
21
22
23
24
25
```

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 397 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 418

**A**

**AB** 14:24,25 16:1
**abide** 62:1 64:17,21
  65:9,12
**ability** 12:1 31:12
  53:11 99:25
**able** 53:14 58:8
  144:24 173:25
  183:23 186:10
  233:21 234:18 267:7
  270:18 276:7 285:20
  317:19 320:7 323:13
**abnormal** 95:13
**absolutely** 238:13
  271:4 303:21 313:24
**academic** 119:13
  230:25 316:22
**accept** 62:16 241:9
**acceptance** 260:1
  261:13 262:8,12
**accepted** 364:10
**accepting** 77:10
**access** 58:6 121:25
  240:16 298:1
**accident** 98:15
**accommodation**
  68:15
**accomplishing** 267:8
**accomplishments**
  285:19
**accountability** 118:24
  142:13 143:18
  194:20
**accuracy** 238:10
**accurate** 75:6 122:9
  199:25 228:14
  393:10 399:14 400:7
**accurately** 42:18
  43:10
**accusation** 157:20
  384:22
**accusations** 157:11
**accuse** 248:22 321:19
**accused** 294:14 343:4
  399:22
**accusing** 353:19
**achiever** 373:24
**acknowledge** 157:18
  262:8 279:23
**ACKNOWLEDGEM...**
  411:8
**Act** 40:7
**action** 409:17
**actions** 191:2
**actively** 336:18
**activity** 147:17,23,24
  148:4,4 344:24

**actual** 94:9 146:19
  149:6 220:18 221:8
  247:9 254:16 394:17
  394:18
**add** 13:16 161:15
**added** 161:9
**adding** 220:16
**addition** 91:13
**additional** 28:17
  195:23 238:4
**address** 14:16 118:25
  119:4,7 120:20
  140:7 152:14
**addressed** 120:24
  131:24 384:21
**addressing** 391:21
**adjourned** 408:8
**adjust** 125:16
**administer** 53:15
**administered** 53:16
**Administrative** 410:19
**administrator** 159:8
  159:13
**admit** 98:23 322:4
**admitted** 231:13
  238:19
**adult** 51:9
**adults** 51:23
**advance** 206:23
  277:14,18 299:2
**advanced** 203:7,10
  207:3 208:11,13
  226:4 254:10 299:15
**advancement** 217:6
**advisor** 25:15
**affect** 98:2
**affiliated** 348:7,21
**affiliation** 310:20
**afraid** 184:25
**African-American**
  317:7
**afternoon** 312:2
**age** 142:17 143:24
**agents** 179:7
**aggressive** 125:12
  181:17
**ago** 8:9 25:19 46:6,17
  158:12 184:21
  380:24
**agree** 10:11 11:17,21
  11:23 29:12 41:23
  43:23 48:25 49:3
  57:14 59:11 80:21
  83:5,7,8 104:11
  108:13 109:19,20
  113:23 117:16
  123:15 124:5 144:15

  161:19,22 167:8
  168:21 174:2,15,24
  189:3 191:4 219:13
  241:15 243:23 252:1
  260:2 261:1,3,17,20
  269:14 272:10
  286:19,25 350:14
  352:7 373:25 398:17
**agreed** 183:15 259:5
  265:20,23 347:9
  410:4,9
**agreeing** 63:3,6
**agreement** 202:10,19
  256:15,20 259:18,24
  262:5 275:8 279:25
  384:13 414:8
**agrees** 62:1
**ahead** 20:13 26:13
  32:17 34:18 42:8
  52:23 53:6 56:2,25
  59:16 64:22 69:16
  79:9,20 81:2 82:12
  84:14,14 92:6 93:9
  95:4 98:13 99:8,23
  100:24 101:2 103:21
  105:6,15 110:20
  112:19 115:4 123:21
  124:13 128:4,14,25
  132:15 140:20
  144:11,20 149:10
  155:12 159:4 168:25
  174:7 175:4,17
  177:5,16 179:3,13
  180:2,15 188:7
  193:19 197:10
  198:21 200:22
  206:21 221:4 222:5
  222:16 227:9 235:14
  239:11 242:2 259:23
  260:13 261:7 264:2
  266:15 269:10
  275:14 276:2,20
  278:6 284:9 285:25
  287:21 292:24
  300:24 304:5 307:4
  309:12 311:23 314:4
  329:12 334:3 339:11
  341:11 342:10
  345:15 350:21
  359:25 370:12 384:2
  398:20
**al** 1:9
**alerts** 169:12
**algorithm** 150:3
**allegation** 147:1
  149:14 153:25 167:1
  179:14 380:4

**allegations** 119:5
  179:22 190:6 363:16
**allege** 8:15
**alleged** 96:14 104:3
  112:25 253:25
**allegedly** 74:18
  177:25 285:4 385:18
  399:18
**allow** 13:3,11 84:3
  140:9 145:17 180:21
  192:12 223:2 251:5
  256:25 267:7 286:23
  310:15
**allowed** 96:17,23
  129:5,8 137:19
  192:14 232:23 233:3
**alternating** 322:12
  323:4
**alternative** 158:9
**amazed** 208:16,20
**ambiguity** 221:2
**ambiguous** 24:18
  52:21 53:4 55:24
  56:23 69:14 99:6
  100:25 103:22 104:6
  115:25 116:2 135:8
  136:15 137:4 154:2
  175:1 176:3 186:1
  186:13 188:5,18
  194:13 201:14
  235:20 247:13
  260:16 263:4 276:18
  287:18 289:10 290:6
  294:16 295:18
  306:15 349:13
  350:22 358:15,17
  385:20 389:9 399:10
  407:3
**amend** 13:16 94:1
  379:3 382:24
**Amended** 401:12,16
  416:14
**Amendment** 322:3
**America** 310:9 340:12
  358:14 360:2 361:23
  362:17 377:20
**American** 207:14
  210:2,8 235:18,25
  237:11 238:10 240:2
  240:23 241:1 297:15
  298:2 405:15 407:1
  415:11
**amount** 26:8 147:24
  321:7
**ancestry** 19:18 377:15
**Anderson** 81:4 97:18
  97:22 103:1 135:24

**Andrew** 68:11
**answer** 10:12 11:10
  11:11 12:2,16 13:3,8
  13:12 21:6,20 22:22
  23:25 26:2 27:13
  28:8 29:5 35:1,6
  41:11 42:10 48:14
  48:16 56:13 57:21
  58:1 65:23,24 67:11
  67:22 86:11 90:4
  94:1 108:23 115:4,6
  128:10 131:14
  153:15 160:2,13,18
  162:8 174:9,10
  175:18,19 191:12,25
  192:22 216:18 217:3
  222:17,20 223:17
  224:2,5 228:14
  231:17,21,24,25
  232:3,6 233:9 251:4
  269:16,22 270:20,23
  271:1,7,9 282:19
  288:17,22,24 291:15
  293:19 300:8,14
  304:10,11,15,21
  305:9 310:2,15
  312:20 315:2,21
  344:8,13 347:11
  348:10,13 351:23
  355:1,12,15,18,25
  356:1,12 357:21
  362:3 365:4 369:23
  370:14 371:10,12,20
  376:8,8 387:25
  388:3 417:1
**answered** 22:25 32:18
  32:21 44:5,10 57:1
  83:22 84:10 89:23
  105:4,7 114:17,20
  115:2 121:1 128:12
  150:12 154:6 155:10
  175:15 180:13
  188:11 193:7 239:17
  269:7,11,15,17,19
  270:22 292:13
  313:10,17 314:2,5
  362:7 370:5,10,16
  370:18,20 371:8,15
  374:7,25 384:15
  388:2
**answering** 12:17
  67:14,16,24 68:4
  162:12 191:11
  201:19,23 217:24,25
  291:16 304:19
**answers** 10:1,2,6
  22:19 23:21 160:5

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 398 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 419

401:12 411:13
**answer's** 231:5
**anthem** 360:6
**anticipate** 323:22
**anybody** 112:9 122:22
**anymore** 49:5 97:1
254:24 323:3
**anyway** 255:2
**apnea** 322:25 323:1
**apologize** 118:2
**apparent** 87:22
**apparently** 126:12,19
146:3 326:4,6,6
337:18 341:21
397:25
**appeal** 40:16
**appear** 73:14 255:7
270:15 282:7
**appeared** 171:8
**appearing** 6:12 13:18
14:8,10
**appears** 43:23 72:17
119:8 143:20 270:16
382:19
**appendix** 381:11,13
382:11,13 393:19,23
394:1,7
**applicable** 158:2
**application** 9:3 41:14
41:21 42:13,17
94:10 374:2
**applications** 94:9
**applied** 32:12 42:13
43:17 374:23
**apply** 32:13 42:21
189:12 372:22 373:5
**appoint** 256:5
**appropriate** 92:20
183:19,21
**approval** 107:17
**approve** 129:19 130:1
**approved** 108:5
395:21
**approximately** 408:9
**April** 74:2 76:19
203:18 228:24,24
**area** 26:24 27:1,7
139:17 247:10
248:12 320:2 396:4
**areas** 70:12 320:6
396:3
**argue** 332:12
**argument** 252:15
**argumentative** 21:18
40:24 41:8 82:9
114:11,16 115:2
145:14 163:8 175:11

175:15 177:3 193:17
198:19 201:3 239:9
241:24 261:5 264:3
267:20 272:23
282:15 285:23
292:22 301:7 304:3
306:20 307:2 315:18
319:9 322:17 329:25
335:4,24 341:2,9
349:13 350:19
354:16 355:11
362:23 363:1 383:24
**arose** 198:2
**arrived** 31:17
**article** 308:16 319:16
319:20,22 320:12,15
331:10 334:9 345:21
**articles** 329:18
**articulated** 204:7
**ascertain** 58:8
**asked** 21:4 22:24
23:22 41:12 42:17
44:9 61:10,11 66:12
66:19 67:7 68:2 81:9
83:21 84:10 87:8
89:22,23 105:3,7
115:1 120:25 123:22
128:11 129:20
146:14 147:18 154:9
155:9 157:23 171:15
175:15 180:13 181:2
183:8 187:15,24
194:12 198:6 216:15
217:9 239:16 249:20
261:2 268:13 269:18
271:8 281:25 282:22
282:23 283:1 289:23
292:12 300:5 309:23
313:6,9,12,14,16
314:2 315:10 346:11
346:12 347:13,20
359:19 361:19 362:1
362:5 370:4,9,24
371:7 374:6,25
384:14 385:6
**asked/answered**
115:5
**asking** 23:2 44:22
45:4,9 49:21 57:23
60:18 63:15 67:3,4
112:10 114:4 118:10
121:9 122:5 130:16
136:10 153:22 155:6
160:14 162:22
189:18 192:12
193:10 199:9 201:21
201:22 204:3 218:21

232:1 257:11 269:1
269:25 276:13,24
290:1 293:3 314:7,9
316:8 317:12 320:13
321:3 327:13 331:24
347:25 348:12 371:3
376:5,23 392:11
**asks** 40:6 94:10 267:3
**assess** 353:23
**assessed** 204:11
**assessing** 100:20
**assessment** 69:25
85:18 99:18 100:16
164:5 175:5,7
196:14 217:8 247:1
254:1,2 284:21,23
**assessments** 144:17
**assessors** 190:16
**assigned** 278:20
283:3
**assignment** 280:16
**assistant** 2:14 31:5,18
33:3
**associate** 31:16 33:3
334:7 339:23
**associated** 364:3
376:11
**Association** 25:4
26:16
**assume** 31:7 35:1
118:13,15 126:13
128:9 132:16 221:24
387:4 395:8
**assumed** 197:21
**assumes** 41:8
**assuming** 21:10 88:14
113:8 151:12 207:14
274:22 275:15
402:15
**assumption** 88:20
197:24
**astonished** 172:20
**attached** 113:25
152:14 382:12,13
411:17
**attachments** 381:12
**attack** 335:20
**attacked** 252:8,11
**attacks** 250:24 302:13
302:16
**attend** 14:21 15:8,10
15:16 16:20 17:22
24:22 27:7,9,14,17
27:19 384:23 385:8
387:5
**attended** 14:22 15:11
386:21,23,24

**attending** 5:7 129:15
129:18,25 130:5,8
130:10 158:23
163:23 164:7,10,13
**attending's** 164:1
**attention** 141:24
173:12 244:16
245:12 248:12 281:4
339:6,7
**attorney** 2:15 6:11
13:19 14:7 87:14
211:7 411:4
**attorneys** 2:1,11,14
13:23 14:6 87:11,16
94:22
**attorney/client** 87:19
90:5
**atypical** 272:9,14,16
272:21 273:2,11
**audio** 122:13,16
123:16 400:1
**auditor** 25:16
**August** 124:23,25
125:7,7 126:4,6,6
211:21,22 233:6
257:13 258:14
337:16 368:6 402:9
402:21 403:10,14,21
404:6 415:7
**Aunt** 326:11,21 327:15
329:10 330:21 333:4
333:12 334:7,14
342:16 351:25
415:20
**Austin** 2:19
**author** 30:22 77:24
**authority** 28:22
**automatically** 198:16
**autonomy** 142:13
143:15
**available** 332:4
**Avenue** 2:4 3:9
**avoided** 193:6
**award** 40:15
**awarded** 40:14
**aware** 92:22 105:10
105:17,20 115:10
145:1,3,11 158:21
168:13,19,20 169:1
209:15 238:16
239:24 253:5,8
271:23 275:7 295:8
295:10,15 303:19,22
305:22,25 306:2
308:21 334:15 381:5
387:19 399:25 400:8
406:1

**Azeredo** 3:5 13:19
**a.m** 5:2,18 38:1,4
93:21,24 109:23
110:1

**B**

**B** 176:1,16,23,25
243:17 259:10
301:11,18 381:11,14
381:15 382:12,13
413:1
**bachelor's** 15:2
**back** 9:9 20:23 38:4
43:12 45:24 88:3
93:13,24 110:3,4,5
110:15 122:6 123:9
123:12 124:1 125:17
130:21 132:18 139:4
148:14 151:8,19,25
153:8,24 154:4
155:6 158:17 165:3
166:4 177:21 182:9
183:16 187:20 193:2
200:23 201:7 207:23
210:16 211:15,17,19
211:21 213:23
215:19,21 225:9
230:2,7 233:7 250:8
259:3,12 262:14
263:1,9,10,15,21
266:23 274:13
284:15 286:17 289:7
297:5 299:1,22
300:4,11,20 301:22
307:6,11 315:25
319:3 340:19 350:2
350:9 362:12 378:8
382:23 393:3
**background** 7:5
**Backwards** 15:4
**bad** 56:3,6 57:2,8
89:20 368:13
**ball** 164:8
**bandwidth** 5:11
**bank** 338:2
**bankruptcy** 36:21,25
37:1,3,18
**bar** 213:14
**based** 29:24 50:16
69:25 70:3 74:25,25
79:21 83:17 88:20
92:14 105:18 108:24
127:16,20 132:8
167:2,11,13 170:3
253:25 269:2 280:9
287:2 321:23 322:1
340:19 342:13,14,19

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 420

342:22 343:2 364:10
378:24
**basically** 70:4 78:14
**basing** 21:11,12
290:24
**basis** 21:22 22:4,5
23:23 127:18 132:5
190:15 200:14 267:4
268:17,21 326:9
**Bates** 39:4 71:11
106:15 116:20
141:18 156:12 168:2
202:11 212:9 236:15
242:19 297:16
324:15 337:11
366:12 389:22
394:19 413:12,16,19
413:23 414:4,10,18
414:21 415:5,13,16
416:3,7,11
**bathroom** 93:6 249:11
249:21 296:19,21
**Bay** 103:4,8,9
**Beamon** 3:4 6:16
123:1
**Beamon's** 354:24
**beating** 62:14
**becoming** 80:22
333:23
**began** 238:2
**beginning** 6:1 88:6
97:21 117:11 135:12
**begins** 5:12 267:1
**behalf** 6:9,13 13:20
340:9
**behavior** 295:9
**belief** 83:24 327:9
**beliefs** 28:19
**believe** 21:13 29:15,22
30:15 33:4,25 40:3
41:12 43:7 50:25
52:3,8,25 54:1,7,15
61:12 74:1 76:19
79:1,10 81:14,25
82:20,25 83:18
92:15,18 94:18 96:3
97:14,25 98:3
102:17,19,20,22
103:10,14 111:20
113:17 114:19,21,22
120:8 125:4 129:21
129:21 131:18 144:4
145:16,21,22 146:4
168:3 172:6 174:10
175:24 180:5,10
181:1,4 184:11,12
185:18,20 186:9

187:5 188:16 189:20
193:11 195:4 198:15
198:16 200:7 204:14
208:2,6,7,8 210:7,11
213:19 222:10 230:4
233:16 234:2,16
239:6,12 240:1
241:21 242:9 243:4
245:9 257:18,23,25
264:13 273:3,25
274:17 278:1 280:21
286:11 296:2 301:12
309:2,6 312:16,22
320:3 323:21 327:3
334:15 338:4 349:15
349:16,21,22 351:10
353:22 354:23 355:6
361:12,19,21,22
362:5,6,15,19 363:5
364:11,15 368:24
369:12 370:19
376:12 377:22
386:15,16,18 393:1
393:16 399:19 406:4
**believed** 94:23 214:19
223:7 389:7
**believes** 146:18
327:11
**believing** 23:23
**Ben's** 334:20
**best** 12:1 21:13 33:19
53:11 99:25 122:3
133:2 260:21 278:20
373:21,22 374:13
**better** 17:19 125:11
282:2
**billed** 159:10
**billion** 337:24
**birth** 14:14
**bit** 233:12 290:9 324:4
**black** 131:12,19
182:15 269:2 270:9
270:11 278:2 303:24
308:3,5,6,9 309:3,8
312:17 314:8,15,19
318:25 319:1,6
320:1,9,17,24 321:4
321:5 327:22 330:8
333:6 334:12 335:1
335:11,14 336:4
337:22,25 338:3,14
338:22,23,25 339:1
339:4,24,25 340:1,2
340:3,9,17,23
342:23 343:4 344:5
344:14 345:1,17
346:8,13,16 347:19

348:5,18,21,23
351:24 354:13,17,19
354:22,24 355:3,4,6
357:13,17,19 360:19
361:12,18,23 364:3
364:4 368:17,24
369:6,9,14 370:2,23
371:6,23 372:2,9,9
394:8
**blackened** 126:11
**blacks** 308:22 340:25
372:20
**Blackwell** 222:6
295:11
**blank** 171:6 394:7
**blanked** 236:23
**bleed** 7:5
**BLM** 340:4 344:15
**blocked** 390:11
406:18
**blocking** 87:20
**blood** 409:17
**blue** 369:12
**board** 9:4 38:12 39:16
41:15 42:5,20,22
206:24 207:2,15,24
210:2,8 235:18
236:1 237:11 238:11
238:17 240:2,3,23
241:1 253:3 254:10
254:13 257:10
297:15 298:2 405:15
407:1 413:4 415:11
**body** 26:24 27:18
262:6
**bold** 167:19 194:23,23
195:5,8
**bolded** 195:21
**Bone** 305:14,19
307:19 308:11,17
310:19
**born** 19:15,16,20,22
19:23
**borrowing** 368:16
**bottom** 74:1 333:9
**bought** 25:7 26:4
338:1
**bouncing** 181:10
**box** 329:23 334:14
396:7,12,14 410:21
**boxed** 396:6
**Boy** 24:22
**Boyd** 325:19
**Branch** 1:9 5:16 202:9
237:24 414:7
**brand** 326:13
**bravo** 381:12

**break** 10:21 11:13,19
12:3,3,6,8,9 46:4,6,7
46:10,16 66:21 93:6
140:16 164:24
224:20 239:3 249:5
249:7,8 290:8
296:19,21 347:1,3
347:12 348:3,9,14
349:2
**breaking** 164:17
**breakout** 93:13 349:25
**breaks** 10:22
**Brindley** 285:11
**bring** 9:7 220:19
257:22 304:19 330:9
378:14 389:14
**bringing** 85:14 146:19
**Brittany** 103:4,8
**Brook** 8:25 51:14
**brought** 8:18,19 12:20
21:11 95:22,24
124:8 173:11,11
183:22,22 371:1
**Brown** 68:7,8 361:7
**buck** 383:5
**build** 259:13
**bullet** 142:7
**bunch** 233:14 323:11
344:15,25
**burden** 51:7
**burn** 98:15
**burned** 95:9
**burning** 98:9
**burns** 95:16
**business** 37:2 51:4
**button** 185:4
**buying** 26:3

---

**C**

**C** 76:4
**calendar** 299:13
**call** 51:21 200:24
215:13 216:1 253:3
288:8 294:22 302:18
311:9
**called** 36:4 77:21
189:1,2 312:4,10,10
335:14
**calls** 51:25 95:1,1
179:10,18 180:7
186:4,14 188:4
287:18 327:7 344:6
365:6 387:16
**call/no** 294:14,19
**calm** 44:15 377:9
**Camden** 14:18
**cancelled** 393:13

396:16
**cancer** 110:7,14,16,22
**Capital** 36:5,14
**caps** 194:22,23,24
195:5,8,20
**captured** 72:18
**care** 31:21 51:9 53:1,7
53:15,16 62:9 63:19
65:21 66:20 97:24
98:2,9,14,24 100:16
127:25 128:8,16,18
134:9 183:20 215:13
216:1 278:22 305:2
305:3 311:24 312:7
319:13 322:14 323:4
380:16 398:4
**career** 47:21 320:6
373:13 381:25
**carefully** 381:22,25
**caring** 247:2 380:12
382:9,11
**case** 1:12 8:10,11 41:6
41:16 66:11 88:7
90:12 94:12,14,16
94:23 95:5,8 144:25
164:9 185:4,6
188:23 251:1,2
281:24 321:13
323:12 342:6,12
360:12,17 363:4,8
364:24 365:2,4
369:4 376:25 379:24
393:9 397:20
**cases** 94:10 321:13
**categories** 245:13
**Catholic** 27:15
**Caucasian** 131:3
182:15,17,20 183:2
**cause** 99:10 147:4
169:6 194:15 233:16
243:16 255:2 283:3
312:11 381:4
**caused** 52:5 74:5
393:12 397:24
**CC** 70:23 260:17
**CCC** 70:4,17,18,19,19
73:10,13,17 79:22
80:20 91:22 107:7
107:17,21 113:4,12
115:20 116:19
117:12 118:7 119:20
120:1 121:8,17
124:5,21,24 126:4
132:3,9,19,22,23
133:1 190:15 195:22
195:25 196:2,4
197:16 199:5 203:10

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 400 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 421

203:11 204:12
206:15,22 209:16,19
211:20 220:24 226:7
227:11 228:8,18,18
230:12 233:25
245:15,24 246:2,7
248:14,18 256:25
260:20 265:7,8
273:19 274:1 289:15
289:22,25 291:4
292:7,25 379:8,9,13
383:2,2,6,13,14,17
397:4,7 398:12
402:23 403:10 404:7
413:18
**CCC's** 254:1
**CDC** 146:15
**center** 9:1 17:24,25
316:22
**certain** 190:19 208:5
236:25 238:25
**certainly** 48:3 291:3
311:8
**certainty** 199:21
**Certificate** 4:10 409:1
**certified** 236:6 256:8
257:9 409:7
**certify** 206:16 254:9
406:23 409:9,15
411:11
**certifying** 238:11
240:9
**Chaaban** 388:22 403:3
**chain** 389:22 416:10
**chair** 197:17 273:25
**chairman** 31:1 273:18
**challenged** 247:5
**challenging** 135:6,20
**chance** 38:21 107:21
117:24 147:7 193:24
324:23 325:1 367:14
**change** 42:2 170:17
170:21 176:13,16
227:5 228:3,25
296:2 373:11 378:23
379:1,2 412:2
**changed** 107:13 406:9
**changes** 78:14 108:3
108:6,10 391:7
406:25 411:15
**changing** 42:10
**Chapter** 37:7,8,9
**character** 333:4
**charge** 146:15 159:15
**charged** 352:6,11,12
352:15
**charges** 347:18

**charitable** 27:22
**chart** 52:12 57:9,12
**charts** 54:4 57:25 58:2
58:2,5,9,16,25 59:4
139:23 150:3,6
151:5 153:6 157:23
159:9,14,22
**chat** 38:15 71:5 93:4
106:10 116:14
141:11 156:3,7
166:12 202:4 213:18
213:23 236:10 242:6
242:8 254:20,23
258:9,10 297:12
302:2 323:17 337:8
366:9 378:12 389:18
**check** 54:14 336:16
386:6
**checking** 296:16
325:25
**chemical** 393:11
**chemistry** 14:24
**chief** 280:17,18
380:16
**child** 8:16 321:6,20
322:25 338:1 343:6
**children's** 19:7,10
353:10 367:7
**child's** 95:9 98:9
368:15 369:4
**chill** 377:7
**choose** 329:1 330:14
**choppy** 74:17
**chose** 369:16 386:18
**Christiana** 17:25
**chronological** 125:3
**church** 26:22,24 27:1
27:2,5,7,8,9,15,16
27:21
**circumstances** 199:8
256:18
**cite** 28:21
**citizen** 111:3
**city** 14:19 318:12,17
318:18,22,23 320:1
320:6
**Civil** 28:24,25 29:2
223:20,24 356:15
**claim** 38:11 40:10,12
42:14 43:12 49:11
50:2
**claimant** 40:14
**claimed** 325:14
**claims** 7:23 40:18
87:25 177:23 178:11
178:16,18,22 212:19
251:2

**clarification** 157:8
**clarification/proof**
157:10
**clarified** 391:6
**clarify** 10:17 63:3
129:23 366:20
**class** 15:22 92:23
127:13 354:1 374:21
**cleanup** 337:25
**clear** 22:17 89:25
193:5 288:11,13,15
**cleared** 354:5
**clearer** 181:9
**clearly** 112:4 172:25
252:18 267:14,16,17
268:10 332:4 335:25
