United States District Court
Southern District of Texas
**ENTERED**
November 14, 2022
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

No. 3:20-cv-99

DR. ROSANDRA DAYWALKER, *PLAINTIFF,*

v.

UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON, *ET AL.,* *DEFENDANTS.*

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

Before the court are the defendants' motion for summary judgment, Dkt. 121, the plaintiff's motion for sanctions, Dkt. 129, and the defendants' motion to strike, Dkt. 135. The motion for summary judgment is granted. The motions for sanctions and to strike are denied.

## I.    BACKGROUND

In 2015, Dr. Rosandra Daywalker entered UTMB's residency program in otolaryngology, which "concerns surgical and medical management of conditions of the head and neck." Dkt. 121 at 3. While her initial reviews were positive, there were concerns with one of her evaluations. Dkt. 121-1 at 124.

Specifically, program director Dr. Susan McCammon noted that, while "[o]verall [Daywalker] received good evaluations for the second half of [her] intern year," she received one negative evaluation that included "tardiness and lack of insight or response to feedback." *Id.* This was enough for McCammon to suggest that "while the remainder of evaluations do not support this, we do think it is important for [her] to focus on professionalism in the next 6-month block." *Id.*

In April 2017, Dr. Wasyl Szeremeta became program director. Dkt. 125 at 5. In Daywalker's first evaluation after the change, Szeremeta noted that while she was doing well overall there were concerns about the "timely completion of paperwork including documentation of patient care as well as residency requirements." Dkt. 121-1 at 113. The Clinical Competency Committee (CCC) expressed concerns that she was failing to complete documentation on time. Dkt. 121 at 5. Daywalker met with Szeremeta and Dr. Farrah Siddiqui, the assistant program director, to discuss her progress and the importance of completing her notes on time. Dkt. 121-1 at 6.

In her first-half evaluation for her third year, Daywalker received positive reviews, including that she was "doing better" and that the issues with her documentation had improved. Dkt. 121-1 at 104. But, according to Siddiqui, the department subsequently discovered performance deficiencies

concerning Daywalker's patient notes. Dkt. 121-1 at 141. Around May 2018, UTMB conducted a routine department-wide review of medical documentation, which revealed that five of Daywalker's notes had been incomplete since June 2017. Dkt. 121-1 at 8. When questioned about the issue, Daywalker stated that four of the five patients "[l]eft without being seen and were supposed to be removed from the schedule." *Id.* Further review found this to be false and that Daywalker "subsequently created notes and 'documentation,'" seemingly to cover up her error. *Id.* at 9. Indeed, Szeremeta believed Daywalker copied-and-pasted prior notes from two other doctors without making any significant edits. *Id.* In short, the CCC had serious concerns that Daywalker had falsified medical records, a possible criminal offense that could have led to the loss of her medical license. *Id.*

The CCC and department chair chose to place Daywalker on remediation in May 2018. Dkt. 121-1 at 20. Remediation is similar to a performance-improvement plan and does not carry penalties. Dkt. 121 at 7. The Associate Dean of Medical Education then independently affirmed the decision. *Id.* Daywalker was notified of the remediation on May 30, 2018, when she was sent a letter detailing specific instances where UTMB felt her performance was inadequate. Among them were:

> 1. Completing tasks in a timely fashion. Several attendings on multiple rotations have noted how your how your productivity

continues to lag behind your peer members. Furthermore, despite the fact that you see fewer patients, what continues to be more of a concern is that your documentation continues to be late and inaccurate."

2. Prioritization of tasks[.] While you have been an active participant in meetings and mission trips, you failed on multiple occasions to complete the work at hand. In all that we do, patient care comes first, and the patient always comes first. Failure of timely documentation puts that responsibility in question and risks error and patient harm."

3. Documentation[.] This is the most serious area of concern. Your inability to document on charts in a timely fashion creates a situation where you make significant errors. Some of these errors appear to be simple acts of omission yet others appear to be deliberate fabrications . . . A much more serious documentation inaccuracy concerns your TDC charts from June 27, 2017 . . . A review of these notes indicate a high suspicion of a falsification of medical records as the information written in your notes with the concomitant detail would be very hard to believe. There was a note in which you indicated a procedure being performed but not billed for. The note was copied from a previous note by Dr[.] Tignor, which had a procedure. The age of your patient in your note had not changed - indicating likely that you copied the note without making any substantial edits. One of these patients was a cancer follow up patient and you copied a note from Dr. Son who had seen the patient 2 years earlier. According to your note, there was no change in his condition nor in his age.