**click** 366:22,24 367:25
368:3
**client** 23:5,13 39:6
60:21 62:10 63:3,6,7
63:7,11,12,13,16
64:19 93:25 248:22
250:7,25 252:21
339:1 404:25
**client's** 60:9 64:15
101:8 205:21
**clinic** 103:4,6,8
118:21,23 125:14
158:5 284:19 287:24
287:24 312:5 320:1
395:12
**clinical** 31:21 32:1,8
33:10 126:21 127:16
259:9,12 276:6
**clinically** 59:22
**clinics** 284:23
**close** 157:24 158:9
163:19 281:17 282:3
368:2 400:11
**closed** 157:25 158:6
161:20 163:22
177:25 399:20
**closely** 118:25 365:3
**closeout** 152:16
**closest** 246:8,12
**closing** 34:21 96:5,15
152:12 167:3 400:6
**club** 24:21 319:21,24
**coach** 136:20
**coaching** 137:21
169:5,8
**Coblens** 388:24 389:5
390:8 391:4,9,17,23
392:18 403:4
**codeine** 323:2
**collect** 159:11
**collective** 196:1

**college** 14:21 15:17
16:10 325:21,22
338:1
**com** 17:1
**come** 9:9 19:24 30:13
56:9 93:13 130:1
148:13 189:13
198:12 211:19 233:3
243:21 265:6 298:25
300:3,10 320:8
367:17 374:13
**comes** 265:5 341:15
360:15 366:25
**comfortable** 391:10
**coming** 79:17 102:3
162:19 211:17
215:21 243:9 263:9
263:9 333:23 392:10
**comment** 70:15 75:16
75:24 226:23 248:5
354:17 363:4 374:17
399:2
**commentary** 79:22
81:11
**commented** 325:10
344:16
**commenting** 318:2
**comments** 56:15
58:15 70:10,13,16
74:7,9,10,18 75:9,10
75:13 76:5 77:12
84:24 101:22,24
125:10 126:8 169:25
182:7,11 184:20
208:19 245:15,21
247:24 248:1,10
295:25 302:7 330:11
336:22
**commit** 171:12
**committed** 171:16,21
**committing** 338:11
**common** 28:17 120:9
272:13
**communicate** 214:21
214:23 235:17
**communicating**
235:24
**communication** 82:14
86:2,9 87:13 139:22
239:15,25 244:18
247:4,12 248:4,7
321:16
**communications** 90:2
247:8
**community** 32:19
340:20 375:16
**community-driven**

348:20
**company** 36:4,17
95:20,21 327:5
333:24
**compassion** 96:12
142:9,20
**compassionate**
278:22
**competency** 129:6
217:7 246:22 276:6
**competency-wise**
299:25
**competent** 85:11
129:10 204:11
**competently** 207:11
**complained** 295:9
**complaining** 295:12
**complaint** 49:20 52:17
52:18 147:11 212:8
213:11 414:15
**complete** 33:18 53:14
59:13 78:24 79:5,11
82:18 83:3,19 85:10
136:1 143:3 152:15
163:2 203:9 299:8
299:11 331:23
**completed** 53:23
58:11,13,19,25 66:6
82:21 84:20,25
85:18 94:8 161:8
166:2 204:17 212:9
213:3,14 241:3
298:9 299:4,6,13,19
299:23,24 300:2,6
300:18 406:10,15,22
414:16
**completely** 298:24
368:2 375:18
**completes** 232:6
**completing** 53:2 55:17
55:20,22 56:20 59:3
80:5 85:15 129:16
204:10
**completion** 247:5
297:23 298:16,23
**compliance** 146:16
147:5,10,15 148:5,8
148:12,13,19 149:21
149:23,24 150:1,2,9
151:13,21
**complied** 88:9
**complimentary** 35:21
282:8
**comply** 63:16
**component** 31:24
32:1,3
**compound** 21:18 88:5

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 401 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 422

99:5 110:17 145:13 154:1 198:19 203:25 222:2 247:14 263:24 275:12 290:5 329:8 339:13
computer 88:15,17,18 89:13,15
computers 88:11
con 51:15 378:22
concern 70:12 74:5 118:23 232:22 237:21 321:10
concerned 150:5 311:19
concerning 394:9
conclude 189:4 248:24
concluded 193:14 320:13
conclusion 79:17 95:1 179:11,19 180:8 185:22 186:5,14,24 188:5 189:14,22 387:17
conditions 229:2 262:9
conduct 50:17 104:15 120:11 250:2,4
conducted 23:9
confederate 309:6,14
conference 306:8 308:14 384:23 385:4 385:8,10,13,14 386:10,21,23,25
confidence 259:13
confidential 60:4 61:25 66:9 71:17,21 72:1 117:3,7 205:9 205:12,19,25 206:2 206:3,5
confines 186:20
confirm 146:24 237:21
confirmation 64:16
confused 136:17 209:18 226:20 339:14,18,18,20
confusing 136:15 239:23 289:10
connected 318:22,24 397:19
connection 5:6 370:25
consent 71:24
consequence 67:21
consequences 67:20
consider 72:25 321:17 358:3,7 392:12 398:9

considered 91:25 328:3 374:21
consistent 74:10,12 78:15 79:13 191:8 194:9,16 267:4 268:4,5,7,12,14,15 268:17,21
consistently 137:18
contact 42:19 159:15
contacted 159:13 405:18
contend 75:4
CONTENTS 4:1
context 57:22 70:16 172:3 303:15
continually 339:4
continue 45:3,12,18 45:20 51:15 62:25 64:13 102:11 137:15 138:25 232:7 251:7 286:18 357:2
continued 257:6 262:9 299:17,17
continuing 101:25
continuous 247:20
continuously 58:5
contract 48:24 254:6 277:6,7 352:24 353:1,3
contrary 74:12
contributed 25:24
contributions 27:22
conversation 70:21 81:20 90:23 91:2,17 91:21 97:10,15 102:23 103:2,15 104:16,25 215:11 233:14 265:2 394:9
conversations 97:11 291:2
convey 194:25
convicted 363:9
convincing 310:21
cook 327:4 328:25
cop 363:6 364:21
copies 332:18
copy 1:24 206:2 410:7 410:11,14
corporation 327:10
correct 17:4 21:15,23 33:7 34:4,5,7 35:11 35:12,14,15 37:13 37:21 38:12 41:25 43:2,18 45:25 47:20 48:8 49:1,5,12 54:23 72:11 73:19 74:15 80:24 88:21 94:24

97:4,5 98:6,20 99:17 100:2 104:20 105:12 111:7 113:18 114:3 114:14 119:6,10 128:1,22 130:2,3 131:19 139:7 145:25 146:2 148:10 149:20 150:18,22 151:24 152:5 159:21 161:21 163:6 164:8 167:12 170:3,7 171:23,24 172:5,10,13 175:13 175:23 177:1 178:13 179:17 186:12 187:14 188:3,17 189:7 191:1 194:6 197:23 199:1 200:9 200:19 201:9,10 202:20 210:24 211:14 215:20 221:18 225:19 227:18 231:16 234:5 234:9,22 237:8,12 238:20 243:13,25 244:19 245:20 253:18,20,21 254:2 256:10,23 260:9 261:3 262:16 265:13 266:12 268:15,18 273:4 275:1 278:3 280:9,16 282:24 283:2 285:15 287:6 287:16 288:10,14 290:4 291:6,10 294:15,20,22 295:1 295:17 298:4 307:20 307:20 313:7 318:13 319:12 320:23,25 321:23 327:18 331:4 340:4 349:11 351:12 351:13,15,19 352:3 354:22,24 358:1,2 364:13 367:10 370:8 374:10,23 375:16 379:4 380:21 383:7 383:21 385:18,23,23 387:9 388:17,19,20 392:25 395:21,22 397:20,24 398:2,11 398:17 399:14 402:9 403:6,21,25 404:1,3 404:4 406:10 407:2 411:12
corrections 411:15
corrective 388:17
correctly 41:22 43:20 43:22 94:9 280:5

correlation 353:18
cost 149:16
counsel 5:24 6:14,16 13:9,17 14:8,9 88:25 94:4 229:21 410:4,9 417:13
count 55:8
country 359:14,15,20
COUNTY 409:4
couple 32:9 68:21 118:7
course 127:21 238:3 322:1 339:3
courses 300:18
court 1:1 3:12 5:8,20 6:4 12:23 62:18,20 62:22 67:15 123:12 166:4 180:6,11 181:2,3,5,6,10 183:9 184:10,11,16 186:17 186:21 187:8,14,17 187:18 188:8,10,13 189:8 266:23 284:15 289:3,7 293:18 315:25 338:18 357:1 362:12 365:19
court's 72:4 117:7
cover 32:21 46:15 281:25
covered 375:12
covering 163:23 293:21
coverup 170:17,21
coworkers 143:4
crafted 266:1
create 305:23 326:12
creating 306:1
credence 220:17
credibility 252:12
crime 345:3
criminal 136:10 167:23 168:11 180:18 344:24
criminals 344:16,18 344:21
criticized 333:5
crossbones 302:25 303:10 306:18 307:14
cross-examination 47:4
CRR 3:12 409:6,24
cuff 347:15
culture 142:18 143:24
current 158:14 240:17
currently 36:7 237:22 353:9

cut 150:4 301:13 336:25
CV 32:10,14,22 55:14 76:20

D

D 413:1
daily 267:4
damages 40:14
Darling 403:4
data 72:18 320:16 322:5 382:6
date 5:17 14:14 43:15 72:12 76:21 77:1,1,3 88:25 212:8,8 213:3 213:11,14 285:7 306:6,9,11 394:21 402:6 411:20 414:14 414:16
dated 74:2 117:13 237:7
daughter 322:9,11
day 7:8 10:23 17:6 54:5 55:21 56:20 57:4 130:10 205:23 206:6 267:11 270:13 399:9 409:21 411:23
days 52:13,15 53:2 210:23 385:9 410:8
Daywalker 1:5 3:2 5:15 6:7 7:19 33:10 47:12 53:20 64:22 65:7,11 69:12,20 70:14 72:14 73:8 74:20 75:11,17,18 75:20 77:5 79:6,13 80:23 82:7,15 86:1 87:11 88:25 89:17 90:25 91:6,14 92:15 96:2 102:25 103:16 104:1 106:3 112:2 115:12 121:14 131:18,25 134:24 145:1,7 147:6 148:20 149:17 152:9 152:17 159:21,25 161:4,5,6 162:1,23 163:1 164:3 170:25 180:21 188:25 191:5 193:12 195:17 210:14 215:16,17 226:1 230:7 232:16 239:6 245:1,23 253:4 257:4 258:15 260:22 261:1 266:3 271:19 275:3 282:24 292:15 297:24 314:8

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 402 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 423

317:24 318:7 350:25
360:22 372:4,25
373:2,23 386:9,14
386:17 387:13,20,23
388:25 392:24 395:3
396:19 398:6 399:7
399:21 402:5 406:2
415:8
**Daywalker's** 35:17,21
58:9 71:23 79:24
89:19 101:9 150:21
170:22 173:12
212:18 378:10
379:14
**dead** 62:14 312:9,9
**deadlines** 194:20
**deal** 44:24
**dealing** 12:24
**dean** 310:24 311:1
312:3,13,15,17
**deans** 373:17
**dean's** 313:4
**debating** 162:19
**December** 72:10
295:21 302:24
305:21 306:5
**decide** 62:4 226:8
343:17
**decided** 260:20
352:25 353:4 384:10
**decision** 190:13
211:18 256:24
274:12 286:8,13
313:3,5 322:6
379:20 402:4,6
**decisionmakers** 402:4
**decisions** 383:12
**decision-making**
404:6
**declined** 63:9
**deem** 171:21
**deemed** 188:1 190:7
349:10
**defamatory** 349:9
387:13,20,21
**defendant** 1:11 13:24
189:2
**defendants** 2:11 6:9
6:13 11:3,20 13:21
14:10 188:23 401:16
416:14
**Defendant's** 401:10
**defending** 14:4
**deficiencies** 34:11
117:18 253:25
**deficiency** 158:25
159:7

**deficient** 35:16 53:1,8
53:17 69:12,18
97:25 142:23,24
245:10 247:8
**Define** 371:25
**definitely** 80:9 81:21
102:3 169:4 271:10
360:21
**definition** 99:14,24
141:4 142:1 273:10
335:10 358:24
**degree** 14:23 15:2,25
16:7 176:14
**degrees** 15:24 16:3
**Delaware** 17:24 19:17
**delay** 12:25
**delays** 397:24
**deliberate** 157:12
**deliver** 260:21
**delivered** 258:1,3
**delivery** 256:10
**demographics** 318:19
**demote** 286:9 288:7
398:16 402:5
**demoted** 200:23
215:25 229:7 241:22
**demotion** 200:18
215:11,12 216:3
273:23 274:18
**deny** 356:2,3
**dep** 56:10
**department** 31:2
51:22 159:8 197:17
212:6 214:13 216:10
216:11 311:25 386:3
404:9 405:16 414:12
**DEPONENT** 411:8
**deported** 20:24,25
21:3
**deposition** 11:5 5:5,9
5:13 8:5 9:11 13:24
14:5 44:25 45:6,18
47:11 60:3 61:7 64:6
64:13 90:19 101:9
101:10 102:12
109:14 124:3 139:2
156:22 205:17
218:18 223:19 224:7
249:18,25 251:8,11
251:21 304:24 305:2
332:13 333:1 356:21
375:23 390:15 408:8
409:11,13
**depositions** 156:6
361:1
**depressed** 59:20,21
59:22,24

**depression** 64:9 65:18
67:10 68:16
**derogatorily** 309:18
**derogatory** 327:21
328:4 333:13
**describe** 344:23
**description** 40:8,11
278:12,13,19 279:5
413:3 414:1 415:1
416:1
**designate** 60:3 71:19
117:5 205:10,12,16
206:6
**designated** 117:2
205:9
**designating** 207:21
**designation** 111:9
**desire** 319:25
**details** 20:16,18 363:3
363:7 364:23 365:3
365:10
**detained** 274:20
**determine** 158:24
252:3 280:1 379:14
**determined** 40:15
221:17,19,22 354:13
**detrimental** 190:21
**Detroit** 18:2
**Devarajan** 109:3
**Devarajan's** 108:15
**deviating** 392:5
**device** 306:17
**diagnosis** 100:1 110:7
110:15,22
**difference** 118:19
170:14 202:24
232:19
**different** 24:23 49:8
55:21 99:10 167:9
170:11,12 187:9
189:15 190:1,5
199:8 200:25 235:2
271:10 300:16
316:20 348:23
**differentiation** 349:6
**differently** 56:11
158:11 251:25
316:19
**difficult** 263:11
**difficulty** 263:6,7
**diffuse** 321:16
**dinging** 133:17
**direct** 141:24 145:24
169:6,9
**directed** 184:21
**directing** 181:16
**DIRECTION** 417:1

**directly** 70:17 248:5
298:19 397:19
**director** 50:8,18 55:4
55:9 69:1,8 70:8,22
73:19 76:18 77:16
77:17 78:3,6 81:10
92:9,17,19 97:2
132:4 158:23 244:8
244:9 256:15 291:7
291:8 311:15,19
372:11 383:6 386:2
**disabilities** 142:18
143:25
**disagree** 252:1
**disagreed** 85:17
**disappeared** 166:11
**discipline** 31:12
**disclose** 9:2 41:5,19
90:5 102:16
**disclosed** 41:16
**discontinuing** 64:12
**discover** 52:10 361:2
361:2
**discrepancy** 157:15
**discriminated** 353:25
354:14
**discrimination** 7:21
41:18 49:11 353:20
354:11 355:9 359:3
**discriminator** 179:9
**discriminatory** 354:12
**discuss** 61:14 72:13
90:2 121:8 245:23
**discussed** 80:20
111:15 113:2 120:12
120:16 130:6 139:11
139:16 233:17
316:14 319:23
384:10
**discussing** 11:1 12:10
111:14 317:25 384:3
391:20
**discussion** 46:20,21
46:25 80:8,9 121:6
184:19 231:5,9,10
232:12,15 233:20
234:19 235:7 245:22
265:7 289:21 292:25
383:16 389:15
**disdain** 336:25
**dishonest** 77:6
**dishonesty** 118:24
**dismiss** 282:6
**dismissed** 279:24
**disparity** 314:12,13
369:19,24
**display** 40:8

**disposition** 293:16
**disproportionately**
317:6
**dispute** 238:10
**disputed** 209:8
**disregard** 241:19
**disrespectful** 23:7
137:12
**disruptive** 63:21 302:9
**disseminate** 350:16
**disseminated** 351:15
351:19
**disseminating** 352:5
**dissimilar** 318:20
**distribute** 410:10
**distributed** 411:4
**DISTRICT** 1:1,2
**disturbing** 315:3
**diverse** 142:16 143:22
**diversify** 373:14,18
**diversity** 142:17
143:23 373:9
**DIVISION** 1:3 2:16
**doctor** 6:17 15:25
38:18 66:22 67:2,5
90:1 93:12 108:22
116:9 117:22 156:24
160:17 161:1,14
164:22 231:25
288:23 324:25
343:23 344:8 347:24
355:13 362:24
367:20 373:23
**doctor's** 65:21 66:20
67:1
**document** 38:22 39:21
41:24 43:23,25 44:2
55:8 71:16 72:8
74:13 93:3 105:19
105:21 106:2,20,23
106:25 107:6 110:24
111:1,23 112:10,15
114:3,13,24 116:4
117:10,12,20 118:5
120:16 125:9 126:15
132:12 140:10
141:22 142:3 150:11
152:5,7,14 156:3
157:1 173:4 201:12
201:17 202:6,17
205:18 206:14
208:15 210:1,3,10
216:16 219:4,6,8,12
219:12,14,18,21
220:1,3,9 226:13
227:11,16 228:16
240:13 242:6,24

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 424

243:3 246:1,15
253:16 255:24 260:9
262:7 264:10 269:2
270:10,12 276:15,24
277:2,4,5 278:2
283:13 286:10
301:25 331:23 332:1
351:11 367:24 379:3
382:4,22 394:19
398:15 401:2 404:24
**documentation** 26:7
53:8,17 87:10
105:11,24 122:9
145:8 152:8,12
154:22,23 177:22
287:2 393:11
**documented** 80:23
97:15 103:14 153:9
**documenting** 57:11
114:9
**documents** 11:17 22:5
63:8 88:8,9 89:24
111:19 116:5 120:15
124:15,21 130:7
145:18,22,23 146:5
146:17,21 147:13,25
150:10 151:23
157:22 167:4 171:22
172:5,8 178:8,10
209:3,7 222:25
223:6 230:23 239:2
241:12,19 246:7,16
246:19 248:18
**doing** 70:5 90:6 96:13
128:21 156:5 169:15
190:17 198:11,14,22
221:12 226:9 264:5
274:23 280:13 282:2
285:21 286:20 288:9
288:15 289:17 301:1
309:24 325:24 332:8
339:21 384:5 395:10
**dollars** 337:24
**Donald** 28:5
**donated** 338:2
**donating** 26:15
**donations** 27:21
**door** 346:2,5
**double** 182:12
**download** 324:23
366:17
**Downstate** 8:25
**downward** 244:23
**Dr** 1:5,16 4:5 5:13 6:7
6:21 7:17,19 11:8,24
30:18,20,23,24
32:19 33:10,16 35:8

35:8,17,21 38:6 45:6
45:25 47:5,12 53:20
54:3 58:9 61:12 64:2
64:22 65:7,11 68:12
68:24 69:11,20,21
70:7,10,14 71:22
72:13 73:5,6,7,24
74:19 75:10,17,17
75:18,20 76:12 77:4
77:5,13 79:6,13,24
80:23 81:5,7,9,25
82:3,7,11,15,15,16
83:20,25 84:1,14,16
85:17,25 86:1 87:10
87:24 88:4,25 89:2
89:16,19 90:23,24
91:6,13 92:15 94:5
96:2 97:9,14 101:9
102:24,25 103:12,16
104:1,4 106:3
108:14 109:3,4
111:20,20,21 112:2
112:3,15,23 113:1,4
113:9,11,22,22
115:9,12,12,18
117:17 121:2,13
126:4 131:18,25
134:23 144:7,12,25
145:1,6,7 146:11,24
147:6,14 148:11,20
149:3,11,16,20
150:17,20 151:12,21
152:8,9,17 153:20
155:4,8,14,19
158:16 159:15,21,24
160:12 161:4,4,5
162:1,23 163:1,18
164:3 165:19 168:13
170:22,25 171:2
172:10 173:11 176:8
178:24 180:21
185:10 188:24,24
191:4,24 192:1,2
193:12 195:14,16
203:2 210:13 211:3
212:18 214:11,15,22
215:16 222:6 225:11
226:1 230:5,6 232:7
232:16 237:22 239:6
243:22,23 244:4,13
245:1,23 247:16
249:16 251:15
252:17 253:3 257:3
257:19 258:5,14,15
259:11 260:8,14,20
260:22,25 261:13,13
264:8,11,12,16,22

265:3 266:3,3
271:18,19,19 272:5
272:17,24 273:7,18
275:3 282:23 285:9
285:11 289:13 291:9
291:12 292:3,5,6,7
292:14,15,19 293:1
295:11 297:7,24
302:24 304:13
306:24 310:18 311:3
312:3,8 313:23
314:7 317:24 318:7
324:10 350:1,11,24
360:22 372:3,19,24
373:2,23 377:14
378:10 379:13
384:13 385:11,18,24
385:25 386:1,9,14
386:16,16,17,18,24
387:10,12,19,23
388:11,22,23,25
389:4 390:8 391:4,9
391:17,23 392:18,24
393:15,16 394:24
395:2,3,4,24 396:19
397:6,10,18 398:6
399:7,17,21,23
403:2,2,3,3,3,4,4,5,5
403:5 404:2 405:13
406:1 407:11 411:10
411:20 415:8,8
**draft** 106:25 407:23
408:1,3
**drafted** 212:25 404:25
**draws** 320:16
**dropped** 164:7
**dropping** 70:6
**due** 397:15
**duly** 6:22 409:12
**duties** 31:15,20 33:2,5
33:6,11 68:25 203:3
278:18 279:5,6
281:2,10
**dwindle** 174:21
**dynamics** 373:11

**E**

**E** 81:15 165:14,14
412:1 413:1,1
**earlier** 38:10 47:21
58:18 121:23 271:8
364:2 405:14
**early** 254:23
**earn** 14:23
**ears** 342:3
**ease** 259:12
**easy** 293:5

**eating** 160:7
**Ed** 68:12
**Edison** 68:11,13
**edits** 78:19 107:7,10
107:11,23,25 157:17
**education** 92:21
321:15 334:10
**educational** 31:24
78:16
**effect** 81:6 276:12,22
**effective** 197:19
278:21
**effort** 196:1
**efforts** 278:21
**egregious** 250:2
**eight** 46:17 332:18
**either** 27:14 56:21
89:19 97:20 144:21
171:1 241:12 291:22
298:19 313:13,15
322:4 341:16 398:7
**elected** 197:17
**electrally** 95:17
**electrically** 95:17
**electronic** 380:3,19
382:6 410:10
**electronically** 411:3
**elements** 167:24
217:10 347:20
**EMAIL** 410:14,16
**embezzled** 364:5
**embezzlement** 345:1
345:7,8 347:18
363:16
**embezzling** 338:16
346:9
**emblem** 303:20,23
306:12,17,21
**emerge** 318:25
**emergency** 11:18
314:19 315:6,14
317:2,6,17 319:14
320:4,9,24 340:25
342:23,25
**empathetic** 247:3
**emphasis** 195:23
**employed** 34:3
**employee** 203:8 276:5
**employees** 31:13
**employer** 48:13
**employment** 30:21
**EMR** 58:5 395:4,5
**encounters** 152:10,16
152:18 154:25 155:2
157:24 158:3,10,12
**encyclopedia** 328:10
**ended** 395:10

**energy** 125:13,14
**engaged** 118:20
**engagement** 189:16
**enrolled** 237:22
**ENT** 16:15 18:1 33:15
76:13 353:10 374:4
374:11 406:3
**entered** 161:9
**enters** 158:6
**entire** 141:14,15
213:19 237:16,18
251:21 293:17 299:8
301:3 320:17 331:12
387:21 396:13
**entitled** 191:5 193:12
204:15 220:2
**entry** 73:25 126:3
**ENTs** 76:6
**environment** 7:21
**Epic** 399:20 400:4
**epithet** 333:13
**equal** 361:13
**equals** 57:4
**ER** 319:6
**errata** 410:1,7,10
411:17
**erred** 162:2
**error** 53:10 158:8
162:24 171:14,20,25
238:20
**errors** 107:12,18
108:1 171:12,18
**Esquire** 1:18 2:2,12,13
**essence** 57:3 111:5
150:16 298:22
406:18
**essential** 105:11
**EST** 5:2
**estate** 36:19
**Esteban** 2:12 6:8
**Esteban.soto@oag....**
2:21
**et** 1:9
**ethical** 148:15
**ethics** 147:13 149:20
**evade** 12:17
**eval** 119:6,9,11,17,25
120:21 121:10
**evals** 120:7
**evaluate** 81:10 119:22
288:14 291:10
**evaluated** 279:22
288:9 289:15,18
**evaluating** 289:25
291:6 292:3
**evaluation** 73:1 74:22
82:21 99:18 119:1

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 404 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 425

119:21 120:13,14
121:20 242:9 244:12
244:14 245:2 287:22
288:1 289:21 290:1
290:3,14,16
**evaluations** 69:19
198:15 289:19,24