Dkt. 121-1 at 6–10.

Daywalker then met with the department chair, Dr. Vicente Resto, to complain of the decision to place her on remediation. Dkt. 121 at 8–9. On June 1, 2018, she submitted an internal complaint against Szeremeta that he was harassing her (creating a hostile work environment) and discriminating

against her based on race and sex. *Id.* at 9. Once UTMB learned of Daywalker's complaints about Szeremeta, it investigated the allegations and took prompt remedial action to limit his interactions with Daywalker. *Id.* at 29; Dkts. 18 ¶ 17; 121-1 at 151, ¶ 9.

Daywalker describes three actions by Szeremeta as racist against her. The first was during a 2016 retreat, where Szeremeta made a comment about black medical students not being interested in otolaryngology in response to a comment that the percentage of black otolaryngologists was low. Dkt. 125 at 3. Daywalker claims that, as a result of this comment, other medical students began to think that she was given preferential treatment. *Id.* at 3–4. The second incident came when Szeremeta commented that a patient once "accused him of not giving enough pain medication because the child is Black" and asking Daywalker "why most Black people in Philadelphia used the emergency room for the majority of their health care," even though she had never worked in Philadelphia. *Id.* at 4. The third is an interaction where Daywalker claims Szeremeta tried to cast her into "an 'angry Black woman' stereotype" when Szeremeta claimed that Daywalker looked like she wanted to assault him after he told her that her facial-plastics rotation was being delayed. *Id.* at 7.

In June 2018, at Daywalker's request, Resto assigned Siddiqui as Daywalker's supervisor, replacing Szeremata. Dkt. 121 at 9. In her second-half evaluation for her third year, Daywalker received mixed reviews. Dkt. 121-1 at 98. While some commented that she was making strides, others noted concerns about the timely completion of her notes. *Id.* Siddiqui commented that though she was completing her notes on time, it was still "occupying most of her day and takes her attention away from reading, self-learning and preparing for cases." *Id.* at 101.

When Daywalker later complained about Siddiqui, UTMB appointed a program director, Dr. Christopher Thomas, to replace Siddiqui as Daywalker's day-to-day contact. Dkt. 121 at 9. In early August 2018, Daywalker requested four months of personal leave. *Id.* at 9. UTMB approved this request and informed Daywalker of this decision via a letter dated August 8, 2018. *Id.* Resto drafted the letter, which "included the recommendations from the CCC, the entire Faculty as well as the GME [Graduate Medical Education] office." Dkt. 121-1 at 4. The letter also informed Daywalker that she would return to UTMB as a third-year resident on December 10, 2018, upon her leave expiring. *Id.* at 5. The decision to retain her as a third-year resident, as opposed to promoting her to fourth-year, was unanimous. Dkt. 121 at 10.

The day after Daywalker received the letter, she converted her personal leave into protected leave under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq*. *Id*. at 10. On the first day she returned—November 6, 2018—Daywalker quit her position. *Id*. at 11. Daywalker then sued UTMB and its president, Dr. Ben Raimer, alleging (1) discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act on the basis of race, gender, and disability; (2) discrimination in violation of the Rehabilitation Act; and (3) FMLA discrimination. Dkt. 18 ¶¶ 27–38.

The defendants moved to dismiss all claims on July 6, 2020. Dkt. 24. The court dismissed Daywalker's sex-discrimination claims and her claim against Raimer. Dkt. 29 at 8–9. It denied the motion on the remaining claims, which are the subject of the defendants' motion for summary judgment.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial

burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).

A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable factfinder could render a verdict for the nonmoving party. *Id.* In other words, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). When considering a motion for summary judgment, the court must consider all evidence in the light most favorable to the nonmoving party, *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290, 292 (5th Cir. 1990), and resolve all reasonable doubts about the facts in favor of the nonmoving party. *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 455–56 (5th Cir. 2005).