**evening** 407:13
**event** 173:16 182:18
**events** 105:21 196:10
197:13,14
**eventually** 31:19
69:22 152:21 190:24
**everybody** 7:2 348:20
**evidence** 28:16 34:22
35:5,5 39:12 41:9
61:2,4 104:5 105:2
146:19 158:13 174:1
174:22,23 175:6
176:2,5,7,8 190:25
191:9 259:19 274:22
284:2,18 289:16
310:22 326:23
364:20 378:25
379:14 397:1 399:6
**evidently** 190:4,5
**exact** 43:15 76:21
77:1,3 144:8 285:7
**exactly** 216:2 247:19
**Examination** 4:8 7:15
**examined** 6:22
**example** 321:14 333:5
340:15
**excellent** 247:3
**excerpt** 121:22 141:18
153:3 413:22
**exchange** 224:7
**exclude** 228:2
**Excuse** 22:12,14 64:4
123:6 153:14 160:24
182:21 197:1 324:22
333:8 343:15 356:10
**excuses** 226:21
**executed** 61:18
**exhibit** 38:14,24 39:15
39:25 40:4 41:19
61:19 64:15 71:5,8
71:19,20 73:14
74:11,14,20,20
106:10,13 107:1,5
112:12 116:14,19
117:3,5,6 132:8
133:7 134:13 139:6
139:13 141:5,11,17
151:7,9,11,19,25
153:4 154:17,18,19
156:7,10,23 166:9

170:23 177:9 178:4
194:5 202:5,8
209:20 212:1,5
230:16 236:10,14
237:5 242:7,16,25
246:2,8 253:17
254:17 255:10
258:11,13 260:18,18
266:2 277:10,11
279:1 280:9 286:6,6
297:11,14 324:14
325:13 330:9,18,20
332:14 337:8,10,17
366:9,11,21,21,23
366:25 367:23 371:2
378:10,20 379:10
380:7 382:12,12,13
384:24,25 385:1
389:19,21 393:3,19
394:3 398:6 399:8
401:10,15 402:20
403:11 405:6 413:3
413:6,11,16,20,24
414:1,4,8,14,22
415:1,4,9,13,17,21
416:1,4,8,12,16
**exhibits** 4:14 125:12
**exist** 104:8 360:14
**existed** 78:13
**existence** 36:8,9
253:7 271:23
**exists** 362:15 404:11
**exonerated** 355:7
364:16
**expect** 209:1 244:15
392:2
**expectations** 139:17
244:15 245:11
283:15,18 392:2
**expected** 267:2,5
278:17
**expecting** 63:12
**expedited** 407:19
**experienced** 68:16
**experts** 349:14,17
**explain** 46:12 47:1,4
153:16 193:14
**explained** 159:12
172:25 186:8 276:3
398:8
**explanation** 59:3,8
147:7 150:24 270:14
**exploited** 333:5
**explosive** 321:15,18
**expression** 76:15
**extent** 114:8 130:16
184:24 376:25

**eyes** 140:5 228:10
**e-mail** 39:8 81:5,16,24
82:13 84:19,24
85:23 86:3,9,11,14
86:18,20 88:4 89:1
89:12,14,21 90:24
107:19 117:2 157:24
170:25 238:6 386:7
388:23,25 389:13,22
390:3,7 391:4,24
392:23 404:8,10
416:10
**e-mailing** 391:10
**e-mails** 80:12,13,15
80:17 87:9,17,25

---

**F**

**F** 165:14
**fabrication** 157:12
**face** 334:13 364:10
**Facebook** 29:7,13,17
29:21 30:2,7,8 323:6
323:7,9,11,14
324:15 325:25
326:16 335:6 336:4
336:12 337:11
338:20 342:17
349:11 351:25
357:25 366:12
415:15 416:2,6
**facility** 306:25
**facing** 104:19
**fact** 76:6 100:1 127:20
153:10 154:5 176:25
179:6 194:14 257:16
274:17 275:24
325:25 326:9 366:2
**facts** 8:2 41:8 113:8
167:12,13 170:3
189:22 194:9,16
214:9 251:1 274:22
360:17 376:24
379:22 380:1 398:24
**factual** 114:24 150:18
150:22 153:25
178:21 190:7 325:11
325:15 349:10
350:16 352:3
**factually** 113:14
115:16 175:23 303:5
**Fact-check** 326:11
**fact-checkers** 325:14
326:8
**faculty** 58:14 78:9
79:23 149:3 190:15
190:22 217:5 232:15
247:20 265:9 279:22

280:1 281:17 282:4
283:19 284:24
287:16,23 288:16
290:17,18,22 291:2
291:3 293:2 295:16
295:24 296:1 301:15
311:15,17
**failed** 283:10,14
**failing** 269:5
**failure** 139:16 393:10
**fair** 63:14 164:5
222:18,21 351:22
373:12
**fall** 167:7
**falls** 217:8
**false** 170:5,15 350:15
398:17
**falsely** 157:21 352:5
**falsification** 147:12,25
150:10 151:22
154:12 167:3,20
171:22 172:5,8
**falsified** 43:24 145:8
146:4,18,20
**falsify** 145:17
**falsifying** 145:22,23
**familiar** 212:14 279:10
406:6
**family** 247:3 338:3
**fans** 76:7
**far** 109:13 172:15
179:22 230:20
312:14
**fare** 44:13
**fashion** 157:25
**faster** 129:7
**faulting** 396:19
**faulty** 95:18
**favor** 12:18 356:2
**favorable** 74:19 75:11
75:12,14 247:10
**favorite** 76:15
**FAX** 410:14,15
**FBI** 345:16,19 346:8
346:17 347:14,17
363:16 364:15
**FDA** 323:1
**February** 72:14,19
117:13 118:9,13
119:16 120:1 124:18
**fed** 338:2
**federal** 28:10,17,25
29:1 223:20,23
356:15
**feedback** 190:23
247:21 290:17 291:3
**feel** 48:17 49:18 84:20

129:9 156:24 183:21
189:11 216:13 238:5
247:7 267:6 335:19
337:5 354:11 370:1
391:10 392:1
**feeling** 48:20 233:2
**fell** 245:9
**fellow** 149:2
**fellowship** 19:2,6
**felt** 50:21 135:19
147:19 195:23
286:17 301:15
321:23,25 368:13,23
**female** 126:20 333:13
394:10,15
**females** 308:24
**fewer** 85:4
**fifth** 3:9 142:6
**figure** 329:22 330:3
333:24
**file** 36:23 49:11 62:17
147:17 323:18
324:24 357:1
**filed** 36:20 37:18
41:21 49:21
**filled** 41:15 42:1,17
43:9,19,21 207:17
207:18,20
**final** 1:24 40:16 50:13
82:20 107:14,16
108:4 194:20 233:9
265:25 331:22 402:3
**financial** 202:21,23,25
203:15,22 204:5
275:9,23 276:4
**financially** 25:25
27:20 51:7
**find** 117:21 173:23
221:7,8 238:24
246:1 253:6 267:7
278:25 303:8 308:19
314:22 354:7
**finding** 148:21
**findings** 130:5 245:24
363:12,15
**fine** 11:5 23:11 54:25
62:21 68:5 76:24
77:2 109:21 131:9
170:12 175:20
191:16 208:23
229:19 250:5 251:3
252:6 258:4 270:16
282:16 304:21
305:10 327:12
332:24 343:12,18,20
347:10 371:13
376:23 391:18

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 426

407:21
finish 10:25 13:8 85:8
    192:14 197:2 201:19
    207:8 223:3 231:17
    286:23
finished 16:9,13
    191:19,24 192:4,25
    256:4 298:24 382:18
finishing 243:15
fire 31:12
fired 49:9
firing 49:7
firm 1:19,19 2:3 235:7
    251:14 363:17,17
firmly 262:1
first 31:17 32:5,9
    33:22,23 34:1 108:7
    111:4 117:11 119:3
    124:7 131:24 135:14
    157:14 213:1 214:2
    214:10 240:8 242:9
    243:24 244:1 256:11
    280:12,16 283:23
    284:22 305:16 306:4
    322:2 331:15 359:1
    359:3,7,14,16,20
    360:2 374:11,22
    390:24 397:14
    401:11,16,17 416:14
    416:16
five 13:22 14:3 15:21
    18:4 41:14,17,25
    46:16 92:23 93:11
    93:16 152:10,18
    153:6 155:23,24
    159:22 161:3,4,5
    211:12 224:20 225:4
    241:12 249:13 349:1
    350:2
five-year 18:7 43:2,3,6
    43:17 239:7,21
    240:10
fixed 147:20 197:5
flag 309:7,14 360:5
Flammer 3:3 6:13
floor 2:18 183:15
    232:4
Floyd 362:20 363:5,10
    363:20 364:20
    365:22 366:3 368:8
FMLA 274:25 275:5
    286:11
focus 310:12 401:25
Foley 3:12 5:21 409:6
    409:24
follow 125:15 188:14
    365:2

following 40:17 53:18
    152:10
follows 6:23 43:7
food 338:2
forced 207:25 329:1
    372:4
forces 90:11
Ford 18:1
foregoing 411:11
Forgive 306:10
form 15:1 20:11 24:7
    32:15 34:16,24 42:9
    49:6 52:20 53:3
    55:23 56:5,23 57:6
    57:15 59:14 60:1
    69:13 79:7,18 80:25
    85:21 89:3,8 94:20
    94:25 98:11,18
    99:21 103:19 105:13
    112:13,17 121:24
    123:19 124:11 128:2
    128:23 130:15,20
    131:1,4 132:11,13
    132:21 135:7,15
    138:20 144:9,18
    146:1 148:1,9,23
    149:8 152:6,25
    159:1 168:17,23
    169:12 170:8 172:14
    173:14 179:1 180:23
    190:8 194:7 200:20
    203:4,24 207:16,18
    207:20 210:5,25
    217:23 219:7,15
    221:1 225:13 226:3
    227:7 228:4 234:11
    238:23 259:21 263:3
    265:25 266:13
    273:20 274:5 275:25
    283:11,17 284:7
    285:22 287:7 291:11
    295:2 300:22 306:14
    309:4,9 315:17
    317:3 318:14 320:11
    321:1,24 326:17
    327:6 328:1 329:24
    333:25 338:19 339:9
    339:12 341:8 342:7
    345:12 349:12 351:2
    351:16 352:8,13
    354:4,10,15 358:5
    359:4 360:7 361:14
    361:20,25 369:1,20
    382:2 387:7 392:14
    398:18 405:19
    406:14,21 411:16
formal 32:2 147:18

290:14
format 89:21
formed 337:23
former 358:1 386:1
forms 43:19,22
forth 409:12
forward 27:25 61:16
    63:1 109:8,13 127:1
    138:2,11 160:21
    185:15 192:18
    252:22 305:11
    361:10 411:5
forwarded 246:17
found 40:13 94:12
    110:11 210:4 308:16
    314:25 327:24
    338:15 354:10 364:4
    387:13,20
four 14:5 18:4,6,10
    22:24 54:3 80:15
    125:4,5 144:4
    152:18 203:19
    221:15 222:25 223:5
    241:11 256:14
    262:17 263:9
fourth 135:12,22
    136:4 166:21 193:11
    201:9 204:19 206:17
    207:4,21 210:24
    221:12 226:9,18
    229:1,8 230:22
    238:12 239:7,19,20
    240:10 241:14,22
    256:6 275:10 288:2
    288:14 299:3 301:22
    393:5,6
Fraser 264:13
fraternity 24:21
    308:19
fraud 168:12,14,22
    169:1 338:11
fraudulent 177:22
free 49:18 156:25
    238:5
freely 10:24
Friday 385:11 386:11
front 104:7 217:18
frustrated 247:18
fulfill 203:16
full 231:25 301:5
    363:3,7
function 301:19,21
funds 338:16 345:18
further 40:16 157:8,10
    409:15
furthermore 265:4

**G**

gag 376:16,17,21
gain 259:13
gaining 338:12
Galveston 1:3,9 5:16
    26:24 237:25 318:13
    318:24
Garza 122:12 123:25
    132:25
Garza's 121:3 122:8
gather 176:8
gender 142:17 143:23
    185:1
general 2:14,15 9:13
    16:16,17 17:7,8,10
    17:23 18:11,14
    32:18 152:4 338:24
    342:22 411:4
generalizations
    340:23 360:19
generalize 316:24
generalizing 342:19
    357:16
General's 6:12 13:19
    14:7
genuinely 145:22
George 362:20 363:5
    363:10,20 364:20
    365:22 366:3 368:8
getting 45:1,2 60:5,16
    102:14 109:14
    122:20 164:23 166:8
    172:21 203:21
    209:18,24 213:22
    220:12 251:16
    275:10,16,18 276:9
    302:10 335:21 343:5
    367:16 371:23 375:8
Gidley 81:5,9 82:2,11
    82:15,16 83:20
    84:16 85:25 88:4
    89:2 90:23 118:22
Gidley's 85:17
give 9:17 10:1,6 22:18
    22:19 27:21 71:14
    76:25 91:7 115:6
    117:23 125:17 147:6
    160:12 165:24
    180:19 189:21 191:5
    192:7 193:13 221:11
    228:14 231:25 232:9
    237:3 246:20 249:12
    255:22 258:21
    263:13 293:19 323:2
    343:6 347:21 355:21
given 8:5 95:14 100:1
    104:25 146:6,9

173:24 196:10
    197:12,14 198:14
    205:24 340:11 397:2
    397:4 409:14 411:13
gives 126:25 192:9
    216:5,8,9 351:22
    396:4
giving 11:11 158:16
    160:5,18 321:6,20
    392:23
glad 173:19
Glorieni 3:5 13:18
GME 54:10 141:2,13
    141:15,18 142:8
    203:6,23 216:6,8,15
    216:15,21,21,23
    217:1,13,16,17
    218:3,6,11,13,14,20
    218:22,24 222:7
    226:2 227:16,19,22
    253:10,11 254:12
    255:13 286:13
    405:16,23 413:22
go 9:10,14 20:13
    21:20 26:13 32:17
    34:18 37:23 40:1
    42:8 45:24 46:14,19
    52:23 53:6 55:16
    56:2,19,25 57:10
    59:16 61:13 64:22
    69:16 79:9,20 81:2
    82:12 84:14,14 88:3
    92:6 93:2,8 95:4
    98:13 99:8,23
    100:24 101:2 102:9
    103:21 105:6,15
    108:20 109:10,17,20
    110:20 112:19 115:4
    116:4 122:6 123:21
    124:1,13 125:25
    127:12 128:4,14,25
    130:21 131:22
    132:15 134:15
    137:20 140:20 141:7
    143:10 144:11,20
    148:18 149:10
    151:18,25 153:8
    154:4 155:6,12
    156:21 157:3 159:4
    164:2 167:14 168:25
    174:7 175:4,17
    177:5,16,21 179:3
    179:13 180:2,6,11
    180:15 181:2 182:9
    183:11,12,13 184:1
    184:11 185:8 187:20
    188:7 193:2,19

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

194:19,21 198:21
200:22 206:21
207:23 208:22 214:8
218:12 221:4 222:5
222:16 224:24 225:3
227:9,18 229:13,15
229:20 233:5,21,23
234:20 235:14
239:11 242:2 244:13
246:22 248:10
249:10,20 255:12,16
256:25 259:23
260:13 261:7 264:2
266:15 269:10 270:9
270:11 271:6 275:14
276:2,20 278:6
284:9 285:25 286:5
287:21 292:24
296:24 298:12
300:24 302:11,13
304:5 307:4,18
309:12 311:23
313:15 314:4,19
320:3 326:20 329:12
331:18,21 334:3
339:11 340:19
341:11 342:10,25
345:15 347:2 350:21
356:25 359:25 368:4
368:4 370:12 372:13
372:15 373:10 375:9
377:1,25 379:12
382:16,23 384:12,18
393:3 398:20 399:5
400:21 401:1
**goes** 168:22 255:21
343:17 360:11
**going** 9:7,9 10:22
11:16,21,23 12:6
23:10,13 28:21 29:4
38:1,4,19 44:23,24
45:4,5,14 46:13
54:13 55:19,20,21
56:9 60:3,12,15 61:8
61:15 62:3,19 64:9
64:13,16,19 65:8,23
65:24 67:11 72:15
86:23,24 87:1,5,12
87:21 90:8,9,15 93:4
93:16,21,24 96:23
102:9 104:12,14
108:17 109:15,23
110:1,3,5 113:23
115:15 119:2 120:24
125:2 126:8,25
129:12 132:18 137:1
137:8 140:5,6,16

142:1 143:4 148:25
153:24 156:2 165:11
165:17 166:21
169:17,23 174:18
177:8 184:1,3,5
186:16 187:23
192:10 193:15
195:10 196:15
200:19 201:25
203:14 205:13 208:3
211:9 218:3,17
220:6,10 221:6,24
224:1,1,2,13,18,23
225:6,9 227:6,18,20
227:23 228:11
229:24 230:2,20
238:24 242:5 243:10
247:18 249:22
250:18,21 251:5,17
254:16 255:18 256:5
256:8 257:3,12,13
257:15 258:8 259:3
263:8 266:11,18
271:1 287:15,22
288:11,17,18,22,24
290:8 293:4,17
296:15,18 297:2,5
301:10 302:3 304:19
308:16 312:6 314:16
317:2 323:23 324:3
329:9 332:11 340:25
342:23 346:6 349:23
350:6,9 355:23,24
355:25 360:9 368:8
373:12 375:17,24
376:25 377:4,25
378:5,8 382:15
387:25 390:12
393:20 394:21 400:3
401:1,4,7 403:17
405:4,8,11 406:19
407:15
**good** 73:1,2 74:23
85:25 86:10 89:19
135:19 165:5,7
198:14 224:20
296:20 327:4 334:6
340:13,15,16 344:14
407:13
**goods** 36:13
**gotten** 170:22 312:12
375:11 379:10
384:19
**governed** 77:19
**GPA** 17:16
**grade** 277:15,19
**graduate** 15:6,21

127:12 238:3
**graduated** 15:5 17:3,8
18:18 92:22 130:25
207:9
**great** 211:23 225:24
296:13 328:21,22,23
399:16 408:7
**greater** 27:1 90:12
**Green** 326:12,21,23
328:7,8 333:22
**ground** 22:16,17
252:18
**grounds** 28:9 145:25
252:18 262:21,25
263:1,5
**group** 341:7
**guess** 72:13 307:13
321:2 326:25 339:20
377:19 405:17
**Guidry** 81:7
**guilty** 180:17,20,22
181:1 183:9 184:6
184:14 185:17,19
186:8 187:1,7,25
188:2 189:5 338:15
**G-I-D-L-E-Y** 82:2

## H

**H** 413:1
**half** 243:11,24 244:1
301:5
**hallway** 307:11,11,24
**hand** 6:19 256:9
409:21
**handbook** 54:2,17
77:18,23,25 78:13
78:22 141:2,18
142:8 216:6 278:14
279:9,11 413:22
**handle** 61:7
**happen** 95:12 345:9
**happened** 16:13 97:7
130:12,24 153:11
154:5 166:14 186:11
199:16 227:2 238:15
313:20
**happening** 190:20
**happens** 119:21
320:14
**harass** 251:5 375:25
**harasser** 179:9
**harassing** 27:10,23
65:4,5 66:3,4 100:22
100:24 181:19 182:3
208:24 219:2 222:13
223:1,15 225:20
226:24 241:23 250:3

268:23 278:4 282:15
293:9,10,14,15
304:9 309:10 310:4
311:21 312:19 313:2
314:1 329:8,25
334:1 341:2,9 344:7
345:13 350:18
354:16 355:10
356:12,13 357:10
359:22,23 361:5,15
363:2 370:10 371:8
371:14 375:1 376:1
376:19 383:9,24
**harassment** 181:25
310:7
**hard** 48:14,16 52:10
173:23 293:6,6
361:13
**harder** 361:22
**Harvard** 14:22 15:10
15:12
**Harvey** 396:17,20
397:15
**head** 30:25 146:14
205:4 244:3
**heading** 176:20
**health** 17:25 212:6
315:8,8 414:12
**healthcare** 68:3
314:12,13,20 315:7
320:2,4,5,10,25
340:24
**hear** 19:10 35:16,20
189:13 285:13
305:16 334:17
357:19
**heard** 189:6 252:9
306:4 342:2
**hearsay** 153:21
287:15
**heat** 95:18
**held** 25:11,14 50:14
200:23 201:7 230:7
**help** 340:20 373:10
**helped** 338:12
**helping** 192:9 377:19
**Heman-Ackah** 168:13
302:24 304:13
306:24 310:18
**Henry** 18:1
**hereinbefore** 409:11
**hereunto** 409:21
**heritage** 375:15 376:4
376:6 377:1
**he'll** 136:16
**high** 125:13 154:12
373:24 374:20

**highlighted** 236:20
237:17 331:14
333:10 390:10,15
395:1 396:3,4,5,12
396:14
**highlights** 390:25
**hire** 31:12
**hired** 20:8 31:3,5,11
34:7 51:12,18
214:13
**Hispanic** 182:16 183:3
**historical** 307:23
**history** 310:9 326:22
330:9 397:23
**hold** 15:24 16:3 116:7
116:9 141:8 209:16
211:1 213:15 329:7
367:4 380:5 390:13
400:23 405:1
**holding** 233:7
**honest** 12:16 183:19
**honestly** 309:5
**honesty** 140:22
**honors** 15:6
**hope** 185:12 252:20
**hopefully** 233:4
**horse** 62:14
**hospital** 18:1 19:7,10
51:6 78:12 306:25
**hospitals** 51:5
**hostile** 7:21
**hot** 185:3
**hour** 224:19
**hours** 52:14 54:3
312:4
**house** 202:10 278:16
414:7
**housing** 338:3
**Houston** 2:6 27:1
238:18 353:11
**hundred** 199:21,24,24
338:2
**hungry** 164:20,21
**Hurricane** 396:17,20
397:15
**husband** 271:20
325:22
**hypocritical** 101:12

## I

**Ibuprofen** 322:15
**idea** 135:19 383:19
**Ideally** 120:3
**ideas** 125:16
**identical** 33:5,6
**identification** 39:19
71:12 106:16 116:21

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 407 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 428

141:20 156:13
202:13 212:11
236:17 242:20
258:16 297:17
324:17 330:22
337:13 366:14
389:24 401:19
**identified** 159:7 161:3
**identify** 5:24 358:9
359:10 402:3
**identifying** 131:5
**Idley** 82:3
**ignoring** 134:6
**illegal** 20:24
**image** 327:4 329:2
**immediate** 58:6
197:18
**immediately** 16:17
189:14,17
**immigrate** 20:8 22:8
**immigrated** 20:1,5,6
20:15 21:21,24 22:1
22:3,6,9
**immigration** 20:16,18
**impair** 10:9
**impeachment** 39:11
**important** 43:24 80:22
123:16 127:25 128:5
128:7,15,17 173:7
195:22 341:5 343:19
**impossible** 263:12
**improve** 106:4 387:24
**improved** 104:15
126:21 197:25
**improvement** 196:11
196:16 197:6,15,21
247:21
**inaccuracies** 157:19
**inaccurate** 303:4,5
325:17 326:16
**inappropriate** 23:15
375:19
**incident** 102:16 151:3
151:4 172:3 175:9
**incidents** 97:8 168:14
**included** 74:20 103:18
121:22 151:11 202:4
302:23 343:7 396:24
**includes** 142:8 404:11
**including** 5:7 40:10
51:22 142:16 143:22
158:1 184:19
**inclusion** 373:9
**incomplete** 331:18,25
**inconsistent** 296:10
296:11
**incorrect** 113:14,24

115:16 287:8 322:5
**increase** 33:7
**independent** 155:7
326:8
**independently** 207:10
**Index** 4:14
**indicate** 154:11
203:13
**indicated** 70:11 94:7,8
147:16 158:4
**indication** 196:11,25
197:15
**indirectly** 298:19
**individual** 5:10
**inefficient** 315:7
**infer** 267:18
**inferring** 267:23 270:4
**informal** 290:16
**information** 40:2 42:3
44:12 46:15 52:11
60:6 61:25 66:9,10
66:17,24 67:25 68:2
89:18 103:17 108:18
109:12 112:12
121:21 146:6,10
150:9 153:21 172:7
172:9,13 192:9
205:22,24 206:23
207:1 209:17 232:9
235:17 236:5 238:4
239:5 240:15 298:1
308:20 326:9 346:10
349:9 350:15 352:6
361:3 363:11,21
364:11 365:12,18
384:19 385:25
387:10 392:12,16
396:6 400:4,9
404:14
**initial** 344:3
**initially** 31:5 171:2
374:5
**initiation** 106:14
156:11 413:14 414:2
**injured** 8:16
**injury** 43:12
**inner** 318:12,17,18
320:1,6
**innocent** 180:16,19,22
181:1 183:8,10
184:6,14 185:17,18
186:8 187:1,6,22,25
**input** 388:12
**insight** 126:21
**instance** 342:24
**instruct** 23:13 29:4
355:23,24

**instructing** 28:7 64:11
108:23 109:1 223:16
224:4 355:20 356:11
**instruction** 355:21
**instructions** 9:15
22:17 410:11
**instrument** 95:14,18
95:20 98:15
**instrumental** 371:22
372:1
**insulated** 95:15,16
**insurance** 25:7,23
26:4,5 102:15
**integrity** 142:9,21,24
**intelligent** 365:4
**intent** 256:17
**intentional** 336:17,18
336:20
**intentionally** 17:14
352:9
**interact** 100:2
**interacted** 33:9
**interacting** 146:16
**interested** 216:22
342:6,11 344:4
372:12 409:18