If the moving party meets its initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the court must accept the

evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (cleaned up).

## III.   ANALYSIS

The court addresses Daywalker's Title VII, FMLA, and Rehabilitation Act claims in turn.

### A. Title VII

#### 1.   Discrimination

Daywalker claims that the defendants discriminated against her in violation of Title VII. To prove a Title VII discrimination claim, a plaintiff must show:

> (1) [s]he is a member of a protected class, (2) [s]he was qualified for the position at issue, (3) [s]he was the subject of an adverse employment action, and (4) [s]he was treated less favorably because of h[er] membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). The first two elements are not disputed by the defendants.

Adverse employment actions in Title VII discrimination cases are only those "ultimate employment decisions such as hiring, granting leave,

discharging, promoting, or compensating." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 824 (5th Cir. 2019) (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007)).

Daywalker argues that she was demoted when she was held back as a third-year resident. Dkt. 125 at 10–11. UTMB responds that while Daywalker was "held back" academically, her pay, leave, and employment status were not affected. Dkt. 121 at 14. Indeed, Daywalker was paid as a fourth-year resident in keeping with the remainder of her class members. *Id.*; Dkt. 121-1 at 133. More importantly, even if she had been held back for both employment and academic purposes, the decision would still be a delayed promotion rather than a demotion. When a delayed promotion is not associated with any negative salary consequences, the Fifth Circuit has held that no adverse employment action occurs. *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (holding that because the plaintiff received backpay and seniority there was no adverse employment action for delayed promotion).[1]

---

[1] Other district courts in this circuit have held that requiring employees to repeat training requirements is not an adverse employment action. *See Latif v. Univ. of Texas Sw. Med. Ctr.*, 834 F. Supp. 2d 518, 526–27 (N.D. Tex. 2011) (resident forced to repeat final rotation); *Mills v. City of Shreveport*, No. CV 5:17-1088, 2019 WL 2579158, at *6 (W.D. La. June 21, 2019) (paramedic suspended and forced to complete remediation training).

Daywalker suggests two additional adverse employment actions: "denial of a facial[-]plastics rotation, and forced termination." Dkt. 125 at 21. The denial of her facial-plastics rotation, however, was never a final employment decision. Daywalker admits that her third-year rotation was shortened to three weeks, but not cancelled. Dkt. 125-11 at 9. While she "was told it would . . . depend on remediation and was postponed indefinitely," there was no final decision to deny her the rotation. *Id.* And even if the decision to deny her the rotation were clearly final, less favorable rotation training is not the kind of "hiring, granting leave, discharging, promoting, or compensating" decision that constitutes an adverse employment action. *Okeke v. Adm'r s of Tulane Educ. Fund*, No. CV 20-450, 2021 WL 2042213, at \*7 (E.D. La. May 21, 2021).

As to Daywalker's claim of forced termination,[2] she has offered no evidence that she was forced to leave. To the contrary—UTMB told her that she could return, albeit as a third-year student. The only negative consequences imposed on Daywalker that she has supported with competent summary-judgment evidence are additional training requirements.

---

[2] Although Daywalker's forced-termination allegation is conclusory and unsupported, the court does address Daywalker's constructive-discharge claim *infra*.

Daywalker points to no evidence that her employment level was affected by the decision to have her repeat some of her third-year training. Because there is no evidence of an adverse employment action, her discrimination claim fails.

Though Daywalker's failure to show an adverse employment action is fatal to her discrimination claim, the court, out of an abundance of caution, will also address the final element of such a claim: similarly situated employees not in the protected class who were treated more favorably. For an employee to be similarly situated, the favorably treated employees must be treated more favorably in "nearly identical" circumstances *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 856 (S.D. Tex. 2010) (quotation omitted). When one employee is disciplined and another is not, whether the employees are similarly situated "may turn on the comparable seriousness of the offenses for which discipline was meted out." *Lee*, 574 F.3d at 261 (citation and internal quotation marks omitted). While the circumstances of the employees do not have to be identical, they do have to be "nearly identical." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (citation omitted).