**interesting** 318:5
321:12,13 328:14,16
328:19 334:5
**interfere** 45:3
**interference** 122:18
**interfering** 251:20
**Internal** 212:6 414:13
**Internet** 238:23
**interpersonal** 244:18
247:2 248:3,7
**interrogatories**
400:23,24 401:11,13
401:18,25 402:11,22
402:24 416:17
**interrogatory** 402:2
**interrupt** 192:23
**interrupting** 60:25
**interruption** 133:15
209:23
**intervention** 100:2
**interviewed** 30:16,18
30:19
**intimately** 364:24
**intimidate** 185:3
**investigate** 364:16
365:13
**investigated** 345:16
345:19
**investigating** 212:18
**investigation** 147:18
148:14 149:6,7,14

149:16 212:3,7
414:14
**Investigations** 212:7
414:13
**investigator** 214:18
**investment** 36:19
**involved** 62:20,22
159:20,24 403:2,2
404:5
**involvement** 34:6
**involving** 7:20 49:25
**in-basket** 158:3
**in-house** 6:14,16 14:9
**in-person** 156:6
**irrelevant** 101:3 327:8
335:4 357:11 360:8
**issue** 68:19,20 83:2
126:17 151:22
152:14 157:4 167:2
177:21 185:4 198:25
220:19 252:12
260:25 272:7 321:9
**issued** 379:8
**issues** 59:10,12,18
126:13 127:16
134:17,19 185:6
198:2 241:2 302:3
314:8,10,11 316:14
346:2
**items** 124:10

_____

**J**

**Jane** 1:25 3:8 5:22
410:18
**janerose@janerose...**
410:16
**January** 246:5
**Jefferson** 15:17,18
16:9,23 17:16
394:10
**Jemima** 326:12,21
327:15 329:10
330:21 333:4,12
334:7,14 342:16
351:25 415:20
**job** 21:6 31:15 33:2,5
33:6 48:17,22 50:4
68:25 147:21 149:17
163:5,10,15 278:11
278:13 279:4,6
322:4 373:12,20,22
**join** 349:25
**Jolly** 305:14,19 307:19
308:11,17
**journal** 319:21,24
**judge** 9:18 12:20 62:3
62:3 68:6,7,8,10,12

109:9,11 174:24
208:23 252:3 269:23
361:6
**judgment** 186:11
**Juggler** 307:19
**Jugglers** 305:14,19
308:12,17 310:20
**July** 72:9 119:10 133:5
133:10 134:12
156:11 210:21 212:8
213:11 226:8 231:3
232:11 233:4 235:21
238:2 246:9 259:15
264:5 275:18 276:11
280:12 286:21 287:3
299:12,15 414:3,15
**June** 14:15 119:10
152:11 203:18
214:13 238:3 246:5
299:9,10 324:21
**junior** 259:11 281:13
282:1
**jury** 9:18 12:20 40:13
56:8 94:11,12,14
106:1 120:23 189:4
195:19 222:10
225:25 241:18
248:23 252:13
267:24 277:25
337:21 354:7 363:10
363:13
**justice** 136:10

_____

**K**

**keep** 13:25 46:7 48:18
51:8 101:21 123:16
160:4 186:16 192:10
208:25 274:12
289:13 293:4 356:24
384:5
**keeping** 48:7 50:23
101:23 124:9 140:24
143:5
**keeps** 268:24 368:1
**kept** 122:17 123:23,24
384:5
**kicking** 384:6
**kid** 368:13
**killing** 362:19
**kind** 13:16 52:18 78:7
158:13 305:23 355:9
372:8 390:9 391:25
**KKK** 303:20,23 304:8
305:10 306:17
310:20 342:13
**kneeled** 364:21
**kneeling** 360:5

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 429

**knew** 137:22 218:8,10
257:12 307:17
**know** 10:16,20,23
12:14 20:14,21 21:6
24:24 28:20 29:8
33:23 37:8 40:25
42:1 49:20 50:20
58:12 60:8 61:17
62:6,22 65:20 67:20
68:7,8,10,12,21
70:20 71:25 74:11
76:6,14,15 80:16,19
81:3 83:25 84:1,16
84:18 88:15 89:4,4
98:23 101:4 102:8
102:21 104:8,10
112:3 113:19,20,21
113:22 122:16,22
123:14,23 126:1
128:21 134:1 136:17
136:18 137:9,24,24
139:19 140:2 144:12
145:19 146:24 150:4
151:14,19 154:16
158:10 159:17,18
163:9 164:3,11,13
164:15 167:24 169:3
169:5,13,22 172:2
172:15 179:22
181:13 182:20,22
185:2 191:5 206:1,4
211:15 217:18,20
218:6,19 219:25
221:7 222:6 227:17
227:19,22 229:16
233:1 234:24 235:6
235:12,13,16,16
235:21 239:2 240:14
240:21 244:21 245:5
248:17 250:7 253:10
253:12,13 255:19
257:4,16 258:6
260:19 263:15,19
265:17,19,21 266:9
267:22 272:12,16,24
273:7 274:16,18
279:15 285:7 290:22
291:1 292:16,19
293:15 294:13 296:8
301:20 302:4,5,10
305:13,15,18 306:7
308:1,15 309:5,23
311:2 315:22 316:16
316:18 317:14,20,21
319:18 324:11 325:3
325:19 330:2,5,5
331:1 333:20 334:8

336:10,11 337:4
338:5,6,13 340:7
345:20 352:14 354:6
354:9 355:2 358:19
358:21 359:5,11
362:22 363:3,7
364:20,23 365:3,9
367:3 368:8,15
376:23 377:3,10,19
381:21 384:7 386:7
386:22 387:5 390:14
390:19 391:9,16
395:16 397:11
402:12 403:18
**knowing** 53:19 235:3
**knowledge** 9:13 29:25
65:12 83:17 86:5,6
87:2 99:25 153:23
244:17
**known** 163:6 184:2
249:23 293:18
303:20
**knows** 198:9 218:21
218:24 332:9
**Kridel** 125:18 259:11
301:11,12

_____ L _____

**lab** 161:9
**lady** 199:5
**Lakeisha** 202:11
414:8
**Lamkin** 238:19
**Lane** 14:18
**language** 124:17
**lapse** 68:22
**lapses** 173:16
**large** 324:24
**larger** 367:5
**lately** 323:8
**Latifa** 394:10
**Latin** 15:1
**laughing** 341:23,24,25
342:3
**Lauren** 3:4 6:15
122:25
**law** 1:19 2:3 28:10,17
181:5,6,11 183:10
184:10,17 186:17,22
187:8,14 188:8,10
188:13 189:8 256:19
**lawsuit** 7:19,24 8:3,18
95:23,25 98:5
178:11,19,22 181:7
**lawsuit's** 182:3
**lawyer** 180:3
**lay** 279:6

**lead** 1:18 117:18
123:18 239:5
**leaders** 338:14 345:17
346:9
**leads** 170:18
**League** 14:18
**learn** 85:2,5 285:3
**learned** 85:1 397:13
**learning** 321:2 397:14
**leave** 56:14 185:10
208:1 210:17 211:16
218:25 262:9,13,16
262:17 267:2 274:25
275:6 280:23 281:13
282:1 286:12 287:4
352:19 353:16 372:4
385:7
**leaving** 69:9 251:17
353:18
**led** 328:9
**left** 152:19 157:21
158:4 171:3,4 253:4
375:7 400:14
**legal** 5:20 88:7 89:5
90:2 95:1 179:11,19
180:8 186:4,14,23
188:5 356:5 387:16
**legally** 20:1,15,19,21
21:10,14,21,24 22:1
22:3,6,8,9 23:24
186:3
**leopard** 296:2
**letter** 30:21,22,23
32:18,20,21,21 88:7
105:1 107:16,20
108:2,4,5,7,8,14,15
110:4 111:18 112:6
112:8,9,22 113:5,13
113:24 115:14,14
122:4 139:5 140:7,8
143:7 152:8 156:11
178:6 196:18,19,23
207:13,16 211:3
236:15 237:14,16,18
237:21 238:17,20,21
238:22,25 239:1,3
239:13 253:5,6,9
254:5 257:18,24,24
258:1,5,14,19,25
259:2 260:22 261:9
261:11 262:6 265:25
267:12 269:13 270:1
271:24,25 272:8
275:22 332:23 379:7
384:20 385:22
387:11 388:12
392:24 414:3,20

415:7
**letters** 241:2
**letting** 61:20,24 62:5
102:8 137:7 218:11
302:10
**let's** 9:10 22:15,15
29:10 47:10 62:12
63:1 64:12 65:15,17
87:19 93:2,17
125:25 138:10 139:4
141:7 160:20 169:19
172:17 177:21 182:9
185:14 187:3 188:14
192:10 193:2 199:22
225:3 228:23 229:11
229:15 233:12
245:25 246:22
247:24 252:1,22
257:22 271:15 286:5
305:10 317:23
379:13 384:18
402:20
**level** 92:20 158:1,7
198:2 207:4,5,5
215:7 226:5 227:18
227:20,23 232:17,18
232:24 233:3,21
247:16 254:8 263:8
268:4,5,7,12,15
280:1,9,12,21
286:17 287:6 309:16
312:3,13
**levels** 201:16,22
**liable** 40:13 94:12
189:5 355:8
**libelist** 387:14
**liberal** 10:21 361:7
**licensed** 42:22
**licensing** 9:3 42:5
**lie** 149:4
**lieu** 352:21
**life** 25:10 96:23
128:22 189:25 274:9
368:15
**liked** 336:12
**likeness** 326:25
**likes** 247:19
**likewise** 13:7
**limit** 304:23,23 356:21
**limitation** 223:18
**limited** 138:19 142:17
143:23 320:16
**line** 109:9,11 412:2
417:2,14
**list** 295:6
**listed** 38:14 76:4,20
78:23 89:21 112:5,7

126:2 133:5 134:20
203:23 233:24 234:4
278:18
**listen** 124:1 137:17
144:24 160:11
241:20
**listened** 145:4 271:17
**literally** 373:10
**literature** 310:19
**little** 233:12 290:9
302:4 308:20 324:4
346:8 347:19
**lived** 239:1
**lives** 334:12 335:2,8
335:11,14,15,18
336:1,5 337:23
338:15,22,23,25
339:1,3,4,24,25
340:1,2,3,9,17,23
341:18 345:1,17
346:13,17 348:6,18
348:21,23 351:25
364:3,4 367:7,10
368:10,17,18,25
369:2,5,6,9,11,12,14
369:15 370:2,24,25
371:4,6 377:22
**LLC** 36:5,11
**loaded** 143:9
**local** 26:23
**lodge** 52:16,17
**lodged** 148:19
**Lone** 36:4,14
**long** 18:16 19:6 50:11
64:10 65:19 68:18
68:19 158:22 205:23
206:6 229:16 231:11
267:11 329:21
331:10
**longer** 35:14 51:5
78:10,13 79:25
227:5 251:6 311:14
**look** 30:2 32:10 38:22
54:23,24 55:14
69:19,23 76:22 79:4
87:24 88:3 118:11
124:20,22 125:16
133:8 141:1 150:3
154:4 179:6 196:20
212:24 228:6 229:12
230:23 231:2 232:13
242:23 246:20
258:22 307:12,18
309:21 323:5 326:20
326:22 327:25 328:2
328:6,11 332:17

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

347:16 365:14,21
367:14,19,22 378:21
379:13 381:11,22,24
397:22 402:21 403:9
**looked** 29:16,20 88:11
88:14 231:6 241:11
272:8 323:7,9 328:7
328:12,13
**looking** 110:24 117:10
118:6,9 132:2 159:9
230:18 242:11
246:14 278:15 309:3
309:8 333:7 346:19
346:25 353:7 381:8
394:3,13 403:16
**looks** 73:24 75:25
331:17 380:7 390:7
391:6 394:23 395:8
396:15 397:17
**lose** 147:21
**lost** 48:17,21 78:11
382:1
**lot** 46:14 144:15
233:20 267:18,23
270:4,8,13 310:8
323:25 329:9 335:6
336:25 338:5 357:14
357:18,24 368:7
369:17
**lots** 178:8,10
**low** 125:13
**lower** 281:24
**Luck** 410:22
**Luke** 78:12
**lunch** 140:17 164:18
**Luncheon** 165:12
**lying** 248:22 252:17
351:10

**M**

**mail** 256:9
**main** 51:6 232:18
410:20
**maintain** 399:8,13
**majority** 317:5
**making** 107:9 112:24
153:24 250:6 293:6
296:4 302:15,17
321:4 340:22 344:25
372:23 392:6
**Makishima** 403:3
**males** 339:7
**malpractice** 8:10,11
38:11 40:1,9,9 41:6
41:13,16 42:14
43:12 98:5 102:15
**Mammy** 330:6 334:8,8

**Mammy-like** 329:22
330:3 333:24
**man** 182:15
**manner** 59:4
**manual** 54:8,10
**manufacturer** 95:19
**March** 203:12,18
209:15 226:5 227:3
227:15,23 228:1,24
256:7 277:3
**Marie** 3:12 5:21 63:23
64:5 123:10 165:24
184:18 205:7 224:6
249:2 266:20 284:13
289:5 362:10 390:20
407:17 409:6,24
**mark** 63:23 64:5 72:1
101:9 184:18,22,23
205:7 206:1 224:6,9
247:8 249:1,3 281:3
**marked** 38:24 39:18
71:4,11,17 106:9,16
116:21 141:19
156:12 158:6 202:12
212:1,10 213:20
236:10,16 242:7,19
258:11,15 297:17
324:16 330:17,21
337:12 366:13
389:19,23 401:9,18
417:13
**marks** 213:24 214:1,3
394:8
**marriage** 409:17
**Martha** 325:15,19
**Marvin** 3:13 5:19
400:13
**match** 16:10,15 17:1,5
17:5,6,12
**matched** 17:2 18:9
34:2
**material** 61:5 114:7,8
114:22,23
**maternity** 280:23
281:12 282:1
**math** 37:21
**matriculated** 201:9
**matter** 5:14 10:25
182:4 193:22 201:5
201:6 244:24 316:4
334:13 335:2,8,11
335:14,16,18 336:1
336:5 337:23 338:15
338:22,23,25 339:2
339:3,5,24,25 340:2
340:2,3,17,23
341:18,24 345:1,17

346:8,13,17 347:19
348:6,18,21,24
351:25 364:3,4
366:2 367:7,10
368:10,17,19,25
369:3,5,7,10,11,12
369:14,15 370:2,24
370:25 371:5,6
377:23 379:21
380:12,15 382:9
409:19
**matters** 311:20
**maximum** 200:15
**maze** 226:21
**ma'am** 21:4 31:9 38:8
38:13 39:1 42:25
91:15 134:14 165:21
237:13 253:1 254:3
297:9 303:6 350:13
**MBA** 16:4
**McCammon** 68:24
69:21 70:7,11 73:5
73:24 77:4,13
243:22,24 244:14
385:11,18,24 386:1
386:17,18 387:11
**McCammon's** 244:5
**MD** 39:18 81:4 97:18
97:22 103:1 135:24
413:6
**MDA** 119:3
**mean** 14:25 43:21
47:24 53:9 73:7
76:22 84:17 111:10
118:1 120:20 121:3
122:2,3 137:24
140:1 148:3,4
163:14 173:2 176:23
184:9 187:10 190:22
192:7 194:11,15,17
201:8 206:7 231:10
234:21 235:25
239:20 252:19
271:18 272:1 287:11
293:4 295:5 307:6
307:22 311:18 332:4
338:21 352:12
360:20 365:8 371:25
379:9 382:12 388:23
393:23 396:6 402:1
402:20
**meaning** 99:17 206:5
**means** 70:19 99:2,3
111:11,13 120:22
235:5,6 272:12,13
272:14,16 373:11,12
373:13

**meant** 37:10 137:23
194:6 272:17
**media** 5:12
**medical** 1:8 5:16 9:1,3
15:9,11,12,15,17,25
16:10,14,21 17:3,17
17:24 38:12 39:16
40:1,9 41:5 42:4,13
42:22 43:11 48:19
50:22 52:4 60:6
67:24 68:1 92:23,23
96:20,21 98:5
102:14 134:1 145:24
153:5,9 154:13
157:12 167:21
177:24 202:9 237:24
244:16 247:5 322:6
342:25 372:10
373:17,18 380:20
395:6 413:4 414:6
**medication** 10:8 321:7
322:10 394:9
**meds** 343:6
**meet** 132:5 139:16
244:15 280:3 283:18
290:4,11 301:20
**meeting** 70:17,18,23
72:12 73:11,14,17
80:8,10,20 103:13
103:18 104:2,3
107:21,22 111:21
112:4,20,25 113:2,5
115:10,11,12,19,20
115:23 116:20
117:13 119:20 120:2
121:4,8,12,18
122:14,15 132:22
133:6 134:18 157:13
165:3 196:3,7 198:4
199:16,17 200:18
215:15,18 226:7
227:3,4 233:6,25
234:15 235:9 256:25
264:12 289:15 292:8
295:16,24 296:1
302:23 303:24
307:19 343:4 379:12
402:21 403:25 404:3
413:18
**meetings** 79:22
120:10 124:22
132:10,19 133:1
220:24 230:12
292:14
**meets** 144:1,2,4
244:15 245:10
**megabytes** 324:4

**member** 26:20,21,23
27:18 36:10 287:23
304:17 305:9 400:2
**members** 149:3
338:17,18
**memorized** 80:17
**memory** 49:19 55:15
105:18
**mention** 230:14
**mentioned** 73:6,10,13
113:6 136:13 157:13
372:20
**merit** 94:19 95:6
**message** 133:19
134:6
**met** 107:16 132:3
143:13,17 404:7
**middle** 11:13 12:10
30:5 60:17 118:16
327:1 347:5 380:10
**midyear** 119:12,13,13
287:4
**mid-August** 210:22
287:4
**mid-year** 119:1,6,9,17
119:21,25 120:21
121:10,20
**milestone** 232:13
**milestones** 231:7
233:17
**mind** 46:18 84:17
113:21 227:5 228:3
228:25 270:5
**mindset** 57:4
**mine** 90:18
**minimum** 200:15
**minute** 37:24 72:20
116:8 140:25 141:8
143:9 177:19 184:1
208:17 209:4,10
224:17 226:21 349:2
367:4 377:7 380:5
381:7 389:14 405:2
405:5
**minutes** 46:6,16,17
93:10,11,17 116:20
117:13 120:4,6,10
124:6,24 126:5
132:9,22 133:6
140:19 164:25 165:2
184:21 197:10 199:5
199:12 209:16,19
211:20 220:24 225:4
228:9,18 246:3,7
249:13 296:24 350:2
378:2 413:18
**misappropriating**
345:18

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 431

**mischaracterizes**
138:9,13,18 363:23
**mischaracterizing**
46:22 374:18
**missed** 7:14 266:16
**misses** 321:12
**missing** 54:19 110:21
391:2
**misstates** 334:1
**mistake** 190:18
207:25 240:5,9
**mistakes** 190:19
240:3
**misunderstood**
129:22
**mixed** 197:8
**Mm-hm** 40:5 72:24
74:3 75:23 98:7
126:10 156:15
268:16,19 298:11
**model** 326:12
**modification** 298:15
**modifications** 107:4
**modified** 298:13
**mom** 321:19
**moment** 9:7 37:20
45:21 47:25 155:25
224:11
**monetary** 40:14
**money** 329:2 338:6,12
340:6,9,19 344:25
353:12,16 364:5
**monograph** 308:25
**month** 132:6 200:15
**monthly** 132:5,7
200:14
**months** 68:21 119:23
200:6,8,12,16,17
203:19 210:21
211:12 244:24
256:14 262:18 263:9
**morbid** 343:3
**morbidity** 321:11
343:3
**morbidity/mortality**
343:8
**morning** 306:7 308:14
**mortality** 321:12 343:3
**mother** 321:4
**motion** 357:1
**Motrin** 322:12 323:4
**mouth** 95:9,16 98:10
344:20
**move** 22:20 23:3,6,14
23:17 24:1 27:25
29:10 30:3 45:4
47:10 62:12,13,16

63:1 65:15 85:12
90:7,13,20 102:2
109:6,13 138:2,10
160:20 169:19,21
172:17 181:17 184:4
184:5 185:14 199:22
202:1 203:14 204:11
206:10 223:18 229:7
252:22 271:15
288:24 293:23,25
294:1 304:23 305:7
305:11 332:25 357:5
361:10 375:3,4
**moved** 206:16
**movement** 339:25
340:2 345:1 346:14
348:18
**moving** 61:16 63:17
63:18 101:17,20
109:7 192:18 206:11
223:17 304:22 305:8
332:12 343:14
356:20 402:18
**MRN** 395:3
**multiple** 29:13 30:17
173:16
**murdered** 363:6,10
364:21
**mute** 123:3
**M&M** 321:10,11
343:17

**N**
**N** 165:14,14,14 413:1
**NAACP** 340:14 342:5
342:11 344:4,14
346:7
**name** 5:19 7:17 49:15
68:11 82:1 113:25
126:1,11 196:4
260:4 294:12,14
313:22,23 319:15,22
**named** 8:2 179:8
**names** 91:7
**Nancy** 326:12,21,23
328:7,8
**narcotics** 321:20
322:20,23 323:3
**nation** 359:1,2,7
**national** 25:4 26:15
360:5
**nationalist** 358:4,8,20
358:21,25 359:6,10
359:12,18,21
**nationalists** 359:13
**naturalization** 20:23
**nature** 182:1

**near** 161:23 321:12
**necessarily** 85:11
171:22 339:2 392:15
**necessary** 105:25
173:22 174:3
**Necessitating** 233:6
**neck** 244:4 364:22
**need** 12:2 23:12 39:10
45:24 46:12 62:17
62:24 84:2 93:10
109:18 118:25 128:9
133:25 134:1,5
138:3,6 157:3
166:10 181:9,15
184:11,13 197:5
206:7 211:8 214:16
218:22 238:4 249:5
249:6,8,10 259:18
261:22,25 262:4
264:14 265:11,12
276:23 296:19,21
301:16,17 320:3
335:22 339:5 343:7
351:23 354:1 363:20
364:19 365:5,11,12
388:23 390:9 391:25
404:14 407:25
**needed** 70:12 83:13
157:11 158:11
195:23 259:14
260:25 290:23
301:18 388:25
**needs** 67:20 142:11
143:11 192:8 281:3
**negate** 173:20,23
380:4
**negated** 398:7
**negating** 380:20
**negative** 86:4,7 369:8
370:7
**neighborhood** 337:25
**neither** 260:23
**never** 91:20 94:14
100:7 104:1,24
150:8 171:14 176:17
198:24 241:22 266:3
274:8 292:17 295:11
298:24 303:1 304:1
304:6 306:12,21
307:13 313:6,12,14
332:1 336:20 369:6
374:1,1
**new** 3:10,10 5:22,23
8:21,22 37:6 78:10
205:1 255:2 332:7
409:3,4,8
**night** 117:2

**noble** 329:6
**nobody's** 335:17
**nodding** 57:17
**noise** 7:4 122:18
133:15 209:23
**nonmedical** 139:24
**non-black** 361:24
**non-blacks** 335:21
**non-financial** 204:6,8
**non-reappointment**
255:17
**non-renewal** 49:7
50:16 190:14 256:13
**non-renewed** 50:14
127:10,11
**non-responsive** 24:1
56:17 129:13 160:5
162:10 191:15
216:20 288:19
291:20 300:12
301:24 371:18 388:7
388:10
**non-responsiveness**
293:17
**Nope** 365:23
**normal** 273:3,12
312:24 324:5
**normally** 39:12 296:9
**North** 317:4
**notary** 409:7 410:3,5
**notations** 80:4 82:4
**note** 12:9 23:21,25
48:7 68:5,18,20
91:22 96:4 117:23
118:3 124:9 130:7
154:13 158:19,20
161:7,9,10 163:2,12
163:16,22 164:2,4
171:6,6,8,13 184:2
185:8 229:3 247:9
251:13 390:24
394:23 395:12,13
396:13 403:24
**noted** 11:6 12:12
44:19 45:16 67:13
101:11 134:23 139:2
251:24 371:19
385:11 411:16
**notes** 34:11,22 47:15
47:20 48:8 50:22,23
53:2,14,22 54:2
55:17,21,22 56:20
58:11,12,20 59:13
66:6 76:8 78:25 79:6
79:12 80:5 85:1,15
91:22 96:5,15 97:25
111:22 112:24 113:1

117:18 118:7 121:21
122:12 125:15
127:17 129:16,19,25
130:2,7,11 131:23
135:3 143:6 152:13
152:21,22,23,24
153:2 154:8,10,11
157:16,16,21 159:10
159:18,19 161:2,6
161:20 162:4,24
163:19,21 167:3
171:12,16 199:24
230:6 233:25 234:1
234:2 296:22 399:20
400:6 403:10
**notice** 4:12 167:16
256:17 411:1
**noticeable** 79:14
**noticed** 307:13,14
**noticing** 6:2
**notification** 405:25
**notified** 157:15 405:17
405:23
**notify** 210:13,19 256:7
256:23
**noting** 101:5
**November** 215:18
253:4 300:21
**nuance** 370:22
**number** 5:12 14:17,20
33:21 143:10,15
144:3,21 166:8
247:25 279:20
280:10 391:19
394:18,19,20 401:25
402:2
**nurse** 158:6
**nursing** 161:8

**O**
**O** 165:14,14,14
**OAG** 3:5
**OAG-0000333-339**
106:15 413:16
**OAG-0003171** 389:23
416:11
**OAG-0010499-521**
212:10 414:18
**OAG-0011300-302**
202:12 414:10
**OAG-0011656-664**
242:19 415:5
**OAG-0011666-670**
71:11 413:12
**OAG-0013058-075**
141:19 413:23
**OAG-007483-495**

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 411 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 432

116:20 413:19
**oath** 38:7 165:20
  225:15 252:25 297:8
  350:12
**object** 11:3 66:14,16
  84:9 129:12 136:14
  137:2 181:18,25
  205:14 219:1 223:15
  226:22 288:19 289:9
  375:22
**objected** 115:17
**objection** 13:11 20:11
  21:17,18 24:7,18
  26:10 27:10,23
  29:18 32:15 34:16
  34:24 40:22,23 41:1
  41:7 42:6,9 43:5
  44:9,16 49:2,6 52:20
  53:3 55:23 56:5,16
  56:22 57:6,15 59:6
  59:14 60:1 69:13
  79:7,18 80:25 82:6,8