Daywalker has offered one classmate as a comparator.[3] That classmate, not a member of Daywalker's protected class, was apparently having problems and not performing satisfactorily in her third year. Dkt. 125 at 21. Remediation was considered, but ultimately rejected. *Id.* But that is the extent of Daywalker's analysis as to why this classmate is a legitimate comparator. The defendants highlight significant differences between the classmate and Daywalker. Dkt. 128 at 11–12. The classmate had different performance issues, and was in a different stage of the disciplinary process. *Id.* Additionally, the evaluation notes for this classmate do not include issues with the accuracy and punctuality of her notes, which were among the most significant concerns that UTMB had with Daywalker. Dkt. 125-8 at 10.

Because Daywalker cannot establish that either an adverse employment action took place or that a similarly situated employee outside of her protected class was treated more favorably, her discrimination claim fails.

### 2. Retaliation

Daywalker argues that the defendants' decision to hold her back as a third-year resident amounts to Title VII retaliation. Dkt. 125 at 24. To prove retaliation under Title VII, Daywalker must show "(1) that she engaged in

---

[3] The names of all classmates are omitted pursuant to a protective order.

activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996). The parties do not dispute that Daywalker engaged in a protected activity under Title VII when she complained to Resto about harassment and discrimination.

The Supreme Court has adopted a broader standard for what constitutes an adverse employment action in a retaliation claim than in a discrimination claim. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). "The key question is whether the challenged action is 'materially adverse' in that it is 'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.*" Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 945 (5th Cir. 2015) (quoting *Burlington*, 548 U.S. at 57). But the standard is only "slightly" broader. *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019). The determination is context specific— courts "look to indicia such as whether the action affected 'job title, grade, hours, salary, or benefits' or caused 'a diminution in prestige or change in standing among . . . co-workers.'" *Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 346 (5th Cir. 2016) (quoting *Stewart v. Miss. Transp. Comm'n*,

586 F.3d 321, 332 (5th Cir. 2009)).

Here, Daywalker's job title, grade, hours, salary, and benefits appear to be unchanged. Additionally, "there is no evidence that she suffered a diminution in prestige or change in standing among her co-workers." *Stewart*, 586 F.3d at 332. Because she has produced no competent summary-judgment evidence that any of these indicia weigh in her favor, a reasonable jury could not conclude that requiring Daywalker to return to her third-year training was materially adverse.

But even if it were materially adverse, she still does not have evidence of a causal link between the decision and her protected activity. To show causation, the plaintiff must first make a *prima facie* case. *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 805 (5th Cir. 2007). After a *prima facie* case is made, the defendant must show a legitimate, non-retaliatory reason for the action. *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013). Once the defendant does so, the burden shifts back to the plaintiff to show that the reason is merely pretextual. *Id.* This is the *McDonnell Douglas* burden-shifting framework. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). The "claims must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). The Fifth Circuit has "placed the

requirement of showing but-for causation at the final, pretext stage, rather than the prima facie stage, in a Title VII retaliation case." *Chapple v. Tex. Health & Hum. Servs. Comm'n*, 789 F. App'x 985, 991 (5th Cir. 2019).

Daywalker cannot point to a *prima facie* causal link. She argues that "Szeremeta clearly knew he was under investigation at the time of the August 8 demotion discussion" and that "Szeremeta . . . drafted and circulated by email the August 8 letter from Resto that mentions Daywalker agreeing to a demotion" and "[i]t will be clear to the jury that Szeremeta was the catalyst and the driving force behind the remediation, demotion and forced termination." Dkt. 125 at 25. The fact that UTMB conducted an investigation in response to Daywalker's allegations of discrimination and harassment does not—without more—give rise to the reasonable inference that holding her at a third-year resident level was because of her complaint.

Further, the defendants have submitted evidence that the decision by the board to hold her at a third-year level was unanimous.[4] But Daywalker insists that Szeremeta tainted the decisionmakers, and therefore imputed his

---

[4] Daywalker suggests that "a jury is not required to believe it was unanimous especially in light of many credibility issue by Defendants throughout motion [sic]." Dkt. 125 at 25 n.5. The defendants have submitted an affidavit by Siddiqui, who participated in the decision to retain her as a third-year, supporting the fact that the decision was unanimous. Dkt. 121-1 at 141. Daywalker has not submitted any evidence to the contrary.

discriminatory attitude to them. *Id.* This theory of causation, however, requires some evidence that "demonstrate[s] that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000). Daywalker points to no such evidence.