  83:12,21 85:21
  86:15 88:5 89:3,8
  92:3 94:20,25 98:11
  98:18 99:5,21
  100:11,22 103:19
  104:6,9 105:3,13
  108:16 110:17
  112:13,17 113:6
  114:10,15 115:1,25
  120:25 121:24
  123:19 124:11 128:2
  128:11,23 130:15,20
  131:4,10 132:11,13
  132:21 135:7,15
  136:9,24 137:5,6
  144:9,18 145:13
  146:1 148:1,9,23
  149:8 152:6,25
  154:1 155:9 159:1
  163:7 168:17,23
  169:4 170:8 172:14
  173:14 174:4 175:1
  175:10,14 176:3,18
  177:2 178:14 179:1
  179:10,18,24,25
  180:7,23 181:24
  185:25 186:1,13,23
  188:4,18 190:8
  191:14,17 193:8,16
  193:25 194:7,13
  195:1 198:18 199:11
  200:20 201:2,14
  203:4,24 206:18
  210:5,25 217:23
  219:7,15 221:1

222:2,13 223:1,10
  223:14 225:13,20
  226:3 227:7 228:4
  234:11,25 235:20
  239:8,16,22 241:23
  247:13 251:22
  259:21 260:11,16
  261:4 262:23 263:3
  263:17,24 266:13
  267:19 268:22 269:8
  269:18,24 272:22
  273:5,20 274:5,21
  275:12,25 276:17
  278:4 282:10,14
  283:11,17 284:7
  285:22 287:7,17,18
  290:5 291:11 292:12
  292:21 294:16 295:2
  295:18 300:22 301:6
  301:24 304:2,9
  306:14,19 307:1
  309:4,9 310:3,7
  311:21 312:19 313:2
  313:9,16 314:1
  315:17 317:1,3
  318:14 319:8 320:11
  321:1,24 322:16
  326:17 327:6 328:1
  329:3,8,24 333:25
  335:3,12,23 338:19
  339:9,12 341:1,8
  342:7,15,18 344:6
  345:12 349:8,12
  350:18 351:2,16
  352:8,13 354:4,15
  354:25 355:10 356:4
  357:10 358:5,15,17
  359:4,8,23 360:7
  361:14,20,25 362:21
  362:25 363:1,22,23
  364:14 365:6,24
  369:1,20 370:4,9
  371:7,14,17 372:14
  374:6,16,24,25
  379:23,25 382:2
  383:9,23,24 384:14
  385:19 387:7,15
  388:6,9 389:2,9
  391:12 392:14
  398:18 399:1,10
  405:19 406:11,14,21
  407:3
**objections** 13:10
  101:6 102:1 137:19
  138:20,20 169:18
  361:8 401:16 416:15
**objectives** 78:16

**objectivity** 392:9
**obligation** 37:12
**obligations** 77:11
**observation** 92:14
**observe** 287:10,12
**observed** 118:22
**observing** 79:23
**obstructive** 322:24,25
**obtain** 16:7 111:23
**obtained** 17:6 20:20
  20:22
**occasion** 47:19
**occasionally** 79:11
  133:19
**occur** 70:8 120:1
  121:10,13 196:12,17
  197:16,22
**occurred** 68:19
  114:12 158:17 172:4
  191:6 193:13 231:2
  273:23,24 307:19
**occurs** 256:13
**October** 212:9,25
  213:7 214:7,19
  236:15 237:7,9
  414:17,20
**offended** 310:10,11
**offense** 167:23 168:11
**offensive** 303:9 305:3
  305:4 309:3,7
  314:23 328:17
**offensively** 318:8
**offer** 30:20
**offers** 40:11
**office** 2:15 6:12 13:20
  14:7 25:11,14 203:6
  253:10,11 286:13
  411:4
**officer** 278:16 376:13
**offices** 238:18 410:19
**official** 111:10 114:13
  152:5 173:4 311:7
**officially** 111:6 147:11
  210:14 226:17
**off-limits** 376:14
**Off-the-record** 389:15
**Oh** 76:10 198:16
  207:24 353:3
**okay** 9:6,23 10:3,18,19
  11:2,5,14,22 12:4,11
  12:12,22 13:5,6,13
  14:2,12 15:3,14
  16:24 17:15 18:12
  18:15 19:9,14 21:8
  21:20 23:11,17 24:9
  24:13 25:1 27:3,6
  28:2 32:11 35:6,7

38:9,14 39:22,23
  41:1 42:19 44:11
  46:2 47:6,7,10,23
  48:4 49:17,23 50:3
  54:6,13 55:10,12
  57:19 58:7,17 59:1
  59:21 61:7 62:7,18
  62:21 64:8,18 65:17
  67:12 68:9 70:25
  71:3,14 72:5,20,22
  73:4,12,16,21,23
  74:8,24 75:2,8,15
  76:2,10,10,17 78:18
  79:15 80:3 81:12,23
  83:15 84:7,12 85:7
  85:13,24 88:13,23
  89:14 91:3 92:13
  93:15,18,19 94:17
  95:7 96:1,9,19 98:16
  99:12 100:3 103:9
  105:23 106:8,22,24
  107:24 110:3 111:4
  111:17 113:16 114:1
  114:6 115:6,21
  116:13,23 118:4,12
  119:15,24 120:4
  122:11,19 123:8
  124:19 125:7,19,24
  125:24 126:19,24
  127:23 129:11,23
  131:22 132:7,23,23
  133:4,11,21 134:7
  134:10,22 135:10
  136:5,6 139:1,4,6,8
  140:23,25 141:7,10
  142:4 143:8,20
  144:2,14,23 146:8
  147:22,22 148:17
  149:18,23 150:7,15
  152:2 153:7 154:24
  155:1,21 156:2,20
  157:6 158:15 161:11
  161:18,25 162:17
  163:3,17 164:6,12
  164:24 165:1,8,22
  166:6,13,15,17,20
  166:23,25 167:10,15
  168:8,20 169:2
  170:12 171:7,10,19
  172:1,16 173:9,19
  174:10 175:19 177:7
  177:14,16 178:9
  180:4,25 181:12,17
  182:2 184:15 187:11
  188:12,14,20 189:10
  190:2 191:3 192:13
  192:17 193:21

195:24 196:9 197:20
  198:23 199:3,13,20
  199:22 201:11,25
  202:3 203:17 204:13
  204:21,25 206:25
  207:12,18 208:3,12
  209:12,24 210:12,18
  211:23,25 212:22
  213:13,15,16,16,16
  213:22 214:1,16
  215:4,8 216:4,24
  217:14,19 219:10
  220:21 221:6 222:9
  224:23 225:2,24
  226:6,11 227:21,25
  228:10,10,15,17
  230:10 231:8 233:11
  233:11,18 234:7,13
  234:17 235:2,11,14
  236:3,8,25 237:2
  238:8,14,24 239:14
  240:7,20 241:5,9
  242:4,7 243:6,21
  244:11 245:3,18,25
  247:22 248:2,16
  249:12 251:10 252:5
  253:14,23 254:14,14
  255:9,15,22 256:4,4
  256:21 257:2 258:2
  258:8 259:1,16
  260:23 261:19
  262:11 264:7 265:10
  265:15 266:7,25
  267:10 271:22 272:4
  273:1 274:2,14
  277:16,24 278:8,15
  279:14,19 280:7,14
  281:8 282:5,21
  283:8 284:1,25
  285:2,10,17 286:4,7
  287:9,14 289:2,11
  289:18 290:7,19
  293:7 296:20 297:10
  297:19 298:5,18,21
  299:20 301:9,14,23
  302:20 303:2,7
  304:7 306:3 307:16
  307:25 309:20 310:5
  311:5,10,16 312:16
  312:22,25 313:11
  314:13 315:12 316:7
  316:15 317:13,18,21
  318:1,21 320:21
  322:8 323:16 324:6
  324:12 325:2,6,9,18
  326:5,10,14 327:2
  329:20,22 330:16

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 412 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 433

335:9 337:19 338:8
339:22 340:21
341:13 343:10,18,23
344:22 345:19
348:25 349:18 351:6
351:22 352:10,16
353:15 356:17 357:7
358:23 360:3,23
361:10 363:14 364:8
364:18,25 365:17
366:7 367:15 368:4
369:18 372:7,17
373:4,7,19 375:4
378:17,19 380:2,18
381:2,8,11,16,17,23
382:5,15,21 383:4
383:11 384:2,17,18
385:16 386:4,13
387:3 388:15 389:13
389:17 390:5,12,17
390:21,22 391:8,15
391:18 392:4,21
393:8,18,20 394:2
394:12,23 395:23
396:2,9,18,23 397:5
397:8,16 398:1,14
400:19 401:8,24
402:8 403:8,20
404:13,23 406:5,7
406:17 408:5
old 307:8 308:18
393:12 394:10,14
Oltman 3:13 5:19
once 166:11 206:22
307:7 410:9
one's 140:22,24
341:25
one-page 367:23
Ongeri 212:15 214:9
214:24 354:22
Ongeri's 212:2
ongoing 310:6
online 207:17,19,21
on-call 51:21,24 134:4
287:25
open 38:16 71:6
106:11 116:16
141:12 152:10 156:8
157:24 159:10,23
161:6,7,10 162:4,24
202:5 212:23 236:11
252:15 255:12
258:22 297:11 320:1
324:7 381:2,3
401:22
opened 346:1,4
operating 128:19

opinion 129:2 385:7
opinion 189:21 316:12
316:13 317:20,22
343:16 365:9
opportunity 60:10
106:19 138:17
233:23 263:14 266:9
323:5 330:25
opposing 13:9 188:25
opposite 144:8
option 199:6
options 126:25 130:13
oral 247:11
order 60:5,11,19,22
61:18,20,23 63:16
64:17,21 65:9,13
71:18 72:4 117:4,8
125:3 205:20 249:17
ordering 407:18
organization 25:3,8
25:12,21,25 26:9
37:2 308:10,23
311:4,8 335:14
336:10 338:22
339:24 340:3,5,15
340:17 341:15
344:15 348:19,22
377:18
organizations 24:5,11
24:15,17,24 26:18
340:8,14 348:6,24
376:11
organization's 312:9
organized 308:22
organizing 36:17
orientation 142:19
143:25
originally 19:15 395:9
Orthodox 26:22,25
27:4,8,15
other's 189:1
OTO 76:4
otolaryngologist
18:17 37:17 47:18
51:11 92:16
otolaryngology 16:19
17:13 18:4,10,23
19:1,3 30:25 31:8,16
31:23 37:16 50:6,9
51:3,16,19,20 54:11
54:12,16,20 77:22
128:6 202:11 207:14
207:24 210:3 214:12
235:18,25 236:1
237:11,23 238:11
240:2,3,23 241:1,2
253:3 283:24 297:15

297:22 298:3 371:24
372:3,12,21 374:22
405:15 406:19 407:2
414:9 415:12
outcome 409:18
outpatient 393:12
outside 136:7,14
173:12 205:25
overall 73:1 232:14
248:1
overseeing 284:4
overwhelming 289:16

P

P 288:9
PA 118:21
page 4:8,10,12,14
29:13,17,21 40:4
74:1 117:11 118:16
125:6 133:12 142:2
151:6 154:16,18,19
154:21 156:21 157:3
157:5 166:21 168:3
177:17 194:21 195:2
195:3,4,9,11 212:24
213:2,10 214:8,8
247:25 255:17 259:8
286:6 325:13 328:10
330:21 331:15,19
335:6 336:4,12
357:25 380:7,8,9
384:23 385:3 393:3
393:8,19 394:2,7,16
394:17,18 403:18,19
412:2 413:3 414:1
415:1,19 416:1
417:2,14
pages 125:4,5 141:25
157:13 174:19
332:15 411:12
paid 203:7 204:1
215:7,9 275:16,18
275:20 276:5,9,11
286:14 329:14,17,21
pain 321:7 322:9
343:6
pan 36:19
pancake 329:23
333:24 334:14
paper 57:25 58:2
papers 32:5,6,9
paperwork 43:10
paragraph 112:5,8
113:13 139:12,14
153:17 154:7 172:25
231:11 256:12,12
267:1 278:24 279:1

381:9,19 385:6
393:6
paragraphs 168:6
Pardon 281:16 389:11
parents 19:20 21:14
25:7
Park 14:18
part 24:4,14,20 25:2,3
25:5,20,23 30:5 60:2
64:5 75:22 80:7,9
81:10 113:12 115:10
129:13 141:14
202:21,23,25 203:1
203:22 204:5,6,8
256:11 276:4 282:18
286:5 290:14 303:12
303:13,17 304:8,24
305:2 308:23 319:11
326:24 331:15 333:9
341:5 377:17 383:16
390:24 391:2 397:1
397:6
partially 398:16
participants 5:6
participate 32:7
participated 17:1
participating 295:23
participation 385:8
particular 121:22
127:7 132:12 134:17
134:18 185:21
240:18 247:9 274:10
308:10
particularly 118:20
parties 109:19 409:16
410:11
Partly 353:17
parts 139:24 141:13
255:4,5,6 340:12
party 6:1 91:23 186:9
189:1,2 358:10,11
pass 220:25 407:6
passed 119:19 285:11
285:14,16
passing 264:9,12,17
264:23 266:4,10
267:13,15,25 269:4
383:5
passive 125:11
paste 150:4
pathology 161:9
patient 51:19,25 52:5
52:9,17 53:1 110:7
110:11 127:25 128:7
128:15,17 130:4,8
130:13 134:9 142:11
142:12,16 143:11,14

143:22 158:5 171:13
278:22 321:5 322:20
380:12,15 381:18
382:9,10,20 393:13
393:17 395:3,9
396:11 398:4
patients 31:22 51:9,17
51:20 84:25 85:2,4
85:16 118:22 130:17
142:13 143:18
152:19 155:22,24
158:3,19 171:3,4
311:24 319:14
322:13,14,22
patient's 57:9,12
Patriots 336:9
pattern 178:21 179:6
190:20
pause 37:22 45:22
71:2 72:21 140:3,16
141:9 156:1 166:16
209:5,11,22 211:2
211:11,24 213:21
221:10 224:12,22
254:21 258:7,24
278:10 296:14 325:5
330:15 337:6 341:22
366:18 380:6 381:10
382:14 385:2 390:6
390:16 400:25 405:3
pay 139:7 12,17,19
221:22,24 233:8
273:14 275:10
276:14,22,25 328:25
353:12
paying 90:19
payment 37:12 94:13
PD 76:4,5
pdf 40:4 74:2 133:13
142:2 168:4 393:21
393:24 394:16,18
pdf's 237:1
pediatric 19:1,3 31:22
31:23 33:15 47:13
51:2,4,10,16,18,20
52:1 75:5 76:6,13
110:7 283:24 301:16
321:5
peer 35:9
penalty 9:21 225:12
225:17
pending 116:10
Pennsylvania 19:13
316:21
people 30:17 52:10
91:5 100:5 107:21
188:25 196:2 233:22

308:2,6,9 314:19
315:5,13 316:25
317:5,10 318:25
319:1,6 320:9,24
342:23 344:5 346:9
351:8 353:19,24
355:7 357:14,17,19
360:19 361:12 364:3
377:20 403:25
**perceived** 96:3,4
313:21 333:18
**perceives** 309:17
**percent** 99:1,2 103:5
103:11 199:21,24
238:13,14
**perception** 316:17
**perfect** 53:7,9,12,15
97:24 98:9,14,24,25
99:1,2,2,14,16,24
100:5,7,10,15,17,19
**perfectly** 12:15 251:3
312:23 400:20
**perform** 82:17 129:8
267:4 268:3,14,14
278:17 280:11 281:2
281:10 285:4
**performance** 35:17,22
70:6 73:1,3,9 75:6
89:20,20 120:11
139:22 158:14
232:14 253:16
279:21 280:2 290:3
384:4 387:24
**performed** 99:19
283:22
**performing** 51:6 92:20
128:20 139:23,24
268:4,7,12,21 280:8
284:19 287:1,5
290:12 292:10,18
**peril** 251:12
**period** 9:25 43:2,3,6
71:10 72:8,9 200:2
242:12,18 248:19
413:10 415:3
**perjury** 9:21 225:12,18
**permit** 10:24,25 13:7
**permitted** 281:1
**persisted** 158:14
**person** 7:6 49:10 75:4
100:8 104:11 131:3
131:7,12 145:17
158:24 185:21
190:22 203:13 216:7
235:23 245:9 260:21
264:24 294:11,17,24
295:6,8 303:24

309:3,8 311:15,17
327:22 343:4 344:20
361:23,24
**personal** 36:25 37:3
59:10,12,18 66:10
83:24 96:7,18
153:22 245:16,19
247:16 250:24
293:24 302:13,16,18
335:20 336:24 337:2
**personally** 216:9
252:8,10 287:12
**person's** 49:14 128:22
206:16 381:25
**Perusing** 39:21
106:23 117:20 118:5
125:9 126:15 141:22
142:3 228:16 243:3
246:15 255:24 382:4
**PG** 215:21
**PGI-1** 214:14
**PGI-4** 214:11
**PGY** 232:24 257:7
284:4 285:14
**PGY-1** 16:18 36:2
75:21
**PGY-2** 36:2 97:21
243:16 281:10
282:23 283:6 284:5
284:5 285:6
**PGY-3** 80:2 97:21
214:22 215:22 219:5
219:6 232:18 233:7
234:20,21 235:8
253:18,22 254:6,7
259:3,9,20 261:1,21
262:15 263:2,15
283:1 286:9,16
299:1 300:20
**PGY-3s** 283:11
**PGY-4** 211:13 214:20
215:7,9 223:6 226:1
226:4 227:6 231:4
232:17,24 233:3
234:21 236:5,6
256:8 257:1,5,7,9
259:14 263:7,10
272:20 278:12 280:9
280:22 281:10 283:6
283:16 286:15,18,20
287:5,11 288:10
290:13 292:11
299:15
**PGY3** 402:5
**PGY4** 402:5
**Philadelphia** 8:20
316:6 317:4 318:11

318:16,23
**phone** 14:20 90:22
**phrases** 107:13
**physician** 40:8,10,12
40:13,17 47:17
58:10 59:12,23
66:13 67:9 68:3
98:22 100:10,16
107:4 129:25 130:1
**pick** 373:20
**picture** 298:13 302:23
303:1,8 307:7,10,18
307:21,23 308:7
309:14 310:24 311:2
313:1,4,25 324:3
**pictures** 307:9,9,23
**picture's** 312:14
**Pine** 33:16 35:9 54:3
76:12 119:2 144:8
144:12 191:24 192:1
211:4 257:19,24,25
258:2,6 260:8,14,20
271:19 272:5,17,25
273:8,15,18 311:3
312:8 323:19 384:13
388:11 403:4
**Pittsburgh** 19:8,11,12
19:13
**place** 65:10,13 190:13
190:25 193:15
197:18 209:10
280:20 311:13
**placed** 71:4 91:5,19
92:11 104:12,14
106:4,9 109:3 111:6
111:12 116:14
121:14 167:18
173:15 176:17 191:7
197:3 202:3 226:12
226:15 229:4 258:10
294:24 297:12
330:17 337:7 383:15
383:19 387:23
389:18
**placing** 111:25 125:21
156:4,4 236:9 366:8
**plaintiff** 1:6 6:7 8:14
188:22 189:1
**PLAINTIFFS** 2:1
**Plaintiff's** 401:17
416:16
**plan** 119:4 164:17
**Plante** 1:19 2:3 4:8 6:5
7:10,13,16 9:6 11:5
11:7,22 13:22 14:3
14:12,13 20:12
21:19 23:1,4,10,20

24:3,8,19 26:12
27:12,24 28:12,20
29:6,11,19 32:16
34:17 37:23 38:5,23
39:1,6,23,24 40:25
41:3,10 42:7 43:6
44:3,7,11,19,22
45:13,20,23 46:5,13
46:24 47:3,7,9 52:22
53:5 54:13,24 55:1
56:1,16,18,24 57:16
59:7,15 60:12,16,21
60:25 61:9,15,22
62:2,7,12,21 63:5,17
64:1,7,18,24 65:7,14
65:16 66:4,12,16,18
66:25 67:6,8,19
69:15 70:25 71:3,22
72:5,6 79:8,19 81:1
82:10 83:15,16,23
84:2,7,11,13 86:17
86:23 87:4,7,15,23
89:9 90:6,15,21 92:5
92:7 93:2,8,15 94:3
94:21 95:3 98:12,19
99:7,22 100:12,23
101:1,5,17,20,23
102:6,13 103:20
105:5,14 106:8,18
108:19,25 109:7
110:2,19 112:14,18
115:3 116:1,7,13
117:9 122:2,7,19
123:1,4,8,20 124:12
128:3,13,24 129:11
130:18,21,23 131:6
131:9,11,16,17
132:14 133:16,21,24
134:7,10,11 136:11
136:16,23 137:3,11
137:16 138:6,10,14
138:22 139:1,3
140:11,18 141:10,23
142:5 144:10,19
145:15 148:2,24
149:9 151:18 153:1
154:3 155:11,25
156:2,17,19 157:2
159:3,5 160:3,7,10
160:19 161:17 162:9
162:15,21 164:19,24
165:4,8,18,24 166:6
166:7,13,17,20,24
168:2,6,9,24 169:2,9
169:15,19 170:1
174:6,8 175:3,16
177:4,19,20 178:18

178:20 179:2,12,20
180:1,9,14 181:21
182:2,8,10,19,22
183:1,7,13,20 184:7
184:20,22 185:7,14
185:16 186:2,6,15
186:25 187:2 188:6
190:9 191:14,18,20
192:7,13,17,24
193:1,9,18 194:1,3
195:4,10,13,16
198:20 200:21 201:4
201:21,25 202:3,16
205:4,11,21 206:11
206:13,20 208:21,25
209:6,12,14,24
211:25 212:13
213:15,22 214:4
216:19 217:4 218:5
218:17 219:3,20,25
220:7,12,15,20
221:3,6 222:15,18
222:21,23 223:2,4
223:11,22,25 224:9
224:15,23 225:3,10
225:21 226:19 227:1
227:8 228:5 229:15
229:22 230:3 232:1
232:8 236:9,19
237:6 239:10 242:1
242:5,14,22 248:23
249:3,6,9,12,22
250:4,11,15 251:10
252:9,23 254:22
255:8 256:1 258:2,8
258:18,23 259:22
260:12 261:6,23
262:2,24 263:18
264:1,20,21 266:14
266:20 267:21
268:24 269:9,20
270:3,24 271:5,13
271:16 273:16,21
275:13 276:1,19
278:5 282:11,16,17
283:12 284:8,12,17
285:24 287:20
288:18 289:2,11,12
290:7,10 291:16,19
291:21 292:23
293:10,13,25 294:5
294:8,10,18 295:4
296:15,20 297:6,10
297:20 300:9,12,15
300:23 301:8,23
302:8,15,21 304:4
304:11,16,18 305:1

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 414 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 435

305:8,12 306:16
307:3 309:11,15,22
310:1,5,14,17
311:22 312:21,23
313:11,18 314:3
315:9 316:2 318:9
318:15 319:2 323:16
323:20 324:2,7,19
325:2,8 327:9 329:4
329:11,13 330:1,13
330:16,24 331:5,13
331:20 332:2,11,17
332:20,24 333:2,9
333:11 334:2,24
335:5 336:23 337:7
337:15 339:10,16,22
341:3,10,23 342:2,4
342:9,20 343:12,14
344:1,10 345:14
346:1,6,15,22 347:4
347:8,13 348:4
349:3,5,20 350:4,10
350:20 351:3,17
354:18 355:2,5,14
355:17,22 356:13,17
356:23 357:6,12,18
357:20 358:18
359:19,24 360:11,18
360:21,24 361:6,11
362:3,9 364:1 365:8
366:1,7,16,23 367:2
367:6,9,15 368:5
369:21 370:6,11
371:17,21 374:8
375:4,8,13,20 376:1
376:5,20 377:2,11
377:13,25 378:9,17
378:18 381:1,3,7
382:15 383:11 384:1
385:21 387:8,18
388:6,9 389:10,17
390:1,17 398:19
399:3,12 400:15,19
401:1,8,21 402:12
402:17,19 403:17,20
404:13,19,22 405:1
405:4,12,20 406:12
407:6,11,25
**Plante-Northington**
1:18 2:2 6:6 7:18
**plays** 143:16 144:16
**please** 5:24 6:3,19 7:7
10:20 22:10 23:3,18
27:13 41:11 45:12
45:17 72:20 90:1,4
90:13,20 101:21
102:11 109:6 116:16

123:7 137:14 138:25
152:13 159:14
160:15 169:15,24
181:23 182:6 183:5
185:2 192:12,21
197:2 205:7 206:10
208:19 224:8 238:5
249:19 266:21
274:16 289:5 293:8
293:23 302:12 305:7
310:13 315:2 330:12
348:16 402:3,6
410:7
**pleasure** 247:16
**point** 27:11 32:23
55:11 63:20 65:4
66:2,3 74:22 79:23
79:25 81:4 94:19
97:10 102:24 104:19
119:5 130:9 166:2
170:22 173:3 177:8
181:19 207:23
214:22 226:13 248:5
249:23 268:23
270:18 274:6 292:4
293:20 303:11
319:24 330:14
336:13 337:1 353:23
375:1 384:7 392:10
408:8
**pointed** 32:20
**pointing** 181:15
**points** 142:7 331:14
**police** 375:22
**policies** 209:13
254:25
**policy** 54:8 141:14,15
145:12,16,19 254:25
255:13 294:25
**political** 24:4,10,15
28:18 358:10,11
**politically** 320:22
**pooling** 320:17
**poor** 337:25 338:3
**popping** 368:1
**population** 142:16
143:22 320:18
**portion** 75:9 123:11
166:3 203:15 205:16
219:2 223:19 236:21
237:17 266:22
284:14 289:6 315:24
362:11 390:19 395:1
**portions** 129:5 255:13
**portrayed** 327:5
**position** 31:4 50:13
62:16 69:8 122:4

150:21 262:15
278:19 283:10,16
317:10 328:25 335:1
352:20 358:13 360:4
378:23 399:9,11
403:1
**possession** 210:10
**possibility** 198:7,10
235:5 384:9
**possible** 120:3 121:11
152:15 159:11
407:22
**possibly** 326:20
**post** 29:7 324:15
326:16 327:19 336:3
337:11 341:17 352:1
366:2,12 369:14,17
369:25 415:16 416:3
416:7
**posted** 30:8,10 303:1
303:4 327:16,17
369:6,7,9,11,12,15
370:13,13 371:9
**poster** 172:19,21
173:2
**posting** 30:5,7 302:22
326:7 370:2
**postponed** 396:21
397:15
**posts** 29:13 30:3
323:6,8,9,12,14
342:17 357:24
**potato** 200:25,25
**potential** 44:13
**potentially** 167:23
168:12 190:21
321:14
**power** 311:7
**practically** 251:22
**practice** 120:9 207:10
252:20
**praising** 333:22
**preach** 101:13
**precede** 230:24,24
**preceding** 106:2
**preface** 87:4
**prep** 408:1
**prepare** 17:12
**preparing** 124:2
**prescribe** 322:19
**presence** 372:24
373:2