Daywalker next argues that the short time between her internal Title VII complaint and the retaliatory action is enough to make out a *prima facie* case. Dkt. 125 at 25–26. Assuming *arguendo* that retaining her at a third-year resident level was an adverse employment action, about two months passed between the protected activity and the adverse employment action.[5] The Fifth Circuit is divided as to whether a two-month gap satisfies the *prima facie* causation requirement. While Daywalker is correct that at least any time gap of up to two years does not *destroy* a properly drawn inference of causation, *Gee v. Principi*, 289 F.3d 342 (5th Cir. 2002), the Fifth Circuit disagrees on how small the time gap must be to independently create a *prima facie* inference of causation. *Porter*, 810 F.3d at 948–49 ("[T]his court has

---

[5] Daywalker submitted her complaint, which is Title VII protected activity, on June 1, 2018. She was sent the letter informing her that she would remain a third-year resident on August 8, 2018. The defendants argue that timeline should be six months, because that was when she would return from FMLA leave and the adverse employment action, if any existed, would take place. But the relevant date for the purposes of causation is when the decision was made, not when the effects would take place.

accepted a two-and-a-half-month gap as sufficiently close in one case, and rejected nearly the same timeframe in another."). For its part, the court is convinced that there must be at least some other evidence of causation when the gap is as long as two months. *See Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 885 (5th Cir. 2020).[6]

And even if Daywalker could make out a *prima facie* causal link, she cannot overcome her burden to show that UTMB's legitimate reason for the adverse action—that Daywalker was suffering performance issues, particularly in completing her notes—was pretextual. The Fifth Circuit has consistently held that temporal proximity alone cannot establish pretext. *See Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) ("[W]e affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but[-]for causation.").

In addition to attempting to show pretext through temporal proximity, Daywalker uses one of the stated reasons for her remediation as evidence of

---

[6] Courts that have allowed similar temporal proximities to establish a *prima facie* case have relied on the Fifth Circuit's decision in *Evans v. City of Houston* that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." 246 F.3d 344, 354 (5th Cir. 2001) (quotation omitted). The court in *Besser* found that to be unpersuasive, as the court "cited only two district court decisions" for that proposition, and the Supreme Court "has favorably cited a decision holding that three months is not within the 'very close' requirement." 834 F. App'x at 885; *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001).

pretext. Dkt. 125 at 28. She claims that "[Resto] did not believed [sic] she had falsified documents as Szeremeta had claimed but he did not remove the false information from the remediation." *Id.* But Daywalker's recollection of this conversation with Resto, accepted as true, is not sufficient to create a fact issue on pretext for two reasons. First, she must have some evidence that each legitimate reason the defendants give was pretextual. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001). But she has not attempted to point to evidence suggesting the other reasons, namely that her notes were untimely and inaccurate, were pretextual. As a result, she cannot prove that but for her protected activity, she would not have been held back as a third-year resident.

Second, Szeremeta merely informed Daywalker that he had a suspicion that she had copied-and-pasted and falsified notes based on particular oddities with the notes that concerned him, but did not make a formal accusation. Dkts. 121-1 at 8–9, 125-8 at 6. Even if Szeremeta misinterpreted the oddities as falsification, there is no evidence that the misinterpretation was pretextual.

Daywalker has not met her burden to establish a genuine issue of material fact as to two of the three elements to prove a Title VII retaliation case. Accordingly, her retaliation claim fails.

### 3. Hostile work environment

Daywalker next contends that she was subjected to a hostile work environment in violation of Title VII. She based this claim largely on "Szeremeta's microaggression and indirect racial slights." Dkt. 125 at 29. Specifically, she complains of Szeremeta (1) commenting that Daywalker looked like she wanted to hit him, (2) asking her about health disparities in races, and (3) commenting about the lack of black students in the otolaryngology program. *See* Dkt. 125 at 3–4, 7. But none of these allegations meet the standard to survive summary judgment in a hostile-work-environment claim.