**present** 3:1 13:23
47:25 78:10 152:22
385:10,12 386:10,15
**presentation** 303:13
303:14 305:20

**presented** 107:20
303:14,16 307:7
308:18 383:1,2
398:12 399:7
**preserve** 229:18
**President** 357:8,14,23
357:25 358:1
**pretenses** 405:25
**pretty** 74:23 121:16
147:1 400:11
**previously** 391:22
**pre-existing** 78:1
**pre-op** 397:18
**PRG-4** 279:21
**primary** 256:13
**prime** 266:8
**print** 167:19 332:22
**prior** 48:5 90:23 91:4
94:1,15 98:1 111:18
124:2 157:17 226:8
227:14 232:11
244:14 245:10
256:14,19 275:11
283:22 294:11,17
374:10 392:23
395:25
**privacy** 142:12 143:14
**private** 292:14
**privilege** 28:9,12,13
28:14,18 90:5 356:9
**privileged** 29:3 66:17
66:23 67:1,2 356:6
**pro** 63:8
**probably** 10:22 76:8
88:10 125:2 140:18
143:13 197:9 229:10
243:13 257:21
298:17 310:8 326:18
327:12 392:19
393:21 403:17 408:4
**probation** 173:17
190:14
**problem** 80:22 127:15
127:19 134:10
140:12 147:20
248:25
**problems** 34:10,21
48:6,7 96:5,7,18,20
96:21 104:20 167:14
**procedure** 28:24,25
29:2 99:19 110:13
129:5,9 223:21,24
356:16
**procedures** 128:20
209:13 255:1
**proceed** 7:7 123:7
**proceeding** 6:2

**proceedings** 389:16
**process** 12:6 89:5
211:10 226:2 254:12
254:13,16 358:12
399:18
**processes** 254:11
**proclaim** 371:4
**produce** 63:12,13
87:11 89:7,23
174:22,23 211:8
234:9 331:8,21,22
**produced** 39:5,13
86:14 87:3 124:21
219:22 323:12 331:3
331:6 332:1
**product** 26:5 327:11
**production** 86:22
122:1
**profession** 142:14
143:19
**professionalism**
139:18,20,21 140:21
141:4,25 142:7
244:17 280:2
**professor** 31:6,16,18
31:19 33:1,3 50:6
**profile** 39:17 40:8
413:6
**profusely** 101:8
**program** 16:11,16,22
17:3,22 18:3 50:7,8
50:18 55:4,8 68:25
69:8 70:8,22 73:19
76:18 77:16,17 78:3
78:6 92:8,17,19 97:2
129:4 132:4 135:21
158:23 163:11,13,16
237:23 238:1,2
239:7,21 240:10
241:3 244:7,9
256:15 279:18,23,24
279:25 280:3 291:7
291:8 311:14,18
371:24 372:10
374:14,15 383:6
386:1 406:3,20
**programs** 240:16
241:4
**progress** 75:21 129:7
245:14
**projects** 125:16 143:5
**promote** 256:18
**promoted** 31:19 32:24
32:25 55:3 203:10
210:15 211:14 223:8
226:1,17 229:1
253:17 257:5

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 415 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 436

**promoting** 272:7
**promotion** 272:7
**pronunciation** 201:1
**proof** 157:9,19
**proper** 57:22 318:3
**properly** 57:11 96:13
  164:2 204:18
**property** 37:11
**proposed** 384:9
**proposing** 303:18
**propounded** 411:14
**protect** 95:15 147:8
**protected** 67:25
  108:17 354:1
**protective** 60:5,10,19
  60:22 61:18,20,23
  64:17,21 65:9,13
  71:18 117:4,8
  205:20
**protests** 368:9
**proud** 377:14
**prove** 179:17,21 180:6
  180:10 184:12,13
  188:2
**proved** 180:22
**proven** 180:17,19
  181:1 183:9 184:6
  184:14 185:17,19
  186:8 187:1,7,25
  398:25
**provide** 36:14 59:9
  63:11 89:10,11,18
  177:24 256:16
  270:13 278:21
  310:18 320:2 380:3
  393:10
**provided** 54:16 63:8
  89:12,14 157:19
  320:5 338:3 365:18
  380:19 382:7 392:13
**provider** 68:3
**providing** 64:15 259:4
**public** 39:16 247:4
  364:17 409:8 410:3
  410:5 413:4
**Publish** 32:6
**published** 319:5
**pull** 58:16 71:1 105:19
  116:3 200:10 209:9
  227:16 277:4 390:4
  400:3 401:2
**pulled** 57:10,12 58:2,5
  58:9 111:2 139:8
  332:6 395:4,4
**pulling** 367:18 399:19
**punch** 294:3
**punish** 388:19,23

**punished** 389:1,7
**punishment** 390:10
  392:1
**punitive** 392:7,11
**purports** 117:12
**purpose** 36:16 240:22
  240:22 373:9 392:6
**purposely** 373:10
**purposes** 204:23
  275:9,23
**pursuant** 205:19
  223:19 251:8 304:24
  356:14,15,22
**put** 42:12,15,16,16
  48:10 73:25 81:13
  92:1 93:4 97:3,12
  112:11 119:22
  133:24 135:13,19
  141:10 148:25
  150:16 151:14 152:4
  156:3,6 166:10
  173:17 187:3 198:24
  199:4,9 209:25
  211:7 213:17,23
  218:13 242:5,8
  254:19 255:1 258:9
  263:14 274:24
  283:10,15 294:11
  301:22 302:2 303:24
  326:7 338:9 351:10
  359:6,13,15,20
  360:1 366:9 368:9
  368:12 386:5 388:22
  388:24 393:25
**puts** 359:1,2
**putting** 91:17 114:13
  114:23 121:19
  123:17 195:20
  211:25 262:14 263:1
  263:20 401:9
**P-0001700** 297:16
  415:13
**P-001844** 236:16
  414:21
**P-001845-889** 156:12
  414:4
**P.C** 2:3
**p.m** 165:11,17 225:6,9
  229:24 230:2 250:18
  250:21 297:2,5
  350:6,9 378:5,8
  400:18 401:4,7
  405:8,11 407:15
  408:9
**P.O** 410:21
**P002064-066** 324:16
  415:16

**P002117** 337:12 416:3
**P002122** 366:13 416:7

**Q**

**quality** 5:9 320:5
**question** 10:12 11:11
  11:13,24 12:18 13:1
  13:3,8 22:5,10,22
  23:19,22 28:9 34:19
  35:3 41:2,11 44:6,21
  44:23 46:23 48:15
  57:22,24 58:1 60:18
  60:24 67:23 84:10
  85:8 87:5 90:4 94:2
  99:10,11 101:15,18
  108:24 114:18,20
  116:10 123:10,22
  124:14 125:20 128:8
  129:22 130:22
  131:15 136:19,21
  150:6 151:5,17
  153:15 155:20
  158:10 160:2,12,14
  169:6,10 170:10
  176:20 183:14
  185:10 187:23
  189:19 191:11,13,21
  191:25 192:22 193:6
  193:7 198:6 201:20
  201:24 215:6 216:18
  217:3,24 218:1
  222:19,22 224:2
  230:4 231:24 232:6
  235:15 251:23
  264:19 266:17,21
  269:11,15,23 270:19
  271:1,3,6 273:17
  279:3 281:11 284:11
  284:13 285:9 288:21
  288:23 289:1,3
  291:15,17,23 292:1
  293:19 294:4,6
  300:8,14 304:14
  309:23 310:2 311:12
  312:24 314:6 315:2
  315:4,9,11 318:6,10
  319:4 339:14 343:10
  343:24 344:3,9,13
  347:5,7,11 348:11
  348:12,14,15 349:4
  349:19 355:12,19
  356:12 362:4,8
  370:15,22 371:11,16
  371:20 377:8 384:4
  388:1,2,4 392:9
  396:11

**questioning** 116:25
**questions** 10:1 12:2,7
  21:7 22:19,24 45:4,9
  71:20 117:6 138:25
  181:10,20 182:1
  183:5,23 197:9
  205:17 219:24
  250:25 294:9 310:13
  316:23 331:25
  346:13 375:10
  376:24 407:9 411:14
**question-and-answer**
  9:25
**quick** 46:3 93:6
  308:15 348:22
**quickly** 6:25 93:14
  393:22
**quid** 63:8
**Quite** 310:21
**quo** 63:9
**quote/unquote** 158:7

**R**

**R** 165:14 412:1,1
**race** 7:20 142:18
  143:24 182:20,23
  185:1 309:17 316:25
  341:6 343:19 345:10
  357:13 360:11
**racial** 302:3 309:18,19
  315:4 334:23
**racially** 311:19 321:23
  322:1 327:21 352:6
  352:11,12,14
**racial-based** 334:23
**racism** 341:6 359:7
  360:13 362:15
**racist** 321:20 322:7
  343:5 356:7,8
  357:15 362:20
**Raimer** 188:24
**raise** 6:18 118:2
**raised** 337:23 338:5
**raises** 340:6
**raising** 340:9
**ran** 281:14
**ranked** 248:3
**Rastus** 333:14
**raving** 76:7,9
**RA-P** 243:17
**reach** 238:5
**reached** 216:14
**read** 4:12 118:3
  121:23 123:12 126:7
  142:6 157:7 166:4
  168:1 194:8 197:7,8
  197:11 214:9,17

236:24 237:14,18
255:19,23 259:5
260:2 261:12,15,17
266:23 267:11
279:14 280:5 284:15
289:7 309:1 315:25
319:20 329:18
331:11,14 337:20
362:12 364:9 380:23
381:20 391:22 407:7
411:1,11
**reading** 117:23 121:4
  140:4,13 154:15,16
  196:21 197:14
  217:11,12 228:6,8
  228:11,13 237:20
  268:9 278:9 334:17
**ready** 7:11 45:21
  57:20 85:12 147:5
  147:10 209:25
  213:23 232:16 294:1
  302:11 325:4 375:8
**real** 36:18
**realigned** 78:10
**reality** 407:5
**realize** 151:8 179:7
  187:16 327:20 363:9
**really** 7:4 61:4 125:13
  125:13 167:7 209:8
  284:3 299:23,24
  307:13 337:5 371:10
**Realtime** 409:7
**reapplied** 16:19
**reason** 10:5 40:20
  41:4 50:21,24,25
  75:3 84:19 149:4
  167:21 169:11 238:9
  245:8 253:2 256:13
  351:9 356:6 360:1
  368:18 388:5,21,22
  412:2
**reasonable** 68:14
**reasonably** 256:19
**reasoning** 188:15
**reasons** 134:1 317:8
**rebuttal** 177:9 178:5
  194:2,5,8 378:11,24
  379:14 380:23 381:4
  381:5,12 393:20
**recall** 12:14 26:14
  30:18 34:12,25
  35:19,23 47:14
  52:24 77:7,9,12
  80:10 84:18 85:22
  86:2 91:1 96:8
  104:22 105:8 106:6
  108:7 110:21 114:4

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 416 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 437

146:22 212:20,21
215:23 221:5 234:15
236:4 265:2 280:24
297:21 321:8 336:6
389:12 405:13
**recalls** 218:23
**receipt** 256:9 410:8
**receive** 51:16 107:3
131:1 178:4,8
278:11 279:4 322:9
322:15 410:9
**received** 69:20,20
82:13,14 89:1 98:5
103:17 150:8 178:7
178:10 242:10 261:9
261:11 265:18,21
288:1 322:11 392:17
392:23 404:15,20,20
**receiving** 273:14
276:25 391:3
**recess** 38:2 54:14
93:22 109:24 165:12
225:7 229:25 250:19
297:3 350:7 378:6
401:5 405:9
**recognition** 335:21
**recognized** 307:10
**recollection** 9:14
33:19 34:14 86:8
133:2 218:7,9,23
391:6
**recommend** 242:25
383:14
**recommendation**
265:8 404:8
**recommendations**
391:7
**recommended** 107:7
247:19
**recommending**
290:20
**reconvene** 93:16
**record** 13:17 14:8
37:24 38:1,4 45:2
46:14,20 52:9 54:15
57:11 58:14 61:14
61:16 64:20 75:19
83:14 93:21,24
97:23 101:22,24
109:10,17,21,23
110:1 117:1 123:12
137:8 138:14,19,24
153:5 154:15 157:7
162:20,23 165:11,17
165:25 166:4 169:21
183:12,13,14,17
184:1 185:8 197:12

205:3,6,8 220:6,11
220:13 223:10,14
224:14,24 225:6,9
229:16,21,24 230:2
237:19 246:19
250:12,14,16,18,21
250:23 251:18 252:2
255:21 261:12,16
266:23 274:19,24
279:15 284:15 289:7
297:2,5 315:25
347:2 349:24 350:4
350:6,9 362:12
375:9 378:1,5,8
382:16 391:1,23
399:6 401:2,4,7
405:5,8,11 406:9
407:15,16 409:13
**recorded** 121:5
**recording** 122:13,17
123:16,23 133:1
144:25 145:2,4,5,6
234:8,12,14,18
271:18 272:2,5
292:17 400:1,9
**recordings** 124:2
**records** 48:19 50:22
52:4 79:16,21 82:25
145:24 147:15 153:9
154:5,13 157:12
161:11 167:21
177:25 178:3 247:6
380:4,20 399:19
400:5
**recruit** 372:10,16
**recurring** 322:23
**red** 396:6,7
**redact** 108:20
**redacted** 118:14
390:25
**refer** 247:15 295:5
**reference** 117:17
241:12,14 243:1
393:2
**referenced** 153:4
398:8,9
**references** 342:16
**referencing** 153:3
391:1 394:1
**referring** 112:21
227:10,12 258:20
273:8 308:17
**reflect** 252:2 274:19
406:9
**reflective** 245:15
**reflects** 44:2
**refresh** 9:13 49:18

55:14 218:7,9,23
**refused** 51:10 371:19
**refute** 34:14,23 104:5
105:2 176:2 382:7
**regarding** 29:13 42:20
52:18 72:2 82:15
89:19 90:24 104:2
113:8 124:9,17
148:14 157:11,20
215:11 235:7 239:18
344:5 357:25 382:8
395:7 404:21
**regardless** 398:24
399:6
**registered** 28:3
**regularly** 30:5
**regulations** 9:11
279:12
**rehabilitate** 270:17
**reinstating** 262:21
**related** 71:20 101:25
112:15 117:6 126:12
127:15 136:6 150:9
205:18 251:1 336:4
356:21 365:22
376:24 409:16
**relates** 21:9 68:15
97:7 100:19 108:2
110:23 124:8 131:25
142:20 153:23
162:24 168:15
178:11 198:25 203:2
226:2 247:11 248:4
272:6 314:15 334:22
347:18 378:23
**relating** 28:18 111:20
167:20
**released** 37:12
**relevance** 345:24
**relevancy** 375:21
**relevant** 66:5,11
182:25 220:16
304:12 335:7 357:13
**religion** 142:18 143:24
**religious** 26:17
**rely** 356:4 361:9
392:16 398:16
**relying** 5:10 112:11,16
153:20 385:17
**remain** 42:4
**remaining** 144:4
**remarkable** 75:21
**remedial** 17:12 374:14
374:17,19
**remediate** 127:4
**remediated** 127:8
**remediation** 11:16

48:10 88:2 91:6,18
91:19,25 92:2,12
93:3,7 97:3,8 104:12
104:14,17,19 105:1
105:12,25 106:2,5
106:14 108:15 109:4
110:5,24 111:6,12
111:25 115:19,22
117:19 121:15,19
123:17 124:7,17
125:22 126:2 130:14
131:24 135:18 139:5
143:6 145:9 149:1
151:1 156:11 167:18
172:21 173:4,13,15
173:18,21 174:2,12
174:20,25 175:13
178:5 181:11 184:16
189:11,24,25 190:4
190:11,12,13,25
191:1,7 193:3,15
196:16 197:4,18,23
198:3,8,10,12,17
199:1,6 200:4,5,19
226:13,15 227:13,14
228:2,22 229:5
230:15 242:25 243:1
243:5,7 262:10
264:9,12,18,23,25
265:6,7 266:4,10
267:3,13 268:1,3
269:4,5 273:23
294:12,25 301:21
378:11,24 379:2,7
379:16 382:24
383:15,20 384:8,20
387:21,24 388:8,16
392:6,17,24 393:4
396:25 397:12
398:10,22,24 399:13
400:6 413:14 414:2
**remember** 12:15
17:18,20 25:18 32:8
41:20 42:11,15 43:8
49:13,14,22,24 50:1
50:2 76:21 77:1,3
79:2,3 86:12 91:16
107:9 108:12 132:25
199:14,18 215:14
216:2 232:25 236:7
245:6 296:4,6
302:22 308:4,8
314:7,9 319:10,17
319:19,20,21 321:3
328:13 334:17
336:18 341:21 366:5
372:23 384:16 387:1

391:3,5 392:20
405:21,23
**remind** 7:1
**reminded** 105:16
**remote** 1:15 5:5 12:23
3:1 5:7
**remotely** 3:1 5:7
**remove** 313:24 352:3
352:4 382:25 383:3
390:13 398:13
**removed** 78:9 152:20
177:11 291:9 311:12
313:7 334:13,18
**removing** 298:15
334:22 398:10
**renew** 49:4 50:21
256:17
**renewed** 48:24 51:1
352:24 353:1,2,3
**repeat** 18:13 35:2
123:9 127:5,8 216:7
216:7,12 221:25
231:15 266:16,21
271:2,6 284:12
289:3 301:10 315:21
348:15 362:9
**repeating** 217:9
300:17 301:2,4
**repetitive** 62:24
**rephrase** 10:17 137:25
261:24 273:16
334:25
**replaced** 388:8
**report** 72:18 75:1
148:8 212:7 414:14
**reportable** 40:17
94:16
**reported** 38:11 58:14
298:2
**reporter** 3:12 4:10 5:8
5:21 6:4 12:23
123:13 166:5 266:24
284:16 289:3,8
316:1 362:13 409:7
**reporting** 1:25 3:8
5:22 151:12 410:18
**repost** 324:20 337:16
337:21 368:9,19
371:4
**reposted** 325:7 349:7
367:11 368:6,20
**represent** 6:1 7:18
**represented** 330:2
**reprimand** 131:1
**reprimanded** 48:12
**Republican** 28:3
**request** 11:19 90:3
407:7

requested 32:22
  123:11 166:3 177:22
  220:8 256:9 261:16
  262:15 266:22
  284:14 287:4 289:6
  315:24 362:11
require 65:3
required 173:3 199:23
  277:18 279:10 410:4
  410:5
requirements 78:20
  281:5 406:23
requires 40:7 244:16
  245:11 248:12
  277:13
reschedule 397:18
rescheduled 395:11
  397:21
research 32:1,2,2,8
  143:5 301:17 308:11
  308:13 316:4,5,9,18
  319:5,12 328:5
  332:8
reserve 407:9
residency 16:11,18,22
  17:2,13,21 18:1,3,8
  18:18 50:8 54:2,9,10
  55:4 77:22 129:4
  135:12,20 139:25
  186:20 187:4,6,9
  188:9 190:17,22
  214:12 230:25
  240:16 256:6 274:10
  278:14 279:9,11,17
  283:23 284:6 298:8
  298:16,23 299:8,9
  299:14 300:19
  371:24 373:6 374:25
resident 33:21 69:12
  70:2,5 82:4 91:13,18
  91:24 120:14,17
  126:12,13,17,18,20
  127:7 128:6 129:8
  129:14,24 130:3,5,6
  130:18,19,25 131:19
  134:16,17,19,25
  147:9 163:2 167:17
  198:9,11 202:19
  210:15,24 214:11,14
  216:12 217:8 221:11
  227:17 229:2 237:25
  244:21 256:23 257:4
  259:12 274:7 276:8
  280:21,22 281:13,25
  282:1 289:20,24
  295:22 315:10
  317:16 374:22

380:17
residents 31:25 69:4,4
  78:20,24 79:5,11
  81:11 84:25 85:1
  91:10 92:10 121:7
  129:4 135:23 159:23
  161:3,20 203:7
  206:23 217:6 220:25
  232:14,20,20 241:3
  244:25 254:10 267:6
  279:10 281:22
  297:25 303:15
  316:12 319:23
  371:23 372:3,11,16
  392:3
resident's 120:11
  161:7
Resident/Fellow
  256:16
resigned 352:20,21,22
  372:6
resources 315:8
respect 142:10,12,21
  142:25 143:14 336:2
respectful 23:6
respects 231:4
responded 152:17
responding 279:16
response 13:1
Responses 401:17
  416:15
responsibilities
  278:18
responsibility 31:21
  77:11 157:18 164:1
  373:16
responsible 152:12
  212:17 217:5 235:24
  264:25 355:8
responsive 160:13
  162:11 231:19,21
  232:2 246:1
responsively 13:4
responsiveness
  142:10,15 143:11,21
rest 51:22 293:1 404:9
Resto 30:19,20,23,24
  32:19 35:8 144:25
  145:6 257:23 258:14
  271:18 291:9 312:4
  313:23 399:17,23
  403:2 415:8
restrained 337:4
restraint 337:1
restroom 46:9
result 334:12
results 233:1 319:18

retain 145:18 255:18
  257:14 259:19 286:9
  288:6
retained 231:14
  234:21 235:8 241:13
  257:16 274:4,6,9,11
  274:15,17,20 290:21
  290:23
retaining 263:21
retaliation 7:22
retaliator 179:9
return 215:15 256:9
  259:4,9 295:17,22
  300:20 410:7,14
returned 210:16
  295:20
revenue 159:11
review 38:20 71:9,10
  72:9,23 75:6 79:16
  80:12 82:25 83:14
  87:8,17 106:20
  107:22 116:17 125:8
  140:10 141:2,12
  152:13 154:11,25
  155:2,7 156:25
  163:12,15 229:14,18
  242:12,17,18 323:13
  324:10 330:25 332:3
  332:23 413:9,10
  415:2,3
reviewed 86:21 107:6
  154:7,10 155:3,13
  155:18 157:16
  200:14 253:20
  279:22
reviewing 30:1 106:21
reviews 382:16
revised 157:22
revisit 60:8
reword 130:22
rewrite 77:15
re-post 213:17
Rice 334:20
Richmond 2:4
right 6:18 43:15 72:1
  72:15 77:14 88:16
  106:21 111:14
  155:17 165:5 166:13
  172:17 177:1 184:25
  187:16 189:21 192:5
  194:8 195:6 211:10
  216:6,8,10,11
  224:16 230:18
  246:14 248:9 296:16
  306:9 321:22 322:2
  327:19 336:8,9
  346:17 383:8

rights 322:3
rising 342:22
risk 52:5 128:21
rival 51:5
RMR 3:12 409:6,24
road 384:6
robes 307:5,15 308:3
  308:3,5
role 134:24 376:13
room 93:14 128:20
  129:3 247:21 251:17
  314:19 315:6,14
  317:2,6,17 319:14
  320:4,9,25 342:25
  350:1 385:7
rooms 340:25 342:23
Rosandra 1:5 3:2 6:7
  7:19 71:9 202:10
  237:22 242:17 260:4
  413:10 414:8 415:3
Rose 1:25 3:8 5:22
  410:18
rotated 33:14
rotation 33:15,18,23
  34:9 35:24 36:1
  47:14 53:21 75:5
  79:25 82:19,22 83:4
  83:19 85:10,19 86:1
  135:5,14,20,24,25
  136:8 176:12,13,15
  190:23 232:24
  243:17 259:11,13
  264:6 280:16 283:7
  285:14,15 300:1
  301:1,3,11,11,12,13
rotations 78:11,15
  96:25 97:17 135:6
  136:7,7 203:9
  204:10 215:22
  221:14 226:9,10
  232:18 233:3,8
  243:18 245:7 257:1
  257:8 259:10 263:8
  283:25 285:1 286:16
  286:20 287:11 299:2
  299:16
rough 407:23,25 408:3
routines 267:5
rude 23:16 63:21
rule 53:22,25 58:23
  148:15 223:20,22,25
  251:9 304:25 356:15
  356:22
rules 9:10 22:16,17
  28:16,24,25 29:2
  187:9 189:15 223:20
  223:23 252:19

279:12
run 296:18 312:3
running 13:25 44:16
  282:3 283:19
résumé 32:13

**S**

S 165:14,14,14 410:20
  413:1
sad 59:25
safe 129:9 278:21
safety 52:6,18
salary 204:2,15,20,21
  204:23 277:14,17,19
sanctioned 67:15
sanctions 45:5 102:2
  224:3
sat 222:24 299:16
satisfaction 218:15
satisfactorily 287:2
  292:11 299:5
satisfactory 287:5
satisfy 382:23
Saturday 385:9
save 38:19 88:8 361:1
saved 177:13
saw 51:19 66:25 67:5
  70:1,4,4,9 75:4
  84:25 113:5 115:14
  167:17 172:19 264:5
  303:9,12 306:24
  307:5,6 326:19
  374:1
saying 21:9 26:6
  53:13 57:3 62:11
  67:19 76:11 83:10
  83:18 85:16,22
  87:16 96:22 99:1
  110:9 113:11 116:12
  120:19 122:8 142:22
  160:25 161:12 162:1
  173:6,13,21,25
  176:15 183:2 187:7
  187:8,21 192:21
  199:15 204:4,22
  215:9,24,24 218:16
  223:7,12 225:25
  239:4 241:18 245:4
  246:11 248:13 252:7
  252:10 259:17
  268:25,25 274:20
  278:1 281:6,20
  283:9,14 294:12,13
  299:7,11 323:24
  326:1 335:18 343:2
  359:21 363:19
  365:10 386:17

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 418 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 439

**says** 40:6 74:14 104:1
118:16,17 126:20
127:20 139:15 157:8
176:23 196:18,19,23
213:7 217:20 218:21
219:6 220:3 223:6
247:1 256:12 257:22
260:1 262:7 270:10
270:12 272:5 275:17
278:2,16 279:12,20
326:7,7 332:14,21
333:3 337:21 340:3
346:7 348:21 380:11
385:6 387:11 391:25
393:9