To make out a race-based hostile-work-environment claim, a plaintiff must show "(1) [s]he is a member of a protected class, (2) [s]he suffered unwelcome harassment, (3) the harassment was based on race, (4) the harassment affected h[er] job, and (5) the employer was responsible." *Johnson v. TCB Const. Co.*, 334 F. App'x 666, 670 (5th Cir. 2009). Comments can be offensive and still "not rise to the level required for employer liability under Title VII." *Id.* "The 'mere utterance of an . . . epithet which engenders offensive feelings' is not enough." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). There must be some evidence concerning the effect of the comments on the employee's work performance. *See id.* at 671.

Unless the verbal harassment is extraordinarily pervasive, judgment as a matter of law is proper. *See White v. Gov't Emps. Ins. Co.*, 457 F. App'x 374, 381 (5th Cir. 2012). Relevant factors are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; and whether it unreasonably interferes with an employee's work performance." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (quotation omitted). Importantly, it "is not a sufficient basis to impute a similar racial intent to [the defendant's] separate, unrelated actions and infer that all the conduct was based on race." *Gibson v. Verizon Servs. Org., Inc.*, 498 F. App'x 391, 394 (5th Cir. 2012).

Here, none of Szeremeta's alleged remarks could allow a reasonable factfinder to find for Daywalker on her hostile-work-environment claim. The Fifth Circuit has required racial insults to be extremely severe to survive summary judgment. *See, e.g., E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 400 (5th Cir. 2007). Even if some of Szeremeta's remarks to Daywalker were insensitive, none were direct racial insults. This circuit requires far more. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 342, 348 (5th Cir. 2007) (finding a far more severe "series of racially insensitive or derogatory remarks to [the plaintiff] during the course of her employment" was not enough for the plaintiff to survive summary judgment).

### 4. Constructive discharge

Daywalker's final Title VII claim is constructive discharge. To make out such a claim, the "plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997). Constructive-discharge claims require a greater degree of harassment than do hostile-work-environment claims. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). Because Daywalker cannot meet the elements for a hostile-work-environment claim, her constructive-discharge claim must also fail as a matter of law. *Vallecillo v. U.S. Dep't of Hous. & Urb. Dev.*, 155 F. App'x 764, 768 (5th Cir. 2005).

### B. FMLA

Daywalker next contends that the defendants retaliated against her for taking FMLA leave. To make a *prima facie* showing of FMLA retaliation:

> a plaintiff must show that: (1) [s]he was protected under the FMLA; (2) [s]he suffered an adverse employment decision; and either (3a) that [s]he was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because [s]he took FMLA leave.

*Wilson v. Noble Drilling Servs., Inc.*, 405 F. App'x 909, 912 (5th Cir. 2010). Though the *McDonnell Douglas* burden-shifting framework also applies to FMLA retaliation claims, *Garner v. Chevron Phillips Chem. Co., L.P.*, 834 F.

Supp. 2d 528, 543 (S.D. Tex. 2011), the Fifth Circuit has not yet decided whether the same but-for causation standard applies as it does under Title VII. *Stanton v. Jarvis Christian Coll.*, No. 20-40581, 2022 WL 738617, at *6 (5th Cir. Mar. 11, 2022).

For the second element, the Fifth Circuit applies the *Burlington* standard rather than the "ultimate employment decision" standard. *See McArdle v. Dell Prod., L.P.*, 293 F. App'x 331, 337 (5th Cir. 2008). But just as there is no adverse employment action to support Daywalker's Title VII retaliation claim, there is none to support the second element of her FMLA claim. Daywalker's FMLA retaliation claim fails on this basis alone.

Nevertheless, even if holding her back as a third-year resident were an adverse employment action, Daywalker's case on the causation element fares no better under the FMLA than it does under Title VII. Similar to Title VII claims, temporal proximity alone can possibly establish a *prima facie* FMLA case only when it is very close in time, but it cannot establish pretext by itself. *Mauder v. Metro. Transit Auth. of Harris Cnty.*, 446 F.3d 574, 583–85 (5th Cir. 2006). Here, there is no evidence to support a *prima facie* case of FMLA retaliation. The defendants have submitted uncontroverted evidence that the decision to hold Daywalker at a third-year level took place before her request to convert her leave into FMLA leave. Dkts. 125-10 at 1–2; 121-1 at 5. There

is no evidence, even temporal proximity, to suggest that the decision was related to her FMLA leave request.