**scenario** 185:21
**schedule** 125:17
152:21 176:10,11,12
301:2,3
**scheduled** 396:15
398:3
**schedules** 176:13
**scholarships** 340:18
**school** 15:9,11,13,15
16:14,20 17:4,17
92:23 240:18 338:1
**schools** 15:10 372:10
373:17
**Scouts** 24:23
**scrambled** 16:16
**scrambling** 16:21
**screen** 297:16 415:12
**scribe** 395:18
**se** 11:15
**Sean** 3:3 6:13
**search** 89:13 308:15
**second** 18:9 33:24
76:8 191:23 211:1
237:4 243:11,12,20
243:25 244:1 256:12
258:22 259:7,8
280:20 282:18
283:23 296:19
**seconds** 71:15 255:23
**secret** 109:2 305:23
306:2 331:9
**section** 40:6 393:5,6
**see** 39:7 40:3 66:22
67:9 72:7,7 75:10,22
76:11 85:4,16 87:9
88:3 110:11,14
111:7 117:14 118:21
120:21 124:23 125:7
125:10 126:3,14,22
127:2,4,5 134:12,15
134:19 135:1,2
139:12 140:7 141:3

154:5 164:1 175:6
195:6,7,14 213:1,9
214:5,6,7 218:11
222:11 228:10 231:3
231:11 234:6 236:20
236:25 240:17
242:24 243:14
245:25 246:8,12,13
246:16 247:25
251:25 254:18
255:10 260:6 262:2
268:9 277:11 278:23
279:2,2 296:22
298:7,10 303:11
306:23 307:12 308:6
308:15 309:15
325:12 332:21 333:3
333:15 334:9,11
340:10 346:20
350:15 364:19 365:5
365:11,12 369:19,22
369:24 375:9 378:13
380:14 382:6 390:9
390:21 395:2 396:5
397:23 398:5 399:20
**seeing** 85:2 130:8
308:8
**seen** 59:23 68:2
113:12 130:4 152:19
157:21 158:5,20
171:3,5 206:15
238:25 306:12,21
307:20,21,24 322:21
340:18,19 354:9
**self-evaluate** 354:2
**self-interest** 142:12
143:12
**sells** 327:11
**seminar** 321:10
**Semi-Annual** 71:9
242:17 413:9 415:2
**send** 30:20 88:8 119:3
238:21,22 254:4
260:14
**sending** 90:24 236:4,7
**senior** 232:19 276:7
280:21
**sense** 224:25
**sensitive** 302:17
311:20
**sensitivity** 142:15
143:21 309:16
**sent** 30:23 32:19,22
88:7,10 107:19
115:15 204:23
206:24 207:1,13
210:2 239:5 240:13

240:14 260:8 337:25
**sentence** 111:4
214:10 259:8 267:23
267:24 279:12
**separate** 254:5,11
**separates** 182:13
**September** 1:17 5:17
30:6,15 409:22
**Serbian** 27:15
**serious** 147:1
**serve** 240:24
**serves** 39:11
**service** 53:21 158:2,7
244:5 281:15,23
282:3 394:21
**services** 36:13
**set** 12:7 182:12
401:11 409:11,21
**setting** 205:25
**settle** 40:12
**settled** 94:15,18
109:16
**seven** 46:17 174:19
245:12 281:4
**sexual** 142:19 143:25
**shadow** 68:24
**Shannon** 238:19
**shared** 289:19,24
290:2 325:16
**sharing** 324:1
**Sheet** 411:17
**Shekeira** 2:13 6:11
**Shekeira.ward@oa...**
2:22
**she'll** 71:23 241:13
276:12
**shit** 295:6
**shocked** 198:13
313:20
**shocking** 310:22,23
**short** 301:13
**shortly** 78:5
**shot** 297:16 415:12
**show** 129:6,6 146:17
218:4 219:4,5,9,18
226:16 267:24
294:15,19,19 301:19
322:5 341:20 398:25
**showed** 125:11
147:15 171:14
222:25 223:5 263:7
307:9 310:19
**showing** 124:16
146:20
**shown** 120:15 241:16
**shows** 121:18 297:23
298:8 322:6

**shut** 303:25
**sic** 81:7 82:3
**Siddiqui** 97:9,14
102:24 103:12 104:4
111:20 112:3,16,23
113:1,4,9,11,22
115:9,12,18 118:17
198:4 264:8,11,16
264:22 265:3 372:19
403:3
**Siddiqui's** 113:23
**side** 185:22 186:10
**sidebar** 56:15 101:22
101:24 138:24
169:25 182:7,11
226:23 330:11
336:22 382:3 383:10
399:2
**sidebars** 45:11
**sides** 188:16 189:7,13
189:20 232:22
**sign** 4:12 60:10
103:17 130:10
163:20 201:12,17
203:2 259:18 260:9
260:15,18 261:2
272:20 275:22
276:15,24 286:10
298:20 407:8 411:1
**signature** 261:8,25
262:4,7 265:12
410:3,5
**signed** 65:2 104:2
157:20 202:17 254:6
275:8 277:2 385:23
395:18,19,20 410:7
410:10,14 411:22
**significance** 275:21
276:14
**significant** 173:3
**signing** 157:17 158:1
275:11
**signs** 206:15
**silent** 224:16
**similar** 79:6 96:11
**single** 173:16
**sir** 152:23 269:24
323:21 327:16
357:21
**sit** 20:22 61:25 208:4
250:8 290:4 294:2
**site** 81:10
**sits** 247:20
**sitting** 285:5
**situation** 63:9 162:3
274:10 321:15,16
351:24

**situationally** 59:24
**six** 119:23 200:5,7,12
200:16,17 244:24
280:12
**six-month** 120:13
200:2
**skill** 129:6 247:12
**skills** 127:22 244:18
247:2 248:4,8
259:14
**skull** 302:25 303:10
306:17 307:14
**slanderous** 387:22
**slave** 327:3 328:24
**slavery** 333:23
**sleep** 322:25 323:1
**sll@aboto.org** 238:7
**slow** 118:20,23 125:14
**slowly** 6:3
**snapshot** 297:22
298:7
**social** 24:17,24
316:14
**society** 142:14 143:19
303:17 305:24 306:2
307:8,10
**socioeconomic**
318:19
**soft** 49:1
**sold** 51:4
**sole** 36:10
**solid** 70:1
**Solutions** 36:5
**somber** 59:25
**somebody** 325:10
**somebody's** 176:16
**someone's** 190:21
**something's** 23:2
**somewhat** 247:10
**son** 133:20,20
**soon** 120:3 121:7,11
140:17 408:2
**sorry** 19:11 20:3 31:22
35:8 73:7 74:16
82:11 107:15 111:1
118:1 130:19 133:9
133:18 134:9 151:16
156:22 166:10
168:18 169:7 173:18
192:2,6 214:23
271:19 272:1 284:10
285:13 289:5 305:16
310:10 362:25
366:17 367:21
388:24 390:3,20
402:1,10 403:15
405:1

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 440

**sort** 17:11 29:7 39:11
48:25 59:25 74:17
77:18 204:4 217:21
248:1 251:15 339:19
347:4 369:10 393:5
396:5,5
**Soto** 2:12 6:8,8 11:3
11:20 13:10,15 14:2
14:4 20:11 21:17
22:12,14,23 23:2,8
23:17 24:7,18 26:10
27:10,23 28:7,14
29:1,18 32:15 34:16
34:24 38:18 39:3
40:22 41:7 42:6,9
43:3 44:1,5,9,17,20
45:7,8,17 46:3,11,19
47:1,6 49:2,6 52:20
53:3 54:17,22 55:23
56:5,14,22 57:6,15
59:6,14 60:1,14,20
60:23 61:8,13,17,24
62:5,10,19 63:2,15
63:20,23 64:4,11,23
65:5 66:2,8,14,21
67:4,17 69:13 71:16
72:3 79:7,18 80:25
82:6,8 83:12,21 84:3
84:5,9 85:21 86:15
86:21 87:1,12 88:5
89:3,8,25 90:10,13
90:20 92:3 93:12,25
94:5,20,25 98:11,18
99:5,21 100:11,22
100:25 101:3,15,18
101:21 102:4,11
103:19,22 104:6,9
105:3,7,13 108:16
108:22 109:5,20
110:17 112:13,17
114:10,15 115:1,25
116:9,24 120:25
121:24 123:19
124:11 128:2,11,23
129:1 130:15,20
131:4,8,14 132:11
132:13,21 133:12
135:7,15 136:9,13
136:22 137:1,10,14
138:4,8,12,16,23
140:9,15 144:9,18
145:13 146:1 148:1
148:9,23 149:8
151:16 152:6,25
153:14 154:1 155:9
156:24 159:1 160:1
160:6,9,17,24

161:13 162:7,13
163:7 164:16,22
167:25 168:5,8,17
168:23 169:5,7,14
169:17,24 170:8
172:14 173:14 174:4
175:1,10,14 176:3
176:18 177:2,17
178:14 179:1,10,18
179:24 180:7,13,23
181:18,23 182:6,12
182:17,21,24 183:4
183:11,18 184:18
185:5,12,25 186:4
186:13,23 188:4,18
190:8 191:12,16,22
192:2,5,11,15,19
193:8,16,25 194:7
194:13 195:1,7,12
197:1 198:18 199:11
200:20 201:2,14,18
201:23 202:2 203:4
203:24 205:2,6,15
206:9,18 207:7
208:18,24 210:5,25
216:17 217:2,23
218:2,16 219:1,7,15
219:20,23 220:5,10
220:14,18 221:1
222:2,13,17,20
223:1,9,13,23 224:4
224:13,18 225:2,13
225:20 226:3,22
227:7 228:4 229:19
231:22 232:5 234:11
234:25 235:20 237:3
239:8,16,22 241:23
247:13 248:21 249:1
249:19 250:1,10,13
250:22 252:6 255:20
257:25 258:21
259:21 260:11,16
261:4 262:23 263:3
263:17,24 264:3,19
266:13 267:19
268:22 269:6,18
270:1,21 271:4,11
272:22 273:5,20
274:5 275:12,25
276:17 278:4 282:10
282:14 283:11,17
284:7 285:22 287:7
287:17 288:25 289:9
290:5 291:11,14
292:12,21 293:8,12
293:22 294:4,5,6,16
295:2,18 300:7,13

300:22 301:6 302:5
302:6,12 304:2,9,15
304:22 305:4,6
306:14,19 307:1
309:4,9,13,20 310:3
310:12 311:21
312:19 313:2,9,16
314:1 315:1,17
317:1,3 318:14
319:8 320:11 321:1
321:24 322:16
323:18,24 324:6,9
324:22 326:17 327:6
328:1 329:3,7,24
330:10 331:2,10,17
331:24 332:10,14,22
333:7,25 335:3,12
335:23 336:21
338:19 339:9,12,21
341:1,8,25 342:7,15
342:18 343:10,15,23
344:6 345:12,23
346:4,12 347:1,6,10
347:24 348:2,10,13
349:1,8,12,18,23
350:18,22 351:2,16
352:8,13 354:4,15
354:25 355:10,16,20
356:10,14,20 357:10
357:16 358:5,15,17
359:4,8,17,22 360:7
360:16,20,23 361:4
361:14,20,25 362:21
362:23 363:22
364:14 365:6,24
367:5,13,19,22
369:1,20 370:4,9,16
371:7,14 372:14
374:6,16,24 375:6
375:17,24 376:3,17
376:22 377:9 379:23
379:25 380:25 381:5
382:2 383:9,23
384:14 385:19 387:7
387:15 389:2,9
391:12 392:14
398:18 399:1,10
400:10 402:10,14
403:15 404:15,16
405:19 406:11,14,21
407:3,7,17 408:2,6
**sounded** 286:2
**sounds** 43:15 406:6
**source** 172:12
**sources** 328:12
**SOUTHERN** 1:2
**span** 43:17 99:20

**speak** 6:3 41:24
138:15,17 159:5
162:13 192:15,19
245:1 270:2 271:14
290:18 292:6 302:1
402:25
**speaker** 7:3 247:4
**speaking** 7:6 94:3
101:6 102:1 137:5
137:19
**speaks** 157:3
**special** 135:3 339:6
**specialist** 5:20
**specific** 53:23 69:18
70:20 78:23 131:15
148:3 279:17 314:17
393:9
**specifically** 8:2 54:4
135:13 139:10,15
145:20 216:20
217:21 296:1 400:1
400:2
**specified** 143:6
**speculate** 92:8
**speculating** 21:2
263:20 264:4 347:17
**speculation** 26:11
92:4 95:2 110:18
129:1 159:2 163:8
174:5 175:2 176:4
177:3 198:19 206:19
210:6 219:16 222:3
239:23 273:6 276:18
287:19 327:7 342:8
344:7 359:9 365:7
387:16 389:3 391:13
**spell** 81:25
**spend** 30:1 329:9
**Spirits** 125:11
**spoke** 238:18 291:4
295:12 311:2
**spoken** 111:24 113:14
113:18 355:3
**sponsored** 20:7 21:5
**spot** 17:7,8
**spots** 296:3
**St** 78:11
**staff** 202:10 354:13,17
354:19 400:2 414:7
**stamp** 168:2
**stamped** 39:4
**stand** 98:8 175:20
252:16 270:6 398:21
398:23
**standard** 157:25
180:18 182:12 187:6
193:3 323:3

**standards** 190:1,3,5
190:10 280:3
**stands** 41:2 184:24
**Star** 36:5,14
**start** 93:6 284:3
**started** 13:16 33:22
51:8 55:9 116:25
141:3 164:19 230:21
286:20 377:5
**starting** 111:14,16
280:11
**starts** 108:14 197:12
380:10
**state** 5:25 12:13 37:5
41:25 48:6 64:20
65:8 84:17 117:1
139:9 152:5 181:23
216:25 229:6 250:23
267:10,12,17 270:5
400:22 402:6 409:3
409:8
**stated** 40:19,21 48:19
79:2 80:5 97:23
174:9 175:18 199:14
227:15 229:3 244:14
260:3 261:18 292:17
304:12,13 335:25
353:24 369:2 372:21
385:18 388:11
**statement** 64:25 65:2
83:6 114:24 151:20
175:8 187:13 221:9
245:19 296:5,6
302:19 304:6 321:4
363:8 372:18,24
373:3 380:20 382:3
382:7
**statements** 88:1 90:17
125:21 245:17 344:5
379:15
**states** 1:1 20:2 75:17
145:7 237:15 259:7
267:14,16 331:16
346:18 400:22
**stating** 152:9 162:22
233:13
**status** 158:5 159:18
211:13 240:17
**statutes** 334:22
**stay** 313:12
**stayed** 58:24
**STENOGRAPHER**
6:17 7:12 38:23
229:20 407:24 408:4
**step** 384:8
**steps** 266:11
**stereotypical** 316:3

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 420 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 441

320:8 341:6
**stick** 183:5 185:6
**stipulate** 174:17,19
  402:17
**stipulating** 274:16
**Stony** 8:25 51:14
**stood** 280:20
**stop** 45:10 60:25
  136:23 169:15,24
  191:22 208:19
  231:22 249:20 293:8
  323:22 376:18
**stopped** 30:4,7
**story** 170:18,21
  188:17 328:14,21,22
  328:24 334:5,6
  364:6
**streaming** 12:24
**Street** 2:17 410:20
**strength** 267:7
**strengths** 100:21
**strike** 24:2 226:19
**strong** 375:15
**stronger** 281:14
**structure** 318:12
**students** 373:18,21,23
**study** 317:24
**studying** 346:23
**stuff** 11:17 63:12 89:6
  118:14 208:20 268:9
  270:8 356:7,8 368:8
  407:18
**subject** 10:25 40:16
  196:15 202:1
**subjectivity** 144:16
**submitted** 378:25
**subscribed** 336:15
  411:22
**subscriber** 336:8
**subscribing** 336:19
**subsequently** 334:12
  338:14
**subspecialty** 18:22
**substance** 108:2
  411:16
**substantial** 83:3
  244:23
**substantiate** 174:25
**sub-rotations** 299:1
**succeed** 263:11,14
**successful** 83:10,11
  217:6 259:14 267:8
**successfully** 33:17
  82:17,18,22 83:4,19
  84:21 85:6,9,18
  299:18,19
**succinct** 262:3

**sudden** 96:14
**sue** 95:19,21
**sued** 179:4 187:16
**sufficient** 138:1 254:5
**suggest** 326:24
**Suite** 2:5
**summarize** 245:22
**summary** 119:8
  122:15 229:4 245:14
**summation** 121:3
  252:14
**SUNY** 8:25
**superb** 247:4
**supersedes** 142:11
  143:12
**supervised** 243:24
  244:8
**supervision** 47:13
  129:3,15 244:22
  281:18 282:4
**supplies** 338:1
**support** 21:22 22:6,7
  27:20 87:10 105:25
**supporter** 357:8,22
**supposed** 152:20
  163:20 203:13 256:7
  256:22 291:5 295:22
  298:25 346:24
**sure** 13:3 20:14,15,17
  20:19 43:14 54:22
  76:14 80:18 83:13
  93:8,8 94:4 99:3,13
  103:5,11 117:25
  121:16 122:20
  127:18 131:22 132:1
  136:21 140:12
  146:25 149:22
  153:10,24 160:13
  166:1 176:19 193:5
  194:19 228:12
  231:18 240:19
  244:10 255:6 258:5
  272:17 303:15
  307:22 324:25 336:7
  339:1 361:6 373:1
  378:15 392:19
  399:21 400:4 404:16
  405:24 407:24
**surgeries** 51:6
**surgery** 8:17 16:16,18
  17:7,9,10,23 18:11
  18:14 95:10 393:13
  395:11 396:16 398:3
**surgical** 127:21,22
**surmise** 172:4
**surmising** 127:22
**surprise** 88:24 144:7

**susceptible** 94:23
**suspend** 251:11
**suspending** 251:8
**suspicion** 154:12
**suspicious** 147:17,23
  147:24 148:4 293:20
**sustain** 269:24
**sustaining** 361:8
**swearing** 64:24
**sworn** 6:22 7:11 64:23
  65:1,3 409:12
**symbols** 342:13
**syrup** 327:15 334:15
**system** 6:15 186:7
  340:24
**Szeremeta** 1:16 4:5
  5:14 6:21 7:17 11:9
  11:25 38:6 39:15,18
  45:25 47:5 61:12
  64:2 71:8 73:7 84:15
  87:24 94:5 106:13
  109:4 116:19 118:17
  141:17 156:10
  160:12 165:19 176:9
  178:25 185:11 192:3
  195:14 202:8 212:5
  225:11 230:5 232:7
  236:14 242:16
  249:16 251:15
  252:17 258:13
  261:13 289:14 297:7
  297:14 324:10,14,15
  330:20 337:10,11
  350:1,11 366:11,12
  377:14 389:21
  397:18 401:15
  405:13 407:12
  409:10 411:10,20
  413:5,6,10,15,19,23
  414:3,7,13,21 415:3
  415:8,12,15,16,20
  416:2,3,6,7,11,13,16
**Szeremeta's** 45:6

_____

**T**

**T** 165:14 412:1 413:1
**table** 4:1 228:22
  341:15
**take** 10:21 11:12 12:3
  12:3,5,8 31:21 46:3
  51:25 66:21 84:21
  156:25 157:18
  158:22 181:16 211:9
  214:2 229:17 266:11
  285:18 296:21
  310:24 311:1,24
  319:3 321:14 326:15

347:1,2,12 348:2,14
  349:1 350:14 351:7
  355:25 360:4 378:2
  378:20
**taken** 5:5 38:2 46:16
  93:22 109:24 165:12
  225:7 229:25 232:25
  244:22,23 250:19
  297:3 300:18 312:7
  350:7 368:15 378:6
  401:5 404:9 405:9
**talk** 13:2 65:17 66:22
  137:11,13 162:18,18
  185:1 205:22 228:20
  228:21 264:22
  321:11 404:17
  407:17
**talked** 111:19 118:18
  168:14 290:18
  295:16 312:8 376:10
**talking** 28:13 47:25
  76:10 80:13 87:15
  89:16 136:12 137:16
  150:25 151:2,10
  152:1,3 153:18,19
  165:23 181:14
  186:21 187:13,18
  204:4 207:15 244:7
  248:2 257:20 259:24
  277:5 338:21,23
  370:23 377:2 381:19
  385:5 394:17
**Tammara** 404:2
**tasks** 267:9
**TDC** 134:25 135:5,13
  136:11 137:22 151:5
  152:19 157:24
  159:14,16,16 163:23
  243:16 259:10 264:6
  280:15,17 281:23
  283:5,6,19 285:4,15
  287:24 299:16
**teach** 31:24 330:8
**teaching** 85:4
**team** 76:4 175:21,25
  176:6,23,24,25
  177:6 244:3 259:10
  259:10 301:19
**Tecca** 325:16,20
**technically** 299:3
**teenagers** 322:23
**telephone** 14:16 394:8
**tell** 9:22 22:11,13,20
  23:5,6,14 38:21 56:7
  56:7 64:2 77:4 80:18
  85:25 88:22 104:19
  120:23 127:19 132:2

135:23 144:22
  149:25 150:1 151:25
  185:22 186:10
  188:22 190:10
  195:19 199:19
  203:21,22 216:5
  219:5 225:18 236:11
  267:22,25 269:3,17
  269:21 290:11 292:9
  292:20 336:7 338:17
  338:18 347:15
  351:21 357:2 389:6
  390:2 396:10 399:17
  399:23
**telling** 45:14 47:14
  106:1 137:21 143:2
  143:3,3 181:21
  222:11 248:17 346:2
  351:9 356:25 397:10
**tells** 400:2,3
**Temple** 16:6 48:18,23
  49:10 50:5,9,18 51:2
  51:3,7,13 52:5 55:17
  57:24 59:3 68:16
  316:5 319:6,7
**ten** 48:1,2 159:14,22
  161:2 296:24 378:2
**tendencies** 125:12
**tenure** 92:11
**tenured** 353:5,7
**ten-year** 99:20
**term** 260:19 279:25
  327:21 328:3 345:6
**terminate** 147:5
**terminated** 48:22
  352:17
**termination** 49:1
  145:25 352:21
**terminology** 333:18
  395:6
**terms** 30:21 229:2
  233:7,8 259:6 260:3
  261:18,21 262:5,8
  267:3 268:2 290:16
  291:3
**testified** 6:23 112:24
  405:14
**testify** 58:18 84:4
  250:9 264:16 276:12
  289:13
**testifying** 9:18 84:3
  405:21
**testimony** 9:17 10:9
  56:10 83:11 87:21
  98:1 108:21 110:10
  209:2 220:17 224:25
  240:11 264:14

Case 3:20-cv-00099  Document 121-1  Filed on 10/13/21 in TXSD  Page 421 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 442

283:22 303:3 334:1
363:24 374:10,18
395:25 409:14
**Texas** 1:2,8 2:6,19
5:16 6:15 8:19 9:4
14:19 28:10,16,23
37:4 38:12 39:16
41:15 42:21 202:9
237:24,25 316:20
317:10,15 413:4
414:6
**text** 133:20
**textbook** 85:3
**texts** 134:2,3
**thank** 6:5 7:9,10,13
19:14 35:7 39:1
65:14 82:23 84:7
123:4,8 131:21
132:23 135:17 144:6
165:8,9 168:5
194:17 195:12 225:1
230:10 242:4 273:13
286:24 296:22,25
334:10 357:4 378:2
403:13 407:11
**then-President** 29:14
**theory** 318:24 358:13
**Thibodeaux** 215:2
354:21
**thing** 86:1 96:11
104:15 138:3,7
213:19 215:6 218:14
235:3 270:10 293:4
315:5 320:14 331:12
334:19 347:23
348:20 363:20 366:3
366:25 367:17,18
369:7
**things** 49:8 96:13
150:4 151:13 167:7
189:16 190:20 197:4
247:18 248:10
251:25 296:16
301:20 310:8 340:10
369:17 379:4
**think** 9:11 13:25 20:3
20:4 28:15 29:6 30:6
31:25 37:21 39:9
40:23 41:20 43:14
45:24 46:21 50:23
55:5,13 56:3 57:18
60:7 62:8 63:14
66:11 68:10 69:17
73:20,22 80:7 81:18
81:19 83:12 89:22
97:9 103:3,23,23,25
105:4 114:17 117:11

134:16 135:14,23
136:16 138:8,12
143:13,16,17 150:12
153:12,16 154:6
160:16,17,24 165:6
166:20 167:9 168:10
170:20 171:1 177:9
177:12 178:15,16
180:12,16 183:18
184:23 188:21
198:13 208:10,11,13
209:8,12 215:5
224:16,19 226:16
232:3 234:23,24
235:1,4,10,11 243:9
244:2 246:6 248:24
251:19,21 252:19
253:17 254:18,22,25
255:1 257:21 269:6
270:21,24 271:7,11
276:3 280:23 284:5
289:4 298:17 299:10
305:21 306:1,8,8
308:4 311:13 313:22
325:12 328:2 334:19
335:7,8 336:1,14,15
339:17 342:5 343:19
344:4,12,19 345:2
356:18 357:14,15
360:24 362:7 367:23
370:23,24 372:19
375:11,14 378:9
393:20 400:11
**thinking** 57:18 84:17
197:9 217:22 235:2
272:25 273:8 315:22
**thinks** 144:13 160:19
**third** 69:24 112:5,8
119:18 193:10
203:19 207:4 221:13
221:14 226:10 230:7
231:15,16 241:13
243:10 257:14,17
290:21 298:25 299:4
299:6,22 300:1,5
301:3 393:6
**Thomas** 15:18 292:3,5
292:6,7,14,19 293:1
**thought** 22:16 36:18
95:5 187:17,21
211:10 303:13
316:19 318:3,5
327:18 328:14,19
334:4,5 354:2
358:12 376:9,10
**threat** 67:21
**threats** 67:18

**three** 112:20 115:11
126:25 187:24
197:10 222:25 223:5
245:12 281:4 298:9
299:8,13,19,24
312:4 353:19,24
406:10,16,23
**thug** 366:4
**Thursday** 385:7
**time** 5:18 7:3 8:24
11:1,12 30:1,25
31:10 32:5 33:9 34:3
37:18 38:25 47:19
48:3 50:7,17 53:18
53:23 58:10 59:13
60:8 65:22 72:23
73:18 78:23 79:6,12
82:5 92:16,18 94:22
95:23 97:3 98:4
100:18 114:7 124:7
125:18 131:19
140:17 156:25
157:14 160:8 163:24
165:7 166:14 170:23
183:25 184:3 193:11
196:2,5 200:2,3
203:8 218:18 220:19
223:8 224:20 229:18
240:8 246:7 248:19
252:4 265:1,5 267:6
273:22 280:22
283:20 287:11 288:2
306:4 308:22 324:1
329:10 371:2 374:12
375:6 377:12 382:17
397:11,12,14 400:10
400:13 406:3
**timely** 34:21 58:20,24
59:4 96:6 139:22
199:25 247:5 393:11
**times** 12:13,25 22:24
58:3 158:14 187:24
288:21 350:23 365:1
**timespan** 68:20
**title** 50:4
**today** 6:10 7:3 9:16
10:6 39:7 134:5
197:19 219:9,19
251:4 326:11
**today's** 5:17 30:3
**told** 21:12 42:11 43:9
62:15 63:6 66:6 67:2
95:15 101:7 106:3
133:22 136:18
137:23 147:4 148:5
148:7 150:2 151:18
175:25 196:14 198:1

198:7 200:18 211:12
211:16 264:11
270:25 290:22
292:10 293:3 300:19
306:24 307:8 312:12
321:5 337:3 346:15
352:2 356:7,8
359:11 362:6 364:11
364:12 374:2 386:7
386:7,9,14 393:15
**tolerated** 167:22
**Tom** 333:14,18
**tomorrow** 408:5
**tonsillectomy** 321:21
**tonsillitis** 322:24
**tool** 388:17
**top** 15:21 72:16 92:22
395:15
**topic** 12:7,10 64:14
**topics** 134:20
**total** 14:1 293:16
**totally** 7:13 101:12
137:12 146:4
**tough** 53:18
**toughest** 135:24 136:8
**town** 385:15
**track** 160:4
**trade** 331:9
**training** 127:21 129:4
214:12 246:23 298:8
298:9 301:17,18
**transcribed** 122:14
**transcript** 224:7
407:20 411:3
**transcription** 411:13
**transcripts** 271:14
**TRANSPORTATION**
2:16
**transpose** 199:16
**treated** 295:13 336:2
**treatment** 342:24
343:1
**trial** 56:10,12 94:11,12
94:15 407:10
**trials** 365:15
**Tricia** 199:15
**tried** 132:5 323:19
**trigger** 339:19
**Trish** 121:3 123:24
**trouble** 323:25
**troubling** 380:11
382:8
**true** 12:16 30:4 36:20
88:2 113:10 135:11
146:25 150:8,23
193:23 217:18
271:12 328:20,22

338:4 364:12 379:16
388:13,14 393:14
409:13
**truly** 145:7 171:4
**Trump** 28:5 29:14
357:9,14,23,25
358:1
**trust** 149:2,5,6,11,12
149:13 351:20,20
363:12 385:25
**trusted** 149:15 363:15
395:24
**trustworthiness**
166:22 167:1,20
168:4,7 169:20,22
170:2,6
**trustworthy** 170:19
**truth** 9:22 143:2
144:22 225:18
248:17 326:25 351:9
351:21 397:10
**truthful** 10:12
**truthfully** 42:11
**try** 10:16 13:2 56:11
159:10 191:1 224:24
245:21 377:6
**trying** 56:12 57:21
102:7 118:3 120:21
133:20 136:20,22
162:15 176:21,22
187:20 191:12
194:24 206:1 217:15
228:13 229:17 231:2
270:8 278:24 282:6
282:12,19 285:18
291:18 305:23
309:15 315:20
323:22 336:24
339:19 340:10
347:21 373:14
376:15,17,18 395:5
406:2
**turn** 47:8 87:18 124:6
244:23 393:18
**turning** 270:7
**TV** 365:15
**twice** 289:4 361:13
**twisting** 270:7
**two** 14:6,9 19:8 21:7
46:6 55:5,7,13 57:13
71:14 76:5,6 92:10
157:16 167:7,14
168:6 187:24 188:16
188:25 190:1,18
197:10 201:15,15,22
210:20 228:18
254:11 255:22

Case 3:20-cv-00099   Document 121-1   Filed on 10/13/21 in TXSD   Page 422 of 425

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 443

281:22 284:22
299:23 317:15 385:9
394:8 406:13
**Tylenol** 322:11,15
323:2,4
**type** 24:21 32:4 37:1
39:11 59:18 63:9
109:2 209:2 220:16
223:25 279:5 318:12
331:9 338:11 342:16
344:24
**typical** 272:14
**typographical** 107:12
107:18 108:1
**typos** 108:10

**U**

**Ukraine** 19:23 376:11
**Ukrainian** 19:18 25:4
26:8,15,21,25 27:4,8
27:14 375:15 377:15
377:19,22
**ultimately** 92:1 130:9
**unanimous** 274:13
**Uncle** 333:14,18
334:20
**uncomfortable** 302:5
**Underbrink** 146:11,24
147:14 148:12 149:3
149:11,20 150:17
151:12,21 152:8
153:20 155:4,8,14
155:19 158:16
159:15 163:18 171:2
172:10 285:9 351:8
351:20 385:25
393:15 394:24 395:2
395:10,15,17,24
397:6,10 403:5
**Underbrink's** 393:16
**underneath** 232:20
**understand** 7:23 8:1
9:16,20,24 10:13,15
11:8,10 12:19,21
16:25 22:21 24:10
38:6 44:7,12 45:7,15
55:19 67:14 86:13
88:19 90:10 99:11
99:13 100:4,5,13
112:7 120:18 124:14
131:10 134:2 135:4
136:19 160:6,9
165:19 170:9 171:11
171:15 178:13,24
179:4 181:8 188:1
215:8 225:11,14,14
231:1,12 248:11,20

252:24 254:15
269:20 270:5 272:15
279:19 281:19 297:7
297:25 310:6 318:11
318:16 320:15,19,20
328:18 333:17
335:10,13,15,17
339:8 341:4,5,12
345:4,8,11 348:5,17
350:11 354:8 360:13
369:13 373:8,15
376:15 387:12 395:5
398:23
**understanding** 135:5
222:8 240:25 241:6
276:21 329:14,16
**understands** 136:21
**understood** 13:14
397:9
**undisputed** 214:9
**undocumented**
102:10
**unfortunate** 328:20
**unique** 332:5
**United** 1:1 20:2
**universities** 372:9,15
**University** 1:8 5:15
6:15 9:1 14:22 15:18
16:6 48:18 51:3,8
57:25 202:9 237:24
316:6 414:6
**unnecessary** 185:9
**unnoticed** 102:9
**unofficial** 111:10
**unpack** 233:12
**unprofessional** 23:15
63:22 251:14,16,20
**unrelated** 345:9
**unsatisfactorily**
292:18
**unsatisfactory** 280:4
**untruthful** 77:8
**un-highlighted** 390:19
**updated** 78:1
**updates** 78:7
**upper** 281:23
**upset** 249:23
**urban** 318:17,18
**USA** 326:11
**use** 278:20 313:22,23
315:6,14 317:5
318:25 319:1 320:9
320:24 321:15 329:2
368:18
**usual** 273:12
**Usually** 188:19,20
**UT** 374:9

**UTB** 58:4
**UTMB** 3:3,4 6:16 7:20
30:14 31:4 32:12,24
34:3,4,7 35:13 42:24
48:3,4 51:24 55:2
69:1,5 88:16,17 91:4
127:21 136:6,8
145:10,12,17 168:15
168:22 179:4,8
188:24 208:1 212:6
216:11 226:2 251:5
254:12 277:13
278:16 295:17
306:25 308:18
352:17,19 353:5,13
354:6,8 371:23
373:24 401:18 403:1
405:16 414:12
416:17
**UTMB's** 354:13
**U.S** 19:25 20:9

**V**

**v** 1:7
**vacancy** 18:8
**vacuum** 360:14
**valid** 363:4,8
**validity** 140:22
**value** 364:10
**variety** 314:10,11
317:7
**various** 58:3
**vein** 299:17
**verdict** 94:11,24
**verification** 404:24
**Verification/Physici...**
39:17 413:5
**verified** 402:13
**verify** 111:24 113:1
161:12 402:11,18
**version** 97:6 193:13
333:13
**versus** 5:15 188:24
**vet** 350:15 351:14,18
352:1 386:20 387:6
393:14 398:5
**vibrate** 133:25
**vice-chair** 386:2
**Victoria** 1:18 2:2 6:6
7:18 13:15 22:12,14
22:23 23:8,18 39:3
44:1,17,20 45:8,19
46:11 56:15 60:7
61:14 62:6 64:4
67:17 86:15 90:13
93:25 102:4 109:5
122:1 137:15 164:16

168:1 169:14,17
177:18 181:18
182:18 183:4 184:20
184:24 185:5 191:22
192:11 195:2 206:9
208:18 216:18 217:3
219:23 220:5 224:21
248:21 249:19 250:1
250:10,22 252:7
268:23 270:2 291:15
293:8,22 302:7
305:6 309:21 330:11
331:3 336:21 339:15
342:1 345:25 346:14
348:3 349:19 350:3
359:18 360:10,20
362:2 375:2,18
377:9 403:16 404:17
**Victoria@plantelaw...**
2:8
**video** 1:15 5:9,20 45:1
195:17 407:16
**videographer** 3:13 5:4
5:8 6:25 37:25 38:3
93:20,23 109:18,22
109:25 122:24 123:2
123:5 165:10,16
225:5,8 229:23
230:1 250:17,20
297:1,4 350:5,8
378:4,7 400:17
401:3,6 405:7,10
407:14
**Vietnam** 119:2
**view** 69:4 170:23
191:6,8 216:21
316:3 320:8 334:21
**views** 87:10 341:6
**violated** 60:22 61:3,19
61:23 148:15 294:25
**violation** 52:19 167:8
382:25
**virtual** 302:23
**visit** 393:12
**VL** 380:13,16 382:10
382:11
**voice** 118:2
**volume** 5:13
**volunteered** 346:10
**vote** 28:5 232:25
233:1 265:8 274:3
404:9,11,21
**voted** 29:8 206:22

**W**

**wait** 47:7 133:23 288:6
**walk** 307:23

**Walker** 71:9 75:17
111:21 117:17
118:16 125:10 126:4
202:11 203:2 214:11
214:15,22 237:22
242:17 247:16 260:5
266:4 395:4 413:9
414:9 415:2
**walking** 249:14,17,24
**want** 7:1 10:20 13:25
21:13 29:23,24
38:24 46:24 47:1
49:5 50:12 59:8 62:8
62:13 63:2 76:23,25
99:3,13 101:14
102:5 116:25 131:22
137:5,9 147:21
160:3 166:1 169:20
174:16 189:4 191:17
193:4 194:19 197:7
200:25 205:13
208:22,22 212:23,24
218:13 219:25
222:10 228:11,20,21
229:20 230:23
242:24 250:22,25
251:11 255:5 258:4
267:22 274:18
277:25 288:7 292:19
296:17 297:11
301:15 331:11
332:22 337:4 345:23
356:23 365:2 366:19
369:22,25 370:14
373:6 376:7,8
377:10 381:24
382:17 393:18 399:5
402:24 403:9 407:19
**wanted** 54:4 88:12
140:12 147:6,8,17
185:8 233:22 240:17
253:6 265:17,19,21
274:23 300:3,10
308:19 316:11,12,16
316:18 317:20,21
352:22 375:14
378:21 383:2
**wants** 94:1
**Ward** 2:13 6:11
**warned** 104:13
**warning** 323:1
**warranted** 198:17
**wasn't** 83:13 86:7
96:25 161:8 176:23
176:24 194:16 200:5
200:17 207:20 216:3
223:8 288:15 295:10

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 444

303:15 306:2 307:22
312:1 354:19 359:17
**waste** 184:3 382:17
**wasting** 218:18
377:11
**Wasyl** 1:16 4:5 5:14
6:21 39:15,17 71:8
106:13 116:19
141:17 156:10 202:8
212:5 236:14 242:16
258:13 297:14
324:14,15 330:20
337:10,11 366:11,12
389:21 401:15
409:10 411:10,20
413:4,6,9,14,18,22
414:2,6,12,20 415:2
415:7,11,15,15,19
416:2,2,6,6,10,14
**watch** 118:25 294:2
**watching** 70:12
**water** 312:9
**Watts** 386:24 403:5
404:2
**way** 23:8 27:21 29:9
41:4 48:12 53:15
57:23 68:23,25 90:8
99:10 143:1 158:9
213:20 252:21 265:6
300:16 313:21 315:8
318:20 319:3 328:23
379:3 409:18
**ways** 204:4
**weakness** 73:9
**weaknesses** 100:21
**website** 26:7 210:8
297:23 346:20,25
**Wednesday** 306:7
**week** 57:5 323:10
407:20
**weekly** 30:10
**weeks** 55:16,20 56:19
57:5,10,13 280:13
**went** 16:17 46:9 53:2
94:14 97:17,22
102:25,25 110:11
123:6 130:25 147:14
148:12 149:19,20,21
149:23 151:8,21
183:16 238:17
253:22 262:17
274:25 299:22 307:6
307:11 325:21,22
405:14
**weren't** 20:25 80:19
161:7 256:5 305:22
319:11 374:20

387:19
**West** 2:17
**we'll** 42:19 109:10
110:4 116:4 143:8
175:19 218:24 224:9
224:16 239:3 248:24
252:2 264:14 271:13
348:14 390:23 407:9
**we're** 7:11 10:22 28:23
28:24 44:25 45:2
46:13 60:3,12,17
61:8,15,20 62:19
87:12 89:16 90:1,7,8
90:15 93:16 104:20
108:16 109:15
111:14 122:19
130:16 131:5,8
133:23 151:10
173:25 181:6,7
192:17 208:3 220:2
220:5,10,14 224:1
224:15,23 225:2
244:7 250:11,13
251:3 264:4 266:11
302:2 304:22 316:22
346:16,17 349:23
391:1 394:12 400:11
402:15
**we've** 136:12 224:18
313:7 384:21
**whatsoever** 34:8
36:15 353:21
**WHEREOF** 409:20
**white** 269:2 270:9,12
278:2 308:3 315:13
339:7 341:17 367:9
368:9,18,25 369:4,5
369:11,15 370:25
371:4
**WI** 410:22
**Wikipedia** 327:24,25
328:11 330:21 331:7
415:19
**Wilmington** 19:16
**withdraw** 194:3 318:9
**withdrawn** 241:4
**witness** 4:4 28:8
39:21 44:4,8,14,14
67:18,22 71:14 84:4
93:5,11,19 101:16
101:19 116:6,12,23
133:14,18,22 134:3
134:8 137:21 141:22
142:3 151:17 156:15
156:18 161:16
162:17 164:23 165:2
165:6,9 166:19,23

168:18 169:8 192:1
192:4 202:15 223:16
242:11 249:5,8,10
251:6 255:22 264:13
269:21 293:11,13
294:7,9 296:17
297:19 324:12 325:6
346:21 348:8 361:5
366:19,24 367:8,12
367:16,21,25 375:25
376:19 378:16
403:19 407:6 408:1
409:10,14,20 411:5
**witnesses** 12:13
270:25
**witness's** 5:10
**woman** 182:14
**women** 333:6
**Wonderful** 46:2
228:15
**word** 69:18 84:22
140:22,24 143:5
149:13,15 344:19
**words** 195:20
**work** 7:21 8:23 30:13
79:24 202:10 215:15
221:13 232:17
247:17 276:7,10
283:5 294:20 311:25
323:19 327:4 328:24
353:9,10 361:13
374:15,17,19 414:7
**worked** 210:20,23
287:23 400:19
**working** 33:22
**works** 89:5,6 356:1
**Worldwide** 362:18
**worse** 56:4,8,19
123:18 162:20 250:6
**wouldn't** 46:18 83:7,8
119:18 145:9 167:8
171:21 174:11
175:12 189:4 231:4
235:23 261:21,25
337:4 358:7 369:14
384:11
**wow** 204:25 208:20
**wrap** 205:4
**write** 32:4 76:7,9 81:5
81:8 112:9 199:12
**writes** 130:7
**writing** 80:6,11,18,19
80:23 81:13,19
97:13 103:13 104:13
105:11 107:19
111:18 124:9 132:17
132:19 146:13

150:11 171:13,16
198:25 232:10 256:8
266:9 319:12 386:5
**written** 53:22,25 74:7
76:1 81:22 84:18
115:13 154:7 164:14
167:6 170:24 247:11
256:17 395:14
**wrong** 76:25 235:6
306:6,10 326:20
405:5
**wrongdoing** 354:5
**wrote** 32:9 76:8 122:4
141:5 395:12,17,17
395:18 397:12

_____
**X**
_____
**X** 413:1,1

_____
**Y**
_____
**yeah** 23:20 54:24
56:16 63:5 74:17
102:6 105:21 111:1
125:5 140:11 151:10
160:3 162:15 165:4
172:9 185:7 187:19
189:18 206:11
216:19 217:25 220:7
224:9 225:16 227:12
231:18 232:9 237:6
237:9 243:15,16,19
246:11,18 248:16
249:3,22 257:21
264:20 275:3,17,20
277:9,13 294:1
310:14 325:7,21
336:20 341:20
342:13 344:2,11,12
345:5 346:21 354:6
367:6 368:21 370:7
373:2 376:20 380:24
381:3 382:19 390:21
394:6,14 397:25
399:4 400:15 404:19
408:6
**year** 17:11 18:9,10
25:17 30:6 33:24
34:1 36:2,2 69:24
75:21 80:1 97:21,21
119:3,11,14,18
125:17 127:5,8
135:12,22 136:4
158:12,21 161:21,23
178:1 201:9 203:14
203:20 204:12,15,20
206:17 207:4,4,21
210:24 216:7,12

221:12,13,14,18,25
222:1 226:8,9,10,18
229:1,8,8 230:8,22
230:24,25,25 231:15
231:16 232:12 238:1
238:12 239:7,19,20
240:10 241:13,14,22
243:10,12,20,25
244:1,10 254:6
256:6 257:14,17
274:11 275:10
280:20 281:3,23,24
283:23 284:6,6
288:3,14 290:21
295:21 298:15,22,25
299:3,4,6,23 300:1,5
300:19 301:3,5,5,22
393:12 394:10,14
**years** 8:9 15:19 18:4,5
18:6,10,20,21 19:8
25:9,19 30:2,2 32:9
37:15,17,19 41:14
41:17,25 47:18 48:1
48:2,5 50:12 55:3,6
55:7,13 80:16
221:15,20,23 284:22
297:23 298:7,8,9,23
299:8,14,19,24,25
317:15 337:22
406:10,13,24
**yellow** 213:14
**yellowed** 213:5,9
255:4,5,6
**yesterday** 332:6
**yes-or-no** 155:20
162:5 291:22,25
293:19
**Yolanda** 302:24
**York** 3:10,10 5:22,23
8:21,22 37:6 409:3,4
409:9
**young** 119:2 199:5
403:5

_____
**Z**
_____
**zero** 388:11
**Zoom** 306:7

_____
**0**
_____
**04** 18:19
**09/04/2021** 39:18
413:7

_____
**1**
_____
**1** 5:12,13 72:19 106:10
106:13 107:1,5
110:25 111:1 112:12

US District Court - Texas
Daywalker v. University of Texas

FINAL - September 7, 2021
Dr. Wasyl Szeremeta

Page 445

139:6,13 141:5
142:20 144:3,21
151:7,9,11,19,25
153:4 154:17,18
166:9 170:23 195:11
230:16 242:12
247:25 333:10
337:25,25 338:3
378:20 380:7 384:24
384:25 393:3 402:2
402:20 413:16 417:9
**1st** 72:9 124:6,7,16
131:23 203:12 227:3
227:3,4,10,15,23
228:1,2,19,21,24
229:4 231:3 232:11
233:15 235:22 246:5
256:7 275:18 276:12
286:21 287:3 299:12
**1-800-825-3341** 1:25
3:11 410:15
**1/1** 246:4
**1/1/17** 242:12
**1/1/201** 242:18 415:4
**1:20** 165:3,6
**1:22** 165:17
**10** 50:12 125:7,8 126:6
417:6,16
**10th** 124:23 125:1
126:4
**10:03** 5:2
**10:46** 93:21
**10:52** 93:17
**10:57** 93:24
**100** 99:1,2 103:4,10
238:13,14
**10011** 3:10
**106** 413:14
**108** 417:15
**11** 50:12 112:4 122:7 337:8
337:10,17 394:2
416:4
**11/17/2017** 394:22
**11:15** 109:23
**11:34** 110:1
**1140** 2:5
**116** 413:18
**12** 366:9,11,21,23,25
367:2,9,20,23 368:1
368:3 416:8
**12/31/2016** 71:10
413:11
**12:34** 164:16 165:11
**13** 37:7 366:21 367:2,5
368:1,2 403:19
417:15
**13th** 133:10 134:12

246:9
**14** 18:19 330:18,20
415:21
**14th** 2:18 368:7
**141** 413:22
**15** 25:18 58:22 212:8
213:12 414:15 417:4
**15th** 2:17 409:21
**154.006(b)(16)** 40:7
**156** 414:2
**16** 58:22 116:15,19
132:8 133:7 134:13
209:20 214:13
226:13 246:2,8
403:12,13 413:20
417:19
**16th** 286:10
**17** 37:19 76:19 124:22
133:5 393:21,24,25
394:16
**18** 141:25 417:17
**182** 417:16
**184** 417:17
**19** 20:3 156:7,10 177:9
177:15 178:4 194:6
378:10 379:10
382:13 393:12,19
394:4,5,10,14 398:7
399:8 414:4
**1959** 20:2
**1961** 20:5
**1962** 14:15
**1985** 15:20
**1989** 15:20
**1994** 18:18

**2**

**2** 71:5,8 73:14 74:11
74:14,20 143:11
195:11 212:9 247:25
281:1 283:16 285:20
393:3,8 413:11
414:17
**2nd** 212:25 213:7
214:7,19 302:24
305:21 306:5
**2:17** 225:6
**2:29** 225:9
**2:35** 229:24
**2:36** 230:2
**20** 25:9 38:14 39:15,25
40:4 41:19 413:6
417:7
**20-plus** 47:18
**2002** 16:8
**2013** 36:24 37:19
43:13 102:16

**2015** 30:15 32:6 33:12
34:9 35:18,22 42:23
42:24 43:7,17 54:18
214:14 238:2
**2016** 28:6 33:13 34:10
35:18,22 54:19 72:9
72:10
**2017** 54:17,19 72:14
74:2 97:19 110:6
124:23 125:1,8
126:4 133:10 152:11
158:18,20 162:25
167:2 246:5,9
253:16 299:12
**2017/2018** 255:14
**2018** 54:17,18,20
97:19 106:15 110:6
117:13 119:10 120:1
131:23 156:12 212:8
212:9 213:7,12
214:19 226:14 230:6
230:13 231:3 233:25
236:15 237:9 253:4
257:13 258:14
275:18 286:11,21
299:10,15 300:21
403:10,21 413:15
414:3,16,17,20
415:7
**2019** 54:18
**202** 414:6
**2020** 28:6 30:6 238:3
306:5 337:17 368:7
**2021** 1:17 5:18 302:25
409:22 411:23
**205** 417:18
**21** 141:11,17 255:10
413:24
**212** 414:12
**215** 14:20 33:12
**22** 212:1,5,23 214:1,2
414:14
**22nd** 117:13 118:10
118:13 119:17 120:1
337:17
**223** 417:4
**224** 417:5
**23** 236:10,14 258:11
260:18 266:2 414:22
**236** 414:20
**24** 297:11,14 415:13
**242** 415:2
**248** 417:19
**25** 25:9 258:13 415:9
**258** 415:7
**26** 389:19,21 390:18
390:24 391:1 416:12

**27** 18:20,21 332:15
401:10,15 416:16
**27th** 152:11
**28** 417:3
**29th** 229:10,11 230:6
230:18 231:6 232:12
233:14,15,16,19,25
235:9
**297** 415:11

**3**

**3** 139:12 143:15 152:7
154:22,23 195:11
211:17,19 214:8
232:24 242:7,16,25
247:25 248:1 253:17
255:17,21 262:21
274:11,13 279:1,1
286:6 298:15 300:19
325:13 384:23 385:3
415:4
**3rd** 72:14
**3-4** 157:13
**3.5** 17:19
**3:00** 250:18
**3:06** 250:21
**3:20-CV-00099** 1:12
**3:51** 297:2
**30** 25:9 106:14 140:19
223:20,22 236:15
251:9 304:25 356:16
410:8 413:15 414:20
**30th** 228:24,25 237:7
237:9 246:5 299:10
**300** 2:17
**304** 417:6
**3084** 14:18
**309** 410:20
**31st** 72:10
**312** 417:7
**324** 415:15
**330** 415:19
**336** 168:3
**337** 416:2
**344** 417:8
**35** 25:9 140:19
**355** 417:9
**366** 416:6
**389** 416:10
**39** 413:4

**4**

**4** 40:4 154:19,21 166:8
168:3 194:21 195:3
195:5,11 202:5,8,19
204:15 208:11,14
210:15 255:21

263:16,21 275:16,18
275:19,20 276:5,10
276:11 277:1,10,11
279:1,7 280:9,12
281:2 285:5 286:6
414:8 417:5,18
**4th** 74:2 238:1
**4's** 232:19 285:20
**4:11** 297:5
**401** 416:14
**409** 4:10
**411** 4:12
**413** 4:14
**45** 164:25 165:2
210:23

**5**

**5** 74:1 195:11 279:20
280:10 380:8,9
391:19,23,25
**5-year** 238:1
**5/28/2018** 389:22
416:10
**5/30/18** 157:14
**5:00** 350:6
**5:06** 350:9
**5:32** 378:5
**5:44** 378:8
**506** 28:15
**512.936.1124** 2:20
**5177** 2:4
**53** 93:17
**542** 410:21
**54853** 410:22

**6**

**6** 74:14 156:21 157:3,5
211:22 403:10,18,21
**6th** 211:21 253:4
402:9,21 404:6
**6/30** 246:5
**6/30/17** 242:13
**6/30/2017** 242:18
415:4
**6:13** 401:4
**6:19** 401:7
**6:24** 405:8
**6:25** 400:18
**6:26** 405:11
**6:28** 407:15

**7**

**7** 1:17 4:8 37:8,9
133:12 154:19,20
324:14 325:13
337:22 401:25
415:17 417:3

US District Court - Texas

FINAL - September 7, 2021

Daywalker v. University of Texas

Dr. Wasyl Szeremeta

Page 446

| | | | | |
|---|---|---|---|---|
| **7th** 5:17 402:9 404:6<br>**7/1/2016** 71:10 413:11<br>**7:28** 408:9<br>**71** 413:9<br>**713-850-0399** 238:6<br>**713.526.2615** 2:7<br>**74** 3:9<br>**740-6574** 14:20<br>**77056** 2:6<br>**77573** 14:19<br>**78701** 2:19<br><br>**8**<br>**8** 258:14 330:9 331:19<br> 332:15 415:7 417:8<br>**8th** 14:15<br>**8/18/17** 394:9<br>**8/29** 230:20<br>**89** 16:14<br><br>**9**<br>**9** 156:11 164:19<br> 403:19 414:3<br>**9:03** 5:18<br>**9:38** 38:1<br>**9:47** 38:4<br>**96** 37:19 | | | | |