### C. Rehabilitation Act

Finally, Daywalker claims that the defendants discriminated against her in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794 (2021). To prove this claim, an employee-plaintiff must show "(1) the employee has a disability; (2) the employee is otherwise qualified to do the work; (3) the employee is being excluded from her job solely because of her disability; and (4) the program receives federal funds." *Wallace v. Soc. Sec. Admin.*, 108 F. Supp. 2d 716, 718 (S.D. Tex. 2000).

Assuming that the first, second, and fourth elements are met, Daywalker has offered no evidence to prove the third. The defendants note that the decision to hold Daywalker as a third-year resident occurred before she requested accommodations. *See* Dkt. 125-10. There is no evidence that the defendants knew about any disability, much less that they based their decision to hold Daywalker back on a disability. Accordingly, Daywalker's Rehabilitation Act claim fails.

## IV.   MOTION TO STRIKE

The defendants have asked the court to strike Daywalker's response to the motion for summary judgment and her motion for sanctions. Dkt. 135.

They do so in response to a discovery dispute the undersigned referred to Magistrate Judge Andrew M. Edison.

Judge Edison determined that, under the Family Educational Rights and Privacy Act of 1974 (FERPA), medical residents qualify for privacy protections as students. *See* minute entry on 8/31/2021; Dkt. 81. So he required that Daywalker, before she could obtain the educational records she sought to discover, must first demonstrate a genuine need for the records that outweighed the FERPA privacy interests. *Id.* Judge Edison later determined that Daywalker had indeed satisfied this requirement. Dkt. 86. He then gave the third-party students time to object, as required by statute. *Id.* at 9.

Several students objected. They intervened in the suit as "adversely affected third parties," and moved for a protective order requiring redaction from the records of any personally identifiable information—including their names—and requiring all future filings with personally identifiable information to be filed under seal. Dkt. 101 at 11–12. The motion was granted. Dkt. 110.

In both her response to the motion for summary judgment and her motion for sanctions, Daywalker has violated the protective order. As a result of the violations, the affected third parties were forced to incur additional

expenses in filing multiple motions to seal. But because the violations do not appear to have been intentional, the court will neither impose sanctions nor strike the filings. The defendants' motion is denied.

## V.   MOTION FOR SANCTIONS

Daywalker has also filed a motion for sanctions. Dkt. 129. First, she charges the defendants with intentionally destroying evidence. The accusation is that a UTMB investigator deleted a document containing interview notes related to Daywalker's claims, and that the staff member in charge of taking minutes at CCC meetings deleted electronic recordings of the meetings' proceedings. *Id.* at 1–4. Neither claim is a basis for sanctions. There is no prejudice from the loss of the document because the interview notes were otherwise produced. And there is no prejudice arising from the deleted recordings because the meeting minutes were produced. Daywalker has presented no evidence of prejudice beyond speculating that there could have been helpful evidence in the recordings.

Second, she claims the defendants unreasonably delayed production in discovery of certain key pieces of evidence. For one thing, she argues the FERPA issue took longer to resolve than necessary. *Id.* at 4–6. But it appears to the court that any delays were largely due to Daywalker's unwillingness to abide by the protective orders. She also complains that certain performance-

appraisal documents produced in discovery looked different from what she expected. But that is no basis for sanctions.

Finally, she claims that the defendants' counsel behaved improperly during depositions. *Id.* at 6–10. After reviewing the incidents described in Daywalker's motion, the court finds that none of them amount to sanctionable conduct.

*     *     *

For the reasons detailed above, the defendants' motion for summary judgment is granted. Dkt. 121. Daywalker's claims against all defendants are dismissed with prejudice. The motion to strike, Dkt. 135, and the motion for sanctions, Dkt. 129, are denied. Final judgment will be separately entered.

Signed on Galveston Island this 14th day of November, 2022.

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE